## LAUNDRY ROOM LEASE

This Lease made the 19th day of May, 2005, between Fifth & 106th Street Associates ("Landlord"), having an office c/o Dalton Management Co. LLC, 3 Park Avenue, Suite 2800, New York, NY 10016 hereinafter referred to as "Landlord") and SEBCO Laundry Systems, Inc. having its principal place of business at 30 Route 22 West Green Brook, NJ 08812 (hereinafter referred to as "Tenant").

### WITNESSETH :

WHEREAS, Landlord is the owner of a housing development in the City of New York and desires to secure the installation, maintenance and operation of coin-operated, self-service laundry equipment ("equipment") for the benefit of the tenants who are residents of the development; and

WHEREAS, Tenant is engaged in the business of installing, maintaining and operating coin-operated, self-service equipment in housing developments in the City of New York;

NOW, THEREFORE, it is mutually covenanted and agreed as follows:

1.    Exclusive Grant of Lease.    For the term of this Lease, Landlord leases to Tenant, the sole and exclusive use and occupancy of the area commonly known as the laundry room (hereinafter referred to as "laundry room") in the building located at 104 East 107th Street, New York, NY 10029.

2.    Term.  Unless sooner terminated in accordance with the terms hereof, the term of this Lease shall be for one (1) year commencing from June 1, 2005.

3.   | Premature Termination.

(a) Notwithstanding any term or clause of this Lease, in the event Tenant fails to commence to carry out and/or continue in good faith and in a diligent manner to carry out any of its obligations under this Lease, including but not limited to a failure to keep the equipment in proper operating condition and repair or to make the payments required hereunder, Landlord may give Tenant written notice specifying in what respects the Tenant has failed to commence to carry out and/or continue in good faith and in a diligent manner to carry out any of its obligations. Tenant shall have thirty (30) days after the receipt of the notice to commence to cure such deficiencies in performance. Otherwise, Landlord shall have the right to terminate this Lease on thirty (30) days notice by delivery to Tenant written notice of termination. Should Tenant fail to remove its equipment within fifteen days after the termination of the Lease, such equipment shall become the property of Landlord without any obligation whatsoever on the part of Landlord.

(b) If during any period of three (3) consecutive months, Lessee's proceeds from the equipment, after payment of rent, average less than one dollar ($1.00) per machine per day, or excessive vandalism or pilferage of the equipment occurs, then Tenant shall have the option to terminate this Lease upon thirty (30) days written notice to Landlord sent in accordance with paragraph 15 hereof.

4.   Rent. On the first day of each month commencing with the month immediately following the month during which Tenant commences installation of the equipment, Tenant shall pay Landlord, at the address identified above or any other such place as Landlord may designate, the following rent Three Thousand Four Hundred Sixteen Dollars and 67/100 ($3,416.67) per month during the period from the commencement of the lease to the expiration of this lease.

2    ✻ This Amount was used to Recalculate

5.   : Equipment to be Installed.    Tenant shall continue to use the existing equipment consisting of the following: Ten (10) Maytag Computer Trac MAH 20 PD Washers and Five (5) American AD 24 Double Load Dyers ("equipment").

Installation of equipment shall be made at the sole cost and expense of Tenant.  Tenant shall install the equipment in compliance with all applicable laws and regulations of any governmental authority having jurisdiction there over and shall vent the dryers to the outside air.

6.    Maintenance of Equipment and Laundry Room; Removal of Violations.    At its own cost and expense, Tenant shall:

(a)  install and maintain in the laundry room adequate and appropriate benches and sorting tables and such other furnishings as are required for the proper functioning of the laundry room;

(b) maintain at its own cost and expense, all the equipment in clean condition and good working order so as to provide full efficient economical and safe service to the tenants of Landlord.

(c) clean all the equipment upon which it has worked or made repairs and the area of the laundry room in which the work was done so as to leave the laundry room clean, orderly and free from offensive odors;

(d) provide complete and proper preventative maintenance service for the equipment as required; and

(e)  remove any violation issued by any governmental entity against the premises after the date on which the equipment is installed by Tenant, provided such violation was issued by reason of the installation, maintenance and/or use of the equipment or the omission to maintain same.  Tenant shall remove any such violation within forty-eight hours or as soon thereafter as is reasonably practicable.

7.    Price.  During the period from the commencement of the lease to the expiration of the lease the charges for the use of the equipment shall be as follows:    (a) washer: $1.50 for a complete wash cycle;    (b) dryer: $0.25 for each drying cycle of six (6) minutes. Other than as set forth above, Tenant may not change the aforesaid charges without the prior written approval of Landlord.

8.    Water, Electricity and Sewerage.    Landlord shall provide Tenant, at no expense to Tenant, electricity, hot and cold water, gas and a connection to the premises' waste line; however, any plumbing or electrical outlets required over and above those now existing in the laundry room shall be supplied and paid for by Tenant.

9.    Access.    Tenant, its authorized agents and representatives shall have free and unobstructed ingress and egress to and from the laundry room daily, Saturdays, Sundays and holidays, with the specific hours to be left to the sole discretion of Landlord.

10.    Indemnification and Insurance.    Tenant agrees to indemnify, defend and hold Landlord and Dalton Management Co. LLC as agent, harmless from and against any and all liability arising out of any claims made in connection with the operation of Lease's equipment. Additionally, Tenant shall defend itself from any such claim.  During the term of this Agreement, Tenant shall maintain, at its exclusive cost and expense, worker's compensation insurance covering all workers engaged in Lessee's business on the premises of Landlord.  Tenant shall also maintain public liability and property damage insurance including accidental death as well as claims for damages to property arising out of the use of Lessee's equipment.  The insurance shall have minimum limits of coverage with respect to public liability and property damage in the amount of not less than $15 million to one person and in the sum of not less than $15 million on account of any one accident.  At least one week prior to commencement of installation of the equipment, Tenant shall furnish to Landlord certificates of insurance by companies Leased to do business in New York showing Landlord, Dalton Management Co. LLC, as agent, and New York State Division of Housing and Community Renewal as additional insured's.  Should tenant

4

fail to furnish and/or maintain sufficient satisfactory insurance, Landlord may, at its option, terminate this contract without any further liability therefore and/or procure such insurance and charge the cost thereof to Tenant. Each insurance policy required to be provided by the terms hereof shall contain a clause prohibiting cancellation except upon the insurer providing thirty days written notice of cancellation to Landlord.

11.    Signage.    Tenant shall post signs in such languages and places in and about the premises as Landlord may reasonably require to inform the tenants of the location of the laundry room and to explain the operation of the equipment. Tenant shall also provide telephone numbers to which communications can be addressed if the equipment fails to properly operate, which telephone numbers shall be operational during the term of this agreement. Tenant shall also reimburse tenants for any money lost if the laundry equipment fail to properly operate within fifteen (15) days of receipt of their claim and Tenant shall post signs which clearly state the procedure for tenants to follow in order to obtain reimbursement.

12.    Assignment.    Tenant shall not subcontract, assign, sublet or transfer, either in whole or in part, this Lease or Leasee's right, title or interest therein or any part thereof without first obtaining Landlord's written consent thereto. For the purpose of this paragraph, a change in the controlling interest in Leasee's shares of stock shall be deemed an assignment of this agreement.

13.    Taxes. If the granting of this Lease to Lessee or the use or installation of the equipment is or shall become subject to any tax, including real property transfer taxes, governmental regulation or law, Tenant agrees to pay the tax or reimburse Landlord therefore and to comply with all pertinent regulations and laws.

14.    Subordination.    This lease is subject to and subordinate to all ground or underlying leases and all mortgages which may now or hereafter affect the real property on which the equipment is installed and to all renewals, modifications, consolidations, replacements and extensions thereof. This clause shall be self-executing and no further instrument of

5

subordination shall be required by any mortgagor. In confirmation of such subordination, Tenant shall execute promptly any certificate which Landlord may request. Lessee hereby constitutes and appoints Landlord as Leasee's attorney-in-fact to execute any such certificate or certificates for and on behalf of Tenant.

15.    Notices.    All notices, demands or other communications required hereby shall be deemed sufficiently given when sent by certified mail, return receipt requested or by hand delivery to the other party at the address set forth above or such other address as may hereinafter be furnished by one party to the other in accordance with the terms of this paragraph.

16.    No Duty to Safeguard.    Tenant agrees that Landlord is under no duty to safeguard or protect the equipment and Landlord will not be liable for any loss or damage to the equipment or any part thereof because of fire, theft, loss, vandalism or other cause.

17.    No Representations.    Landlord makes no representation as to the number of persons who will use the equipment during any period of time or the vacancy rate at Fifth & 105th Street Associates. Except as provided in paragraph 4 hereof, Landlord shall not be liable to the Tenant in any way for any loss or diminution of anticipated profits or for any other loss which Tenant may incur by reason of delay in authorizing the installation of any of the equipment or by reason of any reduction in the number of persons or amount of patronage of the machines from that anticipated by the tenant.

18.    Painting.    Upon completion of installation of the equipment, Tenant shall paint the laundry room in a color or colors selected by Landlord.

19.    Security.    Tenant deposits herewith two (2) months rent in the sum of Six Thousand Eight Hundred Thirty-Three Dollars and 34/100 ($6,833.34) to be held by Landlord as security for the regular and continuous payment of rent until the termination of this agreement.

20.    Arbitration.    Any dispute arising out of this agreement will be resolved by binding arbitration in accordance with the commercial arbitration rules of the American Arbitrators Association.

21.    Entire Agreement.    This lease shall constitute the entire agreement between the parties and no modification thereto shall be made, nor shall any waiver of any of its terms be made except by an agreement in writing executed by both parties or their respective successors or assigns.

Tenant:

SEBCO Laundry Systems Inc.

By:
Steve Breitman
President

Landlord:

Fifth & 106th Street Associates
By:  Dalton Management Co. LLC agent

By:
Ronald C. Dawley
Chief Operating Officer

7

EXHIBIT E

# COMBINED FINANCIAL SUMMARY
## FOR PERIOD ENDED DECEMBER 2006

### Section 1

| | | | | | TOTAL |
|---|---|---|---|---|---|
| TOTAL ASSETS (NET) | 9,135,231 | 24,390,096 | 1,951,145 | 2,429,111 | 37,905,583 |
| TOTAL LIABILITIES | (8,761,187) | (20,555,500) | (5,605,904) | (8,455,728) | (44,077,419) |
| PARTNERS CAPITAL (NET) | 31,353 | 5,863,705 | 4,814,577 | 6,267,142 | 16,976,777 |
| TOTAL REVENUES | (2,235,074) | (6,858,733) | (2,104,446) | (3,191,250) | (14,389,503) |
| TOTAL EXPENSES | 1,829,664 | 7,180,393 | 1,943,728 | 2,650,725 | 13,604,510 |
| TOTAL | (13) | 10,019,961 | 0 | 0 | 10,019,948 |

### Section 2

| | | | | | TOTAL |
|---|---|---|---|---|---|
| TOTAL ASSETS (NET) | 351,224 | 2,389,604 | 817,071 | 666,449 | 4,154,348 |
| TOTAL LIABILITIES | (7,831,898) | 0 | (35,860.97) | (6,605,904) | (14,472,763) |
| PARTNERS CAPITAL (NET) | 260,001 | 0 | 0.00 | 0 | 260,001 |
| TOTAL REVENUES | (2,197,662) | (5,551,920) | (3,242,089.53) | (2,104,446) | (13,096,117) |
| TOTAL EXPENSES | 1,535,128 | 4,612,441 | 3,603,614.19 | 1,943,728 | 11,694,912 |
| TOTAL | (7,363,207) | 1,350,126 | 1,142,734.19 | (6,099,273) | (11,459,619) |

## Section 3

| | | | | | |
|---|---|---|---|---|---|
| TOTAL ASSETS (NET) | 8,754,007 | 22,100,492 | 1,134,074 | 1,762,662 | 33,751,235 |
| TOTAL LIABILITIES | (929,289) | (20,555,509) | (5,559,143) | (1,550,724) | (29,604,656) |
| PARTNERS CAPITAL (NET) | (228,648) | 5,863,705 | 4,814,577 | 6,267,742 | 16,716,776 |
| TOTAL REVENUES | (37,412) | (1,306,813) | 1,137,644 | (1,086,804) | (1,293,385) |
| TOTAL EXPENSES | 294,536 | 2,567,952 | (3,247,180) | 2,908,023 | 2,523,330 |
| TOTAL | 7,853,194 | 8,689,835 | (2,730,029) | 8,300,298 | 22,093,299 |





# JOHN L. EDMONDS, ESQ.

Counselor-at-Law
187-20 Grand Central Parkway
Jamaica, New York 11432

Tel. No. (718) 454-5768          Cell No. (917) 797-5330
Fax No. (718) 264-9800

# MEMORANDUM

To:     Phyllis Seavey

From:   John L. Edmonds

Re:     Lakeview Development

Date:   October 3, 2006

I respectfully decline to withdraw any statements made by myself as it relates to the "Seavey Clan". Your correspondence of September 28, 2006, is an obvious effort to cover your many acts of extortion and racketeering. Apparently, some lawyer with basic intelligence is now giving you advice. I welcome any action you may undertake

The central issue of my various Memoranda to you is that you tactfully and carefully avoid the essential point, as indicated by your Memo of September 28th with its attachments of financial documentation. As stated before, and I reiterate here again, I refuse to permit the Seavey's to have "sole control" over the finances, as it relates to each of the properties. I am an "Owner," not a "Seavey Sycophant".

In any event, you have forgotten that it was I who took Avery to Valley National Bank and introduced him to the Officers there as my partner representing the Seavey interest in Logan Plaza. I gave Avery a Bank application and asked him to complete same and return it to me. Avery failed to do this, and instead informed me after my inquiry, that the card had been given to you. You then went forward to open accounts as the "sole signatory."

The Seavey's have used these accounts as they see fit. This conduct is unacceptable, extortionate and wrongful.

### Re: Logan Plaza

Any review of your financial documents will reflect an income of $2.1 million to $2.4 million. A further review will reflect that the expenditure for operations will be between $700,000 and $1 million, leaving a total of $700,000 to $102 million of unexpended funds of the Partnership.

Phyllis Seavey                    -2-                    October 3, 2006

As a fifty (50%) percent Owner of Logan Plaza property, I require that Partnership moneys be paid over to the Partners. For your information, all of the excess moneys are in Management accounts, but belong to the Partnership.

Therefore, by this writing, I am requiring that you immediately forward to the undersigned $200,000 of those Partnership funds.

I look forward to seeing you at the steps of the Courthouse.

Your Friend,

*Dalton Management Co., LLC*     -2-     *August 8, 2006*
*Attn.: Mrs. Phyllis Seavey*

Finally, so that there will be no misunderstanding as it relates to each of these Developments, please be advised that your continued failure to address in a meaningful way my previous correspondence and your efforts at redirecting those requirements, leaves me with no other alternative than to pursue this matter in a most vigorous fashion, using all of the legal resources available to me.

I will not condone the exclusive control of the rents for the Developments by the "Seavey Empire." I believe that I have both civil and criminal legal support for my position.

Respectfully,

JLE:jna

**JOHN L. EDMONDS**

# DALTON MANAGEMENT CO., LLC

3 PARK AVENUE - Suite 2800
NEW YORK, N.Y. 10016

(212) 679-9800
Fax (212) 679-2111

July 31, 2006

John L. Edmonds, Esq.
187-20 Grand Central Parkway
Jamaica, New York 11432

Dear Mr. Edmonds:

Be advised that Dalton received as a fee in 2005 from Logan Plaza the total dollar amount of $112,147.00 and of this, Thirty-Four Thousand Three Hundred Twenty ($34,320.00) Dollars was paid to the owners of Logan Plaza. Thus, the fee to Dalton was $77,827 which is 3.48% of receipts. This is far below a usual management fee and so charged as a courtesy. This is a small fee for a government enabled property. HDC requires a great deal of paperwork and reporting and effort. If you wish to forfeit the owners portion of the fee, please speak with your Partner and advise Dalton that it is only to charge the property its management fee of 3.48 per cent.

As for taking your money, again be advised that such a thing was never ever done. Dalton chose to change its banking relations and bank with Bank of New York and eliminate the Chase account. All money transferred to the Bank of New York was the Logan Plaza Management Account and its Chase account ceased to exist. We suggested that you co-sign all Logan checks and this would require your weekly attendance at the Dalton office. You thought it sufficient to have all checks xeroxed and copies sent to you. I thought this was okay and we so did and do.

Very truly,

PHYLLIS M. SEARCY

PMS:eg

EXHIBIT G

# HOUSING MANAGEMENT AGREEMENT

This Agreement is made this 3rd day of January 2000 between

## CHURCH HOMES ASSOCIATES

(the "Owner") and

## DALTON MANAGEMENT COMPANY., LLC

(the "Agent").

1.  Appointment and Acceptance: The Owner appoints the Agent as exclusive agent for the management of the property described in Section 2 of this Agreement, and the Agent accepts the appointment, subject to the terms and conditions set forth in this Agreement.

2.  Description of Project: The property to be managed by the Agent under this Agreement (the "Project") is a housing development, consisting of the land, buildings, and other improvements which make up Project No. 012-57077  The Project is further described as follows:

    Name:             Canaan IV Towers

    Location:         95 Lenox Avenue
                      New York, New York  10026

    County:           Manhattan

    No. of dwelling units:        161

3.  Definitions: As used in this Agreement:

    a.  "HUD" means the United State Department of Housing and Urban Development.

    b.  "Secretary" means the Secretary of the United States Department of Housing and Urban Development.

    c.  "Mortgage" means that certain indenture of mortgage by and between the Owner, as mortgagor, and the mortgagee, with respect to the Project, which mortgage is insured by the United States Department of housing and Urban Development.

    d.  "Mortgagee" means any holder of the Mortgage.

    e.  "Principal Parties" means the Owner and Agent.

    f.  "Management Certification" means the Project Owner's and Management Agent's Certification for Multifamily Housing Project for Identity of Interest or Independent Management Agents (Form HUD 9839-B).

Owner has entered into a Regulatory Agreement with the Secretary, whereby the Owner is obligated to provide for management of the Project in a manner satisfactory to the Secretary, and the Principal Parties have executed the Management Certification. In addition, the Owner has entered into a Housing Assistance Payments Contract (HAP) and/or a Rental assistance Payments Contract (RAP) with the Secretary. The Owner has or will furnish the Agent with copies of the Regulatory agreement and the HAP or RAP Contract. In performing its duties under this Management Agreement, the Agent will comply with all pertinent requirements of the Regulatory Agreement, the Management Certification, the Rental Assistance Payments Contract, the Housing assistance Payments Contract, and the directives of the Secretary. In the event of any instruction from the Owner which is in contravention of such requirements, the latter will prevail.

5.  Management Plan (From HUD 9405): Attached hereto and hereby incorporated herein, is a copy of the Management Plan for the Project, which provides a comprehensive and detailed description of the policies and procedures to be followed in the management of the Project. In many of its provisions, this Agreement briefly defines the nature of the Agent's obligations, with the intention that reference be made to the Management Plan for more detailed policies and procedures. Accordingly, the Owner and the Agent will comply with all applicable provisions of the Management Plan, regardless of whether specific reference is made thereto in any particular provision of this Agreement.

6.  Basic Information: As soon as possible, the Owner will furnish the Agent with a complete set of plans and specifications as finally approved by the Secretary and copies of all guaranties and warranties pertinent to construction, fixtures, and equipment. With the aid of this information and inspection by competent personnel, the Agent will thoroughly familiarize itself with the character, location, construction, layout, plan and operation of the Project, and especially of the electrical, heating, plumbing, air-conditioning and ventilating systems, the elevators, and all other mechanical equipment.

7.  Marketing: The Agent will carry out the marketing activities prescribed in the Management Plan, observing all requirements of the Affirmative Marketing Plan. Subject to the Owner's prior approval, advertising expenses will be paid out of the Rental Agency Account as Project expenses.

8.  Rentals: The Agent will offer for rent and will rent the dwelling units, parking spaces, commercial space and other rental facilities and concessions in the Project. Incident thereto, the following provisions will apply:

    a.  The Agent will follow the tenant selection policy described in the Management Plan, giving preference to low income families as required by HUD.

    b.  The Agent will show the premises to prospective tenants.

    c.  The Agent will take and process applications for rentals. If the application is rejected, the applicant will be told the reason for rejection, and the rejected application, with reason for rejection noted thereon, will be kept on file for three (3) years. A current list of prospective tenants will be maintained.

2

d.    The Agent will prepare all dwelling leases and parking permits, and will execute the same in its name, identified thereon as "Agent" for the Owner.  The terms of all leases will comply with the pertinent provisions of the Regulatory Agreement, and the directives of the Secretary.  Dwelling leases will be in a form approved by the Owner and the Secretary, but individual dwelling leases and parking permits need not be submitted for the approval of the Owner or the Secretary.

e.    The Owner will furnish the Agent with rent schedules, as from time to time approved by the Secretary, showing fair market rents and basic rents for dwelling units, and other charges for facilities and services.  In no event will such fair market rents and other charges be exceeded.  Eligibility for dwelling rents which are less than such fair market rents, and the amount of such lesser rents; will be determined in accordance with the Regulatory Agreement, the HAP Contract, and the directives of the Secretary.

f.    The Agent will counsel all prospective tenants regarding eligibility for dwelling rents which are less than fair market rents, and will prepare and verify eligibility certifications and recertifications in accordance with the Regulatory Agreement, the HAP Contract, and the directives of the Secretary.

g.    The Agent will negotiate commercial leases and concession agreements, and will execute the same in its name, identified thereon as agent for the Owner, subject to the Owner's prior approval of all terms and condition.  Commercial rents will not be less than the minimums from time to time approved by the Secretary.

h.    The Agent will collect, deposit, and disburse security deposits, if required, in accordance with the terms of each tenant's lease.  The amount of each security deposit will be as specified in the Management Plan.  Security deposits will be deposited by the Agent in an interest-bearing account, separate from all other accounts and funds, with a bank or other financial institution whose deposits are insured by an agency of the United States Government, and a pro-rata share of interest earned will be credited to each tenant's security deposit.  This account will be carried in the Agent's name and designated of record as " Church Homes Security Deposit Account."

9.    <u>Collection of Rents and Other Receipts</u>: The Agent will collect when due all rents, charges and other amounts receivable on the Owner's account in connection with the management and operation of the Project.  Such receipts (except for tenant's security deposits, which will be handled as specified in Subsection 8h above) will be deposited in an account, separate from all other accounts and funds, with a bank who's deposits are insured by the Federal Deposit Insurance Corporation.  This account will be carried in the Agent's name and designated of record as" Church Homes Rental Agency Account."

10.    <u>Enforcement of leases</u>:  The Agent will assure full compliance by each tenant with the terms of his/her/their.  Voluntary compliance will be emphasized, and the Agent will counsel tenants and make referrals to community agencies in cases of financial hardship or under other circumstances deemed appropriate by the Agent, to the end that involuntary termination of tenancies may be avoided to the maximum extent consistent

3

with sound management of the Project. Nevertheless, and subject to the pertinent procedures prescribed in the Management Plan, the Agent may lawfully terminate any tenancy when, in the Agent's judgment, sufficient cause (including but not limited to non-payment of rent) for such termination occurs under the terms of the tenant's lease. For this purpose, the Agent is authorized to consult with legal counsel to be designated by the Agent, to bring actions for eviction and to execute notices to vacate and judicial pleading incident to such actions. Subject to the Owner's approval, attorney's fees and other necessary costs incurred in connection with such actions will be paid out of the Rental Agency account as Project expenses.

11. __Maintenance and Repair:__ The Agent will cause the Project to be maintained and repaired in accordance with the Management Plan and local codes, and in a condition at all times acceptable to the Owner and the Secretary, including but not limited to cleaning, painting, decorating, plumbing, carpentry, grounds care, and such other maintenance and repair work as may be necessary, subject to any limitations imposed by the Owner in addition to those contained herein.

Incident thereto, the following provisions will apply:

a. Special attention will be given to preventive maintenance, and to the greatest extent feasible, the services of regular maintenance employees will be used.

b. Subject to the Owner's prior approval pursuant to paragraph 11e, below, the Agent will contract with qualified independent contractors for the maintenance and repair of elevators, and for extraordinary repairs beyond the capability of regular maintenance employees.

c. The Agent will systematically and promptly receive and investigate all service requests from tenants, take such action thereon as may be justified, and will keep records of the same. Emergency requests will be received and serviced on a twenty-four (24) hour basis. Complaints of a serious nature will be reported to the Owner after investigation.

d. The Agent is authorized to purchase all materials, equipment, tools, appliances, supplies and services necessary for proper maintenance and repair.

e. Notwithstanding any of the foregoing provisions, the prior approval of the Owner will be required for any expenditure which exceeds Ten Thousand Dollars ($10,000.00) in any one instance for labor, materials, or otherwise in connection with the maintenance and repair of the Project, except for recurring expenses with the limits of the operating budget or emergency repairs involving manifest danger to persons or property, or required to avoid suspensions of any necessary service to the Project. In the latter event, the Agent will inform the Owner of the facts as promptly as possible.

12. __Utilities and Services:__ In accordance with the Management Plan and the operating budget, the Agent will make arrangement for water, electricity, gas, fuel oil, trash disposal, vermin extermination, decorating, laundry facilities, and telephone service.

13. **Employees:** The Management Plan prescribes the number, qualifications and duties of the personnel to be regularly employed in the management of the Project, including a Resident Superintendent, and Social Services Director (if applicable) and maintenance personnel. In addition, there will be bookkeeping, clerical, and other managerial employees. All such personnel will be employees of the Agent and not the Owner, and will be hired, paid, supervised, and discharged by the Agent, subject to the following conditions:

a. As more particularly described in the Management Plan, the Resident Superintendent will have duties of the type usually associated with this position, and the Social Services Director will be responsible for the conduct of a social services program for the project. Each will be directly responsible to the Agent's Project Manager or other officer.

b. The Owner will reimburse the Agent for compensation (including fringe benefits) payable to front line management employees, such as Project Manager, clerical and bookkeeping personnel, and the maintenance employees, Resident Superintendent and the Social Services Director (where applicable), and for all local, state, and federal taxes and assessments (including but not limited to Social Security taxes, employment insurance, and workman's compensation insurance) incident to the employment of such personnel. Such reimbursements will be paid out of the Rental agency Account and will be treated as Project expenses. For this purpose, the rental value of any dwelling unit furnished rent-free to the Resident Superintendent will not be considered a part of his compensation, but will be treated as a Project expense.

c. The Agent will establish and follow an employment policy which affords residents of the Project maximum opportunities for employment in the management and operation of the Project and, to the extent consistent with that consideration, affords employment opportunities to lower-income persons in the area. While personnel will be employed primarily on the basis of ability, the Agent will make a conscientious effort to provide special assistance and training for Project residents and members of minority groups who are not initially qualified.

14. **Disbursements from Rental Agency Account:**

a. From the funds collected and deposited by the Agent in the Rental Agency account pursuant to Section 11 above, the Agent will make the following disbursements promptly when payable:

(1) Reimbursements to the Agent for compensation payable to the employees specified in section 13c above, and for the taxes and assessments payable to local, state, and federal governments in connection with the employment of such personnel.

(2) The single aggregate payment required to be made monthly by the Owner to the Mortgagee, including the amounts due under the mortgage for

5

principal amortization, interest, mortgage insurance premium, ground rents, taxes and assessments, fire and other hazards insurance premiums, and the amount specified in the or Regulatory Agreement for allocation to the Reserve for Replacements.

(3)     For projects insured under Section 236, the monthly remittance to the Secretary of all dwelling rents collected in excess of the "basic rents" approved by the Secretary. Form 3104, Monthly Report of Excess Income, will be prepared each month and submitted to the Secretary whether or not there are such excess rent collections for the month. The original form covering each month and the excess rent collections made during that month (if any) will be mailed within ten (10) days after the end of that month directly tot he assistant Commissioner comptroller, Department of Housing and Urban Development, Washington, D.C., 20412.

(4)     All sums otherwise due and payable by the Owner as expenses of the Project authorized to be incurred by the Agent under the terms of this Agreement, including compensation payable to the Agent, pursuant to Section 26 below, for its service hereunder.

(5)     Charges for front line management related expenses (office supplies, office salaries, advertising, fidelity bond, etc.) Will be charged to the Project in accordance with HUD Handbook #4381.5 and Figure 6-2.

b.     Except for the disbursements mentioned in Subsection 14a., funds will be disbursed or transferred from the Rental agency account only as the Owner may from time-to-time direct in writing.

c.     In the event that the balance in the Rental agency Account is at any time insufficient to pay disbursements due and payable under Subsection 14a., the Agent will inform the Owner of that fact and the Owner will then remit to the Agent sufficient funds to cover the deficiency. In no event will the Agent be required to use its own funds to pay such disbursements.

15.     Budgets: Annual operating budgets for the Project will be as approved by the Owner. Annual disbursements for each type of operating expense itemized in the budget should not exceed the amount authorized by the approved budget. The agent will prepare a recommended operating budget for each subsequent fiscal year beginning during the term of this agreement, and will submit the same to the Owner at least thirty (30) days before the beginning of the fiscal year. The Owner will promptly inform the Agent of changes, if any, incorporated in the approved budget, and the Agent will keep the Owner informed of any anticipated deviation from the receipts or disbursements stated in the approved budget.

16.     Records and Reports: In addition to any requirements specified in the Management Plan or other provisions of this agreement, the Agent will have the following responsibilities with respect to records and reports:

6

a.   The Agent will establish and maintain a comprehensive system of records, books, and accounts in a manner conforming to the directives of the Secretary, and otherwise satisfactory to the Owner. All records, books, and accounts will be subject to examination at reasonable hours by any authorized representative of the Owner or the Secretary.

b.   With respect to each fiscal year ending the term of this Agreement, the Agent will cause an annual financial report to be prepared by a Certified Public Accountant or other person acceptable to the Owner and Secretary, based upon the preparer's examination of the books and records of the Owner and the Agent. The report will be prepared in accordance with the directives of the Secretary, will be certified by the preparer and the Agent, and will be submitted to the Owner within (60) days after the end of the fiscal year, for the Owner's further certification and submission to the Secretary and the Mortgagee. Compensation for the preparer's services will be paid out to the Rental agency account as an expense of the Project.

c.   The Agent will prepare a monthly report comparing actual and budgeted figures for receipts and disbursements, and will submit each such report to the Owner within fifteen (15) days after the end of the month covered. Such reports will not be required for any periods prior to January 1993.

d.   The Agent will furnish such information (including occupancy reports) as may be requested by the Owner or the Secretary from time-in-time with respect tot he financial, physical, or operational condition of the Project.

e.   The Agent will prepare, on a monthly basis, Form 2505, Schedule of Rent Supplement Payments Due, Form 52670, Housing Owner Certification and Application for Housing Assistance Payments, Form 52670A Part I, Schedule of Tenant Assistance Payments Due, and if necessary, Form 52670A Part 2, Schedule of Section 8 Special Claims, and will submit the same to HUD within ten (10 days after the end of the month for which housing assistance payments are claimed. Such payments will be deposited to the Rental Agency Account.

f.   By the fifteenth (15th) day of each month, the Agent will furnish the Owner with an itemized list of all delinquent accounts, including rental accounts, as of the tenth (10th) day of the same month.

g.   By the fifteenth (15th) day of each month, that Agent will furnish the Owner with a Statement of receipts and disbursements during the previous month, and with a schedule of accounts receivable and payable, and reconciled bank statements for the Rental Agency Account and Security Deposit Account as of the end of the previous month.

h.   If, after the Project reaches sustaining (95%) occupancy, the rental collections plus HUD subsidy fall below operating expenses for a sustained period of sixty (60)

7

days, the Agent will immediately send written notification of the same to the appropriate HUD Area/Insuring office.

i.     Except as otherwise provided in this Agreement, all of the Agent's home office bookkeeping, clerical, and other management payroll and overhead expenses (including but not limited to costs office supplies and equipment, postage, transportation for managerial personnel, and telephone services) will be borne by the Agent out of his own funds and will not be treated as Project expenses.

17.   Fidelity Bond: The Agent will furnish, at its own expense, a blanket fidelity bond in the principal sum, which is at least equal to the gross potential income for two (2) months and is conditioned to protect the Owner and the Consenting Parties against misapplication of Project funds by the Agent and its employees. The other terms and conditions o the bond, and the surety thereon, will be subject to the approval of the Owner. Fidelity Bond coverage for front-line employees and principal management staff will be paid from the Project account.

18.   Bids, Discounts, Rebates, etc.: The Agent will obtain contracts, materials, supplies, utilities, and services on the most advantageous terms tot he Project, which can be obtained from more than one source. The Agent will secure the credit to the Owner all discounts, rebates or commissions obtainable with respect to purchases, service contracts, and all other transactions on the Owner's behalf.

19.   Social Services Program: The Agent will be responsible to the Owner for carrying out the social services program described in the Management Plan. The Social Services Director will be directly responsible to the Agent for the conduct of this program.

20.   Tenant-Management Relations: The Agent will encourage and assist residents of the Project in forming and maintaining representative organizations to promote their common interests, and will maintain good-faith communication with such organization to the end that problems affecting the Project and its residents may be avoided or solved on the basis of mutual self-interest.

21.   On-site Management Relations: Subject to the further agreement of the Owner and Agent as to more specific terms, the Agent will, where practical, maintain a management office within the Project. The Resident Superintendent will reside in one of the dwelling units in the Project, and the Owner will make no rental charge for the same.

22.   Insurance: The Owner will inform the agent of insurance to be carried with respect to the Project and its operations, and the Agent will cause such insurance to be placed and kept in effect at all times. The Agent will pay premiums out of the Rental Agency Account, and premiums will be treated as operating expenses. All insurance will be placed with such companies, on such conditions, in such amounts, and with such beneficial interests appearing thereon as shall be acceptable to the Owner and shall be otherwise in conformity with the mortgage; provided that the same will include public liability coverage, with the agent designated as one of the insured, in amounts acceptable to the Agent as well as the Owner. The Agent will investigate and furnish the Owner with full

8

reports as to all accidents, claims, and potential claims for damage relating to the Project, and will cooperate with the Owner's insurers in connection therewith.

23.  Compliance with Governmental Orders: The Agent will take such actions as may be necessary to comply, promptly with any and all governmental orders or other requirements affecting the Project, whether imposed by federal, state, county or municipal authority, subject, however, to the limitations stated in Subsection 13c with respect to repairs.  Nevertheless, the Agent shall take no such action so long as the Owner is contesting, or has affirmed its intention to contest, any such order or requirements.  The Agent will notify the Owner, in writing, of all notices of such orders or other requirements, within seventy-two (72) hours from the time of their receipt.

24.  Non-discrimination: In the performance of its obligations under this Agreement, the Agent will comply with the provisions of any federal, state or local law prohibiting discrimination in housing on the grounds of race, color, creed or national origin, including Title VI of the Civil Rights Act of 1964 (Public Law 88-352, Stat. 241), all requirements imposed by or pursuant to the Regulations of the Secretary (24 CFR, Subtitle A, Part 1) issued pursuant to that Title; regulations issued pursuant to Executive Order 11063, and Title VIII of the 1968 Civil Rights Act.

25.  Agent's Compensation: The Agent will be compensated for its services under this Agreement by monthly fees, to be paid out of the Rental Agency account and Treated as Project expenses.  Such fees will be payable on the tenth day of each month for the prior months.  Each such monthly fee will be in the amount of $7,084 ($44.00 for each dwelling unit in the Project).

Anything in this Paragraph 25 to the contrary notwithstanding, all management fees shall be computed and paid in accordance with HUD requirements.

26.  Term of Agreement: Indefinite.

a.  This Agreement may be terminated by the mutual consent of the Principal Parties as of the end of any calendar month.

b.  In the event that a petition for bankruptcy is filed by or against either of the Principal Parties, or in the event that either makes an assignment for the benefit of creditors, or takes advantage of any insolvency act, the other party may terminate this Agreement without notice to the other.

c.  It is expressly understood and agreed by and between the Principal Parties that the Secretary shall have the right to terminate this Agreement for failure to comply with the provisions of the Management Certification or for other good cause thirty (30) days after the Secretary has mailed written notice to each of the Principal Parties of its desire to terminate this Agreement.  In the event of a default by the Owner under the Mortgage, the Note, the HUD Regulatory Agreement, the HAP Contract, the Secretary may terminate this Agreement immediately upon the issuance of a notice of cancellation to each of the Principal Parties.  If HUD terminates the Agreement, the Owner will promptly make arrangements for

providing management satisfactory to HUD.

d.   In the event a conflict arises between the terms of this Agreement and HUD's rights and requirements, the latter shall prevail.

e.   Upon termination, the Agent will turnover to the Owner all of the Project's cash, trust accounts, investments and records. After the Principal Parties have accounted to each other with respect to all matters outstanding as of the date of termination, the Owner will furnish the Agent security, in form and principal amount satisfactory to the Agent, against any obligations or liabilities which the Agent may properly have incurred on behalf of the Owner hereunder.

47.   Interpretative Provisions

a.   At all times, this Agreement will be subject and subordinate to all rights of the Secretary, and will insure to the benefit of and constitute a binding obligation upon the Principal Parties and their respective successors and assigns.

b.   This Agreement constitutes the entire agreement between the Owner and the agent with respect to the management and operation of the Project, and no change will be valid, unless made by supplemental written agreement, executed by the Principal Parties.

c.   This Agreement has been executed in several counterparts, each of which shall constitute a complete original Agreement, which may be introduced in evidence or used for any other purpose without production of any of the other counterparts.

IN WITNESS WHEREOF, the Principal Parties by their duly authorized officers have executed this Agreement on the date first above written.

OWNER:

CHURCH HOMES ASSOCIATES

Witness:                                    By :

Avenal Dev. & Const. Corp.

Name/Title: Avery R. Seavey, Pres.

Witness:

Witness:                                    DALTON MANAGEMENT COMPANY, LLC

By:

Name/Title:

11

EXHIBIT H

*Temp - typed Copy. poor typing But w/ Dalton Changes included*

# FIFTH AND 106TH STREET ASSOCIATES
# MANAGEMENT PLAN

DALTON MANAGEMENT CO LLC
3 Park AVENUE SUITE 2800
NEW YORK NY 10016
(212) 679 9800

# MANAGEMENT PLAN

I.   THE ROLE AND RESPONSIBILITY OF THE OWNEER AND THE DELEGATION OF AUTHOURITY TO THE MANAGING AGENT................................................................................................................

II.  ESTIMATED SALARY SCHEDULES AND JOB DESCRIPTION...............................................................

III. MARION SCOTT REAL ESTATE, INC..........................................................................................................

IV.  MANAGEMENT.............................................................................................................................................
..................................................

V.   CONTRACTUAL RESPONSIBILITIES........................................................................................................
..................

VI.  PLANS FOR TENANT/MANAGEMENT RELATIONS...............................................................................

VII. PURCHASING & CONTRACT................................................................................................................
..................

VIII. RENTAL OF VACANT APARTMENTS.......................................................................................................
.........

IX.  CHANGES IN THE APPROVED PLAN.......................................................................................................

X.   DHCR REQUIREMENTS...........................................................................................................................
...................................

XI.  EQUAL OPORTUNITY.

1   Project:

Project number:          UDC-86
Project Name             Lakeview Apartments
Projects Address:        4 east 107th street Associates
Number of Dwelling Units: 445
Type of Structure High-rise

Management Company
Name                     Dalton Management Co LLC
Address                  3 Park Avenue suite 2800
                         New York NY 10016
Telephone#:              212 679-9880

# MANAGEMENT PLAN

This plan is intended to set forth the responsibilities of the Managing Agent in the conduct of business affair of the property. In addition, the plan intends to outline a definite program of action to assure:

1. A well managed and maintained development.
2. A pleasant, health, and secure living environment for the residents.
3. A sound relationship between the development and the surrounding community.
4. A housing program that will have continued economic viability.

I.

## II. Role and responsibility of the managing agent
### A. Management Agent's Responsibilities

Dalton Management Co. will be the agent of the fifth and 106th street Associates, (Owner), and responsible to the Owner for all its actions in the operation of the development. As agent Dalton Management will have general supervisory responsibilities over basic principles and policies, and the execution of the duties and services as outlined in the physical maintenance and financial administration of the development.

The administration of the management plan for the Owner, fifth and 106th Associates, will be under the direct supervision of Nealle B. Seavay Resident of Dalton Management Co. LLC. Ms Seavay is familiar with all aspects of subsidy programs for the elderly, and handicapped, low and middle income families in city, state ad federally subsidized rental housing.

Ms Seavay will assist. Avery B. Seavey, Stet. Mr. Seavay Co. Owner/Management of Dalton Management Co LLC. He is an experienced real estate attorney who will be responsible for union matters and supervision of legal actions Stet.

Computerized accounting operations will be supervised by Ronald C. Dawley Coo/Controller

1. The broader duties of the Managing Agent Are as follows:

    a.    To develop a specific Management plan that is consistent with policy guidelines.

    b.    To appoint skilled and qualified personnel to supervise the daily routine maintenance and administration of the property. The personnel assigned to fifth and 106th street Associated will be familiar with management procedures unique to a multi-family housing development and they will be supervised by Nealle B. Seavey and Ronald C. Dawley

    c.    The entire staff of Dalton will be available to apply a brad array of talent and experience in dealing with non-routine problems.

2. Within the bounds of agreed upon policies, Dalton Management Co. will have complete authority and responsibility as follow:

    a.    Rental of vacant units.

    b.    Determining eligibility and income certification within the parameters established by state regulations.

    c.    Operation the property with the financial guidelines established by Owner and the regulation agencies.

    d.    Maintaining accurate records of the day - to-day operations for r property, including collection and accounting of rental revenues.

    e.    Conforming to all federal state and local agency regulations

    f.    Filing all reports required for state agencies, the Owner. These will be completed on time and according to the prescribed form.

    g.    Maintaining the property.

    h.    Establishing and implementing rules governing resident behavior and conditions of occupancy,

    i.    Working with local community associations to assure amiable relations with the community.

## A. Managing Agent fee:

The Managing Agent fee shall include:

1. Budget preparation and analysis.
2. Analysis of building operations.
3. Hiring, training, supervising and termination of employees.
4. Negotiating, executing and monitoring of service contracts.
5. Development of resident service programs
6. Site inspections and reports.
7. Program direction.
8. Liaison with attorneys, government agencies, Owner and accountants.
9. Determination of security needs.
10. General overall supervisor of management and maintenance at all levels.
11. Administrative services
12. Dalton Management CO LLC Fidelity Bond.

All other operating expenses shall be paid out of project income, including where applicable:

1. Maintenance and janitorial staff
2. Legal and auditing expenses
3. Maintenance and repairs
4. Security personnel
5. Legal processing delinquency notices and evictions
6. Management fees as agreed upon
7. Re-rental unit fee of $50.00

The above mentioned services will be consistent wit those noted in the Management Agreement.

## III. ESTMATED SALARY SCHEDULES AND MOB DESCRIPTIONS

### A. Estimated staffing and salary schedules

We expect to Continue to employ the current union, maintenance, and janitorial employees. Dalton Management will undertake a review of the current staffing to determine if reductions in overtime and/or personnel should be implemented. Dalton Management includes staffing in our cost containment procedures, which we have successfully implemented at other sites.

MANAGEMENT

Dalton Management will maintain site office staffed from 9 a.m. to 5 p.m. and such additional hours as necessary based on discussions with the Owner.

The site Manager of Dalton will supervise day-to-day operations. Dalton Management conduct inspections and review project operations on site on at least a weekly basis.

Dalton Management Co. will provide central office employees to render additional services, which can be provided on a centralized basis. The centralized services will include, but are not limited to purchasing, contract administration, coordination for legal actions, and assistance in lease preparation, provision of resident services and other administrative duties.

1.    Superintendent

Supervision and direction:

The superintendent will receive general supervision and direction form the Maintenance supervision who will report to the site manager. Communication with the Owner will be through the senior executives of Dalton Management co.

Duties and Responsibilities:

General: The maintenance supervisor will be responsible for assuring that the residents receive prompt, efficient, and courteous and quality service. In order to execute this responsibility, He will supervise the general administration and

physical operation of the property. The maintenance supervisor will responsible for operating and maintaining electrical and mechanical equipment for providing heat and hot water to the property, and or safety, maintenance, repairs and other related services.

Specific:     The Maintenance supervisor will maintain heaters and other equipment in the buildings assured continuous hot water services, and that the equipment is operating safely and efficiently; determine by inspection that all control equipment is operating properly, check such items as circuit breakers, switches, relay and starters, connections and filters for mechanical faults signs of wear, dirt, or over-loading and other indications of trouble; and perform such preventive maintenance as lubricating moor bearings pumps, replacing brushes and filters.

The Maintenance supervisor will ensure that all necessary maintenance and repairs on the apartments are performed.

The superintendent will directly supervise janitorial maintenance staff. Regularly inspect buildings, grounds and other public areas to assure that employees are performing their assigned duties ion maintaining adequate building cleanliness, upkeep of all public areas and grounds and consult with the Maintenance supervisor regarding employee failures and deficiencies.

The Maintenance supervisor may assign work priorities, determine extent of repairs and the necessary corrective measures.

He/She will maintain files containing written records of maintenance service, equipment readings, operating manuals, inventory, and a library consisting of pertinent data relating to equipment and building fixtures.

The Maintenance supervisor will perform other related duties as assigned including:

1.  Supervise the maintenance and service department staff for performance, attendance, workload, and appearance.
2.  Submit purchase requisitions for all materials, supplies and equipment needed to operate the entire development. To the site manager for approval.
3.  Prepare all necessary reports, forms records as required.

4. Implement and maintain a filing system by apartment in which a history of work performed in that particular apartments kept.

5. Coordinate the orderly completion of tenant service requests and review a weekly report to monitor the service request program.

6. Post and/or distributed general notices (e.g. temporary interruption of services such as hot water, elevator, gas, etc.)

7. Monitor emergency situations.

8. Coordinate inspection of move-ins, restoration of vacant apartments and move-outs.

9. Process receipts and invoices for payment.

10. Conduct regular inspections of the physical conditions of the prosperities with respect to lobbies, corridors, stairwells, roofs, basement, laundry rooms, HVAC rooms, storage and file rooms, pump rooms, outside grounds and sidewalk areas, etc.

11. Continually monitor the performance of the staff and when necessary, recommend discharge of non-or poor performing maintenance staff.

12. Reviews the schedule of work days chart with the site manager.

13. Prepare all maintenance weekly payrolls and submit to the site manager approval. Make certain paychecks are properly distributed.

14. Develop weekly reports to determine what mechanical equipment is in need of repairs. And submit to the site manager who will submit the request to the home office for approval.

15. Assure that no piece of mechanical equipment be modified or changed in any way unless fully discussed with and approved by The Dalton Management Co. Home office.

16. Set up and maintain preventive maintenance schedules to make certain that mechanical equipment (roof fans, pumps, air conditioning, etc.) is operating properly in order to avoid unnecessary costly repairs; and, avoids calling outside contractors unless absolutely necessary.

17. Familiar with various contractor and/or vendor agreements, such as elevator maintenance, laundry room equipment maintenance, hot water burner maintenance, exterminating, painting, etc.

18. Monitors the contractors' performance to make certain that housing company is receiving proper service.

19. Coordinates maintenance responsibilities with the security staff.

20. Coordinates the processing of insurance incident reports with the Management Office and Security.
21. Follow-up on security reports and make necessary corrections (e.g., no lights, loose railing, etc)

In summary, the Maintenance supervisor, the eyes and ears of Dalton Management is to report items which interfere with the carrying out of objectives set forth in the Management plan and is to recommend to them improvements in existing methods and schedules which will more economically and effectively enable Management to attain the ends of a more effective, economic service.

## PORTERS/MAINTAINANCE STAFF

## SUPERVISION AND DIRECTION

Porters/Maintenance staff will be under the direct supervision of the superintendent. They will comply with established policies and procedures that may be imposed from time to time.

## RESPONSIBILITIES

Responsible to perform the duties to provide adequate and efficient housekeeping functions which assure cleanliness of all building halls, basements, stairways, trash room and other public areas.

Each porter and maintenance staff person is assigned an area of responsibility and should perform the following duties:

a. All public areaways, stairways, halls, laundry rooms, building entrances and trash rooms must be swept daily.
b. The public area of all buildings are to be wet mopped three or four times a week; depending upon usage and appearance.
c. The washers and dryers in laundry rooms are to be dusted and wet rag cleaned daily; remove empty soapboxes and other trash daily.
d. All light fixtures, including high hanging global are to be dusted weekly and cleaned of insects, etc., once a month.
e. Mailbox fronts and public walls or halls, must be cleaned once every month, and the trash room walls. Including trash door areas will be scrubbed monthly.

Maintenance staffs are required to report missing light, building damage of vandalism, unusual circumstances and conditions and other related incidents in writing to the superintendent.

### Site Manager

### RESPONSIBILITIES:

The site manager is primarily responsible for providing services for the residents as well as maintaining the financial viability of the property. The site manager will plan, organize, direct, control and coordinate, and make decisions relative to following functions.

- Management plan implementation
- Complete cycle of occupancy
- Rent collection
- Legal rights and Responsibilities of Owner
- Security
- Maintenance
- Office procedures
- Personnel
- Money Management

The site Manager will carry out all the duties as outlined, however, Dalton Management senior executives will supervise the operation of the development on a day-to-day basis. We believe in a team approach where all the experience and resources of Dalton Management are utilized.

<u>Assistant Manager/Occupancy certification Specialist:</u>

Assistant site Manager in the operations of the development. The assistant manager will be completely familiar with all aspects of the management and will concentrate on recertification and occupancy.

Responsible for day-to-day clerical operations:

- Recertification
- Occupancy, Recertification
- Rent collection
- File maintenance
- Annual income affidavit processing
- Inventory

IV        Dalton management

    A.        Responsible for day-to-day operations of the property, including but not limited to:

1. Rent collection
2. Maintenance functions
3. Community relations
4. Administrative functions
5. Landlord tenant matters
6. Purchasing
7. Accounts payable
8. Internal financial controls
9. Accounts receivable
10. Licensee (supervising Broker)
11. Plans for carrying out an effective maintenance and repair program.

A. <u>Programs for preventive maintenance.</u>

1. Dalton executives the site manager and the maintenance supervisor will make sure the maintained staff especially the superintendent has a complete and understanding of the servicing of the mechanical equipment and appliances in the building.