M. Douglas Haywoode, Esq.
Attorney for Plaintiff John L. Edmonds
71 Maple Street
Brooklyn, New York 11225
(718) 940-8800
(718) 940-9574 (fax)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN L. EDMONDS, individually and as a
managing general partner of FIFTH AND
106TH STREET HOUSING COMPANY,
INC., LOGAN PLAZA ASSOCIATES, LP,
CHARLES H. ASSOCIATES a/k/a
CHARLES H. HILL ASSOCIATES, LP
AND AS A LIMITED PARTNER OF
CHURCH HOME ASSOCIATES, LP,

                              Plaintiff,                         Index No.: 08-CV-5646

                 -against-

ROBERT W SEAVEY, individually and as a
General Partner of FIFTH AND 106TH
STREET ASSOCIATES, LP, LOGAN
PLAZA ASSOCIATES, LP, CHARLES
HILL ASSOCIATES, CHARLES HILL               **DECLARATION OF**
ASSOCIATES, LP and as a Limited Partner     **M. DOUGLAS HAYWOODE, ESQ.,**
of CHURCH HOME ASSOCIATES, LP;              **IN FURTHER SUPPORT OF**
PHYLLIS M. SEAVEY individually and as       **PLAINTIFF'S MOTION TO**
owner, manager and member of DALTON         **EXPAND THE TIME FOR**
MANAGEMENT COMPANY LLC;                     **DISCOVERY AN ADDITIONAL 120**
AVERY B. SEAVEY, individually and as a      **DAYS**
General Partner of LOGAN PLAZA
ASSOCIATES, LP, CHURCH HOME
ASSOCIATES and owner of DALTON
MANAGEMENT COMIPANY, LLC;
NEALE B. SEAVEY, individually and as
owner, manager and member of DALTON
MANAGEMENT COMPANY, LLC; and
RONALD DAWLEY as Chief Executive
Officer of DALTON MANAGEMENT
COMPANY, LLC; DALTON
MANAGEMENT COMPANY, LLC, THE
SEAVEY ORGANIZATION, and MARK
PANETH & SHRON, Auditors,

                              Defendants.

1

M. Douglas Haywoode, an attorney admitted to practice before this Court, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.    I, M. Douglas Haywoode am the attorney for Plaintiff John L. Edmonds.

2.    I submit this declaration in further support of Plaintiff's instant application to extend the time for discovery and in reply to Defendants' purported opposition to Plaintiff's application. Affirmant must initially point out that in their ten-page, opposition paper to Plaintiff's instant motion Defendants have failed to respond to the evidence presented by Plaintiff in support of his application but instead have chosen to paraphrase, misstate and distort the deposition testimonies conducted by them of Plaintiff and his accountants and then inform the Court of their intention to move for summary judgment based on the false statements they have made and concocted in their opposition papers.

3.    Plaintiff seeks an order to extend the discovery period because it is uncontroverted that the allegations in Plaintiffs original Complaint and Order to Show Cause are fully borne out by the testimony in the depositions of William H. Jennings, who was deposed for Marks, Paneth & Shron and Ronald Dawley, deposed individually, and on behalf of Dalton Management, of which entity he is the Chief Executive Officer. The depositions of Plaintiff's accountants, Orley G. Cameron and Adam Pryce, taken, respectively on April 21st & 22nd, 2009, further confirm beyond all contravention the theme and direction of the Plaintiff's case.

4.    The attorneys for Defendants have asserted a fair reading of the depositions testimonies of the witnesses would show no allegations exist as to their wrong doing in these premises. They protest a lack of sophistication of Plaintiff's auditors, Cameron, Griffith & Pryce, who are Certified Public Accountants ("CPA") with extensive experience, one of whom previously worked with DHCR, and profess some intricate knowledge of Federal Housing Regulations, which

they presume is denied Plaintiffs emissaries, but nothing justifies the patent omissions observed in this case by Plaintiff's auditors.

5.    The primary obligation of Dalton Management in these premises was to keep and maintain a General Ledger which depicted the transactions of the four developments, which are the subject of this action with reasonable particularity and fidelity so as to create a transparent record of the affairs of the Partnership for the diverse Partners and Limited Partners concerned. It is conceded in this record in both the testimony of William Jennings and Ronald Dawley this was not done by Dalton. The testimony of the examining accountants is consonant with these admissions against interest of the Defendants lead witnesses, as, far from stating they found no evidence of any unlawful appropriation by the Defendants in their year and a half inquiry, they clearly disclaim any ability to form any professional opinion of the records produced by Defendant Dalton by reason of the total incompleteness of these records, which leave the examiners puzzling over the manner in which it is claimed by Defendants anywhere from $2.8 to $7 Million Dollars was expensed by the Partnerships according to Dalton Management , whose books and General Ledgers, Dawley admits, were not conformed and reconciled with the numbers contained in the year end financial statement issued by Marks, Paneth & Shron for the year 2006. Jennings, the Marks Paneth representative testifies at page 186 of his deposition at lines 9 & 10, Dalton's records are "…deficient in internal controls". Plaintiff's auditor Orley Cameron's testimony of April 21st 2009 is to the same effect at pp 34 line 6, pp 57 line 25 and pp 106 line 22. Auditor Adam M. Pryce's testimony echoes this fact at pp 61:14, pp 79:18 &19 and pp 81, 24 & 25. All accountants for all parties are unanimous to this effect. Dalton Management receives in excess of $500,000.00 yearly from these developments to perform a task the dearth of information supplied by it in this matter clearly suggests they are not performing. They are enabled to do this by virtue of the "cover" provided by Defendant Marks, Paneth & Shron.

6.      Defendant Marks, Paneth & Shron are viewing the identically deficient documents produced by Dalton Management in tax year 2006, yet profess some uncanny and virtually supernatural ability to propose voluminous adjustments to these "journal entries", no memorialization being made or recorded for these proposals, or any acceptance by the management company of these adjustments, which phenomena, coupled with Dalton's constant references to Marks, Paneth & Shron as our "accountants" create a certain inference to the most casual observer Marks, Paneth & Shron is both accountant and auditor of these funds in flagrant disregard and violation of all rules and acceptances of the accounting profession and of the State and Federal regulatory agencies.

7.      Counsel for Defendants administered a virtual CPA's examination to partners of Cameron, Griffith & Pryce who were deposed by them on April 21st, & 22nd, 2009, but, it is interesting to note, that William Jennings of Marks, Paneth & Shron, who was deposed by Plaintiff on February 3rd, 2009, expresses unfamiliarity with the auditing standards and regulations of the accounting profession at line 12 of page 154 of his deposition.

8.      On page 154 line 12 of Mr. Jennings deposition, he states, he is not familiar with the Yellow Book, GAGAS regulations concerning the suggestion that auditors should be changed every three to four years to maintain independence. It appears the Quality Review Committee allegedly established by Defendant Marks, Paneth & Shron and the "peer review" group Jennings testifies was recently formed, similarly failed this test. William Jennings confirms the existence of the additional Seavey buildings where Defendants Dalton and Marks, Paneth & Shron function at pp 145:14 and pp188 & 189 of his deposition. Notwithstanding, this admission by Mr. Jennings and its confirmation in the February 24, 2009 deposition testimony of Defendant Ronald Dawley, Counsel for Marks, Paneth & Shron, Attorney William Kelly, who was present at both these depositions and heard the

testimonies, questions the Affirmant's statement of this fact contained in a question put to Cameron, Griffith & Pryce, CPA at page 64 of the Deposition of Adam Pryce of April 22nd, 2009.

9.     The careful reading of the testimony of William H. Jennings of February 3rd, 2009, shows that Defendant Marks, Paneth & Shron was recently organized in the year 2000.  There is little knowledge by Mr. Jennings of his predecessors and the named partners of his firm as to whether they are living or deceased, and Marks Paneth & Shron appears to be a mere association of accountants t in a lucrative practice (See pages 11, 12 of Jennings deposition transcript). The connections of William Shron, however, who died in January of 2009 with Robert W. Seavey and the Seavey Organization goes back to the 1970s, however, it appears that Jennings began work for the Seaveys as long ago as January of 1991, when he became a partner after his previous supervisor Arthur Goldman, succumbed to a heart attack.

10.     Jennings represents the Seaveys with regard to other developments in which this Plaintiff was not a participant, to wit, University, Riverview, Sand Realty and Bethune Towers.  At line 20 of page 15 of that Jennings deposition transcript, Affirmant requested space be left for the provision of the answer to the questions in relation to my request for a list of the developments owned by the Seaveys which Marks Paneth & Shron service and Mr. Kelly representing Marks Paneth & Shron states for the record, he is comfortable with that request.  Notwithstanding that Attorney Kelly did not object to the Plaintiff's request, no such list was ever provided and when the question was put to the Plaintiff's accountant Adam Pryce, during his April 22, 2009 deposition, it was attacked by Attorney Kelly as lacking any foundation in this record.  (See p. 65: 14 &15)

11.     However, Jennings concedes at page 18 line 12 of his deposition transcript that it is possible that he represents at least 14 of the Seavey Developments.   He further goes on to suggest at line 15 that he might have six others.   On page 18 line 22 Jennings conceded the information as to all

Seavey owned buildings could be determined from his client list in less than 10 days. Notwithstanding, his Attorney, not having provided the information requested, attacks the questions proposed to Plaintiff's accountant, Adam Pryce during his April 22nd, 2009 deposition as "unfounded" information. Mr. Kelly stated again at page 20, lines 2 – 4 of the Jennings deposition transcript that he was "comfortable" with that request.

12.    At page 20 of the Jennings deposition transcript, the issues of GAGAS, the so-called Yellow Book, requirements are raised, particularly with regard to paragraph 3.14, which requires auditors to avoid situations that could lead third-parties with knowledge of the relevant facts and circumstances to conclude that they are not able to maintain independence in conducting audits. Though Jennings first answers at page 20 line13 that he does not know this section of GAGAS he recovers to suggest he is knowledgeable of the concept and that his organization functions in accordance with those requirements and he continues on page 21, line 8 that Marks, Paneth & Shron has a department specifically designed for that.

13.    Jennings testifies at page 23, line 7, that owing a "significant amount of fees, may compromise the auditors judgment", and he states at line 13 as well that "certain relationships with the clients". In the wake of the discussion of the firms long history with the Seaveys at page 23, line 16, Jennings states, in response to the question of what relationships might cause compromise, "I can't think of anything off hand".

14.    At pages 23, line 19 and 24, from 1-15, GAGAS regulations 3.13 which, cautions against services by auditors that involve performing management functions or making management decisions and auditing their own work are discussed, together with a necessity that a determination be made by the auditor, that such service does not violate these principles. Section 3.14 of the GAGAS regulations specifically says audit organizations should not perform management functions, make

6

management decisions or create a situation that impairs the audits organizations independence, both in fact and in appearance. Jennings testifies at page 24, line 18, that he is familiar with these regulations, and that Marks, Paneth & Shron has always operated pursuant to these guidelines. At page 26 Jennings concedes that some of the four developments have owed Marks, Paneth & Shron monies at the end of particular fiscal years, in violation of the above rules. He states, he did not recall but he was sure "it wasn't enough" to jeopardize their independence.

15.     Jennings admits at the top of page 27 that each building charges $24, 000.00 for their audit, but upon the Affirmant's suggestion that the Lakeview contract and the Partnership in question is charged $34,000.00, Jennings recollection is refreshed at line 14, page 32.

16.     At page 77, line 11, of his deposition transcript Jennings concedes that $74, 000.00 may have been owed to Marks, Paneth & Shron by the Lakeview Housing Development and additional monies by the other corporations going back several years, a fact which must be weighed under the GAGAS Rules before performing any audit for such a client.

17.     A fascinating colloquy takes place between pages 79 & 84, of Jennings deposition transcript as to whether that additional $74,000.00 was paid to Marks, Paneth & Shron in the real world, as opposed to the world of "doc side" accounting. Jennings concedes, at page 83, line 10 of his deposition transcript, that the monies were received by Defendant Marks, Paneth & Shron according to Defendant Dalton's records saying that is a correct statement. When the question was put to him as to Defendant Marks, Paneth & Shron's records, Jennings answer is that he is only a partner and does not keep the company's records and is not in administration and the accounts receivable clerk, therefore, he cannot make the judgment to respond to the question being put to him.  The Affirmant then requested from Jennings the name of an accounts receivable clerk, his attorney, Mr. Kelly then

7

advised "perhaps such a clerk will be produced" at page 84, line 7 of Jennings deposition transcript, but to date no such a person has been proffered by the Defendants.

18.     The colloquy concerning the billing of the unexplained $74,000.00 Defendant Marks Paneth & Shron received in 2006 from the Lakeview Development continues, showing the synergy between these parties was such that monies mysteriously materialized from prior years are being owed to different parties, the progeny of which could not be attributed with any specificity to any cause or purpose. Jennings' testimony on the issue of whether DHCR's approval was obtained for the payment of the additional $74,000.00 in 2006 goes through the looking glass once again, and in pages 91-92 the answer seemed not responsive to the question of whether application to DHCR was made for approval of the $74,000.00, until finally at line 16 of page 92, Jennings answered that DHCR's approval was not necessary. and that this was tax exempt, he states the tax service is not covered by the retainer. The contract which is attached as **Exhibit G** to Plaintiff's application in support of his TRO is to the contrary in that the services are covered by the retainer which is $34,155.00.

19.     At page 93 of Jennings  deposition transcript Jennings opines that the $74,000.00 it received in addition to the contracted amount of $34,155.00 may have been paid in previous years and expensed in previous years and may not have been expensed in 2006.  It is impossible to know the truth of this without an audit that covers the preceding four or five years before the year 2006.

20.     The Plaintiff brings to the Court's attention the $181,000.00 that has had an active life of almost a decade in the books of Defendant Dalton, while unknown expensing and accrediting of the monies occurred and the name of the beneficiaries were masked under the cloak of Defendant Dalton Management. At page 95, line 6, of his deposition, Jennings concedes there is no documentation which would memorialize a proposal for a journal adjustment with respect to this money. At page 95 of William Jennings deposition testimony the total thrust of the Plaintiff's case is

admitted to.  At line 6, Jennings says there was no memorialization of the proposal with regard to the acceptance of the $108, 000.00 by Defendant Dalton.  At line 11, he concedes Dalton should have accepted this and amended its general ledger, this is affirmed again at line 14, page 95.  Once again at line 15, the question is, they would have amended and changed their general ledger, and the answer is for that prior year that is correct. At line 19, the question is, so that if Plaintiff auditors, Cameron, Griffith and Pryce look at Defendant Dalton's books in March of 2007 they should have seen that change to the general ledger, is that correct?  At line 24 Jennings answers, that is correct.

21.    At page 96 of Jennings testimony, Affirmant puts the question to Jennings that the change was not made by Dalton and Affirmant inquires that if that refreshes the witness's recollection as to what he just testified to his answer is, "I don't know what their procedures were internally, as far as I was concerned. They would have to make it at the end of 2006 to correct 2006 based on the journal entries. If it was made in 2007, the only thing it would affect would be the balance sheet account."  Jennings repeats this process at pages 99 and 100, of his deposition transcript in which $82, 909.00 is reported as a "management consultant fee," but these monies are credited to the audit expense and paid to Defendant Marks Paneth and Shron as a "management expense". Once again, Defendant Marks, Paneth & Shron audits Defendant Dalton's ledger, but Jennings testifies at page 100, line 8, that he does not know if Defendant Dalton's general ledger was changed by it.

22.    It is damningly admitted and conceded by Jennings at page 101, lines 2 & 3, of his deposition transcript that in March 2007 when Plaintiff's auditors looked at Defendant Dalton's general ledgers, those ledgers did not reflect these journal entries. At page 101, line 9, Jennings comments, in a perfect world, which very rarely happens he "Dalton" would have recorded these journal entries in 2006 to close out his old books. Jennings then states that Defendant Marks, Paneth & Shron does not verify that, it is not part of their procedures. At page 102, Jennings side steps the

question as to whether Defendant Marks Paneth & Shron has any knowledge as to what is in Dalton's books by non-responsively stating that we ask him specifically about this "journal entry" and by stating  that he is telling us what "should" have happened. At page 104, Jennings agrees that Defendant Dalton, if it was doing accounting here, had a duty to make the journal entries and to show it in its general ledger, Jennings answering yes in 2006, at lines 9 & 10 at page 104.  Once again at page 105 & 106 at lines 24, 25 & 1-5, Jennings concedes that, if they "Dalton" were keeping books and records, they should have made the adjustments in 2006. Jennings testifies at page 107, that many of his clients repeatedly refer all requests for documentation to him and Defendant Marks, Paneth & Shron.

23.    At page 109, lines 4 -14, requests were directed directly to Marks, Paneth & Shron by Cameron, Griffith & Pryce, with regard to documentation for a $29, 915.16 note written by Defendant Robert W. Seavey and HUD financial statements for 2006, but Jennings states he knows nothing of it and cannot say who in Marks, Paneth & Shron did respond to the direct request from Plaintiff's auditors.

24.    At page 111 & 112 of his deposition transcript, Jennings concedes that another group of requests from Cameron, Griffith & Pryce went unanswered and failed to come to his attention, though it should have happened in the natural course of the Marks, Paneth & Shron process. At page 113, line 6, Affirmant puts the question to William Jennings as to why Marks, Paneth & Shron would have had all these documents? Jennings answers continue over the next several pages of discourse and objections by his attorneys but the record will show no responsive answer was given to this question.

25.    Jennings discusses the meaning of the concept of the trial "balance" and states that he believes that Dalton provided these in the years that he worked with Dalton, but then concedes that he

does not personally know this to be the case at line 25 of page 32. Jennings then testifies at page 35, that the trial balance is not an impediment to any audit and that its absence is not uncommon, but concedes that it is desirable or preferable that accountants use trial balances, line 7.

26.     On page 44 line 17of his February 3rd, 2009 deposition transcript, Jennings speaks with extreme casualness to an account, which it later develops constitutes a major cause of concern as to the functioning between Defendants Marks, Paneth & Shron and Dalton Management.  He refers to unpaid management fees prior to the year 2000, which were not collected due to project financial hardship.  Between pages 48 and 50 of his deposition transcript, the thought is pulled from Mr. Jennings that he suggested to Defendant Dawley, Defendant Dalton's CEO, the necessity that Marks, Paneth & Shron be paid for the time being devoted to this audit.

27.     This record suggests this unholy tandem functions in at least 16 to 20 public housing facilities in the New York Metropolitan area and constitutes the common scheme and plan through which a pattern of racketeering is conducted by these Defendants. It is for this reason Plaintiff seeks an extension of the discovery schedule to allow a maximum effort by an enhanced team of accountants to "walk this audit back" to 1999 – 2000; and determine if the pattern of inventing of undocumented claims and debts, and questionable interpretations of provisions of contracts pertaining to reimbursement by the diverse Partnerships of "front line" and "central office" employees are endemic to all developments in which the Defendants function. Such a finding would suggest, not only RICO concerns, but would justify inquiries by the United States Attorney's office.

28.     At page 20 of the Jennings deposition, the issues of GAGAS, the so-called Yellow Book requirements are raised, particularly with the regard to paragraph 3.04, which requires auditors to avoid situations that could lead third-parties with knowledge of the relevant facts and circumstances to conclude that they are not able to maintain independence in conducting audits.

11

Though Jennings first answers at page 20 line13 that he does not know this section of GAGAS he recovers to suggest he is knowledgeable of the concept and that his organization functions in accordance with those requirements and he continues on page 21, line 8 that Marks, Paneth & Shron has a department specifically designed for that.

29.    At pages 23, line 19 & 24, from 1-15, GAGAS regulations which 3.13, cautions against services by auditors that involve performing management functions or making management decisions and auditing their own work are discussed by Jennings, together with a necessity that a determination be made by the auditor, that such service does not violate these principles.  Section 3.14 of the GAGAS regulations specifically says audit organizations should not perform management functions, make management decisions or create a situation that impairs the audit organizations independence, both in fact and in appearance.

30.    Jennings testifies at page 24, line 18, that he is familiar with these regulations, and that Marks, Paneth & Shron has always operated pursuant to these guidelines.  At page 26 Jennings concedes that some of the four developments have owed Marks, Paneth & Shron monies at the end of particular fiscal years, in violation of the above rules. He states, he did not recall but he was sure "it wasn't enough" to jeopardize their independence.  Jennings admits at the top of page 27 that each building charges $24, 000.00 for their audit, but upon my suggestion that the Lakeview contract and the Partnership in question charged $34,000.00, Jennings recollection is refreshed at line 14. At page 32, Jennings discusses the meaning of the concept of the "trial balance" and states that he believes that Dalton provided these in the years that he worked with Dalton, but then concedes that he does not personally know this to be the case at line 25 of page 32.  Jennings then testifies at page 35, that the trial balance is not an impediment to any audit and that its absence is not uncommon, but concedes that it is desirable or preferable that accountants use trial balances, at line 7.

31.     On Page 52, line 15, Jennings testifies that Marks, Paneth & Shron review contracts also to see that there is compliance with the contracts by the vendors.  He testifies at line 19 - 20 that they may even keep copies of the contracts to ensure payments are in compliance therewith. This testimony is particularly of interest and concern in view of the claims maintained by Marks, Paneth & Shron and both Attorneys in this matter that the "front line" employees whose expenses must be paid by the partnership include the  " home office" employees of the Defendant Dalton's home office.  The Management contract between Defendant Dalton Management and the Partnerships identifies "front line" employees as persons working on the site of the housing developments or project site, such as any social worker or any superintendant.  In no way does it even suggest that the home office executives and employees of Dalton Management expenses should be paid by the Partnerships, yet, this proposition is maintained by the Defendants Marks Paneth and Dalton Management, which is already receiving in excess of $500,000.00 yearly from the four Partnerships' Developments, by reason of its claims to be the accountant in the circumstance. It  receives this money plus the full payment of home office salaries and expenses from the Partnerships, so that the combination of Marks, Paneth & Shron with Dalton, functioning in tandem, results in yet another substantial windfall to Dalton Management and the Seavey Defendants which may total in the millions of dollars throughout these developments.

32.     This testimony by Jennings is particularly of interest and concern in view of the claims maintained by Marks, Paneth & Shron and both Attorneys in this matter that the "front line" employees whose expenses must be paid by the Partnership include the home office employees of the Defendant Dalton's home office.

33.     The Management Agreement between Defendant Dalton Management and the Partnerships identifies "front line" employees as persons working on the site of the housing

developments or the project site, including project managers, maintenance employees, clerical employees, superintendents and social workers.  In no way does the Management Agreement  even suggest that the salaries and fringe benefits of the home office executives and employees of Defendant Dalton Management should be paid by the Partnerships, yet, this proposition is maintained by the Defendants and Dalton Management, which is already receiving an excess of $500,000.00 yearly from the Partnerships' four Housing Developments.  By reason of its claims to be the accountant in the circumstance, Dalton Management receives a fee for accounting services plus the full payment of home office salaries and expenses from the Partnerships, so that the combination of Defendants Marks, Paneth & Shron with Dalton, functioning in tandem, results in yet another substantial windfall to Defendant Dalton Management and the Seavey Defendants which may total in the millions of dollars to these Developments.

34.     In paragraph 5 of Defendants' Opposition to Plaintiff's application to extend the discovery period, Defendants' counsel states that during Plaintiff's April 17, 2009 deposition in this matter conducted by Defendants, Plaintiff made "stunning admissions" and in light of this testimony Defendants will move for summary judgment.  Defendants' counsel then presents what he claims are statements made by the Plaintiff during his deposition.  However, Defendants have presented to this Court neither a copy of Plaintiff's deposition transcript which contains the alleged statements made by Plaintiff during his April 17, 2009 deposition nor does he provide the documents which he claims he presented to Plaintiff during his April 17, 2009 deposition.  One of the alleged "stunning admissions" made by Plaintiff as presented in paragraph 5 of Defendants' opposition papers is as follows:

> He originally wanted to file this lawsuit because of his belief that Defendants' were improperly paying their employees from the Partnership's assets.  When shown a copy of the management agreement that explicitly provided for such

payments, Plaintiff opined that the Defendants were somehow able to conspire with and assert undue influence over the approving government agencies.

35.    However, the evidence and records presented by Plaintiff in support of his application for a TRO in this matter fully contradict Defendants' counsel's above-described statement and in fact as shown below the records presented in here fully support Plaintiff's "belief that Defendants were improperly paying their employees from the Partnerships assets."   The Affirmant calls the Court's attention to pages 21-23 paragraphs 28– 33 of Plaintiff's Affidavit in support of his TRO application which was filed with the Court on June 23, 2008.   The Management Agreement between Defendant Dalton Management and the Partnerships is attached as **Exhibit G** to Plaintiff's above-described Affidavit and paragraph 13(b) of that Management Agreement which Defendants' counsel purports to cite in Defendants' opposition papers is fully cited by Plaintiff on page 22 of his Affidavit in support of his TRO and that paragraph provides as follows:

Employees: The Management Plan prescribes the number, qualifications and duties of the personnel to be regularly employed in the management of the Project, including a Resident Superintendent, and social Services Director (if applicable) and maintenance personnel.   In addition, there will be bookkeeping, clerical, and other managerial employees.   All such personnel will be employees of the Agent and not the Owner, and will be hired, paid, supervised, and discharged by the Agent, subject to the following conditions: **(See Exhibit G, p.5, para. 13)**

b.    The Owner will reimburse the Agent for compensation (including fringe benefits) payable to front line management

employees, such as Project Manager, clerical and bookkeeping personnel, and the maintenance employees, Resident superintendent and the Social Services Director (where applicable), and for all local, state, and federal taxes and assessments (including but not limited to Social Security taxes, employment insurance, and workman's compensation insurance) incident to the employment of such personnel. Such reimbursements will be paid out of the Rental agency Account and will be treated as Project expenses. For this purpose, the rental value of any dwelling unit furnished rent-free to the Resident Superintendent will not be considered a part of his compensation, but will be treated as a Project expense.
**(See Exhibit G, p. 5, para. 13(b))**

36.    However, paragraph 16(i) on page 8 of the Management Agreement between Defendant Dalton Management and the Partnerships specifically and strictly prohibits Defendant Dalton Management from using the Partnerships' assets to pay its home office employees salaries and other office expenses and provides as follows:

> **i.**    Except as otherwise provided in this Agreement, all of the Agent's home office bookkeeping, clerical, and other management payroll and overhead expenses (including but not limited to costs office supplies and equipment, postage, transportation for managerial personnel, and telephone services) **will be borne by the agent out of his own funds and will not be treated as Project expenses.** (Emphasis added) **(See Exhibit G, pp. 6-8, para. 16 (i))**

37.    Here, contrary to Defendants' counsel assertion in Defendants opposition to Plaintiff's instant application, there is no provision in the Management Agreement between Defendant Dalton and the Partnerships to "reimburse" and "compensate" Defendant Dalton for its home office expenses, employees salaries and fringe benefits for its management of the Partnerships' Housing Developments. As shown above, paragraph 16(i) of its Management Agreements with the Partnerships, office expenses, employee salaries and fringe benefits must be borne by the Agent, who in this case is Defendant Dalton Management.

38.    Moreover, as stated in its Management Agreement with the Partnerships, Defendant Dalton receives a fee from the revenue of each Partnership for the management of its Housing Development.  It would, therefore, be absurd, if not financial suicide, for the Partnerships to agree to pay Defendant Dalton Management a fee for its management of their Housing Developments in addition to compensation for its office expenses and employees' salaries and fringe benefits, including the salary of Defendant Ron Dawley, who was paid $140,000.00 (one hundred and forty thousand dollars) in 2006 from the Partnerships' assets. **(See Exhibit Q) attached to Plaintiff's Affidavit in support of his TRO,** Defendants' counsel's assertions here are classic examples of his multiple distortions and fabrications of the facts in this case, particularly, when the facts fully support the claims Plaintiff has made herein.

39.    The limited Partnerships' financial records which Defendant Dalton produced to Plaintiff's auditors reveal that the salaries of several of Defendant Dalton's home office employees, including Defendant Dawley, are being paid from the Partnerships' assets and not by Defendant Dalton as required by its Management Agreements with the Partnerships.  As shown in **Exhibit Q** attached to Plaintiff's Affidavit in support of his TRO, on May 16, 2007 Plaintiff's auditors requested the personnel records of Defendant Dalton's home office employees whose salaries are being paid from the Partnerships' assets, but who are **not** listed in Defendant Dalton's records as employees of the Partnerships' Housing Developments.  Employees of the Partnerships' Housing Developments are called "front line" management employees in paragraph 13(b) of the Management Agreement between Defendant Dalton and the Partnerships and as shown in paragraph 13(b) of **Exhibit G** the salaries and fringe benefits of these front line employees and the project office expenses are authorized by paragraph 13(b) of the Management Agreement to be paid from the Partnerships' rent revenues and assets.

40.     Defendant Dalton has refused to produce the personnel records of its home office employees listed in **Exhibit Q ,**which is attached to Plaintiff's Affidavit in support of his TRO**,** and Defendant Dawley has told Plaintiff's auditors that Plaintiff would have to commence legal action and obtain a Court order directing Defendant Dalton Management to produce to him and his auditors the personnel records of Defendant Dalton Management's home office employees, whose salaries are being paid from the Partnerships' revenues and assets which payments are in contradiction to the terms of its management agreement with the Partnerships.   The records which Defendant Dalton inadvertently provided to Plaintiff's auditors revealed that the unauthorized use of the Partnerships' assets to pay its home office expenses and salaries amounted to approximately $500,000.00 (five hundred thousand dollars) in 2006.

41.     Defendants have not submitted transcripts of Plaintiff's deposition testimony, which was taken by their attorneys almost two weeks prior to their submission of their opposition to Plaintiff's instant motion.  It is obvious, however, that the statements Defendants' counsel is attributing to Plaintiff's deposition testimony are "bits" and "pieces" of his testimony which he is selecting and deliberately and incorrectly paraphrasing and distorting so as to mislead the Court with the hope that the Court would render a decision in their favor.

42.     Further, the evidence does not support Defendants' counsel's statement in paragraph 5 of his opposition papers, that Plaintiff "originally wanted to file this lawsuit because of his belief that Defendants" were improperly paying their employees from the Partnerships' assets.  Even though the records presented here fully support Plaintiff's belief that Defendants were improperly paying their home office employees from the Partnerships' assets this belief was not the sole reason upon which Plaintiff's instant action was brought.   Plaintiff's lawsuit was brought because it had become abundantly clear to him as stated in his Affidavit in support

18

of his application for a TRO and his Complaint that the Defendants had devised schemes to defraud him of the Partnerships' assets and to cover-up these fraudulent schemes.

43.     The statements made by Defendants' counsel, Darren Traub, in his opposition to Plaintiff's application to extend the discovery period shows a total disregard for the facts in the instant case.  It is astonishing that Mr. Traub would state in paragraph 4 of his Declaration that prior to the commencement of the instant action Plaintiff had for more than six (6) months "unfettered access to review and audit the Partnerships' books and records."  In fact, the history of Defendants refusing to provide Plaintiff, a bonafide partner and owner of the Partnerships' properties, with access to the Partnerships' records is clearly documented in the records presented here and Defendants' refusal to provided access to Plaintiff to the Partnerships' books and records continues to today and has lead Plaintiff's counsel to move for sanctions against Defendants on April 21, 2009 before Magistrate Judge Francis.

44.     **Exhibits A, B and C,** which are attached to Plaintiff's Affidavit in support of his application for a Temporary Restraining Order ("TRO") clearly demonstrate Plaintiff's repeated requests to Defendants to produce and provide him with access to the Partnerships' financial and other records, which are to be maintained by Defendant Dalton Management, pursuant to its Management Agreements with the Partnerships.        **Exhibits A, B and C**, attached to Plaintiff's Affidavit in support of his TRO, show that Defendants repeatedly refused and ignored Plaintiff's requests to provide him and his auditors, whom he was forced to retain to audit the Partnerships' financial records, with access to the Partnerships' financial and other records which Defendant Dalton had contracted with the Partnerships to prepare and maintain in its custody and possession at all times.

19

45.     In early April, 2007 Plaintiff's auditors went to Defendant Dalton's offices with the intention of auditing the Partnerships' financial records.  A limited number of documents were provided to them and on May 10, 2007 they made their first written request to Dalton Management for the Partnerships' financial records that would have allowed them to proceed with the audit Plaintiff had hired them to conduct.   On May 15, 2007 Defendant Marks Paneth & Shron provided Plaintiff's auditors with a partial response to their May 10, 2007 request for the Partnerships' financial records and Defendant Ron Dawley, Chief Operating Officer ("CEO") of Defendant Dalton Management, told Plaintiff's auditors that their request for the Partnerships' financial records to proceed with their audit had to be made to Defendant Marks Paneth & Shron, the Partnerships' auditors who had been retained by the Partnerships for the "sole" purpose of auditing the Partnerships' financial records and providing all the Partners, including Plaintiff, an annual independent  auditors' report for each Partnership  pursuant to the Partnerships' contracts with the State and Federal agencies.

46.     Between May 16, 2007 and October 23, 2007 Plaintiff's auditors submitted nine (9) memos to Defendants Dalton Management, Marks Paneth & Shron and Neale Seavey, which listed in detail their request for the Partnerships' financial records to support the information they were finding in Defendant Dalton's general ledgers.  **(See Exhibit B attached to Plaintiff's Affidavit in support of his TRO)** Plaintiff's auditors' multiple and repeated requests to Defendants Dalton Management and Marks Paneth & Shron for the Partnerships' financial records were either ignored or bluntly refused.

47.     On June 26, 2007 Plaintiff wrote to Defendants Robert Seavey, Phyllis Seavey and Dalton Management regarding their refusal to provide his auditors with access to the Partnerships' financial records that would allow them to proceed with a full and complete audit of the financial

records of the Partnerships' Housing Developments in which he held an interest and ownership.  **(See Exhibit C attached to Plaintiff's Affidavit in support of his TRO)**  However, his efforts to obtain full access to the Partnerships' financial records were ignored and/or denied by all of the Defendants.

48.      Finally, on October 25, 2007 Plaintiff's auditors wrote a letter to Defendant Dalton Management, to the attention of its CEO, Defendant Ronald Dawley.    In their October 25, 2007 letter Plaintiff's auditors attached a number of their previous requests for the Partnerships' financial records, dating back to May 16, 2007, and pleaded with Defendant Dawley to provide them with the information they had been requesting for the past six (6) months so that they can proceed with their audit of the financial records for the Partnerships' Housing Developments.  In paragraph 2 of their October 25, 2007 letter, signed by Orley Cameron, to Defendant Dalton and its CEO Plaintiff's auditors state the following:

> 1.      The enclosed list detailed the information we have requested but have not yet received.  We must, therefore, ask you to provide us with **ALL** of the information, items and supporting documents on the enclosed lists **on or before Friday, November 2, 2007 by 5:00 p.m.**  This will allow us to proceed with the audits of the financial statements.  Please note that if we do not receive the information and supporting documents on the enclosed list, we would then be forced to inform our client, that we are unable to complete the audits.  In addition, we must inform our client that information is either not available or you have refused to make them available to us.
> **2.      (See Exhibit B attached to Plaintiff's Affidavit in support of his application for a TRO -- Plaintiff's auditors' October 25, 2007 letter to Dalton Management)**

49.      At the bottom of page 37 and the top of page 38 of his deposition transcript, Jennings testifies that after an initial discussion with Plaintiff's auditors, Cameron, Pryce and Griffith, he received a "threatening letter."  He then explained that the "threat" was that Plaintiff's auditors stated that they would advise Plaintiff, their client, of their inability to get information from

Defendants Dalton and Marks, Paneth & Shron unless the information they had requested from them was provided by a designated date. The "threatening letter" in question is Plaintiff's auditors' letter to Defendant Dalton dated October 25, 2007 and attached as **Exhibit B** to Plaintiff's Affidavit in support of his application for a TRO and which is quoted above.

50.    Defendant Ron Dawley telephoned Plaintiff's auditors on November 15, 2007 to respond to their October 25, 2007 letter to him requesting the Partnerships' financial records so as to proceed with their audit.  Defendant Ron Dawley's November 15, 2007 response to Plaintiff's auditors' October 25, 2007 letter, occurred more than three (3) weeks after he had received their letter.  In a letter dated November 15, 2007 Plaintiff's auditor, Orley Cameron, with whom Defendant Dawley had spoken on November 15, 2007 wrote to him as follows:

> 1.    In the conversation, you told us that the accountant said that the time needed to respond to the request is not included in the audit fees.  You further said that DHCR would have to approve the additional fees, or the requesting partner would need to pay for the time.
>
> 2.    We reminded you that we requested the information from Dalton Management Company and not from the audit firm.  We further reminded you that the items requested are to support information recorded in the general ledger, information that is the responsibility of the management company.
>
> 3.    You acknowledged that that may be so but we (the Management Company) do not have (the support for the general ledger) for them, and the auditor must be paid to provide them.
>
> **4.    (See Exhibit B attached to Plaintiff's Affidavit in support of his application for a TRO – Plaintiff's auditors November 15, 2007 letter to Dalton Management)**
>
> b.    Defendant Dawley did not respond to Plaintiff's auditors' November 15, 2007 letter to him nor did he provide them with the Partnerships' financial records which

they had requested and which would have allowed them to proceed with their audit of the Partnerships' financial records, therefore, on November 29, 2007 they issued to Plaintiff their "Independent Auditors' Report" which is attached as **Exhibit A** to Plaintiff's Affidavit in support of his application for a TRO.  Paragraphs 2 and 3 of this report state as follows:

1.      We were unable to complete the audits because the company's management refused to provide documentation and or explanation to substantial items in the general ledger some of which include: several journal entries recorded in general ledgers of all four companies; the original document to support Notes Payable to Seavey on Lakeview; support for the balances recorded in Lakeview's Money Market and investment accounts, among many others.

**2.**      Because we were unable to obtain substantiation for several items recorded in the general ledger, and we were unable to apply alternative auditing procedures to the items listed and the others mentioned, as discussed in the preceding paragraph, the scope of our work was not sufficient to enable us to express, and we do not express an opinion on the financial statements referred to in the first paragraph.      **(See Exhibit A attached to Plaintiff's Affidavit in support of his application for a TRO)**

51.      Given the fact that the records Plaintiff has presented here were filed with the Court on or about June 23, 2008 and since June 23, 2008  Defendants have been in possession of Plaintiff's Affidavit in support of his application for a TRO and all of the Exhibits described herein, Defendants' counsel's statements in his declaration that Plaintiff has repeatedly abused the discovery process and that "Plaintiff undertook even before this action was commenced by having 'unfettered access' to review and audit the Partnerships' books and records" and that the accounting firm retained by Plaintiff to audit the Partnerships' financial records "has served three different document requests, all of which were timely and fully responded to," can only be characterized as blatant misrepresentations to this Court as well as a total disregard for this Court.

52.     The party in the instant action who has abused the discovery process is Defendants and their attorney Darren Traub who continue to deny Plaintiff with access to the Partnerships' financial records by refusing to respond to Plaintiff's discovery demands and withholding financial records from Plaintiff, his auditors and attorney, which records would fully support Plaintiff's claims and are in direct contradiction to  Defendants' opposition to Plaintiff's claims in this action.

53.     One of the glaring examples of Defendants' cover-up and fraudulent scheme can be found at the "Lakeview" Housing Development which Defendant Robert Seavey described "as the largest of them all" in his Affidavit in Opposition to Plaintiff's application for a TRO.  A prior managing agent of Lakeview had informed Plaintiff that it costs approximately $638.00 (six hundred and thirty-eight dollars) per month to maintain each unit at this housing development.  This development consists of 446 (four hundred and forty six) units.  Hence, even at an inflated cost of $700.00 (seven hundred dollars) per unit, it costs approximately $3,200,000.00 (three million, two hundred thousand dollars) per year for the maintenance of this housing development.  However, the financial records for this housing development show that the annual revenue of this housing development is approximately $6,500.000.00 (six million, five hundred thousand dollars).  In 2007 Defendants reported in the Internal Revenue Service Partnership Form 1065, Schedule K.1 that this Housing Development operated at a loss of approximately $2,200.00 (two thousand, two hundred dollars).  In addition, Defendants repeatedly refused to provide Plaintiff's auditors with documents to support their use of the difference of almost than $3,000,000.00 (three million dollars) between the revenues it received for this housing development and the cost of maintaining this housing development.

54.     In paragraph 10 on pages 3-4 of his Affidavit in Opposition to Plaintiff's

application for a TRO, which was filed with the Court on or about September 15, 2008,

Defendant Robert Seavey states as follows:

> i.      We reminded Edmonds on numerous occasions that
> the properties are low to middle income government
> subsidized housing projects that do not generate a
> significant amount of profit.  Indeed, as the numbers show,
> the income that the properties do produce has increased
> since Dalton started managing the properties.  As for one
> property – the largest of them all – Dalton is prohibited by
> DHCR regulations from making any distribution.

55.     Despite Defendant Robert Seavey's statement above that "indeed as the numbers

show, the income that the properties do produce has increased since Dalton started managing the

properties", for several years Defendants have made absolutely no distribution payments to Plaintiff

from the Lakeview Housing Development and as noted by Defendant Robert Seavey the Lakeview

Housing Development "the largest of them all" has reported to the IRS that it operated at a deficit in

2006 and 2007.

56.     It should also be noted that on page 3 paragraph 9 of his affidavit in opposition to

Plaintiff's application for a TRO, Defendant Robert Seavey states:

> i.      Throughout the years, Edmonds has consistently
> complained that he did not receive enough income from the
> Partnerships, although he received partnership distributions
> in excess of $20,000 a month for the last for the last few
> years.

57.     However, a review of the 2007 Internal Revenue Service Partnership Form 1065,

Schedule K.1 which Defendants filed with the IRS states that Plaintiff received the following

distributions:

| | | |
|---|---|---|
| **i.** | Lakeview Housing Development | $     0.00 |
| ii. | Church Homes Housing Development | 2,227.00 |
| **iii.** | Charles Hill Housing Development | 1,338.00 |

      iv.       Logan Plaza Housing Development       170,000.00

      **1.**      **TOTAL** …………..  $**173,565.00**

58.     Hence, in 2007 Defendants Seavey, Dalton Management and Marks Paneth & Shron reported to the IRS that  it paid to Plaintiff  $173,565.00 (one hundred and seventy three thousand, five hundred and sixty five dollars) in partnerships distributions even though in his Affidavit in opposition to Plaintiff's application for a TRO, which he filed with this Court on or about September 15, 2008, Defendant Robert Seavey states that Plaintiff "received partnership distributions in excess of $20,000.00 a month for the last year."   Not only does the partnerships distributions Defendants reported to the IRS that it paid to Plaintiff fall seriously short of $20,000.00 per month in partnership distributions but Plaintiff has no record or recollection of ever receiving $20,000.00 per month in partnership distributions from Defendants since they began managing the Partnerships' Housing Developments more than a decade ago.

59.     The pattern of racketeering complained of in the premises is nowhere more clearly defined as in this one dynamic, in which several hundreds of thousands of dollars are withheld from the Partnership in plain sight. It is this type of function, together with the leases of the Seavey group, BNAS with the laundries and garages and etc., that have caused the Limited Partners of the Partnerships to bring action in the Supreme Court of the State of New York and which occasioned the instant action by the Plaintiff here. At page 54 of the Jennings deposition Affirmant inquired as to why Defendant Dawley would have to go to its auditors, Defendant Marks, Paneth & Shron to get information in response to the May 10th, 2007 request for Defendant Dalton's financial records to support its general ledger entries and Jennings answer is "It beats the heck out of me. I'll be honest with you. I'll call it lazy".  Jennings agrees that Dawley has all of this information and did not wish to

hurt himself and passed the request on to Defendant Marks, Paneth & Shron for money, at line 25 of page 54.

60.    It is the experience of the Plaintiff's auditors that in a multitude of other circumstances Defendant Dawley did not have this specific and particularized information, which, under generally accepted accounting standards and GAGAS, should not have been in the possession of any auditors, unless those auditors are functioning as the accountants to these entities and, therefore, are not independent.  Jennings concedes at page 56, line 8, that this is not the only time that Dawley referred Plaintiff's auditors to Marks, Paneth & Shron but, that it was repeatedly done.  Of course, Exhibit B attached to Plaintiff's Affidavit in support of his TRO makes this practice by Defendant Dalton Management abundantly clear.  Jennings refers on page 58 to a permanent file maintained by Defendant Marks, Paneth & Shron with regards to Defendant Dalton's accounts, which we believe were not produced during discovery in this matter.

61.    At page 56 and 66 of the Jennings deposition it is developed that in 2006 an audit of $34, 155.00 was reported to DHCR and submitted to HUD. Though Jennings protests that he does not know that the statements were mailed, he can see at line 17 that he knew it would be received at some point by DHCR and that it might possibly be reviewed by HUD.  At the bottom of page 68, at line 25 of his deposition transcript, Jennings concedes that the actual sum paid to Defendant Marks, Paneth & Shron in 2006 was $108,525.45 at the top of page 69, lines 1 and 2, which amount is significantly greater than the amount reported by Defendant Dalton and in the schedule submitted to DHCR and HUD by Defendant Marks Paneth & Shron.

62.    On pages 71 and 72 of his deposition transcript, Jennings concedes that the journal entries referring to the difference in the report of $34,000.00 and $108,000.00 should have been done by a proposal that Defendant Marks, Paneth & Shron makes to either correct or reclassify the

27

financial statements in accordance with GAGAS.  At line 16 he has testified, however, that he has no

independent recollection that the request was made of Dalton, but that he did have a recollection that

it was actually transmitted to Dalton, at line 25.  At page 72, line 3, he is fairly certain of it. At line 4

Affirmant calls for the production of such a document and Jennings testifies its standard procedure.

       63.     Affirmant points out that the maintenance of trial balances are standard procedure,

also, which Jennings agrees to in line 11.  Finally, at line 19 of page 72, Jennings concedes that he

has no independent knowledge that such a proposal for journal entry change was sent to Dalton by

Marks, Paneth & Shron. At line 20 and 23, in the wake of admission that this is information that he

can't retrieve from his records at page 72, line 22, I call for the production of this information in 10

days.  At page 73, Traub, who is not Jennings Attorney, refers to the box loads that were provided

suggesting we "go fish" through those for the items in question.  At page 73 line 9 – 14 Affirmant

questions the methodology of sending box loads of diverse papers, as to whether it is in

compliance with the Discovery Demands. Although Counsel suggested in colloquia they would

produce these documents at page 74, no documentation has been produced to date in this regard.

       64.     In the deposition of William Jennings of Marks Paneth taken February 3rd, 2009 and

Ronald Dawley of Dalton Management on February 24th, 2009, an issue arose, beginning at page

27 of the deposition of the 24th as to the reclassification of a debt expensed by Logan Plaza prior to

1999.  This debt was originally owed to previous management companies, Grenadier Management,

Prestige Management and Marion Scott Management, but was summarily and unilaterally restated

to be owed to Dalton Management, controlled by the Seavey Defendants, and left on the financial

records for over nine years, apparently awaiting a propitious time when it might safely be

appropriated to Dalton under circumstances in which its genesis and origin were long obscured.

65.    In his deposition of February 3rd Marks Paneths' William Jennings testified the moneys were owed to Dalton at page 148. In the deposition of February 24th, however, Defendant Ronald Dawley of Dalton Management testified the money belonged to the three previous management companies, Marion Scott, Prestige and Grenadier, and that a Seavey family member whose name he said he could not recall directed it be listed in 2000 in the records as owed to Dalton Management. (pp. 27 to 60.) He further testified (p.46) William Jennings of Marks Paneth knew the full history of this account and advised the Seavey defendants the money should be paid to the partners as income in 2000 but this advice was refused by the Seavey's, and its 9 year retention ensued, with the full knowledge of Marks Paneth and without any further effort on its part to correct this egregious overreaching and quasi-appropriation.

66.    The matter is raised again at pages 130 through 140 and at 149, after penetrating inquiry,  Dawley admits the assertion of Dalton's ownership was a complete fiction, and "untrue". It is uncontroverted at page 166 Marks Paneth, the Auditors, never reported this matter to DHCR or any regulatory agency, nor did they disclose, or otherwise question it in their continuing audits. Yearly financial statements ignored this and similar financial dealings involving undocumented notes payable to Defendant Robert Seavey, a related party, in the amount of $29,000, despite declarations made at each audit that all dealings with related parties had been disclosed to the Auditors.  Jennings testified he did not delve into this matter as the amount of money was below "the level of materiality" employed by Marks Paneth and Shron as auditors, and alleged bills were retroactively generated and paid to Marks Paneth in 2006, said to have originated from a series of questionable services stretching back to 2000 and 2001, again suggesting a possible pattern of the creation of ancient debts originating from a time long passed to any present reviewer, which facilitates the taking down of substantial claimed consultant and other fees years later. See the

29

transcript of February 24th, 2009, at pages 194 to 206. Mr. Pryce speaks to the issue of

transactions being material if it concerns related parties in his deposition of April 22nd, 2009 at pp.

21:4 & 8; and 68:15 &16, under the GAGAS, Governmental accounting standards. Dalton

management is and was at all times controlled by the Seavey Group and family.

      67.     At pages 46 through 49 of the Pryce deposition of April 22nd, 2009, Attorney M.

Darren Traub initiates a colloquy concerning documents requested to be copied by individuals

from my office on the afternoon of April 16th, 2009, during a discovery session in the wake of

Affirmant's request under 41 of the General Partnership law which  documents were taken by

defendant Dawley with the representation they would be sent out for copying and provided to my

inquisitors the following morning.  Dawley later advised these the documents must be held until

reviewed by his attorneys.  Affirmant was alerted to this situation on Sunday, April 19th, 2009, by

my assistants and e-mailed both defendants counsel we could not proceed with the deposition of

Phyllis Seavey the following morning unless the documents in question were revealed as to

content to this office.  Traub refused and threatened to, and did, bring on a motion for sanctions

before Magistrate James Francis alleging Affirmant's failure to attend the deposition was

wrongful.  Traub had asserted the irrelevancy of the documents in electronic communications sent

on Sunday, April 19th, 2009, so it would appear he had read these documents at some time prior to

that time, though he later professes not to have seen the papers until sometime Monday.  The 21

page motion for sanctions which concerned the documents apparently suppressed contained

everything except the vital "two sheets" that had so alarmed my associates.  The documents

themselves were withheld until Tuesday, April 22nd, 2009 when it was backhandedly electronically

mailed to my office, despite the fact all counsel were seated face to face in Mr. Traub's office at

the time of the surreptitious submission, and the document could simply have been handed directly to me.

68.    The documents in question consisted of letters and a resolution written by Defendant Robert Seavey to the J.P. Morgan, Chase Bank, confirming Plaintiff's claimed interest in the Lakeview Partnership in direct contravention of claims made by the Defendant in this and several other actions that Edmonds share had been pledged and conveyed to another Seavey entity, BNAS Management, sometime in 2001.  This canard was surfaced by the defendants in 2007 in preparation for obtaining Edmonds consent to a sale of the development whereupon almost 90% of his proceeds would have been claimed by BNAS, which is an entity owned and controlled by Avery Seavey.  The deal and scheme became unwound when Edmonds insisted on receiving a check in full for his designated share at the closing table upon completion of the sale.

69.    The original pledge was made by Edmonds some time in 2000 when he required the sum of $1.6 Million Dollars to redeem a local radio station from Chapter 11, to enable him to collect payment of $5.3 Million Dollars which constituted his interest in that company. Edmonds apparently borrowed $1.5 Million Dollars of his own partnership reserve funds, and an additional $125,000.00 from BNAS, in return for which his partners of 30 years extracted this draconian commitment.  Edmonds was to repay the moneys by 2001, but did so nine months late at which time he was told by defendant Robert Seavey he should just re-deposit the monies in the partnership escrow account and the matter would be resolved.  Edmonds deposited a check for $2.3 Million Dollars in the account which was in his and Robert Seavey's name and considered the matter closed.  Apparently letters and resolutions were issued to diverse banks informing these of Edmonds retention of his partnership interests two of which were the documents suppressed by Defendant's attorneys until the most recent deposition cycle was concluded.  A review of Traub's

deposition of Edmonds on Friday, April 17th, showed the Plaintiff was severely questioned with regard to the question of his interests in the partnerships with no mention of the exculpatory documents which had been taken by Dawley the previous evening, and then held for almost 5 days for alleged Attorney review. Nothing so characterizes the spirit of defendants discovery responses over the last several months as this episode.

70.    The excessive absences of the lead attorney for Dalton Management and the extremely limited flow of discovery information provided by Defendants has resulted in a circumstance in which literally less than 10% of the information Plaintiff inquired into has been produced.  Plaintiff asks the extension requested to allow for a maximum effort by an enhanced group of Auditors who might walk this investigation of the books and records of Dalton Management back to the inception of their tenure to discover if the patterns discussed above are continuously evidenced in the prior years.  Plaintiffs additionally require such minimal inquiry into the affairs of the other Seavey developments as would disclose the extent to which the delects complained impact the funds and interests of the Plaintiff in such developments, and if the racketeering pattern continues in those venues.

WHEREFORE; your declarant prays that the instant motion be granted in all respects, and that the time for conducting discovery be extended for an additional 120 days, and for such other and further relief as the court may deem proper.

Dated: Brooklyn, NY
        May 6, 2009

                                            _____
                                            s/ M. Douglas Haywoode
                                            M. Douglas Haywoode