UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
JOHN L. EDMONDS, INDIVIDUALLY AND AS A :
MANAGING GENERAL PARTNER OF FIFTH AND
106TH STREET HOUSING COMPANY, INC.,
LOGAN PLAZA ASSOCIATES, LP, CHARLES H.    : Index No.: 08 CIV 5646-HB
ASSOCIATES a/k/a CHARLES H. HILL
ASSOCIATES, LP AND AS A LIMITED PARTNER   :
OF CHURCH HOME ASSOCIATES, LP,
                                           :
                    Plaintiffs,

        -against-                          :

ROBERT W. SEAVEY, INDIVIDUALLY AND AS A   :
GENERAL PARTNER OF FIFTH AND 106TH
STREET ASSOCIATES, LP, LOGAN PLAZA
ASSOCIATES, LP, CHARLES HILL ASSOCIATES,  :
CHARLES HILL ASSOCIATES, LP AND AS A
LIMITED PARTNER OF CHURCH HOME            : **DECLARATION IN**
ASSOCIATES, LP; PHYLLIS M. SEAVEY           **SUPPORT OF MOTION**
INDIVIDUALLY AND AS OWNER, MANAGER        : **FOR SUMMARY JUDGMENT**
AND MEMBER OF DALTON MANAGEMENT
COMPANY LLC; AVERY B. SEAVEY,             :
INDIVIDUALLY AND AS A GENERAL PARTNER
OF LOGAN PLAZA ASSOCIATES, LP, CHURCH
HOME ASSOCIATES AND OWNER OF DALTON       :
MANAGEMENT COMPANY, LLC; NEALLE B.
SEAVEY, INDIVIDUALLY AND AS OWNER,        :
MANAGER AND MEMBER OF DALTON
MANAGEMENT COMPANY, LLC; AND RONALD       :
DAWLEY AS CHIEF EXECUTIVE OFFICER OF
DALTON MANAGEMENT COMPANY, LLC;           :
DALTON MANAGEMENT COMPANY, LLC, THE
SEAVEY ORGANIZATION, and MARKS PANETH &   :
SHRON, Auditors,
                                           :
                    Defendants.
------------------------------------------------------------ X

ROBERT W. SEAVEY, hereby declares, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the managing general partner of Fifth and 106th Street Associates, LP and I have personal knowledge of the facts and circumstances set forth herein. I respectfully make this declaration in support of the Defendants' Motion for Summary Judgment.

2. I have known Edmonds since 1957, and since that time, he has been a close, personal friend of my family, including my wife Phyllis and my children Avery and Nealle—all named defendants in this action.

3. Beginning in the early 1970's, Edmonds entered into four limited partnerships (the "Partnerships"), Fifth and 106th Street Associates, LP a/ka Lakeview Apartments ("Lakeview"), Logan Plaza Associates, LP ("Logan Plaza"), Charles H. Housing Associates, LP ("Charles Hill"), and Church Home Associates, LP ("Church Home"), with me or members of my family (or entities owned by them). Each Partnership owns and operates a different low or middle income, residential development. The housing projects consist of approximately 840 residential units, all of which are either city or state government sponsored and overseen through programs such as Mitchell-Lama and Section 8, and agencies such as the New York State Division of Housing and Community Renewal ("DHCR"), the U.S. Department of Housing and Urban Development ("HUD"), the New York City Department of Housing Preservation & Development ("HPD"), and the New York City Housing Development Corp. ("HDC").

4. Lakeview is a 446-unit apartment complex with 6 commercial units located at 1250 Fifth Avenue, 4 East 107th Street, 35 East 106th Street and 1590 Madison Avenue in New York County and receives funds and subsidies from HUD and the New York City Housing Authority and is subject to DHCR rules and regulations. Fifth and 106th Street Associates, LP, the partnership that owns Lakeview, was formed in 1973.

5. Lakeview was initially operated with Edmonds and I each owning a 7.5% interest as general partners. The remaining 85% of the partnership is owned by several different limited partners. A copy of the Amended Agreement of Limited Partnership (the "Partnership Agreement") of Fifth and 106th Street Associates is attached hereto as Exhibit 1. However, as of

June 16, 1976, Edmonds and I each transferred 5% of our general partnership interest to Robert Carmel, but retained the right to manage that interest. A copy of the June 16, 1976 letter memorializing our agreement is attached hereto as Exhibit 2.

6.  Thereafter, by Agreement for Purchase and Sale of Partnership Interest (the "Sale Agreement"), dated July 26, 1999, Edmonds sold 1.3% of his general partnership interest and the 5% Carmel interest that he controlled to BNA Realty Company, LLC ("BNA") for the price of $325,000. Edmonds retained only a 1.2% interest in Lakeview as a limited partner. A copy of the Sale Agreement is attached hereto as Exhibit 3. The transfer of Edmonds interest to BNA was memorialized in the Second Amended Agreement of Limited Partnership of Fifth and 106th St. Associates L.P. (the "Second Amendment"), dated July 30, 1999. A copy of the Second Amendment is attached hereto as Exhibit 4. The Second Amendment, which was signed by all of the partners in Lakeview, explicitly states that Edmonds owns only a 1.2% interest in Lakeview.

7.  Logan Plaza is a 131-unit apartment building located at 1425 Amsterdam Avenue in New York County that receives funds and subsidies from HDC. Logan Plaza is owned by Logan Plaza Associates LP, a partnership equally owned by Edmonds on the one hand and my children, Avery and Nealle Seavey through entities they own, on the other.

8.  Charles Hill is a 102-unit apartment building located at 2050 Fredrick Douglass Boulevard in New York County that receives Section 8 funds from HUD and is so supervised. Charles Hill is owned by Charles H. Housing Associates, LP. As reflected in the Amended and Restated Certificate of Limited Partnership, dated October 31, 1984, a copy of which is attached hereto as Exhibit 5, Edmonds owns a 1% interest in the operations of Charles Hill and a 24.745% interest in the "capital transactions" of Charles Hill. The remaining interests are owned by

Avenel Corporation (1% operations interest and a 24.745% "capital transactions" interest) and a limited partner (owning 98% operations interest and a 50.51% "capital transactions" interest).

9. Church Home is a 161-unit apartment building located at 95 Lenox Avenue in New York County that receives Section 8 funds from HUD and is so supervised. Church Home is owned by Church Home Associates, L.P. Edmonds owns a 1.34% interest in Church Home as a limited partner.

10. Throughout the years, we had used different management companies to manage the day-to-day activities of the properties. Edmonds and I both agreed that such management companies had either mismanaged the properties or, in some cases, refused to manage our properties as they were not financially successful.

11. Accordingly, in 2000, with Edmonds' knowledge and consent, the Partnerships selected and entered into agreements with Dalton Management Company, LLC ("Dalton") to manage the properties. A copy of one of Dalton's Management Agreement with Church Homes is attached hereto as Exhibit 6. The Management Agreement is a standard HUD agreement and is the same for Logan and Charles Hill. For Lakeview, DHCR has a different management agreement with a different fee structure. Dalton is a limited liability company which is owned by members of the Seavey family and has approximately eleven employees skilled in this type of government agency related work.

12. Since the properties are subject to city and state government sponsored programs, the actions of Dalton are highly regulated and monitored by the above-mentioned agencies. Thus, Dalton maintains detailed books and records of the Partnerships. Dalton retains the accounting firm of Marks Paneth & Shron ("MP&S"), one of the most prominent and well-respected accounting firms that specialize in government subsidized real estate, comprised of

4

approximately 70 partners and principals, to provide tax preparation, rent increase applications, and auditing services for the Partnerships. In contrast, Edmonds retained an accounting firm located in Brooklyn which seems to have far less experience and resources in the government housing area.

13. Periodically and at the end of each business year, accountants from MP&S audit each of the Partnerships' books and records. At the conclusion of the audit, the MP&S accountants meet with Dalton's employees to discuss recommendations for the books and records. MP&S also provides tax return preparation services to the Partnerships and assists the Partnerships in dealing with the IRS and handling any audits conducted by supervisory and taxing authorities. All of the other bookkeeping services are provided by employees of Dalton, including accounts payable, accounts receivable, handling and recording the rent bills and receipts, and handling all other financial transactions for the Partnerships.

14. Dalton has received a letter of commendation from the State of New York for managing the properties and has received approvals for an increase in management fees from the city and state of New York. A copy of that letter is attached hereto as Exhibit 7.

15. Moreover, when Lakeview, the largest of the Partnerships, was audited by the IRS in 2004 and when Dalton was audited by the IRS in 2007, the IRS issued "no change" letters indicating that the tax returns and supporting books and records were in compliance with the tax code and IRS regulations. Copies of the "no change" letters are attached hereto as Exhibit 8.

16. Throughout the years, Edmonds has consistently complained that he did not receive enough income from the Partnerships, although he received partnership distributions in approximately $20,000 a month in 2007 and 2008. In fact, he has threatened numerous times to

file a RICO action against us if he did not receive more money from Dalton and/or the Partnerships. Copies of some of his threatening letters are attached as Exhibit 9.

17.   I am aware that Edmonds has a history of commencing frivolous litigation against his various business partners in an effort to obtain more money out of his business dealings than he is entitled to. Therefore, I and members of my family took Edmonds' threats seriously. However, we reminded Edmonds on numerous occasions that the properties are low to middle income government subsidized housing projects that do not generate a significant amount of profit. Indeed, as the numbers show, the income that the properties do produce has increased since Dalton started managing the properties. In fact, the partners in Logan, Charles Hill, and Church Home had never received a distribution payment until Dalton took over as manager of that property.

18.   So that Edmonds could see for himself that there was no mismanagement by Dalton, Dalton has made books and records available to him for inspection. As a partner in each of the Partnerships he is entitled to review them. As a matter of fact, each and every month, a copy of checks dispensed, financial statements, and payroll documents were provided to Edmonds. Moreover, he was able to contact Dalton and/or Marks Paneth & Shron with any questions or concerns, a right that he exercised frequently.

19.   Nonetheless, on March 27, 2007, Edmonds retained the accounting firm of Cameron, Griffiths & Pryce ("CG&P") to review the books and records of the Partnerships. For almost six months, CG&P came to Dalton's offices to review the books and records. Dalton cooperated with Edmonds' review and allowed CG&P access to the books and records of the Partnerships.

20. At the conclusion of the review, Edmonds claimed that some of the documentation supporting some of the accounting entries were not made available to CG&P. Although Dalton had produced the books and records available to CG&P, Dalton requested that Edmonds compile a comprehensive list of the documents that he contended was missing so that Dalton and the Partnerships could review the requests. Edmonds did not comply with the request. Instead, CG&P sent six different letters, each containing different vague and ambiguous requests. Copies of those letters are attached hereto as Exhibit 10.

21. Since Dalton manages approximately 2000 residential units, all of which are city and state government sponsored and overseen, with day to day issues, it is disruptive to sporadically have employees track down information whenever CG&P happened to think of a request.

22. Through discovery in this action, I have been provided with a copy of an initial audit report prepared by CG&P in November 2007, in which the firm specifically disclaimed any opinion regarding the financial statements of the Partnerships. A copy of that report is attached hereto as Exhibit 11. Additionally, I have been provided with CG&P's report dated December 12, 2007, which appears to summarize their conclusions and recommendations resulting from their six-month inspection. A copy of that report is attached hereto as Exhibit 12. I had not received copies of either report before this lawsuit.

23. Additionally, after this action was commenced, I learned that Edmonds had apparently executed a series of agreements with T-WOL Leasing Corp. ("T-WOL") culminating

in a self-titled Confidential Negotiated Settlement and Release of All Claims (the "Confidential Agreement") agreeing to have Fifth and 106th Street Associates pay T-WOL the sum of $100,000 in exchange for T-WOL surrendering an alleged, unauthorized lease of space at Lakeview. The "agreement" was made without my required consent as co-Managing General Partner and without the required approval of DHCR, the agency supervising the project. A copy of this agreement is attached hereto as Exhibit 13.

24.     I did not sign the Confidential Agreement and had not seen it before late last year when T-WOL sent it to my attention demanding payment thereon.

25.     Now, T-WOL has commenced a litigation against Fifth and 106th Street Associates seeking payment on the Confidential Agreement claiming damages totaling $1,480,696, all stemming from Edmonds' unauthorized agreements.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: New York New York
       July 9, 2009

_____
Robert W. Seavey

in a self-titled Confidential Negotiated Settlement and Release of All Claims (the "Confidential Agreement") agreeing to have Fifth and 106th Street Associates pay T-WOL the sum of $100,000 in exchange for T-WOL surrendering an alleged, unauthorized lease of space at Lakeview. The "agreement" was made without my required consent as co-Managing General Partner and without the required approval of DHCR, the agency supervising the project. A copy of this agreement is attached hereto as Exhibit 13.

24. I did not sign the Confidential Agreement and had not seen it before late last year when T-WOL sent it to my attention demanding payment thereon.

25. Now, T-WOL has commenced a litigation against Fifth and 106th Street Associates seeking payment on the Confidential Agreement claiming damages totaling $1,480,696, all stemming from Edmonds' unauthorized agreements.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: New York New York
July 9, 2009

_____
Robert W. Seavey