1

1
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    CASE NO.: 08 CIV 5646
4    -------------------------------------------------x
     JOHN L. EDMONDS, Individually and as a
5    managing general partner of FIFTH AND 106TH
     STREET HOUSING COMPANY, INC., LOGAN PLAZA
6    ASSOCIATES, LP, CHARLES H. ASSOCIATES a/k/a
     CHARLES H. HILL ASSOCIATES, LP and as a
7    limited partner of CHURCH HOME ASSOCIATES, LP,
8
9                        Plaintiffs,
10        -against-
11
     ROBERT W. SEAVEY, Individually and as a general
12   partner of FIFTH AND 106TH STREET ASSOCIATES, LP,
     LOGAN PLAZA ASSOCIATES, LP, CHARLES HILL
13   ASSOCIATES, CHARLES HILL ASSOCIATES, LP and as a
     limited partner of CHURCH HOME ASSOCIATES, LP;
14   PHYLLIS M. SEAVEY, individually and as owner,
     manager and member of DALTON MANAGEMENT and
15   member of DALTON MANAGEMENT COMPANY, LLC; AVERY
     B. SEAVEY, individually and as a general partner
16   of LOGAN PLAZA ASSOCIATES, LP, CHURCH HOME
     ASSOCIATES and owner of DALTON MANAGEMENT
17   COMPANY, LLC; NEALE B. SEAVEY, individually and
     as owner, manager and member of DALTON MANAGEMENT
18   COMPANY, LLC; and RONALD DAWLEY as chief
     executive officer of DALTON MANAGEMENT COMPANY,
19   LLC; DALTON MANAGEMENT COMPANY, LLC, THE SEAVEY
     ORGANIZATION, and MARK PANETH & SHRON, Auditors,
20
21                       Defendants.
22   -------------------------------------------------x
23              DEPOSITION of JOHN EDWARDS
24                   APRIL 17, 2009
25



**2**

```
 1
 2
 3          DEPOSITION of JOHN EDWARDS,
 4    taken by Defendants, held at the offices of
 5    Herrick, Feinstein, LLP, 2 Park Avenue, New York,
 6    New York, on April 17, 2009, commencing at
 7    10:00 a.m., before Eileen Mulvenna, CSR/RMR,
 8    Certified Shorthand Reporter, Registered Merit
 9    Reporter and Notary Public of the State of New
10    York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1
 2          IT IS HEREBY STIPULATED AND AGREED,
 3    by and between the attorneys for the respective
 4    parties herein, that filing and sealing be and
 5    the same are hereby waived.
 6
 7          IT IS FURTHER STIPULATED AND AGREED
 8    that all objections, except as to the form of the
 9    question, shall be reserved to the time
10    of the trial.
11
12          IT IS FURTHER STIPULATED AND AGREED
13    that the within deposition may be signed and
14    sworn to before any officer authorized to
15    administer an oath, with the same force and
16    effect as if signed and sworn to before the
17    officer before whom the within deposition was
18    taken.
19
20
21
22
23
24
25
```

**3**

```
 1
 2    A P P E A R A N C E S :
 3
 4
 5    M. DOUGLAS HAYWOODE, ESQ
      Attorneys for Plaintiff
 6        71 Maple Street
          Kings Chancellery
 7        Brooklyn, New York  11225-5001
      BY:  HERRICK, FEINSTEIN, LLP, ESQ.
 8
 9
10    HERRICK FEINSTEIN, LLP
      Attorneys for Defendants Seavey, et al.
11        2 Park Avenue
          New York, New York  10016
12      BY:  M. DARREN TRAUB, ESQ.
          dtraub@herrick.com
13
14
15    WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
      Attorneys for Defendant Mark Paneth & Shron
16        3 Gannett Drive
          White Plains, New York  10604-3407
17      BY:  WILLIAM J. KELLY, ESQ.
          william.kelly@wilsonelser.com
18
19
20    A L S O   P R E S E N T :
21
22        Robert Seavey
          Phyllis Seavey
23
24
25
```

**5**

```
 1              John Edmonds
 2    JOHN EDMONDS,
 3        having been duly sworn by Eileen Mulvenna,
 4        a Notary Public of the State of New York,
 5        was examined and testified as follows:
 6    EXAMINATION
 7    BY MR. TRAUB:
 8        Q.    State your name and address for the
 9    record, please.
10        A.    John L. Edmonds, E-D-M-O-N-D-S,
11    187-20 Grand Central Parkway, Jamaica, New York.
12    11432 is the zip.
13            MR. TRAUB:  This deposition is being
14        taken pursuant to notice and agreement of
15        counsel and will be used for the purpose of
16        cross-examination at trial and all other
17        uses in accordance with the Federal Rules
18        of Civil Procedure.
19    BY MR. TRAUB:
20        Q.    Mr. Edmonds, good morning.
21        A.    Good morning.
22        Q.    We've met several times.
23        A.    That's correct.
24        Q.    It's nice to see you again.
25            I just want to let you know, I know
```

## 6

John Edmonds

1 John Edmonds
2 you've had your deposition taken before and I'm
3 sure you've even taken a few depositions. This
4 will be similar to any deposition that you've
5 seen or that you've taken in that we have a court
6 reporter here.
7 And, obviously, she can only take
8 down what is stated orally. So what I would ask
9 is that you allow me to ask my questions to you
10 and let me finish. And then a response, if you
11 could give an oral answer. Obviously, a head nod
12 yes or a head no no can't be taken down.
13 And I'll give you the same courtesy
14 of allowing you to finish your complete answer
15 before talking back over so that the court
16 reporter doesn't have us talking over each other.
17 A. Very good.
18 Q. Also, if you need a break at any
19 time, obviously, please feel free to do so. I
20 just ask that you allow me to finish any question
21 that's pending and for you to give a complete
22 answer to any pending question before we take
23 such a break.
24 A. Very good.
25 Q. We do have coffee and water behind

## 7

John Edmonds

1 John Edmonds
2 you as well, so if at any time, please turn
3 around and help yourself.
4 Can you describe for me all of your
5 real estate investments that you currently have.
6 A. Fifth and 106th Street.
7 Q. And that's the one that's in this
8 deposition -- or that's in this case known as
9 Lakeview?
10 A. Lakeview.
11 Charles Hill. Church Home. And
12 Logan Plaza. I think they comprise perhaps 952
13 units.
14 Q. Are there any other real estate
15 investments that you're currently in other than
16 the four partnerships at issue in this action?
17 A. Not at the present time.
18 Q. In the past ten years, have you been
19 involved in any other real estate investments?
20 A. Yes, I have.
21 Q. In which real estate investments
22 were those?
23 A. Those were investments in the city
24 of Newark, New Jersey.
25 Q. We'll take these one at a time.

## 8

John Edmonds

1 John Edmonds
2 With the investment in the city of
3 Newark, New Jersey, can you describe for me the
4 actual property.
5 A. Yes. The property was located
6 almost against Elizabeth, New Jersey. The back
7 end of the property ends up in Elizabeth. It was
8 across the street from a public golf facility
9 there for the people that live in that community.
10 It's quite a nice community.
11 Q. Was it a vacant piece of property?
12 A. Yes, it was.
13 Q. Who was your partner, if any, in
14 that investment, that city of Newark?
15 MR. HAYWOODE: Object to the
16 relevance.
17 Now the witness may answer.
18 A. I had an arrangement with three or
19 four people. Rod Shaw, who is an engineer of
20 some 30 or 40 years. I've forgotten this
21 fellow's name now, but at any rate, the
22 arrangement was a very elemental one. It was a
23 part of the kind of thing that I do frequently,
24 and that is to say that I involve them to the
25 extent that they were partners, and they each got

## 9

John Edmonds

1 John Edmonds
2 a percentage of the amounts to be made.
3 Q. Were you the managing general
4 partner?
5 A. Managing general partner, that's
6 correct.
7 Q. And what percentage ownership did
8 you have in that partnership?
9 A. I believe I kept somewhere between
10 68 and 75 percent.
11 Q. And the other remaining 32 to
12 25 percent was split between the other three
13 partners?
14 A. Yes, that's correct. And of course,
15 the budget included a fee for Rod Shaw because he
16 was the person to be on the site to assist in the
17 management of that project.
18 Q. What did the project actually
19 consist of?
20 A. It consisted of -- I believe it was
21 116 units of housing under a HUD program that
22 would have given the public housing residents an
23 opportunity to own their own unit in a
24 condominium fashion.
25 Q. I guess I'm a little confused.

3 (Pages 6 to 9)

10

John Edmonds

1  
2  Because earlier when I asked, you said it was a
3  vacant piece of land.
4      A.    It was vacant as of the time that we
5  started the construction, yes.
6      Q.    And then you actually built a
7  116-family apartment building --
8      A.    We finished -- we finished
9  two-thirds of the project.
10     Q.    And then what happened with the
11 project?
12     A.    The City of Newark called me in,
13 Harold Lucas, who was then the executive director
14 of the Newark Housing Authority and had been, in
15 the Clinton administration, the deputy assistant
16 commissioner for public housing.  And in that
17 role, he made certain that his old city would get
18 a good part of those funds, and they did.
19     Q.    So did you sell the property then to
20 the City of Newark; is that --
21     A.    I was put off the property.  What
22 happened was that I had a state senator there who
23 was a partner of the contractor, the builder,
24 that was a local builder there on the site.  And
25 he was a vice president of -- the contractor's

11

John Edmonds

1  
2  name was Tony Gomes.  He was a vice president of
3  Tony Gomes' construction company, a state senator
4  and a deputy mayor, I believe.
5      And they called me in on an occasion
6  before their board and indicated to me that they
7  desired to have Mr. Gomes complete the project
8  without the further participation of the Edmonds
9  group.  And incidentally, I had Phyllis over
10 there on one occasion to discuss --
11     MR. HAYWOODE:  Indicating
12 Mrs. Seavey, who is with us today.
13     A.    -- to discuss the management
14 capability of her company, Dalton Management.
15 And that was for the reason that if the place was
16 to become a condominium for the tenants, then
17 they would have to have a managing agent there.
18     Q.    So that you were considering then
19 Dalton Management as a management group for this
20 project?
21     A.    That's correct.
22     Q.    You said that the Edmonds group
23 was -- believe me, I apologize if I get the term
24 wrong -- was put out of the project by the City
25 of Newark.

12

John Edmonds

1  
2      When you say "the Edmonds group,"
3  you're talking about yourself and your three
4  partners; is that correct?
5      A.    Yes.
6      Q.    Was it taken from you through a
7  condemnation?
8      A.    No.
9      Q.    Was there --
10     A.    By a direction of the mayor of the
11 City of Newark.
12     Q.    So there was no lawsuit?
13     A.    No lawsuit.
14     Q.    Did you get paid for --
15     A.    I got paid for the percentage of
16 completion, yes.  And I'll tell you that I had
17 several meetings with the board of the Housing
18 Authority, which consisted mainly of tenants,
19 their counsel, the executive director and this
20 state senator, who represented the mayor at the
21 meetings, and --
22     Q.    Not to interrupt you.
23     Is this the City of Newark Housing
24 Authority?  Is that --
25     A.    Yes, the City of Newark Housing

13

John Edmonds

1  
2  Authority.
3      And the first meeting I had with
4  them, they asked me what was the total amount of
5  completion of the project.  And I indicated to
6  them that it was about three-quarters completed,
7  two-thirds to three-quarters.  And they asked me
8  how much of a fee I was expecting.  And I told
9  them $1.4 million, which would be the fee that we
10 had -- that I earned for three-quarters of
11 completion.
12     Q.    At that time, were there any tenants
13 that were in the property?
14     A.    As far as I can recall, no, no
15 tenants at that time, because it was not
16 completed.
17     Q.    Okay.  So this isn't a project that
18 was completed in phases; in other words, there
19 was one building completed, tenants moved in.  It
20 was supposed to all be completed before tenants
21 moved in?
22     A.    That's correct.
23     Q.    Okay.
24     A.    And after having a couple of
25 meetings with them, they told me that they could

**14**

John Edmonds

1  only pay $1.2 million for the services of the
2  Edmonds group. And so I recognized that I was in
3  a very difficult position, with the mayor opposed
4  to me and so forth and so on, so I accepted that
5  and we left the job.
6      Q.    You said that you were expecting
7  around about $1.4 million for the project. Was
8  this the fee that you would obtain if you had
9  sold the project upon completion?
10      A.    No, I think we were looking for a
11  fee of approximately $2 million.
12      Q.    Is that for selling the project upon
13  completion?
14      A.    Yes, that's correct.
15      Q.    So you never planned to actually run
16  this project, then?
17      A.    No. I -- I was looking really at
18  that time as to whether or not Dalton Management
19  Company could -- could be the manager of that
20  project once it was completed.
21      Q.    When you say "at that time," about
22  what year were you considering Dalton Management
23  Company to be the management company of --
24      A.    I think this began in 1996, I
25

**15**

John Edmonds

1  believe. And I finally finished with them I
2  think in 2002, from the point of the lawsuit and
3  so forth and so on. Because I brought a lawsuit
4  in the Superior Court in Newark, New Jersey.
5      Q.    Against the City of Newark?
6      A.    Yes, against the City of Newark and
7  against the young man that I had selected to
8  be an architect. His name was Ben Thompson, I
9  believe. Benny Thompson.
10      Q.    You were the plaintiff in that
11  lawsuit?
12      A.    Yes.
13      Q.    And at what point did you sell,
14  finally for $1.2 million, the property to the
15  City of Newark?
16      A.    I guess it must have been about
17  2000, about then.
18      Q.    What was the outcome of the lawsuit
19  that you had filed?
20      A.    The outcome was that the judge -- I
21  realized, after I had retained these attorneys,
22  et cetera, that this was a part of a relationship
23  between the courts and these lawyers and so forth
24  and so on, they had good political contact, that
25

**16**

John Edmonds

1  I had to hire the wrong group of lawyers.
2      And so the judge told me, on an
3  examination that was being conducted by myself
4  and the lawyer that I had retained on Benny
5  Thompson, that Benny Thompson committed some
6  perjury statements. And the judge says, Well, I
7  think that Mr. Thompson is senile. So,
8  Mr. Edmonds, I don't think I will permit this to
9  go further. I'm going to award the lawyers here
10  their fees and that should end this litigation.
11      Q.    When you say "an examination," is
12  this a cross-examination at trial or was this an
13  examination before trial?
14      A.    Cross-examination at trial.
15      Q.    And so then at the end of the trial,
16  the judge dismissed your lawsuit; is that
17  correct?
18      A.    That's correct.
19      Q.    Are there any other properties that
20  you have owned other than in the last ten years,
21  other than the five real estate projects you've
22  named so far?
23      A.    Yes, I made -- I made an approach to
24  the -- to the housing authority in North
25

**17**

John Edmonds

1  Carolina, to -- I can't think of the name of that
2  city now.
3      MR. HAYWOODE:  Durham?
4      THE WITNESS:  Durham, North
5  Carolina, that's correct.
6      A.    And the approach was similar to the
7  one that I had used in Newark where -- this
8  acreage that I had there, about 15 acres, which
9  was very close to a school, North Carolina
10  College, was that this site could be used for
11  students, graduate students, et cetera.
12      And we were going to build type of
13  housing that was beginning to be very popular
14  down there, three-story buildings. Something
15  that Seavey and I did in the last job we did
16  here, that type, which was the -- we did a job
17  here for the -- for the Harlem River Development
18  Corporation on Eighth Avenue, 138th Street.
19      Q.    Not to interrupt you, but when you
20  say "we," who is the we --
21      A.    I'm talking about Bob and I --
22      Q.    I'm talking about the one in Durham,
23  North Carolina.
24      A.    I owned the site. I brought my team

5 (Pages 14 to 17)

18

John Edmonds

1 down. Team consisted of Hal Harris, young
2 engineer by the name of Phil -- Philip Zerbrisky
3 [ph], of course, Rod Shaw and myself. And we
4 made this proposal.
5       And once again, it was one of those
6 situations in which the board consisted of the
7 presidents of the public housing authority. And
8 they had the executive director and counsel. And
9 the lawyer there was a gentleman by the name of
10 Banks, again, very involved in the politics of
11 Durham.
12       Q.    Whose lawyer was Banks? For the
13 City?
14       A.    For the City.
15       Q.    And going back a step further, you
16 had described it was yourself, Hal Harris, Philip
17 Zerbrisky and Rod Shaw. Were you the managing
18 general partner of this property as well?
19       A.    Yes.
20       Q.    What was your ownership interest?
21       A.    Probably about the same. I made the
22 same arrangement I attempted to arrange in
23 Newark, New Jersey.
24       Q.    About 68 to 75 percent?

19

John Edmonds

1       A.    Yes.
2       Q.    Did you actually end up acquiring
3 any property with respect to this partnership?
4       A.    No. What occurred was that the
5 executive director and counsel had formed a
6 not-for-profit. And that not-for-profit was to
7 be their development arm. And they were using
8 this as a way of siphoning the federal funds off
9 of the project. And what happened was that the
10 feds came in, federal -- FHA's office was in
11 Greensboro, and fired all of them.
12       Q.    When you say "all of them," you're
13 talking about the City housing --
14       A.    Yes, the --
15       Q.    -- development?
16       A.    -- the executive director, he fired
17 them -- fired the executive director and he fired
18 the deputy executive director, a female, who was
19 an architect.
20       Q.    Fired them from their job or fired
21 them off of this project?
22       A.    Fired them from their job.
23       Apparently the executive director
24 had used some of the funds to buy a diamond ring

20

John Edmonds

1 for his daughter and to go on vacations,
2 et cetera, with federal funds. And that's the
3 reason they were fired.
4       Now, when I appeared in court, I
5 indicated to the judge that I was not a member of
6 the North Carolina bar. And he asked me whether
7 I intended to request of him a special permission
8 to appear. And I told him no.
9       Q.    Was that a pro hac vice application?
10       A.    Yes, it would have been.
11       Q.    I guess I'm a little bit lost. When
12 you say you appeared in front of the judge, was
13 there a lawsuit involved?
14       A.    Yes, there was a lawsuit that I
15 brought, I think I brought this lawsuit, in order
16 that I might be able to go forward and do the
17 development in accordance with my original plan.
18       Q.    Who did you sue in this lawsuit?
19       A.    The housing authority there in
20 Durham.
21       Q.    Were there any other defendants
22 other than the housing authority?
23       A.    I think that the individuals -- the
24 executive director was I believe one of the

21

John Edmonds

1 defendants, yeah.
2       Q.    In what year was this lawsuit filed
3 in?
4       A.    It must have been in about 2000,
5 2002. I don't recall the exact time.
6       Q.    And that was in state court of North
7 Carolina?
8       A.    Yes, Durham, North Carolina.
9       MR. HAYWOODE:  Darren, note my
10 continuing objection to this entire line of
11 questioning as to its relevancy.
12       The witness may answer.
13       Q.    And what was the outcome of that
14 lawsuit?
15       A.    The City -- I mean, the court
16 dismissed my lawsuit because he said that -- the
17 judge said that the Edmonds group was an LLC and,
18 as such, was required to have local counsel to
19 represent them. And I had enough of the
20 relationships between local counsel and the --
21 and the courts in these states and so I didn't go
22 forward.
23       Q.    Had you tried to obtain local
24 counsel for that lawsuit?

6 (Pages 18 to 21)

22

John Edmonds

1
2   A.     No.
3   Q.     Are there any other real estate
4   investments that you've owned in the last ten
5   years?
6   A.     No, none.  Just this year I started
7   a negotiation with the housing authority of North
8   Charleston, South Carolina.  Again the same
9   approach.  It is a proposal to build
10  condominium-type apartments for public housing
11  residents.
12  Q.     Going back real quick to the Durham,
13  North Carolina project that you were considering,
14  had you discussed this project with Dalton
15  Management Company?
16  A.     I don't think I did, no.
17  Q.     Who are your partners in the North
18  Charleston, South Carolina matters, if anyone?
19  A.     I was going to use, obviously, Rog
20  and myself.  And I was going to bring in my CPA,
21  who's actually in Greensboro, North Carolina,
22  Rudolph Clark, to be on the spot and be able to
23  keep up with things for me.
24  Q.     Is that your personal CPA?
25  A.     Yes.

23

John Edmonds

1
2   Q.     Or a corporate CPA?
3   A.     A personal CPA.
4   Q.     Had you established a partnership or
5   LLC or any other entity with regard to this North
6   Charleston, South Carolina matters —
7   A.     No, I had not.  I realized, after
8   having a discussion with the lawyer who called me
9   from — on two or three occasions, that I might
10  be stepping into the same kind of situation that
11  I was in before.  And so I just indicated to this
12  lawyer that I didn't think that we wanted to go
13  forward.
14  Q.     Is that currently moving forward?
15  A.     No, it is not going forward now.
16  Q.     Is that it then for your real estate
17  investments in the last ten years?
18  A.     Yes.
19  Q.     Other than stocks, bonds, mutual
20  funds, secured instruments, CDs, bank accounts,
21  do you have any non-real estate investments that
22  you're involved in currently?
23  A.     The only investments that I would
24  have would have been — would be the investments
25  that are managed and controlled by Dalton

24

John Edmonds

1
2   Management Company and Bob Seavey.
3   Q.     What about in the last ten years;
4   did you have any other non-real estate
5   investments?
6   MR. HAYWOODE:  Objection to the
7   relevance.
8   The witness may answer.
9   A.     I can't think of any.
10  Q.     Were you involved with a radio
11  station?
12  A.     Oh, with — yes, with — Inner City
13  Broadcasting.
14  Q.     Inner City Broadcasting?
15  A.     Yes.  I was vice chairman and then
16  general counsel, and then I ended up suing the
17  company.
18  Q.     Did you have partners — let me ask,
19  was Inner City Broadcasting a partnership or —
20  A.     No, that's a corporation controlled
21  by Percy Sutton.
22  Q.     Was he the majority shareholder in
23  that corporation?
24  A.     Well, what Percy did was to form
25  another LLC, transferred all the assets from the

25

John Edmonds

1
2   original corporation to that LLC, and made his
3   son the chairman of the new LLC, and had — had
4   the board — basically people identified with
5   Percy in the political circle in Harlem had the
6   board to approve that.
7   And I objected to this.  And many of
8   the members on the board would tell me after
9   meetings that they agreed with me, that I was
10  right and so forth and so on; but none of them,
11  except one, the president, a young man by the
12  name of David Lantell, was willing to join me in
13  my lawsuit.
14  Q.     How many members of the board were
15  there?
16  A.     I don't recall, but there were some
17  rather prominent people there.  Hal Jackson was a
18  vice chairman and — Hal must be a hundred years
19  old today, but he still works — he has, I think,
20  a Sunday morning jazz program on BLS.
21  Q.     Would you say there's more than five
22  members on the board?
23  A.     Yes.
24  Q.     More than ten?
25  A.     I think — yes, more than ten at

7 (Pages 22 to 25)

26

John Edmonds

1
2  that time.
3          And also John Procope was on that
4  board. He's now deceased. And John was back and
5  forth. First he was going to join me and then he
6  didn't. Then he was trying to make some
7  arrangement with me, he and Carl McCall, that
8  would bring us together, that is to be able to
9  negotiate with Percy.
10         And what happened was, I realized
11 after we had several meetings that these guys
12 didn't intend to force a return of the corporate
13 assets to the corporation, but they just wanted
14 to see whether or not they could make some
15 arrangement that would satisfy me and satisfy
16 Sutton.
17     Q.     What was your ownership interest in
18 the Inner City Broadcasting?
19     A.     I would say -- I think I owned
20 somewhere between maybe -- maybe 20 percent. I
21 don't remember the interest.
22     Q.     Were you the sole plaintiff in your
23 lawsuit?
24     A.     No.
25     Q.     Who was --

27

John Edmonds

1
2      A.     I was joined by the young man who
3  was then the president, David Lantell. We ended
4  up with 18 percent of the ownership in this
5  lawsuit.
6      Q.     Combined between the two of you?
7      A.     Combined between the two of us.
8      Q.     Who are the defendants in that
9  lawsuit?
10     A.     Sutton and his son. And I may have
11 named a couple of the other members. I think
12 Dr. Watkins. It was -- he was a very well-known
13 physician, medical person here in the Harlem
14 community.
15     Q.     Was he another member of the board?
16     A.     Yes, he was.
17     Q.     Were you represented by counsel in
18 that lawsuit, or did you file that lawsuit on
19 your own?
20     A.     I was represented by counsel.
21     Q.     What was the basis of that lawsuit?
22     A.     The basis of the lawsuit was the
23 assets owned by the Inner City Broadcasting
24 Corporation had been transferred, that is all of
25 the properties, et cetera, to this newly created

28

John Edmonds

1
2  LLC that Sutton had formed, and left the -- the
3  original company a shell company.
4      Q.     Was that lawsuit filed in state
5  court or federal court?
6      A.     State court, state Supreme Court
7  here in New York County.
8      Q.     When was that lawsuit filed?
9      A.     I think that was in '95 or '96.
10     Q.     What was the outcome of that
11 lawsuit?
12     A.     We won an award from the court based
13 upon an offer made by Sutton after Pepe, his son,
14 had obviously committed perjury in his testimony.
15     Q.     When you say "his testimony," at a
16 lawsuit or in a deposition?
17     A.     At the lawsuit, during
18 cross-examination.
19     Q.     So it actually went to trial then?
20     A.     Yes, it did.
21     Q.     And when you said during an offer,
22 was it a settlement that was approved by the
23 court?
24     A.     Yes.
25     Q.     So it wasn't an actual verdict then?

29

John Edmonds

1
2      A.     No.
3      Q.     It was --
4      A.     No.
5      Q.     It was a settlement --
6      A.     Yes.
7      Q.     -- approved by the court?
8      A.     Yes, it was. What happened was that
9  the judge asked me what would be the value of
10 your interest at this time in the corporation.
11 And I told her it was probably about $6 million.
12 And she then had Sutton to go into her study, the
13 back.
14         And then when he came out, she
15 called myself and my counsel in and said, Look,
16 Mr. Sutton is willing to pay $5.9 million, and I
17 would urge you to accept it rather than continue
18 to go forward.
19         And I said, Fine.
20     Q.     Can you think of any other non-real
21 estate investments similar to the radio station
22 that you've been involved in?
23     A.     Yes, Amsterdam News. I was a
24 principal holder of the interest in the Amsterdam
25 News. We purchased it. That was Sutton, myself,

8  (Pages 26 to 29)

30

John Edmonds

1
2  John Procope, Carl McCall, Clarence Jones, Bill
3  Tatum.
4      Q.    Was the Amsterdam News a partnership
5  or an entity?
6      A.    It was a corporation.
7      Q.    And so what was your shareholder --
8  what was your stock percentage ownership of
9  Amsterdam News?
10      A.    After we got going, Percy wanted
11  out, so we bought him out.  And we ended up with
12  three owners; Edmonds, Tatum and Procope.  And I
13  would say I owned 40 percent of the company.
14  Made me the principal.  And we had a shareholders
15  agreement.
16      Q.    Were you the managing shareholder?
17      A.    I was the chairman of the
18  corporation.
19      Q.    Okay.
20      A.    This matter was tried once again in
21  the Supreme Court in New York County.
22      Q.    I hate to interrupt, but when you
23  say "this matter," was there a lawsuit that was
24  brought in connection with Amsterdam News?
25      A.    Yes, that's correct.

31

John Edmonds

1
2      Q.    Who was the plaintiff in this
3  lawsuit?
4      A.    I was.
5      Q.    Was there anyone else who was a
6  plaintiff with you?
7      A.    No.
8      Q.    And who were the defendants in that
9  lawsuit?
10      A.    It was Procope and Tatum.
11      Q.    Those were the other -- your other
12  partners?
13      A.    Two, yes.
14      Q.    Did you file the lawsuit on your own
15  behalf or did an attorney file it for you?
16      A.    I was represented by counsel.
17      Q.    Was this in state court or federal
18  court?
19      A.    State court.
20      Q.    What was the basis of your lawsuit?
21      A.    That the -- that the shareholders
22  agreement gave me the right to purchase the
23  controlling interest of the corporation.  And
24  Tatum was represented by Victor Kovner at that
25  time.  Kovner had been a partner of Ed Koch.

32

John Edmonds

1
2      And this matter was -- went before a
3  judge there, who was obviously friendly to them.
4  And he made a ruling that -- citing the Agora
5  case, if you remember that case.  He said, yes,
6  you have a right under this ruling.
7      And I think the jury went out and
8  took about five minutes to come back with an
9  award for me of the amounts of monies that Tatum
10  had been taking under the table from the company.
11      And then the judge said that the
12  issue of the control of the corporation is one of
13  law.  And I decided that, in view of the fact
14  that Mr. Tatum has been the editor and the
15  managing person there, actively every day, that
16  he should continue to own the newspaper.
17      Q.    So this lawsuit went to trial as
18  well?
19      A.    Yes.
20      Q.    Did the judge overturn the jury's
21  verdict?  Is that --
22      A.    No, he did not.  He kept the jury's
23  verdict to the extent of the award -- the money
24  award.  But he took the position that the -- that
25  the right to the controlling interest would go to

33

John Edmonds

1
2  Tatum.
3      Q.    Are there any other non-real estate
4  investments besides the radio station and
5  Amsterdam News that you can think of?
6      A.    None at the moment.
7      Q.    Are you a partner in any company
8  that has served as a vendor for any of the four
9  partnerships or buildings in issue in this
10  lawsuit?
11      A.    None that I know of.
12      Q.    Have you received any money as a
13  referral fee from any vendor which has provided
14  services to any of the partnerships or buildings
15  in this lawsuit?
16      A.    No.  I don't -- I don't deal with --
17  if the vendor is a local person from the Harlem
18  community, I try to give him as much business as
19  I possibly can in whatever situation I find
20  myself.
21      Q.    Can you give me an example of a
22  local businessman in Harlem that you've
23  recommended to work at the partnerships or at the
24  buildings?
25      A.    Hal Harris is a good example.  He

9  (Pages 30 to 33)

**34**

John Edmonds

1  lives in -- in Lakeview and he's a licensed real
2  estate broker. And he came to me on one occasion
3  and said to me that he had an assignment of a
4  lease from a hospital which was on the west side
5  of Manhattan.
6      And he says, You know, your medical
7  space here at Lakeview has been vacant for five
8  or six years, and I can produce a client for
9  this -- for this space.
10      And I said, Fine.
11      And I signed the agreement because I
12  had -- I had spoken to Bob about it and I said --
13  and Bob wanted to know what was the deal, who was
14  the client, so forth. And I said, Bob, he says
15  he can deliver. We got space that's been vacant
16  for five or six years. Let's see whether he can
17  deliver.
18      And the client he had was Mount
19  Sinai Hospital. And apparently he did deliver
20  Mount Sinai. I don't know whether he -- whether
21  he and Bob later changed the deal. Because
22  apparently, as I kind of -- looking at it, what
23  he did was to assign his contract to Seavey or to
24  Fifth and 106th Street associates.

**35**

John Edmonds

1      Q.   When you say "he" assigned it,
2  you're talking about Hal Harris?
3      A.   Yes, that's correct.
4      Q.   And Hal Harris' company is T-wall
5  [ph]; is that correct?
6      A.   He's got a couple of companies. One
7  is Win Back [ph]. One is T-wall, the one you
8  just mentioned. And then sometimes he operates
9  in his own, just as a broker.
10      Q.   And there's actually a lawsuit
11  concerning T-wall suing Fifth and 106th Street --
12      A.   Yes.
13      Q.   -- over this payment for this --
14      A.   That's correct.
15      Q.   -- contract?
16      A.   Hal made me understand that he was
17  entitled to get from Dalton Management Company, I
18  assume, because -- a hundred thousand dollars a
19  year after the first two years of this agreement.
20  He told me further that the agreement provided
21  for -- for Lakeview or Dalton to have $685,000
22  per year for the use of this space.
23      Q.   Now, you said earlier Hal Harris
24  lives at Lakeview; is that correct?

**36**

John Edmonds

1      A.   Yes.
2      Q.   Does he pay rent?
3      A.   Ask Bob Seavey here. Bob would
4  know. I wouldn't.
5      Q.   Are you --
6      A.   The last time I saw any
7  information --
8          MR. HAYWOODE: Lord knows we've sued
9  him often enough.
10      A.   Last time I saw any information, I
11  think Hal owed either 38,000 or 138,000,
12  something like that, he hasn't paid.
13      Q.   And your counsel, Mr. Haywoode, said
14  Lord knows we've sued him enough.
15          Was he referring to you sued him in
16  landlord/tenant court for --
17      A.   Yeah, I remember on one occasion he
18  asked me to come to testify in court. Hal has
19  some kind of a deal. And I had been in his
20  apartment several times. And he has this
21  business about -- he's supposed to be very
22  religious. So when you come into his apartment,
23  he wants you to take off your shoes.
24      And he records everything, every

**37**

John Edmonds

1  conversation he has of any kind. He just says,
2  I'm so busy, John, that I don't remember, so I
3  want to record what we say here.
4      And so then he came to me later,
5  after that lawsuit, in which, you know, I
6  testified that Hal -- he's got the best apartment
7  I've seen in the building. What are you talking
8  about? Four bedrooms and -- and he's running a
9  business out of there and so forth and so on.
10      And he's got a front man. I've
11  forgotten the guy's name. I don't know whether
12  he lives there or not, but I know I got some
13  recent correspondence from them in which this guy
14  uses the building entrance on Fifth Avenue -- he
15  called it Upper Manhattan something, and said
16  that his office was located in this suite,
17  Suite 2R or 3R, which suite he's talking about is
18  Hal's apartment.
19      Q.   Have you ever shared an office space
20  with Hal Harris?
21      A.   No, none that I know of.
22      Q.   Has Hal Harris ever paid you any
23  income or fee for referring business to him?
24      A.   No.

10 (Pages 34 to 37)

---

**38**

John Edmonds

1  
2    Q.    So if Hal Harris had told Mr. Seavey  
3    that he splits commissions with you, he would be  
4    lying?  
5    A.    That's correct.  
6    Q.    Are there any other local Harlem  
7    businesses that you can think of that you  
8    referred business to from the partnerships?  
9    A.    Well, at one point, I was insisting  
10    upon having minority firm -- a local minority  
11    firm in managing the properties.  And somehow  
12    they always would get some conflict with the  
13    state housing division and they would move them  
14    off of the site.  And I wondered about that, if  
15    that would happen.  
16    Q.    Are you familiar with the security  
17    company called Enterprise 9?  
18    A.    I believe that's a company that Mel  
19    owns.  
20    Q.    Are you a partner in that company?  
21    A.    No, I'm not.  
22    Q.    Have you ever received any money  
23    from Enterprise 9?  
24    A.    No, not that I know of.  
25    Q.    Did you ever represent to anyone at  

---

**39**

John Edmonds

1  
2  DHCR or HUD that Enterprise 9 was your company?  
3    A.    No.  I might have said that it was  
4  an associate of mine.  And I'm sure if anyone  
5  there asked me, that's what I said, Oh, yes, it's  
6  Mel Haywoode's company.  
7    Q.    Did you recommend Enterprise 9 to be  
8  a vendor for one of the partnerships?  
9    A.    I might have.  I don't recall.  I  
10  really don't recall.  I know that I always wanted  
11  Mel -- And Mel wanted to handle the  
12  landlord/tenant matters, so I may have  
13  recommended Enterprise 9 also.  
14    Q.    And so did you recommend  
15  Mr. Haywoode then to perform landlord/tenant work  
16  for the partnerships?  
17    A.    Yes.  
18    Q.    And you recommended that to  
19  Prestige, a former management company at the  
20  property?  
21    A.    Perhaps to Prestige.  And I know I  
22  recommended it to Bob Seavey.  
23    Q.    In fact at one point, Mr. Haywoode  
24  actually sued at least one of the partnerships,  
25  Logan Plaza, claiming RICO violations for unpaid  

---

**40**

John Edmonds

1  
2  attorneys' fees; is that correct?  
3    A.    That's correct.  
4    Q.    Were you named as a defendant in  
5  that lawsuit?  
6    A.    I don't know whether I was named as  
7  a defendant or not, but I do know that -- yes,  
8  what happened was that Seavey named me as a  
9  defendant in which he was counterclaiming against  
10  me for his failure to pay Mel the amounts due  
11  him.  
12    Q.    So Mr. Haywoode then named  
13  Mr. Seavey as one of the named defendants, but  
14  not you; and then Mr. Seavey did a third-party  
15  complaint against you as a defendant?  
16    A.    Yes.  
17    Q.    Turning to this matter --  
18    MR. TRAUB:  Mark this as Exhibit  
19  No. 1.  
20    (Defendants' Exhibit 1, 3/8/07  
21  Letter to Seavey from Edmonds, marked for  
22  identification.)  
23    Q.    Mr. Edmonds, you've been handed  
24  what's been marked as Defendants' Exhibit No. 1.  
25  Do you recognize this document?  

---

**41**

John Edmonds

1  
2    A.    Yes, it was a letter that I wrote  
3  Bob.  
4    Q.    And what's the date on the letter?  
5    A.    It's March 8, 2007.  
6    Q.    And if you can read for the record  
7  the first sentence in your letter.  
8    A.    "Rudy Clark, CPA, has forwarded to  
9  me a copy of your response dated March 2, 2007,  
10  in connection with my retention of Mr. Clark in  
11  his professional capacity to examine the books  
12  and records of Dalton Management Company, LLC,  
13  your family-owned management company.  
14    "In view of the above-cited  
15  correspondence, I am directing this  
16  correspondence to you and to Phyllis Seavey,  
17  Esq., the principal owner of Dalton Management  
18  Company; Avery Seavey, Esq., a minority owner;  
19  and Nealle Seavey, Esq., a minority owner; and  
20  Ron Dawley, the chief executive" --  
21    I said chief executive officer.  I  
22  now understand that Mr. Dawley considers himself  
23  the chief operating officer.  
24    -- "of Dalton Management Company  
25  Corporation."  

11 (Pages 38 to 41)

**VERITEXT REPORTING COMPANY**  
www.veritext.com  
(212) 279-9424               (212) 490-3430



42

John Edmonds

2 Q. Okay. And then your next sentence
3 says that you retained Mr. Clark --
4 A. "For the precise purpose of
5 examining all of the books and records of Dalton
6 Management Company as it relates to the above
7 property."
8 Q. Why did you retain Mr. Clark to
9 examine the books and records of Dalton
10 Management Company?
11 A. Rudy Clark has been my CPA for maybe
12 10, 12, 15 years. He originally was here in
13 New York City. And as a matter of fact, if my
14 recollection is clear, when we were at 5 Beekman
15 Street, we rented space to Rudy Clark and to a
16 Londell MacMillian, who was a CPA at that time.
17 I now understand that he is considered New York's
18 top litigator or something to that effect.
19 Q. I don't --
20 A. So that's the reason I sent the
21 correspondence.
22 Q. My question was, why did you retain
23 him for the purpose of examining the books and
24 records of Dalton? Was there something that
25 triggered your desire for an examination of the

43

John Edmonds

2 books and records of Dalton?
3 A. Yes.
4 Q. And what was that?
5 A. I had -- on the Logan Plaza matter,
6 I had gone to Avery Seavey, and I told him that,
7 with respect to Logan, since we were the only two
8 parties interested, that is the Seaveys and
9 Edmonds each own about 50 percent each, that I
10 thought that we should open an account at the
11 bank that I did business with, which was Valley
12 National Bank.
13 And I took Avery there to the bank,
14 to the Madison Avenue office at 40th Street,
15 that's my principal office, introduced him to the
16 officers. And the vice president in charge of
17 the office said to me, Mr. Edmonds, you go ahead
18 and sign and Mr. Seavey can get this back to us
19 as early as he can.
20 And I did and gave Avery a document.
21 And maybe three, four, five weeks
22 later, I called Avery, because I figured that he
23 was busy doing other things. And I said, Avery,
24 you haven't returned that -- that signature card
25 or document to the bank. You know, what's

44

John Edmonds

2 holding it up?
3 And he said to me that he had given
4 it to his mother.
5 And I said, Well, why would you do
6 that?
7 He says, Well, that's our way of
8 handling matters. My mother is in charge of
9 Dalton and so forth and so on.
10 And so I said, Okay.
11 And I came down to Seavey's office
12 and asked to meet with Bob. Phyllis has a habit
13 of sitting in the back. Bob's office is like a
14 horseshoe. And when you talk to Bob, she
15 generally hears everything that you say to him.
16 And when I told him that I wanted
17 this to be done, I wanted it done immediately, he
18 said to me that he would have to discuss it with
19 Phyllis. And just at that point, Phyllis came
20 forward and said to me, John, darling -- she
21 always calls me darling when she's getting ready
22 to do you in.
23 She says, John, darling, that's not
24 the way that we're going to handle this.
25 And I said, Phyllis, that's not a

45

John Edmonds

2 determination for you to make; it's a
3 determination for the managing partners of the
4 property to make. And where's Bob?
5 Bob then came out and says to me --
6 he says, John, let's not have an extended
7 discussion about this today. You -- I'll work it
8 out with Phyllis and I'll get back to you.
9 And he didn't get back to me. So I
10 called him again. And then Bob arranged a
11 meeting at a restaurant on 34th Street, a Thai
12 restaurant, as I recall, between Park and Lex, on
13 the northern side of the street.
14 And when I got to the meeting, I was
15 surprised, because I thought it was the meeting
16 between Bob and myself, that the Singer brothers
17 was there. And they -- I said, Gee, I didn't
18 know that the Singers were going to be a part of
19 this meeting.
20 They are the limited partners in the
21 Lakeview situation.
22 Q. And you understood this meeting to
23 discuss opening a bank account about Logan?
24 A. Yes.
25 The meeting was concluded. And then

12  (Pages 42 to 45)

46

John Edmonds

1 I said to Bob, Look, we need to settle this
2 business about the bank account today.
3     So he says, Well, let me talk to
4 Phyllis further and I'll give you a call.
5     I said, Fine.
6     I didn't get a call from Bob. So
7 one day I came down here and I said, Bob, I want
8 to talk to you about this. Bob said to me that
9 he was on his way to a meeting and that I could
10 discuss it with Phyllis and Avery.
11     And I undertake the discussion, and
12 Phyllis said to me, John, I've told you, this is
13 not the way it's going to be done. Dalton is
14 going to manage these accounts. And I've asked
15 you not to -- come in making this demand. And
16 as a matter of fact, I want you out of my office.
17     By the time, Bob had disappeared.
18     And I said, Well, I didn't come to
19 see you. I came to see Seavey.
20     And she said, Well, Seavey is not
21 here. He has a meeting outside the office. And
22 I order you out or else I'm going to call
23 security.
24     Q.     When you mean "Seavey," you mean Bob

47

John Edmonds

1 Seavey; is that correct?
2     A.     Yes, Bob Seavey.
3     Q.     And what time was this meeting?
4     A.     Maybe 2 o'clock in the afternoon.
5     Q.     I'm sorry, what date?  2006, 2007?
6     A.     I think this is 2007.
7     Q.     Okay.
8     A.     I think it was 2007.
9     And so I left. And when I got
10 downstairs, I told the -- the security guy
11 there -- I said, Look, when Bob comes in here,
12 you tell him that I'm not going to come down here
13 to be insulted by Phyllis and if he wants to
14 discuss anything further with me, then be in
15 touch.
16     In the meantime, I think the
17 Singers -- even earlier the Singers had brought a
18 lawsuit against Bob as it related to a parcel
19 that they own at 23rd Street -- they're the
20 limited, Bob is the general -- and 23rd -- I
21 think between First and Second Avenue.
22     And they came to me and asked me --
23 and said to me that they were going to start a
24 lawsuit against Seavey on Lakeview because they

48

John Edmonds

1 said they only own 25 percent of the parcel on
2 23rd Street and that would be difficult to
3 overturn as a minority holder, but that the
4 combination of them and myself come to somewhere
5 between 85 and 90 percent of the ownership of
6 Lakeview. And I joined with them on that
7 occasion.
8     And I think the brother said that --
9 I said, You know -- and this is going to be
10 rough -- this is going to be a tough lawsuit. I
11 said, Because Bob doesn't give up very easily.
12     And they said to me that -- Well,
13 neither do we.
14     And then I recall that, at one
15 point, Bob had been the senior counsel, I believe
16 right here in this building, for the Singers and
17 Andrew Cuomo. They had a firm.
18     Q.     And the purpose of the lawsuit that
19 the Singers brought was to force the sale of
20 Lakeview, is that correct?
21     A.     That's correct.
22     Q.     And you had joined in wanting to
23 sell the property at Lakeview?
24     A.     Yes.

49

John Edmonds

1     And then --
2     Q.     Let me back you up for one second.
3 You said that initially you wanted, with respect
4 to Logan, to transfer the Logan bank accounts to
5 Valley National Bank?
6     A.     Yes.
7     Q.     And that the Seaveys refused to
8 transfer the bank account to Valley National
9 Bank?
10     A.     That's correct.
11     Q.     Were you aware of which bank
12 account -- I'm sorry, which bank Logan currently
13 had accounts at at that time?
14     A.     Oh, yes, I remember a discussion I
15 had with Phyllis about that. The bank that we
16 had been was Chase Bank, had been the bank
17 that where all these accounts were. And I
18 approached Phyllis and I said -- she transferred
19 them to the Bank of New York.
20     And I said, Why did you transfer
21 those -- you know, we were getting good service,
22 et cetera.
23     She says, For Dalton's convenience,
24 John.

13 (Pages 46 to 49)

50

John Edmonds

2 So I said, Well, you know, I don't
3 approve of that at all and I want you to know
4 that.
5 Q. Now, you will agree that Logan has a
6 management contract with Dalton; is that correct?
7 A. That's what they tell me.
8 Q. Were you a signator to the contract?
9 A. I don't recall whether I was or not.
10 I may have been, but I don't really recall.
11 Q. Why did you want to move Logan's
12 account to Valley National Bank?
13 A. Because I wanted to begin to get in
14 a position to have more involvement with how our
15 monies were being used, either the reserves and
16 whatever else; I wanted to be able to keep up
17 with that; I wanted to know where that was, and
18 so forth and so on.
19 Q. Now, the Seaveys offered you the
20 opportunity to cosign all checks from Logan,
21 didn't they?
22 A. I have no recollection of that. The
23 only thing I generally receive from Logan and any
24 of the other developments is a monthly statement
25 that sets forth the amounts collected, the

51

John Edmonds

2 amounts -- generally speaking, they do attach the
3 checks that relate to the employees and Domestic
4 Relations Corp. checks and that kind of thing,
5 but the other checks they do not.
6 MR. TRAUB: Can I have this marked
7 Defendants' Exhibit No. 2, please.
8 (Defendants' Exhibit 2, 7/31/06
9 Letter to Edmonds from Seavey, marked for
10 identification.)
11 BY MR. TRAUB:
12 Q. Mr. Edmonds, you've just been handed
13 Defendants' Exhibit No. 2. Have you ever seen
14 this letter before?
15 A. Yes. It was sent to me by Phyllis
16 in 2006.
17 Q. Do you recall receiving this letter?
18 A. I don't recall receiving it, but I
19 acknowledge that I received it.
20 Q. If you look at the last paragraph,
21 can you read that paragraph for the record,
22 please.
23 A. "As for the taking of your money,
24 again, be advised that such a thing was never,
25 ever done. Dalton chose to change its banking

52

John Edmonds

2 relations and bank with the Bank of New York and
3 eliminate the Chase account. All monies
4 transferred to the Bank of New York was a Logan
5 Plaza Management account and its Chase account
6 ceased to exist.
7 "We suggested that you cosign all
8 Logan checks, and this would require your weekly
9 attendance at the Dalton office. You thought it
10 would be sufficient to have all checks xeroxed
11 and copies sent to you. I thought this was okay
12 and we so did and do," which is not accurate.
13 Q. Does that reflect your recollection,
14 though, that --
15 A. That this was the letter, yes.
16 Q. -- that Seaveys asked you to
17 cosign --
18 A. Yes.
19 Q. -- on the Logan checks?
20 A. Yes.
21 Q. And that you said that you didn't
22 need to come in and cosign on the checks?
23 A. I believe I may have said that,
24 Look, if you just send me copies of all the
25 checks, that would be sufficient for me.

53

John Edmonds

2 Q. So turning back your attention to
3 Defendants' Exhibit No. 1, you said you had
4 retained Mr. Clark for the precise purpose of
5 examining all of the books and records of Dalton
6 Management as it relates to the above properties.
7 Why did Mr. Clark not end up being
8 the CPA that you used for the examination?
9 A. Mr. Clark's office is now in
10 Greensboro, North Carolina, and he obviously has
11 many clients. And --
12 MR. HAYWOODE: I'm just going to
13 note my objection to the question insofar
14 as it might call for speculation.
15 The witness may respond.
16 A. He contacted either Mel or the firm
17 that's now doing the examination here in
18 Brook- -- who have an office in Brooklyn, on
19 Utica Avenue, to do the examinations and they're
20 undertaken there.
21 Q. And the reason you didn't use
22 Mr. Clark is because he was in Greensboro, North
23 Carolina?
24 A. Yes, and not -- you know, just was
25 not feasible for him to examine -- be here to

14 (Pages 50 to 53)

54

John Edmonds

1  examine and try to run his business in North
2  Carolina.
3      Q.   Prior to sending this March 8, 2007,
4  letter to Robert Seavey, had you discussed with
5  Mr. Clark retaining him to examine the books and
6  records?
7      A.   Yes, I probably did discuss it with
8  him.  And he said to me that, John, it's not
9  feasible for me because I have other clients -- a
10 lot of clients and I can't come to New York and
11 spend, you know, weeks examining books and
12 records, et cetera.
13     Q.   So if he told you that he was in
14 Greensboro, North Carolina, which you knew at
15 that time, and he told you it was not feasible
16 for him to do the examination, why did you write
17 a letter to the Seaveys telling them that
18 Mr. Clark would in fact be doing the examination?
19     A.   I think I wrote that letter because
20 he was my CPA.  And at that time, I had no other
21 involvement with any other CPA firm.  And so I
22 wrote that letter to say, Look, Rudy is my CPA
23 and I'm going to ask him to do this and so on.
24     And then I discussed it with him and
25

55

John Edmonds

1  he made it plain that it would be almost
2  impossible for him to assume that responsibility.
3      Q.   I guess I'm confused by your
4  testimony.  At the time you wrote this letter,
5  you had or had not already discussed the
6  retention of Mr. Clark with Mr. Clark?
7      A.   I believe I had discussed the
8  retention of Mr. Clark at the time that I wrote
9  the letter.  I wouldn't have written a letter
10 without -- without my having knowledge of the
11 fact that -- that I was seeking to use him for
12 that purpose.
13     Q.   Even though Mr. Clark told you he
14 was in Greensboro and it would be practically
15 impossible for him to come to New York to
16 undertake such a large examination, you still
17 wrote this letter?
18     MR. HAYWOODE:  My objection is to
19 the form, Counsel, because we don't know
20 when which of those informations [sic] was
21 provided unless you lay a foundation at the
22 time.
23     Object to the form.
24     MR. TRAUB:  I'm going to cite you
25

56

John Edmonds

1  Federal Rule 30, which is what corresponds
2  with this deposition.  And under Federal
3  Rule 30(c)(2), it states, "An objection
4  must be stated concisely, in a
5  nonargumentative and a nonsuggestive
6  manner."
7      And I'm taking issue with your
8  suggestive comments in your objection.  So
9  I'll let you do a concise and
10 nonargumentative and nonsuggestive
11 objection, but that's the basis of the
12 extent that I'm going to allow your
13 objections.
14     MR. HAYWOODE:  Counsel, you said, he
15 spoke with you, he spoke with you.  The
16 witness has testified, I spoke with him; I
17 spoke with him.  Your question suggests,
18 again, that he did the one act before
19 having spoken with him.
20     And I simply said that you should
21 lay a foundation for the sequence of these
22 conversations.  Because you're saying
23 something that is unspecified and he's
24 answering something which is entirely
25

57

John Edmonds

1  different.
2      MR. TRAUB:  I think the record
3  speaks for itself, that we actually did
4  discuss the precise sequence of
5  conversations and events, and that was the
6  determination of my prior questions.
7  BY MR. TRAUB:
8      Q.   Mr. Edmonds, if you turn to the
9  fourth paragraph down in your March 8, 2007,
10 letter, can you please read that statement.
11     A.   "This examination will be in
12 accordance with 28 U.S.C. 1331, the Racketeer
13 Influenced and Corrupt Organizations Act (RICO),
14 18 U.S.C. 1964(a), personal jurisdiction over the
15 named defendants pursuant to U.S.C. 1965."
16     Q.   Mr. Edmonds, what is your
17 understanding as to what a RICO action is?
18     MR. HAYWOODE:  Objection to the
19 relevance of his understanding.
20     The witness may answer.
21     A.   My understanding of it is that it's
22 an action brought on behalf of the plaintiff in
23 connection with alleged racketeering as it
24 relates -- in this instance, as it relates -- to a
25

15 (Pages 54 to 57)

58

John Edmonds

1  number of parcels of real property.
2
3      Q.   Do you understand actually, though,
4  what a claim under RICO is?
5      A.   I don't know whether I do or not.
6      Q.   But yet, you stated in your
7  March 8th letter that this would be in
8  accordance with RICO, is that correct?
9      A.   Yes, that's correct.
10     Q.   Did you actually look up 28 U.S.C.
11  1330 --
12     A.   I did not, no.
13     Q.   Did you look up 18 U.S.C. 1964(a) at
14  the time?
15     A.   No, I did not.  I believe that the
16  conduct of the Seaveys was such and continues to
17  be such that it fitted the pattern of a RICO
18  action.
19     Q.   You say it fit with the pattern of a
20  RICO action.  What is your understanding of what
21  a pattern of a RICO action is?
22     A.   The pattern is where there is an
23  abuse on the part of a party, in this instance,
24  Dalton, Seavey, Bob Seavey, Phyllis, and the
25  Seavey kids, as it relates to these properties

59

John Edmonds

1
2  that I named in the action.  I think that their
3  conduct is racketeer influenced.  They're looking
4  to skin the cat all for themselves and leave
5  nothing for any partner, including Edmonds.
6      Q.   When you say "abuse," please be
7  specific in what you mean by "abuse."
8      A.   Well, it's an abuse, in terms of how
9  I understand it, for a party to enter into
10  partnerships with another party and then assume
11  complete control and refuse to give accountings
12  for all of the dollars that are received and the
13  use of those dollars.
14          As a matter of fact, sir, the last
15  time I was at DHCR, the young fellow who is the
16  deputy commissioner who -- Lakeview is part of
17  his mission, told me to speak to his counsel when
18  I asked them to give me a record of all of the
19  holdings and the deposits that they cosign on
20  behalf of the partnerships.
21          When I spoke to his counsel, his
22  counsel told me that he would not permit it.  And
23  then when I was leaving the building on the
24  elevator, this young fellow said to me, I'm going
25  to have lunch with Bob tomorrow and I'll tell him

60

John Edmonds

1
2  that you were down here.
3          And I said, Fine.
4      Q.   When was the last time that you were
5  at DHCR?
6      A.   I think that was just before -- that
7  was in 2007.  2007, I think.  2007 or 2008.  I
8  don't remember.
9      Q.   And who was this quote-unquote young
10  man that you're testifying to?
11     A.   I don't know.  Fernandez -- I don't
12  know his name.  I know that he -- he apparently
13  lives in the East Harlem area, but I don't know
14  his name.  But I do know that he's a functionary
15  down there.
16     Q.   And that he had lunch with Bob?
17     A.   According to him, I don't know that
18  he had lunch with Bob.  According to him.
19     Q.   Are there any other abuses that you
20  can think of when you used the term "abuse"?
21     A.   Well, I think that when you are in a
22  business relationship with a person and you
23  attempt to -- and you go forward -- not attempt,
24  but go forward to secure complete control of the
25  relationship and dominate the placing of monies

61

John Edmonds

1
2  and determine where the monies should be sent and
3  so forth and so on, that -- that you are
4  committing a quality of abuse that fits
5  criminality.
6      Q.   You will agree with me -- strike
7  that.
8          Are you aware that each of the four
9  housing projects at issue --
10          MR. HAYWOOD:  You meant to withdraw
11  something from the record, not strike it?
12  You meant to withdraw --
13          MR. TRAUB:  I'm okay with striking
14  my comment.  Same thing.
15          MR. HAYWOODE:  Does the federal
16  rules give you the authority to strike
17  something?
18          MR. TRAUB:  It's my deposition --
19          MR. HAYWOODE:  So you're going to
20  withdraw it?
21          MR. TRAUB:  I'll withdraw the first
22  incorrect part of my sentence, if that
23  makes you happy.
24          MR. HAYWOODE:  No, I just want to be
25  sure that you're withdrawing the question.

16 (Pages 58 to 61)

62

John Edmonds

1
2    Because we don't have authority to strike
3    it.
4            MR. TRAUB:  It wasn't a question.  I
5    hadn't finished my question.
6            MR. HAYWOODE:  Okay.
7    BY MR. TRAUB:
8        Q.    Mr. Edmonds, are you aware that all
9    four of the partnership housings are controlled
10   in some part by a different federal- or
11   state-sponsored housing agency?
12       A.    Yes.
13       Q.    For instance, Lakeview is controlled
14   by DHCR; is that correct?
15       A.    DHCR on behalf of the State Urban
16   Development Corporation.
17       Q.    Do you know how Lakeview is
18   financed?
19       A.    Yeah.  I believe that it was
20   financed by the State Urban Development
21   Corporation.  And in those years -- now, this is
22   some, what, 40 years ago, I think there was a
23   provision of that -- of the law at that time that
24   permitted the funding of these affordable housing
25   developments up to 90 percent.

63

John Edmonds

1
2            And I believe that what Bob did here
3    was to go to Rubin Glick, who I think we hired at
4    that time as the -- as a principal contractor, to
5    borrow the funds, 10 percent.  And on that basis,
6    I think the project was funded.  And I believe
7    the funding was somewhere between 16 and
8    $20 million that -- at that time.
9        Q.    Do you know how Lakeview takes in
10   money on a daily, weekly or monthly basis?
11       A.    At one point, the documents that I
12   would get from Phyllis on the left-hand column
13   would list the amounts taken and deposited, the
14   dates of deposit, et cetera.  And the other
15   column would list the uses of the dollars.
16           The most recent thing that I've
17   received does not do that.  It doesn't give you
18   that information.  In other words, there's much
19   less information given by the most recent
20   statements that they've been giving.
21       Q.    Do you know which entities regulate
22   Lakeview?
23       A.    Yeah, I've said on behalf of -- on
24   behalf of the State Urban Development
25   Corporation, DHCR.  And there's another agency

64

John Edmonds

1
2    that's at 40th Street, I believe, and Third
3    Avenue -- I can't think of the name of that
4    agency -- that has a role in the -- in the
5    regulation.  And also, I believe HUD has one.
6            I remember that -- I think that this
7    lady, Deborah Van, something, Amorgin, was at
8    HUD.  And I think that basically the federal
9    government is responsible for putting these
10   monies into various states and state housing
11   agencies to be used for affordable housing
12   purposes.
13       Q.    And do you have an understanding as
14   to whether or not each of these government
15   entities have regulations or rules that govern
16   the operation of Lakeview?
17       A.    Yes, I understand that -- And I
18   understand also that at one point Seavey's
19   nephew was the deputy commissioner for downstate
20   New York with the state agency.  And I think that
21   he had a role in enunciating the policy of DHCR.
22       Q.    So you're saying that Seavey's
23   nephew may have had a role in actually --
24       A.    Not "may have had."  He did have a
25   role.

65

John Edmonds

1
2        Q.    He had a role --
3        A.    Bob arranged for his appointment for
4    that purpose through the governor then, Cuomo.
5        Q.    You're saying Bob's nephew had a
6    role in drafting the DHCR regulations?
7        A.    No, I didn't say that.  He had a
8    role in implementing them and defining them.
9        Q.    With respect to Lakeview or with
10   respect to all housing projects?
11       A.    With respect to, I would presume,
12   all housing of an affordable nature in the
13   downstate area here in New York.
14       Q.    Do you know how the management fees
15   are calculated for Lakeview?
16       A.    No, I guess Phyllis has -- has a
17   system for calculating them.  And I think she
18   told me she only -- We only -- We only -- We only
19   take what they will permit, John.  And in fact,
20   our fees are only -- management fees are only
21   2 1/2 percent.
22       Q.    Are you aware that --
23           MR. HAYWOODE:  Just a minute.  He
24   wasn't exactly finished.
25       A.    And if you look at -- you know, if

17 (Pages 62 to 65)

66

John Edmonds

2 you look at the statements that I've seen at the
3 end of the year, you'll see that some 18 or
4 20 percent, somewhere between 12 and 20 percent
5 will have gone to -- to Dalton Management for
6 management purposes. For example, Phyllis' staff
7 are all paid by the partnership, not by -- by
8 Dalton Management. They get a percentage of
9 income --
10    Q.    Mr. -- I'm going to stop you now --
11        MR. HAYWOODE:  Wait a second.
12        MR. TRAUB:  Mr. Haywoode, let me
13    finish my interruption.
14 BY MR. TRAUB:
15    Q.    I don't believe you're answering the
16 question that I have on the table.
17        MR. HAYWOODE:  Just a minute.  I
18    believe the process is to let him answer
19    and then move to strike what's not
20    relevant.
21        MR. TRAUB:  Given that I have a time
22    constraint today --
23        MR. HAYWOODE:  To interrupt the
24    witness in the middle of a question that
25    you asked him?

67

John Edmonds

2 BY MR. TRAUB:
3    Q.    Did you understand the question
4 that's before you right now?
5    A.    I thought I did.
6        MR. TRAUB:  Can the court reporter
7    read back the question.
8        (Record read.)
9        MR. HAYWOODE:  Had you finished your
10    answer?
11        THE WITNESS:  Yes.
12        MR. HAYWOODE:  You were in the midst
13    of saying something when Mr. Traub stopped
14    you.
15        THE WITNESS:  No --
16        MR. HAYWOODE:  Are you finished?
17        THE WITNESS:  -- I think I've
18    completed the answer.
19        MR. HAYWOODE:  Okay.
20 BY MR. TRAUB:
21    Q.    Are you aware, with respect to
22 Lakeview, that DHCR provides a flat rate fee for
23 management fees?
24    A.    I'm aware of the fact that they may
25 well do that, but they also provide some device

68

John Edmonds

2 where that flat rate is avoided.
3    Q.    With respect to -- withdrawn.
4        When you say there may be some
5 device for avoiding that fee, is that what you're
6 referring to when you said that some of the
7 employees of Dalton are paid directly from the
8 partnerships?
9    A.    All of them.
10    Q.    All of them are paid directly from
11 the partnerships?
12    A.    Everybody there, as far as I can
13 determine, are paid with partnership funds and
14 not the management fee of Dalton Management.
15    Q.    In your view, that's inappropriate?
16    A.    Yes.
17    Q.    And in your view, does that breach a
18 contractual obligation?
19    A.    I think it does.
20    Q.    And which contractual obligation do
21 you believe that to breach?
22    A.    The contractual obligation is that
23 the contract would require them to receive X
24 dollars for management services.  Most of the
25 companies that do this kind of business receive

69

John Edmonds

2 something like 6 percent for their fee and
3 they're responsible to pay their own employees.
4 In this instance, that does not apply.
5    Q.    And that would be -- and we'll get
6 to it a little later.
7        That would be the basis for your
8 statement in the verified complaint and in your
9 affidavit that the -- I want to be precise in my
10 quotation here of you -- that "there's no
11 provision in the management agreements between
12 defendant Dalton and the partnerships to pay the
13 salaries of defendant Dalton's employees
14 including defendant Dawley, who was paid
15 $140,000"; is that correct?
16    A.    I know of no provision in the
17 management contract that would permit the payment
18 of management -- management fees above and beyond
19 what is normal and usual in the -- in the
20 industry.  Okay.
21        And I repeat, I think for the fourth
22 time, that that is not the way in which Dalton
23 Management handles that management fees and that
24 the employees of Dalton Management are paid by
25 the partnership above and beyond any fee that

18  (Pages 66 to 69)

**70**

John Edmonds

1  Dalton Management receives.
2
3       Q.   In your view, that's incorrect, it
4  shouldn't be paid from the partnerships, it
5  should be paid by Dalton directly?
6       A.   Not in my view, but I think it's
7  rational.  Yes.  That's what should be done, yes.
8            Incidentally, is Phyllis denying
9  that this is the process?
10      Q.   I'm not here to answer your
11  questions.  Unfortunately, this is -- I'm taking
12  your deposition today.
13      A.   Okay.
14      Q.   Are there any other abuses that you
15  can think of specifically --
16      A.   I've said to you over and over
17  again, Mr. Traub, today that the system of
18  management imposed by the Seaveys in each of the
19  projects is a system that is abusive and it's a
20  system that should not be and it's a system for
21  the kind of racketeering, et cetera, that the
22  Seaveys -- that the Seaveys go forward with.
23            For instance, Phyllis has all the
24  records of all these monies everywhere, okay, and
25  my accountants are having a very difficult time

**71**

John Edmonds

1
2  getting the kind of information that would give
3  us an accurate picture of where the monies are
4  and where the reserves are and where the
5  investments are.
6       Q.   Is it your understanding that over
7  the last two days, being Wednesday and Thursday,
8  that your accountants have been at Dalton
9  Management reviewing all of the retainage
10  accounts --
11      A.   My --
12      Q.   Let me finish my question for the
13  record.
14      A.   Go ahead.
15      Q.   Thank you.
16            -- all of the investment accounts
17  and retainage accounts over the last two days?
18      A.   I don't set their schedule for them.
19  Okay.  And I don't know whether they're there or
20  not.  They set their own schedule.  So they may
21  be there, they may not be there.
22            But I do know that they have
23  informed me on more than one occasion that on the
24  occasions that they're there for the examination
25  of books and records, their examination is not

**72**

John Edmonds

1
2  unfettered, but rather that -- principally Nealle
3  sits and tells them what they can have and what
4  they can't have.
5       MR. HAYWOODE:  Indicating the
6  defendant Nealle Seavey?
7       THE WITNESS:  That's correct.
8       A.   And that does not make it feasible
9  for them to go quickly through this examination.
10      MR. TRAUB:  Can I mark this
11  Defendants' Exhibit 3, please.
12          (Defendants' Exhibit 3, 3/27/07
13  Letter to Seavey from Edmonds, marked for
14  identification.)
15      Q.   Mr. Edmonds, I've given what's been
16  marked to you as Defendants' Exhibit No. 3.  Do
17  you recognize this letter?
18      A.   Yes.
19      Q.   Is that your signature at the
20  bottom?
21      A.   Yes.
22      Q.   And can you please read the very
23  first line.
24      A.   "I have retained the accounting firm
25  of Cameron Griffiths & Pryce, CPAs, LLC, to

**73**

John Edmonds

1
2  conduct an examination of the referenced
3  properties under the management of Dalton
4  Management, LLC."
5       Q.   And so a second ago when you were
6  referring to your accounting firm, is this who
7  you were referring to, Cameron Griffiths & Pryce?
8       A.   That is correct.
9       Q.   When did you first meet Cameron
10  Griffiths & Pryce?
11      A.   Sometime after I had written --
12  sometime in 2007 or 2006.
13      Q.   Would it be between the time that
14  you wrote Defendants' Exhibit No. 1 and
15  Defendants' Exhibit No. 3?
16      A.   Yes.
17      MR. HAYWOODE:  My objection is
18  that's already in the record from the
19  previous testimony, but the witness has
20  answered again.
21  BY MR. TRAUB:
22      Q.   I'm sorry, I missed your answer,
23  Mr. Edmonds.
24      MR. HAYWOODE:  He said yes.
25      Q.   Mr. Edmonds, you said yes, between

19 (Pages 70 to 73)

74

John Edmonds

1  John Edmonds
2  the time that you wrote those two?
3     A.   Yes.
4     Q.   And how did you locate Cameron
5  Griffiths & Pryce?
6        MR. HAYWOODE:  Objection to the
7  relevance.
8        The witness may answer.
9     A.   I located them -- I believe, I might
10  have had asked Mel if he knew of any accountants
11  that did this quality -- this kind of auditing
12  work. And Mel, I think said, he did. He had in
13  mind another gentleman, and this person told Mel
14  that he was actually too busy to take on that
15  kind of an assignment, but that he was aware of a
16  group of CPAs who could undertake this
17  assignment. And he made reference to the Cameron
18  group.
19     Q.   When you say "this assignment," can
20  you tell me what the scope of the assignment is.
21     A.   The scope of the assignment is to
22  examine the books and records over -- over the
23  last ten years, going all the way back to I
24  guess 2000.
25     Q.   And at the time that you had

75

John Edmonds

1  John Edmonds
2  retained Cameron Griffiths & Pryce, were you
3  already seeking to file a RICO action against the
4  defendants?
5     A.   Yes, that was the --
6        MR. HAYWOODE:  Objection to so much
7  of that as might call for attorney-client
8  privilege of some attorney or other.
9     Q.   Well, let's go back to Defendants'
10  Exhibit No. 1, please.  If you look at the last
11  paragraph, last full paragraph, not the one that
12  says, "I should be happy to address this issue,"
13  but the one above that.  Can you please read that
14  for the record.
15     A.   Which --
16     Q.   Defendants' Exhibit No. 1, your
17  March 8, 2007, letter.
18     A.   Which paragraph?
19     Q.   The second-to-last paragraph, the
20  one that begins, "I anticipate."
21     A.   "I anticipate that you, Dalton
22  Management and the owners thereof, will be served
23  by my counsel forthwith.  Upon that service, it
24  is your view that you have -- it is your view
25  that you have been libeled.  I invite you to

76

John Edmonds

1  John Edmonds
2  respond -- if it is your view that you've been
3  libeled, I invite you to respond in the usual
4  counterclaim and say what fees you might have to
5  pay in any state court action."
6     Q.   When you say "you will be served by
7  counsel forthwith," will be served with what?
8     A.   Obviously a summons and complaint.
9     Q.   In a RICO action?
10     A.   Yes.
11     Q.   So at the time then, that you did
12  retain Cameron Griffiths & Pryce, the date -- after
13  you said you wrote this first letter, you were
14  already anticipating filing a RICO action?
15     A.   That is correct.
16     Q.   Regardless of what Cameron
17  Griffiths & Pryce found in their audit?
18        MR. HAYWOODE:  Objection.
19  Argumentative.
20     A.   I knew that their audit -- assuming
21  that the books and records would be made
22  available to them, their audit would -- would
23  come up with -- with a consistent number of just
24  abuses that Seaveys committed as managing -- as
25  managers and controllers of the property.

77

John Edmonds

1  John Edmonds
2     Q.   When you say you knew that, why did
3  you know that? What is the basis of your
4  knowledge?
5     A.   Oh, all of the -- the exchanges that
6  I had with Bob and Phyllis through -- through an
7  extended period.
8     Q.   And I guess I'm a little lost.
9  Based on your exchanges with Bob and Phyllis,
10  what did you know --
11        MR. HAYWOODE:  I'm going to object
12  to counsel being lost, but -- please, can
13  you restate the question.
14     Q.   I'm okay with my question.  You can
15  answer if you understood it.
16     A.   No, I really don't understand why
17  you continue to repeat this -- I made my position
18  very clear here. I've said to you over and over
19  again, and I repeat, the Seaveys have abused and
20  taken advantage of the other managing general
21  partner of these properties that have been
22  identified in these letters.  Okay?  And that's
23  John Edmonds.
24        And John Edmonds is now moving,
25  through counsel, to correct that.  And I intend

20  (Pages 74 to 77)

VERITEXT REPORTING COMPANY
www.veritext.com
(212) 279-9424                    (212) 490-3430

---

**78**

John Edmonds

```
1   to do whatever I have to do to correct it in
2   terms of lawsuits.  I am prepared to go to my
3   grave fighting Robert Seavey and his abuse.  He
4   and I both will go to the grave.
5        Q.    Mr. Edmonds, let me -- maybe I'll
6   rephrase the question for you.
7            I had asked you whether or not
8   depending on the outcome -- whether or not your
9   filing of a RICO action depended upon the outcome
10  of Cameron Griffiths & Pryce's audit.  And you
11  said you knew that the Cameron Griffiths & Pryce
12  audit would find irregularities.
13           And my question to you is, what
14  irregularities did you know of at that time?
15           MR. HAYWOODE:  Objection to the form
16       of the question.
17           There were letters to Pryce
18       Cameron and Griffiths --
19           MR. TRAUB:  Mr. Haywoode, your
20       objection is now going beyond what is
21       allowed for under federal rules.  Your
22       objection is noted.
23  BY MR. TRAUB:
24       Q.    You can answer the question.
```

---

**79**

John Edmonds

```
1            MR. HAYWOODE:  Just so we're clear,
2       litigation followed the CPA inquiry.  So
3       you're putting a hypothetical question.
4            MR. TRAUB:  Mr. Haywoode, again,
5       your objection goes beyond what is called
6       for under federal rules.  Your objection is
7       noted on the record.  Mr. Edmonds --
8            MR. HAYWOODE:  My objection is it's
9       hypothetical and the witness can answer the
10      question.
11       Q.   You cannot direct --
12           MR. HAYWOODE:  -- if he understands
13       it.
14       A.   I retained them because I knew that
15  these abuses existed.
16       Q.   And my question is, what abuses did
17  you know of?
18       A.   I knew of the management abuses.  I
19  just answered that several times.
20       Q.   No, you --
21       A.   Yes, I did.  I told you that I knew
22  that the abuses existed based upon the kind of
23  responses that I was getting from Seavey and from
24  Phyllis.
```

---

**80**

John Edmonds

```
1        Q.    But my question is, what
2   irregularities in accounting did you have
3   knowledge of at that time?
4        A.    I'm not an accountant.  And I would
5   not know of what irregularities.  That's the
6   reason I retained those accountants.
7        Q.    You said you knew there were
8   irregularities.
9        A.    I knew there were irregularities,
10  but the nature of the irregularities and how they
11  were being handled, I didn't know.  So that's the
12  reason I went and got the accountants.
13       Q.    Did you know of any specific
14  irregularities at that time?
15           MR. HAYWOODE:  Counsel, at this
16       point, I object.  There is an element of
17       badgering the witness.  The irregularities
18       are in the complaint.  I mean, again, I
19       don't see the purpose of asking him for a
20       restatement of what he knew before the
21       complaint.  Again, it's argumentative.
22       It's badgering the witness.
23       Q.    Mr. Edmonds, did you have any
24  specific knowledge of any irregularities before
```

---

**81**

John Edmonds

```
1   Cameron Griffiths & Pryce did their audit?
2        A.    I told you yes, I did.
3        Q.    And which --
4        A.    The specific irregularities was the
5   process by which her staff was paid.  That's one
6   specific irregularity.
7        Q.    By "she" are you referring to --
8            MR. HAYWOODE:  Indicating the
9       defendant Phyllis Seavey.
10           MR. TRAUB:  Mr. Haywoode, again,
11       this is not your deposition today, so I'd
12       ask you not to testify.
13       Q.    Are you referring to her being
14  Mrs. Seavey?
15       A.    Yes.
16       Q.    So is the way that her staff was
17  paid out of the partnerships is one of the
18  specific irregularities that you knew of?
19       A.    That's right.
20       Q.    Okay.  Have you used Cameron
21  Griffiths & Pryce on any other real estate
22  multifamily housing projects?
23       A.    No.
24       Q.    Have you used Cameron Griffiths &
```

**VERITEXT REPORTING COMPANY**

(212) 279-9424    www.veritext.com    (212) 490-3430

82

John Edmonds

1 Pryce at all before this audit?
2
3    A.    No.
4    Q.    How much were you paying Cameron
5 Griffiths & Pryce for their audit?
6        MR. HAYWOODE: Objection.
7    A.    I paid them whatever the fees are
8 that they charge.
9    Q.    And what are those fees?
10        MR. HAYWOODE: Objection.
11        We're getting into an area here of
12 confidentiality. As to how much the
13 accountants are being paid?
14        MR. TRAUB: Absolutely.
15        MR. HAYWOODE: What's the relevance
16 of that to this inquiry?
17        MR. TRAUB: Are you instructing him
18 not to answer the question?
19        MR. HAYWOODE: I have to instruct
20 him at this point not to answer that, yes.
21        MR. TRAUB: I'll give you one chance
22 to withdraw your objection, for two
23 reasons.
24        MR. HAYWOODE: Am I under threat
25 here?

83

John Edmonds

2        MR. TRAUB: No, I'm giving you a
3 chance to withdraw your objection.
4        Number 1, it's relevant if you're
5 going to use them as an expert witness on
6 accounting.
7        MR. HAYWOODE: We haven't indicated
8 their use as an expert witness.
9        MR. TRAUB: And number 2 --
10        MR. HAYWOODE: Just a minute.
11        I haven't indicated their use as an
12 expert witness. I have not even specified
13 any particular accountant as an expert
14 witness.
15        I think I've informed you, Darren,
16 that there are several accountants who may
17 be becoming interested in this matter. I
18 haven't designated anybody as an expert
19 witness.
20        MR. TRAUB: As you've also made
21 clear throughout your pleadings and your
22 depositions, that an accountant's
23 independent auditing which can be
24 influenced by payment is an issue when
25 relying on an accountant and an auditor.

84

John Edmonds

2 And so, again --
3        THE WITNESS: Bob ought to know all
4 about that because the firm who's -- who he
5 has retained through the years have blown
6 their independence a thousand times
7 already.
8        MR. TRAUB: Again --
9        MR. KELLY: Let me also add that if
10 Cameron Griffiths & Pryce are fact
11 witnesses, and that if they're being paid
12 by a party for any purpose, that should be
13 disclosed, if asked, and it's relevant that
14 way.
15        MR. HAYWOODE: A fact witness?
16        MR. TRAUB: If you're not using them
17 as an expert witness, then you're using
18 them as a fact witness.
19 BY MR. TRAUB:
20    Q.    And so again I'll ask you one more
21 time on the record, in light of all of the
22 statements, how much have you paid Cameron
23 Griffiths & Pryce?
24        MR. HAYWOODE: No determination has
25 been made as to who will testify as an

85

John Edmonds

2 expert. No designation has been made of
3 any fact witness as opposed to an expert
4 witness. They have done what they are
5 attempting to do. And from the records,
6 they haven't been terribly successful with
7 getting the information they were asked to
8 get.
9        MR. KELLY: Actually, they have
10 testified already in this case when you
11 submitted affidavits by Mr. Cameron, which
12 makes them a fact witness in this case.
13 You submitted the affidavit in connection
14 with the order to show cause. You
15 submitted the affidavit again in connection
16 with the opposition to the motion to
17 dismiss.
18        They are witnesses in this case.
19 We're entitled to find out how much they've
20 been paid by a party in this case.
21        MR. HAYWOODE: My objection to this
22 question at this point, Cameron Griffiths &
23 Pryce are going to be examined, you better
24 put that question to them.

22  (Pages 82 to 85)

86

```
1                John Edmonds
2    BY MR. TRAUB:
3        Q.    My question, Mr. Edmonds, to you is,
4    how much have you paid Cameron Griffiths & Pryce?
5    My question to Cameron Griffiths & Pryce will be
6    how much have they received.  This is your --
7        A.    My answer to that question is that
8    I'm paying them as -- as they proceed in
9    accordance with their requirements.
10       Q.    Do you know how much you have paid
11   them?
12       A.    As of this time?
13       Q.    As of this time.
14       A.    I don't.
15       Q.    Have you paid them more than a
16   hundred thousand dollars?
17       A.    Yes.
18       Q.    Have you paid them more than
19   $500,000?
20       A.    No.
21       Q.    Have you paid them more than
22   $250,000?
23       A.    No.
24       Q.    More than $200,000?
25       A.    I don't know.
```

87

```
1                John Edmonds
2        Q.    So it's more than $100,000 and less
3    than $250,000?
4        A.    Yes.
5        Q.    Do you know the specific number that
6    you've paid them?
7        A.    No, I do not.
8        Q.    When you retained Cameron
9    Griffiths & Pryce, what did you tell them the
10   scope of the project was?
11       A.    I told them, as I've outlined in
12   these letters, that it would be a RICO
13   examination and I was looking for them to examine
14   the books, records, et cetera, of Dalton and the
15   conduct of Seavey, Phyllis and Avery and Nealle,
16   over the last ten year period.
17       Q.    Did you give them any specific
18   instruction as to what they should be looking
19   for?
20       A.    No, just go through the books and
21   records.  I said to them, You go through the
22   books and records and I'm sure you're going to
23   find these abuses?
24       Q.    Did you tell them of any abuses that
25   you suspected at that time?
```

88

```
1                John Edmonds
2        A.    I've testified to that already.
3        Q.    My question was, did you tell
4    Cameron Griffiths & Pryce of any of the abuses
5    that you --
6        A.    I testified to that already.  I
7    said -- I told you that I told them that one of
8    the abuses that I was aware of was the business
9    of putting Dalton's management people on the
10   payroll of the partnerships rather than on the
11   payroll of the management company.
12       Q.    Did you tell them of any other
13   abuses that you suspected?
14       A.    No, I told them in general terms
15   that, as they went through these records, I was
16   sure that they would find a substantial number of
17   abuses.
18       Q.    What is your understanding of
19   Cameron Griffiths & Pryce's credentials with
20   respect to audits and forensic accounting of
21   government-subsidized multifamily housing
22   projects?
23            MR. HAYWOODE:  Objection to his
24   understanding.  It calls for speculation.
25            MR. TRAUB:  His understanding calls
```

89

```
1                John Edmonds
2    for speculation, Mel?
3            MR. HAYWOODE:  His understanding of
4    their --
5            MR. TRAUB:  I want to know what his
6    understanding is.  I'm not asking him to
7    speculate.  I'm asking if he --
8            MR. HAYWOODE:  His understanding of
9    what?
10           MR. TRAUB:  Can you repeat the
11   question.
12           (Record read.)
13           MR. TRAUB:  Of government-subsidized
14   multifamily housing projects.
15       A.    I've been given to understand that
16   they have substantial experience in this area.
17   As a matter of fact, I believe that the young
18   lady, Miss Pryce -- Miss Griffith owns it --
19   Miss Pryce -- Miss Griffith was an auditor -- I
20   believe an auditor for DHCR, retained -- they
21   would retain her to examine the books and records
22   of affordable housing companies.  That's what
23   I -- you know -- and that they have -- as a team,
24   they have this background experience.
25       Q.    What is the source of your
```

23 (Pages 86 to 89)

**VERITEXT REPORTING COMPANY**
**(212) 279-9424**      www.veritext.com      **(212) 490-3430**

90

John Edmonds

1          John Edmonds
2 understanding?
3     A.    The source of my understanding is
4 information that they gave me with respect to
5 their backgrounds as I discussed it.
6     Q.    Did they actually give you a
7 physical document on their backgrounds?
8     A.    No, just a -- just a discussion back
9 and forth in their offices.
10     Q.    When you were looking to retain
11 them?
12     A.    Yes.
13     Q.    Can you name any other multifamily
14 real estate properties for which they are the
15 accountants for?
16     A.    No, I cannot.
17     THE REPORTER:  Do you think we can
18 take a break?
19     MR. TRAUB:  It's 12 o'clock now.  Do
20 you want to take a one-hour lunch break at
21 this point?
22     MR. KELLY:  Let's take a five-minute
23 break.
24     MR. TRAUB:  That's perfect.
25     (Recess from the record.)

91

John Edmonds

1          John Edmonds
2     MR. TRAUB:  Can I get you to mark
3 this Defendants' Exhibit No. 4.
4     (Defendants' Exhibit 4, 12/12/07
5 Cameron, Griffiths & Pryce letter
6 attaching their report, marked for
7 identification.)
8 BY MR. TRAUB:
9     Q.    Mr. Edmonds, I've just handed you
10 what's given to you as Defendants' Exhibit
11 No. 4. Do you recognize this document?
12     A.    Yeah.
13     Q.    What is this document?
14     A.    It's a letter to me from Cameron
15 Griffiths & Pryce.
16     Q.    And did you receive this document?
17     A.    Yes.
18     Q.    And when did you receive this
19 document?
20     A.    Well, I guess at or about the -- at
21 or about the date as set forth here, 12/12/2007.
22     Q.    Did you receive any other reports or
23 summaries from Cameron Griffiths & Pryce
24 regarding their audit of the books and records of
25 the partnerships?

92

John Edmonds

1          John Edmonds
2     A.    I don't think -- other than oral
3 discussions had with Cameron Griffiths & Pryce at
4 their office, I don't think I've gotten anything
5 else.
6     One of the things that they report
7 to me at all times is that -- that the documents
8 that they asked for, they had great difficulty in
9 getting them and that not more than 40 to
10 60 percent of them had been responded to.
11     Q.    My question was, was this the last
12 written -- or the only written document that
13 you've received that constitutes --
14     A.    As long as -- yeah, I don't recall
15 receiving any other document.
16     Q.    You testified there were oral
17 discussions that you also had with Cameron
18 Griffiths & Pryce.
19     A.    Yes, I just stated that.
20     Q.    Were the oral discussions after you
21 received this document or before this document?
22     A.    After.  We've had several
23 meetings --
24     Q.    Okay.
25     A.    -- at their office.

93

John Edmonds

1          John Edmonds
2     Q.    Did your oral discussions result in
3 any modification in any way of the information
4 contained in that report?
5     A.    As far as I know, no.
6     Q.    So this report then constitutes
7 the findings of Cameron Griffiths & Pryce as of
8 today?
9     MR. HAYWOODE:  I'm going to object
10 to this question because you're suggesting
11 categories, of this witness, of something
12 that he could not possibly know.  You know,
13 Cameron & Griffith, as we speak, are
14 looking at records pursuant to our --
15     MR. TRAUB:  Mr. Haywoode, I'm going
16 to remind you once again of your
17 limitations on what you're allowed to
18 object to under Federal Rule 30.  You can
19 give a short, concise, nonargumentative and
20 nonsuggestive objection.
21     MR. HAYWOODE:  I'm going to follow
22 your example from the last deposition at
23 which you set the record straight.  And as
24 we speak, they're looking at information.
25 So the form of the question, how can we say

24  (Pages 90 to 93)

---

**94**

John Edmonds

1
2  that that's the end? They're still engaged
3  in the process.
4      MR. TRAUB: Can you please read back
5  my question.
6      (Record read.)
7  A.   The answer is no.
8  Q.   No, you've received another --
9  A.   I've said to you that I've had
10 several meetings with them as they go through the
11 auditing process at their office in which we
12 discuss what progress they've made and what
13 difficulties they're having in getting
14 information.
15 Q.   And I asked you whether or not any
16 of those discussions resulted in any modification
17 of this report and you said no; is that --
18 A.   That's correct.
19 Q.   Okay. So other than being advised
20 that they were having problems receiving certain
21 documents --
22 A.   Difficulties.
23 Q.   -- difficulties receiving certain
24 documents, have they ever shared findings with
25 you other than as contained in that report?

---

**95**

John Edmonds

1
2  A.   Orally they've informed me of what
3  those findings were to date. If you take a look
4  at this, this is only one year. This is only
5  2006 they're talking about.
6  Q.   So what else have they advised you
7  of that they found other than as contained in
8  this report?
9      MR. HAYWOODE: Just a second.
10     Let the record show that I have
11 provided to counsel all the reports and
12 documents in my possession from Cameron
13 Pryce and Griffith. They certainly go
14 beyond this.
15     MR. TRAUB: Actually, they don't,
16 Mel. It was this and it was five or six
17 letters requesting documents and items.
18 That was all --
19     MR. HAYWOODE: And the information
20 in the order to show cause, a complete set
21 of the letters that Cameron and Pryce --
22     MR. TRAUB: And again, it may be
23 you're misunderstanding; maybe it's me
24 that's misunderstanding.
25     What we've been provided with,

---

**96**

John Edmonds

1
2  including what's in the order to show
3  cause, is letters requesting documents and
4  items, an affidavit from Cameron orally
5  saying that he didn't get all the documents
6  and items that were requested in his
7  letters in this report.
8      We've not received any other
9  information that constitutes a finding or
10 conclusion so far based on their audit.
11     Are you --
12     MR. HAYWOODE: The audit -- I would
13 object to any characterization of anything
14 they've said as a finding and conclusion
15 because they haven't seen everything. They
16 say that consistently. They say, We
17 haven't been able to --
18     MR. TRAUB: My role here today and
19 your role is not to argue with each other.
20     MR. HAYWOODE: Darren, you know I
21 wouldn't do that.
22     MR. TRAUB: I know.
23     MR. HAYWOODE: I just want to say
24 the question, the form, findings and
25 conclusions, there's no conclusion here.

---

**97**

John Edmonds

1
2  BY MR. TRAUB:
3  Q.   Have they shared with you any other
4  findings other than as contained in their report
5  that's been marked as Exhibit No. 4?
6  A.   Orally, we've had discussions in
7  their office as to -- as to what progress they're
8  making in the examination of the books and
9  records?
10 Q.   Other than them telling you that
11 they are having, to use your term, "difficulties"
12 finding or obtaining documents, have they told
13 you that they have found any other issues with
14 regards to the audit and accounting?
15 A.   Yeah, they discussed those issues
16 with me orally.
17 Q.   And what were those issues that they
18 discussed with you?
19 A.   Essentially, the refusal of the
20 Seaveys to provide them with critical information
21 in order that they might complete the other years
22 going -- 2005, '4, and so forth and so on.
23 Q.   Anything else shared with you in
24 those oral discussions?
25 A.   I can't think of anything else.

25 (Pages 94 to 97)