98

John Edmonds

Q.   Did you ever -- after obtaining the report marked as Defendants' Exhibit No. 4, did you ever share that report with the Seaveys or anyone else from Dalton Management?

A.   I don't recall whether I did or not.
(Witness peruses the exhibit.)

A.   I might have spoken to Bob and said to him that -- you know, that my accountants are having a very difficult time with Phyllis and Dalton, getting information so that they can complete their audit.

Q.   Did you ever discuss with either the Seaveys or anyone else from Dalton the information contained in the report dated 12/12/2007?

A.   I think I did.

Q.   What did you discuss with them?

A.   That -- that this account reflects what their auditing approach has found thus far.

Q.   Do you recall whether or not you actually presented them with a copy of the report?

A.   I think I may have given it to Bob. I'm not sure.

99

John Edmonds

Q.   Did you ever share or discuss this report with anyone from Marks Paneth & Shron?

A.   I have no recollection of that.

Q.   Before commencing this lawsuit, did you or Cameron Griffiths & Pryce ever attempt to sit down with either -- let's start even sit down with the Seaveys to discuss the issues concerned in Defendants' Exhibit No. 4 to see if there was an explanation or if they could be fixed?

A.   I testified earlier that Phyllis threatened to have me arrested if I came to that office to -- to have any discussion about Dalton and its management of the properties.

Q.   So is then your answer to my previous question no?

A.   The answer is what I gave. So, no, I have not been back there because I don't want to suffer further insults. I'm a very sensitive guy.

Q.   Have you ever asked anyone else on your behalf to discuss this document with the Seaveys to determine whether or not --

A.   I have counsel and --

Q.   Mr. Edmonds, you have to let me

100

John Edmonds

finish my question, just for the record. I understand that you know what I'm going to ask, but my question is, before filing this lawsuit, did you ask anyone else on your behalf to sit down with the Seaveys to discuss the findings enumerated in Defendants' Exhibit No. 4?

A.   I may have discussed it with Mel. And I think the position was that, you know, you're not going to get anything positive from the Seaveys, so why bother?

Q.   What about with anyone from Dalton; did you or any agent of yours discuss this with anyone else from Dalton?

A.   When I would call, I would call on 104. And Dawley's on 103. He would generally end up with a call. And he was always -- to him it was a source of great humor. He was always laughing. Oh, John, in other words, what are you bothering us about again kind of thing.

And so --

Q.   So your answer is you didn't discuss it with anyone from --

A.   No.

Q.   How about with anyone from Marks

101

John Edmonds

Paneth & Shron; did you or anyone on your behalf try to discuss the items contained in Defendants' Exhibit No. 4 with Marks Paneth & Shron to determine if there was an explanation behind the items?

MR. HAYWOODE:  Objection to form in the sense there are a series of letters from the accountants to Marks Paneth & Shron stating questions, which are in this record.

Is your question directed to anything he might have said outside of that pattern, that sequence of communications, all of which is in the pleadings and all of which have been presented here?

MR. TRAUB:  Mr. Haywoode, again, your objection goes far beyond that is allowed in Federal Rule 30.

MR. HAYWOODE:  Counsel's question is did he or anyone on his behalf ask these questions.  And there are a series of documents from Cameron Pryce & Mitchell [sic] in the pleadings and presented to you, which raise the very question that I

102

John Edmonds

1  understand you to be asking him.
2  MR. TRAUB: Mel, your objection is
3  now suggestive, which violates Federal
4  Rule 30. So, Mel, I don't need a response
5  from you.
6  BY MR. TRAUB:
7  Q. Mr. Edmonds, did you understand my
8  question?
9  A. Repeat it, please.
10  Q. Did you or anyone on your behalf
11  ever try to discuss Defendants' Exhibit No. 4
12  with Marks Paneth & Shron?
13  A. It may be that the accountants
14  attempted to discuss it with them. But after I
15  retained them, you know, I was not going to
16  bother Jennings' office. Because there was
17  another situation in which some charming lady
18  would get on the phone and tell me that he was
19  out on in California or whatever.
20  Q. Turning to Defendants' Exhibit
21  No. 4, have you actually sat down with Cameron
22  Griffiths & Pryce and discussed all of the
23  information contained in this letter?
24  A. Well, the information contained in

103

John Edmonds

1  the letter seems to me to be restricted to 2006.
2  And if you're asking that question, the answer is
3  yes, I've had oral discussions with them, as I've
4  testified to several times this morning, at their
5  office.
6  Q. And so you understand, then, what is
7  contained in this letter?
8  A. Yes.
9  Q. If you turn to the second page of
10  their letter, the very first issue that they
11  raise is that there's an accounts payable on the
12  books and records of 181,000 as amount owing to
13  Dalton Management.
14  Do you see where I'm looking at?
15  A. Which page is this?
16  Q. It actually says page 2 at the
17  bottom, and it's Issue No. 1.
18  A. Uh-huh, yeah.
19  Q. Are you familiar with this issue?
20  A. Yes, it's the $181,000 that are fees
21  due the partners as a result of the 6 percent
22  annual fee that you are entitled to if your
23  project is running -- up and running and there
24  are no major problems, et cetera.

104

John Edmonds

1  That would mean that it would be
2  3 percent each. But Phyllis and Bob are those
3  that decided to use this as -- that amount as a
4  tax write-off, and so they keep it on the record.
5  And I think every year they write it off rather
6  than to pay -- pay me my $91,000.
7  Q. Do you have an understanding,
8  though, that if the $181,000 is paid, that you'll
9  get $90,500?
10  A. I have an understanding that I'm a
11  50 percent owner of the project and I would
12  insist upon that.
13  Q. So your issue, though, with respect
14  to Item No. 1 is --
15  A. Issue very simply is pay me my
16  $91,000.
17  Q. In other words, you want -- you're
18  not claiming that 181,000 was not paid or was
19  paid inappropriately, you're claiming that it
20  remains on the books and records, but the $90,500
21  should be paid to you?
22  A. The inappropriateness is the use of
23  a fee that belongs to me. I don't care what they
24  do with their 90 -- to benefit Dalton taxwise,

105

John Edmonds

1  Dalton writes it off every year.
2  Q. Have you made a demand for your
3  portion --
4  A. Several times.
5  Q. -- of the $181,000?
6  A. Certainly.
7  Q. Did you make it in writing?
8  A. I don't know if I made it in writing
9  or not. I made the demand several times, but one
10  occasion or so I did make it in writing.
11  Q. Who did you make the demand to?
12  A. I think I sent a letter to Bob, a
13  letter to Phyllis, a letter to Dalton Management
14  and cc'd Avery and Nealle.
15  Q. What was their response when you
16  asked for this $181,000?
17  A. I didn't ask for the $181,000.
18  Q. Or for your portion -- sorry, you're
19  right. For your half of the $181,000.
20  A. That -- the response is that the
21  partnership has not agreed and the fee will
22  remain a fee payable to Dalton until such time as
23  the partnership decides that this fee should be
24  paid.

27 (Pages 102 to 105)



**106**

John Edmonds

1
2  Q.  You were present at the deposition
3  of Ron Dawley, were you not?
4  A.  Yes.
5  Q.  Have you reviewed the transcript of
6  Mr. Dawley?
7  A.  No, I have not.
8  Q.  Do you recall Mr. Dawley's testimony
9  about this $181,000 when asked questions by your
10  counsel, Mr. Haywoode?
11  A.  No.
12  Q.  If Mr. Dawley had testified that
13  there was an agreement between the partners that
14  if this money were to be paid, that it would be
15  paid 50/50, 50 percent to you and 50 percent to
16  the Seaveys as the other partners, but that you
17  had insisted it remain on the books and records
18  records --
19  A.  If he testified to that, that's an
20  absolute lie. So I don't want anything that
21  belongs to me in the hands of the Seaveys.
22  Q.  So it's your position that this
23  money is to be paid 50/50 to the partners and not
24  remain on the books and records?
25  A.  That's correct.

**107**

John Edmonds

1
2  THE WITNESS:  Bob, do you have a
3  check for me today?
4  Q.  Turning to --
5  MR. SEAVEY:  I know where to get it
6  for you, but I'll have to beat her up.
7  MR. HAYWOODE:  It's on the way.
8  You'll lose that fight.
9  THE WITNESS:  I always do.
10 BY MR. TRAUB:
11  Q.  Mr. Edmonds, if you look actually
12  under the subheadings under -- I guess we'll call
13  it Issue No. 1 -- subheadings are observation,
14  background, recommendation and then it says,
15  "Management's response."
16  Do you see where I'm looking?  I'm
17  back --
18  MR. HAYWOODE:  Page 2.
19  MR. TRAUB:  Page 2.
20  MR. HAYWOODE:  You're on page 2,
21  Darren, and you're looking at management
22  response (indicating).
23  A.  I have page 2, "Management response
24  to [sic] not used."
25  Q.  Above the "to [sic] not used," do

**108**

John Edmonds

1
2  you see how the management response is kind of a
3  subheading under Issue No. 1?
4  A.  The recommendation?
5  Q.  Under the recommendation, see where
6  it says -- Issue No. 1, it says, "Accounts
7  payable Logan Plaza Associates," and the
8  subheading that says, "Observation" that has some
9  language, "Background" has some statements,
10  "Recommendation" has some statements, and then it
11  says "Management response."
12  Have you ever received any
13  information to fill in this management response?
14  A.  Is that the statement -- the
15  recommendation, "The management company should
16  ensure the proper accounting records are kept.
17  The auditor should verify that amounts listed in
18  the accounts payable schedule is actually due to
19  those vendors.
20  "The 181,000 attributed to Dalton
21  Management Company should be requested by the
22  appropriate account to ensure that the future
23  remittances are made to the appropriate vendor."
24  Q.  And then there's another subheading
25  right under that and it says, "Management

**109**

John Edmonds

1
2  response," and then there's nothing after that.
3  A.  That's correct.
4  Q.  Have you ever received any response
5  from management to fill in this information?
6  A.  The response that I've testified to
7  earlier, and that was that Phyllis told me
8  that -- that this amount would remain on -- on
9  the books and records of Dalton until there's --
10  there was an agreement by both partners that
11  respectfully [sic] that they should get their
12  fees.  And she said -- and Avery has not agreed.
13  Q.  Have you told Cameron Griffiths &
14  Pryce about Miss Seavey's response that you just
15  gave?
16  A.  Yes.
17  Q.  Do you have any understanding one
18  way or the other that the $181,000 was money owed
19  to a former management company?
20  A.  I have an understanding that that
21  $181,000 is the fee passed over to Dalton from
22  the former management company, which fee is a
23  part of that 6 percent that the owners are
24  entitled to get where the project is operating
25  efficiently and above and beyond any obligations.

**VERITEXT REPORTING COMPANY**
www.veritext.com

(212) 279-9424                                   (212) 490-3430

110

John Edmonds

2  Q.   Turning on to Number 3 and it says,
3  "Management fees."  You see where I'm looking --
4  A.   Yes.
5  Q.   -- kind of the bottom part of
6  page 2?
7  A.   Yeah.
8  Q.   And the issue raised in there is
9  that Dalton Management paid itself fees that are
10 called overages totaling $64,052 for the three
11 years, 2006, 2005, and 2004.
12      Do you see where I'm reading?
13 A.   Yeah.
14 Q.   Do you agree with that statement?
15 A.   I can't agree with it.  They got the
16 books and records.  How can I -- I don't know
17 what --
18 Q.   Do you have any reason to doubt your
19 auditor's statements?
20 MR. HAYWOODE:  Objection.
21 A.   No.
22 MR. HAYWOODE:  Objection.
23 A.   No, I don't have any reason to doubt
24 their statement.
25 Q.   When you go to background at the

111

John Edmonds

2  very bottom of page 2, it says, "In an attempt to
3  address the overpayments, the management company
4  set up a receivable for the 44,675, which was
5  credited to the current year's expense.  This
6  resulted in a partial reimbursement."
7  MR. HAYWOODE:  Just one second.  Are
8      you reading the entire statement?
9  BY MR. TRAUB:
10 Q.   -- "and an understatement of current
11 year management fee."
12      Do you see where I'm reading?
13 A.   Yes.
14 Q.   Have you discussed this issue with
15 Cameron Griffiths & Pryce?
16 A.   In oral discussions, yes.
17 Q.   And what did they tell you about
18 this issue?
19 A.   Just what they put here.
20 Q.   And their recommendation is that the
21 management maker an additional reimbursement of
22 approximately 69,034 for payment in excess of
23 what is permitted by the management contract, is
24 that correct?
25 A.   Yes.

112

John Edmonds

2  Q.   Have they told you any other issues
3  with regards to Issue No. 3 regarding management
4  fees of Church Homes?
5  A.   Church Homes, I thought we were
6  talking about Logan.
7  Q.   If you look at Issue No. 3, it says,
8  "Management fees for Church Home Associates."
9  A.   Okay.
10 Q.   Have they told you any other issues
11 with management fees for Church Home Associates?
12 A.   They're continuing their
13 examination.  That's all they said to me.  This
14 is what they've -- in 2000 -- in their
15 examination of the 2006 records, this is what
16 they found.  And this is -- they're continuing to
17 look at the books and records.
18 Q.   But as of today, they haven't told
19 you of any other issues that they have found thus
20 far with respect to management fees of Church
21 Home Associates?
22 A.   Orally, they have discussed with me
23 their findings as they go along.
24 Q.   Have they told you about any
25 findings that they have found with regards to

113

John Edmonds

2  management fee of Church Home Associates?
3  A.   They discuss with me the whole
4  process used by Dalton to retain these monies.
5  Q.   Mr. Edmonds, other than the process,
6  have they told you of any other monies that they
7  have found that they have issue with with regards
8  to management fee of Church Home Associates?
9  A.   This report tells me what they have
10 found thus far.
11 Q.   So the answer then is, other than
12 what's in this report, they've not told you any
13 other issues orally with regards to -- any issues
14 or with regards to management fees --
15 A.   I told you, they've discussed with
16 me --
17 Q.   Problems finding --
18 A.   -- problems and so forth and so on.
19 For instance, they have indicated to me that --
20 you know, we've asked them for these specific
21 things, and he would name a few of the items.
22      And he says, We have not been able
23 to get them, and we're continuing to attempt to
24 get those.
25 Q.   Turning to Issue No. 4, the audit

29  (Pages 110 to 113)

114

John Edmonds

1
2  fee for Church Homes, it says that the issue that
3  they've found --
4        MR. HAYWOODE: Page 3.
5        THE WITNESS: Uh-huh.
6     Q.   -- the issue that they found was
7  that $44,769 was paid for audit services of
8  Church Homes and that they believe that it
9  exceeded the contracted amount by 17,769 plus
10  2,000 accrued to be paid in a subsequent period.
11       Do you see where I'm looking at?
12    A.   Yeah.
13    Q.   Are you contesting the services
14  received by Church Home Associates or just the
15  amount that was paid?
16    A.   Well, Church Home Associates is a
17  project in which Seavey owns 25 percent, I own
18  25 percent, the limited partner owns 50 percent.
19  We purchased that mortgage in 2006, I believe,
20  for 2 million -- each party paid -- 25 percent
21  investment was $2,100,000.
22       Seavey put up that amount. I put up
23  that amount. And I know Seavey thought I
24  wouldn't have the money, but I did have it.
25    Q.   Are you sure you're not confusing

115

John Edmonds

1
2  that with Charles Hill Associates?
3     A.   The Church Home? Yes, I am
4  confusing that -- I am. I'm talking about
5  Charles Hill, yes.
6     Q.   So Charles Hill -- you do not own
7  25 percent of Church Home Associates; is that
8  correct?
9     A.   I don't think either of the managing
10  general partners do.
11    Q.   So your last testimony about the
12  25 percent and 25 percent and then the limited
13  owning the remainder, that was with regards to
14  Charles Hill and not Church Home?
15    A.   That's correct, that's correct, not
16  Church Home.
17    Q.   So my question with regard to the
18  audit fee of Church Homes, are you contesting the
19  actual audit services received or just that you
20  believe that there was a 17,769 overpayment other
21  than what was due under the contract?
22    A.   I'm contesting the process used by
23  the Seaveys to pay obligations of theirs of a
24  management company, and the business of using
25  fees that belong to the partnership to pay for

116

John Edmonds

1
2  these services.
3     Q.   And so --
4        MR. HAYWOODE: My objection, for the
5  record, the statement you just read,
6  Darren, says audit expense for 2006
7  exceeded the contracted amount of 17,769,
8  plus 2,000 accrued to be paid in a
9  subsequent period. That was the full
10  statement. You asked him about the 17,000,
11  but not the 2,000.
12       MR. TRAUB: I believe that I
13  actually read the full statement into the
14  record. And my question to him had nothing
15  to do with the payment, but it had to do
16  with are you contesting the services
17  received or are you contesting the alleged
18  overpayment of those services.
19       MR. HAYWOODE: But you said 17,769.
20  You did not add the 2,000.
21  BY MR. TRAUB:
22    Q.   Mr. Edmonds, do you understand my
23  question?
24    A.   Am I contesting --
25    Q.   With regard to the issue of audit

117

John Edmonds

1
2  fee for Church Homes Associates that's discussed
3  in Item No. 4 on page 3 of Defendants' Exhibit
4  No. 4, is the issue with regard to the audit
5  services received or is the issue with respect to
6  the alleged overpayment for these audit services?
7     A.   The issue, sir, for the 20th time,
8  is the objection I have to the Seaveys'
9  management control of these -- the dollars,
10  including Church Home, that result in issuing
11  monies paid to Dalton Management that Dalton
12  Management is not entitled to.
13    Q.   Mr. Edmonds --
14    A.   I don't care -- I don't know how
15  they used the money.
16    Q.   This will go a lot faster today,
17  meaning this deposition, if you listen to the
18  question that I'm asking and you respond to that
19  question.
20       My question has to do, not with your
21  issue with regards to your lawsuit, with regards
22  to Issue No. 4 specified in this. With regards
23  to this --
24    A.   For me, Mr. Traub, it's a report of
25  the auditors. And this report only continues to

---

**118**

John Edmonds

1   

2  reflect the quality of abuse that I'm talking

3  about. That's how I view it.

4      Q.   So your issue then is that you

5  believe --

6      A.   I've answered that, Mr. Traub. I

7  don't want you to give me an answer. You know,

8  I've answered your question.

9      Q.   With all due respect, Mr. Edmonds,

10  you have not, and I think that the record will

11  reflect that. But I'll move on.

12      MR. HAYWOODE: Object to it as

13  argumentative.

14  BY MR. TRAUB:

15      Q.   With regard to the salaries and

16  office expenses, which is the issue raised in

17  Number 5 at the bottom of page 3 --

18      Do you see that?

19      A.   Yes, what about it?

20      Q.   -- what discussions have you had

21  with Cameron Griffiths & Pryce regarding the

22  salaries and office expenses --

23      A.   Look, I've answered that a thousand

24  times. I've said to you that the discussions

25  are, in connection with that, the business of

---

**119**

John Edmonds

1   

2  Dalton placing their employees on the payroll of

3  the partnership rather than of the management

4  company.

5      Q.   Mr. Edmonds, before you filed this

6  lawsuit and you served it as a verified complaint

7  and before you filed your affidavit in support of

8  the order to show cause, did you review all of

9  the contracts with Dalton Management?

10      A.   I've said to you earlier I could not

11  review all of the contracts because they were not

12  made available to me.

13      Q.   What about all of the contracts that

14  you attached as exhibits to your affidavit, did

15  you review all of those contracts?

16      A.   I don't remember whether I did or

17  not.

18      Q.   So you didn't check to see whether

19  or not those contracts state --

20      A.   Mr. Traub --

21      Q.   Again, Mr. Edmonds --

22      A.   I -- I want to be very plain, if I

23  can again. And that is that my objection is to

24  the process followed by the Seaveys in gaining

25  control and in -- in putting excessive monies in

---

**120**

John Edmonds

1   

2  the pockets of Dalton Management Company as a

3  matter of practice.

4      Q.   And my question to you, Mr. Edmonds,

5  was, before you filed your complaint and before

6  you signed your affidavit in support of the order

7  to show cause, did you in fact review the

8  documents and contracts attached to your

9  affidavit?

10      A.   I probably did, yeah. I probably

11  would have, sure.

12      Q.   Let's just skip the formalities and

13  turn to this.

14      MR. TRAUB: Can you mark this as

15  Defendants' Exhibit No. 5.

16      (Defendants' Exhibit 5, Affidavit in

17  Support of Order to Show Cause, marked for

18  identification.)

19  BY MR. TRAUB:

20      Q.   Actually, let me take that back for

21  one second and get you a clean copy.

22      MR. TRAUB: Can we take a

23  five-minute break? Let's break for lunch

24  now. This would be a good time. It's

25  almost one o'clock.

---

**121**

John Edmonds

1   

2      MR. KELLY: Is that okay with

3  everybody?

4      MR. TRAUB: Why don't we come back

5  at two o'clock.

6      THE WITNESS: How long do you expect

7  to go today?

8      (Luncheon recess from the record.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

31 (Pages 118 to 121)

**VERITEXT REPORTING COMPANY**
**www.veritext.com**
(212) 279-9424          (212) 490-3430



122

```
1              John Edmonds
2        A F T E R N O O N  S E S S I O N
3                (1:51 p.m.)
4    JOHN EDMONDS,
5         having been previously sworn, resumed the
6         stand and testified further as follows:
7    EXAMINATION (Cont'd.)
8    BY MR. TRAUB:
9        Q.    Mr. Edmonds, before we move on,
10   Defendants' Exhibit No. 4, which is the
11   investigative report as of 12/12/2007 from
12   Cameron Griffiths & Pryce, is this the report
13   that forms the basis for your complaint with
14   respect to inaccuracies in the auditing of the
15   partnerships books and records?
16       A.    I think that it will be necessary
17   for these accountants to do the investigation
18   that I have retained them to do in order that we
19   can go forward with proof of our case.
20       Q.    But for the actual monies and
21   statements made in your complaint, other than for
22   difficulties to get documents, which you stated
23   earlier, it's Defendants' Exhibit No. 4 that
24   makes up the basis for those -- or contains all
25   Cameron Griffiths & Pryce's findings to date?
```

123

```
1              John Edmonds
2        A.    I don't know whether that's accurate
3    or not. At least as of the time when they gave
4    me this report, this was -- this was how far they
5    had been able to go.
6        Q.    And as of the time that your
7    complaint was written, this is all you had
8    received from the auditors; is that correct?
9              MR. HAYWOODE: I'm going to object
10   to the form. There are a series of letters
11   here. Counsel has seen them. They predate
12   this report. All of those came to the
13   client, obviously.
14             MR. TRAUB: Mel, Number 1, if that's
15   the case, he can answer to that extent. I
16   don't need you telling him what my question
17   means. And there's nothing inappropriate
18   about my question if there are such
19   letters.
20       Q.    So Mr. Edmonds, other than the
21   letters requesting other documents, is this the
22   statement that makes up the basis for your
23   complaint?
24       A.    I've told you earlier that --
25             MR. HAYWOODE: Objection to form.
```

124

```
1              John Edmonds
2        A.    -- that the basis for my complaint
3    is the conduct of the Seaveys and their
4    management company in connection with the
5    management of these four properties.
6        Q.    And what you stated earlier was that
7    that conduct, as you understand it, is to be that
8    they paid Dalton employees directly from the
9    partnerships?
10       A.    That's one of the -- one of the
11   basis for the complaint.
12       Q.    What are the others?
13       A.    I cannot be specific about that
14   because the accountants are continuing their
15   investigation --
16       Q.    But as of the date of the
17   complaint --
18             MR. HAYWOODE: Darren --
19             Were continuing their investigation.
20       A.    -- and I expect that they will find
21   a series of defalcations and abuses that would be
22   the basis for proceeding with respect to this
23   matter.
24       Q.    As of the date that you filed the
25   complaint, had they notified you of any
```

125

```
1              John Edmonds
2    defalcations they had found?
3        A.    I believe we retained them --
4    when --
5              THE WITNESS: After we filed the
6    complaint, isn't that correct?
7              MR. HAYWOODE: (Nods head in the
8    negative.)
9        Q.    Other than turning to your counsel,
10   let me try --
11             MR. HAYWOODE: I don't know why he's
12   looking at me, because he may not know when
13   the complaint was filed. He didn't file
14   it. Perhaps you could tell him the dates.
15             MR. TRAUB: And I will --
16             MR. HAYWOODE: We know they were
17   retained in March.
18             MR. TRAUB: The complaint was filed
19   on June 23, 2008.
20             MR. HAYWOODE: Okay.
21       A.    They had been retained prior to
22   that.
23       Q.    So at the time of June 23, 2008, had
24   they told you of any defalcations that they had
25   uncovered?
```

126

John Edmonds

1
2     A.    I've indicated to you that -- that
3  this --
4     Q.    "This," you mean Defendants' Exhibit
5  No. 4?
6     A.    Yes, this report was what they --
7  they had found for the year 2006.
8     Q.    And so that report for what they
9  found for the year 2006 formed the basis for your
10 complaint as of June 23, 2008?
11          MR. HAYWOODE:  My objection is that
12    the complaint will speak for itself.
13          The witness may answer.
14    A.    The answer is that -- that the
15 complaint was filed as a result of my decision to
16 go forward with this -- this action in view of
17 the kind of responses that I was getting from the
18 Seaveys.
19          MR. TRAUB:  Can I mark this as
20    Defendants' Exhibit No. 6.
21          (Defendants' Exhibit 6, Verified
22    Complaint, marked for identification.)
23 BY MR. TRAUB:
24    Q.    I'm also handing you what's been
25 marked as Defendants' Exhibit No. 5 and 6.

127

John Edmonds

1
2          MR. HAYWOODE:  I was wondering where
3  5 was.  Okay.  5, Darren, is --
4          MR. TRAUB:  It's marked --
5          MR. HAYWOODE:  Oh, I'm sorry.
6          MR. TRAUB:  I made a --
7          MR. HAYWOODE:  Okay.
8     Q.    Mr. Edmonds, if you turn with me
9  first to Defendants' Exhibit No. 6, and that's
10 the complaint.  And if you turn to the
11 second-to-last page in Defendants' Exhibit
12 No. 6 --
13    A.    Page numbered what?
14    Q.    It actually is unnumbered.  It comes
15 out to page 48.  You just had your hand on it.
16 It has your signature, or what appears to be your
17 signature.  The next page.  The next page.
18          MR. HAYWOODE:  The other way.
19    A.    Yeah, uh-huh.
20    Q.    Mr. Edmonds, is that in fact your
21 signature?
22    A.    Yes, it is.
23    Q.    And can you read the paragraph that
24 your signature is attesting to.
25    A.    "I, John L. Edmonds, have read the

128

John Edmonds

1
2  foregoing summons and complaint and know the
3  contents thereof and the same is true to my own
4  knowledge except as to matters therein stated to
5  be true on information and belief.  And as to
6  those matters, I believe it to be true."
7     Q.    Before you signed this verification,
8  did you read through the verified complaint?
9     A.    Yes, I did.
10    Q.    And did you agree with all of the
11 statements in the verified complaint?
12    A.    My counsel prepared the complaint.
13 I obviously agreed with them because I signed the
14 complaint.
15    Q.    If you turn with me to page 18 and
16 you look at the second paragraph in 18, the one
17 that says "Over a period of one year."
18          Do you see where I'm looking?
19    A.    Yes.
20    Q.    It says, "Over a period of one year
21 in which plaintiff's auditors attempted to review
22 the accounts for business tax year 2006, Dalton
23 was unable to supply fundamental support
24 information for the revenues or expenditures of
25 that year from the information contained in its

129

John Edmonds

1
2  general ledgers.
3          "Plaintiff's auditors found Dalton
4  Management and Marks Paneth & Shron's financial
5  records for the housing developments disclosed an
6  approximately $4 million discrepancy between
7  claimed expenses and any documented support from
8  which those figures could be verified in 2006."
9          Do you agree with that statement?
10    A.    Yes, I do.
11    Q.    And where are you getting the basis
12 for your --
13          MR. HAYWOODE:  Again, my objection
14    is, your question to him does he agree with
15    it -- this is received information.  You
16    know --
17          MR. TRAUB:  Mel, he verified this in
18    a complaint.
19          MR. HAYWOODE:  Well, to the extent
20    that that verification --
21 BY MR. TRAUB:
22    Q.    Mr. Edmonds --
23          MR. HAYWOODE:  -- is not
24    exhaustive --
25    A.    No, sir, I did not ever sign at any

33 (Pages 126 to 129)

130

John Edmonds

1
2  time a false statement for anyone --
3       MR. HAYWOODE: Knowingly.
4  A.     -- okay?
5  Q.     Thank you.
6       So what is the basis for your
7  signing a verified complaint that states that
8  your auditors disclose an approximately
9  $4 million discrepancy between the claimed
10 expenses and any document supported from which
11 these figures could be verified in 2006?
12 A.     The basis for that statement would
13 be the conferences that I had with these
14 auditors.
15 Q.     Well, now, earlier when I asked you
16 about the conferences that you had with the
17 auditors, you told me that nothing was added
18 substantively than is found in Defendants'
19 Exhibit No. 4 and that those conferences had to
20 do with their -- I'm sorry, your word was
21 "difficulty" in obtaining papers.
22      MR. HAYWOODE: Objection.
23      Not the witness' testimony as
24 characterized.
25 A.     Mr. Traub, let me tell you this --

131

John Edmonds

1
2  Q.     It's Traub with an R.
3  A.     Traub.
4  Q.     Yes.
5  A.     Mr. Traub, let me tell you this: I
6  signed this complaint. I believe it to be true
7  and that's the reason I signed it. All right?
8       Now, if you're asking me did you
9  check this, did you check that, did you do this,
10 did you look at that, did you check this, the
11 answer is no. I used what information I had and
12 signed the complaint or this affidavit as -- as
13 set forth in the complaint.
14 Q.     Did your auditors orally tell you
15 that they found $4 million of --
16 A.     I answered that question -- I've
17 answered that question for you a thousand times.
18 Q.     But my question specifically,
19 Mr. Edmonds, which has never been asked today,
20 was, did your --
21 A.     That's not true. It was asked
22 earlier. That same question was asked earlier.
23 Q.     The record will reflect what the
24 record reflects. And that's incorrect.
25      My question for you --

132

John Edmonds

1
2       MR. HAYWOODE: Darren, I recall
3  specifically giving you a document at the
4  deposition of William Jennings --
5       MR. TRAUB: Mel, your statements --
6       MR. HAYWOODE: -- which had this
7  information in it, which talked about it
8  and set up in categories the amount of
9  money.
10      MR. TRAUB: Mel --
11      MR. HAYWOODE: Now, again, that's
12 why I'm objecting to the form of these
13 questions --
14      MR. TRAUB: But, Mel --
15      MR. HAYWOODE: -- because you're
16 trying it to what he said or may have said
17 orally, but there are papers you have which
18 show it isn't so.
19      MR. TRAUB: And the papers that you
20 gave us at Bill Jennings' deposition is
21 Exhibit No. 4; is that correct?
22      MR. HAYWOODE: I have no
23 recollection as we sit here what number it
24 was, but I do remember the document as
25 vividly as if it were before me. And it

133

John Edmonds

1
2  talked about an impact risk analysis or
3  something like that, and it talked about
4  the discrepancies that you're asking him
5  about.
6       MR. TRAUB: Can I finish asking the
7  witness questions?
8       MR. HAYWOODE: My objection to the
9  form of the question. It mischaracterizes,
10 obviously, the documents that you have.
11      MR. TRAUB: Let me ask my question
12 again, Mel. I want you to listen to it
13 this time as well, because it has nothing
14 to do with documents.
15      MR. HAYWOODE: Okay. Go ahead.
16 BY MR. TRAUB:
17 Q.     My question Mr. Edmonds, is, did
18 Cameron Griffiths & Pryce orally ever tell you
19 that they found a $4 million discrepancy when
20 reviewing the partnerships' books and records in
21 2006?
22 A.     They told me as they approach an
23 analysis of the problems, it would come to
24 approximately that amount of money.
25 Q.     They did tell you that?

34  (Pages 130 to 133)

**134**

John Edmonds

1    A.   I believe they did, yes.

3    Q.   And which of the accountants told you that?

5    A.   I don't remember. I've never had a meeting with an individual accountant. I've had meetings with the team.

8    Q.   When you turn to page 47 of your verified complaint and you look at paragraph G, which comprises part of your prayer for relief in this action, you state that you were praying "for a judgment against the defendants for money damages in an amount not yet determined as such damages are increasing, but in no event less than $500. million, together with costs and attorneys' fees and such other further relief as this court deems proper."

18    A.   That's correct.

19    Q.   Now, what is --

20    A.   I base that statement --

21      MR. HAYWOODE: Had you finished your question?

23      MR. TRAUB: Yes. He was answering the question.

25      MR. HAYWOODE: Okay.

**135**

John Edmonds

2    A.   What I believe to be the value of the four projects as of that time.

4    Q.   Has the four projects -- it's your contention that the four projects have been wholly taken from you by the defendants?

7    A.   Yes.

8    Q.   I'd like you to turn with me now to your affidavit, which is Defendants' Exhibit No. 5. And I'll start off by asking you, if you look at page 27 --

12    A.   Page 24 -- yes.

13    Q.   Do you recognize that signature?

14    A.   Yes, I do.

15    Q.   Whose signature is that?

16    A.   It's my signature.

17    Q.   Did you read this entire affidavit before --

19    A.   Yes, I did.

20    Q.   Did you actually write this affidavit?

22    A.   No, I did not prepare the affidavit.

23    Q.   But you thoroughly reviewed the affidavit?

25    A.   I reviewed the affidavit.

**136**

John Edmonds

1    Q.   Did you review every sentence in the affidavit before you signed it?

4    A.   I read the affidavit. I don't know whether I reviewed every sentence, but I agreed with my allegations in that affidavit.

7    Q.   Before signing the affidavit, did you do any independent verification of the information contained in your affidavit?

10    A.   What independent verification could I do? They have all of the books and records.

12    Q.   For instance, did you read all of the contracts specified and referred to in your affidavit?

15    A.   I could not read all of them. I --

16      MR. HAYWOODE: Objection.

17      Unless counsel states a time. He may have read some of these things 20 years ago. I don't know. You're saying did he read them, what, before signing that document? Is that your question?

22      MR. TRAUB: Yes.

23      MR. HAYWOODE: Did he read it at the time?

**137**

John Edmonds

2 BY MR. TRAUB:

3    Q.   Before signing your document --

4      MR. HAYWOODE: No, "before" means at any time before --

6      MR. TRAUB: Let me --

7      MR. HAYWOODE: -- in the last 20 years.

9      MR. TRAUB: No, you have got to let me finish my statement.

11      MR. HAYWOODE: Go ahead.

12    Q.   Before signing your affidavit, did you do any independent verification of the language contained in here, such as reading an entire agreement that's referred to in your document, to determine whether or not the language contained in your affidavit is in fact reflected in that document?

19    A.   And I'll --

20      MR. HAYWOODE: Objection to form.

21      The witness can answer if he understands the question.

23    A.   I will answer in the same way that I answered earlier, and that is that I reviewed the affidavit. And on the basis of my review of the

35 (Pages 134 to 137)

138

John Edmonds

1
2    affidavit and the information that was flowing to
3    me, I believe the complaint to be accurate and,
4    on that basis, I signed it.
5        Q.    If you turn with me to page 23, and
6    specifically looking at paragraph No. 32.
7            Will you read the first sentence for
8    the record, please.
9        A.    I said, "Defendant Dalton has
10   refused to produce" --
11       Q.    No, page 23, paragraph 32.
12       A.    Paragraph 32.
13            "There's no provision in the
14   management agreements between defendant Dalton
15   and the partnerships to pay the salaries of
16   defendant Dalton's employees, including defendant
17   Dawley, who was paid $140,000 in 2006 from the
18   partnerships' rent revenues. In fact, the
19   management agreement" --
20       Q.    Let's stop, just with the first
21   sentence. And you cite to an Exhibit Q; is that
22   correct?
23       A.    Yeah.
24       Q.    Okay. Now, when you turn to -- I
25   apologize.

139

John Edmonds

1
2            Let's start this way: The
3    management agreement that you're testifying to
4    you've attached as Exhibit G. Can you turn with
5    me to Exhibit G?
6        A.    Where is it? What page?
7            MR. HAYWOODE: It's in the back
8    (indicating).
9            (Pause from the record.)
10       Q.    Exhibit G is a housing management
11   agreement dated January 3, 2000. This one is for
12   Church Home Associates.
13            (Witness peruses the exhibit.)
14       Q.    Mr. Edmonds, am I to understand from
15   your testimony earlier that you didn't fully read
16   through this housing management agreement at the
17   time that you signed the affidavit? Is that
18   correct?
19            MR. HAYWOODE: Objection. That is
20   not the witness' testimony.
21       A.    I said I read it fully, I understood
22   it, I discussed it with my counsel, and it's my
23   testimony that the allegations are correct and
24   truthful.
25       Q.    Okay. If you'll turn with me -- if

140

John Edmonds

1
2    you keep your finger there and you flip back to
3    Exhibit -- I'm sorry, page 23, paragraph 32, I
4    don't want you to lose the Exhibit G.
5        A.    Page 23?
6        Q.    Uh-huh. Again, paragraph 32.
7        A.    Yeah.
8        Q.    You reference paragraph 16I of the
9    Church Home Associates' management agreement. Do
10   you see where I'm looking?
11       A.    I said, "See Exhibit Q," according
12   to --
13       Q.    No, keep going.
14       A.    Records and reports.
15       Q.    You say, "In fact, the management
16   agreements between defendant Dalton and the
17   partnerships provide," then it has "records and
18   reports," and then you cite to --
19       A.    "Including but not limited to the
20   cost of office supplies and" -- "will be borne by
21   the agent out of his own funds and will not be
22   treated as project expenses."
23       Q.    So you're referring to paragraph 16I
24   of Exhibit G; is that correct?
25       A.    Yes.

141

John Edmonds

1
2        Q.    Now, can you read the very first
3    clause of Exhibit I, how it begins, please.
4        A.    Begins what, records and reports?
5        Q.    Where it says, "Except" --
6        A.    "Except as otherwise provided in
7    this agreement."
8        Q.    Let me ask you a question.
9            Before you signed your affidavit,
10   did you look to determine if there was any other
11   language in this agreement that related to
12   payment of salaries of defendant Dalton's
13   employees?
14       A.    I went through this agreement -- I
15   believe it to be true. And I used the
16   information and the information that I was
17   receiving from the accountants.
18       Q.    Okay. If you can now turn back to
19   Exhibit --
20       A.    No -- we're not going to get
21   anywhere with this -- this case is not going to
22   turn on the basis of whether I remembered line 2
23   of page 3. It's not going to turn on that basis.
24       Q.    Mr. Edmonds, do me a favor --
25            MR. HAYWOODE: Unfortunately there

36  (Pages 138 to 141)

---

**142**

John Edmonds

are other judges -- I forgot what I was going to say.

MR. TRAUB: There's no question pending, so there's no objection for you to be making right now.

MR. HAYWOODE: My objection to your last question, because you're referring to another section of the contract and asking him if he read the other section of the contract.

And my objection is, there's no foundation that whatever other section you're referring to says something different from what he's reading there.

MR. TRAUB: Mel, this is --

MR. HAYWOODE: Lay the foundation and then he can answer the question.

MR. TRAUB: Mel, when you read the transcript, you'll see I didn't ask him if he read a specific section. I asked him if he read through any agreement to make sure that no other section --

MR. HAYWOODE: So you're saying any other agreement anywhere?

**143**

John Edmonds

MR. TRAUB: My question was, did he read through this agreement -- it says, "Except as otherwise provided in this agreement."

My question was, did he read through that agreement to make sure there was no other section that related to his statements in paragraph 32.

MR. HAYWOODE: And his answer --

MR. TRAUB: And his --

MR. HAYWOODE: -- was, I went through it.

MR. TRAUB: His answer was, I went through it, correct.

BY MR. TRAUB:

Q. Now, I'm asking you, please, to turn back to Exhibit G.

A. What page is Exhibit G?

Q. It's one where you should be holding your finger on.

THE WITNESS: Is this G?

MR. HAYWOODE: Yes.

Q. And specifically if you'll turn with me to page 5 of Exhibit G.

**144**

John Edmonds

MR. HAYWOODE: Is there any particular spot, Darren, on page 5 that you want him to look at?

MR. TRAUB: Let's look at 13B.

A. Page 5, 13D?

Q. B as in boy.

A. B?

Q. Uh-huh.

A. It begins by reading, "The owner will reimburse the agent for compensation including fringe benefits payable to frontline management employees, such as a project manager, clerical and bookkeeping personnel and the maintenance employees, resident superintendents, and the social services director, where applicable, and for all security taxes, employment insurance and Workmen's Compensation insurance."

Q. I think you skipped a part. It says, "All local, state and federal taxes and assessments."

MR. HAYWOODE: I don't -- well --

A. And for all local, state and federal taxes and assessments, yes.

**145**

John Edmonds

Q. And then it continues. You can continue, please.

A. "Such reimbursements will be paid out of the rental agency's account and will be treated as project expenses. For this purpose, the rental value of any dwelling unit furnished, rent-free, to the resident superintendent will not be considered a part of his compensation, but will be treated as a project expense."

Q. And Mr. Edmonds, had you read this paragraph before you signed --

A. Yes, I did.

Q. -- the affidavit --

A. Yes, I did. I'll repeat. I read all of the paragraphs. I read with the assertions I've made here.

Q. Paragraph 13B, though, specifically states that "The owner," which is the project owner, in this case I believe it's Church Homes because that's this management agreement, "will pay out of their rental agency account for compensation" --

A. That was an agreement --

Q. Hold on, Mr. Edmonds. Let me finish

37 (Pages 142 to 145)

146

John Edmonds

1
2  my statement.  You're interrupting.
3        -- "for compensation payable to
4  frontline management employees."
5        That seems to state that the owner
6  will pay for, directly out of his rental agency
7  account, the salary of Dalton's employees, does
8  it not?
9        MR. HAYWOODE:  Objection.
10        There's no foundation in what you
11  just read for the question that you just
12  put.
13  BY MR. TRAUB:
14     Q.    Mr. Edmonds, does it not?
15     A.    Yes.  And that's what this
16  citation reflects for me and the reason it's
17  cited here is the quality of abuse that the
18  Seaveys have have done in this case.  If they
19  made the arrangement to do this, then that
20  arrangement must have been made with his nephew.
21     Q.    Okay.  If you'll turn with me --
22        MR. HAYWOODE:  For the record,
23  Darren, are you saying that 13B says
24  something different from the first
25  paragraph?

147

John Edmonds

1
2        MR. TRAUB:  Mel, I'm not
3  responding -- again, I'm not here for a
4  deposition.  And there's no question
5  pending on the table, Mel.
6        MR. HAYWOODE:  Well, the question
7  presupposes that there's some difference --
8        MR. TRAUB:  Mel.
9        MR. HAYWOODE:  -- between the two
10  paragraphs.
11        MR. TRAUB:  What you're doing right
12  now is inappropriate.
13        MR. HAYWOODE:  Note my objection to
14  form.
15        MR. TRAUB:  The question was asked
16  and it was answered.  There was no question
17  pending for you to object to.  Once again,
18  Mel, your objection is inappropriate under
19  the federal rules, and I need you to please
20  conduct yourself in accordance with those.
21        MR. HAYWOODE:  Again, my objection
22  for the record is as to form.
23        MR. TRAUB:  That's it.
24        MR. HAYWOODE:  The question
25  presupposes a different between the two --

148

John Edmonds

1
2        MR. TRAUB:  No, you're entitled to
3  make objection to form, period.  You're not
4  entitled to make an argument or a
5  suggestion.  And if you continue doing
6  this, Mel, if you continue acting like
7  this, we're going to have to involve the
8  court.  Because this is not appropriate
9  under the federal rules.
10        MR. HAYWOODE:  Once again, I made no
11  argument for the record.  I made no legal
12  argument.  I simply pointed out where the
13  form objection lies; that's it.
14        MR. TRAUB:  I'll cite you one more
15  time, "An objection must be stated
16  concisely, in a nonargumentative and
17  nonsuggestive manner."
18        There's nothing in there about legal
19  or anything.  Your objection is both
20  argumentative and suggestive and,
21  therefore, opposite to what is provided in
22  the federal rules.
23        So I don't need a response from you.
24  There's no question pending to Mr. Edmonds,
25  and that's my who my questions are going to

149

John Edmonds

1
2  today.
3  BY MR. TRAUB:
4     Q.    Mr. Edmonds, if you'll turn with me
5  to paragraph 2 -- I'm sorry, page 2, paragraph 3
6  of your affidavit, which is Exhibit No. 5.
7        Do you see where I'm looking?
8     A.    Yes.
9     Q.    You state that "Since May 16, 2007,
10  more than one year ago, defendant Dalton and the
11  other defendants named herein have repeatedly,
12  persistently and without explanation or cause
13  refused to produce to plaintiff and his auditors
14  the financial records in their possession in
15  connection with defendant Dalton's management and
16  operation of the partnerships' housing
17  developments named herein in which plaintiff is a
18  managing general partner and has substantial
19  financial interest and ownership in these
20  properties."
21        Do you see where I'm reading?
22     A.    Yes.
23     Q.    Isn't it true, though, that your
24  auditors were at defendant Dalton for almost six
25  months obtaining and reviewing records and

38  (Pages 146 to 149)

150

```
1           John Edmonds
2  documents?
3        MR. HAYWOODE:  Objection to the form
4  as to what is meant by at the auditors for
5  almost six months.
6        MR. TRAUB:  At Dalton.
7        MR. HAYWOODE:  At them for six
8  months?  Did they reside with them?  I
9  mean, I don't know.
10       MR. TRAUB:  Mel, your objection --
11       MR. HAYWOODE:  That's my objection
12  as to form.
13       MR. TRAUB:  Thank you.
14       MR. HAYWOODE:  What does that
15  question mean?
16       MR. TRAUB:  You're entitled to say
17  objection to form; that's it.
18    A.    I answered that question before for
19  you, too, and I'll answer it again.
20        I said that the auditors reported to
21  me orally that they were having a very, very
22  difficult time getting books and records that
23  they require to do their audit from Dalton
24  Management, and that Dalton Management had a
25  setup that impeded or blocked that information.
```

151

```
1           John Edmonds
2        And that setup was that Nealle would
3  sit there at the table.  And when they would ask
4  for A, B or C, she would indicate whether it was
5  available or not.  And if it were not available,
6  and they insisted upon it, she would then turn to
7  her mother, Phyllis, and Phyllis would then make
8  a decision.  And that decision was that, Look,
9  this is all you're going to get from us.
10    Q.    But you'll agree that they did get
11  something, didn't they?
12       MR. HAYWOODE:  Objection.
13    A.    Yeah, I guess they got something
14  because they, for one year, for 2006.
15    Q.    They certainly made enough -- got
16  enough books and documents to write their report
17  that's Defendants' Exhibit No. 4; is that
18  correct?
19    A.    A report that reflects that
20  experience for the year of 2006, examination of
21  the records for the year of 2006.
22        Are you suggesting, sir --
23       MR. TRAUB:  Let's mark this as
24  Defendants' Exhibit No. 7, please.
25
```

152

```
1           John Edmonds
2        (Defendants' Exhibit 7, 6/22/07
3  Letter to variety of people from John
4  Edmonds with attachments, marked for
5  identification.)
6  BY MR. TRAUB:
7    Q.    Mr. Edmonds, do you recognize
8  Defendants' Exhibit No. 7?
9    A.    Yes, I do.
10    Q.    Is this a letter that you sent on
11  June 22, 2007?
12    A.    That's correct.
13    Q.    Will you please read the last
14  paragraph on the first page.
15    A.    "I have been informed by my
16  accountants, who I have directed to examine the
17  books and records of all of the developments that
18  Edmonds and Seavey or the Seavey organization
19  have an interest in, that every effort to
20  frustrate the examination of the books and
21  records are being made.
22        "Books and records not available due
23  to vacation of an employee and/or books and
24  records available only at the site on Saturday.
25  This will not deter my efforts herewith."
```

153

```
1           John Edmonds
2    Q.    And then you continue and you
3  threaten -- you state -- I apologize.  You state
4  that the examination is necessary to support the
5  RICO lawsuit which you're proposing to file; is
6  that correct?
7    A.    That's correct.
8    Q.    And in fact you threaten that you
9  will -- if you don't get the documents -- that you
10  will call the office of the U.S. Attorney to
11  request that their office direct the IRS to
12  conduct an investigation; is that correct?
13    A.    That's correct.
14       MR. HAYWOODE:  I'm sorry.  May I
15  interrupt you for just a moment?  You had
16  graciously said that we might do the
17  deposition here Monday, rather than at the
18  court?
19       MR. TRAUB:  Yes.
20       MR. HAYWOODE:  So that perhaps we'll
21  do it that way for the benefit of the
22  witnesses so they don't wind up going --
23       MR. TRAUB:  Okay.
24       MR. HAYWOODE:  Please go ahead.
25       MR. TRAUB:  Remind me at the end so
```

39  (Pages 150 to 153)

154

John Edmonds

1  we can book an appropriate conference room.
2      A.   Yes, I made that statement because I
3  knew that -- that the Internal Revenue Service
4  previously investigated Seaveys' tax filings.
5      Q.   Do you know what the outcome of that
6  investigation was?
7      A.   Yeah, they -- they noticed Seavey
8  that they would not proceed, but that he would be
9  required to notice everyone with an interest in
10 the partnership that -- that they had looked at
11 his books and records.
12          So for me, it would have meant that
13 maybe his accountants were smart enough or
14 experienced enough or had enough influence in the
15 IRS to permit Seavey to escape.
16     Q.   So you think that the Seaveys'
17 accountants had some influence over the IRS that
18 allowed them to escape?
19     A.   Well, yeah, I think, obviously, the
20 accountants or Seavey had that quality of
21 influence.
22     Q.   Okay.
23          MR. HAYWOODE:  Once again, Darren --
24          MR. TRAUB:  Could you mark this as
25

155

John Edmonds

1  Exhibit 8.
2          MR. HAYWOODE:  Your phone number.
3          MR. TRAUB:  (212) 592-1578.
4          (Defendants' Exhibit 8, 10/26/06
5  Letter from the IRS to Jennings with
6  attachment, marked for identification.)
7          MR. TRAUB:  This will be Exhibit 8.
8          MR. HAYWOODE:  This is 8.
9  BY MR. TRAUB:
10     Q.   Mr. Edmonds, I've given you what's
11 marked as Defendants' Exhibit No. 8.  Have you
12 seen this document before?
13     A.   I don't remember seeing it, no.
14     Q.   This document at least purports to
15 be a letter dated October 26, 2006, from the IRS.
16 Do you see that?  And the very first line says,
17 "I've completed the examination of your return
18 for the year shown above" -- and the tax year
19 shown above is December 31, 2003 -- "and I am
20 pleased to inform you I'm proposing no change to
21 your tax return."
22          And so is it your testimony that you
23 believe that this letter was obtained by
24 influence?

156

John Edmonds

1      A.   First of all, it doesn't -- it
2  doesn't mention Seavey at all, this letter
3  doesn't.
4      Q.   If you look at the re line, it's
5  Fifth and 106th Associates, is it not?
6      A.   Yes.
7      Q.   So is it your testimony about the
8  IRS -- it was your understanding that the IRS did
9  an audit, but -- so is it your testimony then
10 that it's this letter that was procured by the
11 influence of Marks Paneth & Shron over the IRS?
12     A.   Yeah, I believe so, yes.  I believe
13 that -- that Marks Paneth & Shron have that kind
14 of relationship.  They're a firm that's, what, 40
15 or 50 years old, and they deal with the Internal
16 Revenue Services all the time.  And you know,
17 they -- you identify, you know, who you can deal
18 with.
19     Q.   And going back --
20     A.   But I mean, the issue is whether or
21 not they required Seavey to give notice to all of
22 the interested parties in the partnerships.  You
23 have that letter?
24     Q.   Give notice of what, Mr. Edmonds?

157

John Edmonds

1      A.   Notice of the fact that his -- that
2  the 2003 return for Fifth and 106th Street
3  Associates had been -- had been reviewed by the
4  IRS and a decision had been made to accept the
5  return.
6      Q.   So is it --
7      A.   Accept the return, but that Seavey
8  would be required -- and that's what he said in
9  his letter -- be required to notice all of the
10 parties interested in the partnerships of that
11 fact.
12     Q.   Where in Defendants' Exhibit No. 8
13 does it state that the IRS is compelling
14 Mr. Seavey to give notice?
15     A.   It does not -- it does not in any
16 way state -- make that statement; but I do know
17 that Seavey sent a letter and said in his letter
18 that the government -- in response to the IRS
19 review of the -- of the return for Fifth and
20 106th Street Associates requires that I notice
21 you of the fact that the return had been
22 investigated.
23     Q.   So you did in fact then get notice
24 that the return had been investigated?

40 (Pages 154 to 157)

158

John Edmonds

1
2    A.    Yeah, from Seavey.
3    Q.    Okay.  Going back --
4    A.    You --
5    Q.    Going back --
6    A.    Do you agree with that, that Seavey
7    sent such a notice out?
8    Q.    Mr. Edmonds, going back to
9    Defendants' Exhibit No. 7 --
10    A.    Go ahead.
11    Q.    The great part, Mr. Edmonds, about
12    you being the plaintiff and me being the attorney
13    is that I get to take the --
14    A.    You're back to --
15    Q.    Back to Defendants' Exhibit No. 7.
16    And looking again at the bottom paragraph, you
17    state that "Edmonds and Seavey, or the Seavey
18    organization" -- they're frustrating your
19    auditors' examination because of vacation and the
20    employee and books and records available only at
21    the site on Saturday; is that correct?
22    A.    That's what I was told.
23    Q.    Did you ever inform the Seaveys in
24    writing that Nealle and Phyllis Seavey were not
25    providing all of the documents to your

159

John Edmonds

1
2    accountants?
3    A.    I believe I did.  It may have been
4    an oral notification, but I think I probably sent
5    them a letter.
6    Q.    Okay.
7    A.    This had to do with -- this letter
8    had to do with the alleged interest of Abe
9    Mordowitz, a lawyer, in his effort to purchase
10    the property of Fifth and 106th Street, at
11    106th and Fifth Avenue.
12        We went to a closing.  Bob was at
13    the closing.  We were going through the
14    contract -- and in fact, the contract might have
15    been signed.  I think we did sign some
16    documents -- and then Bob's son-in-law, who was
17    there representing the Seaveys, said, "Let's
18    review this again," et cetera.
19        And at this point, Seavey then got
20    up and said that he had to leave because he had
21    not eaten and that his diabetes was beginning to
22    bother him and he felt very faint.  So he left.
23        Subsequent to that, I got a series
24    of calls from Abe Mordowitz, who said to me that
25    he had deposited with Seavey $3.8 million and

160

John Edmonds

1
2    that he could bring a lawsuit to force the sale.
3        And I said, Well, you know, that's
4    up to you.
5        Then subsequent to that, on an
6    occasion that I was down in Florida, I got about
7    ten calls from Abe Mordowitz indicating that he
8    was going to proceed in this lawsuit.  He never
9    did.
10        And my conclusion was that Abe
11    Mordowitz was never a legitimate purchaser, but a
12    front man for Bob Seavey in connection with the
13    ownership of that property.
14        I want to repeat for you that that
15    property is the most valuable piece of property
16    of the partnerships; that I had been told that
17    the property could add an additional 100 units on
18    the Fifth Avenue side because it was underzoned
19    when built.
20        MR. TRAUB:  I'm going to move to
21    strike all of that as nonresponsive to my
22    question.
23    BY MR. TRAUB:
24    Q.    Mr. Edmonds, if you turn back with
25    me to Defendants' Exhibit No. 5, page 3, turn

161

John Edmonds

1
2    with me to Paragraph No. 5.
3    A.    Paragraph Number 5 in what?
4    Q.    Defendants' Exhibit No. 5, your
5    affidavit.
6    A.    Where?
7    Q.    Right in the middle of that
8    paragraph, there's a sentence that begins,
9    "However, their attempt to audit the 2006
10    financial records of defendant Dalton."
11        MR. HAYWOODE:  I'm sorry, Darren.
12    Where is this?
13        MR. TRAUB:  Page 3, paragraph 5.
14        THE WITNESS:  He keeps going back to
15    that same --
16        MR. HAYWOODE:  Must be a pony in
17    there somewhere.
18    Q.    You could probably rest assured that
19    you can keep that on your knee for quite some
20    time.  We're going to go through every paragraph
21    on this page -- on this document.
22        You have in there, "However, in the
23    attempt to audit the 2006 financial records of
24    defendant Dalton, plaintiff's auditors" --
25        MR. HAYWOODE:  Paragraph 5?

41  (Pages 158 to 161)

162

John Edmonds

1
2       MR. TRAUB: Paragraph 5.
3       THE WITNESS: Yes.
4       MR. KELLY: Slow down.
5       MR. HAYWOODE: Of the what?
6       MR. TRAUB: Do you see where it says
7   "However"?
8       THE WITNESS: Yeah, here.
9       MR. HAYWOODE: You see it?
10      THE WITNESS: Yes.
11  BY MR. TRAUB:
12      Q.    "However, in their attempts to audit
13  the 2006 financial records of defendant Dalton,
14  plaintiff's auditors found no records to support
15  approximately $7,500,000 of expenses in its
16  general ledgers for its management and operation
17  fee of the partnership housing development."
18          Mr. Edmonds, what is the basis for
19  your $7,500,000 figure?
20      A.    The basis would be the reports and
21  the oral interviews that I had with -- with the
22  accountants.
23      Q.    Again, earlier today, I asked you
24  was there anything in one of the oral interviews
25  you had with the accountants that changed or

163

John Edmonds

1
2   modified or somehow amended the investigation
3   report that we've discussed earlier and that's
4   been marked as Defendants' Exhibit No. 4, and you
5   told me no.
6       A.    I repeat, then.
7       Q.    Where in Defendants' Exhibit No. 4,
8   which is the 12/12/2007 investigation report, do
9   you find the basis to support a $7,500,000
10  figure?
11      A.    The basis to support that allegation
12  is in the first sentence, "Defendants Dalton and
13  Marks Paneth & Shron's refusal to provide
14  plaintiff's auditors with the financial records
15  of the partnership housing developments have
16  caused them to be unable to complete an audit for
17  even one year of the ten years that defendant
18  Dalton has been managing and operating housing
19  developments. See Exhibit A.
20          "However, in their" --
21      Q.    That's not --
22      A.    What's that?
23      Q.    That's not what you state here.
24  What you state here is "In their attempt to
25  audit, they found no records to support

164

John Edmonds

1
2   $7,500,000 of expenses in general ledgers."
3           The question is --
4       A.    That's right.
5       Q.     -- where are you getting the
6   $7,500,000 number?
7       A.    I'll repeat, the accountants -- the
8   accountants, in oral discussions in their office,
9   gave me that information.
10      Q.    Okay.
11          MR. HAYWOODE: Let the record also
12  show documents were produced showing that
13  analysis by the accountants. I think the
14  record showed more from different analyses
15  at different dates.
16          MR. TRAUB: Mel, again, your
17  testimony is not what we're here for today.
18          MR. HAYWOODE: I'm pointing to the
19  record that you have documents in your
20  possession which would substantiate --
21          MR. TRAUB: Mel, this is my
22  deposition --
23          MR. HAYWOODE: -- what you're
24  asking.
25          MR. TRAUB: -- transcript and you

165

John Edmonds

1
2   are not entitled to make notes on it, nor
3   are you entitled to testify on it.
4           MR. HAYWOODE: The documents will
5   speak for themselves.
6   BY MR. TRAUB:
7       Q.    Mr. Edmonds, you cite for this
8   paragraph Exhibit E.
9       A.    Yeah. Where is that?
10      Q.    It's attached to your affidavit as
11  Exhibit E.
12      A.    Yes, it's Exhibit E.
13      Q.    Do you see that?
14      A.    Yeah.
15      Q.    What is Exhibit E?
16      A.    It's the -- it says, "Combined
17  financial summary for the period ended
18  December 2006."
19      Q.    Do you know who provided this
20  combined financial summary to you?
21      A.    The auditors.
22      Q.    Do you know who prepared this
23  combined financial --
24      A.    No, I do not.
25      Q.    If you turn to paragraph 6, you

42  (Pages 162 to 165)

166

John Edmonds

1    state that "The defendants are" -- and I'm
2    quoting -- "depriving plaintiff" -- being you --
3    "of this financial and ownership interest in the
4    partnerships while the defendants named herein
5    are reaping enormous and personal financial
6    gains."
7        A.    Absolutely true.
8        Q.    How are the defendants depriving you
9    of your ownership interest in the partnerships?
10       A.    By refusing my participation in the
11   decision-making of the projects and by having a
12   exclusive and sole control of these projects and
13   using their management company, Dalton Management
14   Company, owned by Phyllis, to disregard any
15   requests that I make.
16       Q.    And what ownership -- withdrawn.
17            What is the basis for your statement
18   that Phyllis is the owner of Dalton Management
19   Company?
20       A.    Every time I talk to Phyllis or to
21   any of the Seaveys, including Bob, and Phyllis
22   will, in my recollection, state to me that she is
23   the owner. That's how she identifies herself, I
24   am the owner.

167

John Edmonds

1        Everybody else has -- has an
2    interest, but I think that the way in which the
3    Seaveys had worked it out, I think Phyllis owns
4    52 percent of the company. She doesn't call
5    herself chairman or anything. She says, I'm the
6    owner. And the other percentages are controlled
7    by Avery in a partnership called ABN -- I think
8    ABNS; Avery, Bob, Nealle Seavey.
9        Q.    Turn with me to page 6. It's
10   paragraph 12 of your affidavit.
11           MR. TRAUB:  This is going to be 9
12       and this will be 10.
13       Q.    Mr. Edmonds, in this paragraph, it
14   refers to Lakeview partnership. You state that
15   you own a 9 percent interest in the partnership
16   and you describe that interest as a managing
17   general partner; is that correct?
18       A.    I don't describe the interest as
19   managing. I say I am a managing general partner.
20   I say further, I believe, that the managing
21   general partners own 18 percent. But I've been
22   informed by Bob Seavey -- we originally I think
23   owned 7 percent each, but Bob arranged to
24   purchase from one of the relatives of the Singers

168

John Edmonds

1    her interest, which I think was 2 or 3 percent.
2        Q.    You say, "Plaintiff is a managing
3    general partner of the Lakeview partnership and
4    owns a 9 percent interest in that partnership."
5        A.    That's the basis upon which I made
6    that statement, is what -- the information that
7    Seavey had given me.
8        Q.    And is that what you understand
9    yourself to own and to be?
10       A.    That's correct.
11       Q.    I'm going to hand you what's been
12   marked as Defendants' Exhibit No. 9.
13           (Defendants' Exhibit 9, Agreement
14       for Purchase and Sale of Partnership
15       Interest, marked for identification.)
16       Q.    And also what's being marked as
17   Defendants' Exhibit No. 10.
18           (Defendants' Exhibit 10, Second
19       Amended Agreement of Limited Partnership of
20       Fifth and 106th Street Associates, L.P.,
21       marked for identification.)
22   BY MR. TRAUB:
23       Q.    Mr. Edmonds, Defendants' Exhibit
24   No. 9, it's an agreement for purchase and sale of

169

John Edmonds

1    partnership interest.
2        Have you seen this document before?
3        A.    I may have, yeah. I think I may
4    have seen it.
5        Q.    If you turn to page 5 and the
6    Exhibit A and B, do you recognize your signature?
7        A.    Yes, I do.
8        Q.    This agreement for purchase and sale
9    of partnership interest is an agreement whereby
10   you are selling your partnership interest in
11   Fifth and 106th Street to BNA Realty Company,
12   LLC; is that correct?
13       A.    Yes, Bob Seavey and --
14       Q.    If you turn to page 2, the very top
15   of page 2, it says, under little z, that "The
16   balance of Edmonds' interest in the partnership
17   (1.2 percent), which is now converted at this
18   time to a limited partnership interest, however,
19   the assignment of which shall not be effective
20   until Edmonds' death."
21       Do you see that?
22       A.    Yes.
23       Q.    Then in connection with that, a
24   second amended agreement of limited partnership

43  (Pages 166 to 169)

170

John Edmonds

2  of Fifth and 106th Street Associates was signed;
3  is that correct?  And that's what's been given to
4  you as Defendants' Exhibit No. 10.
5      A.    Yes.  That's the agreement Bob --
6      Q.    If you look at --
7      A.    Yes, that's the agreement that Bob
8  Seavey went out to -- to Mineola and removed so
9  that there would be no record of this agreement.
10  And the reason he went to Mineola was that the
11  original partner had filed this partnership in
12  Nassau County.
13      Q.    If you turn to paragraph 3 on page 3
14  of this agreement, it states that "Edmonds'
15  7.5 percent partnership interest is assigned,
16  transferred and conveyed to BNA so that BNA shall
17  have a 6.2 percent of said 7.5 percent interest
18  in the partnership as a general partner and
19  Edmonds shall retain and does retain 1.2 percent
20  of his former 7.5 percent partnership interest as
21  a limited partner."
22          And then on page 5, it appears to
23  have your signature; is that correct?
24      A.    Yes.
25      Q.    And the signatures of, in fact, all

171

John Edmonds

2  of the partners in Fifth and 106th Street?
3      A.    That's correct.
4      Q.    Do you know of any amendment to the
5  partnership agreement of Fifth and 106th Street
6  Associates that came after this second amended
7  agreement?
8      A.    I know of no amendment.  I do know
9  that the amounts of monies that is being cited
10  here were repaid to the partnership.  Seavey had
11  set up a situation in Chase Bank where
12  $1.7 million of $3 billion was in his name and
13  1.3 in mine.
14          Those monies are the monies that
15  I've repeated to you several times were the
16  6 percent fee that the partners are entitled to
17  while operating the project in a positive
18  fashion.
19          I was given a certain date to pay
20  that money.  I did not make that date, but I paid
21  the money later.  As a matter of fact, I called
22  Bob Seavey and told him that I was prepared to
23  pay it, and I paid it with the highest legal
24  rate, I think it was 16 percent, back to the
25  partnership in order to redeem my position.

172

John Edmonds

2          And Seavey, when I told him that I
3  was prepared to do that, he instructed me to
4  place the check back in the Chase account and
5  endorse it for -- I think the letter was CL --
6  client number so and so and so, and put it in the
7  account.  And that's exactly what I did.
8      Q.    Can you show me where in the second
9  amended agreement of limited partnership of Fifth
10  and 106th Street Associates it provides that
11  when you repay the money, you'll be put back in
12  as a --
13      A.    No.
14      Q.    -- managing partner?
15      A.    No, I can't.  I can't.  And
16  that's -- but I repaid the money.  And I don't
17  think Seavey can take the position that, yeah, we
18  got the money back, but you're still out.  I
19  think that's a ludicrous position and I doubt
20  that he would take it in any set of
21  circumstances.
22          Do you deny that I repaid the money?
23      Q.    Going back to --
24      A.    Answer my question.  Do you deny
25  that I repaid the money?

173

John Edmonds

2      Q.    Going back to Defendants' Exhibit
3  No. 5, which is your affidavit, looking at
4  paragraph 13 discussing Logan Plaza, you are in
5  fact a 50 percent owner of Logan Plaza; is that
6  correct?
7      A.    That's correct.
8      Q.    Prior to Dalton taking over as the
9  management company of Logan Plaza in 2000, had
10  you ever received a distribution for your
11  ownership interest in Logan Plaza?
12      A.    No.  There -- there were no
13  distributions at Logan Plaza till such time as we
14  purchased the project.  In other words, the
15  project was -- the limited part of the project as
16  I recall was the Boston Financial organization.
17          They told Avery Seavey that they
18  were getting out of the business of having an
19  interest in the affordable housing area and that
20  it would be available for sale.
21          Avery and I then negotiated with
22  them.  They agreed to accept from us each 2
23  point, I think it was -- no.  They agreed to
24  accept $640,000 each, from Avery and from me.
25  And that -- the Logan Plaza, being an 80/20

44  (Pages 170 to 173)

**174**

John Edmonds

1 situation, HVC then stepped in, took control of
2 the mortgage and I believe paid out Boston
3 Financial for its participation.
4        MR. TRAUB:  This as Number 12,
5 please.
6        (Defendants' Exhibit 11, Amended and
7 Restated Certificate of Limited Partnership
8 of Charles H. Housing Associates, marked
9 for identification.)
10 BY MR. TRAUB:
11        Q.    Mr. Edmonds, if you look at
12 paragraph 14 of your affidavit concerning Charles
13 Hill Associates, you testified that you own
14 25 percent interest in that partnership; is that
15 correct?
16        A.    That's correct.
17        Q.    Is that your understanding of your
18 ownership interest in Charles Hill?
19        A.    That's correct.
20        Q.    I've given you what's been marked as
21 Defendants' Exhibit No. 11, which is the amended
22 and restated certificate of limited partnership
23 of Charles H. Housing Associates.
24        (Witness peruses the exhibit.)

**175**

John Edmonds

1        Q.    Is Charles H. Housing Associates the
2 same as your Charles H. Hill Associates
3 partnership?
4        A.    Charles H. Housing Associates are
5 the owners of Charles H.
6        Q.    And if you turn to page 47 --
7        MR. HAYWOODE:  I'm sorry, did the
8 witness finish?
9        Are the owners of Charles H., the --
10        THE WITNESS:  Yes, the real
11 estate -- Charles H. is the -- is the real
12 estate.
13        MR. HAYWOODE:  Uh-huh.
14        Q.    Now, Mr. Edmonds, if you turn to
15 page 47 --
16        A.    Yeah.
17        Q.    -- it lays out all of the different
18 ownership interests in this partnership.  It
19 provides that you have a 1 percent interest in
20 the operations of the partnership; is that
21 correct?
22        A.    What does that mean, "a 1 percent
23 interest in the operations"?
24        Q.    Well, if you're looking at

**176**

John Edmonds

1 Schedule A, it says capital contribution, you
2 made $100.  It says your interest in the
3 operations is 1 percent and your interest in
4 capital transactions is 24.745 percent.
5        A.    That's correct.
6        Q.    And that actually the investor
7 limited partner, Charles Hill Tower Associates,
8 has 98 percent of the interest in the operations.
9        Is that correct?
10        A.    That's what it says here.
11        Q.    Did you --
12        A.    I only know that the investor
13 limited partner purchased for himself and his
14 company that 50.51 percent and that the general
15 partners purchased, by the payment of
16 $2.1 million each, the 24.745 percent.
17        Q.    So you purchased, am I correct, the
18 mortgage actually on this property?
19        A.    That's correct.
20        Q.    So you get 25 percent of all
21 mortgage payments on this property?
22        A.    That's correct.
23        Q.    But you actually own a 1 percent
24 interest in the ownership on this property?

**177**

John Edmonds

1        A.    No, I own a 25 percent interest in
2 the ownership of this property.  Why would I own
3 a 1 percent interest in the property when -- when
4 I've paid for 25 percent interest?
5        Q.    Do you know --
6        A.    Why would I do that?
7        Q.    Do you know of any other document
8 other than the one that I've given you that sets
9 forth the ownership interest of Charles Hill
10 partnership?
11        A.    I can't think of one.
12        Q.    Turning back to your Defendants'
13 Exhibit No. 5, which is your affidavit --
14        (Discussion off the record between
15 the witness and his counsel.)
16        Q.    -- looking at paragraph 20, which is
17 on page 9 of your affidavit --
18        (Pause from the record.)
19        Q.    -- you state that "On or about the
20 summer of 2005, reliable employees of the
21 partnerships' housing developments communicated
22 to plaintiff that excessive costs were being
23 incurred by the partnerships' housing
24 developments as a result of the contracts

45  (Pages 174 to 177)

---

**178**

John Edmonds

2  defendant Dalton had entered into on behalf of
3  the partnerships' housing developments, as well
4  as to the improper management and operation of
5  the partnerships' housing developments by
6  defendant Dalton."
7        A.    Yes.
8        Q.    Which employees?
9        A.    Basically they were the -- the
10 employees who did the work at the development,
11 who clean, made the repairs and so forth and so
12 on.  They told me that -- that Phyllis had made
13 an arrangement with a company someplace in Long
14 Island that required them to spend about three to
15 four hours a day to go out there to get materials
16 that they might need to service the tenants and
17 that they didn't understand that since the
18 largest supplier of equipment, plumbing,
19 electrical, et cetera, was right at
20 86th Street -- 88th Street and Third Avenue
21 and within 15 to 20 minutes they could go down
22 and order their material.  And they said that
23 this company would deliver any materials that
24 they needed within 24 hours.
25        And beyond that, they said that this

---

**179**

John Edmonds

2  was the company who supplied these materials
3  originally and there was no issue, no question of
4  them not having the particular piece of pipe or
5  electrical fixture, et cetera, that they needed
6  to make a repair.
7        Q.    Do you remember the names of any of
8  the employees that told you this?
9        A.    I don't -- I don't wish to disclose
10 any names as I fear that they would be -- they
11 would be punished in the strong and determined
12 way that Phyllis Seavey has.
13       Q.    Mr. Edmonds, while I recognize that
14 you may not want to disclose the names --
15       A.    I haven't answered the question.
16 I'm not going to.  Okay?
17       Q.    On the record, are you refusing to
18 state the basis for your paragraph 20?
19       A.    No, no.  I've set forth in plain
20 language what the basis of paragraph 20 is.  I've
21 said I decline to name the individual employees
22 because I don't want them fired or put out of
23 work.
24       Q.    What about deposed in this action;
25 don't you think that their testimony would be

---

**180**

John Edmonds

2  relevant to this action?
3        A.    Well, when that comes, if it's
4  necessary, I'll consider whether I should call
5  any of them.
6        Q.    Actually, Mr. Edmonds, it's
7  necessary right now for you to either disclose --
8        A.    It isn't necessary for me to
9  disclose it.  I not going to disclose it, and
10 I've told you that before.
11       Q.    You don't have to raise your voice.
12       A.    Well, I do because you don't seem to
13 understand me.
14       Q.    And you don't have to point to me
15 either.
16       A.    Yes, I do because you don't seem to
17 understand me.
18       MR. HAYWOODE:  Counsel, I suggest
19 you make a motion for a ruling on this.
20       MR. TRAUB:  I'm trying to avoid
21 making unnecessary motions when Mr. Edmonds
22 brought this lawsuit on the basis of
23 statements from, quote-unquote, reliable
24 employees, but is now refusing to --
25       THE WITNESS:  I didn't bring the

---

**181**

John Edmonds

2  lawsuit on the basis -- that was a part of
3  the information that I received from
4  various sources.  All right?  And that's
5  the basis of my bringing the lawsuit and
6  the fact of the kind of control that the
7  Seaveys have exercised over these
8  properties.
9        MR. TRAUB:  Again, Mr. Edmonds, I've
10 asked you not to raise your voice.
11       MR. HAYWOODE:  And I object to
12 characterizing his voice as being raised.
13 I've heard him much louder.
14       THE WITNESS:  That's absolutely
15 correct.  You should be in court with me
16 one day --
17       MR. TRAUB:  I plan on it.
18       THE WITNESS:  -- on opposite sides
19 and you'll see how I raise my voice.
20       MR. TRAUB:  I plan on it soon.
21       MR. HAYWOODE:  Counsel, nationwide
22 we have a whistle-blower problem.  There
23 are regulations that pertain to that.  And
24 that's why I think it should be relegated
25 to a motion.  I think any court would

46  (Pages 178 to 181)

182

John Edmonds

1
2    understand at least the logic of what
3    Mr. Edmonds is saying. To the extent we
4    offer it as proof in a trial, that's
5    another issue.
6    BY MR. TRAUB:
7        Q.   Mr. Edmonds, turning to
8    paragraph 23, you state that the auditor's review
9    of Dalton's financial records --
10       A.   What page is that?
11       Q.   Page 10.
12       A.   I state which?
13           MR. KELLY:  I'm missing 10 in mine.
14           MR. TRAUB:  Paragraph 23, page 10.
15           MR. HAYWOODE:  I don't have 10
16    either.
17           MR. KELLY:  It goes to 11 and then
18    10.  One page out of order.
19           MR. TRAUB:  You can take off the
20    binder and switch the pages --
21           MR. KELLY:  Oh, thanks.
22           MR. TRAUB:  -- if you want to put
23    them back in order.
24           MR. HAYWOODE:  You wanted something
25    to do; right?

183

John Edmonds

1
2    BY MR. TRAUB:
3        Q.   You state that your auditor's review
4    of Dalton's records "reveal that defendants
5    Phyllis Seavey and Dawley repeatedly and on a
6    consistent basis purposefully provided false and
7    misleading information in the monthly financial
8    package by not reporting amounts paid to the
9    partnerships in connection with the third-party
10   agreements it entered into for the partnerships."
11       A.   Uh-huh.
12       Q.   Which third-party agreements are you
13   referring to in paragraph 23?
14       A.   Which third-party agreements?
15       Q.   Yes.
16       A.   I'm talking about an agreement with
17   the with the garage operator.  Talking about
18   an agreement with the laundry operator.  And I'm
19   talking about an agreement with with the
20   people who install these telephonic wires on the
21   roofs of these buildings.
22       Q.   And are you contending that these
23   vendors actually paid money to the partnerships?
24       A.   No, I'm contending that these
25   vendors have what you would call sweetheart

184

John Edmonds

1
2    deals.  For instance, the garage as an
3    example, that contract with that garage operator
4    gives him the right to operate that garage at a
5    fee substantially below what the fees ought to
6    be.
7            And it also gives him the right
8    that, in the event that the project is disposed
9    of, that he continues to operate the garage and
10   that if he at any time decided that he didn't
11   want to operate it further, that he would have
12   six months to make up his mind and go from there.
13           And I'm saying that the Seaveys by
14   doing that, and having this garage operator enter
15   into an agreement with ABNS, then they that
16   they should be removed because I think that the
17   basic partnership rule is that the managing
18   general partner has the responsibility to always
19   act in the best interest of the partnership.
20           And I consider that if Seavey and
21   those are behaving in a way to benefit themselves
22   and some third party, that he was not acting in
23   the best interest of the partnership and should
24   be removed.
25       Q.   Are you aware of when that agreement

185

John Edmonds

1
2    with the garage was entered into?
3        A.   Whenever they came aboard.  I don't
4    know when they came aboard.
5        Q.   Have you seen this agreement?
6        A.   I haven't seen the agreement.
7        Q.   So you're not aware of the date that
8    the agreement was signed --
9        A.   Does Bob deny that the agreement
10   exists?  No, I don't know when it was signed.
11       Q.   Are you aware of the term of the --
12   the length and term of the agreement?
13       A.   It has an indefinite term.
14       Q.   But in paragraph 23, you state that
15   they're providing misleading information by not
16   reporting amounts paid to the partnerships in
17   connection with these third-party agreements.
18           What payments are you referring to
19   that the partnerships are receiving from these
20   third-party agreements?
21       A.   I don't know that the partnerships
22   are receiving any payment.  I believe that, on
23   behalf of the partnership, these companies that
24   the Seaveys have formed are the -- are the
25   operators of this.  And my essential position is

47  (Pages 182 to 185)

186

John Edmonds

1
2  that these are monies that should go to the
3  partnerships and not to Seavey or to any company
4  that he might have formed.
5      Q.    Have you seen any document showing
6  that there's money going to the Seaveys or any
7  partnership that he might --
8      A.    No, I only have been able to
9  determine that, in fact, Avery Seavey is a
10 managing general partner of an agreement between
11 the Seaveys and the operator of the garage.
12     Q.    Is there money from the garage that
13 you believe is going to the Seaveys?
14     A.    Yes.
15     Q.    And --
16     A.    If he's a partner with the garage
17 operator, then obviously monies are going to him.
18     Q.    So it's your understanding that
19 Avery is a partnership in the garage?
20     A.    Yes. And in the laundromat also.
21     Q.    And he's also partnership in the
22 laundromat?
23     A.    Yes. And also partners in that
24 electronic --
25     MR. HAYWOODE:  Sign.

187

John Edmonds

1
2      A.    -- sign, upstairs.
3      Q.    What documents have you seen to
4  support your understanding --
5      A.    Those are not the kind of documents
6  that Seavey would distribute to me.
7      Q.    Has anyone ever told you that Avery
8  is a partner in those --
9      A.    I said I investigated that.
10     Q.    And who told you that Avery was a
11 partner in the partnership --
12     A.    State of New York.
13     Q.    Which document of the State of New
14 York told you that?
15     A.    I went to Albany and visited their
16 office --
17     Q.    Whose offices?
18     A.    The Secretary of State at the
19 Harriman campus.
20     -- and secured this information.
21     Q.    By looking at what document at the
22 Secretary of State's office?
23     A.    They showed me a document that
24 reflected the organizations of this corporation
25 or limited liability company, of which Avery

188

John Edmonds

1
2  Seavey was the managing general partner along
3  with the garage operator.
4      Q.    Do you remember the name of the LLC?
5      A.    ABNS.
6      Q.    It's your understanding that the
7  garage operator is a partner in ABNS?
8      A.    ABNS, that's correct.
9      Q.    You cite, though -- for your
10 contention, paragraph No. 3, you cite Exhibit A.
11     Q.    What's Exhibit A?
12     Q.    Well, you cite here that "The
13 plaintiff's auditor's review revealed that, on a
14 consistent basis, they provided false, misleading
15 information by not reporting amounts paid to the
16 partnership." And you say, "See Exhibit A."
17     MR. HAYWOODE:  Are you referring to
18 the Cameron Griffiths letter of --
19     MR. TRAUB:  If you look at
20 paragraph 23, in bold, at the very end of
21 23, you say, "See Exhibit A."
22     MR. HAYWOODE:  I see listing
23 Exhibit Q.  Where am I --
24     THE WITNESS:  "Plaintiff relied
25 totally upon the monthly financial packages

189

John Edmonds

1
2  which defendant Dalton prepared and sent to
3  him as being true and accurate.  However,
4  plaintiff's auditor's review of Dalton's
5  financial records reveal that defendants
6  Phyllis Seavey and Dawley repeatedly, and
7  on a consistent basis, purposely provided
8  false and misleading information in the
9  monthly financial package by not reporting
10 amounts paid to the partnership in
11 connection with third-party agreements it
12 entered into for the partnerships."
13     Q.    Then what's the very next thing in
14 the parentheses say?
15     A.    "See Exhibit A."
16     Q.    So when we go to Exhibit A, we find
17 an independent auditor's report; is that correct?
18     A.    Exhibit A and Exhibit -- that's G.
19     MR. HAYWOODE:  (Indicating.)
20     A.    Yeah.
21     Q.    Where in the defendants' -- in the
22 independent auditor's report in Exhibit A does it
23 state that they found false, misleading
24 information by not reporting amounts paid to the
25 partnerships in connection with the --

48  (Pages 186 to 189)

---

190

John Edmonds

1
2    A.    The answer to that is paragraph 2.
3    "We were unable to complete the audits because
4    the company's management refused to provide
5    documentation and/or explanation to substantiate
6    items in the general ledger, some of which
7    include several journal entries recorded in
8    general ledgers of all four companies, the
9    original document to support the notes payable to
10   Seavey or Lakeview, support for the balances
11   recorded in Lakeview money market and investment
12   accounts, among many others."
13       Q.    And you --
14       A.    "Because we were unable to obtain
15   substantiation for several items recorded in the
16   general ledger and we were unable to apply
17   alternative auditing procedures to the items
18   listed and the others mentioned as discussed in
19   the preceding paragraph, the scope of our work
20   was not sufficient to enable us to express and we
21   do not express an opinion as to the financial
22   statements referred to in the first paragraph."
23       Q.    And you understand those two
24   paragraphs to mean that there was false,
25   misleading information in the monthly financial

---

191

John Edmonds

1
2    package because they didn't report amounts to
3    partnerships in connection with the third-party
4    agreements that it entered into for the
5    partnerships?
6        A.    Yes. Because I believe that he has
7    the prime responsibility for reporting any
8    amounts of monies engendered by the partnerships
9    and that those monies should go into the
10   partnerships, not into the Seaveys' pockets.
11       Q.    You state here in paragraph 54 on
12   page 13 that "Defendant Dawley informed
13   plaintiff's auditors that Dalton was unable to
14   produce this basic and standard information
15   necessary for the audit because defendant
16   Dalton's software was incapable of producing the
17   required 'trial balances'" -- that term's in
18   quote -- "from entries made in their general
19   ledgers which recorded the daily expenditures for
20   the management and operation of the partnerships'
21   housing developments."
22            Who told you that Mr. Dawley stated
23   the software is incapable of producing trial
24   balances?
25       A.    Obviously this is information

---

192

John Edmonds

1
2    that -- that the auditors got from Dawley.
3        Q.    Did the auditors tell you that
4    Dawley was able to provide them with a general
5    balance -- with a general ledger?
6        A.    I don't recall.
7        Q.    Do you know the --
8        A.    I only know that -- that they
9    informed me that Dawley's position was if -- if
10   they were looking for these trial balances,
11   et cetera, that they would have to go to the
12   accountants.
13       Q.    That's your understanding of what
14   Mr. Dawley told them?
15       A.    Yes.
16       Q.    In paragraph 55, you state that "The
17   defendants have breached their management
18   agreements and by refusing to maintain proper
19   computer systems, they're in violation of the
20   federal and state regulations which provide
21   substantial subsidies to the partnerships'
22   housing developments which govern their
23   management and operations."
24            Which federal and state regulations
25   are you referring to, Mr. Edmonds?

---

193

John Edmonds

1
2        A.    I'm sure that they're both federal
3    and state regulations related to the management
4    of these parcels that requires the management to
5    maintain a proper computer system for the
6    management of the partnerships' financial
7    information. And either the Seaveys don't have
8    it or either they refuse to use it.
9            I understand that what they do,
10   according to Dawley, is that they -- that the
11   expenditures are made and that the checks for the
12   expenditures are attached, and that it is then
13   turned over to their accountants for their
14   accountants to convert from -- whatever the
15   system -- convert it from -- from the way in way
16   in which they keep their books to another form.
17           And I just can't think of it right
18   now.
19       Q.    Have you seen any specific federal
20   and state regulations that --
21       A.    No, I have not.
22       Q.    If you turn to page 16 of your
23   affidavit, you state that "The auditors found
24   that defendant Dalton had entered into several
25   contracts in excess of $10,000 supposedly in

49 (Pages 190 to 193)

194

John Edmonds

1
2 connection with the maintenance and repair for
3 the various housing developments of the
4 partnership," and then you cite to Exhibit I.
5          If you turn to Exhibit I --
6     A.    Where's that?
7     Q.    Under -- close to the back.  And you
8 have a tab that says, "Exhibit I."
9          What is your understanding of what
10 is Exhibit I?
11    A.    Let me see.
12          (Witness peruses the exhibit.)
13    A.    As far as I can determine, these are
14 a listing of the checks that would have gone out
15 to various outfits who perform, according to
16 this, repair contracts, payroll, and that kind of
17 thing.
18    Q.    Is your contention that each one
19 of these items is a violation of the management
20 agreement?
21    A.    My contention is that these items
22 reflect a process by which the Seaveys are able
23 to use the partnership monies as they see fit.
24 And I would suggest that perhaps the partnership
25 are paying perhaps expenses for his other

195

John Edmonds

1
2 interests, the other partnerships that he may
3 own.
4     Q.    So is it your contention that we ever
5 thought each one of these is listed under Church
6 Homes Associates, that you believe some of these
7 may have been related to work at a different
8 entity?
9     A.    That's correct.  Maybe related to an
10 entity that is wholly unrelated to these
11 partnerships.
12    Q.    And what document have you seen that
13 gives you that belief?
14    A.    Just looking at this document that
15 spells out, you know, what the repairs were and
16 so forth and so on.  I don't know that all of
17 these are repairs that were made at any of the
18 partnerships' properties.
19    Q.    Have you or your auditors undertaken
20 to contact any of these vendors to ask them for
21 proof about these repairs?
22    A.    I don't think that they've
23 undertaken that.  They're trying to complete the
24 examination of the books and records of Dalton
25 Management.  And I guess at some point my counsel

196

John Edmonds

1
2 will determine whether or not these companies
3 should be contacted in connection with our
4 lawsuit.
5     Q.    So is it my understanding then,
6 without any documentary proof and without even
7 contacting these vendors, that you attached this
8 as an exhibit to a federal complaint and a
9 federal affidavit testifying --
10    A.    For me a court is a court.  Okay.
11 And I attached those because these are documents
12 that the accountants have been able to get and
13 they indicate what Seavey says are expenses of
14 Dalton Management related to the operation of the
15 projects.
16    Q.    Can you point to me in your
17 paragraph 35 where you state that the information
18 made is upon information and belief and not your
19 firsthand --
20    A.    I don't -- I do not use the language
21 "information and belief."  I set forth in
22 unequivocal terms what I understand that's going
23 on here.
24    Q.    And again, your understanding is not
25 based on documentary evidence and not based on

197

John Edmonds

1
2 contacting these vendors, but just your belief?
3     A.    No, based upon information that I've
4 gleaned from my auditors as they go through the
5 books and records.
6     Q.    What did your auditors glean then to
7 show then that your understanding is --
8     A.    I do not know.  I'm not an
9 accountant.  I don't know.  I only know what my
10 oral discussions have been with them and what
11 their reports are to date.
12    Q.    Have they orally reported to you
13 that they found proof that not all of these
14 vendors supplied work for Church Homes
15 Associates?
16    A.    They have indicated to me that it is
17 likely that -- the fact that all of these vendors
18 may not be doing work on behalf of the
19 partnerships.  They may be doing work for the
20 Seaveys' other interests.
21    Q.    And your auditors determined that
22 based upon a review of the books and records that
23 they've received so far?
24          MR. HAYWOODE:  Objection.
25          I object to the suggestion in this

50  (Pages 194 to 197)