198

```
 1              John Edmonds
 2   question that the auditors now have
 3   determined that.  I don't hear any
 4   testimony here about anybody having
 5   determined it.
 6        MR. TRAUB:  He stated that he
 7   unequivocally made a statement to the
 8   court.  So clearly someone --
 9        A.    I unequivocally made it.  This is my
10   affidavit, and I don't -- I don't submit
11   affidavits on information and belief.  I never do
12   that.
13        Q.    Do you wish to strike or remove that
14   paragraph sitting here today?
15        A.    I do not.  I want it in.  I do not
16   wish to strike any paragraph of any affidavit or
17   document that I have submitted in this matter.
18        Q.    Okay.  Turning to page 18,
19   paragraph 40.
20        What exhibit is that?
21        Q.    It's not an exhibit:  It's the
22   actual affidavit itself.
23        A.    Okay.  All right.  As shown in
24   Exhibit B, reads, "Attached hereto, in reviewing
25   defendant Dalton's general ledgers, plaintiff's
```

199

```
 1              John Edmonds
 2   auditors found entries indicating that, in 2006,
 3   defendant Dalton has deposited approximately
 4   $800,000 to $1 million in investment accounts for
 5   Lakeview partnership, as shown in Exhibit A and B
 6   attached hereto;
 7        "Defendant Dalton has refused to
 8   provide plaintiff's auditors with the financial
 9   statements for these investment accounts, names
10   and addresses of the investors, and/or any
11   contact information for these investments made in
12   2006 which represent a substantial amount of the
13   partnerships' funds."
14        Q.    When you look at Exhibit B, it shows
15   that the account that they're referring to is the
16   Salomon Smith reserve account.  Isn't it true,
17   Mr. Edmonds, that you are in fact a signatory on
18   that account?
19        A.    I may be, but that does not -- that
20   does not give me -- if the other side, Seaveys,
21   are controlling the books and records, that does
22   not give me a right to get the information.
23        Q.    Did you give your accountants any
24   information with regards to the Salomon Smith
25   reserve account?
```

200

```
 1              John Edmonds
 2        A.    No, all I did was to ask them to go
 3   forward, to get as much information as they can
 4   get and continue to -- to investigate and to
 5   determine what the problems were.
 6        Q.    Other than not receiving -- or
 7   allegedly not receiving information on this
 8   account, are you contending there's anything
 9   wrong with this investment account at Salomon
10   Smith?
11        A.    I don't know whether there's
12   anything wrong or not.  That's the reason that
13   I'm having the accountants go through it.  But
14   if -- if they continue and the Seaveys continue
15   to refuse to give me access, then I believe that
16   they're secreting and hiding.
17        Q.    Mr. Edmonds, in this lawsuit, you
18   filed a series of different document requests,
19   did you not?
20        A.    Yes.
21        Q.    And in response to those document
22   requests, the Seaveys have made, along with Marks
23   Paneth & Shron, a large number of documents
24   available to your accountants; is that --
25        MR. HAYWOODE:  I'm going to
```

201

```
 1              John Edmonds
 2   object --
 3        Q.    -- correct?
 4        MR. HAYWOODE:  -- to the question
 5   based on the use of relative terms like
 6   "large" and "some" unless there's an
 7   accurate quantification here.
 8        Q.    Over 20 banker's boxes full of
 9   boxes, have they not?
10        MR. HAYWOODE:  Is it 20 banker's
11   boxes?
12        A.    I know nothing about that.
13        Q.    Do you know how many pages of
14   documents have been produced in response to your
15   document request?
16        A.    No.  I've indicated to you, and I
17   can repeat, that my accountants indicate to me
18   that somewhere between 40 to 60 percent of the
19   requests that they have made for documents have
20   been declined.
21        Q.    Since the inception of this lawsuit?
22        A.    Beginning as of the time that they
23   were retained.
24        Q.    My question for you was, since the
25   inception of this lawsuit, have they --
```

51 (Pages 198 to 201)

202

John Edmonds

2     A.    Beginning as of the time that they
3 were retained to investigate this matter and to
4 report their findings.
5     Q.    And in fact, you made a partnership
6 demand under the New York partnership laws to
7 come to Dalton and do an inspection of the books
8 and records, did you not?
9     A.    I may have. I probably did. And
10 that has nothing to do with whether or not those
11 partnership documents were made available and
12 indeed those investment accounts were made
13 available. They continue to refuse to make those
14 available.
15     Q.    To your knowledge, as you sit here
16 today, have those documents been -- have the
17 defendants in any way refused to produce those
18 documents?
19     A.    I repeat what I said earlier, that
20 my accountants report to me --
21     Q.    When is the last time that your
22 accountants reported this to you?
23     A.    The accountants -- I said I've had
24 several oral meetings with them, and they have
25 indicated to me that they have great difficulty

203

John Edmonds

2 in getting the information and materials that
3 they need about the partnerships' investments,
4 et cetera.
5     Q.    When was the last time they made
6 that representation to you?
7     A.    In any meeting that we might have
8 had --
9     Q.    When is the last meeting you had
10 with them?
11     A.    I don't recall the exact date, but
12 it's been since we've instituted this action.
13     Q.    Has it been in 2009?
14     A.    Yes, I've met with them in 2009.
15     Q.    Have you ever asked them whether or
16 not they have enough documents to --
17     A.    They obviously do not.
18     Q.    Mr. Edmonds, let me finish my
19 question.
20     A.    I mean, there's no point in putting
21 that question to me, do they have enough
22 documents.
23     Q.    Mr. Edmonds --
24     A.    They obviously do not. That's the
25 reason that they are continuing to do the

204

John Edmonds

2 examination of the books and records as they are
3 made available.
4     Q.    Mr. Edmonds, have you ever asked
5 yourself if maybe the accountants you hired are
6 not capable of doing this audit?
7     A.    No, I would not ask myself that. I
8 think that they're very capable. I think they're
9 at least as capable as the accountants that
10 Shron -- at least as capable and probably better
11 accountants.
12     Q.    Mr. Edmonds, again, I'm going to ask
13 you not point to me or raise your voice.
14     A.    Well, when you tell me about whether
15 or not --
16     MR. HAYWOODE: Let the record
17 reflect this is a capacious room and
18 there's a long distance between Mr. Edmonds
19 and Mr. Traub, my esteemed counsel or -- I
20 just object to characterizations that he's
21 pointing or raising his voice inordinately.
22     He has a powerful voice. And there
23 is some emotion here. I don't feel it's
24 excessive. I think it's prejudicial on the
25 record to keep saying pointing your finger

205

John Edmonds

2 and shouting.
3     Q.    Mr. Edmonds, if you'll look on
4 paragraph 41 on page 18 of your affidavit. Would
5 you please look at paragraph 41, page 18,
6 Mr. Edmonds. You talked about a Merrill Lynch
7 account set up for Lakeview partnership in which
8 a check for $82,720 was sent.
9     Are you aware that the DHCR requires
10 certain monies to be placed into a
11 DHCR-controlled account every month?
12     A.    I'm aware, as I said to you earlier,
13 that DHCR has signature rights on partnership
14 accounts and that accounts are handled in that
15 fashion because they have a program in which they
16 look to have these investments made in government
17 instruments, county instruments, city
18 instruments, this kind of thing. So to the
19 extent that that's being done, they require that
20 they also sign off.
21     Q.    So you require then the
22 partnerships -- or at least Lakeview, which is
23 under DHCR purview, requires that money be sent
24 from the rent revenue accounts to a
25 DHCR-controlled account; is that correct?

52 (Pages 202 to 205)

206

John Edmonds

1
2      A.     To an account controlled by DHCR and
3  Seavey.
4      Q.     You believe that DHCR is conspiring
5  with Seavey on this account?
6          MR. HAYWOODE:  Excuse me, the word
7  was what?
8          THE WITNESS:  "Conspiring."
9          MR. HAYWOODE:  Conspiring.
10          THE WITNESS:  No.
11          MR. HAYWOODE:  Objection.
12      A.     I believe that DHCR is doing what
13  they're required to do, and that is to have a
14  signature on the accounts to make certain that
15  the governmental programs are in accordance with
16  the mandate from the federal government, where
17  these monies begin.
18      Q.     What is the basis for your statement
19  that the Seaveys have signature rights on this
20  Merrill Lynch account?
21      A.     If it's DHCR-controlled, they
22  obviously have signature rights because it would
23  require two signatures, DHCR's signature and the
24  signature on behalf of the partnership.
25      Q.     Have you seen any documents to show

207

John Edmonds

1
2  you that the Seaveys have signature rights on
3  this Merrill Lynch account?
4      A.     They haven't produced any.  They
5  have all the documents.  I keep telling you they
6  have all these documents.  Ask your -- ask your
7  clients where those documents are.
8      Q.     So again, this is just your
9  presumption then that the Seaveys have signature
10  rights in this Merrill Lynch account?
11      A.     My presumption, what I understand to
12  be the process used by government agencies to
13  protect these investments so that the investors
14  are not able to go in and invest in items that
15  they would not approve.
16      Q.     Looking at paragraph 44 on page 19
17  of your affidavit.
18          MR. TRAUB:  Why don't we take a take
19  a five-minute break.
20          (Recess from the record.)
21  BY MR. TRAUB:
22      Q.     Mr. Edmonds, if you'll turn with me
23  to page 19, paragraph 44.
24      A.     Of the affidavit?
25      Q.     Of the affidavit, please.

208

John Edmonds

1
2      You state, "The defendant Dalton had
3  contracted with TMO Parent, LLC; Merit Parking,
4  LLC; Macquarie New York Parking III, LLC; Sebco
5  Laundry to lease property of the partnerships'
6  housing developments.  A portion of the monies
7  defendant Dalton received in connection with
8  these commercial leases for the partnership
9  housing developments was delivered to the Seavey
10  family and the Seavey organization."
11          What is the basis for your statement
12  that a portion of the money was delivered to the
13  Seavey family and the Seavey organization?
14      A.     The partnership agreements that the
15  Seaveys have with the lessee.
16      Q.     Have you seen any partnership
17  agreements between the Seaveys and the lessee?
18      A.     Well, these are -- they're here.
19  That's what this is.
20      Q.     Exhibits D and L?
21      A.     Yeah.
22      Q.     Well, Exhibit D appears to be a
23  garage lease agreement dated December 16, 1996,
24  and then with an extension in 1996.
25      A.     And also talks about the fact that

209

John Edmonds

1
2  the -- that the lessee has the right to renew and
3  to renew and to renew.
4      Q.     Let's start with this one.  What is
5  your understanding of what the fair market value
6  for the rent for this garage would have been in
7  1996?
8      A.     I've been reliably informed that
9  this lease is substantially under what other
10  leases in the area are paying.
11      Q.     And who informed you of this fact?
12      A.     Hal H. Harris, who has or had
13  clients in the garage business.
14      Q.     But again, this is not a partnership
15  agreement, is it?  This is a lease.
16      A.     It's a lease between --
17      Q.     Fifth and 106th as approved by the
18  DHCR?
19      A.     Yes.
20      Q.     With the -- with Merit Parking Corp;
21  is that correct?
22      A.     Yes, Merit.  They have several
23  names, Merit, et cetera.
24      Q.     And this is the source of your
25  understanding that the Seaveys are personally

53  (Pages 206 to 209)



210

John Edmonds

1
2  getting money from the commercial leases?
3      A.    I said -- yes -- I said that I
4  visited Albany and secured this information from
5  the Department of State.
6      Q.    Have you even any checks whereby the
7  garage or the laundry are paying the Seaveys
8  directly?
9      A.    If checks, they go to the Seaveys.
10  They don't come to me.
11      Q.    So is your answer no, you have not
12  seen any checks?
13      A.    I have not seen any checks.
14      Q.    Other than this lease agreement and
15  this -- and the partnership agreement that you
16  said you saw at the Secretary of State's office,
17  have you seen any other documents to support your
18  contention that payments are going directly to
19  the Seaveys or the Seavey organization?
20      A.    No, I haven't. And once again, they
21  have the books and records and they can tell you
22  whether or not Dalton Management and/or ABNS
23  receives payments from this lessee.
24      Q.    Mr. Edmonds, do you have any
25  evidence that the money that is supposed to go to

211

John Edmonds

1
2  the partnerships actually ended up in the
3  Seaveys' personal accounts?
4      A.    What would be evidence? The only
5  evidence that there could be would be checks,
6  money, orders, whatever, that would go to Dalton
7  Management or to ABNS.
8      Q.    And you haven't seen any such
9  checks?
10      A.    No, I have not.
11      Q.    Isn't it true that Cameron,
12  Griffiths & Pryce's report, which is Defendants'
13  Exhibit No. 4, alleges problems with
14  classification of funds and the way that the
15  books are maintained; they do not actually allege
16  that there are any missing or unaccounted funds
17  at this time?
18      MR. HAYWOODE:  I'm going to object
19  to the characterization of the report.
20  That report, like any auditor's report,
21  will say that --
22      MR. TRAUB:  Mel, your objection --
23  for what you said so far, that's what
24  you're allowed under the rules.
25      MR. HAYWOODE:  Well, no, I want to

212

John Edmonds

1
2  point to where it is.
3      The auditors are saying we didn't
4  see it --
5      MR. TRAUB:  Mel, you're testifying
6  now.
7      MR. HAYWOODE:  -- it doesn't say
8  there's not support.  It says we didn't see
9  it.
10      MR. TRAUB:  Mel, you're
11  testifying --
12      MR. HAYWOODE:  I'm not testifying to
13  any fact in this case, Darren.
14      MR. TRAUB:  You just did.
15      MR. HAYWOODE:  I'm simply -- no, I'm
16  not.  I'm saying that your question as to
17  form is wrong because an accountant's
18  comment -- any accountant, the IRS,
19  anybody, wouldn't say that, you know --
20      MR. TRAUB:  Mel, you're testifying
21  right now.
22      MR. HAYWOODE:  -- they're just
23  saying we didn't see it.
24      MR. TRAUB:  Mel, you're testifying.
25  Your objection is improper under Federal

213

John Edmonds

1
2  Rule 30.  I'm going to ask you --
3      MR. HAYWOODE:  I hear your ruling.
4  I except from it.
5  BY MR. TRAUB:
6      Q.    Mr. Edmonds --
7      MR. HAYWOODE:  There may be a day
8  when I won't be able to do that.
9      Q.    -- is there anything you can point
10  me in the auditor's investigation report at
11  Defendants' Exhibit No. 4 that states that there
12  are actually missing or unaccounted for funds?
13      MR. HAYWOODE:  Objection again as to
14  form as to what we mean by
15  "unaccounted-for."
16      A.    Well, no, I testified to the effect
17  that Dalton Management as the managing agent
18  receives whatever monies that are paid, either
19  Dalton Management or ABNS receives whatever
20  monies that are paid by Merit Parking.  And I
21  haven't seen the checks, no.
22      Q.    But there's nothing in the report
23  that's Defendants' Exhibit No. 4 that says
24  there's money that's unaccounted for, is there?
25      A.    No, thus far.

54  (Pages 210 to 213)

214

```
 1                  John Edmonds
 2        Q.   Are you personally aware of any
 3   money that is missing or unaccounted for?
 4        A.   No, I'm not.  All I know --
 5        Q.   Do you --
 6        A.   -- is that the Seaveys have all the
 7   records.  And if I'm inaccurate, then I'm
 8   inaccurate.  They have all the records.  They
 9   keep those records.  They make it difficult or
10   impossible to get any copy of anything that might
11   tend to support the fact that they are receiving
12   monies from these rental institutions, from the
13   garage and so forth.
14        Q.   Mr. Edmonds, do you have any
15   documents that show you that the monthly reports
16   that you receive are inaccurate?
17        A.   No, I do not.  I have documents only
18   that show very recently the monthly reports have
19   been made more difficult to decipher.  They
20   changed the way in which they were reporting up
21   to 2008 and in 2009.  Now the monthly reports are
22   different.
23        Q.   Mr. Edmonds, were you a party to a
24   conversation where all the defendants conspired
25   to transfer money away from the partnerships to
```

215

```
 1                  John Edmonds
 2   the Seaveys?
 3        A.   No, I've never been a party to any
 4   such conversation.
 5        Q.   Are you aware of any witness who
 6   claims to have documentary or other evidence that
 7   the defendants conspired to transfer money away
 8   from the partnerships to the Seaveys?
 9        A.   I only have the statement that I
10   made to you that -- that Hall H. Harris has
11   indicated to me that the lease agreements with
12   Merit Parking are such that it is substantially
13   below what is the market in the area.
14             And beyond that, that -- that the
15   agreement is an agreement between ABNS and the
16   Merit Parking Corporation, with Merit Parking
17   having the right to endless renewals at a
18   below-the-market rate interest -- or payment.
19        Q.   Mr. Edmonds, are you aware of any
20   witness who claims to have witnessed or
21   participated in a conversation --
22        A.   No, I'm not.
23        Q.   -- where the defendants conspired to
24   transfer money away from the partnerships to the
25   Seaveys?
```

216

```
 1                  John Edmonds
 2        A.   No, I'm not.
 3             MR. TRAUB:  Let's just take a
 4   five-minute break real quick.  And I might
 5   be finished.  I just want to look over
 6   everything one more time.
 7             (Recess from the record.)
 8             MR. TRAUB:  Back on the record.
 9   BY MR. TRAUB:
10        Q.   Mr. Edmonds, this agreement that you
11   state that you saw at the Albany Secretary of
12   State, do you have a copy of that?
13        A.   No, I do not.
14        Q.   Do you remember the name of the
15   document that you saw?
16        A.   It was just a document that set
17   forth the -- the name of the -- of the company
18   filed by Avery, the ABNS name, setting forth that
19   previously the Seaveys had listed these -- these
20   corporations, et cetera, as being inoperative.
21   They were -- they were apparently filed and they
22   would indicate to the State that they're not
23   operating these -- these companies.
24        Q.   And which companies are you
25   referring to when you say "these companies"?  The
```

217

```
 1                  John Edmonds
 2   garages or ABNS?
 3        A.   ABNS -- ABNS.
 4        Q.   So is it a certificate of
 5   incorporation for ABNS that you're referring to?
 6        A.   Yes, it would be the certificate of
 7   incorporation.
 8        Q.   And that's the basis for your belief
 9   that ABNS is getting money paid directly from the
10   garages and the laundromat?
11        A.   That -- and statements made to me by
12   reliable sources that the Seaveys have
13   contractual agreements with -- with the laundry
14   and with the garage.
15        Q.   And who --
16        A.   What I basically --
17        Q.   Mr. Edmonds, who are those reliable
18   sources that told you that?
19        A.   I just decline to disclose them at
20   this time.
21        Q.   Are they the same ones that you're
22   referring to earlier that told you that there
23   were contracts with vendors to deliver
24   materials --
25        A.   I decline to comments on that.
```

55 (Pages 214 to 217)

218

John Edmonds

Okay. But what really is the -- is the cooker here is the kind of provisions that is set forth in the lease agreement with this vendor.

Q. It's your contention that, because the lease is under market and renews for indefinite period of time, that that is the basis for your contention that the Seaveys are getting some sort of payment directly from the garage and/or the laundromat?

A. That's correct.

MR. TRAUB: Thank you. Nothing further.

Bill, I don't know if you wanted to start. It's 4:15.

MR. KELLY: I can start.

EXAMINATION

BY MR. KELLY:

Q. Good afternoon, Mr. Edmonds.

A. Good afternoon, sir.

Q. I'm going to try my best to avoid going over some of the same ground, but I may --

A. That would be appreciated.

Q. -- I may seem to be doing that when I introduce whatever topic I'm going to be

219

John Edmonds

addressing, so bear with me.

You mentioned the name Hal Harris before.

A. Yes.

Q. What is your relationship with Mr. Harris?

A. None other than that he's a tenant and a real estate broker.

Q. Do you know where Mr. Harris' address is?

A. Yes, he lives in Lakeview. And he hasn't paid Seavey any rent recently --

THE WITNESS: Did he pay his rent yet, Bob?

Q. When did he tell you that the market -- that the garage lease was below market?

A. Oh, maybe a couple of years ago. Based upon his -- his relationship with other clients.

Q. Do you know how he came to learn what the lease for the garage required as the lease payments?

A. No, I don't think he indicated what the payments were. He just indicated to me that

220

John Edmonds

it would be a most unusual circumstance for the partnerships -- or the partnership, Fifth and 106th Street, to enter into an agreement with a below-the-market-rate tenant and, beyond that, to enter into an agreement where all the rights to renewal, et cetera, lie with the tenants.

Q. So I guess my question is, if he didn't know what the rate under the lease was, how could he know if it was below market?

A. He apparently knew that it was below market because of his expertise in the community. He had clients that were -- or has clients that were in the business, in the parking business.

And on that basis -- and this was maybe three years ago, two or three years ago. On that basis, he said that any -- that there must be an arrangement made with the -- with the garage operator because of the advantages that he had under the terms of the lease.

Q. Are you familiar with -- well, let me withdraw that.

Do you have any educational background in accounting?

A. No.

221

John Edmonds

Q. Have you ever taken any accounting courses?

A. None.

Q. Are you familiar with generally accepted auditing standards?

A. I hear accountants use that term. I don't know what it means.

Q. Are you familiar with government auditing standards?

A. No. I don't know anything about accounting. That's the reason I've retained these accountants.

Q. Are you aware that there are several paragraphs in your affidavit that you discuss generally accepted auditing standards and you cite specific --

A. I discussed them only on the basis of my discussion with my -- with my auditors.

Q. Which one of your auditors did you have the discussion regarding Section 3.1 --

A. With all of them at any meeting that we might have.

Q. Are you familiar with the term "trial balance"?

56  (Pages 218 to 221)

222

John Edmonds

1
2     A.     Yes, I've heard of the term.
3     Q.     What is your understanding of what a
4  trial balance is?
5          MR. HAYWOODE:  Objection.  Vague as
6  to what his understanding is.
7          The witness can answer.
8     A.     All I know is that it would be a
9  record, I assume, kept by the management company,
10  in this instance, of the monies received and the
11  expenditure.
12     Q.     You spent a paragraph in your
13  affidavit discussing the definition of a trial
14  balance --
15     A.     Based upon that definition given to
16  me by my accountants.
17     Q.     But other than what your accountants
18  told you, do you have any understanding of what a
19  trial balance is?
20     A.     No, I don't.
21     Q.     Do you know what a general ledger
22  is?
23     A.     No, except that my accountants
24  indicated, with respect to the Seaveys, that the
25  general ledger was not kept up to date.

223

John Edmonds

1
2     Q.     Who told you that the general ledger
3  was not kept up to date?
4     A.     The accountants.
5     Q.     Was it one of the accountants or all
6  of the accountants?
7     A.     In the course of my discussion with
8  them, that was their analysis on the basis of the
9  examination of 2006.
10     Q.     So to the extent there's a
11  discussion in your affidavit about trial balances
12  or general ledgers, it's based on your
13  discussions with the accountants?
14     A.     That's correct.
15     Q.     No other independent knowledge that
16  you bring from somewhere else?
17     A.     No.
18          MR. HAYWOODE:  For the record,
19  Mr. Dawley testified to these things in
20  Mr. Edmonds' presence.  That record will
21  speak for itself.
22          MR. TRAUB:  The record will also
23  show that that deposition was taken months
24  after the filing of the complaint and the
25  affidavit.

224

John Edmonds

1
2          THE WITNESS:  Yes, that's correct.
3  And it also -- the affidavit reflects the
4  information as gathered by the accountants
5  as of that time.  And I think that what
6  they were referencing is the 2006 records
7  that they had been able to review.
8  BY MR. KELLY:
9     Q.     Do you know what a journal entry is?
10     A.     Nope.
11     Q.     To the extent that there's
12  discussion of journal entries in your affidavit,
13  is that based upon -- what is that based upon?
14     A.     Based upon my discussion with my
15  accountants.
16     Q.     Do you have any knowledge -- or at
17  the time you -- at the time you signed this
18  affidavit, did you have any knowledge of the
19  procedures for journal entries at Dalton?
20     A.     No, that's -- that's something that
21  Dalton keeps among itself.  I do recall the
22  testimony of the chief operating officer with
23  respect to the journal entries, et cetera.
24     Q.     So what is the basis for your
25  statement in the affidavit, page 25,

225

John Edmonds

1
2  paragraph 50, "Clearly defendants are in blatant
3  violation of the government auditing
4  standards" --
5     A.     Based upon --
6     Q.     Excuse me, let me finish.
7          -- "since the conduct of defendants
8  Dalton, Dawley and Marks Paneth & Shron
9  demonstrates that defendant Dalton is not the
10  party preparing the account journals"?
11     A.     Well, based upon two things.  First
12  of all, the statement by the accountants, the
13  statement by the accountants.  And then Dawley's
14  own testimony.
15     Q.     Well, wasn't Mr. Dawley's testimony
16  taken several months after you signed this
17  affidavit?
18     A.     Yes.
19     Q.     So that couldn't be the basis of
20  this affidavit.
21     A.     Yes --
22          MR. HAYWOODE:  I'm going to object
23  to that because Dawley talked to the
24  accountants originally.  If he said the
25  same thing to them that he said at the

226

John Edmonds

1      John Edmonds
2  deposition on February 24th, that might
3  explain it.
4          I just point that out as an
5  objection to form.  You're saying it
6  couldn't have happened, but they talked to
7  each other.  I don't know.
8  BY MR. KELLY:
9      Q.    So if the deposition of Dawley
10 happened after you signed this affidavit, then it
11 couldn't form the basis of any knowledge you had
12 in --
13     A.    I've indicated to you --
14         MR. HAYWOODE:  Objection again.
15         Go on.
16     A.    -- that the information that I have
17 in connection with my affidavit is information
18 that I've secured from my accountants.  And their
19 information I gather is based upon their
20 conversations with Dawley and Nealle Seavey and,
21 I guess, Phyllis Seavey.
22     Q.    When did you have the conversation
23 with the accountants in which they gave you
24 information that supported the statement that
25 Marks Paneth and not Dalton is a party to

227

John Edmonds

1      John Edmonds
2  preparing the account journal entries?
3      A.    I believe that the accountants
4  interviewed Dawley in his capacity as chief
5  operating officer and inquired, about these
6  government operating standards and the other
7  standards, of him.
8          And apparently he responded in the
9  same way in which he responded in his testimony,
10 that -- I have to think.  He must have told them,
11 because that's what they told me, that these --
12 that the Seaveys do not keep a record of their
13 management and control of the monies, that they
14 write down the figure and they put a check next
15 to that figure, or -- and/or bill or whatever,
16 and that they then give it to the accountant and
17 then the accountant converts it to meet their
18 needs.
19     Q.    So the basis of your discussion in
20 your affidavit regarding journal entries is
21 solely based upon your knowledge received from
22 the accountants?
23     A.    That's correct.
24     Q.    Have you ever reviewed any invoices
25 submitted by Marks Paneth & Shron to Dalton or

228

John Edmonds

1      John Edmonds
2  any of the partnerships?
3      A.    Nope.  The only thing I ever
4  received from Dalton are the -- as I said, the
5  family court records and checks that impact upon
6  the employees at the various projects.
7      Q.    So in your affidavit, when you
8  state, "A review of these invoices show that
9  they're not accrued, but instead charged against
10 the 2006 expenses, which is a departure from
11 generally accepted accounting principles" --
12     A.    That's a statement made to me by my
13 accountants.
14     Q.    You have no other outside knowledge
15 about what the contents of the invoices show or
16 whether or not --
17     A.    No.
18     Q.    -- they depart from generally
19 accepted accounting principles?
20     A.    None.
21     Q.    Did you ever have the occasion to
22 have a conversation with William Jennings from
23 Marks Paneth & Shron?
24     A.    I've had some conversations with
25 Jennings through the years, but usually I speak

229

John Edmonds

1      John Edmonds
2  to his first assistant, young lady.
3      Q.    Do you recall that young lady's
4  name?
5      A.    No.
6      Q.    Do you recall having a conversation
7  with Mr. Jennings at the end of 2007 regarding
8  requests for information from your accountants?
9      A.    I may have.  I know that -- I know
10 that I had informed Rudy Clark he should -- at
11 that time that he should be in touch with
12 Jennings.  And also I told the accountants,
13 Cameron, et cetera, that they should talk to
14 Jennings.
15     Q.    You mentioned Rudy Clark in your
16 answer just now.  Did you have discussions with
17 Mr. Clark regarding contacting William Jennings
18 or Marks Paneth & Shron?
19     A.    Yeah, I told him to be in touch with
20 them to get complete copies of tax returns on
21 each of these developments, the whole return, not
22 just that part of the return that might impact
23 on -- on me.
24     Q.    Do you know when you spoke with
25 Mr. Clark about getting this information from

58  (Pages 226 to 229)

230

John Edmonds

1   Marks Paneth & Shron?
2       A.    Oh, I think I spoke to him at the
3   time when I first discussed with him this
4   process, that I was going to go forward on this.
5   And also Rudy had informed me that they sent him,
6   you know, only a partial return.  I don't know
7   the term for it.
8       But that did not reflect the
9   return -- did not reflect all of the information
10  necessary for him to do a tax return that
11  reflects properly what my interest was,
12  et cetera.
13      And as a matter of fact, it appeared
14  that the tax return was prepared such that
15  Edmonds ended up paying all the taxes.
16      Q.    Do you know who prepared the tax
17  returns for the partnerships?
18      A.    I only know that the only firm
19  that's represented Seavey, maybe for 40 years, is
20  the Shron firm.
21      MR. HAYWOODE:  Indicating the
22  defendant Marks Paneth & Shron.
23      Q.    Do you recall when you had Mr. Clark
24  request this information?

231

John Edmonds

1       A.    Is it -- when I first spoke to him
2   before I retained these accountants as a result
3   of Rudy saying to me that he could not do this
4   kind of investigation because of his engagements
5   and work in North Carolina, and that I should
6   seek other accountants who are familiar with
7   affordable housing projects and the requirements
8   of the federal government and the state
9   government and the City of New York.
10      Q.    Did Mr. Clark ever advise you that
11  money was unaccounted for with regards to the
12  partnerships?
13      A.    I don't think he did.  I don't think
14  he advised me of that.  I think that information
15  I received from Cameron, et cetera.
16      Q.    Going back to communications,
17  conversations you may have had with Mr. Jennings,
18  do you recall a particular phone call in which
19  Mr. Jennings said he was going to Europe and that
20  he wouldn't be able to respond to requests from
21  Cameron Griffiths?
22      A.    Yes.
23      Q.    What do you recall about that
24  conversation?

232

John Edmonds

1       A.    Only that he said he would be away
2   for two or three weeks.
3       Q.    Did you say anything during that
4   conversation?
5       A.    To him?
6       Q.    Yes, to him.
7       A.    I said to him that -- you know, that
8   Cameron Griffiths are in need of this information
9   if we're going to progress in terms of our
10  lawsuit, and that we shouldn't have to wait until
11  he came back from Europe to get that information.
12      And he said, John, you know, my
13  assistant is here and you can always deal with
14  her.
15      Q.    And did you direct Cameron
16  Griffiths' advice to deal with the assistant?
17      A.    I don't recall whether I did or not,
18  but I probably did.
19      Q.    In your communications with Cameron
20  Griffiths & Pryce, did you ever have any written
21  communications to them?
22      A.    No.  My communications with Cameron
23  Griffiths & Pryce are always at meetings in their
24  office in Brooklyn, on Utica Avenue.

233

John Edmonds

1       Q.    Other than the two reports that have
2   been marked in evidence today, which is
3   Exhibit 4 --
4       A.    Those are the reports related to the
5   2006 --
6       Q.    -- and Exhibit A to your affidavit,
7   have they provided you any other written
8   materials?
9       A.    No other written.  Oral materials.
10  They have said A, B and C, and they're still
11  having great difficulty in getting the Seaveys to
12  make books, records, et cetera, available to
13  them.
14      Q.    Have they complained to you about
15  Marks Paneth & Shron not making books and records
16  available that were in their possession?
17      A.    I don't recall them making any
18  statement to that effect as to Marks Paneth &
19  Shron.
20      Q.    Are you aware of any statement by
21  Marks Paneth & Shron, written or oral, that you
22  believe to be false?
23      A.    There's no basis for me to -- to
24  assume that any statement that they made may be

234

John Edmonds

1  false; but I do refer you to my conversations
2  with Cameron in which -- when I say "Cameron," I
3  mean his group -- in which they indicate to me
4  that the Shron auditors have the principal
5  responsibility for the returns and accounting at
6  Dalton Management.
7     Q.   Which one of the auditors told that
8  to you?
9     A.   These are discussions I have had
10 with all three auditors at one time.  Usually the
11 meetings -- everybody's present at the meeting.
12 You know, these auditors --
13    Q.   Are you aware -- can you identify --
14    MR. HAYWOODE:  Bill, you asked a
15 question several -- three questions back,
16 and I apologize being late with it,
17 concerning anyone writing to Marks Paneth &
18 Shron.
19       I would --
20    MR. KELLY:  No, I did not ask a
21 question about anybody writing to Marks
22 Paneth & Shron.
23    MR. HAYWOODE:  Well, if you didn't,
24 then I will not point to the series of

235

John Edmonds

1  letters contained in the --
2     MR. KELLY:  Let's not point to them.
3     MR. HAYWOODE:  But if you did, there
4  are several letters in the order to show
5  cause addressed to Marks Paneth & Shron
6  here from the accountants.
7  BY MR. KELLY:
8     Q.   Do you recall, Mr. Edmonds, any
9  representations that have been made to you from
10 Marks Paneth & Shron?
11    A.   Representations of what nature?
12    Q.   Do you recall any statements made to
13 you by Marks Paneth & Shron?
14    MR. HAYWOODE:  Note my objection to
15 the form.
16       Because they issued financial
17 statements every year concerning --
18    MR. KELLY:  Mel, no.  You have your
19 objection.  You don't need to suggest
20 information to the witness.
21    MR. HAYWOODE:  Well, you're saying
22 did they make any representations and there
23 is a financial statement --
24    MR. KELLY:  Mel, please --

236

John Edmonds

1     MR. HAYWOODE:  -- and I object to
2  the form of the question.
3     MR. TRAUB:  Mel, a deposition is not
4  your place to argue with the question other
5  than to form or instruct the witness if
6  there's a problem.  This is not an
7  opportunity to argue the merits of the
8  case.
9     MR. HAYWOODE:  I'm not arguing the
10 merits of any case.  I'm just pointing out
11 that the question carries a tautology in it
12 because it's saying did they make any
13 representations to you when they made
14 representations in a financial statement.
15       Now, who would that be to?
16 Certainly not the subscribers to the New
17 York Times.
18    MR. TRAUB:  You're now arguing with
19 me.
20    MR. HAYWOODE:  I'm not arguing.  I
21 objecting to the form of the question.
22    MR. KELLY:  Make your objection and
23 then we proceed.
24    MR. TRAUB:  You don't need to give,

237

John Edmonds

1  nor are you entitled to give your basis for
2  your objection to form.  You're entitled to
3  say, Objection to form, and that's it.
4     THE WITNESS:  Well, I gather that
5  the process that Mr. Kelly is following
6  here is an attempt to, in effect, indict
7  the accountants.  When I say that, I mean
8  he's trying to show that these accountants,
9  these community accountants, as they've
10 been called by people, don't really know
11 what they're doing and so, therefore, any
12 information that they've gleaned is
13 invalid.
14 BY MR. KELLY:
15    Q.   I'll ask the question again.
16       Do you recall any statements from
17 Marks Paneth & Shron to you?
18    MR. HAYWOODE:  Same objection.
19    A.   I've said to you that, based upon my
20 accountants report, 2006 report, and my various
21 meetings with the Cameron group, I made the
22 statement that I made in my affidavit.
23    Q.   So is your testimony that you do not
24 recall any statements made by Marks Paneth &

60  (Pages 234 to 237)

238

John Edmonds

1    John Edmonds
2    Shron to you?
3        A.    To me, no.  Because I -- the only
4    statement that I recall is the one that I've
5    already testified to, when Jennings told me that
6    he'd be away for three to four weeks and that I
7    could deal with his assistant.
8        Q.    In your discussions with your
9    accountants, were any statements that Marks
10   Paneth & Shron made to them communicated to you?
11           MR. HAYWOODE:  Objection to form.
12           How would he know?  Well, objection.
13       A.    Repeat your question.  What did you
14   say?
15       Q.    In your discussion with your
16   accountants, did they tell you about any
17   statements that Marks Paneth & Shron made to
18   them?
19       A.    They may have.  They probably did,
20   once again, in the meetings that we would have.
21       Q.    Do you recall if they identified any
22   statements that they believe were made by Marks
23   Paneth & Shron that they believed to be false?
24       A.    No, they merely point to the role
25   that Marks Paneth & Shron has in the

239

John Edmonds

1    partnerships.  It's their position that the books
2    and records of the partnerships are kept by the
3    Shron firm, not by partnerships.
4        Q.    And other than what your accountants
5    have told you, you have no source of information
6    for that belief?
7        A.    No, I haven't.
8        Q.    Have you seen any advertisements by
9    Marks Paneth & Shron?
10       A.    None that I know of.
11           MR. HAYWOODE:  Off the record.
12           (Discussion off the record.)
13   BY MR. KELLY:
14       Q.    What contracts did you enter into
15   based upon fraudulent statements?
16       A.    All of them.
17       Q.    When did you enter into these
18   contracts?
19       A.    Whenever the dates are on the
20   documents.
21       Q.    Are you referring to the partnership
22   agreements?
23       A.    Yeah.
24       Q.    Can you identify what statements

240

John Edmonds

1    were said to you at the time that you entered
2    into these agreements?
3        A.    I've said to you that -- that --
4    well, there's really only one kind of approach
5    that Seavey would make that grew out of my use my
6    own monies, that is the monies that I was
7    entitled to get from the partnerships in which he
8    said that he required -- the partnerships
9    required me to resign and they required me to
10   have a limited time, one year, to return the
11   funds, failure to return the funds would mean
12   that I would lose my general partnership and that
13   I would become 1.4 -- one-fourth partner --
14   limited partner and that, at my death, the
15   properties would go to the Seaveys.
16       Q.    Are you aware of --
17           MR. HAYWOODE:  Are you finished?
18       A.    And I said that the monies that I
19   used and repaid was a year late on the basis of
20   the advice given to me by Seavey in which he
21   said, Just put the check in the account and mark
22   it as CL number so and so and so, and it would
23   go -- the bank will have that returned to the
24   account.

241

John Edmonds

1        And I also said that those were -- I
2    recognized late that those weren't Seaveys' money
3    that he was talking about.  He was talking about
4    my own monies.
5        Q.    Are you referring to the agreement
6    marked as Exhibit 10?
7        A.    I guess so.  That's the agreement in
8    which he had me sign all these things, yes, in
9    order to get this advance.
10       Q.    Exhibit 9 and 10 actually is what I
11   was referring to.
12           THE WITNESS:  Where's 9?
13           MR. HAYWOODE:  Here's 10.
14   BY MR. KELLY:
15       Q.    Prior to commencing this action, did
16   you give any consideration to what impact a
17   complaint for $500 million would have on
18   defendant Marks Paneth & Shron?
19       A.    Yeah, serious consideration to that.
20       Q.    What was your consideration?
21       A.    I thought it would send their heads
22   spinning in particular, if a jury made that kind
23   of an award.
24       Q.    Did you consider the impact on Marks

61  (Pages 238 to 241)

**242**

John Edmonds

1  John Edmonds
2  Paneth & Shron's business that a filing of a
3  $500 million complaint would have?
4        A.    No, I didn't consider that. I
5  considered only that I would sign this complaint
6  and that we would proceed and that -- that the
7  courts would make that determination as we went
8  down the road.
9        Q.    I want to direct your attention to
10  Exhibit 8, which is a letter from the Internal
11  Revenue Service.
12        A.    Yeah.
13        Q.    Do you recall discussing this letter
14  earlier today?
15        A.    Yeah.
16        Q.    Isn't it probable and possible that
17  the IRS proposed no change to the tax returns
18  because they were done properly to begin with?
19        A.    Yes, that's all together probable
20  and possible. But I don't know why then they
21  would require Seavey to notice the partnerships
22  and its participants to the effect that there
23  need not be any change in his return.
24              And Seavey said so in his letter.
25  He said that pursuant to the direction of the

**243**

John Edmonds

1  John Edmonds
2  Internal Revenue Service, you are hereby noticed
3  that the return that was filed on the year it was
4  filed, I think, what, 2003, has been accepted,
5  and I'm sending you this letter or notice
6  pursuant to the direction of the Internal Revenue
7  Service.
8              So, you know --
9        Q.    Do you see that the letter is
10  addressed to Mr. Jennings of Marks Paneth &
11  Shron?
12        A.    I don't know who it's addressed to.
13  I only know that I got a copy of it from Seavey.
14        Q.    Do you have any knowledge of any
15  work besides -- well, let me withdraw that.
16              What is your understanding of the
17  work Marks Paneth & Shron did on behalf of the
18  partnerships and Dalton Management?
19        A.    They are, according to the Seaveys,
20  auditors of the partnerships. They also
21  apparently convert the -- the Seaveys' factual
22  situation into a form that reflects a consistent
23  and accurate return. In other words, they play a
24  dual role. The exact nature of that role, you
25  know, I don't want to argue, but --

**244**

John Edmonds

1  John Edmonds
2        Q.    Has anyone ever told you that Marks
3  Paneth & Shron has done anything wrong in
4  connection with their work done on behalf of the
5  partnerships --
6        A.    Yes, yeah. Sure. That's what my
7  accountants have stated.
8        Q.    What have they stated in that
9  regard?
10        A.    They stated that Marks Paneth &
11  Shron are not auditors, but they're both the
12  bookkeepers and the auditors.
13        Q.    Which one of the accountants told
14  you that?
15        A.    The group, as a result of what they
16  saw in the 2006 books and records.
17        Q.    And when did they tell you that?
18        A.    From the very beginning of their --
19  of their tenure.
20        Q.    When did you decide to include Marks
21  Paneth & Shron as a defendant in this action?
22        A.    I decided to include them because I
23  felt that they were facilitating this wrongful
24  conduct by -- and protecting the Seaveys in that
25  wrongful conduct, in that racketeering.

**245**

John Edmonds

1  John Edmonds
2        Q.    When did you make that
3  determination?
4        A.    I made that determination when my
5  accountants reported to me the dual role of Marks
6  Paneth & Shron. They said that's against
7  accounting standards, that was improper; that
8  you --
9        Q.    Did they --
10        A.    They said the two functions should
11  be separated. And they said further, that,
12  generally speaking, in order for an accounting
13  firm to establish that they are strictly the
14  auditors, that there was a procedure whereby the
15  client would -- would be required by the auditing
16  firm to get another auditor for -- to make
17  certain that their role was not improperly
18  interpreted.
19
20              THE WITNESS: Any further questions,
21  Mr. Kelly?
22              MR. KELLY: No, I have no further
23  questions.
24              THE WITNESS: Thank you very much.
25              MR. TRAUB: I have just a few

62 (Pages 242 to 245)

246

John Edmonds

1    follow-up.
2    EXAMINATION (Cont'd.)
3    BY MR. TRAUB:
4        Q.    Mr. Edmonds, you are an attorney; is
5    that correct?
6        A.    That's correct.
7        Q.    And you are a member of the state
8    bar of New York?
9        A.    Yes, for 52 years.
10       Q.    For 52 years as an attorney, and I
11   presume for equally as much time, if not more, as
12   a sophisticated businessman as well --
13       A.    I don't know whether I'm
14   sophisticated or not.  And the reason I don't
15   know that is that a sophisticated businessman
16   wouldn't have allowed his partners to get the
17   kind of advantage that the Seaveys had in this
18   situation.
19       Q.    Then as a businessman, before you
20   sign a contract, and especially as an attorney,
21   you review that contract, do you not?
22       A.    Yes, of course.
23       Q.    And you read every term in that
24   contract and you probably even negotiate
25

247

John Edmonds

1    contracts that you sign before you sign them?
2        A.    Yeah, particularly for clients, but
3    I don't do it necessarily with that kind of
4    approach as it relates to partners, people who
5    are in business with me.
6        Q.    But you are capable of doing that
7    type of approach, are you not?
8        A.    Yes.
9            MR. TRAUB:  Nothing further.
10   EXAMINATION
11   BY MR. HAYWOODE:
12       Q.    You mentioned the redemption of your
13   interest in the partnership paid in 2001 and that
14   you gave --
15       A.    No, I think -- I think -- was it
16   2001?  Whatever the check -- the date -- I think
17   maybe it was 2001.
18       Q.    September 2001, would that refresh
19   your recollection?
20           I'll withdraw the question.  That's
21   not important.
22           How much money did you pay to redeem
23   your interest in the corporation?
24       A.    I paid --
25

248

John Edmonds

1        MR. TRAUB:  Objection to the form.
2    I don't think that --
3        MR. KELLY:  No talking objections.
4        MR. TRAUB:  I just object to form in
5    terms -- objection to the use of the term
6    "for redeeming your partnership interest."
7        A.    Well, the -- did I pay -- how much I
8    paid, I think it was $2.1 million.  I'm not sure.
9    2.1 -- no, wait a minute.  Was it -- no.  Yeah,
10   it was 2.1, but that included interest at the
11   rate of 16 percent annually.  I paid that -- I
12   put that money back in the account that Seavey
13   instructed me to put it in.
14       Q.    Was any further discussion held on
15   the subject after you paid that money?
16       A.    No, I just told Bob that I was
17   redeeming my interest, although it was a year
18   late, by repaying the obligation.
19       Q.    And in whose name was the account to
20   which you returned that money?
21       A.    It was in the Morgan Chase account.
22       Q.    Were you a signatory on that
23   account?
24       A.    Yes, I was.
25

249

John Edmonds

1        Q.    Was anyone else a signatory along
2    with you on that account?
3        A.    Seavey and -- as I read it, I
4    realized that Avery, Dalton Management and
5    Nealle, everybody was on the account.
6            MR. HAYWOODE:  All right.  Nothing
7    further.
8            (Examination concluded.  The time is
9    4:55 p.m.)

63  (Pages 246 to 249)

250

1
2  STATE OF NEW YORK      )
3                  ss:
4  COUNTY OF WESTCHESTER  )
5
6
7      I, JOHN EDWARDS, the witness herein,
8  having read the foregoing testimony of the pages
9  of this deposition, do hereby certify it to be a
10 true and correct transcript, subject to the
11 correction, if any, shown on the attached page.
12
13              oOo
14
15
16
17  _____
18              JOHN EDWARDS
19
20
21 Subscribed and sworn before me
22 this _____ day of_____, 2009.
23
24 _____
25     NOTARY PUBLIC

252

1
2  (Continued)
3          E X H I B I T S
4
5  Exhibit 7   6/22/07 Letter to variety of      152
6              people from John Edmonds with
7              attachment
8  Exhibit 8   10/26/06 Letter from the IRS to    155
9              Jennings with attachment
10 Exhibit 9   Agreement for Purchase and Sale   168
11             of Partnership Interest
12 Exhibit 10  Second Amended Agreement of        168
13             limited partnership of Fifth and
14             106th Street Associates, L.P.
15 Exhibit 11  Amended and Restated Certificate  174
16             of Limited Partnership of Charles
17             H. Housing Associates
18
19
20
21
22
23
24
25

251

1
2  April 17, 2009
3          I N D E X
4  WITNESS       EXAMINATION BY         PAGE
5
6  JOHN EDWARDS
7          MR. TRAUB          5
           MR. KELLY         218
8          MR. TRAUB         246
           MR. HAYWOODE      247
9
10         E X H I B I T S
11 EDWARDS                    PAGE
12
13 Exhibit 1   3/8/07 Letter to Seavey from    40
14             Edmonds
15 Exhibit 2   7/31/06 Letter to Edmonds from  51
16             Seavey
17 Exhibit 3   3/27/07 Letter to Seavey from   72
18             Edmonds
19 Exhibit 4   12/12/07 Cameron, Griffiths &   91
20             Pryce letter  attaching their
21             report
22 Exhibit 5   Affidavit in Support of Order to 120
23             Show Cause
24 Exhibit 6   Verified Complaint             126
25

253

1
2          ERRATA SHEET
           VERITEXT REPORTING COMPANY
3          1-800-727-6396
           1350 BROADWAY
4          NEW YORK, NEW YORK 10018
5
6  NAME OF CASE:    EDMONDS V. SEAVEY
   DATE OF DEPOSITION:  APRIL 17, 2009
7  NAME OF DEPONENT:   JOHN EDWARDS
8
9  PAGE  LINE(S)   CHANGE        REASON
10 ___|___|_____|_____
11 ___|___|_____|_____
12 ___|___|_____|_____
13 ___|___|_____|_____
14 ___|___|_____|_____
15 ___|___|_____|_____
16 ___|___|_____|_____
17 ___|___|_____|_____
18 ___|___|_____|_____
19 ___|___|_____|_____
20
21          JOHN EDWARDS
22 Subscribed and sworn to before me
23 this _____ day of _____, 2009.
24
25 _____

64  (Pages 250 to 253)

VERITEXT REPORTING COMPANY

(212) 279-9424          www.veritext.com          (212) 490-3430

254

```
1
2    STATE OF NEW YORK    )
3                    ss:
4    COUNTY OF NEW YORK   )
5
6         I, Eileen Mulvenna, Notary Public
7    within and for the State of New York, do hereby
8    certify:
9
10        That I reported the proceedings in
11   the within entitled matter, and that the within
12   transcript is a true record of said proceedings.
13
14        I further certify that I am not
15   related to any of the parties to the action by
16   blood or marriage, and that I am in no way
17   interested in the outcome of this matter.
18
19        IN WITNESS WHEREOF, I have hereunto
20   set my hand this 28th day of April, 2009.
21
22
23        _____
              Eileen Mulvenna, CSR/RMR
24
25
```

65  (Page 254)

1

## A

**Abe** 159:8,24 160:7
    160:10
**able** 20:17 22:22
    26:8 50:16 96:17
    113:22 123:5
    186:8 192:4
    194:22 196:12
    207:14 213:8
    224:7 231:21
**ABN** 167:8
**ABNS** 167:9 184:15
    188:5,7,8 210:22
    211:7 213:19
    215:15 216:18
    217:2,3,3,5,9
**aboard** 185:3,4
**above-cited** 41:14
**absolute** 106:20
**absolutely** 82:14
    166:8 181:14
**abuse** 58:23 59:6,7,8
    60:20 61:4 78:4
    118:2 146:17
**abused** 77:19
**abuses** 60:19 70:14
    76:24 79:16,17,19
    79:23 87:23,24
    88:4,8,13,17
    124:21
**abusive** 70:19
**accept** 29:17 157:5,8
    173:22,24
**accepted** 14:5 221:6
    221:16 228:11,19
    243:4
**access** 200:15
**account** 43:10 45:23
    46:3 49:9,13 50:12
    52:3,5,5 98:19
    108:22 145:5,22
    146:7 172:4,7
    199:15,16,18,25
    200:8,9 205:7,11

205:25 206:2,5,20
    207:3,10 225:10
    227:2 240:22,25
    248:13,20,22,24
    249:3,6
**accountant** 80:5
    83:13,25 134:6
    197:9 212:18
    227:16,17
**accountants** 70:25
    71:8 74:10 80:7,13
    82:13 83:16 90:15
    98:9 101:9 102:14
    122:17 124:14
    134:3 141:17
    152:16 154:14,18
    154:21 159:2
    162:22,25 164:7,8
    164:13 192:12
    193:13,14 196:12
    199:23 200:13,24
    201:17 202:20,22
    202:23 204:5,9,11
    221:7,13 222:16
    222:17,23 223:4,5
    223:6,13 224:4,15
    225:12,13,24
    226:18,23 227:3
    227:22 228:13
    229:8,12 231:3,7
    235:7 237:8,9,10
    237:21 238:9,16
    239:5 244:7,13
    245:5
**accountant's** 83:22
    212:17
**accounting** 72:24
    73:6 80:3 83:6
    88:20 97:14
    108:16 220:24
    221:2,12 228:11
    228:19 234:6
    245:7,12
**accountings** 59:11

**accounts** 23:20
    46:15 49:5,14,18
    71:10,16,17
    103:12 108:6,18
    128:22 190:12
    199:4,9 202:12
    205:14,14,24
    206:14 211:3
**accrued** 114:10
    116:8 228:9
**accurate** 52:12 71:3
    123:2 138:3 189:3
    201:7 243:23
**acknowledge** 51:19
**acquiring** 19:3
**acreage** 17:9
**acres** 17:9
**act** 56:19 57:14
    184:19
**acting** 148:6 184:22
**action** 7:16 57:18,23
    58:18,20,21 59:2
    75:3 76:5,9,14
    78:10 126:16
    134:11 179:24
    180:2 203:12
    241:16 244:21
    254:15
**actively** 32:15
**actual** 8:4 28:25
    115:19 122:20
    198:22
**add** 84:9 116:20
    160:17
**added** 130:17
**additional** 111:21
    160:17
**address** 5:8 75:12
    111:3 219:11
**addressed** 235:6
    243:10,12
**addresses** 199:10
**addressing** 219:2
**administer** 4:15

**administration**
    10:15
**advance** 241:10
**advantage** 77:20
    246:18
**advantages** 220:19
**advertisements**
    239:9
**advice** 232:17
    240:21
**advise** 231:11
**advised** 51:24 94:19
    95:6 231:15
**affidavit** 69:9 85:13
    85:15 96:4 119:7
    119:14 120:6,9,16
    131:12 135:9,17
    135:21,22,24,25
    136:3,4,6,7,9,14
    137:12,17,25
    138:2 139:17
    141:9 145:14
    149:6 161:5
    165:10 167:11
    173:3 174:13
    177:14,18 193:23
    196:9 198:10,16
    198:22 205:4
    207:17,24,25
    221:15 222:13
    223:11,25 224:3
    224:12,18,25
    225:17,20 226:10
    226:17 227:20
    228:7 233:7
    237:23 251:22
**affidavits** 85:11
    198:11
**affordable** 62:24
    64:11 65:12 89:22
    173:19 231:8
**afternoon** 47:5
    218:19,20
**agencies** 64:11

207:12
**agency** 62:11 63:25
64:4,20 145:22
146:6
**agency's** 145:5
**agent** 11:17 100:13
140:21 144:11
213:17
**ago** 62:22 73:5
136:19 149:10
219:18 220:16,16
**Agora** 32:4
**agree** 50:5 61:6
110:14,15 128:10
129:9,14 151:10
158:6
**agreed** 4:2,7,12 25:9
105:22 109:12
128:13 136:5
173:22,23
**agreement** 5:14
30:15 31:22 34:12
35:20,21 106:13
109:10 137:15
138:19 139:3,11
139:16 140:9
141:7,11,14
142:22,25 143:3,5
143:7 145:21,24
168:14,20,25
169:9,10,25 170:5
170:7,9,14 171:5,7
172:9 183:16,18
183:19 184:15,25
185:5,6,8,9,12
186:10 194:20
208:23 209:15
210:14,15 215:15
215:15 216:10
218:4 220:4,6
241:6,8 252:10,12
**agreements** 69:11
138:14 140:16
183:10,12,14

185:17,20 189:11
191:4 192:18
208:14,17 215:11
217:13 239:23
240:3
**ahead** 43:17 71:14
133:15 137:11
153:24 158:10
**al** 3:10
**Albany** 187:15
210:4 216:11
**allegation** 163:11
**allegations** 136:6
139:23
**allege** 211:15
**alleged** 57:24
116:17 117:6
159:8
**allegedly** 200:7
**alleges** 211:13
**allow** 6:9,20 56:13
**allowed** 78:22 93:17
101:19 154:19
211:24 246:17
**allowing** 6:14
**alternative** 190:17
**amended** 163:2
168:20 169:25
171:6 172:9 174:7
174:22 252:12,15
**amendment** 171:4,8
**Amorgin** 64:7
**amount** 13:4 103:13
104:4 109:8 114:9
114:15,22,23
116:7 132:8
133:24 134:13
199:12
**amounts** 9:2 32:9
40:10 50:25 51:2
63:13 108:17
171:9 183:8
185:16 188:15
189:10,24 191:2,8

**Amsterdam** 29:23
29:24 30:4,9,24
33:5
**analyses** 164:14
**analysis** 133:2,23
164:13 223:8
**Andrew** 48:18
**and/or** 152:23 190:5
199:10 210:22
218:10 227:15
**annual** 103:23
**annually** 248:12
**answer** 6:11,14,22
8:17 21:13 24:8
57:21 66:18 67:10
67:18 70:10 73:22
74:8 77:15 78:25
79:10 82:18,20
86:7 94:7 99:15,17
100:22 103:3
113:11 118:7
123:15 126:13,14
131:11 137:21,23
142:18 143:10,14
150:19 172:24
190:2 210:11
222:7 229:16
**answered** 73:20
79:20 118:6,8,23
131:16,17 137:24
147:16 150:18
179:15
**answering** 56:25
66:15 134:23
**anticipate** 75:20,21
**anticipating** 76:14
**anybody** 83:18
198:4 212:19
234:22
**apartment** 10:7
36:21,23 37:7,19
**apartments** 22:10
**apologize** 11:23
138:25 153:3

234:17
**apparently** 19:24
34:20,23 60:12
216:21 220:11
227:8 243:21
**appear** 20:9
**appeared** 20:5,13
230:14
**appears** 127:16
170:22 208:22
**applicable** 144:17
**application** 20:10
**apply** 69:4 190:16
**appointment** 65:3
**appreciated** 218:23
**approach** 16:24
17:7 22:9 98:20
133:22 240:5
247:5,8
**approached** 49:19
**appropriate** 108:22
108:23 148:8
154:2
**approve** 25:6 50:3
207:15
**approved** 28:22
29:7 209:17
**approximately**
14:12 111:22
129:6 130:8
133:24 162:15
199:3
**April** 1:24 2:6 251:2
253:6 254:20
**architect** 15:9 19:20
**area** 60:13 65:13
82:11 89:16
173:19 209:10
215:13
**argue** 96:19 236:5,8
243:25
**arguing** 236:10,19
236:21
**argument** 148:4,11

3

148:12
argumentative
  76:19 80:22
  118:13 148:20
arm 19:8
arrange 18:23
arranged 45:10 65:3
  167:24
arrangement 8:18
  8:22 18:23 26:7,15
  146:19,20 178:13
  220:18
arrested 99:12
asked 10:2 13:4,7
  20:7 29:9 36:19
  39:5 44:12 46:15
  47:23 52:16 59:18
  66:25 74:10 78:8
  84:13 85:7 92:8
  94:15 99:21
  105:17 106:9
  113:20 116:10
  130:15 131:19,21
  131:22 142:21
  147:15 162:23
  181:10 203:15
  204:4 234:15
asking 80:20 89:6,7
  102:2 103:3
  117:18 131:8
  133:4,6 135:10
  142:9 143:17
  164:24
assertions 145:17
assessments 144:22
  144:25
assets 24:25 26:13
  27:23
assign 34:24
assigned 35:2
  170:15
assignment 34:4
  74:15,17,19,20,21
  169:20

assist 9:16
assistant 10:15
  229:2 232:14,17
  238:7
associate 39:4
associates 1:6,6,6,7
  1:12,12,13,13,13
  1:16,16 34:25
  108:7 112:8,11,21
  113:2,8 114:14,16
  115:2,7 117:2
  139:12 140:9
  156:6 157:4,21
  168:21 170:2
  171:6 172:10
  174:9,14,24 175:2
  175:3,5 176:8
  195:6 197:15
  252:14,17
assume 35:19 55:3
  59:10 222:9
  233:25
assuming 76:20
assured 161:18
attach 51:2
attached 119:14
  120:8 139:4
  165:10 193:12
  196:7,11 198:24
  199:6 250:11
attaching 91:6
  251:20
attachment 155:7
  252:9
attachments 152:4
  252:7
attempt 60:23,23
  99:6 111:2 113:23
  161:9,23 163:24
  237:7
attempted 18:23
  102:15 128:21
attempting 85:5
attempts 162:12

attendance 52:9
attention 53:2 242:9
attesting 127:24
attorney 31:15 75:8
  153:10 158:12
  246:5,11,21
attorneys 3:5,10,15
  4:3 15:22 40:2
  134:15
attorney-client 75:7
attributed 108:20
audit 76:17,20,22
  78:11,13 81:2 82:2
  82:5 91:24 96:10
  96:12 97:14 98:12
  113:25 114:7
  115:18,19 116:6
  116:25 117:4,6
  150:23 156:10
  161:9,23 162:12
  163:16,25 191:15
  204:6
auditing 74:11
  83:23 94:11 98:20
  122:14 190:17
  221:6,10,16 225:3
  245:15
auditor 83:25 89:19
  89:20 108:17
  245:16
auditors 1:19
  117:25 123:8
  128:21 129:3
  130:8,14,17
  131:14 149:13,24
  150:4,20 158:19
  161:24 162:14
  163:14 165:21
  191:13 192:2,3
  193:23 195:19
  197:4,6,21 198:2
  199:2,8 212:3
  221:19,20 234:5,8
  234:11,13 243:20

244:11,12 245:14
auditor's 110:19
  182:8 183:3
  188:13 189:4,17
  189:22 211:20
  213:10
audits 88:20 190:3
authority 10:14
  12:18,24 13:2
  16:25 18:8 20:20
  20:23 22:7 61:16
  62:2
authorized 4:14
available 76:22
  119:12 151:5,5
  152:22,24 158:20
  173:20 200:24
  202:11,13,14
  204:3 233:13,17
Avenue 2:5 3:11
  17:19 37:15 43:14
  47:22 53:19 64:3
  159:11 160:18
  178:20 232:25
Avery 1:15 41:18
  43:6,13,20,22,23
  46:11 87:15
  105:15 109:12
  167:8,9 173:17,21
  173:24 186:9,19
  187:7,10,25
  216:18 249:5
avoid 180:20 218:21
avoided 68:2
avoiding 68:5
award 16:10 28:12
  32:9,23,24 241:24
aware 49:12 61:8
  62:8 65:22 67:21
  67:24 74:15 88:8
  184:25 185:7,11
  205:9,12 214:2
  215:5,19 221:14
  233:21 234:14

4

240:17
**a.m** 2:7
**a/k/a** 1:6

**B**

**B** 1:15,17 144:7,8
151:4 169:7
198:24 199:5,14
233:11 251:10
252:3
**back** 6:15 8:6 18:16
22:12 26:4 29:13
32:8 35:8 43:18
44:13 45:8,9 49:3
53:2 67:7 74:23
75:9 90:8 94:4
99:18 107:17
120:20 121:4
139:7 140:2
141:18 143:18
156:20 158:3,5,8
158:14,15 160:24
161:14 171:24
172:4,11,18,23
173:2 177:13
182:23 194:7
216:8 231:17
232:12 234:16
248:13
**background** 89:24
107:14 108:9
110:25 220:24
**backgrounds** 90:5,7
**badgering** 80:18,23
**balance** 169:17
192:5 221:25
222:4,14,19
**balances** 190:10
191:17,24 192:10
223:11
**bank** 23:20 43:11,12
43:13,25 45:23
46:3 49:5,6,9,10
49:12,13,16,17,17
49:20 50:12 52:2,2

52:4 171:11
240:24
**banker's** 201:8,10
**banking** 51:25
**Banks** 18:11,13
**bar** 20:7 246:9
**base** 134:20
**based** 28:12 77:9
79:23 96:10
196:25,25 197:3
197:22 201:5
219:19 222:15
223:12 224:13,13
224:14 225:5,11
226:19 227:21
237:20 239:16
**basic** 184:17 191:14
**basically** 25:4 64:8
178:9 217:16
**basis** 27:21,22 31:20
56:12 63:5,10 69:7
77:3 122:13,24
123:22 124:2,11
124:22 126:9
129:11 130:6,12
137:25 138:4
141:22,23 162:18
162:20 163:9,11
166:18 168:6
179:18,20 180:22
181:2,5 183:6
188:14 189:7
206:18 208:11
217:8 218:7
220:15,17 221:18
223:8 224:24
225:19 226:11
227:19 233:24
237:2 240:20
**bear** 219:2
**beat** 107:6
**becoming** 83:17
**bedrooms** 37:9
**Beekman** 42:14

**began** 14:25
**beginning** 17:14
159:21 201:22
202:2 244:18
**begins** 75:20 141:3
141:4 144:10
161:8
**behalf** 31:15 57:23
59:20 62:15 63:23
63:24 99:22 100:5
101:2,21 102:11
178:2 185:23
197:18 206:24
243:17 244:4
**behaving** 184:21
**belief** 128:5 195:13
196:18,21 197:2
198:11 217:8
239:7
**believe** 9:9,20 11:4
11:23 15:2,10
20:25 38:18 48:16
52:23 55:8 58:15
62:19 63:2,6 64:2
64:5 66:15,18
68:21 74:9 89:17
89:20 114:8,19
115:20 116:12
118:5 125:3 128:6
131:6 134:2 135:2
138:3 141:15
145:20 155:24
156:13,13 159:3
167:21 174:3
185:22 186:13
191:6 195:6
200:15 206:4,12
227:3 233:23
238:22
**believed** 238:23
**belong** 115:25
**belongs** 104:24
106:21
**below-the-market**

215:18
**below-the-market...**
220:5
**Ben** 15:9
**benefit** 104:25
153:21 184:21
**benefits** 144:12
**Benny** 15:10 16:5,6
**best** 37:7 184:19,23
218:21
**better** 85:23 204:10
**beyond** 69:18,25
78:21 79:6 95:14
101:18 109:25
178:25 215:14
220:5
**bill** 30:2 132:20
218:14 227:15
234:15
**billion** 171:12
**binder** 182:20
**bit** 20:12
**blatant** 225:2
**blocked** 150:25
**blood** 254:16
**blown** 84:5
**BLS** 25:20
**BNA** 169:12 170:16
170:16
**board** 11:6 12:17
18:7 25:4,6,8,14
25:22 26:4 27:15
**Bob** 17:22 24:2
34:13,14,15,22
36:4,4 39:22 41:3
44:12,14 45:4,5,10
45:16 46:2,7,8,9
46:18,25 47:3,12
47:19,21 48:12,16
58:24 59:25 60:16
60:18 63:2 65:3
77:6,9 84:3 98:8
98:24 104:3
105:13 107:2

5

159:12 160:12
166:22 167:9,23
167:24 169:14
170:5,7 171:22
185:9 219:15
248:17
**Bob's** 44:13 65:5
159:16
**bold** 188:20
**bonds** 23:19
**book** 154:2
**bookkeepers** 244:12
**bookkeeping** 144:14
**books** 41:11 42:5,9
42:23 43:2 53:5
54:6,12 71:25
74:22 76:21 87:14
87:20,22 89:21
91:24 97:8 103:13
104:21 106:17,24
109:9 110:16
112:17 122:15
133:20 136:11
150:22 151:16
152:17,20,22,23
154:12 158:20
193:16 195:24
197:5,22 199:21
202:7 204:2
210:21 211:15
233:13,16 239:2
244:16
**borne** 140:20
**borrow** 63:5
**Boston** 173:16 174:3
**bother** 100:11
102:17 159:22
**bothering** 100:20
**bottom** 72:20
103:18 110:5
111:2 118:17
158:16
**bought** 30:11
**boxes** 201:8,9,11

**boy** 144:7
**breach** 68:17,21
**breached** 192:11
**break** 6:18,23 90:18
90:20,23 120:23
120:23 207:19
216:4
**bring** 22:20 26:8
160:2 180:25
223:16
**bringing** 181:5
**Broadcasting** 24:13
24:14,19 26:18
27:23
**BROADWAY**
253:4
**broker** 34:3 35:10
219:9
**Brook** 53:18
**Brooklyn** 3:6 53:18
232:25
**brother** 48:9
**brothers** 45:16
**brought** 15:4 17:25
20:16,16 30:24
47:18 48:20 57:23
180:22
**budget** 9:15
**build** 17:13 22:9
**builder** 10:23,24
**building** 10:7 13:19
37:8,15 48:17
59:23
**buildings** 17:15
33:9,14,24 183:21
**built** 10:6 160:19
**business** 33:18
36:22 37:10,24
38:8 43:11 46:3
54:2 60:22 68:25
88:8 115:24
118:25 128:22
173:18 209:13
220:14,14 242:2

247:6
**businesses** 38:7
**businessman** 33:22
246:13,16,20
**busy** 37:3 43:23
74:14
**buy** 19:25

---

**C**

**C** 3:2 151:4 233:11
**calculated** 65:15
**calculating** 65:17
**California** 102:20
**call** 46:5,7,23 53:14
75:7 100:15,15,17
107:12 153:10
167:5 180:4
183:25 231:19
**called** 10:12 11:5
23:8 29:15 37:16
38:17 43:22 45:10
79:6 110:10 167:8
171:21 237:11
**calls** 44:21 88:24,25
159:24 160:7
**Cameron** 72:25
73:7,9 74:4,17
75:2 76:12,16
78:11,12,19 81:2
81:21,25 82:4
84:10,22 85:11,22
86:4,5 87:8 88:4
88:19 91:5,14,23
92:3,17 93:7,13
95:12,21 96:4 99:6
101:23 102:22
109:13 111:15
118:21 122:12,25
133:18 188:18
211:11 229:13
231:16,22 232:9
232:16,20,23
234:3,3 237:22
251:19
**campus** 187:19

**capability** 11:14
**capable** 204:6,8,9
204:10 247:7
**capacious** 204:17
**capacity** 41:11
227:4
**capital** 176:2,5
**card** 43:24
**care** 104:24 117:14
**Carl** 26:7 30:2
**Carolina** 17:2,6,10
17:24 20:7 21:8,9
22:8,13,18,21 23:6
53:10,23 54:3,15
231:6
**carries** 236:12
**case** 1:3 7:8 32:5,5
85:10,12,18,20
122:19 123:15
141:21 145:20
146:18 212:13
236:9,11 253:6
**cat** 59:4
**categories** 93:11
132:8
**cause** 85:14 95:20
96:3 119:8 120:7
120:17 149:12
235:6 251:23
**caused** 163:16
**cc'd** 105:15
**CDs** 23:20
**ceased** 52:6
**Central** 5:11
**certain** 10:17 94:20
94:23 171:19
205:10 206:14
245:17
**certainly** 95:13
105:7 151:15
236:17
**certificate** 174:8,23
217:4,6 252:15
**Certified** 2:8

**certify** 250:9 254:8
254:14
**cetera** 15:23 17:12
20:3 27:25 49:23
54:13 63:14 70:21
87:14 103:25
159:18 178:19
179:5 192:11
203:4 209:23
216:20 220:7
224:23 229:13
230:13 231:16
233:13
**chairman** 24:15
25:3,18 30:17
167:6
**chance** 82:21 83:3
**Chancellery** 3:6
**change** 51:25
155:21 242:17,23
253:9
**changed** 34:22
162:25 214:20
**characterization**
96:13 211:19
**characterizations**
204:20
**characterized**
130:24
**characterizing**
181:12
**charge** 43:16 44:8
82:8
**charged** 228:9
**Charles** 1:6,6,12,13
7:11 115:2,5,6,14
174:9,13,19,24
175:2,3,5,6,10,12
176:8 177:10
252:16
**Charleston** 22:8,18
23:6
**charming** 102:18
**Chase** 49:17 52:3,5

171:11 172:4
248:22
**check** 107:3 119:18
131:9,9,10 172:4
205:8 227:14
240:22 247:17
**checks** 50:20 51:3,4
51:5 52:8,10,19,22
52:25 193:11
194:14 210:6,9,12
210:13 211:5,9
213:21 228:5
**chief** 1:18 41:20,21
41:23 224:22
227:4
**chose** 51:25
**Church** 1:7,13,16
7:11 112:4,5,8,11
112:20 113:2,8
114:2,8,14,16
115:3,7,14,16,18
117:2,10 139:12
140:9 145:20
195:5 197:14
**circle** 25:5
**circumstance** 220:2
**circumstances**
172:21
**citation** 146:16
**cite** 55:25 138:21
140:18 148:14
165:7 188:9,10,12
194:4 221:17
**cited** 146:17 171:9
**citing** 32:4
**city** 7:23 8:2,14
10:12,17,20 11:24
12:11,23,25 15:6,7
15:16 17:3 18:14
18:15 19:14 21:16
24:12,14,19 26:18
27:23 42:13
205:17 231:10
**CIV** 1:3

**Civil** 5:18
**CL** 172:5 240:23
**claim** 58:4
**claimed** 129:7 130:9
**claiming** 39:25
104:19,20
**claims** 215:6,20
**Clarence** 30:2
**Clark** 22:22 41:8,10
42:3,8,11,15 53:4
53:7,22 54:6,19
55:7,7,9,14 229:10
229:15,17,25
230:24 231:11
**Clark's** 53:9
**classification**
211:14
**clause** 141:3
**clean** 120:21 178:11
**clear** 42:14 77:18
79:2 83:21
**clearly** 198:8 225:2
**clerical** 144:14
**client** 34:9,15,19
123:13 172:6
245:15
**clients** 53:11 54:10
54:11 207:7
209:13 219:20
220:13,13 247:3
**Clinton** 10:15
**close** 17:10 194:7
**closing** 159:12,13
**coffee** 6:25
**collected** 50:25
**College** 17:11
**column** 63:12,15
**combination** 48:5
**combined** 27:6,7
165:16,20,23
**come** 32:8 36:19,23
46:16,19 47:13
48:5 52:22 54:11
55:16 76:23 121:4

133:23 202:7
210:10
**comes** 47:12 127:14
180:3
**commencing** 2:6
99:5 241:16
**comment** 61:14
212:18
**comments** 56:9
217:25
**commercial** 208:8
210:2
**commissioner** 10:16
59:16 64:19
**commissions** 38:3
**committed** 16:6
28:14 76:24
**committing** 61:4
**communicated**
177:22 238:10
**communications**
101:14 231:17
232:20,22,23
**community** 8:9,10
27:14 33:18
220:12 237:10
**companies** 35:7
68:25 89:22
185:23 190:8
196:2 216:23,24
216:25
**company** 1:5,15,17
1:18,18,19 11:3,14
14:20,24,24 22:15
24:2,17 28:3,3
30:13 32:10 33:7
35:5,18 38:17,18
38:20 39:2,6,19
41:12,13,18,24
42:6,10 88:11
108:15,21 109:19
109:22 111:3
115:24 119:4
120:2 124:4

7

166:14,15,20
167:5 169:12
173:9 176:15
178:13,23 179:2
186:3 187:25
216:17 222:9
253:2
**company's** 190:4
**compelling** 157:14
**compensation**
144:11,18 145:9
145:23 146:3
**complained** 233:15
**complaint** 40:15
69:8 76:8 80:19,22
119:6 120:5
122:13,21 123:7
123:23 124:2,11
124:17,25 125:6
125:13,18 126:10
126:12,15,22
127:10 128:2,8,11
128:12,14 129:18
130:7 131:6,12,13
134:9 138:3 196:8
223:24 241:18
242:3,5 251:24
**complete** 6:14,21
11:7 59:11 60:24
95:20 97:21 98:12
163:16 190:3
195:23 229:20
**completed** 13:6,16
13:18,19,20 14:21
67:18 155:18
**completion** 12:16
13:5,11 14:10,14
**comprise** 7:12
**comprises** 134:10
**computer** 192:19
193:5
**concerned** 99:8
**concerning** 35:12
174:13 234:18

235:18
**concise** 56:10 93:19
**concisely** 56:5
148:16
**concluded** 45:25
249:9
**conclusion** 96:10,14
96:25 160:10
**conclusions** 96:25
**condemnation** 12:7
**condominium** 9:24
11:16
**condominium-type**
22:10
**conduct** 58:16 59:3
73:2 87:15 124:3,7
147:20 153:12
225:7 244:24,25
**conducted** 16:4
**conference** 154:2
**conferences** 130:13
130:16,19
**confidentiality**
82:12
**conflict** 38:12
**confused** 9:25 55:4
**confusing** 114:25
115:4
**connection** 30:24
41:10 57:24 85:13
85:15 118:25
124:4 149:15
160:12 169:24
183:9 185:17
189:11,25 191:3
194:2 196:3 208:7
226:17 244:4
**consider** 180:4
184:20 241:25
242:4
**consideration**
241:17,20,21
**considered** 42:17
145:9 242:5

**considering** 11:18
14:23 22:13
**considers** 41:22
**consist** 9:19
**consisted** 9:20 12:18
18:2,7
**consistent** 76:23
183:6 188:14
189:7 243:22
**consistently** 96:16
**conspired** 214:24
215:7,23
**conspiring** 206:4,8
206:9
**constitutes** 92:13
93:6 96:9
**constraint** 66:22
**construction** 10:5
11:3
**contact** 15:25
195:20 199:11
**contacted** 53:16
196:3
**contacting** 196:7
197:2 229:17
**contained** 93:4
94:25 95:7 97:4
98:15 101:3
102:24,25 103:8
128:25 136:9
137:14,17 235:2
**contains** 122:24
**contending** 183:22
183:24 200:8
**contention** 135:5
188:10 194:18,21
195:4 210:18
218:5,8
**contents** 128:3
228:15
**contesting** 114:13
115:18,22 116:16
116:17,24
**continue** 29:17

32:16 77:17 145:3
148:5,6 153:2
200:4,14,14
202:13
**Continued** 252:2
**continues** 58:16
117:25 145:2
184:9
**continuing** 21:11
112:12,16 113:23
124:14,19 203:25
**contract** 34:24
35:16 50:6,8 68:23
69:17 111:23
115:21 142:9,11
159:14,14 184:3
246:21,22,25
**contracted** 114:9
116:7 208:3
**contractor** 10:23
**contractor's** 10:25
**contracts** 119:9,11
119:13,15,19
120:8 136:13
177:25 193:25
194:16 217:23
239:15,19 247:2
**contractual** 68:18
68:20,22 217:13
**contribution** 176:2
**control** 32:12 59:11
60:24 117:9
119:25 166:13
174:2 181:6
227:13
**controlled** 23:25
24:20 62:9,13
167:7 206:2
**controllers** 76:25
**controlling** 31:23
32:25 199:21
**Cont'd** 122:7 246:3
**convenience** 49:24

conversation 37:2
214:24 215:4,21
226:22 228:22
229:6 231:25
232:5
conversations 56:23
57:6 226:20
228:24 231:18
234:2
convert 193:14,15
243:21
converted 169:18
converts 227:17
conveyed 170:16
cooker 218:2
copies 52:11,24
229:20
copy 41:9 98:22
120:21 214:10
216:12 243:13
Corp 51:4 209:20
corporate 23:2
26:12
corporation 17:19
24:20,23 25:2
26:13 27:24 29:10
30:6,18 31:23
32:12 41:25 62:16
62:21 63:25
187:24 215:16
247:24
corporations 216:20
correct 5:23 9:6,14
11:21 12:4 13:22
14:15 16:18,19
17:6 30:25 35:4,6
35:15,25 38:5 40:2
40:3 47:2 48:21,22
49:11 50:6 58:8,9
62:14 69:15 72:7
73:8 76:15 77:25
78:2 94:18 106:25
109:3 111:24
115:8,15,15 123:8

125:6 132:21
134:18 138:22
139:18,23 140:24
143:15 151:18
152:12 153:6,7,12
153:13 158:21
167:18 168:11
169:13 170:3,23
171:3 173:6,7
174:16,17,20
175:22 176:6,10
176:18,20,23
181:15 188:8
189:17 195:9
201:3 205:25
209:21 218:11
223:14 224:2
227:23 246:6,7
250:10
correction 250:11
correspondence
37:14 41:15,16
42:21
corresponds 56:2
Corrupt 57:14
cosign 50:20 52:7,17
52:22 59:19
cost 140:20
costs 134:15 177:23
counsel 5:15 12:19
18:9 19:6 21:19,21
21:25 24:16 27:17
27:20 29:15 31:16
36:14 48:16 55:20
56:15 59:17,21,22
75:23 76:7 77:12
77:25 80:16 95:11
99:24 106:10
123:11 125:9
128:12 136:17
139:22 177:16
180:18 181:21
195:25 204:19
Counsel's 101:20

counterclaim 76:4
counterclaiming
40:9
county 28:7 30:21
170:12 205:17
250:4 254:4
couple 13:24 27:11
35:7 219:18
course 9:14 18:4
223:7 246:23
courses 221:3
court 1:2 6:5,15
15:5 20:5 21:7,16
28:5,5,6,6,12,23
29:7 30:21 31:17
31:18,19 36:17,19
67:6 76:5 134:16
148:8 153:18
181:15,25 196:10
196:10 198:8
228:5
courtesy 6:13
courts 15:24 21:22
242:7
CPA 22:20,24 23:2
23:3 41:8 42:11,16
53:8 54:21,22,23
79:3
CPAs 72:25 74:16
created 27:25
credentials 88:19
credited 111:5
criminality 61:5
critical 97:20
cross-examination
5:16 16:13,15
28:18
CSR/RMR 2:7
254:23
Cuomo 48:18 65:4
current 111:5,10
currently 7:5,15
23:14,22 49:13
_____
        D
_____

D 208:20,22 251:3
daily 63:10 191:19
Dalton 1:14,15,16
1:17,18,19 11:14
11:19 14:19,23
22:14 23:25 35:18
35:22 41:12,17,24
42:5,9,24 43:2
44:9 46:14 50:6
51:25 52:9 53:5
58:24 66:5,8 68:7
68:14 69:12,22,24
70:2,5 71:8 73:3
75:21 87:14 98:5
98:11,14 99:13
100:12,14 103:14
104:25 105:2,14
105:23 108:20
109:9,21 110:9
113:4 117:11,11
119:2,9 120:2
124:8 128:22
129:3 138:9,14
140:16 149:10,24
150:6,23,24
161:10,24 162:13
163:12,18 166:14
166:19 173:8
178:2,6 189:2
191:13 193:24
195:24 196:14
199:3,7 202:7
208:2,7 210:22
211:6 213:17,19
224:19,21 225:8,9
226:25 227:25
228:4 234:7
243:18 249:5
Dalton's 49:24
69:13 88:9 138:16
141:12 146:7
149:15 182:9
183:4 189:4
191:16 198:25

damages 134:13,14
darling 44:20,21,23
Darren 3:12 21:10
  83:15 96:20
  107:21 116:6
  124:18 127:3
  132:2 144:3
  146:23 154:24
  161:11 212:13
date 41:4 47:6 76:12
  91:21 95:3 122:25
  124:16,24 171:19
  171:20 185:7
  197:11 203:11
  222:25 223:3
  247:17 253:6
dated 41:9 98:15
  139:11 155:16
  208:23
dates 63:14 125:14
  164:15 239:20
daughter 20:2
David 25:12 27:3
Dawley 1:18 41:20
  41:22 69:14 106:3
  106:6,12 138:17
  183:5 189:6
  191:12,22 192:2,4
  192:14 193:10
  223:19 225:8,23
  226:9,20 227:4
Dawley's 100:16
  106:8 192:9
  225:13,15
day 32:15 46:8
  178:15 181:16
  213:7 250:22
  253:23 254:20
days 71:7,17
deal 33:16 34:14,22
  36:20 156:16,18
  232:14,17 238:7
deals 184:2
death 169:21 240:15

Deborah 64:7
deceased 26:4
December 155:20
  165:18 208:23
decide 244:20
decided 32:13 104:4
  184:10 244:22
decides 105:24
decipher 214:19
decision 126:15
  151:8,8 157:5
decision-making
  166:12
decline 179:21
  217:19,25
declined 201:20
deems 134:17
defalcations 124:21
  125:2,24
defendant 3:15 40:4
  40:7,9,15 69:12,13
  69:14 72:6 81:10
  138:9,14,16,16
  140:16 141:12
  149:10,15,24
  161:10,24 162:13
  163:17 178:2,6
  189:2 191:12,15
  193:24 198:25
  199:3,7 208:2,7
  225:9 230:23
  241:19 244:21
defendants 1:21 2:4
  3:10 20:22 21:2
  27:8 31:8 40:13,20
  40:24 51:7,8,13
  53:3 57:16 72:11
  72:12,16 73:14,15
  75:4,9,16 91:3,4
  91:10 98:3 99:9
  100:7 101:3
  102:12,21 117:3
  120:15,16 122:10
  122:23 126:4,20

126:21,25 127:9
127:11 130:18
134:12 135:6,9
149:11 151:17,24
152:2,8 155:5,12
157:13 158:9,15
160:25 161:4
163:4,7,12 166:2,5
166:9 168:13,14
168:18,19,24
170:4 173:2 174:7
174:22 177:13
183:4 189:5,21
192:17 202:17
211:12 213:11,23
214:24 215:7,23
225:2,7
defining 65:8
definition 222:13,15
deliver 34:16,18,20
  178:23 217:23
delivered 208:9,12
demand 46:16 105:3
  105:10,12 202:6
demonstrates 225:9
deny 172:22,24
  185:9
denying 70:8
depart 228:18
Department 210:5
departure 228:10
depended 78:10
depending 78:9
DEPONENT 253:7
deposed 179:24
deposit 63:14
deposited 63:13
  159:25 199:3
deposition 1:23 2:3
  4:13,17 5:13 6:2,4
  7:8 28:16 56:3
  61:18 70:12 81:12
  93:22 106:2
  117:17 132:4,20

147:4 153:17
164:22 223:23
226:2,9 236:4
250:9 253:6
depositions 6:3
  83:22
deposits 59:19
depriving 166:3,9
deputy 10:15 11:4
  19:19 59:16 64:19
describe 7:4 8:3
  167:17,19
described 18:17
designated 83:18
designation 85:2
desire 42:25
desired 11:7
deter 152:25
determination 45:2
  45:3 57:7 84:24
  242:7 245:3,4
determine 61:2
  68:13 99:23 101:5
  137:16 141:10
  186:9 194:13
  196:2 200:5
determined 134:13
  179:11 197:21
  198:3,5
development 17:18
  19:8,16 20:18
  62:16,20 63:24
  162:17 178:10
developments 50:24
  62:25 129:5
  149:17 152:17
  163:15,19 177:22
  177:25 178:3,5
  191:21 192:22
  194:3 208:6,9
  229:21
device 67:25 68:5
DHCR 39:2 59:15
  60:5 62:14,15