1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

JOHN L. EDMONDS, et al.,

               Plaintiffs,

                            Case No.

    - against -          08-CV-5648(HB)

ROBERT W. SEAVEY, et al.,

               Defendants.

------------------------------------------x

                  April 21, 2009

                  10:20 a.m.

      DEPOSITION of ORLEY GEORGE CAMERON,
taken by the Parties, pursuant to Subpoena,
held at the offices of Herrick, Feinstein,
LLP, 2 Park Avenue, New York, New York
10016, before Donna A. Metz, a Registered
Professional Reporter and Notary Public in
and for the State of New York.

**2**

APPEARANCES:

M. DOUGLAS HAYWOODE, ESQ.
Attorney for Plaintiffs
71 Maple Street
Kings Chancellery
Brooklyn, New York 11225-5001

HERRICK, FEINSTEIN LLP
Attorneys for Defendants Robert W.
Seavey, Phyllis M. Seavey, Avery B.
Seavey, Nealle B. Seavey, Ronald Dawley,
Dalton Management Company, LLC and
The Seavey Organization
2 Park Avenue
New York, New York 10016
By: M. DARREN TRAUB, ESQ.,
of Counsel
(File No. 6955-004)

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
Attorneys for Defendant Marks
Paneth & Shron
3 Gannett Drive
White Plains, New York 10604-3407

By: WILLIAM J. KELLY, ESQ.,
of Counsel
(File No. 01439.00148)

ALSO PRESENT:

JOHN L. EDMONS
PHYLLIS M. SEAVEY
RONALD DAWLEY

**3**

STIPULATIONS:

IT IS HEREBY STIPULATED AND
AGREED by and between the attorneys for
the parties hereto that sealing and
filing of the within deposition be and
the same are hereby waived; and that the
transcript may be signed before any
Notary Public with the same force and
effect as if signed before the Court.

IT IS FURTHER STIPULATED AND
AGREED that all objections, except as to
the form of the question, shall be
reserved to the time of trial.

o 0 o

**4**

ORLEY GEORGE CAMERON,
having been duly sworn by the Notary
Public (Donna A. Metz), was examined
and testified as follows:
EXAMINATION
BY MR. KELLY:
Q.  Good morning, Mr. Cameron.
My name is Bill Kelly.  I represent
defendant Marks Paneth & Shron in the action
that brought us here today known as Edmonds
against Seavey, et al.
I'm going to ask you a series of
questions this morning.  If you don't
understand me or if you don't hear me, please
let me know.  I will rephrase or I will speak
louder.
If you do answer the question, we
will assume that you understood it and that
you heard it and that your answer is to that
question.
A.  Um-hum.
Q.  Are you represented by counsel here
today?

**5**

Orley George Cameron
THE WITNESS:  Am I?
MR. HAYWOODE:  I think he is
represented by independent counsel, but I
am here to assist, you know.
But he has no independent attorney.
THE WITNESS:  Do I need one?
MR. KELLY:  It's not for me to
answer your questions today.
MR. HAYWOODE:  Perhaps if you come
to that conclusion at any time you will
tell Mr. Kelly and then you will have to
arrange to get a lawyer.
I don't know.
MR. KELLY:  I am going to ask the
court reporter to mark the Subpoena to
Orley Cameron as Defendants' Exhibit 13.
(Copy of Subpoena issued to Orly
Cameron (sic), marked Defendants' Exhibit
13 for identification, this date.)
Q.  Mr. Cameron, did you bring any
documents with you here today in connection
with this matter?
A.  Yes.
Q.  What documents did you bring with

2  (Pages 2 to 5)

**6**

Orley George Cameron

1
2 you today?
3    A.   I brought with me a couple of
4 correspondence between our firm Cameron,
5 Griffiths & Pryce and Dalton Management.
6       Some of them were directed to Marks
7 Paneth, yes.
8    Q.   Did you bring any timesheets or
9 diaries reflecting -- first, did you bring any
10 timesheets reflecting time spent in connection
11 with this engagement?
12    A.   No.
13    Q.   Did you bring any billing records in
14 connection with this engagement?
15    A.   No.
16    Q.   I am going to ask the witness to
17 look at Exhibit 13, please.
18       Have you ever seen this Exhibit 13
19 before today?
20    A.   Yes.
21    Q.   Were you served with this subpoena
22 in a civil case prior to your appearance here
23 today?
24    A.   Yes.
25    Q.   When you were served with the

**7**

Orley George Cameron

1
2 subpoena, did you review the subpoena?
3    A.   Yes.
4    Q.   Did anybody instruct you not to
5 bring documents with you today that may have
6 been called for in the subpoena?
7    A.   No.
8    Q.   Can you tell me why you did not
9 bring any timesheets in regard to your
10 engagement here with Mr. Edmonds?
11    A.   We don't keep timesheets.
12    Q.   When you say "we," are you referring
13 to the firm Cameron Griffiths & Pryce?
14    A.   Yes.
15    Q.   How does Cameron Griffiths & Pryce
16 keep a record of the time spent on any
17 particular engagement?
18    A.   We keep a record of the time in the
19 workpapers, some of the workpapers that we do.
20       Generally we don't keep regular
21 time.  We estimate the time that any
22 engagement would have taken us and we work
23 within that time.
24    Q.   Do you bill your clients for the
25 time you spend on an engagement?

**8**

Orley George Cameron

1
2    A.   We generally bill the client based
3 on estimated time.  We have a budget and we
4 negotiate a price at the beginning of the
5 engagement.
6    Q.   Do you bill by the hour or by some
7 other method?
8    A.   We are billing is based on estimated
9 hours, but we don't bill by the hours.
10       We determine upfront based on an
11 assessment of what the engagement might be and
12 then we determine what the price should be.
13    Q.   So starting a new engagement or an
14 engagement with the clients, is it correct to
15 say that you estimate the amount of time you
16 anticipate spending on that engagement --
17    A.   Yes.
18    Q.   -- agree to that total with the
19 client for the total sum fees and that's how
20 you bill your clients?
21    A.   Correct.
22    Q.   Is that how you billed Mr. Edmonds
23 in this case?
24    A.   Correct.
25    Q.   Prior to or at the time of the

**9**

Orley George Cameron

1
2 engagement, how much time did you estimate you
3 would bill Mr. Edmonds for this engagement?
4    A.   We -- based on having discussed with
5 Mr. Edmonds and based on the fact this is an
6 organization and we ask him, that is being
7 audited over a period of time, we estimate it
8 should not take us more than at most two, two
9 and a half months.  It's on that basis we
10 determine, and two and a half months only to
11 the extent we have to wait for confirmation.
12    Q.   Did you come to an amount that you
13 thought would be the appropriate fee when you
14 first were engaged by Mr. Edmonds?
15    A.   Yes.
16    Q.   What was that amount?
17    A.   We agreed on 1 percent of revenues
18 for each project.
19    Q.   Did you have an understanding at the
20 time you started the engagement of what the
21 approximate revenues were for each project?
22    A.   Yes.
23    Q.   What projects are you referring to?
24    A.   Logan, Church Home, Charles Hill,
25 Lakeview.

3 (Pages 6 to 9)

10

Orley George Cameron

1
2  Q.   What was your understanding at the
3  time you started your engagement for the
4  revenues for each of those projects?
5      A.   Lakeview we understand was
6  approximately five million.
7          Church -- Logan was a little less
8  than a million.
9          And Church Home was approximately
10 two million, were approximately two million.
11     Q.   So, if my math is correct, you
12 anticipated about eight million dollars of
13 revenue for the projects?
14     A.   Yes.
15     MR. HAYWOODE:  I am sorry, Bill.
16 Can I hear the numbers again?
17 Five for Lakeview.
18 Two for Church Home.
19     MR. KELLY:  And one for Logan.
20     THE WITNESS:  About 1.5.
21     MR. HAYWOODE:  1.5 for Logan?
22     THE WITNESS:  Um-hum.
23     Q.   And how much did you anticipate for
24 Church?
25     A.   Approximately $2 million.

11

Orley George Cameron

1
2      MR. HAYWOODE:  So it's the higher
3  number.
4      Q.   So adding in now the Church amount,
5  you anticipated about $10 million of revenue
6  for these projects?
7      A.   I think we estimate approximately
8  $9.5 million, thereabouts, $10 million.
9      Q.   Do you know how much you have
10 charged Mr. Edmonds thus far for your work in
11 connection with this engagement?
12     A.   Well, it's approximately 1 percent
13 of that bill and that was what we had agreed
14 on.
15     Q.   Have you been paid by Mr. Edmonds
16 the amount of money you have charged him?
17     A.   Yes.
18     Q.   Do you anticipate charging
19 Mr. Edmonds any additional fees?
20     A.   Well, we have to do additional
21 engagement.
22         Once the engagement expands on what
23 we anticipate, I expect it would have been,
24 yes.
25     Q.   Can you put a dollar amount on the

12

Orley George Cameron

1
2  amount of fees that you have received from
3  Mr. Edmonds thus far?
4      A.   I think approximately about 150,
5  160,000, approximately.
6          $150,000, approximately.
7      Q.   Do you have any outstanding invoices
8  to Mr. Edmonds as we sit here today?
9      A.   No.
10     Q.   Do you anticipate billing
11 Mr. Edmonds for work incurred thus far that he
12 hasn't been billed yet?
13     A.   We would have to go back and review
14 our work; but, currently, no.
15     Q.   When you say you have received
16 150 or $160,000, is that the fees received by
17 you, personally, or the Cameron Griffiths &
18 Pryce firm?
19     A.   The firm.
20     Q.   Is the 1 percent of revenues a
21 regular practice of the firm in charging their
22 audit clients?
23     A.   Yes.
24     Q.   When were you first engaged by
25 Mr. Edmonds in connection with anything?

13

Orley George Cameron

1
2      A.   Approximately March -- approximately
3  March of '07.
4      Q.   Had you done any work for
5  Mr. Edmonds prior to March of '07?
6      A.   Never met him before.
7      Q.   Had you done any work for
8  Mr. Edmonds prior to March of '07?
9      A.   No.
10     Q.   Had you done any work for
11 Mr. Haywoode prior to March of '07?
12     A.   No.
13     Q.   How did you come to know
14 Mr. Edmonds?
15     A.   Still a mystery to me.
16         Someone from North Carolina called
17 me, I think it's a CPA, another colleague,
18 called me, asked me if I am willing to review
19 some housing projects, and I said yes, and he
20 told me that a gentleman named Mr. Edmonds is
21 coming to see me.
22     Q.   Had you reviewed any -- had you done
23 any work whatsoever in connection with real
24 estate properties in the past?
25     A.   Yes.

4  (Pages 10 to 13)

14

Orley George Cameron
1
2     Q.   Let's go through your professional
3 history.
4          Are you a licensed CPA?
5     A.   Yes, I am.
6     Q.   Where are you licensed?
7     A.   New York State.
8     Q.   When did you become licensed?
9     A.   I think around '92, 1992.  It's so
10 long ago I can't remember.
11     Q.   Did you attend a college prior to
12 becoming a CPA?
13     A.   Yes, that's a requirement.
14     Q.   What college did you attend?
15     A.   Brooklyn College.
16     Q.   What degree -- did you get a degree
17 from Brooklyn College?
18     A.   Yes.  I got a bachelor's degree from
19 Brooklyn College.
20          I continued on with the master's
21 program, yes.
22     Q.   What was your degree in?
23     A.   Accounting.
24     Q.   After completing your time at
25 Brooklyn College, what did you do

15

Orley George Cameron
1
2 professionally next?
3     A.   Actually, while at Brooklyn College
4 I worked as an auditor.  I mean that's after
5 my first degree.  I worked as an auditor at --
6 for the Department of Social Services.
7          Then I transferred to the State
8 Controller's Office and that's where I got my
9 experience.
10     Q.   What years did you work at the State
11 Controller's Office?
12     A.   I think it should be between 1990
13 and '94.  No, 1990 and '92, '93, yes.
14     Q.   And what were your duties while at
15 the State Controller's Office?
16     A.   I was a state auditor.
17     Q.   What did you audit while you were
18 there?
19     A.   I audited various state agencies,
20 not-for-profit organizations that received
21 funding from including DHCR, state funded.
22     Q.   Did you audit the state agencies or
23 the entities that received funding from state
24 agencies?
25     A.   We audit agencies that received

16

Orley George Cameron
1
2 funding from state agencies and we also
3 audited state agencies because we audit -- we
4 do performance audit.
5          So basically review their oversight
6 of the agencies that they fund.
7     Q.   After you left the State
8 Controller's Office, what did you do next
9 professionally?
10     A.   I worked as a controller for a
11 not-for-profit organization in the city.
12     Q.   What organization was that?
13     A.   I think the current name is FACES.
14          Then the name was Minority Task
15 Force.
16     Q.   How long did you work at what was
17 then called Minority Task Force?
18     A.   Approximately two and a half years.
19     Q.   Do you recall the year you stopped
20 working at Minority Task Force?
21     A.   I remember clearly because that's
22 when I start my own practice.
23          It was August of 1994.
24     Q.   And when you started your own
25 practice in August of 1994, what was it

17

Orley George Cameron
1
2 called?
3     A.   My practice?  Cameron Accounting.
4     Q.   When you started your own company
5 Cameron and Company, did you have any
6 partners?
7     A.   No.
8     Q.   Did you have any employees?
9     A.   Yes.
10     Q.   What was the nature of the work you
11 provided at Cameron and Company?
12     A.   The same I provide now.
13          I do audits, tax and consulting.
14     Q.   What type of audits do you perform?
15     A.   I perform audits of -- financial
16 audits.
17     Q.   Do you audit financial statements of
18 companies?
19     A.   Yes.
20     Q.   Do you perform forensic audits?
21     A.   Yes.
22     Q.   Do you perform fraud examinations?
23     A.   No.
24     Q.   What type of entities do you
25 currently perform audits of financial

5 (Pages 14 to 17)

**18**

Orley George Cameron

1
2   statements for?
3       A.   I audit numerous agencies: credit
4   unions, mortgage brokers, churches,
5   not-for-profit agencies, for-profit agencies.
6       Q.   Other than your engagement with
7   Mr. Edmonds, do you audit any entities that
8   own apartment complexes?
9       A.   No.
10      Q.   Other than your engagement with
11  Mr. Edmonds, do you audit any entities that
12  manage apartment complexes?
13      A.   No.
14      Q.   Other than your engagement with
15  Mr. Edmonds, do you audit any entities that
16  provide low income housing?
17      A.   No.
18      Q.   Other than your engagement with
19  Mr. Edmonds, do you audit any companies that
20  manage low income housing projects?
21      A.   No, but it might be instructive to
22  know that Minority Task Force does provide low
23  income assisted houses.
24      One of the projects I have, I
25  actually receive -- I oversaw the building of

**19**

Orley George Cameron

1
2   it while I was there.
3       Q.   You are referring to the Minority
4   Task Force that you were at between '92 and
5   '94?
6       A.   Yes.
7       Q.   Since your completion of your
8   studies at Brooklyn Law, have you taken any --
9       A.   Brooklyn College.
10      Q.   Brooklyn College.  Sorry.
11      -- have you taken any other
12  educational courses in connection with your
13  profession?
14      A.   Oh, that's required.
15      Q.   Have you taken any other
16  professional courses in connection with
17  auditing --
18      A.   Yes.
19      Q.   -- in connection with auditing?
20      A.   Yes.
21      Every year, at least 40 credits.
22      Q.   Have you taken any professional
23  courses in connection with auditing entities
24  that provide low income housing?
25      A.   Yes.  That's required, yes.

**20**

Orley George Cameron

1
2       Q.   What courses have you taken?
3       A.   Yellow Book Standard, GAGAS,
4   Government Accounting Government Auditing
5   Standards.
6       Q.   In your work at Cameron, Griffiths &
7   Pryce, does Cameron, Griffiths & Pryce audit
8   any entities that are regulated by the DHCR?
9       A.   Yes, the projects that we are
10  currently on.
11      Q.   Other than the Edmonds engagement,
12  does Cameron, Griffiths & Pryce audit any
13  entities that are regulated by the DHCR?
14      A.   No.
15      Q.   Other than the Edmonds engagement,
16  does Cameron, Griffiths & Pryce audit any
17  entities that are regulated by HUD?
18      A.   No.
19      Q.   Other than the Edmonds engagement,
20  does Cameron, Griffiths & Pryce audit any
21  entities that are regulated by any state or
22  government subsidized projects?
23      A.   No.
24      Q.   When you were first engaged by
25  Mr. Edmonds, what was the engagement?

**21**

Orley George Cameron

1
2       A.   The engagement was a regular
3   financial statement audit.
4       Q.   Of what entities?
5       A.   The four projects:  Lakeview,
6   Charles Hill, Church Home, Logan.
7       Q.   Once you accepted the engagements,
8   did you take steps to review any literature in
9   connection with auditing these four projects?
10      A.   Sure.
11      Q.   What literature did you review?
12      A.   Well, the first thing I do I went to
13  the HUD website to look at their -- what their
14  requirements are.
15      And by the way, just to be specific,
16  Cameron, Griffiths & Pryce was formed
17  specifically because I have my separate
18  practice.  I brought all twelve of them
19  together to provide the necessary expertise to
20  work on the project.
21      Q.   So prior to the engagement with
22  Mr. Edmonds, Cameron, Griffiths & Pryce did
23  not exist?
24      A.   Right.
25      Q.   What type of legal entity is

6 (Pages 18 to 21)

**22**

Orley George Cameron

1
2  Cameron, Griffiths & Pryce?
3      A.  LLC.
4      Q.   Prior to the formation of Cameron,
5  Griffiths & Pryce, what was the legal entity
6  that you practiced at?
7      A.  Sole proprietorship.
8      Q.   Prior to the formation of Cameron,
9  Griffiths & Pryce, what was the practice of
10  Ms. Griffiths?
11      A.  She does the same type of practice
12  we were.
13          Actually, both of us collaborate and
14  audit, but we have the same type of practice,
15  yes.
16      Q.   Prior to the formation of Cameron,
17  Griffiths & Pryce, what was the type of
18  practice that Mr. Pryce practiced?
19      A.  Actually, he's a controller at
20  FACES.
21      Q.   Is he a controller at FACES now?
22      A.  Now, yes.
23      Q.   Do you know if Ms. Griffiths, if she
24  is a CPA?
25      A.  Yes.

**23**

Orley George Cameron

1
2      Q.   Do you know if Mr. Pryce is a CPA?
3      A.  Yes, he is a CPA.
4          We are not permitted to form
5  partnership unless we are CPAs.
6      Q.   Do you know whether Ms. Griffiths
7  prior to the formation of Cameron, Griffiths &
8  Pryce had been involved in any audits of any
9  DHCR regulated entities?
10      A.  I am not sure she audited.
11          She worked almost every year at
12  Deloitte and Touche.
13      Q.   Was that the seven years prior to
14  forming Cameron, Griffiths & Pryce?
15      A.  I met her just about three years --
16  about three years ago when she left.
17      Q.   Does Cameron, Griffiths & Pryce have
18  any other client other than Mr. Edmonds?
19      A.  No.
20      Q.   Do I understand it correctly,
21  though, that you in your sole proprietorship
22  have other clients other than Mr. Edmonds?
23      A.  Correct.
24      Q.   Does Ms. Griffiths in her practice
25  also have a sole proprietorship other than in

**24**

Orley George Cameron

1
2  connection with Cameron, Griffiths & Pryce?
3      A.  Yes.
4      Q.   And in her sole proprietorship she
5  has other clients other than Mr. Edmonds?
6      A.  Yes.
7      Q.   Do you know if Mr. Pryce has a sole
8  proprietorship outside of Cameron, Griffiths &
9  Pryce?
10      A.  Yes, he does practice, yes.
11      Q.   That's in addition to his work as
12  controller at Minority FACES?
13      A.  Yes.
14      Q.   I believe you said that Mr. Edmonds
15  is Cameron, Griffiths & Pryce's only client;
16  correct?
17      A.  You are correct.
18      Q.   So all of the revenue generated by
19  Cameron, Griffiths & Pryce is generated from
20  the engagement with Mr. Edmonds?
21      A.  Correct.
22      Q.   What percentage of revenue to you,
23  personally, is the engagement with John
24  Edmonds?
25      A.  For me, personally?

**25**

Orley George Cameron

1
2      Q.   Correct.
3      A.  Less than 5 percent.
4      Q.   Do you know what percentage of
5  revenue to Ms. Griffiths the engagement with
6  John Edmonds provides?
7      A.  No.
8      Q.   Do you know what percentage of
9  revenue to Mr. Pryce the engagement with John
10  Edmonds provides?
11      A.  No.
12      Q.   When you first started the
13  engagements with Mr. Edmonds, other than
14  reviewing the HUD website, what other
15  literature did you review in preparing for the
16  audit?
17      A.  None that I recall offhand.  I mean
18  the only difference with those projects as
19  compared to any other revenue-based project,
20  it's the regulatory aspects.
21      Q.   In planning and preparing for your
22  audit, did you develop any audit programs?
23      A.  Unfortunately, we did not get to
24  that spot.
25          Why?  Because when we began, one of

7  (Pages 22 to 25)

26

Orley George Cameron

1  the first requests we have, in order to
2
3  develop -- you develop first your planning
4  program and in order to get to your audit
5  program with various steps, cash, et cetera,
6  you first need a trial balance in order to
7  review the accounting, do analytic -- get a
8  sense of what the organization is.
9      Unfortunately, they did not have
10 trial balance.
11     Q.  When you were --
12     MR. HAYWOODE:  When you said they
13 did not have trial balances, indicating
14 Dalton Management?
15     THE WITNESS:  Dalton Management.
16     Q.  When you were first engaged by
17 Mr. Edmonds, what did Mr. Edmonds tell you
18 about the partnerships?
19     A.  He had a concern.  He had a concern
20 because he was getting -- he was receiving
21 monthly financial statements, and one of the
22 problems with the financial statement was
23 there were entries in the distribution account
24 that seems out of whack.
25     I hope that's an English word.

27

Orley George Cameron

1
2      That was not normal.  That was
3  unusual.
4      For example, the distribution
5  account was showing a distribution in '06, for
6  example, December of '06, of I think about
7  over $6,000, based on his estimation he should
8  have received over 3,000 -- $300,000.  I am
9  sorry.  Over 600,000.  Based on his estimation
10 he should have received over 300,000, but
11 there was not.
12     So that was one of his major
13 concerns.
14     Q.  What other concerns did he have?
15     A.  Those were the concerns that he
16 articulate to me.
17     His concern was basically whether or
18 not he was getting his fair share of
19 distribution.
20     Q.  Do you recall what entity he was
21 referring to on that particular distribution?
22     A.  It was in all the four projects, but
23 the one that we actually looked over in
24 greater detail was Logan Plaza.
25     Q.  Did you enter into an engagement

28

Orley George Cameron

1
2  agreement with Mr. Edmonds that was written?
3      A.  Yes.
4      Q.  Do you still maintain a copy of that
5  engagement agreement?
6      A.  Correct, sure.
7      Q.  Do you recall what the terms of that
8  engagement were?
9      A.  Basically, we were going to do a
10 financial statement audit in accordance with
11 generally accepted auditing standards.
12     Q.  Once you started your engagement,
13 what was the first step you undertook in
14 furtherance of that engagement?
15     A.  I think we contacted Ron --
16     MR. HAYWOODE:  Indicating Mr. Dawley
17 who is present today.
18     A.  And we asked for him to provide us
19 with a number of items:  bank reconciliation,
20 trial balance, the standard items that we
21 require for planning engagements.
22     Q.  Did you receive the items you
23 requested?
24     A.  We did not receive the trial
25 balance.  We received the bank reconciliation,

29

Orley George Cameron

1
2  not all at once.
3      Then it was -- we got -- what we got
4  as far as the trial balance was monthly
5  general ledgers.
6      There is no way we can do an audit
7  with that, but he was able to facilitate us
8  for the annual general ledger.
9      Q.  At some point you received an annual
10 general ledger?
11     A.  Yes.
12     Q.  And did that general ledger have an
13 opening balance for each account?
14     A.  For the balance sheet account, yes.
15     Q.  Did that general ledger have a
16 closing balance for each account?
17     A.  Yes.
18     Q.  What information is contained on a
19 trial balance that is not contained on a
20 general ledger?
21     A.  The general ledger is a detail
22 listing of the account.
23     The trial balance is a summary of
24 the account.  That's a basic tool of an
25 audit.  If we did not get a trial balance, we

8 (Pages 26 to 29)

**30**

Orley George Cameron

1    Orley George Cameron
2    must necessarily create one.
3    Q.   Does the general ledger break out
4    the transactions by account?
5    A.   Yes.
6    Q.   And in breaking out those
7    transactions by account, does it do it in a
8    chronological order?
9    A.   Yes.
10   Q.   And at the end of that chronological
11   order, is there a total for that account?
12   A.   Yes.
13   Q.   So could somebody take a general
14   ledger with those totals broken out on an
15   account by account basis and create a trial
16   balance from that?
17   A.   Yes.  Unfortunately, that's what we
18   have to do.  That's what we have to do if you
19   didn't get a trial balance.  But a trial
20   balance is a basic tool of any competent
21   accounting system.
22   Q.   How many accounts do each one of
23   these partnerships have on their general
24   ledger?
25   A.   I didn't count.  We didn't count.

**31**

1    Orley George Cameron
2    Several.  Many.
3    Q.   So is it fair to say that the
4    information that you required on the trial
5    balance was contained in the general ledger
6    but that it would have been difficult for you
7    to take the information from the general
8    ledger and use that as a trial balance?
9    A.   Time consuming.  I mean difficulty,
10   but time consuming.
11   You have to create something that is
12   automatically done by any competent accounting
13   system.
14   Q.   Other than the bank reconciliations
15   and the trial balance and general ledger items
16   that we were just discussing, what else did
17   you request in connection with performing the
18   audits of the financial statements of these
19   partnerships?
20   A.   Oh, God.  We request -- request the
21   loans, request the loans, request to see the
22   schedule of accounts payable, accounts
23   receivable, request the schedule for revenues.
24   Q.   Would the accounts payable be
25   reflected on the general ledger?

**32**

1    Orley George Cameron
2    A.   Yes, the summary, yes.
3    Q.   Would the accounts receivable be
4    reflected on the general ledger?
5    A.   Yes, the summary.
6    Q.   Would the loans be reflected on the
7    general ledger?
8    A.   Yes.
9    The amount would be reflected, but
10   then if I see a loan for, if I may say,
11   29,000, I need to see.  So what we request is
12   the documentation supporting those items on
13   the general ledger.
14   Q.   At some point, did you issue a
15   report in connection with your engagement in
16   this matter?
17   A.   Yes.
18   MR. KELLY:  I am going to ask the
19   court reporter to mark as Exhibit 14,
20   this document.
21   (Document entitled "Independent
22   Auditors' Report," was marked as
23   Defendants' Exhibit 14 for
24   identification, as of this date.)
25   MR. KELLY:  I have asked the witness

**33**

1    Orley George Cameron
2    to review Exhibit 14.
3    (Witness perusing document.)
4    Q.   Is this the report you issued in
5    connection with your engagement in this
6    matter?
7    A.   Yes.
8    Q.   Have you issued any other report in
9    connection with your engagement in this
10   matter?
11   A.   We issue what we call management
12   comment, yes.
13   Q.   Do you see at the top of this
14   document it's titled "Independent Auditors'
15   Report"?
16   A.   Yes.
17   Q.   Has there been any subsequent
18   auditors' report with a similar title?
19   A.   No.
20   Q.   In your work in connection with the
21   engagements in this action, did you gain an
22   understanding of the internal controls of
23   these partnerships?
24   A.   Did we?
25   MR. HAYWOODE:  I didn't hear the

9  (Pages 30 to 33)

34

```
1           Orley George Cameron
2    answer.
3         THE WITNESS:  He asked me, did
4    we.
5         A.  Our assessment was there was no
6    internal control that can be relied on,
7    unfortunately.
8         Q.  What facts are you relying on to
9    come to that assessment?
10        A.  To begin with, number one, we didn't
11   have a trial balance.  We did not have the
12   trial balance.
13        Number two, the accounts were, as
14   Ron said, were on a cash basis, but we don't
15   know because the accounts receivable and the
16   revenue account had the same number of debits
17   and credit.
18        One of the things -- it's important
19   to know that the revenue account is strictly a
20   credit balance account.
21        Your credit revenue -- I'm sorry.
22   It's a credit revenue, a balance.  You have
23   your credit revenue, your debit, accounts
24   receivable, or cash.
25        You never credit revenues, then
```

35

```
1           Orley George Cameron
2    debit revenues to bring it back to any.
3         If your account is kept on an
4    accrual basis, your credit revenues, debit
5    accounts receivable.
6         When you call it cash, you credit
7    accounts receivable and you debit cash.
8    Revenue remains the same.
9         If you are on a cash basis, when you
10   collect cash, your credit revenues, debit
11   cash.
12        Never do you have debit-credit going
13   through your accounts receivable account
14   unless you need to make correction adjustments
15   which is generally few and far between.
16        That's number one.
17        Number two, with due respect to Ron,
18   and he was very helpful, but he's the CEO.
19   Much of the standard documentation that we
20   request and require of the audit, he didn't
21   have them.  He didn't know where they are.  He
22   didn't have them in his possession.
23        MR. HAYWOODE:  I am sorry.
24        He didn't have them in his
25   possession?
```

36

```
1           Orley George Cameron
2         THE WITNESS:  I don't know if he did
3    not have them.  He could not make them
4    available to us.  So let me put it this
5    way.
6         Q.  In conducting your audit and in
7    reaching whatever conclusions you reached, did
8    you find that any money from any of the
9    partnerships was improperly taken by any
10   individual?
11        A.  We did not come to that conclusion,
12   but we make some observation which obviously
13   raises some concern to us.
14        Q.  Can you tell me your understanding
15   of what a cash basis accounting method is?
16        A.  A cash basis accounting method is
17   one where you report cash as you receive them,
18   as opposed to, if I may say, because it's
19   difficult to explain cash basis without
20   referring to accrual basis.
21        Accrual basis, you recognize
22   revenues when earned, whether the cash is
23   received or not, and you recognize expenses
24   when incurred, whether they are paid or not.
25        The cash basis on the other hand is
```

37

```
1           Orley George Cameron
2    you just book the cash at the time you receive
3    it.
4         Q.  Do you know which basis of
5    accounting the partnerships were managed
6    under?
7         A.  Well, Ron told us they use a cash
8    basis, but then in a cash basis you don't bill
9    revenues.
10        MR. HAYWOODE:  You don't --
11        THE WITNESS:  On the cash basis you
12   don't bill revenues.  You just collect
13   revenues.
14        I think what really happened and
15   what complicated the issue was he was
16   using both together, because he would
17   bill the clients and then he reversed it,
18   the billing.
19        That's what, in my judgment, makes
20   it difficult for us to audit revenues.
21        Q.  Earlier you said that you had not
22   reached any conclusion as to whether or not
23   money was improperly taken from the
24   partnerships.
25        Did you convey that information to
```

10  (Pages 34 to 37)

38

Orley George Cameron

1  Orley George Cameron
2  Mr. Edmonds?
3      MR. HAYWOODE: Objection.
4      That was not the witness's total
5  answer.
6      You left out the second part where
7  he said concerns were raised.
8      A. I conveyed -- if I may just add -- I
9  conveyed those concerns. We conveyed those
10 concerns in our management comment, management
11 comment.
12     Q. Did you ever tell Mr. Edmonds that
13 you had not found any money improperly taken
14 from any of these partnerships?
15     MR. HAYWOODE: Objection.
16     Asked and answered.
17     The witness may respond if he
18 understands.
19     A. I did not convey those terms.
20     Q. Did you ever tell Mr. Edmonds that
21 you did find money that was improperly taken?
22     MR. HAYWOODE: Objection.
23     Asked and answered.
24     The witness may answer.
25     A. I did not confirm -- did not convey

39

1  Orley George Cameron
2  those comments.
3      We allow our reports to speak for
4  themselves.
5      Q. In Exhibit 14, I note that the last
6  sentence -- actually, the entire last
7  paragraph is one sentence, which concludes,
8  "The scope of our work was not sufficient to
9  enable us to express and we do not express an
10 opinion on the financial statements referred
11 to in the first paragraph."
12     Do you see that?
13     A. Yes.
14     Q. Has that changed?
15     A. No.
16     MR. KELLY: I am going to ask the
17 court reporter to mark as the next
18 exhibit which is Exhibit 15.
19     (Copy of document on the letterhead
20 of Cameron, Griffiths & Pryce, to
21 Mr. John Edmonds, was marked as
22 Defendants' Exhibit 15 for
23 identification, as of this date.)
24     Q. Do you have Exhibit 15 in front of
25 you?

40

1  Orley George Cameron
2      A. Yes, I do.
3      Q. What is this document?
4      A. This is what we call the management
5  comments.
6      Q. Is this the document you were
7  referring to in your earlier testimony
8  regarding management comments?
9      A. Correct, yes.
10     Q. Other than Exhibit 14, which is the
11 independent auditors' report, and Exhibit 15,
12 the one you have in front of you, did you
13 provide any other reports or comments in
14 writing to Mr. Edmonds?
15     A. None that I recollect.
16     MR. HAYWOODE: Let the record show
17 that it is my representation that all the
18 reports provided by Mr. Cameron and his
19 associates have been delivered to you.
20     So, again, to my present
21 understanding, you have them all.
22     MR. KELLY: Okay.
23     Q. Are Exhibit 14 and Exhibit 15 all of
24 the reports provided by Cameron, Griffiths &
25 Pryce to Mr. Edmonds?

41

1  Orley George Cameron
2      MR. HAYWOODE: Again, not to
3  interfere here, but if that's available,
4  the only ones we have given you, then
5  that might be all.
6      MR. KELLY: I believe Mr. Cameron
7  will be able to tell us if these were all
8  the reports.
9      Q. Are these all the reports you
10 provided?
11     A. Reports, yes.
12     MR. KELLY: I think the fact that we
13 have them both marked as exhibits
14 indicate they have been provided to us.
15     MR. HAYWOODE: I am simply saying I
16 don't know if there may be more. You
17 would know that.
18     Q. Mr. Cameron, are there any other
19 reports, other than Exhibits 14 and 15?
20     A. We may have provided comments. I
21 don't know. We may have provided
22 communication. If we sent a memo, I don't
23 know what else we have. These are the
24 reports, these are the standard reports for
25 audit, yes.

11 (Pages 38 to 41)

42

Orley George Cameron

1
2      MR. HAYWOODE: My objection is he
3   may not remember.
4      A.  I don't remember all the
5   communication we have had between, but I know
6   these are the standard reports that we have
7   provided.
8      Q.  Did you provide any other writings
9   to Mr. Edmonds or Mr. Haywoode in connection
10  with your engagement in this matter?
11     A.  I'm sure we have.
12     Q.  What writings did you provide to
13  Mr. Edmonds?
14     A.  I communicate with him.
15        I remember the first one that I
16  communicated with him was the difficulty we
17  had in getting information for the audit.
18     Q.  Did you bring a copy of that
19  communication with you?
20     A.  No.
21     Q.  Do you remember when that
22  communication occurred?
23        MR. HAYWOODE: Once again, Bill,
24  objection, because we supplied all this
25  and Mr. Cameron knew that we supplied

43

Orley George Cameron

1
2   it, which may explain why he didn't bring
3   it.
4       I think your question is asking him
5   to recall things that, you know, I don't
6   know that it is humanly possible to tell
7   you, yes, there were seven of this and
8   six of that.
9       My objection to your question is how
10  would he recall?
11      MR. KELLY: I think we will ask him
12  the question and we will find out what he
13  does recall.
14      MR. HAYWOODE: Okay.
15     Q.  What communications in writing have
16  you had with Mr. Edmonds?
17      MR. HAYWOODE: Objection, again.
18  Same objection.
19     A.  I communicate to him some of the
20  difficulties we are having in conducting the
21  audit.
22     Q.  Did you send these communications as
23  letters or memos?
24     A.  Memos.
25     Q.  Were those mailed to Mr. Edmonds?

44

Orley George Cameron

1
2     A.  They were mailed, faxed, e-mailed.
3     Q.  Did you retain copies of these
4   communications?
5     A.  Yes, we did.
6     Q.  What format would these
7   communications look like?
8     A.  Word document.
9     Q.  Would they be addressed to
10  Mr. Edmonds?
11    A.  Some of the ones, some of the
12  communication to Mr. Edmonds were actually
13  cc's, communication to Ron, the company, and
14  they were cc'd to Mr. Edmonds, yes.
15    Q.  Let me see if I understand this so I
16  can cut off some of these questions.
17       The only formal reports were the two
18  marked as 14 and 15?
19    A.  Yes.
20    Q.  But there were other communications
21  and Mr. Edmonds may have been cc'd on some
22  other documents that went to Dalton or other
23  people?
24    A.  Correct.
25    Q.  In any of those other documents,

45

Orley George Cameron

1
2   other than the two reports, did you render an
3   opinion regarding your audit of the financial
4   statements?
5     A.  We only render opinion on the
6   financial statement or a disclaimer of
7   opinion.
8     Q.  So none of those other documents
9   would modify any opinion in these reports?
10    A.  No, unfortunately.
11    Q.  I am going to ask you to take a look
12  at Exhibit 15, page 3.
13       Do you see item 5, salaries and
14  office expense?
15    A.  Um-hum.
16    Q.  What is your understanding of the
17  issue you raise in this document?
18    A.  There was a contract which my
19  reading of the contract indicates, number one,
20  the project, I think they call them the
21  projects, will pay frontline fees.
22       But there is also a statement which
23  said none of the fees, expenses, salaries of
24  the central office shall be borne by the
25  project.

12  (Pages 42 to 45)

46

Orley George Cameron

1
2    Q.   Do you recall what contract you are
3    referring to?
4        A.   That's the management contract.
5    That's a contract between the partnership and
6    the management company.
7        Q.   Did you read that entire contract
8    when reaching this issue?
9        A.   Yes.
10       Q.   Did you notice any other provision
11   of that contract that allowed for payment of
12   front office salaries?
13       A.   Frontline, yes, but we define
14   frontline office as the office at the
15   project:   Bookkeeping, project manager,
16   clerks at the project, yes.
17       And I think the wording of the
18   contract will clearly illustrate to me that
19   there was a delineation being made between the
20   frontline office of the project and the
21   central office, because in that contract it
22   said all the salaries, expenses, rent of the
23   management company, shall be borne out of the
24   management company's own expense, if I
25   remember that clearly.

47

Orley George Cameron

1
2    I didn't know that my memory was so
3    good.
4        MR. KELLY:  I am going to ask the
5    court reporter to mark as the next
6    exhibit, Exhibit 16.
7        (Copy of Affidavit of Orley G.
8    Cameron, was marked as Defendants'
9    Exhibit 16 for identification, as of this
10   date.)
11       Q.   Do you have Exhibit 16 in front of
12   you?
13       A.   Um-hum.
14       Q.   Do you recognize Exhibit 16?
15       A.   Yes, I do.
16       Q.   Is Exhibit 16 an affidavit you
17   supplied in this case?
18       A.   Yes.
19       Q.   I direct your attention to paragraph
20   4 of the affidavit.
21       A.   Um-hum.
22       Q.   Do you see that?
23       A.   Yes.
24       Q.   Does that paragraph discuss the
25   issue of the payment of salaries of Dalton

48

Orley George Cameron

1
2    employees?
3        A.   Yes.
4        Q.   This paragraph has a reference to
5    Exhibit G to the papers submitted in
6    connection with that.
7        Do you see that?
8        A.   Is G attached here?  I see the
9    reference, G, Exhibit G.  I don't see G.
10       Q.   I actually think you just quoted
11   from the document before.
12       A.   I did.
13       MR. KELLY:  I will state for the
14   record I have Exhibit G in front of me
15   and you had it right.
16       Exhibit G, page 8, paragraph 16-I
17   states:
18       "Except as otherwise provided in
19   this agreement, all of the agent's home
20   office bookkeeping, clerical and other
21   management, payroll, and overhead
22   expenses, including, but not limited to,
23   costs, office supplies and equipment,
24   postage, transportation for managerial
25   personnel, and telephone services, will

49

Orley George Cameron

1
2    be borne by the agent out of his own
3    funds and will not be treated as project
4    expenses."
5        Q.   Is that the section you were
6    referring to here in your affidavit here and
7    in your testimony just before?
8        A.   Correct.
9        Q.   And you had a copy of this agreement
10   at the time you were performing your audit
11   services; correct?
12       A.   Um-hum.
13       Q.   And you had a copy of this agreement
14   at the time you signed this affidavit?
15       A.   Um-hum.
16       I said um-hum, but I did say yes.
17       THE REPORTER:  You did not say yes.
18   I am writing exactly what you said, sir.
19       THE WITNESS:  I'm sorry.
20       What did I say?
21       THE REPORTER:  You said um-hum.
22       Q.   Did somebody point out to you the
23   clause of that contract or is that something
24   you discovered on your own?
25       A.   I read it, yes.  I read it.  I had a

13  (Pages 46 to 49)

**50**

Orley George Cameron

1    Orley George Cameron
2  discussion with Ron.
3       I have a discussion with Mr. Edmonds
4  about it.
5    Q.  What did --
6       MR. HAYWOODE:  Have you finished?
7    Q.  Did you finish your answer?
8    A.  Yes.
9    Q.  What did Mr. Dawley tell you about
10  that in connection with this?
11    A.  He disagreed with my positions.
12       I don't remember.
13    Q.  Did he explain why he disagreed with
14  your position?
15    A.  I mean, he asserted that the payment
16  or the employees that we were looking for, he
17  said those were -- as a matter of fact, he
18  confirmed that they were Dalton's employees
19  and that's one of the reasons why he objected
20  that we would not be able to see the personnel
21  file, but he confirmed, he assert that they
22  are frontline employees.
23       There seemed to be a contradiction
24  of that statement.
25    Q.  At the time you made the statement

**51**

1    Orley George Cameron
2  in the affidavit and had your discussion with
3  Mr. Dawley --
4    A.  I had discussion -- my discussion
5  was way before I made the statement in the
6  affidavit.
7    Q.  At the time you made the statement
8  in the affidavit, then, were you familiar with
9  section 13 of the contract, 13-B specifically,
10  which states, "The owner will reimburse the
11  agent for compensation, including fringe
12  benefits payable to frontline management
13  employees, such as project manager, clerical
14  and bookkeeping personnel and the maintenance
15  employees, resident superintendent and the
16  social services director, where applicable,
17  and for all local, state and federal tax
18  assessments, including, but not limited to,
19  Social Security taxes, employment insurance
20  and workman's compensation insurance, incident
21  to the employment of such personnel.  Such
22  reimbursements will be paid out of the rental
23  agency account and will be treated as project
24  expenses.  For this purpose, the rental value
25  of any dwelling unit furnished rent free to

**52**

1    Orley George Cameron
2  the resident superintendent will not be
3  considered part of his compensation but will
4  be treated as a project expense."
5    A.  Yes.  I was very familiar with
6  that.  Those are the basic contending issues.
7       Because the history was if that's
8  the basis on which the allocations were made,
9  then it means that the employees were project
10  employees and, therefore, we have the right to
11  see the personnel file.
12       So if they were not project
13  employees and we did not have the right to see
14  the files, then they are central office
15  employees, yes.
16    Q.  Section 13 says, "All such personnel
17  will be employees of the agent and not the
18  owner."
19       Were you familiar with that
20  provision of the contract?
21    A.  Section.
22    Q.  13, "All such personnel will be
23  employees of the agent and not the owner, and
24  will be hired, paid, supervised and discharged
25  by the agent."

**53**

1    Orley George Cameron
2       Were you familiar with that section
3  of this contract?
4    A.  Yes.
5    Q.  Is it your understanding that the
6  employees were paid from funds from the
7  project rather than funds from Dalton
8  Management?
9    A.  Yes.
10       MR. HAYWOODE:  Objection.
11       I don't understand the question, but
12       the witness has answered.
13    Q.  Is it your understanding that --
14       MR. KELLY:  Let me withdraw that.
15    Q.  Is it your position that payment of
16  the employees out of project expenses is
17  improper pursuant to the contract?
18       MR. HAYWOODE:  Well, unless you say
19       which employees -- if the witness
20       understands, I don't.
21    A.  I prefer to answer the question you
22  asked first.
23       And it is my position that the
24  employees were paid out of Dalton -- I mean
25  the Dalton employees were paid out of the

14  (Pages 50 to 53)

54

Orley George Cameron

1
2  project expense.
3     Q.  Is it your position that that was in
4  contravention of the agreement?
5     A.  Yes.
6        MR. HAYWOODE:  My objection is that
7     the agreement clearly speaks for itself.
8     Q.  Are you familiar with an accounting
9  term called adjusting journal entries?
10    A.  Oh, yes, yes.
11    Q.  Are you familiar with an accounting
12 term, journal entries?
13    A.  Oh, yes.
14    Q.  Did you gain an understanding, as
15 part of your audit involvement, how journal
16 entries were made at Dalton Management in
17 connection with these four projects?
18    A.  Not clearly, no.
19    Q.  Did you gain an understanding as to
20 how adjusting journal entries were made by
21 Dalton in connection with these four
22 projects?
23       MR. HAYWOODE:  I object to the form
24    of the question, "did you gain an
25    understanding" because I don't know --

55

Orley George Cameron

1     A.  You are right.  I am not clear what
2  it means if I gain an understanding.
3        Journal entries are basic tools of
4  accounting that we use to adjust and/or
5  correct account balances.
6        They were the same way at any
7  organization.
8     Q.  Did you gain an understanding about
9  how adjusting journal entries were made at
10 Dalton in connection with these projects?
11       MR. HAYWOODE:  My objection, again,
12    it sounds as if you are asking him, did
13    you comprehend what method was being used
14    by Dalton.
15       Is that the question?
16    Q.  Does the witness understand the term
17 "gain an understanding"?
18    A.  No, I'm not sure what it means.
19    Q.  Are you familiar with the term "gain
20 an understanding"?
21    A.  Yes, I am familiar.
22    Q.  What is your -- explain to me what
23 the term "gain an understanding" means to
24 you?

56

Orley George Cameron

1
2        MR. HAYWOODE:  My objection is that
3     it is argumentative.
4        Perhaps you would change the
5     question.  I honestly don't understand
6     what you're asking him.
7        Did he gain an understanding of the
8     French language, or did he gain an
9     understanding of how the French language
10    was being spoken in Quebec?
11       Do you hear the nuance?
12       MR. KELLY:  I do, Mel, and I am
13    comfortable with my line of questioning
14    and I appreciate your objection.
15       If the witness has a problem, he
16    will let me know.
17    Q.  Are you familiar with the term "gain
18 an understanding"?
19    A.  I am familiar with the term but I
20 don't know what you mean, if we gain an
21 understanding -- you mean of who did or of how
22 they were done?  We just saw the journal
23 entries.
24    Q.  Putting that aside, I just want to
25 explore your definition of "gain an

57

Orley George Cameron

1
2  understanding."
3     A.  Okay.
4     Q.  How are you familiar with the term
5  "gain an understanding"?
6        MR. HAYWOODE:  I object to the
7     relevancy of his understanding of that
8     phrase.
9        The witness may answer.
10    A.  Gain an understanding means you
11 comprehend, you have seen a situation and you
12 review the situation and you come to an
13 understanding, get a knowledge on the working,
14 conceptually, of that situation.
15    Q.  Is "gain an understanding" a phrase
16 often used in accounting standards?
17    A.  Very often, yes.
18    Q.  So when I use the term "gain an
19 understanding," you understand that it's
20 relating to your work as an accountant?
21    A.  Right, but I understand it's also a
22 technical term.
23       So unless you use it -- we generally
24 use the term "gain an understanding" of the
25 internal control structure, but we don't

15 (Pages 54 to 57)

58

Orley George Cameron

1  really gain an understanding of journal
2  entries, because journal entries are journal
3  entries.
4      Q.  Did you gain an understanding of how
5  the journal entries were made, not of the
6  particular journal entries, but the process in
7  which Dalton made those entries?
8      A.  No.
9      Q.  Did you gain an understanding of how
10  the adjusting journal entries were made, not
11  the individual entries, but how the process
12  was made?
13      A.  My understanding, and I hope this
14  goes to the question that you asked, because
15  my understanding of what Ron communicated to
16  me was that the auditors make those entries.
17  I don't know if that's the question you're
18  asking.  If that's the question you're asking,
19  yes.
20      Q.  Do you know if anybody from Marks
21  Paneth & Shron made journal entries on the
22  books and records of Dalton Management in
23  connection with these projects or do you know
24  if Marks Paneth proposed journal entries, or

59

Orley George Cameron

1  something else?
2      A.  Well, the journal entries were -- I
3  will put it this way:  We get copies of the
4  journal entries, listing of the journal
5  entries, and they were described to us as the
6  auditor's adjusting journal entries.
7      So whether they were proposed, we
8  see no evidence that they were approved of.
9      The journal standards are the sole
10  responsibility of management and they may be
11  proposed by the auditors, but must be the
12  responsibility of management, is the standard.
13      Q.  In your audits of other companies
14  and in your experience as an accountant, when
15  an auditor comes in and does their audit, is
16  it common for the auditor to proposed
17  adjusting journal entries?
18      A.  Yes.
19      Not to the extent that they were at
20  Dalton, no.  But, yes.
21      MR. HAYWOODE:  I'm sorry.  The
22  answer was not to the extent --
23      THE WITNESS:  Not to the extent --
24  not to the extent -- if I may say, not to

60

Orley George Cameron

1  the amount of journal entries at Dalton.
2      Q.  You are referring to the number of
3  journal entries, not the amount of money
4  involved?
5      A.  Both, both.
6      Q.  How much money was involved in the
7  journal entries at Dalton?
8      A.  As a matter of fact, it's difficult
9  for us to quantify because we have a
10  spreadsheet where we separate the ledger on
11  the adjusting trial balance of the
12  accountant.  It's way in the millions, several
13  millions of dollars.
14      Q.  The adjusting journal entries, is it
15  fair to characterize those as reclassification
16  of entries on the general ledger?
17      A.  Yes.  Many of them were, yes.
18      Q.  It does not -- is it fair to say
19  that it doesn't reflect that money was
20  improperly paid, just mischaracterized?
21      A.  It's difficult for me to say that.
22      Let me say, for example, in one of
23  the instances listed in our report where
24  management -- where fees were reclassified

61

Orley George Cameron

1  from accounting line to management consulting,
2  number one, we have no way and we could not
3  determine whether or not those -- because one
4  of the purposes of us looking at the account
5  is to see whether or not the expenses
6  themselves were appropriate, were
7  appropriate.  We have no way of seeing whether
8  they were appropriate.
9      There were invoices coming from '02
10  that were reclassified into current year's
11  expense.  So, are those accounts?
12      And, by the way, they were not
13  accrued in the financial statements prior.
14  So, are those appropriate?  I don't know.
15      That's a report we provide, that it
16  raised concerns for us.
17      Q.  Do you know on what basis, cash
18  basis or accrual basis, the financial
19  statements were audited by Marks Paneth &
20  Shron?
21      A.  They were -- well, the report that
22  he had given, by its nature it was audited on
23  an accrual basis.
24      Q.  And for the most part, the records

16  (Pages 58 to 61)

62

Orley George Cameron

1    Orley George Cameron
2    of Dalton were on a cash basis; correct?
3    A.   Yes.  For the most part, yes.
4    Q.   In order to convert the cash basis
5    records for an accrual basis financial
6    statement, don't you need several adjusting
7    journal entries?
8    A.   You need basically -- there are two
9    entries that you need, actually.
10    You need to adjust accounts
11    receivable and you need to adjust accounts
12    payable.
13    That's all you need to adjust.
14    Those are the two entries you need to adjust
15    to bring cash basis to accrual basis.
16    Q.   And, in that process, did you review
17    those adjusting journal entries?
18    A.   One of the difficulties we had,
19    because, remember, Ron worked with us, with
20    Marks Paneth for the explanation of the
21    journal entries.  But unfortunately, we have
22    never -- I was looking forward to the
23    opportunity to meet.  We had never met until I
24    think at the deposition, yes.
25    MR. HAYWOODE:  Indicating the

63

Orley George Cameron

1    Orley George Cameron
2    February 3rd deposition of William
3    Jennings.
4    Q.   Prior to that depositon of
5    Mr. Jennings, did Mr. Jennings and you have a
6    conversation regarding your work in connection
7    with the Edmonds project?
8    A.   Yes.
9    Q.   In any of those conversations, did
10    Mr. Jennings offer to meet with you to go over
11    these journal entries?
12    A.   Yes.
13    Q.   Did you have an agreement to meet
14    with him to go over these journal entries?
15    A.   No.
16    Q.   How often did you speak with
17    Mr. Jennings?
18    A.   I spoke with him, I think it's
19    once.
20    As a matter of fact, when he called
21    we had a conference call.
22    I know he called and he left a
23    message at my office once, and that was after
24    we had a conversation before.  So when I spoke
25    with him, yes, it was a conference call

64

Orley George Cameron

1    Orley George Cameron
2    between myself and Sandra.
3    Q.   Did you ask Mr. Jennings questions
4    during this conference call?
5    A.   Yes, I did.
6    Q.   Did Mr. Jennings answer your
7    questions during this conference call?
8    A.   Not -- yes, he did answer the
9    questions.
10    Q.   Did he refuse to answer any of your
11    questions?
12    A.   All right, if I may say, one of the
13    issues we were discussing at that meeting was
14    the fact that there was a loan that was
15    forgiven and that loan was being amortized
16    over a 30-year period, and we had a discussion
17    as to why.
18    They said that was not in accordance
19    with GAAP.
20    He took the position that GAAP was
21    not -- GAAP was not important.
22    Q.   Do you recall the amount of the loan
23    that was discussed?
24    A.   I think the loan -- I think it was a
25    $200,000 -- I don't remember the exact amount,

65

Orley George Cameron

1    Orley George Cameron
2    but the loan was for a ten-year period, and
3    the fact is that GAAP required that such loan
4    must be amortized.
5    I mean for tax purposes, it should
6    have been recognized immediately.
7    GAAP, over the period of the loan,
8    at the minimum, even for tax purposes, it is
9    to be amortized over the period of the loan,
10    but it was being amortized over the period for
11    30 years, which seemed to us arbitrary.
12    Q.   Other than this dispute about how to
13    characterize -- how to treat the loan, did you
14    have any other disputes with Mr. Jennings?
15    A.   No, there were no disputes.
16    Actually, at that time we left on an
17    agreement that we were going to put off,
18    because we were going back and forth, we were
19    going to put all the questions that we have
20    together and we would have one meeting, which
21    I think was -- which I think was good, was a
22    desired compromise on both of our parts.
23    Q.   But the meeting never occurred?
24    A.   Well, the meeting never occurred,
25    because when I asked to have him, then there

17   (Pages 62 to 65)

66

1          Orley George Cameron
2  was a dispute, actually not between Jennings
3  and myself but between Ron and myself, as to
4  who was going to pay for his time.
5      Q.   So there was a dispute as to who
6  would pay for Mr. Jennings' time --
7      A.   Right.
8      Q.   -- to respond to these inquiries
9  from Cameron, Griffiths & Pryce?
10     A.   Right.
11     Q.   As auditor for these entities, are
12 the fees charged by Marks Paneth & Shron set
13 by a contract?
14     A.   Yes.
15     Q.   And if additional work outside the
16 audit is to be undertaken, such as responding
17 to these inquiries, they can't be charged
18 under the audit; correct?
19     A.   Correct.
20     Q.   So Mr. Jennings could not charge his
21 time to the partnerships without violating
22 that contract; correct?
23     A.   Correct.
24     Q.   And it was your understanding that
25 Mr. Jennings wanted to be paid for his time

67

1          Orley George Cameron
2  spent responding to these inquiries?
3      A.   Yes.  That was what was communicated
4  to me, yes.
5      MR. HAYWOODE:  Indicating Mr. Dawley
6  communicated that?
7      THE WITNESS:  Yes.
8      Q.   Do you know if Mr. Jennings was ever
9  paid for his time in responding to these
10 inquiries?
11     A.   I don't know.
12         It's interesting to note, though,
13 that we were not auditing Marks Paneth &
14 Shron.
15         We were auditing --
16     MR. HAYWOODE:  Dalton.
17     A.   -- Dalton.  I keep forgetting that
18 because their name is so similar.
19         We were auditing Dalton.  So the
20 information we requested was and expected to
21 be provided by Dalton.
22     Q.   Did you expect Mr. Jennings to
23 provide his time to respond to these inquiries
24 without receiving compensation?
25     A.   No.

68

1          Orley George Cameron
2      MR. HAYWOODE:  Objection.
3         That was not the witness's
4  testimony.
5      A.   And, frankly, that was not my
6  concern.
7      Q.   As a professional, though, you would
8  agree that Mr. Jennings should be entitled to
9  be compensated for his time?
10     MR. HAYWOODE:  Objection.
11         What his opinion is on someone
12 else's time is not relevant.
13     A.   Yes.  I would expect it, yes.
14     Q.   Did you ever have any discussions
15 with Mr. Edmonds regarding Generally Accepted
16 Auditing Standards in the context of this
17 engagement?
18     A.   Oh, yes.
19     Q.   What did you tell Mr. Edmonds about
20 Generally Accepted Auditing Standards in the
21 context of this engagement?
22     A.   I mean, we had several discussions.
23 I can't recall what I told him.
24         What I told him, obviously, if you
25 look at -- Generally Accepted Auditing -- I'm

69

1          Orley George Cameron
2  sorry Standard --
3      Q.   Yes, GAAS.
4      A.   Yes, many.
5         One of the salient points which was
6  of concern was the independence as compared to
7  the standard that is promulgated by the GAO.
8      Q.   What are you referring to when you
9  talk about the independence?
10     A.   The auditor's independence, GAO, as
11 well as the Office of Government Accounting
12 office, as well as SAS, Statement on Auditing
13 Standards, specifically delineate, if I may
14 say, the arm's length requirement between an
15 auditor and an auditee.
16     Q.   In the context of this engagement
17 between Marks Paneth & Shron and the
18 partnerships, what issue did you have with
19 regard to Marks Paneth & Shron's independence?
20     A.   Numerous.
21         We saw those numerous journal
22 entries that were being made, number one.
23         Number two, the documentations that
24 we requested of Dalton Management, he referred
25 us to the accountant.

18  (Pages 66 to 69)

70

Orley George Cameron

1
2      MR. HAYWOODE: I'm sorry. He,
3  meaning Mr. Dawley?
4      THE WITNESS: Right.
5      A.  He referred us to the accountants
6  Marks Paneth & Shron.
7      As a matter of fact, with regard to
8  the journal entries, he said those are the
9  accountants' journal entries.  You may ask
10 them about that.  If I may quote Ron, he said
11 those are the accountants' journal entries.
12 You have to ask them about that.
13     The standards specifically state,
14 specifically state that, number one, the books
15 and records of the auditee is the sole
16 responsibility of management.
17     The accountant's responsibility is
18 to assist and to render an opinion on them.
19 That's number one.
20     Number two, there is also a
21 standard, what they call, there is a contract,
22 it's the de minimis, that rule requires that
23 additional, what they call nonaudit service
24 that is performed by the auditor should not be
25 more than 40 hours and should not exceed

71

Orley George Cameron

1
2  $5,000.  That's a GAGAS rule.
3      Anything above that, it says,
4  destroys the auditor's independence.
5      We know that in '06, request a
6  contract for $34,000 -- actually, we did not
7  see the contract but we know the contract is
8  amount is $34,000 because that is what was
9  disclosed in the supplemental report, but all
10 the prior year's contracts said $34,000,
11 approximately 34,000, I think it's 34,155,
12 which clearly set out what the accountant's
13 responsibilities are, and that there should be
14 additional services, that those services must
15 be approved by DHCR.
16     Q.  That was a long answer.  I am going
17 to try and break it down so we can have a
18 discussion.
19     A.  Yes.
20     Q.  At some point you talked about the
21 de minimis rule.
22     A.  Yes.
23     Q.  Do you know what standard you are
24 referring to when you talk about that?
25     A.  The de minimis rule, it's the

72

Orley George Cameron

1
2  accounting independent standard.  I think it's
3  Amendment No. 3, but I don't remember the
4  specific, but read along from point 13 to 26
5  and it clearly illustrates.
6      Q.  And what standard are you referring
7  to?
8      A.  GAGAS, Government Accounting
9  Standards, Auditing Standards, Government
10 Auditing Standard -- I'm sorry.
11     Q.  Generally Accepted Government
12 Auditing Standards?
13     A.  Thank you.  That's the definition.
14     Q.  What section?
15     A.  Amendment No. 3, and that was
16 promulgated and became effective in '03.  So
17 that's the rule.
18     Q.  Other than in that section, are you
19 aware of any other provisions that govern the
20 de minimis rule?
21     A.  SAS standard, but I don't remember
22 the exact one.
23     Q.  What in SAS governs the de minimis
24 rule?
25     A.  And the basic standards -- the basic

73

Orley George Cameron

1
2  overarching principle is that the auditor must
3  be independent in both substance and
4  appearance.
5      It says, the auditor should not
6  perform nonaudit service, such that anyone is
7  familiar with these types of services, these
8  activities, would have any suspicions that
9  independence is violated.
10     Q.  You mentioned the auditor should not
11 have more than 40 hours of work or $5,000 in
12 fees?
13     A.  Right.  That's the de minimis rule,
14 yes.
15     Q.  In what rule does it set forth
16 40 hours or $5,000?
17     A.  I don't remember it off the bat.  I
18 can find it.
19     I think the rule speaks of
20 materiality.  The rule speaks of materiality.
21     In the question and answer, at least
22 the guidance that is provided for that rule
23 states no more than 40 hours, no more than
24 $5,000.
25     So, number one, the rule

**VERITEXT REPORTING COMPANY**
www.veritext.com
(212) 279-9424                              (212) 490-3430

74

Orley George Cameron

1  specifically states materiality, the guidance
2  provides the amount.
3      Q.  So the de minimis rule has a
4  materiality component such that the larger the
5  organization being audited, the larger the
6  de minimis level?
7      A.  I don't know.
8      MR. HAYWOODE:  Objection.  Is that a
9  question or are you testifying?
10      A.  I am not aware of that.
11      The guidance basically says 40
12  hours, 5,000.
13      MR. HAYWOODE:  My objection, again,
14  to the question, because it sounded like
15  testimony rather than a question to the
16  witness.
17      Excuse me.  I would just assume from
18  that if someone was paid $3 million he
19  had more leeway to his relative
20  materiality figure which would be
21  astronomical, but it doesn't work that
22  way.  It doesn't hold.  The proposition
23  doesn't hold, is my point.
24      Q.  Do you know if Marks Paneth & Shron

75

Orley George Cameron

1  provided tax preparation services to any of
2  the partnerships?
3      A.  That's included in the contract.
4      Q.  What contract are you referring to?
5      A.  The engagement between them, yes.
6      Q.  Are the fees charged for the tax
7  preparation work included within the audit
8  fees?
9      A.  Yes, it is one contract, yes.
10      Q.  The amount of audit fees charged,
11  does that include work done for tax
12  preparation?
13      A.  The contract, the engagement letter,
14  especially for -- has three components:
15  Audit, tax and cash flow analysis.
16      Q.  Were those three components charged
17  separately by Marks Paneth & Shron?
18      A.  When you say if they were charged
19  separately, no, not to my knowledge.  All of
20  that is covered in the contract.
21      Q.  Does the fact that an accounting
22  firm provides tax preparation services, in
23  addition to audit services, compromise the
24  firm's independence?

76

Orley George Cameron

1      A.  No, it would not.
2      Q.  Even in situations in which the tax
3  preparer charged fees in excess of the 40
4  hours and $5,000, would that compromise
5  independence?
6      MR. HAYWOODE:  Objection, because
7  from the witness's testimony, that's not
8  this case.
9      He just testified it was included in
10  the contract.
11      A.  To answer the question, no, it would
12  not, but it was included in the contract, yes,
13  but that's permitted.  That's what is nonaudit
14  services permitted in the independence rule.
15      Q.  Would representation of the
16  taxpayer, the entity, in connection with an
17  IRS audit, also be permitted under the rule
18  you are discussing?
19      A.  It would, but it is still, though,
20  governed by the de minimis rule.
21      Actually, the standard clearly
22  expresses that when there is a conflict, when
23  such conflict between audit service and
24  nonaudit service arises, the audit

77

Orley George Cameron

1  organization must evaluate and make a choice
2  as to what they want to do, whether they want
3  to maintain the audit service or maintain the
4  nonaudit service.
5      But because of the independence,
6  because of the concern for independence,
7  the rule clearly, the de minimis rule basically
8  fixed, said nonaudit service should not exceed
9  5,000 or 40 hours because it may compromise
10  independence.
11      Q.  Are you aware that Fifth and 106th
12  Street Associates was subjected to an IRS
13  audit during -- for yearend 2003?
14      A.  I saw an invoice to that extent,
15  yes.  That was paid, apparently, I don't know
16  if it's all of it or some of it, I don't know
17  what the amount of it, but there was an
18  invoice to the extent that it was paid in '06.
19      Q.  Does the representation of Marks
20  Paneth & Shron in connection with that IRS
21  audit, is that an exception to the de minimis
22  rule and the rule of independence?
23      A.  There is no exception to the
24  de minimis rule.

20  (Pages 74 to 77)

---

**78**

Orley George Cameron

1
2     There is an exception to the
3  nonaudit service, but it is bound by the
4  de minimis rule.
5     Q.   Is that engagement to represent
6  Fifth and 106th Street Associates in
7  connection with the IRS audit an exception to
8  the independence rule?
9     A.   I don't know what the price was, and
10 I don't know what the amount of time that was
11 involved.
12    Q.   Do you recall what the outcome was
13 in connection with the IRS audit?
14       MR. HAYWOODE:  Objection to the
15 relevance.
16    A.   No.  That was not an issue for me.
17       MR. KELLY:  I am going to ask the
18 court reporter to mark this as the next
19 exhibit.
20       (Copy of document on the letterhead
21 of Internal Revenue Service, Department
22 of the Treasury, dated October 26, 2006,
23 was marked as Defendants' Exhibit 17 for
24 identification, as of this date.)
25    Q.   Do you have Exhibit 17 in front of

---

**79**

Orley George Cameron

1
2  you?
3     A.   Um-hum.
4     Q.   Have you seen this letter before?
5       (Witness perusing document.)
6     A.   I don't recall.
7       I saw something related to this, but
8  not specifically this one, no.
9     Q.   What did you see related to the IRS
10 audit?
11    A.   Huh?
12    Q.   What did you see related to the IRS
13 audit?
14    A.   I saw a letter from I think one of
15 the Seaveys, saying that the audit was done
16 and there was no change.
17    Q.   What does no change mean in the
18 context of an IRS audit?
19       MR. HAYWOODE:  Objection to the
20 relevance of this entire line.
21       MR. TRAUB:  I want to point out that
22 objection to relevancy is not permissible
23 under the Federal Rules.
24       MR. HAYWOODE:  I'm sorry?
25       MR. TRAUB:   Objection to relevancy

---

**80**

Orley George Cameron

1
2  is not an objection permissible under the
3  Federal Rules.
4     A.   What a no change means?
5     Q.   Yes.
6     A.   It means that an audit was done and
7  there were no findings.
8       The tax return was not adjusted.  It
9  remained as it was filed.
10       MR. HAYWOODE:  Just one second.
11       Darren, we've had this discussion a
12 couple of times.
13       We never know where these
14 depositions wind up being heard, whether
15 it's a state agency or a federal agency,
16 which is why the suggestion as to better
17 practice is to make objections which
18 would be made in a court of law, so long
19 as you are compliant for the most part
20 with 221 rules.  That's why we do it.
21       MR. TRAUB:   221 is a state court
22 rule and this is a federal court
23 proceeding.
24       MR. HAYWOODE:  New York State
25 practice and federal practice is very

---

**81**

Orley George Cameron

1
2  similar.
3       I have the book here and I can show
4  it to you.
5       It talks about the depositions in
6  the federal rule states.  New York is a
7  federal rule state.
8       MR. TRAUB:  There is a difference
9  between federal rules and state rules.
10       My only point is your objection to
11 relevancy is not permissible and
12 appropriate under the federal rules.
13       I am not going to argue with you
14 about it.  I made my statement on the
15 record.
16       MR. HAYWOODE:  You never know where
17 these transcripts wind up being heard.
18       That is why it is the suggestion of
19 the bar, some lawyers, some professors,
20 that it's better to say it than not.
21       That's all.
22 EXAMINATION
23 BY MR. KELLY:
24    Q.   Isn't it fair to say that a no
25 change decision by the IRS is a good thing for

21 (Pages 78 to 81)

82

Orley George Cameron

1
2  the taxpayer to receive?
3      A.  Oh, every time.
4      MR. HAYWOODE:  Off the record.
5      (Whereupon, a discussion was held
6  off the record.)
7      MR. HAYWOODE:  May I have 35
8  seconds?
9      MR. KELLY:  We haven't taken a break
10  yet.  Let's take a short recess.
11      (Whereupon, a recess was taken from
12  11:56 a.m. to 12:04 p.m.)
13  EXAMINATION
14  BY MR. KELLY:
15      Q.  In connection with your work in
16  connection with the engagement with
17  Mr. Edmonds, did you have the occasion to
18  review monthly reports that were sent to
19  Mr. Edmonds?
20      A.  I saw them.  I frankly didn't review
21  them because they were not necessarily in good
22  form.  We were working on the project, so I
23  didn't necessarily --
24      MR. HAYWOODE:  I'm sorry?
25      A.  They were not necessarily in good

83

Orley George Cameron

1
2  form.
3      MR. HAYWOODE:  You said something
4  after that.
5      A.  We were working on the project, so I
6  didn't want to have to spend time on those
7  monthly reports.
8      Q.  So is it safe to say that you
9  haven't identified anything misstated or wrong
10  in those monthly reports?
11      A.  Oh, yes.
12      The one that I saw, the distribution
13  account was incorrect.
14      Q.  What was incorrect about the
15  distribution account?
16      A.  I mean the distribution account,
17  first of all the distribution account has
18  debit balance, which it will have, but it
19  was -- when we compared one for December, for
20  example, Logan, it was showing 651,000 and
21  that continued, I am talking about December of
22  '06, and that continued through January,
23  February, March, April, May of '07.  It
24  continued through '07.
25      But when we reviewed the

84

Orley George Cameron

1
2  distribution, the distribution was actually,
3  I think, 260 for '06.
4      Q.  Any other discrepancies you found
5  with regard to the monthly reports?
6      A.  I mean, I just focused on the
7  account.  Those monthly reports were not
8  relevant for us.
9      Q.  Do you know if anybody else at
10  Cameron, Griffiths & Pryce had any
11  communications with Mr. Jennings, other than
12  yourself?
13      A.  I mean that one time when we spoke
14  it was a conference call between Sandra --
15  with Sandra, me, and Mr. Jennings.
16      Q.  Do you know if Ms. Griffiths had any
17  conversations with Mr. Jennings outside of
18  your being involved in the call?
19      A.  Not to my knowledge.
20      Q.  Do you know if Mr. Pryce had any
21  conversations with Mr. Jennings outside of
22  your presence?
23      A.  Not to my knowledge, but I can
24  almost say a firm no.
25      Q.  I am sorry.  I didn't mean to limit

85

Orley George Cameron

1
2  it to just Mr. Jennings.
3      Did anybody at Marks Paneth & Shron
4  have conversations with -- I will put it in
5  the same order.  Excuse me.
6      Do you know if Ms. Griffiths had any
7  conversations with anybody at Marks Paneth &
8  Shron, other than what you are aware of with
9  that conference call?
10      A.  Not to my knowledge.
11      Q.  And the same question for
12  Mr. Pryce.
13      A.  Not to my knowledge.
14      Q.  Is it fair to say that you are the
15  primary professional on this engagement for
16  Cameron, Griffiths & Pryce?
17      A.  To the extent that, yes, I was the
18  one first contacted, right.
19      Q.  Are you the person most
20  knowledgeable at Cameron, Griffiths & Pryce
21  with regard to the engagements?
22      A.  No.  We are equally knowledgeable,
23  yes.
24      I think I am the least
25  knowledgeable, actually.  They're much sharper

22  (Pages 82 to 85)

**86**

1         Orley George Cameron
2    than me.
3         Q.   What was your role in this
4    engagement?
5         A.   In terms of what?  All three of us
6    worked on it together.
7              Adam much less because while Sandra
8    and myself are self-employed, Adam has other
9    employment.
10        Q.   Do you know if Ms. Griffiths or
11   Mr. Pryce had any communications with
12   Mr. Edmonds outside of your presence?
13        A.   Not to my knowledge, no.
14        Q.   Prior to appearing here today for
15   this deposition, did you have discussions
16   about this deposition with anybody?
17        A.   Yes.  We discussed it together, Adam
18   and Sandra, we discuss it together.
19        Q.   What did you discuss?
20        A.   We discussed the -- we went over the
21   information for the audit.  We went over the
22   audit procedures.  We went over the standards,
23   applicable standards.
24        Q.   When you say you went over
25   procedures and applicable standards, are you

**87**

1         Orley George Cameron
2    referring to specific documents you looked at
3    or in general?
4         A.   Both.
5         Q.   What documents did you look at?
6         A.   I looked at the -- I looked at the
7    GAGAS independent standard.
8              Sandra looked at SAS.
9              Adam looked at the Yellow Book.
10             And we shared notes.
11        Q.   Did you look at any documents other
12   than what you just testified to?
13        A.   In general, there were many
14   documents we looked at.  We shared notes.
15        Q.   Other than those specific documents
16   you identified, do you recall any other
17   specific documents you looked at in
18   preparation for the deposition?
19        A.   No, not specific for the deposition.
20        Q.   Did you have any conversations with
21   Mr. Edmonds?
22        A.   In preparation, no.
23        Q.   Did you have any conversations with
24   Mr. Haywoode?
25        A.   Yes.

**88**

1         Orley George Cameron
2         MR. HAYWOODE:  I object.
3         Q.   What were those conversations?
4         A.   He told me what time and where to
5    go.
6         MR. KELLY:  It seems like
7    Mr. Haywoode has an objection.
8         MR. HAYWOODE:  Yes.
9         My objection is if they had
10   conversations with me as an attorney or
11   in contemplation of my representation of
12   them, I'm not sure that's something you
13   are permitted to inquire about.
14        MR. TRAUB:  Are you stating on the
15   record that you represent Cameron,
16   Griffiths & Pryce as their attorney?
17        MR. HAYWOODE:  No.  I made the
18   statement that I did not, this morning.
19        But if they approached me with such
20   an intention, then I would question if
21   that aspect of any discussion would be
22   admissible.
23        With that caution, the witness can
24   answer.
25        Q.   Did you ever approach Mr. Haywoode

**89**

1         Orley George Cameron
2    with the intention of engaging his services as
3    an attorney?
4         A.   No.
5         Q.   What were the discussions you had
6    with Mr. Edmonds -- excuse me.
7         A.   By the way I asked him did I think
8    we needed an attorney for this.  That was the
9    only question.
10        Q.   What else did the discussion with
11   Mr. Haywoode do you recall?
12        A.   As a matter of fact, the discussion
13   we had this morning, because the deposition
14   said 150 East 42nd Street, and he told me, no,
15   it's at 2 Park Place.
16        So that was the last discussion I
17   remember.
18        Q.   Turning back to Exhibit 16, the
19   affidavit, did you prepare this document?
20        A.   Exhibit 16?
21        Q.   Exhibit 16.
22        A.   I didn't prepare it.  I edited it.
23        Q.   Do you have in your possession --
24        MR. KELLY:  Strike that.
25        Q.   Were you provided a draft of this

23  (Pages 86 to 89)

90

Orley George Cameron
1
2  document that you then edited?
3      A.  Yes.
4      Q.  Do you still have a copy of that
5  draft of that document?
6      A.  No.  It was sent to me and I get on
7  my WordPerfect.  Whatever was sent was...
8      Q.  Who sent you this document?
9      A.  I don't remember.
10     Q.  Do you --
11     A.  I think, was it Joan?
12     Q.  Is it that you don't recall the
13 individual who sent it but you recall it was
14 sent from a particular law office?
15     A.  It came from --
16         MR. HAYWOODE:  If the question is
17     was the document typed at my office, I
18     believe that every document in this
19     litigation was typed in my office or
20     prepared in my office by my personnel.
21     Q.  So is it fair to say the draft of
22 this document was sent to you from
23 Mr. Haywoode's office, you made changes on
24 your computer and sent it back?
25     A.  Right.

91

Orley George Cameron
1
2      Q.  Do you recall what changes you made
3  from the original document?
4      A.  No.  That's over a year ago.
5         MR. KELLY:  I believe I am finished
6     with my questioning.
7         I will be handing off the witness to
8     Mr. Traub.
9         Is this a good time to take a break
10    or do you want to go right into it?
11        MR. HAYWOODE:  You can go right
12    through, Darren.
13        MR. TRAUB:  I can be done by one
14    o'clock.
15        MR. KELLY:  Then let's do that.
16        (Pause.)
17 EXAMINATION
18 BY MR. TRAUB:
19     Q.  Mr. Cameron, as you know, I am
20 Darren Traub from the law firm of Herrick,
21 Feinstein LLP and we represent the Seavey
22 defendants, Dalton Management, Ron Dawley, the
23 Seavey organization in this matter.
24     I have a few questions to ask you.
25 I ask that you give me the same courtesy that

92

Orley George Cameron
1
2  you gave Mr. Kelly today and that you let me
3  finish my question, first, and that you give
4  an oral answer to it.
5      Again, if you don't understand my
6  question or statement in it, please let me
7  know and I will rephrase it for you.
8      A.  Okay.  Did I do such with Kelly?
9      Q.  Yes.  That's what you did with him
10 so I am asking that you do the same thing with
11 me.
12     A.  Okay.
13     Q.  When Mr. Edmonds first approached
14 you in March of 2007 about this project, what
15 did he tell you was the scope of the project?
16     A.  He told me that he needed an audit.
17 He needed to have the audit.
18     My question was, was this an audit
19 to comply with changing auditors, or is it an
20 audit to comply with HUD requirement?
21     He said, no, it's an audit.
22     And he raised the issue with the
23 distribution in the account.  He just want to
24 see why.  He's concerned because of those
25 amounts in the distribution were not

93

Orley George Cameron
1
2  reflecting what he should have been getting.
3  So that was where he had a concern.
4      Q.  Did he ask you to perform a forensic
5  accounting on some of these matters or simply
6  an audit?
7      A.  We gave him a regular, what do you
8  call it, standard audit engagement, forensic,
9  yes.
10     Q.  When you say we, who are you
11 referring to?
12     A.  Cameron, Griffiths & Pryce.
13     Q.  At that time in March of 2007 was
14 Cameron, Griffiths & Pryce already organized?
15     A.  No.  We organized, but at the time
16 when we gave him the engagement we were
17 organized.
18     He contacted me in '05.  In March I
19 looked at the scope of the project.
20     I am familiar with the audit, but I
21 forget when I bring additional expertise,
22 forensic to the project.
23     Q.  Did he tell you how large each of
24 the partnership's housing projects were?
25     A.  Yes.  In terms of the number of

24  (Pages 90 to 93)

94

Orley George Cameron

1
2 units?
3     Q.   Yes.
4     A.   Yes.
5     Q.   Did he tell you that these housing
6 projects were regulated by different entities,
7 such as DHCR, HUD, Mitchell-Lama, and others?
8     A.   Yes.
9     Q.   Did you tell him at that time that
10 you did not have experience, prior to this
11 engagement, with government regulated -- with
12 government regulated housing projects?
13     A.   No, not in those terms, no.
14     Q.   What terms did you use?
15     A.   I told him I'm not quite familiar
16 with them, but his issue was not so much the
17 regulation or the compliance issue.  So we
18 didn't see that as a conflict.
19          That's one of the reasons why Adam
20 was brought in, because of that regulation.
21     Q.   And what is Adam's experience again?
22     A.   Adam currently is a controller at
23 FACES where they manage or the firm manages
24 HUD-assisted projects.
25     Q.   Do they manage DHCR projects?

95

Orley George Cameron

1
2     A.   I don't know who or what are the
3 agencies that are involved.
4          When I was there, it was HPD.  But
5 since then they have had funding from various
6 government agencies.
7     Q.   Do you think that to do a complete
8 audit of the four partnerships at issue here
9 that you need to have an understanding of the
10 different governmental regulations and
11 requirements to understand the different types
12 of investment accounts, capital accounts, and
13 distributions that are made?
14     A.   To some extent, but remember our
15 focus was not on the regulation or the
16 compliance issue.
17          Our focus was on the financial,
18 internal controls, and there's a difference.
19     Q.   Specifically your focus was what?
20     A.   My focus was first financial.
21     Q.   To determine whether or not
22 Mr. Edmonds was getting all of the
23 distributions that were due to him?
24     A.   And that the financial statements
25 were in accordance with Generally Accepted

96

Orley George Cameron

1
2 Accounting Standards.
3     Q.   Did anyone counsel you to form
4 Cameron, Griffiths & Pryce as an entity?
5     A.   No.  We elected to.
6     Q.   And who wrote the organizational
7 documents for you?
8     A.   I did.
9     Q.   And who filed the organizational
10 documents for Cameron, Griffiths & Pryce?
11     A.   I did.
12     Q.   Did you inform Mr. Edmonds that you
13 would be forming Cameron, Griffiths & Pryce in
14 response to his retaining the company?
15     A.   Yes, we did.  An engagement letter
16 is in Cameron, Griffiths & Pryce.
17     Q.   Did the three members of Cameron,
18 Griffiths & Pryce put in capital contributions
19 into the formation of Cameron, Griffiths &
20 Pryce?
21     A.   Yes.
22     Q.   And those capital contributions paid
23 for things such as the letterhead?
24     A.   Um-hum.
25     Q.   And the business cards?

97

Orley George Cameron

1
2     A.   Yes.
3     Q.   And any other related expenses?
4     A.   Um-hum.
5          MR. KELLY:  Can you just clarify
6 those last couple of answers?
7          THE WITNESS:  Yes, yes, yes.
8          MR. KELLY:  Thank you.
9     Q.   To date since its formation
10 Mr. Edmonds has been the only client of
11 Cameron, Griffiths & Pryce; is that correct?
12     A.   That's correct.
13     Q.   In reviewing the files for Lakeview,
14 did Cameron, Griffiths & Pryce discover
15 any money was actually missing or unaccounted
16 for?
17     A.   We could not make that
18 determination.
19     Q.   In reviewing the files for
20 Logan, did Cameron, Griffiths & Pryce discover
21 that any money was missing or unaccounted for?
22     A.   We could not make that
23 determination.
24     Q.   In reviewing the files of Church
25 Homes, did you discover any home that was

25 (Pages 94 to 97)

98

Orley George Cameron

1  missing or unaccounted for?
2
3        A.  We could not make that
4  determination.
5        MR. HAYWOODE:  I object to the use
6  of the term "unaccounted for," because
7  there were several projections that
8  would say supporting evidence was not
9  supported.
10        MR. TRAUB:   Your objection goes
11  beyond --
12        MR. HAYWOODE:  I object to the form
13  of the question.
14        MR. TRAUB:   That is all you need to
15  say.
16        There is no question before you
17  right now.
18        Q.  My next question is, in reviewing
19  the files of Charles Hill, did Cameron,
20  Griffiths & Pryce discover any money that was
21  missing or unaccounted for?
22        A.  If I may use this opportunity to
23  clarify --
24        Q.  First answer the last question.
25        A.  Not based on -- again, based on

99

Orley George Cameron

1  information we have we can't make that
2  determination.
3
4        You notice that the report is a
5  disclaimer because we did not have
6  sufficient -- we were not provided with all
7  the information that we need.
8        Q.  When you say the report is a
9  disclaimer report, are you referring to
10  Defendants' Exhibit 14 or Defendants' Exhibit
11  15?
12        A.  Let me see which one is which.
13        This is 15.
14        Number 14, yes.
15        Q.  Okay.
16        Did you or anyone to your knowledge
17  at Cameron, Griffiths & Pryce ever tell
18  Mr. Edmonds or Mr. Haywoode that you have
19  discovered approximately a $4 million
20  discrepancy between the claimed expenses and
21  any supporting documents for 2006 in any of
22  the partnerships?
23        A.  At various stages, yes.
24        Q.  And what did you tell him about
25  that?

100

Orley George Cameron

1
2        A.  Because the expenses were on the
3  books.
4        The document was not available to
5  vouch for those expenses, and that's what is
6  in the disclaimer report.  We were unable to
7  vouch for the amounts.
8        Q.  So do you see the amount of money
9  that is being reported but you are unable to
10  actually verify that that amount --
11        A.  Right.
12        Q.  -- was spent?
13        A.  Right.  In other words, the
14  documentation supporting them, and most of
15  those within those adjusting journal entries
16  were not available.
17        Q.  Did you ever tell him a figure
18  different than $4 million?
19        A.  When we get, after -- I think, what
20  do you call it -- the deposition started,
21  discovery started and we were given additional
22  information, we were able to update our
23  records.
24        Q.  Since the discovery has started and
25  you were given additional information, have

101

Orley George Cameron

1
2  you been able to find documents to support
3  some of the numbers?
4        A.  Some, yes.
5        Q.  But the number has not gone up since
6  then?
7        A.  No.  It has not gone up, no.
8        Q.  Have you discovered in reviewing all
9  of the documents any payments that have gone
10  directly to any of the Seaveys from a vendor?
11        A.  Gone to the Seaveys from a vendor?
12        Q.  Directly to the Seaveys from a
13  vendor.
14        A.  That would not be in the document,
15  no.
16        Q.  Have you not seen any documents that
17  show that?
18        A.  That shows the vendor is someone
19  that Dalton would have paid.
20        Q.  Yes.  So you are not seeing any
21  money from a vendor to the Seaveys; is that
22  correct?
23        MR. HAYWOODE:  Objection.
24        A.  No.  I don't know.  Why would I see
25  them in these books?

26 (Pages 98 to 101)

102

Orley George Cameron
1
2    Q.   So the answer is no, then, you have
3  not seen any documents?
4        MR. HAYWOODE:  In these books.
5    A.   Not in those books, no.
6    Q.   Have you seen any documents outside
7  of the books?
8    A.   No.
9    Q.   Have you seen any payments that have
10  gone from a tenant to any of the partnership
11  projects directly to the Seaveys?
12    A.   No.
13    Q.   Earlier you said you have been paid
14  roughly $150,000 or $160,000 for the original
15  project, and then you stated that you may
16  anticipate expanding the project and getting a
17  different retainer?
18    A.   No, not that I anticipate.  Well, I
19  anticipate, because of the expansion of the
20  project, right.
21    Q.   How has the project expanded since
22  the original project that you had already
23  discussed with us?
24    A.   The original engagement was to do a
25  financial statement audit of '06.

103

Orley George Cameron
1
2        We have since then, there's a need
3  to look at records going back to 2000.
4    Q.   So, in other words, you have now
5  been asked to look at documents and records
6  other than the 2006 audit, but when you were
7  originally retained it was only to review
8  the books and records of 2006; is that right?
9    A.   Right.
10        Actually, Mr. Edmonds contemplated a
11  full audit beginning with 2002, but as a start
12  we said let's start with '06.
13    Q.   When were you asked to expand your
14  review of the audit outside of 2006, tax
15  returns, documents and statements?
16        MR. KELLY:  I object to the form of
17  that.
18    Q.   You can answer.
19    A.   When was I asked?
20    Q.   When were you asked to expand the
21  scope of your audit from the 2006 books and
22  records?
23    A.   I don't remember specifically.
24        I think we gave -- the report is
25  dated November 29, '08.

104

Orley George Cameron
1
2    Q.   Which report are you talking about?
3    A.   Exhibit 14.
4    Q.   Exhibit 14.  Okay.
5    A.   So I'm sure it's subsequent to that.
6    Q.   Before you began your audit, were
7  you shown any drafts of any complaints,
8  affidavits or any other legal pleadings
9  prepared for this lawsuit?
10    A.   No.
11    Q.   I think you testified earlier that
12  the only auditor's report and written report
13  giving or setting forth some findings were
14  Defendants' Exhibits 14 and 15; is that
15  correct?
16    A.   Um-hum.
17        MR. KELLY:  Wait.  An oral answer,
18  please.
19    A.   Oh, yes.  I'm sorry.
20    Q.   Have you modified in any way
21  Defendants' Exhibits 14 or 15 orally to
22  Mr. Edmonds?
23    A.   If I modified it?
24    Q.   Yes.
25    A.   I don't understand what you mean by

105

Orley George Cameron
1
2  modify it.
3    Q.   Have you told him any additional
4  information or findings, other than as
5  reflected in Defendants' Exhibits 14 and 15?
6    A.   Yes.  Actually, yes.
7        Since, based on the discovery, there
8  was an invoice for $22,000 that was dated, I
9  think, in '05.  I think it was dated in '05
10  that was providing support of a closing and
11  was amortized as part of a closing cost that
12  was conducted in March of '04.  The closing
13  was in March or -- I'm sorry -- '04, yes,
14  March or April of '04.
15        And that invoice was issued in '05.
16  I think it's about thirteen months after and
17  was being amortized as part of the closing.
18        I obviously had some concern about
19  that.  Number one, it's legitimacy, since it
20  came in a year after, and it's proprietary
21  because it's amortized.  Audits are never
22  amortized.  That's number one.
23        Number two, I think it compromises
24  the audit function because the auditor is
25  actually auditing his own work.

27  (Pages 102 to 105)

106

Orley George Cameron

1  Orley George Cameron
2  I mean, assuming the invoice,
3  because the invoice was amortized -- the word
4  is "capitalized" -- as part of the audit, as
5  part of a mortgage closing, but it lists
6  several items on the invoice including, I
7  don't remember the specific wording, something
8  that has to do with review mortgage document,
9  because it talks about taxes, it talks about
10 cash flows, it talks about requests from the
11 partners. That was the invoice from Marks
12 Paneth & Shron.
13     Q.  So other than the invoice to Marks
14 Paneth & Shron for $22,000 --
15     A.  Actually, it's a little bit more
16 than that.
17     Q.  Approximately $22,000.
18     Have you advised Mr. Edmonds of any
19 other issues you have discovered other than as
20 set forth in Defendants' Exhibits 14 and 15?
21     A.  No, just general discussion of the
22 nature and the quality of the internal control
23 structure and accounting records.
24     MR. HAYWOODE:  Mr. Traub, I know
25 most of the exhibits were given to you.

107

1  Orley George Cameron
2  You are asking him if he said
3  anything else.
4  All those documents came from this
5  witness.
6     MR. TRAUB:  I think when you review
7  the transcript you will see my question
8  was, did he give any other investigation
9  reports or statements of what he's
10 discovered.
11     What you are referring to is you
12 have, and I will state on the record, you
13 have provided us with letters from
14 Cameron, Griffiths & Pryce to Dalton
15 Management and some of the other
16 defendants, including Marks Paneth &
17 Shron, requesting additional documents.
18     MR. HAYWOODE:  And you have certain
19 commentary which I specifically recall
20 which you have not questioned this
21 witness about today, and all of that
22 originated with this witness.
23     I just want that clear on the
24 record, because you are asking him is
25 there anything else, and you and I and

108

1  Orley George Cameron
2  Bill know there is something else.
3     MR. TRAUB:  I think the witness has
4  already answered the questions and the
5  transcript and the witness's sworn
6  testimony will speak for itself, and I am
7  comfortable with that.
8     MR. HAYWOODE:  We, the attorneys,
9  know there were more documents than you
10 have referred to.
11     MR. TRAUB:  I will give you a chance.
12     What other documents do you believe
13 constitute an investigative report or are
14 you constituting show one of the
15 auditor's commentary or discovery was
16 related to their audit that is not
17 contained in Defendants' Exhibits 14 and
18 15, which Mr. Cameron himself has
19 testified constitute the world of those
20 such documents?
21     MR. HAYWOODE:  I am not going to
22 take your question because I don't
23 know what you mean by the terminology
24 "auditing" report.
25     I am simply stating for the record

109

1  Orley George Cameron
2  that you have in your possession, and
3  Bill Kelly has, too, more documents from
4  Cameron, Griffiths & Pryce than you have
5  raised and referred to in this
6  deposition.
7     That's all I'm pointing out.  You
8  have more.
9     MR. TRAUB:  I am sure in your
10 response to our discovery and motion, you
11 will answer that to the court.
12     MR. HAYWOODE:  Everyone will answer
13 something.
14     Q.  You stated in response to
15 Mr. Kelly's question about what did you find
16 was inaccurate or misleading about the monthly
17 statements Mr. Edmonds was receiving from
18 Dalton, and your comment was the distribution
19 accounts were incorrect.
20     Is that a fair characterization of
21 your testimony?
22     A.  Yes.
23     Q.  When you discussed the distribution
24 number which is identified in the monthly
25 statements with Mr. Dawley, didn't he tell you

28  (Pages 106 to 109)

110

Orley George Cameron

1
2  that number was actually the running total of
3  what had been distributed to the partners from
4  Dalton not just in the year identified on that
5  financial statement?
6        MR. HAYWOODE: Objection to the
7  leading nature of the question.
8        A. No. The question is clear. He
9  didn't tell me that.
10       What he told me was the adjusting
11 entries were booked in the distribution
12 account.
13       Q. Isn't it true, though, that what you
14 found when you were auditing the financial
15 statements of the company that the financial
16 statements only showed what had actually been
17 distributed for that year?
18       A. Yes.
19       It showed what was distributed for
20 that year, but where is the cumulative
21 distribution?
22       Q. Did you find any distributions that
23 were unequal, in other words, more money that
24 was going to the Seaveys than was going to
25 Mr. Edmonds?

111

Orley George Cameron

1
2       A. No, we didn't find that, no.
3        MR. TRAUB: I am done with my
4  questions.
5        I think Mr. Kelly has a few
6  additional questions.
7        MR. KELLY: Actually, Mr. Haywoode
8  has the opportunity to question you
9  before I ask my questions.
10 EXAMINATION
11 BY MR. HAYWOODE:
12      Q. Mr. Cameron, with regard to Fifth
13 and 106th Street Housing Corporation, have you
14 heard that Mr. Edmonds has been previously
15 advised or did he discuss with you that
16 previous managers had indicated that $638 per
17 unit would be to cover the expense, the yearly
18 expense of Fifth and 106th Street
19 Corporation?
20       Had you heard that; $638 per month?
21      A. Yes. Mr. Edmonds had that
22 discussion with me.
23      Q. I am just throwing out positive
24 figures. When you multiply that out for the
25 446 units there, that would be about $3.12

112

Orley George Cameron

1
2  million in expense for that housing company
3  for one year, would that be correct,
4  approximately?
5        A. I generally depend on computers for
6  the calculation.
7        Q. Assuming, arguendo, multiplying 446
8  on a yearly monthly basis, an average of $638
9  would be that, do you know the gross income of
10 Fifth and 106th Street to be 7 million or so
11 dollars a year?
12       A. In '06 the gross income is 6 plus, I
13 don't remember the exact amount, but it's
14 above $6 million.
15       Q. So it is fair to say that, assuming
16 the accuracy of those numbers, about
17 $3 million yearly being generated at Fifth and
18 106th which is not attributable to expense?
19       MR. TRAUB: Objection.
20       Lacks foundation.
21       Q. Assuming that the expense was
22 $3 million and the income was 6. whatever, it
23 would be $3 million theoretically left after
24 all expenditures, according to what we all
25 discussed; is that correct?

113

Orley George Cameron

1
2        MR. TRAUB: Objection. Assumes
3  facts not in evidence.
4        MR. KELLY: Objection.
5        MR. HAYWOODE: The witness just
6  testified to that.
7        A. Theoretically, it's a theoretical
8  question, and I answered theoretically yes.
9        Q. Did 106th Street report a profit for
10 2006 or did they report a deficit?
11       A. They reported a deficit.
12       Q. And how much was that deficit, if
13 you recall?
14       A. I don't recall.
15       It's in excess of a million dollars.
16 I don't recall exactly what the amount is.
17       Q. If I suggested it was $2,000, would
18 that refresh your recollection, a deficit for
19 106th Street after receiving $6.8 million was
20 $2,000, does that refresh your recollection at
21 all?
22       MR. KELLY: Objection.
23       A. I would have to go back and look at
24 it.
25       Q. Now, was any distribution made from

29 (Pages 110 to 113)

**114**

Orley George Cameron

1
2  106th Street to either Mr. Edmonds as the
3  general managing partner or to any of the
4  limiteds, was any distribution made to them?
5      A.  In '06, I don't recall any
6  distribution.
7      Q.  You are aware, are you not, that in
8  addition to the lawsuit being brought by John
9  Edmonds that several of the limited partners
10  have also brought a claim against these
11  defendants for these same reasons, are you
12  aware of that?
13      MR. TRAUB:  Objection.
14      A, that's not accurate.
15      If you are going to ask a question,
16  you should also reflect on the record
17  that Mr. Edmonds was also named as a
18  defendant in that lawsuit.
19      MR. HAYWOODE:  Which part of it is
20  not accurate?
21      MR. HAYWOODE:  Not all of these
22  defendants were named in the lawsuit
23  brought by the Singers, and in fact your
24  lawsuit was a named defendant in there as
25  well.

**115**

Orley George Cameron

1
2      MR. HAYWOODE:  I will accept your
3  correction that there were two lawsuits.
4      The first one did not claim John
5  Edmonds, is that correct, and the second
6  one did, but it sought the sale of the
7  property; is that correct?
8      MR. TRAUB:  Are you talking about
9  the current one that is actually pending
10  now?
11      MR. HAYWOODE:  I am talking about
12  the two suits that were brought by the
13  limiteds.
14      MR. TRAUB:  I believe the first one
15  did not name Mr. Edmonds as a defendant.
16      It also did not name all of these
17  defendants as named defendants.
18      MR. HAYWOODE:  Okay.
19      I have no further questions.
20      MR. KELLY:  I have some questions
21  about what Mr. Haywoode was just asking
22  about.
23      MR. TRAUB:  Just so the record is
24  clear, I believe Mr. Edmonds testified
25  that he joined as a plaintiff in the

**116**

Orley George Cameron

1
2  first lawsuit as well.
3      MR. HAYWOODE:  Okay.
4  EXAMINATION
5  BY MR. KELLY:
6      Q.  Mr. Cameron, you were just asked
7  several questions about other lawsuits
8  involving the limited partners.
9      How did you learn about those
10  lawsuits?
11      A.  I mean, just in conversation between
12  the attorneys.
13      Q.  Do you mean conversation between you
14  and Mr. Haywoode prior to today or just now as
15  we are sitting here?
16      A.  Well, I mean conversation between
17  the attorneys.
18      MR. HAYWOODE:  Indicating
19  Mr. Edmonds and myself.
20      THE WITNESS:  Right.
21      A.  I mean, those are not conversation
22  that I am a part of, but in the same way I am
23  hearing it between you both or between you.
24  That's all I heard.
25      MR. HAYWOODE:  So indicating

**117**

Orley George Cameron

1
2  Mr. Edmonds, Mr. Haywoode, Mr. Traub and
3  Mr. Kelly.
4      Q.  In connection with one of the
5  questions Mr. Traub asked you about the
6  $4 million discrepancy, you responded, we
7  update our records.
8      A.  Yes.
9      Q.  What did you mean by update our
10  records?
11      A.  In other words, some of the
12  information we got during the discovery, we
13  were able to vouch for some of the items that
14  we were looking for.
15      We still need explanation.
16      Q.  What records do you maintain in
17  connection with this?
18      A.  The records that we received we
19  have.
20      Q.  Do you have workpapers that you
21  created in connection with this engagement?
22      A.  Yes, we do.
23      Q.  Are those workpapers maintained at
24  Cameron, Griffiths & Pryce?
25      A.  Yes.

30 (Pages 114 to 117)