1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
JOHN L. EDMONDS, et al.,

        Plaintiff,

                                Case No.
   - against -           08-CV-5648(HB)

ROBERT W. SEAVEY, et al.,

        Defendants.
------------------------------------x

                April 22, 2009
                10:15 a.m.

    DEPOSITION of ADAM M. PRYCE, taken by the Parties, pursuant to Subpoena, held at the offices of Herrick, Feinstein, LLP, 2 Park Avenue, New York, New York 10016, before Donna A. Metz, a Registered Professional Reporter and Notary Public in and for the State of New York.

**Page 2**

APPEARANCES:

M. DOUGLAS HAYWOODE, ESQ.
Attorney for Plaintiffs
71 Maple Street
Kings Chancellery
Brooklyn, New York 11225-5001

HERRICK, FEINSTEIN LLP
Attorneys for Defendants Robert W.
Seavey, Phyllis M. Seavey, Avery B.
Seavey, Nealle B. Seavey, Ronald Dawley,
Dalton Management Company, LLC and
The Seavey Organization
2 Park Avenue
New York, New York 10016
By: M. DARREN TRAUB, ESQ.,
    of Counsel
    (File No. 6955-004)

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
Attorneys for Defendant Marks
Paneth & Shron
3 Gannett Drive
White Plains, New York 10604-3407

By: WILLIAM J. KELLY, ESQ.,
    of Counsel
    (File No. 01439.00148)

ALSO PRESENT:

JOHN L. EDMONS
PHYLLIS M. SEAVEY

**Page 3**

STIPULATIONS:

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the parties hereto that sealing and filing of the within deposition be and the same are hereby waived; and that the transcript may be signed before any Notary Public with the same force and effect as if signed before the Court.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of trial.

o 0 o

**Page 4**

ADAM M. PRYCE, having been duly sworn by the Notary Public (Donna A. Metz), was examined and testified as follows:

EXAMINATION
BY MR. KELLY:

Q. Good morning, Mr. Pryce.
A. Good morning, Mr. Kelly.
Q. Obviously you know my name.
   This morning, we will be asking you a few questions regarding your engagement with Mr. Edmonds.
   If at any time you don't understand my question or you don't hear my question, please let us know.
   If you answer the question, we will assume you understood the question and that you are responding to that question.
   Does that seem fair to you?
A. Yes.
Q. At any time you would like to take a break, please let us know.
   Are you represented by counsel here

**Page 5**

Adam M. Pryce
today?

THE WITNESS: Am I?

MR. HAYWOODE: I have explained to Orley, I did not talk to you, I do not represent you. I represent John Edmonds.
   If you wish to be represented by counsel you may do that, but yesterday Orley determined that he would not be represented.
   You may do the same.
   I will listen to what is said.
   I will object in the interest of John Edmonds, but I am mindful that you are a witness put forward by my client John Edmonds.

THE WITNESS: Okay.

A. I take the same position that Orley took yesterday.
Q. Can you tell me a little bit about your educational history?
A. I did my bachelor's in accounting at the University of West Indies, Kingston, Jamaica.
   I did also the ACCA. That is the

```
                                    6
 1            Adam M. Pryce
 2   Association of Chartered Certified Accountants
 3   in U.K. I did level 2, which is equivalent of
 4   a master's in accounting.
 5      Q.  When did you complete that
 6   educational --
 7      A.  I completed that in 1994.
 8          The bachelor's in 1986 and the ACCA
 9   in 1994 and my bachelor -- ACCA.
10          MR. HAYWOODE:  What is that?
11          THE WITNESS:  Association of
12   Chartered Certified Accountants in U.K.
13      Q.  You said that was a level 2?
14      A.  Level 2 which is equivalent of
15   master's in accounting.
16      Q.  When did you complete that
17   educational aspect?
18      A.  In 1994.
19          Sorry.
20          1994, yes, 1994.
21      Q.  When you completed that educational
22   aspect, did you then begin your professional
23   career?
24      A.  No.
25          I started my professional career --
```

```
                                    7
 1            Adam M. Pryce
 2   I did ten years in accounting in Jamaica.
 3      Q.  I am going to ask that you keep your
 4   voice loud so the court reporter can hear and
 5   type down what is being said.
 6      A.  Okay.
 7          Are you talking about experience?
 8   Do you want me to go to that?
 9      Q.  Right now I would like to know where
10   you worked and when.
11      A.  My first job was the Investment Bank
12   of Jamaica, which I worked for two years as a
13   senior accountant.
14          Then I moved on to Alcan Sprostons.
15   This is a division of Alcan Aluminum of
16   Canada, which I worked for two years.
17          Then I worked with Jamaica Aluminum
18   Company for six years as the chief accountant.
19      Q.  After your work at the Jamaica
20   Aluminum Company, what did you do next?
21      A.  Well, I migrated to United States in
22   1995.
23      Q.  Did you change your employer in 1995
24   when you migrated to the United States?
25      A.  In 1995 I worked with H & R Block.
```

```
                                    8
 1            Adam M. Pryce
 2      Q.  What did you do with H & R Block?
 3      A.  Tax preparer, tax preparation.
 4      Q.  How long did you work at H & R
 5   Block?
 6      A.  Between I think December '95 to
 7   '98. I don't remember, somewhere around that
 8   time.
 9      Q.  After your work at H & R Block, what
10   did you do next?
11      A.  At that time I was doing the CPA
12   examination, which I passed in November of
13   2000.
14          MR. HAYWOODE:  Sorry. What
15   examination?
16          THE WITNESS:  CPA.
17      A.  The CPA exam which I passed in
18   November of 2000.
19      Q.  I didn't mean to interrupt.
20          Were you continuing?
21      A.  Yes.
22      Q.  Okay.
23      A.  And then I work with Leroy Duffus,
24   CPA.
25      Q.  Can you spell that please?
```

```
                                    9
 1            Adam M. Pryce
 2      A.  L-e-r-o-y D-u-f-f-u-s, CPA, for a
 3   year.
 4      Q.  What did you do there?
 5      A.  I was an auditor.
 6      Q.  Was that the first position you held
 7   that you did any auditing work?
 8      A.  Yes.
 9      Q.  What types of companies did you
10   audit?
11      A.  Not-for-profits, most
12   non-for-profits.
13      Q.  After your time at Leroy Duffus,
14   where did you work next?
15      A.  I worked with Orley Cameron, CPA for
16   two years as a senior auditor.
17      Q.  Do you know what years those were?
18      A.  I think it's 2002 to 2004.
19      Q.  During your work with Orley Cameron,
20   CPA, what type of companies did you audit?
21      A.  Small not-for-profit companies,
22   daycare.
23      Q.  After your work with Orley Cameron
24   CPA, where did you work next?
25      A.  Well, at that time I have -- while I
```

**Page 10**

Adam M. Pryce

was working with Orley I had a position at FACES New York, Inc., FACES NY, Inc., as a controller.

This is a company that is a not-for-profit organization. Its main service is low income housing, HUD assisted projects.

And there's also a limited liability partnership that is owned by Citibank, ESIC Enterprise. This is a Citigroup limited liability partnership which FACES New York is the management company, and I'm the controller.

Q. As controller of FACES New York, can you describe your work responsibilities?

A. Well, I'm responsible for overall financial management of the corporation, 501(c)3 corporation, including the partnership, the limited liability partnership.

Q. Does FACES New York prepare financial statements that are audited?

A. Yes.

Q. What is your involvement in the preparation of those financial statements?

**Page 11**

Adam M. Pryce

A. Well, I prepare the inhouse financial statements, as independent auditor. So I'm responsible for arranging the audit, overseeing it.

Q. Is your work as controller for FACES New York a full-time position?

A. It's a full-time position, yes.

Q. Do you have any other employment other than your work at FACES New York at the current time?

A. Yes.

I have a public company -- a public accounting firm, Adam Pryce, CPA.

Q. How long have you had a public accounting firm Adam Pryce, CPA?

A. I think since 2005.

Q. And what type of work does Adam Pryce, CPA do?

A. I do audits, small audits. I do compilation.

I review engagements, income taxes, financial planning.

Q. What type of clients does Adam Pryce, CPA provide audit services for?

**Page 12**

Adam M. Pryce

A. Audit service, I did one for a school, churches, most not-for-profit.

Q. Other than your work at FACES New York, as controller, and Adam Pryce, CPA, do you have any other professional engagements?

A. Well, when I came to this country I did real estate. I have a real estate broker's license.

I worked with Century 21.

Q. Did there come a point in time where you were a founding member of an accounting firm known as Cameron, Griffiths & Pryce?

A. Yes.

Cameron, Griffiths & Pryce was incorporated, I think, June 2007, to do specifically this job here, this project.

Q. So Cameron, Griffiths & Pryce has no other business purpose other than this engagement with Mr. Edmonds?

A. It was formed to do this engagement, yes.

Q. How did you come to learn about the engagement with Mr. Edmonds?

**Page 13**

Adam M. Pryce

A. Orley invited me on the project.

Q. What did Orley Cameron tell you about the project when he invited you?

A. Well, he told me that Edmonds had certain concerns about distribution.

Q. Did he tell you anything else?

A. No, distribution, and he wants an audit to be done.

Q. What did you say in response to Mr. Cameron?

A. Well, I said I will join the team.

Q. At that point you were engaged by Mr. Edmonds to conduct an audit, is that correct?

A. Can you repeat that?

Q. At that point you were engaged by Mr. Edmonds to conduct an audit?

A. A financial audit.

We were engaged to do a financial audit.

Q. What is a financial audit?

A. A financial audit is one in which we follow GAAS, generally acceptable accounting standards -- auditing standards, which is set

**14**

Adam M. Pryce

by the AICPA, GAGAS in this case, which is government auditing standards which we follow in this case, and GAAP, general accepted accounting principles, GAAP, G-A-A-P.

So we follow GAAP, we follow GAAS, and we follow GAGAS.

Q. What steps did you take in planning for this audit?

A. Well, first we visited the Dalton Management, and first thing we asked for, trial balance.

We didn't get a trial balance. This was very strange because usually the system produces a trial balance.

We use this trial balance to do the planning and the preliminary analytic review.

Q. In preparing for the audit, did you consult any professional guide?

A. All guides we do 40 credits per year, we have our accounting, GAAP, GAAS, we consult those, GAAS, GAGAS, and the GAAS is what we consult.

We consult also the HUD, the government project, because we notice that

**15**

Adam M. Pryce

three of them were HUD assisted projects.

Q. Just to clarify for the court reporter, HUD is H-U-D?

A. Yes, HUD, yes.

MR. HAYWOODE: Housing and Urban Development Corporation.

THE WITNESS: Yes.

Q. GAAP is G-A-A-P, all capital letters?

A. Yes.

Q. GAAS is G-A-A-S, all capital letters?

A. Um-hum.

Q. And GAGAS is G-A-G-A-S, all capital letters?

A. Yes.

Q. Prior to your involvement with Mr. Edmonds, had you audited any clients that were subject to HUD regulations?

A. I have not audited with HUD regulation, but I have the experience, seven years as a controller with a project that are HUD assisted projects.

Q. For projects that are HUD assisted,

**16**

Adam M. Pryce

can you tell me what regulations or rules HUD imposes on those projects?

A. Well, first thing, HUD -- this is government. Then GAGAS, we have to know the GAGAS rules. This is governed by GAGAS, also GAAP, because GAAP, we cannot forget GAAP, and GAAS, we have to be governed by GAAS.

Q. In your time as an auditor in any of your positions, had you audited any entity that was regulated by DHCR?

A. No.

Well, one of our projects at FACES; one of our projects, the DHCR is regulated by DHCR, the HDFC projects.

Q. What does HDFC stand for?

A. Housing -- I don't remember exactly right now.

Q. When you were first engaged by Mr. Edmonds, did you agree upon a price you would charge Mr. Edmonds for the services provided?

A. We look on -- we got the financial statements, the trial balance, and our fee was determined 1 percent of revenue.

**17**

Adam M. Pryce

Q. For what year were you going to audit?

A. It was to be audited 2005, 2006.

Q. Was your fee going to be 1 percent per year of audit?

A. 1 percent of the revenue, yes; 1 percent of whatever the revenue per year, yes.

Q. Maybe my question wasn't clear.

You said you were going to audit 2005 and 2006?

A. Yes, two years. Usually two years when you are auditing, two years comparison.

If the corporation is in business for at least two years, you need to have two years in order to do proper planning because you are comparing, like for example, salary, contract, expenses, against rental revenue, the percentage. You want to see if it's consistent over the years.

If it's 80 percent here, 70 percent there, then you have to examine why has it changed. So you need to have at least two years comparison.

Q. When you were first engaged by

VERITEXT REPORTING COMPANY
(212) 279-9424    www.veritext.com    (212) 490-3430

Page 18

Adam M. Pryce

Q. Mr. Edmonds, did you enter into an engagement agreement?
A. Yes. We had an engagement agreement, yes.
Q. Do you still have a copy of that engagement agreement?
A. Yes, we have the engagement. Yes.
Q. After you began your engagement, what steps did you take next to do the engagement?
A. Okay. When we got the engagement, the next step was to do the fieldwork.
Q. What do you mean by "fieldwork"?
A. Fieldwork, that is to go to the client and then do the testing. We have to do a sample, based on our analytic procedure, based on the fluctuation, if there is fluctuation.
   We compare previous years and we do testing based on the fluctuation. We determine high risk areas to be tested. That is our professional judgment, based on our professional judgment.
Q. How many times did you go and do

Page 19

Adam M. Pryce

fieldwork?
A. How many times? Many times. I didn't count them.
Q. Was it more than a hundred times?
A. I don't think it's one hundred times.
Q. Do you maintain records reflecting what you did on a particular day in connection with this engagement?
A. The only records we maintain in terms of testing, we have documentary evidence to support what we test.
   So I don't know what you mean, if you're talking about time. You mean logs?
Q. Yes, timesheets or time logs.
A. No. Our engagement was a fixed engagement, fixed fee.
Q. What documents did you request from Dalton Management at the beginning of your fieldwork?
A. A number of documents.
Q. Do you recall any of those documents in particular?
A. Yes.

Page 20

Adam M. Pryce

For example, there was $180,000 in accounts payable. In Dalton books it says it belongs to Dalton Management, and we did test that and we found that was not Dalton Management. It's for the partners.
Q. Who told you it was for the partners?
A. Well, I think Orley and Sandra confirm with Ron.
Q. With Ron Dawley?
A. Confirm with Ron and Edmonds. Edmonds says it's for the partners.
   Ron, I don't know. After we found out that is for the partners, is not for Dalton.
   In the books it said for Dalton Management. So one of the questions is that how, if a vendor gives an invoice, how is it that another vendor owes the liability -- owns the liability, belongs.
   A vendor gives an invoice. So we couldn't get invoice. We tried to test the invoice. There was no testing. It was just stated in the invoice, $180,000, in Dalton,

Page 21

Adam M. Pryce

when in fact further that was a great mystery, and that was a third-party transaction, related party transaction, which is not an arm's length transaction and was not disclosed in the audit report.
   It doesn't matter the amount. Related party transaction should be disclosed.
Q. You mentioned in your previous answer that Mr. Edmonds acknowledged that the money was due to the partners; is that your understanding?
A. Yes.
Q. How did you get that understanding?
A. Well, Orley corroborated, my partner corroborated, and I think he corroborated with Seavey as well, like 180,000.
Q. So Orley corroborated that $180,000 was due to the partners with both Mr. Edmonds and the Seaveys?
A. Yes.
Q. Who was in charge of the engagement for Cameron, Griffiths & Pryce?
A. Orley is the lead partner in the engagement.

```
                                            22
 1           Adam M. Pryce
 2      Q.  At some point after commencing your
 3  fieldwork, did Cameron, Griffiths & Pryce
 4  issue an independent auditor's report?
 5      A.  We did issue a report, a disclaimer
 6  opinion.
 7           We didn't form an opinion of
 8  financial statement because there were client
 9  scope limitations, client restriction.  We
10  didn't get to finish our testing in order to
11  form an opinion.  That was called a
12  disclaimer.
13           We didn't form an opinion because we
14  had a number of client restrictions and scope
15  limitations.
16           MR. KELLY:  I am going to ask the
17      court reporter to hand the witness
18      Exhibit 14.
19      Q.  Is this the independent auditor's
20  report that you were referring to in your
21  previous answer?
22      A.  Yes.  This is what they call
23  disclaimer, yes.
24      Q.  After you issued this independent
25  auditor's report, did you then provide a
```

```
                                            23
 1           Adam M. Pryce
 2  document to Mr. Edmonds relating to specific
 3  issues you had identified?
 4      A.  No.  Before that we always inform
 5  Edmonds as to, with management, management
 6  reports, as to where we are, as to where we
 7  are, what are the items that we need, what we
 8  tested and what's the problem.
 9           So this was the final report after
10  that.
11      Q.  When you informed Mr. Edmonds about
12  items you were testing before this report, how
13  did you do that?
14      A.  Through written agreement, written
15  communication.  We have a number of management
16  reports that we gave Edmonds.
17      Q.  Do you still have copies of these
18  management reports?
19      A.  Yes, we do have copies of them.
20           MR. TRAUB:  I want the record to
21      reflect we have not receive any written
22      management reports dated before November
23      29, 2007.
24           MR. HAYWOODE:  Let the record
25      reflect, as it did yesterday, that I have
```

```
                                            24
 1           Adam M. Pryce
 2      given to both counsel all records, all
 3      papers, all notes received by Mr. Edmonds
 4      and in my file with regard to this
 5      investigation by the Cameron, Griffiths &
 6      Pryce Corporation.
 7           You have everything in your
 8      possession.  Whether you call it an
 9      auditor's report or you call it just
10      something scribbled on a piece of paper
11      or scribbled on any other document, it is
12      all in your possession.
13      Q.  What do written management reports
14  look like?
15      A.  Before that, let me clarify.
16           One of the items that were addressed
17  in our management report was the $180,000,
18  that was one of the items, material items that
19  was raised.
20      Q.  What do the written management
21  reports look like?
22      A.  Well, it tells you what are the
23  discrepancies, what we test, what we see, what
24  we didn't get clarification for, because we
25  are there to verify, verify based on what
```

```
                                            25
 1           Adam M. Pryce
 2  Dalton gives us, the trial balance, these
 3  figures.
 4      Q.  And how many of these written
 5  management reports did you provide to
 6  Mr. Edmonds?
 7      A.  A number.  I don't recall how many.
 8  I don't recall how many.
 9      Q.  Was it more than five?
10      A.  I don't know.
11      Q.  After you issued the auditor's
12  report --
13           MR. KELLY:  Strike that.
14           I am going to ask the court reporter
15      to show the witness Exhibit 15.
16           MR. HAYWOODE:  I would urge that all
17      counsel withdraw their questions rather
18      than strike them, because there is no
19      judge here.
20           If it's a motion, it's going
21      nowhere.
22      Q.  Mr. Pryce, do you have Exhibit 15 in
23  front of you?
24      A.  Yes.
25      Q.  Do you recognize this document?
```

**Page 26**

Adam M. Pryce

A. Yes.
Q. What is this document?
A. This document is from Cameron, Griffiths & Pryce, addressed to Mr. John Edmonds.
Q. What is the purpose of this document?
A. The purpose of this document is to say that we have performed the audit of the above entities, and then it refers, on which we base no opinion, and saying that this is solely for inhouse use.
Q. Other than Exhibits 14 and 15 --
A. Yes.
Q. -- in which you express no opinion with regard to your audit work --
A. This is the disclaimer opinion.
Q. -- have you modified that disclaimer of opinion in any way since you issued these documents?
A. No, we have not modified the disclaimer because of scope limitations. We have not been satisfied based on what we tested, based on issues surrounding

**Page 27**

Adam M. Pryce

independence, independence of external auditors and who was doing the accounting, issues of independence. That's very important.
    We saw evidence, appearance of independence, based on GAGAS, based on GAAP, based on GAAS, and we weren't satisfied with some of these. So we couldn't -- we made no opinion. We still have disclaimer of opinion.
    MR. HAYWOODE: We were dissatisfied, Ms. Metz.
    THE WITNESS: We were not satisfied.
    MR. HAYWOODE: "We were not satisfied." Dissatisfied.
A. We still stick with the disclaimer of opinion.
Q. You said you saw evidence regarding independence issues?
A. Yes.
Q. What evidence are you referring to?
A. Okay.
    GAGAS mentions two overreaching principles.
    One is auditors are not supposed to

**Page 28**

Adam M. Pryce

make management decisions.
    When you have audit services, must be the de minimis rule, says that less than 40 hours, maximum of $5,000.
    We see, for example, at Lakeview, for example, where there was a contract from DHCR for $34,000 and there was $108,000 charged, a difference. We considered that as overreaching.
    So those were overreaching according to GAGAS.
Q. Is there anything else you saw that you referred to when you said you saw evidence of independence issues?
A. Yes.
    One of the requirements of the audit is that you test management estimates.
    Management makes estimates. You test the estimates to make sure the estimates are reasonable, according to professional requirements.
    One of the requirements for DHCR was to calculate a shelter tax and the estimate was not made by Dalton, but it was done by the

**Page 29**

Adam M. Pryce

auditor. And the estimate was done by the external auditor.
Q. Anything else?
A. That's one of the examples.
    There are a number of other things which -- there is a pattern at Lakeview, in, for example, Church Home, for example, where we have the exact contract amount exceeded over $5,000, the de minimis rule as well.
Q. Anything else?
A. Those are examples.
Q. When you said you saw evidence, I just want to know what evidence you saw.
A. I gave you two evidences.
Q. Anything else?
A. The others -- this audit was done over a year ago --
    MR. HAYWOODE: Objection to any question --
A. -- so I can't remember everything that you want me to remember, but I give you examples.
    MR. HAYWOODE: I withdraw my objection.

**Page 30**

Adam M. Pryce

My objection to the question which calls upon a witness who submitted documentation which counsel all have in their possession, and you are asking for his present recollection as he sits here today of what he wrote over a year ago. I object to the form of that question.

MR. KELLY: I heard your objection. I am going to proceed with my questioning.

MR. HAYWOODE: Please.

Q. At any point, did you speak with anybody from Marks Paneth & Shron regarding the Edmonds engagement?

A. My partners Sandra and Orley spoke to one of the partners. I did not personally speak to anybody from -- to any of the auditors, Shron, I didn't speak to anybody.

Q. What did your partners, Ms. Griffiths and Mr. Cameron, tell you about their conversation with Marks Paneth & Shron?

A. This was an issue that has to do with our refinance, a loan refinance, in which the fees, the finance fees were amortized over

**Page 31**

Adam M. Pryce

thirty years instead of over the life of the loan, which disputes GAAP. General acceptable accounting principles says that when you refinance it should be written over the life of the loan instead of thirty years.

So that is a GAAP problem. I think that is what they spoke to him about. I can't recall.

Q. Did Mr. Cameron tell you that the partner at Marks Paneth & Shron offered to sit down with Cameron, Griffiths & Pryce and go over any issues they may have?

MR. HAYWOODE: Objection to the leading nature of the question, but the witness may answer.

A. Let me answer that.

I think at the time when the partner was contested, he said he was traveling to Europe or he was traveling somewhere.

In fact, Sandra or we decided to communicate -- I'm saying we, my two partners. It was Ron Dawley who referred them to Shron. So we didn't contact. It was Ron Dawley who referred them because of

**Page 32**

Adam M. Pryce

information that we needed.

That was strange.

Q. Did your partners, Mr. Cameron or Ms. Griffiths, tell you that Marks Paneth & Shron had offered to meet with Cameron, Griffiths & Pryce and go over any issues they may have?

MR. HAYWOODE: Objection, again.

A. I don't recall.

I don't see why Dalton Management was the accountant. I don't see why Dalton Management shouldn't deal with the matter, because they are the accountants.

MR. KELLY: I am going to ask the court reporter to mark this as the next exhibit.

(Copy of Subpoena issued to Adam Pryce, was marked as Defendant's Exhibit 18 for identification, as of this date.)

Q. Do you see Exhibit 18 in front of you?

A. Yes.

Q. Have you seen that document before?

A. Yes.

**Page 33**

Adam M. Pryce

Q. Was that document given to you several weeks ago at your office?

A. Yes.

Q. At the time you received this document, did you review the document?

A. Yes, I did.

Q. What did you do in response to this document?

A. I'm here today.

Q. Did you contact anybody when you received this document?

A. No.

Q. Prior to your deposition here today, did you speak with anybody about your deposition?

A. No.

Q. Did you speak with anybody in connection with your anticipated testimony today?

A. No.

Q. Looking back at Exhibit 15, is this something that you described previously as a written management report?

A. Yes. These are the questions from

**Page 34**

Adam M. Pryce

the management report, we call it, yes. These were issued, yes.

Q. Am I understanding you correctly that you issued several of these types of documents prior to this particular one?

A. I don't know what you mean by "several."

Q. Did you issue previous documents similar to this prior to this one?

A. I don't know if it's prior to this, but these were issued by us to John Edmonds.

I don't know if there were previous. I didn't count them.

Q. After the date of this document, December 12th, 2007, did you or Cameron, Griffiths & Pryce prepare similar documents updating the findings in this one?

A. Well, this is December 12th, 2007. So this is after the audit report. This is after the audit report.

Yes, we did update Edmonds. We did update Edmonds.

Q. After you issued Exhibit 15 on

**Page 35**

Adam M. Pryce

December 12th, 2007 --

A. Yes.

Q. -- did you provide additional written updates to Mr. Edmonds?

A. I can't recall.

Because, remember, we were given some documents after we came here. I think we came two places. So we did update it. So this is the update.

Q. Do you recall any additional update after this?

A. No.

MR. KELLY: I think I may be finished.

(Pause.)

MR. KELLY: I am finished with my questioning.

MR. HAYWOODE: For the record, let me indicate that Sandra Griffiths, the third partner, had indicated her intention to be present this morning and she was ready and willing to be deposed in any order or at least after Mr. Pryce's testimony, but we were

**Page 36**

Adam M. Pryce

informed by Bill Kelly that he has an assignment this afternoon in the federal district courts and must leave before one o'clock, and that when apprised of that information and at Mr. Kelly's direction, we advised Ms. Griffiths not to come.

She is ill and has been somewhat ill, but she was prepared to come and give her testimony this morning.

MR. KELLY: And let me also just clarify for the record that Ms. Griffiths was subpoenaed to appear yesterday and we were informed that she was ill.

So her deposition had been adjourned on that premise.

We were informed when we appeared here this morning that Ms. Griffiths was available for this afternoon, and as I indicated, I was unavailable, and I'm sure we will work together to reschedule her deposition at the nearest open date for all of us.

MR. HAYWOODE: I always work together with you.

**Page 37**

Adam M. Pryce

EXAMINATION

BY MR. TRAUB:

Q. Good morning, Mr. Pryce.

A. Good morning.

Q. My name is Darren Traub. I represent the other defendants in this action other than Marks Paneth & Shron and I just have a few followup questions for you.

You stated that you have a full-time job at FACES New York, Inc. as a controller; is that correct?

A. Yes.

Q. Does FACES know that you also have a job with with Cameron, Griffiths & Pryce?

A. Well, I'm a partner of Cameron, Griffiths & Pryce.

Q. And did you disclose your partnership interests in Cameron, Griffiths & Pryce to FACES New York?

A. If I disclosed it? Yes.

Q. So they are aware of the project you are handling for Mr. Edmonds?

A. Of course.

Q. And you stated that FACES New York

10 (Pages 34 to 37)

**Page 38**

```
 1            Adam M. Pryce
 2   is involved with the project called HDFC, is
 3   that correct?
 4       A.   The HDFC building, it reports on HUD
 5   as well.
 6       Q.   I believe you testified --
 7       A.   By the way, because HDFC is on DHCR
 8   as well.
 9       Q.   You also said that HDFC is regulated
10   by DHCR, is that correct?
11       A.   Yes.
12       Q.   What is your involvement with HDFC?
13       A.   I don't know. I don't understand.
14   You mean in terms of what?
15       Q.   Are you also -- do you do the
16   accounting for the books and records of HDFC?
17       A.   Yes. HDFC is a HUD project, which I
18   do the books for.
19       Q.   So you do work with DHCR also --
20       A.   No.
21       Q.   -- for HDFC?
22       A.   No. I work with FACES New York.
23   That is a HUD assisted project.
24       Q.   Let me rephrase my question.
25            On behalf of FACES New York and on
```

**Page 39**

```
 1            Adam M. Pryce
 2   behalf of its project HDFC, do you have
 3   contact with DHCR?
 4       A.   No, I don't. I don't have any
 5   direct contact with DHCR.
 6       Q.   Who is responsible for the direct
 7   contact with DHCR for the HDFC project?
 8       A.   Well, the executive director.
 9       Q.   Other than the current project, have
10   you ever audited a project that is regulated
11   by Mitchell-Lama?
12       A.   No.
13       Q.   Other than the current project, have
14   you ever regulated -- have you ever audited a
15   project that is regulated by HDC?
16       A.   HDFC?
17       Q.   HDC.
18       A.   What HDC mean?
19       Q.   Are you not familiar with the term
20   HDC?
21       A.   I don't know what is HDC. I am not
22   familiar with HDC.
23            What is that? HDC can mean many
24   things. I don't know. Clarify that.
25       Q.   Are you familiar with the
```

**Page 40**

```
 1            Adam M. Pryce
 2   governmental institute?
 3       A.   I am familiar with HUD.
 4       Q.   HUD is the entity which you are
 5   familiar with?
 6       A.   And DHCR works with HUD. That's the
 7   state.
 8       Q.   What about any other governmental
 9   regulated agencies, are you familiar with any
10   other ones other than HUD?
11       A.   I don't know. You mean --
12            MR. HAYWOODE: I object.
13       A.   I don't know.
14            MR. HAYWOODE: I don't know that is
15   appropriate.
16       A.   I don't know what you're driving at.
17       Q.   My question is you said you are
18   familiar with HUD.
19            Are you familiar with any --
20       A.   No. Let me explain what I said.
21            I do the accounting for FACES
22   New York, HUD assisted projects.
23            I do not have any personal contact
24   with anybody of DHCR or HUD.
25       Q.   What about with any other state or
```

**Page 41**

```
 1            Adam M. Pryce
 2   legal governmental agencies that regulate
 3   multifamily housing projects?
 4       A.   I don't have any personal contact
 5   with any of them.
 6       Q.   You also stated that Mr. Cameron
 7   asked you or said you should join the team,
 8   and you did, and the team you referred to is
 9   Cameron, Griffiths & Pryce, and you formed the
10   entity Cameron, Griffiths & Pryce for the
11   purpose of conducting the audit of the
12   projects for Mr. Edmonds; is that correct?
13       A.   Yes.
14       Q.   Did you put a capital contribution
15   into Cameron, Griffiths & Pryce?
16       A.   In initiating the formation.
17       Q.   What was your initial capital
18   contribution?
19       A.   I put in the fees, the state fees.
20       Q.   You, personally, put up the fees?
21       A.   Yes, I put in the fees as well.
22       Q.   In reviewing --
23            MR. TRAUB: Withdrawn.
24       Q.   In auditing the projects, and by
25   that I mean the four partnerships that
```

### Page 42

Adam M. Pryce

Mr. Edmonds retained you to review, did you report all of your findings to Mr. Cameron?

A. If I report my findings to Mr. Cameron?

Okay. We audited the financial statements and we joined together.

Q. So Mr. Cameron, then, would be aware of any findings that you came across during the audit?

A. Mr. Cameron, Ms. Griffiths and myself, the three of us are aware. We all aware of the findings. We did review each other's work.

Q. You did review each other's work?

A. Yes.

Q. Have you ever audited any other multifamily dwelling residential housing projects?

A. Not audited, but I have experience working with FACES New York on similar projects, yes.

Q. With FACES New York, how many housing projects does FACES New York have?

A. We have about seventy-seven.

### Page 43

Adam M. Pryce

Q. Seventy-seven?

A. Plus we have scatter site projects as well, which is funded by New York City, HRA administration.

Q. You are not the auditor for those projects?

A. No. I'm the controller.

Q. In reviewing the files for the different projects on behalf of Mr. Edmonds, have you discovered any money that is missing or unaccounted for?

A. Before we go, we did not review. We did an audit. An audit is full-blown attestation agreement.

A review is a limited assurance agreement. We didn't do a review for Mr. Edmonds. We did a financial audit. It's different from a review.

When you use review, it's kind of confusing to me, based on GAAP, based on GAAS.

Q. Let me rephrase my question. In doing your financial audit for Mr. Edmonds of the four partnerships, did you discover any money that is missing or

### Page 44

Adam M. Pryce

unaccounted for?

A. We didn't discover any cash problems.

We discovered transactions that we couldn't test.

We discovered, for example, there was $29,000 in the books for Seavey, for Seavey loan, which couldn't be tested and couldn't be disclosed because of third party transaction.

We didn't discover any cash missing. We discovered figures that we couldn't verify.

Q. Did you discover any payments that should have gone to either the partnerships or Dalton Management but instead went directly to any of the Seaveys?

A. We didn't see that. We didn't see that.

However, when we look at Church Home there was a bank account that suddenly appearing at the end in our testing that the details that was distributed, that the details was not in the books of Dalton.

### Page 45

Adam M. Pryce

Q. But did that account show any monies being paid directly to the Seaveys?

A. It was a distribution. There was a distribution paid to the partners, but the detail of it was not inside the general ledger.

Q. Thank you.

MR. HAYWOODE: I object to any characterization, monies paid directly to the Seaveys, because we know that the Seavey group and the Seavey family is a substantial component of Dalton Management.

MR. TRAUB: Once again, I remind you that your objection is beyond what is permissible under the Federal Rules.

MR. HAYWOODE: In your opinion. I am not going to be governed here today by your opinion.

MR. TRAUB: You are going to be governed by the Federal Rules.

MR. HAYWOODE: I have seen enough of your opinions.

MR. TRAUB: I have no further

```
                                    46
 1           Adam M. Pryce
 2   questions.
 3       Since we are on the record, I want
 4   to state on the record at 5:35 yesterday
 5   you filed a motion for sanctions and to
 6   compel documents that had been produced
 7   to your office more than seven hours
 8   prior to the filing of your motion.
 9       I also pointed that out to you in an
10   email after you filed.
11       MR. HAYWOODE: I missed what
12   Mr. Traub said about seven hours,
13   Ms. Metz.
14       Could you read it back?
15       (Whereupon, the requested portion
16   was read back by the reporter.)
17       MR. TRAUB: Your motion. And I
18   asked you to withdraw or correct the
19   statements in your motion to compel
20   documents in your statements that you had
21   not yet received those documents, as they
22   were untrue, and I have not heard a
23   response from your office yet.
24       So I want to ask on the record, do
25   you intend to withdraw your motion filed
```

```
                                    47
 1           Adam M. Pryce
 2   seven hours after the production of
 3   documents?
 4       MR. HAYWOODE: Mr. Traub, what time
 5   did you produce the documents that you
 6   say you produced to my office?
 7       MR. TRAUB: 10:11 a.m.
 8       MR. HAYWOODE: Where was I yesterday
 9   at 10:11 a.m.?
10       You know I was here with you
11   yesterday.
12       MR. TRAUB: Until one o'clock.
13       MR. HAYWOODE: Until one o'clock, so
14   if you served something on my office on
15   that morning and I wasn't there, I didn't
16   see it.
17       The documents -- the motion was made
18   prior to my knowledge that you had served
19   papers which we had asked for as long ago
20   as Thursday, the 16th, which were
21   withheld from us, which we requested on
22   Sunday afternoon after you deposed
23   Mr. Edmonds for five hours on Friday, the
24   day after we asked for the documents, and
25   you put a series of questions to him
```

```
                                    48
 1           Adam M. Pryce
 2   which are directly addressed by the
 3   documents that you were concealing, and
 4   on Sunday when I indicated to you that I
 5   could not proceed with any further
 6   deposition unless I heard and found what
 7   those documents were, what did you do?
 8       You didn't send it to me Sunday, but
 9   you knew it and you had it.
10       You didn't send it to me or tell me
11   Monday morning when I said send me the
12   documents and the deposition of
13   Ms. Seavey will ensue. You didn't
14   respond to that.
15       Your response was to make a motion
16   for sanctions at the end of the day at
17   5:30 with nothing further.
18       When I came here yesterday you
19   didn't bring the documents to me and give
20   them to me, if you intended me to know it
21   or to have it.
22       The questions I raised before the
23   magistrate is why a lawyer would conceal
24   documents, represent they had nothing to
25   do with the deposition that Mrs. Seavey
```

```
                                    49
 1           Adam M. Pryce
 2   was about to give?
 3       Why would a lawyer do that when in
 4   the midst of the document are documents
 5   which contravene allegations made by him
 6   and his client in three or four lawsuits
 7   that I know of, especially this one?
 8       You argued before the magistrate
 9   certain circumstances which are directly
10   contradicted by the documents that you
11   submitted to my office sometime yesterday
12   when I wasn't home, there.
13       Particularly, the motion made to the
14   magistrate raises the question as to why
15   you would write a 21-page affidavit
16   complaining about our inability to
17   proceed to the depositon of Mrs. Seavey
18   because we say we wanted to see the
19   documents being held since Thursday, the
20   16th, and never produced to the
21   magistrate the documents that you say you
22   produced to me one day later.
23       That looks to me like a deliberate
24   effort to conceal evidence, to force a
25   deposition under circumstances where I
```

Page 50

Adam M. Pryce

knew on Thursday, so far as I could see, that the documents that you were spiriting and hiding away are documents which directly related to the testimony to be given by Mrs. Seavey and any other defendant.

And I don't understand that professionally, counselor. I have a professional problem with that.

MR. TRAUB: Exactly, Mr. Haywoode. The professional problem I have is the abundant misstatements that come out of your mouth without any factual knowledge whatsoever.

First of all, you should know that the first time that I was told that you were actually missing documents was in your e-mail Sunday night.

In fact, I had not seen the documents until Monday morning.

At that time, we began to review them, Bates label them, and prepare them for production to your office.

I had not known anything Thursday

Page 51

Adam M. Pryce

afternoon and in fact the investigation and review of those documents were continuing by your office on Friday and, as far as your e-mail made it sound like to the magistrate, Saturday and Sunday.

So we were not going to continue to piecemeal photocopies for you. We were going to wait for you to tell us everything you wanted, photocopy them at one time, and produce them to you, just like we have done twice in the past.

In addition, you should note that both the document production that have occurred to your office in the past occurred through my office, after we reviewed them and were able to determine whether or not any of the documents were privileged, confidential, or how they need to be produced.

That is the way discovery occurs in both state and in federal court.

Moreover, regardless of whether you knew the documents had been produced to your office at 10:11 a.m., at the time I

Page 52

Adam M. Pryce

then informed you, at 5:38 p.m. yesterday, that your motion was incorrect because your office had already had the documents. You never responded, which is why I am now giving you a chance on the record to state whether or not you will withdraw your motion that was filed seven hours after the documents had been produced to your office.

That's the only question I am posing to you.

MR. HAYWOODE: I say again, the question raised in my motion was why this document wasn't presented to us Monday morning before the depositon of Phyllis Seavey.

MR. TRAUB: Because you didn't show up for the deposition, Mr. Haywoode.

MR. HAYWOODE: I am speaking.

I want to know why the document wasn't given to us Thursday afternoon at the time we requested. This recent fabrication about Bates numbering is ridiculous.

Page 53

Adam M. Pryce

MR. TRAUB: Did you request documents from my office?

MR. HAYWOODE: Hundreds of pieces of paper have been exchanged by all the parties in boxloads and you will not see a Bates number on any one of those hundreds, maybe several thousands of pages, not a Bates number on one of them.

This was nothing but a contrivance to suppress evidence directly relevant to the cross-examination that you did of Mr. Edmonds. The very following day while we were waiting for those documents you put a series of questions to John Edmonds concerning his ownership of shares in these corporations which were directly contravened by the documents that were being suppressed and held, and you continued to hold them, and even when you went to the magistrate with your 21-page production, you did not include the documents.

Why not before the magistrate? Because then the magistrate might have

14 (Pages 50 to 53)

**Page 54**

Adam M. Pryce

seen what everyone else saw, what I referred to as my sentinels and shepherds in the field saw Thursday night, that you were suppressing evidence which you intended -- which directly touched upon your deposition of John Edmonds and which would have directly impacted on the deposition of Phyllis Seavey, Bob Seavey, Avery Seavey, Nealle Seavey, any other defendant that you would have produced.

And when did you produce it? Not to me Monday morning, not to the magistrate in your motion, but you snuck it into my office allegedly in the morning.

I don't monitor the e-mails all day, and I don't see them sometimes until the following day.

I had no idea that you even sent other e-mails to my office last night.

I don't live in the office.

MR. TRAUB: Mr. Haywoode --

MR. HAYWOODE: Why, when I said to you I have a cell phone number, and I said it to both counsel, a 24-hour cell

**Page 55**

Adam M. Pryce

phone number, anything you had to say to me you could have said. You could have said it Sunday, all night Sunday, Monday.

My motion to the magistrate is as to why a lawyer would have held this document until even Tuesday morning and sent it to me at a time when he knew I was in his office engaged in another deposition.

I call that sleight of hand, which bothers me professionally.

MR. TRAUB: That's nice, Mr. Haywoode.

I ask you number one to show me a single request to my office to produce documents Thursday. You cannot because the request never came to me or my office.

MR. HAYWOODE: That's what you say. I don't know. But you certainly knew it Sunday and it still took you until Tuesday to give it to us, and you certainly knew the text of it on Sunday.

MR. TRAUB: Mr. Haywoode, I did not

**Page 56**

Adam M. Pryce

know --

MR. HAYWOODE: Because you said it didn't have anything to do with anything and you said Phyllis Seavey's name wasn't in it.

So you knew what it was.

I want to know if any body of attorneys looking at those exhibits and knowing the facts of this case could conclude that a lawyer looked at those exhibits and said, oh, this has nothing to do with any question he could possibly ask any of my clients.

I have a professional problem with that assessment.

MR. TRAUB: Mr. Haywoode, when you have the facts, you argue the facts. When you have the facts on your side, you argue the facts. When you have the law on your side you argue the law, and when you have neither you do as Mr. Haywoode is now doing and you pound the table.

MR. HAYWOODE: I haven't pounded any table.

**Page 57**

Adam M. Pryce

MR. TRAUB: Figuratively.

MR. HAYWOODE: When you have the evidence which contravenes your case and indicates major, major contradictions in presentations you have made in this and several other suits, you suppress it.

MR. TRAUB: Mr. Haywoode, clearly you have not reviewed the documents that have been produced to your office because when you see them you will know that what they are a cover letter from Mr. Seavey to various parties enclosing the exact same documents that were provided and marked as exhibits in your client's deposition on Friday.

I don't intend to engage in this any further with you.

Clearly, you are not going to withdraw your motion. So we will respond in due course.

Do you have any other questions?

MR. KELLY: No.

THE WITNESS: I just want to say

**Page 58**

Adam M. Pryce

something.

MR. HAYWOODE: Oh, one further thing.

Did you not say that Mrs. Seavey would be unavailable after the 20th and will not be here and would be unable to be deposed?

Mrs. Seavey was certainly here today and yesterday.

Did you not say it was difficult to get to this place, when her office is right across the street, and when I said let's do the deposition here as a courtesy to the Seaveys, who I have known for many years, so it is convenient to them rather than have them come out to my office?

MR. TRAUB: Mr. Haywoode, I think this is the problem.

MR. HAYWOODE: This has nothing to do with the deposition record.

I don't know. If you want to keep it on, go ahead.

You said what you wanted to say. I

**Page 59**

Adam M. Pryce

said what I wanted to say.

MR. TRAUB: I will just correct the misstatement.

My comment was that Mrs. Seavey would be unavailable over the course of the next two weeks.

There were depositions scheduled yesterday so Mrs. Seavey's deposition could not be held.

There was a deposition scheduled for today.

I stand by my statement to the magistrate, as I presume you do as well.

I have nothing further for this witness and there are no questions in front of him.

THE WITNESS: May I say something?

MR. TRAUB: No. There is no question.

THE WITNESS: Can I say something?

MR. TRAUB: No.

MR. HAYWOODE: I wish to examine the witness.

**Page 60**

Adam M. Pryce

EXAMINATION
BY MR. HAYWOODE:

Q. Mr. Pryce, let me try to get a fix on this.

You and your associates looked at the 2006 books of these corporations at one point; is that correct?

A. Yes.

Q. Is it your testimony that when you looked at the books and you tested areas, you were unable to come to any conclusion because you could not see the supporting evidence to support the areas of testing that you conducted?

A. Yes.

MR. KELLY: Objection.

Q. Is that what you said?

A. Yes. There were material areas that we couldn't get evidence, we couldn't form an opinion.

Q. Now, sir, when these --

MR. HAYWOODE: I withdraw that.

Q. This is not an unusual circumstance for an auditor; is it?

**Page 61**

Adam M. Pryce

MR. KELLY: Objection.

A. Well, first thing, the system didn't produce a trial balance.

We saw a number of adjusting journal entries, correcting journal entries at the yearend which were above the normal requirement, five adjusting entries that the auditors usually propose, five to ten. That's a normal audit.

We saw over twenty journal entries at least each year.

It suggests that there was deficiency in the internal control of the auditor.

Q. Would you describe those deficiencies?

A. Deficiency and a number of entries that Dalton should have made, because Dalton I understand was using cash basis of accounting but that was confusing, because if you use cash base of accounting you do not record receivables or payables.

We saw receivables in Dalton's book and yet it was confusing.

```
                                    62
 1           Adam M. Pryce
 2       Now, those journal entries that we
 3   saw, the number of journal entries we saw
 4   proposed by the auditor, we didn't see any
 5   evidence that they were approved by Dalton
 6   and Dalton did not book them that way neither.
 7       Now, if you are converting from cash
 8   basis of accounting to accrual basis, which is
 9   GAAP, GAAP, then there are two journal entries
10   you need to see at yearend. One with
11   receivables and one with payables.
12       They were excessive journal
13   entries. They were evidence that they were
14   approved by Dalton.
15       Usually --
16       Q. Did you say there were?
17       A. There were no evidence that these
18   proposed entries were approved by Dalton.
19   Dalton is responsible for the financial
20   statement.
21       Management is responsible for the
22   management statement.
23       Auditors are there to form an
24   opinion of the financial statement.
25       Q. So that your findings were that
```

```
                                    63
 1           Adam M. Pryce
 2   these decisions were being made by the
 3   auditor?
 4       A. Yes.
 5       MR. KELLY: Objection.
 6       A. Because the accountant, normal
 7   practice according to GAAP, should have sent a
 8   letter to the client asking the client to
 9   approve the journal entries, and we didn't see
10   the evidence, and Dalton didn't book them in
11   that order neither.
12       So the question is, those are things
13   we didn't have the evidence. So we couldn't
14   form an opinion neither.
15       Q. Is it fair to say that an objective
16   observer might have looked at this and
17   determined that Dalton was not the accountant
18   but that Marks Paneth & Shron was the
19   accountant for these developments?
20       MR. KELLY: Objection.
21       A. Well, the journal entries were not
22   approved by Dalton. So if they're not
23   approved, then there is an implication that
24   management decisions were being made by the
25   auditor, and this is overreaching, one of the
```

```
                                    64
 1           Adam M. Pryce
 2   aspects of the overreaching rule of GAGAS.
 3       We were not there -- we were there
 4   to conduct a financial audit on any matters
 5   that come to our attention which were
 6   considered material, we need to disclose them
 7   for our client, and this is what we did in our
 8   management letters.
 9       Q. Are you familiar with the issue that
10   arose concerning frontline employees and
11   central office employees being paid by the
12   partnership corporation?
13       A. Yes, I am familiar.
14       Q. And you are aware that one of
15   Mr. Edmonds's concerns was that the
16   developments of which he is a partner may be
17   paying expenses having to do with other
18   developments owned by the Seavey group that he
19   is not a member of? Have you heard that
20   situation?
21       A. Yes.
22       Q. To your knowledge --
23       MR. HAYWOODE: I withdraw that.
24       Q. Are you aware that there are some
25   twelve other units which John Edmonds is not
```

```
                                    65
 1           Adam M. Pryce
 2   associated with, which are owned by the Seavey
 3   group?
 4       A. Yes, I am aware.
 5       Q. Are you aware that all of those
 6   developments in our present information have
 7   Dalton Management as the manager and Marks
 8   Paneth & Shron as the auditor? Are you aware
 9   of that?
10       MR. KELLY: Objection.
11       A. Yes.
12       MR. KELLY: You just asked a
13   question upon information.
14       Can I ask you to identify what
15   information you are referring to?
16       MR. HAYWOODE: Information provided
17   in discovery by the parties.
18       MR. KELLY: Can you be more specific
19   than that?
20       MR. HAYWOODE: Well, I will.
21       On one occasion we asked for an
22   allocation of the amounts of payment
23   being made by each development to the
24   central office staff of Dalton Management
25   and we received a paper which listed
```

```
                                    66
 1          Adam M. Pryce
 2   three developments: Charles Hill, Logan
 3   Plaza, and Church Home.
 4       On another occasion previous, when
 5   we had raised the same question, we
 6   received the same sheet but it listed the
 7   several other developments, including
 8   Lakeview, indicating the same
 9   assessments.
10       This is the source of our
11   information and it was raised in a
12   previous deposition with Mr. Dawley
13   because we were wondering why the second
14   time it was raised the paper, which
15   listed the other developments, was cut
16   off and we were only given three.
17       MR. KELLY: What aspect of that
18   information implies Marks Paneth & Shron
19   was the auditor for those?
20       MR. HAYWOODE: That was the
21   testimony of the previous witnesses at
22   the previous depositions. That is my
23   recollection of the testimony of
24   Mr. Dawley and of Mr. Jennings. That is
25   my recollection.
```

```
                                    67
 1          Adam M. Pryce
 2       MR. KELLY: That is definitely not
 3   the testimony of Mr. Jennings.
 4       That's why I asked you what
 5   information --
 6       MR. HAYWOODE: I say it on
 7   information and that's my present
 8   recollection of the source of that
 9   information.
10       MR. KELLY: Okay.
11       MR. HAYWOODE: If it is not true, I
12   am certainly subject to correction.
13       It is my present information that in
14   every one of these buildings, from
15   fourteen to sixteen of them, that Marks
16   Paneth & Shron is the auditor and Dalton
17   Management is the accountant.
18       If that's not true, counsel, you
19   certainly have the means to correct me
20   and I will stand corrected.
21       MR. KELLY: That's why I asked you
22   what information you were relying on.
23       MR. HAYWOODE: And I told you what
24   it was.
25       MR. KELLY: Thank you.
```

```
                                    68
 1          Adam M. Pryce
 2       Now you can answer the question.
 3   EXAMINATION
 4   BY MR. HAYWOODE:
 5       Q. The question was, are you aware that
 6   that situation pertains or had you heard that
 7   that situation pertains?
 8       MR. KELLY: Objection.
 9       A. Yes.
10       Q. Would that impact the questions of
11   independence that you referred to in the GAGAS
12   rules?
13       A. Yes.
14       MR. KELLY: Objection.
15       A. Yes, but this is also related party
16   transaction as well, a number of related party
17   transactions as well, and independent rule,
18   yes.
19       Q. If you look, and I am not talking
20   about this situation, but let's take any
21   situation, if you come to a situation and you
22   conduct an audit and you see, for instance,
23   figures are presented in the end year
24   financial statement done by the auditor which
25   show no relationship in terms of adjusted
```

```
                                    69
 1          Adam M. Pryce
 2   journal entries to the figures in the books of
 3   the accountants, is there any way that you can
 4   form any opinion as to what happened to the
 5   difference in the money between the
 6   accountant's journal and the money reported in
 7   the financial statement by the auditor?
 8       Is there any way you can form any
 9   opinion as to what happened to that money?
10       MR. KELLY: Objection.
11       A. This problem suggests that the
12   proposed journal entries were not approved by
13   management.
14       Q. By the accountant?
15       A. By the accountant.
16       MR. KELLY: Objection.
17       Q. And with regard to the monies which
18   are in that spread between what the
19   accountants had and what the auditors issued,
20   put the case that that amount of money was
21   $7 million, just theoretically. Could you
22   tell what happened to that $7 million from
23   simply looking at the general ledger and then
24   looking at the financial statement?
25       MR. KELLY: Objection.
```

**Page 70**

```
 1              Adam M. Pryce
 2     A.  Yes.  Well, the bottom line of any
 3  financial statement, in this case they were
 4  partnerships.  The bottom line of everything
 5  goes to the capital account which is where
 6  distribution takes place.  So everything goes
 7  there.
 8          So whatever transaction takes place,
 9  that's the bottom line and that sets up the
10  distribution.
11          The bottom line of the financial
12  statement, in this case the partnership goes
13  right to the capital account, and it's that
14  bottom line that is used to distribute to the
15  partners.
16     Q.  Sir, what I am trying to understand,
17  without anything else, if you looked at a
18  situation and the general ledger said
19  $3 million was expended and then you looked at
20  a financial statement, and it says $7 million
21  was expended, and you saw no request proposed
22  for journal entry adjustments, no proposal
23  coming from the auditor, no acceptance coming
24  back from the accountant to the auditor, could
25  you in any way tell what happened to the
```

**Page 71**

```
 1              Adam M. Pryce
 2  monies which were between the two accounts?
 3          MR. KELLY:  Objection.
 4     A.  Well, first thing you need to look
 5  for supporting evidence, because we are there
 6  to do a financial audit, to test, based on our
 7  sample, any matters, to disclose them.
 8          So as I said, if the bottom line of
 9  all these transactions go to the capital
10  account and that's where the distribution
11  takes place, so it has implication for moneys
12  as well.
13     Q.  But you wouldn't know what happened
14  to those monies, is that correct?
15          MR. KELLY:  Objection.
16          MR. TRAUB:  Objection.
17     A.  If I have no evidence.
18     Q.  If you have no evidence, you
19  couldn't tell.
20          MR. KELLY:  Objection.
21     A.  (No response.)
22     Q.  So if someone were to tell you that
23  money was given to Casey Stengle, would you be
24  able to say yes or no the money went to Casey
25  Stengle?
```

**Page 72**

```
 1              Adam M. Pryce
 2          MR. KELLY:  Objection.
 3          MR. TRAUB:  Objection.
 4     A.  The transaction we couldn't form.
 5  We didn't have the evidence.  So we couldn't
 6  form an opinion.
 7     Q.  You wouldn't know if that money went
 8  to Mel Haywoode, would you?
 9          MR. KELLY:  Objection.
10     A.  No.
11     Q.  You wouldn't know if Mel Haywoode
12  stole that money, took that money, invested
13  that money with Bear Stearns, you would have
14  no way of knowing what happened to that
15  money?
16          MR. KELLY:  Objection.
17     Q.  Would you?
18          MR. KELLY:  Objection.
19     A.  Our aim there, Mel, was to test the
20  records, because if there's any matters that
21  is questionable we are supposed to bring that
22  to the attention.
23          This is what GAGAS, GAAP, GAAS asks
24  us to do.  That's what governs our behavior.
25          It is not personal.  We are there to
```

**Page 73**

```
 1              Adam M. Pryce
 2  follow those rules.
 3     Q.  So you formed no personal opinions?
 4     A.  We formed no personal opinions about
 5  Ron or Seavey.  We were there as independent
 6  auditor to follow GAAS.  That's what governed
 7  our behavior, to follow GAAP, which is the
 8  presentation of financial statements, to
 9  assure that accrual basis of accounting is
10  used, and that's what we report on.
11     Q.  Mr. Pryce, you wouldn't know what
12  happened?
13     A.  We wouldn't know anything.
14          MR. KELLY:  Objection.
15     A.  If we don't have anything, we
16  wouldn't know.
17          MR. HAYWOODE:  No further questions.
18          THE WITNESS:  We are there to gather
19  evidential matter and to test them.  We
20  don't know if we don't see evidence.
21          MR. HAYWOODE:  No further
22  questions.
23  EXAMINATION
24  BY MR. KELLY:
25     Q.  Mr. Pryce, I am going to follow up
```

19 (Pages 70 to 73)