UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

JOHN L. EDMONDS, INDIVIDUALLY AND AS
A MANAGING CENTRAL PARTNER OF FIFTH AND 106TH
STREET HOUSING COMPANY, INC., LOGAN PLAZA
ASSOCIATES, LP, CHARLES H. ASSOCIATES a/k/a
CHARLES H. HILL ASSOCIATES, LP AND AS A
LIMITED PARTNER OF CHURCH HOME ASSOCIATES, LP

        Plaintiffs,

    -against-

ROBERT W. SEAVEY, INDIVIDUALLY AND AS A
GENERAL PARTNER OF FIFTH AND 106TH STREET
ASSOCIATES, LP, LOGAN PLAZA ASSOCIATES, LP,
CHARLES HILL ASSOCIATES, CHARLES HILL
ASSOCIATES, LP AND AS A LIMITED PARTNER OF
CHURCH HOME ASSOCIATES, L.P., PHYLLIS M.
SEAVEY, INDIVIDUALLY AND AS OWNER, MANAGER
AND MEMBER OF DALTON MANAGEMENT COMPANY,
LLC., AVERY B. SEAVEY, INDIVIDUALLY AND AS
A GENERAL PARTNER OF LOGAN PLAZA ASSOCIATES,
LP, CHURCH HOME ASSOCIATES AND OWNER OF
DALTON MANAGEMENT COMPANY, LLC., BEALE B.
SEAVEY, INDIVIDUALLY AND AS OWNER, MANAGER
AND MEMBER OF DALTON MANAGEMENT COMPANY,
LLC., AND RONALD DAWLEY AS CHIEF EXECUTIVE
OFFICER OF DALTON MANAGEMENT COMPANY, LLC.,
DALTON MANAGEMENT COMPANY, LLC, THE
SEAVEY ORGANIZATION, and MARKS PANETH
& SHRON, Auditors.

        Defendants.

- - - - - - - - - - - - - - - - - x

(Caption continued on next page.)

      500 Pearl Street
      New York, New York

RONALD DAWLEY

      February 24, 2009
      10:45 a.m.

           LEX 71923

---

2

2     DEPOSITION of RONALD DAWLEY, a Defendant

3  in the above-entitled action, held at the above

4  time and place, pursuant to Order, taken before

5  Angela Torregrossa, a shorthand reporter and

6  Notary Public within and for the State of

7  New York.

---

3

2  A p p e a r a n c e s :

3

4    M. DOUGLAS HAYWOODE, ESQ.

5      Attorney for All Above Plaintiffs
      71 Maple Street

6      Kings Chancellery
      Brooklyn, New York 11225

7    BY: M. DOUGLAS HAYWOODE, ESQ.

8

9

10   HERRICK FEINSTEIN, LLP

11      Attorneys for All Above Defendants
      except Marks, Paneth & Shron

11     2 Park Avenue
      New York, New York 10016

12   BY: M. DARREN TRAUB, ESQ.

13

14

15   WILSON ELSER MOSKOWITZ EDELMAN &
      DICKER, LLP

16      Attorneys for Defendant
      MARKS, PANETH & SHRON, LLP

17     3 Gannett Drive, 4th Floor
      White Plains, New York 10604

18   BY: WILLIAM J. KELLY, ESQ.

19

20

21  ALSO PRESENT:
     ORLY CAMERON

22    SANDRA GRIFFITHS
     ADAM PRYCE

23    JOHN EDMONDS

24

25

---

4

2     S T I P U L A T I O N S

3

4    IT IS HEREBY STIPULATED AND AGREED

5  by and between the attorneys for the

6  respective parties herein, that filing,

7  sealing and certification be and the

8  same are hereby waived.

9

10    IT IS FURTHER STIPULATED AND

11  AGREED that all objections, except as

12  to the form of the question shall be

13  reserved to the time of the trial.

14

15    IT IS FURTHER STIPULATED AND

16  AGREED that the within deposition may

17  be signed and sworn to before any

18  officer authorized to administer an

19  oath, with the same force and effect as

20  if signed and sworn to before The

21  Court.

22

23

24

25

5

1

2  R O N A L D   D A W L E Y, the witness herein,

3       having been first duly sworn by a

4       Notary Public of the State of New York,

5       was examined and testified as follows:

6  EXAMINATION BY

7  MR. HAYWOODE:

8       Q     State your name for the record,

9  please.

10      A     **Ronald Dawley.**

11      Q     State your address for the record,

12  please.

13      A     **401 Second Avenue, New York, New**

14  **York, 10010.**

15      Q     Mr. Dawley, I am going to put

16  questions to you concerning the affairs of

17  these investments that are being manned by

18  your counsel. Mr. Kelly, who I presume you

19  met before, may have an objection. If they

20  do, I guess you'll listen to what they say,

21  but I think for the most part under the rules

22  of procedure if you understand the question

23  you will respond to it. The lawyers will deal

24  with whatever cleaning up has to be done

25  later. If I say something that you don't

LEX REPORTING SERVICE

800-608-6085

6

1

2  understand say so. If you need time to

3  reflect on something take it and hopefully we

4  will get through everything that we have an

5  interest in.

6           Is that okay with you?

7      A     **Okay.**

8      Q     Mr. Dawley, you work with Dalton

9  Management presently?

10     A     **Yes.**

11     Q     What is your position, sir, with

12  Dalton?

13     A     **I'm the chief operating officer.**

14     Q     When were you first employed by

15  Dalton?

16     A     **November of 1999.**

17     Q     In what capacity were you hired in

18  November of 1999?

19     A     **As a chief operating officer.**

20     Q     What is the office location of

21  Dalton Management?

22     A     **34 Park Avenue.**

23     Q     Is there any particular room

24  there?

25     A     **It's the 28th floor.**

LEX REPORTING SERVICE

800-608-6085

Dawley

7

1

2      Q     Do you occupy the entire 28th

3  floor there?

4      A     **No, just one section of it.**

5      Q     Do you occupy together with some

6  other entity or organization?

7      A     **No.**

8            **We have one small area, about**

9  **twelve or thirteen hundred square feet that's**

10  **leased by Dalton Management.**

11     Q     Who do you lease it from?

12     A     **Cohen Brothers.**

13     Q     I am sorry?

14     A     **C-O-H-E-N Brothers.**

15     Q     The area that you occupy, does it

16  have a separate room number or something?

17     A     **They don't give you room numbers.**

18  **We use 2800. We use Suite 2800, but they**

19  **don't officially assign you your room.**

20     Q     Are you in the same facility with

21  the Seavey Group or the Seavey Organization?

22     A     **They are next door.**

23     Q     When you say next door, they are

24  in another area of this floor?

25     A     **They are in another area, yes.**

LEX REPORTING SERVICE

800-608-6085

Dawley

8

1

2      Q     Do you have a common reception

3  room?

4      A     **No.**

5      Q     So the entrance to Dalton is not

6  the entrance to the Seavey Group?

7      A     **No.**

8      Q     There is a wall between the

9  operations?

10     A     **With a door.**

11     Q     So that access to the one

12  operation is not physical access to Dalton

13  Management?

14     A     **You need to rephrase that. I**

15  **don't know what you mean.**

16     Q     In other words, if once I enter

17  the Seavey Group, there is no way that I could

18  from there walk over into Dalton Management,

19  is there?

20     A     **There is a door that connects the**

21  **two suites.**

22     Q     Is that door closed or is it kept

23  opened or what?

24     A     **Sometimes.**

25     Q     Sometimes which?

LEX REPORTING SERVICE

800-608-6085

Dawley

9

2  A  **Sometimes opened and sometimes**
3  **closed.**
4  Q  So then it is possible that if
someone came into the Seavey Group, they could
walk into the group and they could be at
7  Dalton, is that correct?
8  A  **They could.**
9  Q  Now, how many persons work at that
10  location for Dalton?
11  A  **They have six including myself.**
12  Q  Yourself and five others?
13  A  **Yes.**
14  Q  What are the names of the other
15  five?
16  A  **Michael Hill, Joan Mondesir.**
17  Q  What is his position?
18  A  **He's the manager for two**
19  **properties.**
20  Q  Which two properties is that?
21  A  **Haywoode Towers and Galileo.**
22  Q  Haywoode and Galileo?
23  A  **Associates.**
24  Q  What is the location of Haywoode
25  Towers approximately?

LEX REPORTING SERVICE
800-608-6085

Dawley

10

2  A  **175 West 90th.**
3  Q  Galileo Associates has a property
4  where?
5  A  **303 West 21st.**
6  Q  Now, you mentioned Joan Mondesir.
7  A  **Yes.**
8  Q  What is her title?
9  A  **She is basically our compliance**
10  **officer.**
11  Q  Who else is at that location?
12  A  **Lynn Shapiro**
13  Q  What is her title, sir?
14  A  **She is, I guess you would say,**
15  **assistant controller.**
16  Q  The fourth and fifth persons are?
17  A  **Alonzo Rodgers and Veronica**
18  **Mackenzie.**
19  Q  What's Mr. Rodger's title?
20  A  **He's our legal liaison.**
21  Q  In that description, what are the
22  duties of Mr. Rodgers as to legal liaison?
    A  **He coordinates the landlord/tenant**
    **cases with the attorneys and the managers.**
25  Q  He have event any other duties?

LEX REPORTING SERVICE
800-608-6085

Dawley

11

2  A  **He downloads the rent revenues**
3  **that come in and deposits them into the bank.**
4  Q  Ms. Mackenzie?
5  A  **She is the accounts payable clerk.**
6  Q  Sir, if you recall or if you can
7  tell us approximately what is your yearly
8  salary at Dalton Management?
9      MR. TRAUB:  Objection.
10  Irrelevant.
11      You're welcome to answer.
12  A  **$140,000.00 a year.**
13  Q  Roughly what is the salary of
14  Michael Hill?
15  A  **Approximately 60.**
16      MR. TRAUB:  I am going to do
17  the same objection for each of
18  these questions, but I am not
19  going to instruct him not to
20  answer, but I just want my
21  objection on the record.
22      MR. HAYWOODE:  I know that.
23  Q  And Joan Mondesir?
24  A  **Approximately 80.**
25  Q  Lynn Shapiro?

LEX REPORTING SERVICE
800-608-6085

Dawley

12

2  A  **Approximately 60.**
3  Q  Mr. Rodgers, Alonzo Rodgers?
4  A  **Approximately 45.**
5  Q  Ms. Mackenzie?
6  A  **Approximately 40.**
7  Q  Sir, how many investments or sites
8  or buildings does Dalton manage from this
9  location?
10      MR. TRAUB:  Same objection.
11  A  **Ten.**
12  Q  What are the names of those sites?
13  A  **Church Home Associates, Logan**
14  **Associates, Charles Hill Associates, Haywoode**
15  **Associates, Cooper Gramercy Associates,**
16  **University Riverview Associates. Bethune**
17  **Tower Associates, Galileo Associates, Fifth**
18  **and 106th Street Associates and YA Associates.**
19  Q  Does Dalton manage any other
20  investments from any other site?
21      MR. TRAUB:  Objection to the
22  form.
23  A  **Say again?**
24  Q  Does Dalton manage any other
25  investments from any other site?

LEX REPORTING SERVICE
800-608-6085

Dawley

13

1
2    MR. TRAUB:  You mean does
3    Dalton have another office that
4    they manage out of?
5    Q    I will withdraw the question.
6        Does Dalton manage any other
7    investments?
8    A    **No.**
9    Q    That's the totality of what Dalton
10    does?
11    A    **Yes.**
12    Q    With regard to these investments,
13    you know Mr. Edmonds, John Edmonds, is that
14    correct?
15    A    **Yes.**
16    Q    It is a fact that he's associated
17    in the ownership of Church Homes, Logan,
18    Charles Hill and Fifth and 106th Street, is
19    that correct?
20    A    **That's what I've been told.**
21    Q    With regard to Robert Seavey,
22    Phyllis Seavey, Avery Seavey and Neale Seavey,
23    the Seavey Group they also participate, to
24    your knowledge, in the ownership of those
25    investments, is that correct?

Dawley

14

1
2    MR. TRAUB:  Objection.
3        Are you asking the Seavey
4    Group? Are you categorizing the
5    Seavey Group as the four Seavey's
6    or are you saying that's a fifth
7    name, if you will, in your list?
8    Q    No.
9        I am asking if the Seavey's are
10    interested in the buildings that John Edmonds
11    are interested in to your knowledge?
12    A    **As far as I know, they have some**
13    **relationship.**
14    Q    With regard to each of the other
15    investments the John Edmonds isn't interested
16    in, is it fair to say that the Seavey's, some
17    of the Seavey's, have interests in those
18    investments also?
19    A    **That's my understanding.**
20    MR. TRAUB:  In each of them?
21    THE WITNESS:  I don't know
22    if each person, what if any
23    interest they each own.
24    MR. HAYWOODE:  Just so we
25    get together here, you can do

Dawley

15

1
2    redirect, but in the middle of
3    his examination under the new
4    rules this is not appropriate.
5    MR. TRAUB:  I was just
6    clarifying the question and
7    answer, because he didn't let me
8    get my objection out and your
9    question was a little vague and
10    ambiguous.  I was trying to
11    clarify and get my objection out.
12    He answered.  I will put my
13    objection on the record.
14        Objection.  Your question is
15    vague and ambiguous.
16        You need to slow down and
17    let me get my objection out.
18    THE WITNESS:  Okay.
19    Q    Do you have any training or
20    qualification in any area, CPA or accounting,
21    or anything of that nature, sir?
22    A    **Yes.**
23    Q    What if anything is that
24    qualification?
25    A    **I graduated with a major in**

Dawley

16

1
2    accounting.
3    Q    From where, sir?
4    A    **University of Washington.**
5    Q    Is that in the State of
6    Washington?
7    A    **Yes.**
8    Q    What degree, sir, did you receive
9    there?
10    A    **Bachelors Degree.**
11    Q    Did you do any additional study or
12    work, or obtain any additional qualification,
13    other than the Bachelors of Art Degree?
14    A    **No.**
15    Q    Before working at Dalton
16    Management, did you work in the accounting
17    field at any other company?
18    A    **Yes.**
19    Q    What company?
20    A    **Hudson River Management.**
21    Q    Where was that?
22    A    **Manhattan.**
23    Q    I am sorry?
24    A    **Manhattan.**
25    Q    What years did you work with

Dawley

17

```
2   Hudson River Management?
3       A    I think it was five years. Five
4   years prior to working for Dalton Management.
5       Q    Prior to going to Hudson River
6   Management, sir, for whom did you work?
7       A    I worked for -- I don't remember
8   their name. I only worked there a short time,
9   but it was for an asbestos removal company on
10  Long Island.
11      Q    In what year did you receive your
12  Bachelor of Arts, Mr. Dalton?
13      A    1967.
14      Q    Prior to the asbestos company for
15  whom did you work?
16      A    I worked for Florida Flooring.
17      Q    Where is that located?
18      A    It's in Brandon Florida.
19      Q    How long were you with them?
20      A    About five years.
21      Q    In what capacity did you work for
22  them?
23      A    I was the controller.
24      Q    Prior to Florida Flooring?
25      A    It was a housing -- it was a
```

LEX REPORTING SERVICE
800-608-6085

Dawley

18

```
2   development company in New Bedford. I worked
3   there about a year, year and a half.
4       Q    That's New Bedford, Connecticut?
5       A    No, Massachusetts.
6       Q    What was the next highest salary
7   you received, in any of these developments,
8   prior to coming to Dalton if you recall?
9       A    The prior job I had with Hudson
10  River Management I was making I think 105.
11      Q    Sir, would you describe to me the
12  duties of Dalton Management, with regard to
13  the investments that John Edmonds and the
14  Seavey's are interested in? What are your
15  duties generally with those duties?
16      A    My duties or the company's.
17      Q    The company's?
18           MR. TRAUB: You mean the
19           partnerships that Edmonds and the
20           Seavey Groups are in together
21           right now?
22           MR. HAYWOODE: Yes.
23      A    You're talking what Dalton
24  Management does for those companies?
25      Q    Yes.
```

LEX REPORTING SERVICE
800-608-6085

Dawley

19

```
2           What does Dalton do?
3       A    Dalton is the managing agent.
4   They bill the tenants, they collect the
5   revenues, they pay the expenses.
6       Q    Is there anything else that Dalton
7   does?
8       A    They apply for rent increases when
9   appropriate.
10      Q    Does Dalton keep books and records
11  of these corporations?
12      A    Their partnerships, yes.
13      Q    Dalton has been responsible for
14  keeping those books and records since you've
15  there?
16           MR. TRAUB: Objection to the
17           form.
18      Q    Dalton has been responsible for
19  keeping the books and records of these
20  corporations since you've been there?
21           MR. TRAUB: General
22           objection to form. That's a
23           statement not a question.
24           MR. HAYWOODE: Not if you
25           put a question mark at the end.
```

LEX REPORTING SERVICE
800-608-6085

Dawley

20

```
2           Do you understand what I am
3           saying, assuming there is a
4           question mark at the end?
5           MR. TRAUB: I am not telling
6           him not to answer, but just
7           objection to form.
8       Q    Do you understand?
9       A    Yes.
10          Dalton started to manage the
11  properties in the year 2000. They did not
12  start to manage Lakeview until later. I don't
13  remember exactly when.
14      Q    How many years now have you been
15  managing Lakeview that you recall roughly?
16      A    Roughly eight.
17      Q    You began managing all the other
18  properties in 2000?
19      A    Yes.
20      Q    In point of fact Dalton had
21  managed Charles Hill prior to 2000, is that
22  not so?
23      A    Not that I am aware of.
24      Q    Are you knowledgeable of who your
25  predecessor as chief executive officer was at
```

LEX REPORTING SERVICE
800-608-6085

Dawley

21

2 Dalton before 2000?
3    A    No.
4    Q    Does Dalton keep the books and
5 records of these investments?
6    A    I am sorry, which?
7    Q    Of the Seavey/Edmonds investments
8 Dalton keeps the books and records?
9    A    Yes.
10    Q    You were approached some time in
11 March of 2007 by Cameron, Pryce & Griffiths
12 and told that they were asked to do an audit
13 of those records?
14        MR. TRAUB:  Objection to
15    form.
16    A    I don't remember the exact date,
17 but that's about right.
18    Q    Mr. Cameron contacted you and
19 requested information, did he not, with regard
20 to the audit?
21        MR. TRAUB:  Objection to
22    form.
23    A    I spoke to him, but I don't
24 remember exactly what we talked about other
25 than that they were going to come in and look

LEX REPORTING SERVICE
800-608-6085

---

Dawley

22

2 through the books and records for the four
3 companies.
4    Q    Did there come a time, when Mr.
5 Cameron and his associates came in and
6 requested that?
7    A    Requested what?
8    Q    To look at the books and records?
9    A    Yes, they did.
10    Q    If you remember, how many times
11 did they come in to meet with you on that?
12    A    I don't know.
13        It was over a period of months.
14    Q    I am sorry?
15    A    It was over a period of months
16 that they came in and left and came back.
17    Q    As these requests were made, were
18 you able to provide the information that they
19 were requesting?
20    A    They came in and asked for the
21 information. We provided them with everything
22 that we had in our office. They were allowed
23 to, you know, look at everything; bank
24 statements, cancelled checks, billings,
25 invoices.

LEX REPORTING SERVICE
800-608-6085

---

Dawley

23

2    My accounts payable person helped
3 them find stuff. I helped them find stuff. I
4 showed them where all the records were in the
5 back. We have a storage area. It's all laid
6 out by month and went through it with them and
7 showed them where everything was and helped
8 them pull it if they couldn't find it.
9    Q    Did there come a time, when they
10 indicated there was information basic to their
11 audit that they could not receive from what
12 you had made available?
13        MR. TRAUB:  Objection to the
14    form.
15    A    I think they asked for some
16 documents. I think one of the items was the
17 mortgages, which would have been the original
18 closing papers when the property was either --
19 was either refinanced. I didn't have access
20 to those and so I couldn't provide them.
21    Q    Did you tell them where they might
22 inquire to get it?
23    A    I indicated that the outside
24 accountant, Marks, Paneth & Shron, would
25 possibly have that information, because they

LEX REPORTING SERVICE
800-608-6085

---

Dawley

24

2 need it in order to provide the footnotes in
3 the financial statements.
4    Q    To your knowledge, did they go to
5 Marks, Paneth & Shron to get that information?
6    A    I believe they did contact, Marks,
7 Paneth & Shron about getting information.
8    Q    I am going to show you a letter to
9 Dalton Management dated May 16, 2007, which is
10 in the Order to Show Cause, which has been
11 filed in this case.
12        MR. TRAUB:  Are you marking
13    it as an Exhibit?
14        MR. HAYWOODE:  We will mark
15    it. If you will bear with me for
16    a moment, but it is in the
17    pleadings.
18        MR. TRAUB:  So I can keep my
19    notes, you said we are going to
20    mark Exhibits and we will make
21    photocopies later. Were you
22    going to start the number
23    sequential from Bill Jennings
24    deposition or did you want to
25    start over?

LEX REPORTING SERVICE
800-608-6085

Dawley

25

MR. HAYWOODE: Let's start
over from this location.

Q    I am referring to Exhibit B in
support of John Edmonds's affidavit on the
Order to Show Cause, which is dated I think
June 20th of 2008.

Here's a communication, which says
it's a follow-up request dated May 10th to
your response on the 15th and it asks for
certain items; distribution basis and sporting
documentation for journal entries, retained
earnings account and adjusting partner capital
account. It's Item One here.

Do you recall receiving this
communication and seeing that request?

A    It's familiar, but I don't recall
specifically.

Q    To your present recollection, were
you able to comply with that request?

MR. TRAUB: Look at the
whole request.

Q    Counsel, is suggesting you take a
look at the whole page, Items One through
Eight, and is there a second page.

LEX REPORTING SERVICE
800-608-6085

---

Dawley

26

MR. TRAUB: It's dated the
same, but I can't tell if it's
the same letter.

Q    Let's deal with the first page
that you're looking at. Look through the
whole page.

How much of those requests, to
your recollection, were you able to provide or
comply with?

A    In reference to Number 1 journal
entries that I made we had support for.

Q    I am sorry?

A    Any journal entries that were made
-- that I made there is support for.
Description of or reason for it. Number 2, it
says it wanted the original mortgage notes. I
indicated that I didn't have those. Number
three it says the mortgage loan agreement. I
did not have those.

Q    Who had those?

A    The people that were at the
closing. The partners and I would have
presumed that Marks, Paneth & Shron had them
in order to complete their financial

LEX REPORTING SERVICE
800-608-6085

---

Dawley

27

statements.

Q    Go ahead.

A    Number four, again loan documents
I did not have.

Q    Who had the loan documents?

A    The partners would each have had a
copy of the loan documents and they would have
provided to Marks, Paneth & Shron in order to
provide the footnote information.

Q    Go ahead.

A    Number 5 accounts payable, there
was one item that they are talking about here
of $180,000.00.

Q    What did that pertain to, sir?

A    This was a management fee due
Dalton for unpaid management fees that we had
inherited when we took the property in 2000.

Q    What was the question that they
had with regard to that fee?

A    They wanted detailed support and
all I have was the beginning balance that was
carried over from prior to when we took over
the books and records.

Q    Let me understand, Mr. Dawley,

LEX REPORTING SERVICE
800-608-6085

---

Dawley

28

there was $180,000.00 owed management fees
prior to Dalton coming on the job?

A    Yes.

Q    To what management company was
that money owed?

A    I don't know.

Q    Who was the management company
before Dalton came to the job?

A    I don't know if it was Prestige,
Marion Scott or Grenadier. I had forgotten.

Q    Were you in any position to
determine why this debt was carried on the
books and to whom the money was owed?

A    The reason for leaving it on the
books was that it had been expensed in prior
years and taken as a deduction on the tax
return. If it is written off it then becomes
income in the year that it's written off. The
other alternative is to go ahead and pay it,
which was not done. It's still on the books.

Q    I am sorry, this was the item that
the accountant, the Cameron accountant
questioned?

A    That's what it says, Number 5,

LEX REPORTING SERVICE
800-608-6085

Dawley

29

2  yes.

3  **Q**  Did any of the previous companies,
4  make claim for that money against Dalton or
5  these investments?

6  **A**  **Not that I am aware of.**

7  **Q**  Were these companies aware that
8  these monies were outstanding to your
9  knowledge?

10  **A**  **I have no -- I don't know what**
11  **they knew or didn't know.**

12  **Q**  You indicated that there were two
13  ways of dealing with it and one way is to pay
14  it.

15  To whom could that money have been
16  paid?

17  **A**  **It was on the books as a payable**
18  **to Dalton Management.**

19  **Q**  To Dalton?

20  **A**  **To Dalton Management.**

21  **Q**  So that when the accountant asked
22  you about it, they were asking for the backup
23  and support as to why $180,000.00 was owed to
24  Dalton, is that correct?

25  **A**  **That's what their question is**

LEX REPORTING SERVICE
800-608-6085

---

Dawley

30

2  **Number 5, yes.**

3  **Q**  You told them at that time that
4  the money wasn't owed to Dalton?

5  MR. TRAUB:  Objection.

6  **Q**  Did you?

7  **A**  **No.**

8  **The money was on the books as a**
9  **payable to Dalton Management.**

10  **Q**  I see.

11  Who entered the money on the
12  books?

13  MR. TRAUB:  I don't think
14  he's finished.

15  **A**  **The agreement between the Seavey's**
16  **and John Edmonds was that if it's paid to**
17  **Dalton, John Edmonds would get 50 percent of**
18  **it. From what I understand that is still in**
19  **effect today if that money is paid.**

20  **Q**  There was a written agreement?

21  **A**  **No.**

22  **No, not that I am aware of it.**

23  **Q**  How did you learn of this
24  agreement?

25  **A**  **I was informed by the Seavey's.**

LEX REPORTING SERVICE
800-608-6085

---

Dawley

31

2  **Q**  Which Seavey informed you of that?

3  **A**  **I don't recall.**

4  **It's been too long ago.**

5  **Q**  Which of the Seavey's hired you,
6  Mr. Dawley?

7  **A**  **I was hired by Dalton Management.**

8  **The owners of Dalton Management**
9  **are Neale Seavey and Avery Seavey. They are**
10  **my employers.**

11  **Q**  Did you know any of the Seavey's
12  before coming to this job?

13  **A**  **No.**

14  **Q**  You had have no previous dealing
15  with the Seavey's before applying for this
16  job?

17  **A**  **No.**

18  **Q**  How did you learn about this job?

19  **A**  **I was completing my job with River**
20  **Rental. We were selling the properties and**
21  **they wanted somebody to come in and set up**
22  **their accounting so that they could go ahead**
23  **and take back the management and manage it**
24  **themselves. I was approached to do that.**

25  **Q**  By whom?

LEX REPORTING SERVICE
800-608-6085

---

Dawley

32

2  **A**  **By the Seavey's.**

3  **Q**  Who?

4  We have four Seavey's. Was it
5  Neale, Avery, Phyllis or Robert, who
6  approached you?

7  **A**  **I believe it was Mrs. Seavey,**
8  **Phyllis Seavey.**

9  **Q**  Phyllis?

10  **A**  **Yes.**

11  **Q**  Phyllis inquired into your
12  experience?

13  **A**  **They requested a resume, yes.**

14  **Q**  You were interviewed by her?

15  **A**  **I was interviewed by the Seavey's,**
16  **yes.**

17  **Q**  By Phyllis and other Seavey's?

18  **A**  **Avery and Neale.**

19  **Q**  I see.

20  As a result of that interview you
21  were hired?

22  **A**  **Yes.**

23  **Q**  Of the three Seavey's that you
24  mentioned who told you that $180,000.00 on the
25  books, if not paid to someone else, could be

LEX REPORTING SERVICE
800-608-6085

Dawley

33

2  paid to Dalton Management and divided by John
3  Edmonds and the Seavey's?
4           MR. TRAUB: Objection.
             Asked and answered.
    **Q**    Who told you that?
7           MR. TRAUB: Same objection.
8    **A**    **I don't remember.**
9           **You're talking eight, almost nine**
10  **years ago. It's been on the books for that**
11  **long.**
12   **Q**    When that was suggested to you,
13  given your years in accounting, did you find
14  that suggestion strange?
15          MR. TRAUB: Objection to
16  form.
17   **A**    **What do you mean by strange?**
18   **Q**    Well, did it seem to you that
19  monies owed to let's say the New York Yankees,
20  presumably for services provided by the New
21  York Yankees, could be divided by the Boston
22  Red Sox?
23          MR. TRAUB: Objection.
24   **Q**    Did it seem to you that was an
25  accounting possibility?

LEX REPORTING SERVICE
800-608-6085

Dawley

34

2           MR. TRAUB: Objection.
3           That is an improper
4  hypothetical.
5           MR. HAYWOODE: That is a
6  hypothetical, yes.
7           Let the witness answer the
8  question.
9           MR. TRAUB: I am not
10  instructing him not to. I am
11  just putting my objection on the
12  record.
13   **A**    **The financial statements from**
14  **prior years had taken the $180,000.00 as an**
15  **expense. It carried over into the year when**
16  **we acquired the company. It was still a**
17  **payable by Logan Plaza. If it was written off**
18  **and not paid or never to be paid the partners**
19  **would have to pick up $180,000 of income. I**
20  **don't know what discussions the Seavey's and**
21  **John Edmonds have or had, but it was told to**
22  **me that their decision was not to do that.**
             **The other alternative if you want**
25  **to get rid of it was to pay it and split it**
25  **50/50. That also was not done. So it remains**

LEX REPORTING SERVICE
800-608-6085

Dawley

35

2  **on the books as a payable and it hasn't**
3  **changed, nothing has transpired with that**
4  **amount.**
5    **Q**    Sir, did you understand the
6  question that I asked you though, did you
7  consider it a --
8    **A**    **You mean the Yankees and the Red**
9  **Sox?**
10          **I don't follow baseball. I don't**
11  **even like baseball.**
12   **Q**    The question I am basically asking
13  is that if money is owed to A and money has
14  been expensed owed to A, deduction has been
15  taken owed to A and yet you're then instructed
16  by someone and you don't recall who, is that
17  correct?
18   **A**    **Yeah.**
19   **Q**    Was it one of the Seavey's?
20   **A**    **Possibly, because they would have**
21  **been the ones that would have had the**
22  **discussion with John Edmonds to have made the**
23  **decision.**
24   **Q**    But you're theorizing now.
25          It was not John Edmonds, was it?

LEX REPORTING SERVICE
800-608-6085

Dawley

36

2    **A**    **No, John did not say anything.**
3    **Q**    So it was one of the Seavey's?
4    **A**    **It was one of the Seavey's.**
5    **Q**    If you were told that's money
6  that's owed to somebody else, pay it to us,
7  did that seem to you something that would be
8  lawful?
9           MR. TRAUB: Objection.
10          That is mischaracterizing
11          the prior testimony. He never
12          testified that he was instructed
13          to pay it to anyone.
14          MR. HAYWOODE: Well, let the
15          record speak for itself.
16   **Q**    Sir, did you consider that what
17  you were asked to do was lawful?
18          MR. TRAUB: Again same
19          objection.
20          He wasn't asked to do any
21          thing.
22   **Q**    Did you consider that the
23  suggestion made to you was a lawful one, sir?
24          MR. TRAUB: Same objection.
25   **A**    **The amount that was on the books**

LEX REPORTING SERVICE
800-608-6085

Dawley

37

2  was never disbursed to anybody.

3      Q    But, sir --

4      A    The only alternative --

5              MR. TRAUB:  Let him finish.

6      A    Was never disbursed and if it was

7  disbursed what you would have done is you

8  would have written off the amount as a

9  distribution and distributed the money 50/50

10  to each of the parties.  Nothing ever

11  transpired and I don't make the decision on

12  the characterization on the tax return.

13  That's the prerogative of the owners and their

14  decision as told to me was that they did not

15  want to do anything with that amount.  They

16  wanted to continue to leave it on the books as

17  a payable so they wouldn't have to pick up

18  &90,000.00 each as income.  That's -- that's

19  all I can tell you.

20      Q    But you were then told that if you

21  pay it to Dalton that the owners will take 50

22  percent of it each, is that correct?

23              MR. TRAUB:  Objection to

24      form.

25      A    One of the ways that I told you

LEX REPORTING SERVICE

800-608-6085

Dawley

38

2  that they had suggested taking that amount of

3  payable off the books was to pay it to Dalton.

4  That would then be an expense.  Whether it was

5  a carry over from management fees from another

6  company or not they owned the company.  They

7  can determine how they want to pay Dalton.  If

8  they wanted to pay them an extra fee of

9  $180,000 they could so do it.  That would be a

10  cash transaction.  It would be an expense to

11  Logan.  It would be split 50/50 between

12  Edmonds and the Seavey's.  Dalton would pick

13  it up as income, disburse half of it back to

14  John Edmonds, for which he would have income

15  of 50 and Dalton would have income of 50.

16      Q    Sir, how would that distribution

17  be made, would it be made as a distribution

18  from income?

19      A    It would have to be made from

20  income.  You have to have cash to pay it.

21      Q    Would it be made as a capital

22  distribution?

23              MR. TRAUB:  Objection.

24              That asks for a

25      hypothetical.

LEX REPORTING SERVICE

800-608-6085

Dawley

39

2      A    I already explained that it

3  wasn't.

4              One of the ways it can be done is

5  that if Logan Plaza wrote a check as a

6  management fee to Dalton.  You write off the

7  $180,000.00 as a payable, so you have an

8  income in the expense so you have nothing.

9  Then Dalton gets the income, they pick it up,

10  they give half of it back to John or he has to

11  pick up his half.  Dalton takes the half as an

12  expense, because it -- because they paid it to

13  John.

14      Q    What would have happened if

15  Prestige or Marion Scott or Grenadier had come

16  along within six years and said where is our

17  $180,000?  What would have happened then?

18              MR. TRAUB:  Again objection

19      to form.  Hypothetical.

20              MR. HAYWOODE:  Are you

21      directing him not to answer?

22              MR. TRAUB:  I didn't say

23      that.  I am just getting my

24      objection out.

25              MR. HAYWOODE:  Okay.

LEX REPORTING SERVICE

800-608-6085

Dawley

40

2      Q    What would have happened if they

3  had showed up in six years and asked for this

4  money?

5              MR. TRAUB:  You're talking

6      six years from?

7              MR. HAYWOODE:  Whenever it

8      was owed.

9              MR. TRAUB:  I guess this is

10      my problem with the question.

11              His testimony for the last

12      fifteen minutes has been that the

13      money is still there.  It was

14      never disbursed.  It was never

15      given.  You keep asking these

16      questions if they came in and

17      asked for this money back and his

18      testimony has been, that is my

19      problem, the money was not

20      disbursed.  That was one way they

21      could do it.  They didn't do it

22      that way.  The money is still

23      there.  That has been his

24      testimony.  Your question is

25      improper if they come in and now

LEX REPORTING SERVICE

800-608-6085

Dawley

41

2    and ask for their money. It's
3    there still there.
4        Q    My question is as to the
correctness?
6        A    **You need to explain to me.**
7        Q    The lawfulness of money being owed
8    to Grenadier or Marion Scott or Prestige being
9    paid to Dalton, is that proper accounting, is
10   that proper disbursement of funds?
11           MR. TRAUB:  Objection in
12           that A it asks for a legal
13           conclusion.  He's not an
14           attorney.  You asked for the
15           lawfulness.  That is a legal
16           conclusion.
17           MR. HAYWOODE:  Are you
18           finished?
19           MR. TRAUB:  No, I am not
20           finished.  I get my objection.
21           You asked your question.  I get
22           to do my objection.
23           Objection.  Asks for an
24           improper legal conclusion.  It's
25           an improper hypothetical.

LEX REPORTING SERVICE
800-608-6085

Dawley

42

2        Assumes facts not in evidence and
3        mischaracterizes prior testimony.
4            If you understand the
5        question you can answer it.
6        A    **If money was owed then you would
7    and if you felt that you owed it you would
8    have to pay it.**
9        Q    How could Dalton lawfully take
10   money that you knew was owed to somebody else?
11   The books were telling you that, is that
12   right?
13           MR. TRAUB:  Again objection.
14           Asks for a legal conclusion,
15           assumes facts not in evidence.
16           MR. HAYWOODE:  I've heard
17           that objection.  It's calling for
18           a legal conclusion.  This man is
19           an accountant.  A trained
20           accountant.
21           MR. TRAUB:  You asked how is
22           that lawful.  That is a legal
             conclusion.  In and of itself
             that is a legal conclusion.  He's
25           not being offered as an expert.

LEX REPORTING SERVICE
800-608-6085

Dawley

43

2        Q    You're a trained accountant, is
3    that correct?
4        A    **Yes.**
5        Q    That's the profession that you
6    followed pretty much since 1967, is that
7    correct?
8        A    **Yes.**
9        Q    If someone came to you and said,
10   "Look, I owe money to Prestige and Marion
11   Scott and Grenadier Management, but I want you
12   to pay that money to me," would you consider
13   that to be a request in accordance with normal
14   accounting principles as you understood them?
15           MR. TRAUB:  Again objection.
16           It's an improper
17           hypothetical.  It calls for facts
18           not in evidence and asks for a
19           legal conclusion and asks for
20           expert testimony.
21           MR. HAYWOODE:  I asked him
22           for an accounting opinion.
23           MR. TRAUB:  Again it asks
24           for expert testimony when he's
25           here today as a fact witness, but

LEX REPORTING SERVICE
800-608-6085

Dawley

44

2        I am not instructing him not to
3        answer.  My problem though again
4        is your question assumes that the
5        money A was paid and B if you pay
6        the money --
7            MR. HAYWOODE:  My question
8        assumes nothing.
9            I just asked this man does
10       he consider that a proper
11       accounting principle if someone
12       asked him that?  That is my only
13       question.  I didn't ask if it was
14       paid, if it is not paid.  I asked
15       him did he consider that a proper
16       accounting principle.
17           MR. TRAUB:  My objections
18       are on the record.  If you
19       understand you can answer.
20       A    **I didn't give this a lot of**
21   **thought.**
22       Q    You just did it?
23           MR. TRAUB:  Again objection.
24           There was nothing that was
25           done.  That is my problem.  Your

LEX REPORTING SERVICE
800-608-6085

Dawley

45

2      comment it was just done assumes
3      that you have listened to the
4      last twenty minutes of testimony.
5      Nothing was done.
6      Q     Sir, did you say to the Seavey's
7   or whoever asked you to do that, "No, that's
8   not the right way. Let's find out who we owe
9   this money to and pay it to them?"
10          MR. TRAUB:  Same objection.
11          Nothing was asked to be
12      done.
13      Q     Did you ever say that to them?
14      A     First of all, I wouldn't -- well,
15   I did not ask any questions. It was recorded
16   on the books and at the request of the
17   partners, which is their prerogative. Nothing
18   illegal transpired in my opinion, because
19   nothing ever took place.
20          What you could have done, which
21   would have been appropriate, is to write it
22   off and pick it up as income.
23      Q     Did you suggest that they do that?
24      A     It was suggested to both of them.
25      Q     By who?

LEX REPORTING SERVICE
800-608-6085

Dawley

46

2      A     By Bill Jennings, because he had
3   to do the tax return. He informed them on a
4   tax basis, they would have to pick that up as
5   income. My understanding and I was told --
6      Q     When did Bill Jennings --
7          MR. TRAUB:  Let him finish.
8      Q     When did Bill Jennings inform them
9   of that?
10      A     I don't remember, but it was about
11   the time that it was on the books that it was
12   questioned,  seven, eight years ago or
13   something it was brought up.
14      Q     Did they do it?
15      A     Do what?
16      Q     What Bill Jennings told them?
17          MR. TRAUB:  Objection.
18          Again you're
19      mischaracterizing the testimony.
20      Q     Did they do what Bill Jennings
21   told them?
22          MR. TRAUB:  Same objection.
23      Q     Did they do what Bill Jennings
24   told them?
25          MR. TRAUB:  Same objection.

LEX REPORTING SERVICE
800-608-6085

Dawley

47

2      A     They were told -- they were not
3   told. They were advised if they wrote it off
4   that it would be picked up as income and the
5   partners would have to pick it up as income
6   without any cash in their pocket.
7          I -- let me finish. My
8   understanding is that the Seavey's didn't
9   care, but that John Edmonds objected, so we
10   did nothing with it at his request as
11   communicated to me.
12      Q     Bill Jennings said to you that
13   they could not do what they had proposed in
14   the first instance, is that correct?
15      A     Do what?
16          MR. TRAUB:  Objection to
17      form.
18      A     Do what?
19      Q     That they could not simply leave
20   the money there or receive it themselves and
21   divide it, is that what I understood you to
22   testify before that Bill Jennings said that to
23   them?
24      A     No.
25      Q     You tell me what did you just say

LEX REPORTING SERVICE
800-608-6085

Dawley

48

2   to this record that Bill Jennings said to
3   them?
4          MR. TRAUB:  Why don't we
5      read back his answer.
6      Q     No.
7          Tell us what you recall that you
8   just said to us in this record that Bill
9   Jennings said.
10          MR. TRAUB:  Objection.
11          Asked and answered. The
12      record will speak for itself.
13          MR. KELLY:  I'd I had like
14      to hear it read back.
15          MR. HAYWOODE:  That may be,
16      but I am asking this witness a
17      question. I am not objecting to
18      the reading back. I want him to
19      tell me now what he remembers
20      saying to me about what Bill
21      Jennings said.
22          MR. TRAUB:  Objection to the
23      form.
24          MR. HAYWOODE:  It's my
25      deposition. I'd like to hear the

LEX REPORTING SERVICE
800-608-6085

Dawley

49

2 witness's answer.
3      MR. TRAUB: It's also my
4 witness.
       MR. HAYWOODE: Are you
directing him not to answer at
7 this point?
8      MR. TRAUB: Absolutely.
9      MR. HAYWOODE: That is what
10 you should say.
11      You realize that is not in
12 accordance with 221 or anything
13 that happens in depositions.
14 You're simply obstructing this
15 witness's answer so he can go
16 back and check and see what he
17 said and give us an answer. I am
18 asking for his best recollection.
19      MR. TRAUB: You know what,
20 it's also improper that you keep
21 asking the witness the same
22 question for the last twenty
23 minutes and you don't like the
24 answer or you just don't
25 understand it.

LEX REPORTING SERVICE
800-608-6085

Dawley

50

2      MR. HAYWOODE: All I am
3 hearing is objection, objection.
4 Now we are getting into a debate
5 on the record between counsel,
6 which is not what this is about.
7      MR. TRAUB: Go get the
8 judge.
9      MR. HAYWOODE: You're
10 directing this witness not to
11 answer as to what he remembered
12 he testified to a few minutes
13 ago?
14      MR. TRAUB: Let's stop.
15 We'll go get Judge Baer. If you
16 want to go to Judge Baer I have
17 no problem doing it. I know I am
18 right on this one. You can laugh
19 all you want. I would like the
20 record to reflect he's laughing.
21      MR. HAYWOODE: Let the
22 record reflect, that I think the
   suggestion that we go find Judge
   Baer and interrupt him on this is
25 against everything that the new

LEX REPORTING SERVICE
800-608-6085

Dawley

51

2 rules on discovery are about.
3 The new rules would say answer
4 the question and then go find the
5 judge if there is a question of
6 its admission into evidence.
7 That is my understanding and what
8 I am looking at is that you're
9 simply directing a witness not to
10 answer something which perhaps
11 you find sensitive.
12      MR. TRAUB: I don't find it
13 sensitive.
14      MR. HAYWOODE: I am just
15 trying to get the truth.
16      MR. TRAUB: You haven't got
17 the truth yet.
18      MR. HAYWOODE: Are you
19 directing him not to answer?
20      MR. TRAUB: I am asking the
21 court reporter to read back his
22 prior answer.
23      MR. HAYWOODE: Fine. That
24 is your request, but you're
25 directing him not to answer?

LEX REPORTING SERVICE
800-608-6085

Dawley

52

2      I don't consent to the read
3 back at this point. This is my
4 deposition.
5      MR. TRAUB: It's my witness.
6      MR. HAYWOODE: You don't
7 have the right to say that.
8      MR. TRAUB: We are going to
9 stop this deposition right now
10 and we are going to get Juge
11 Baer. We will tell him you
12 clearly don't understand how to
13 take a deposition. Either you
14 let the reporter read back the
15 question or we will go and get
16 the judge.
17      MR. HAYWOODE: Oh, have we
18 come to this.
19      MR. TRAUB: We will stop
20 this deposition right now. We
21 will go get Judge Francis. I
22 have no problem getting the
23 Magistrate Judge. That is what
24 we are here for.
25      MR. HAYWOODE: You are

LEX REPORTING SERVICE
800-608-6085

Dawley

53

1 interrupting the deposition in
2 the middle of my questioning.
3     MR. TRAUB: You can make
4 your record all you want. I made
5 my objection. Either you can
6 have the court remember read back
7 his answer so you can hear it or
8 we will stop and get Judge
9 Francis.
10     MR. HAYWOODE: I heard the
11 witness's answer the first time.
12 I heard what the witness said
13 after he made the answer. I want
14 to know what the witness recalls
15 of what he said, because he's
16 telling me something entirely
17 different and I don't think
18 counsel ought not to be arguing
19 this.
20     If you're directing him not
21 to answer let's make that clear
22 on the record that is what you're
23 doing.
24     You're directing him not to

Dawley

54

1 answer this question, is that
2 correct?
3     MR. TRAUB: No, and don't
4 put words in my mouth.
5     Mel, stop it.
6     MR. HAYWOODE: You can make
7 an objection on the record and
8 you can, after making the
9 objection, let him answer. I
10 understand the new rules and the
11 old rules are the same on this or
12 you can tell him don't answer the
13 question, which are you doing?
14     MR. TRAUB: Mel, we are done
15 here.
16     MR. HAYWOODE: We may be,
17 because you're determined to walk
18 out the door and I am certainly
19 not going to restrain you here.
20     Which are you doing, Darren,
21 are you telling him don't answer
22 the question or are you making an
23 objection, but he may answer?
24     MR. TRAUB: I am objecting.

Dawley

55

1     MR. HAYWOODE: As I
2 understand the rules that is all
3 you can do here.
4     MR. TRAUB: Can I finish
5 now?
6     MR. HAYWOODE: Go ahead.
7     MR. TRAUB: Thank you.
8     Mel, you asked him a
9 question. He gave you an answer.
10 You asked him another question.
11 I objected to it as
12 mischaracterizing prior
13 testimony. You then asked the
14 witness, "Can you tell me what it
15 is you think you said to me?" I
16 said the record speaks for itself
17 and we can have the record read
18 back. You objected to that and
19 you wanted the witness to
20 re-characterize his prior
21 testimony. I will let him
22 answer, but first, Mel, I want
23 the record read back.
24     MR. HAYWOODE: No.

Dawley

56

1     MR. TRAUB: Then that is my
2 problem.
3     MR. HAYWOODE: I want to
4 hear from this witness what he
5 meant when he said something that
6 Bill Jennings said.
7     Are you directing him not to
8 respond to that at this point
9 unless the record is read back,
10 is that what you're saying?
11     MR. TRAUB: Mel, this is the
12 most unprofessional conversation
13 I've ever had at a deposition.
14     MR. HAYWOODE: I don't know
15 how many years you have been
16 doing it, but I have been doing
17 it 48, so whatever.
18     MR. TRAUB: Have you been
19 doing it correct for 48? I don't
20 think so.
21     MR. HAYWOODE: I'd like to
22 think so.
23     MR. TRAUB: I'd like to
24 think I am doing it correctly

Dawley

57

2  too.
3      MR. HAYWOODE:  Are you
4  telling him not to answer?
5      MR. TRAUB:  Mel, I am
6  telling you either we let the
7  record be read back or we stop
8  and go get Judge Francis to
9  figure out this dispute.
10     MR. HAYWOODE:  There is not
11  a dispute.  I am only asking you,
12  are you telling the witness not
13  to answer?
14     MR. TRAUB:  I am telling the
15  witness not to answer till the
16  record is read back.
17     MR. HAYWOODE:  Good, fine.
18  That is your response.
19     You're directing him not to
20  answer until the record is read
21  back.
22     MR. TRAUB:  Correct.
23     MR. HAYWOODE:  Read the
24  record back.
25     Note my objection to what

Dawley

58

2  you're doing, because you
3  directed the witness not to
4  answer a question, which I said
5  is in violation of everything
6  that the new rules say.
7      MR. TRAUB:  I've also said
8  that we can stop and you can go
9  plead your case to Judge Baer.
10     MR. HAYWOODE:  We can take
11  it up with Judge Francis and
12  Judge Baer and Judge I don't
13  know.  I don't know, Suda and
14  everybody else later.
15     Can we have the record read
16  back?  Let's hear the witness's
17  testimony about William Jennings.
18     (Whereupon, the requested
19  portion was read back by the
20  reporter.)
21  Q    You said Bill Jennings advised
22  them to take the money as income and to pay
23  tax on it, is that correct?
24  A    Bill Jennings told them the
25  consequences of writing it off that they would

Dawley

59

2  have to pick it up as income 50 percent each.
3  The partners decided not to do that so we left
4  it on the books where it still is.
5  Q    So that it's fair to say that the
6  partners, as you testified, did not take the
7  advice or the alternative suggested by William
8  Jennings?
9  A    That's correct.
10     It's still in the books.
11  Q    That was seven years ago?
12  A    When it was put on I think that's
13  about right.  It was about seven or eight
14  years ago.
15  Q    That $180,000.00 has sort of sat
16  there in limbo for seven or eight years, is
17  that your understanding of it?
18  A    It's still there as a payable.
19  Q    I see.
20     Now, when you say that the
21  partners conveyed this to you, you never had
22  any discussion with John Edmonds on this
23  subject directly, did you?
24  A    No.
25  Q    You can't recall which of the

Dawley

60

2  Seavey's you had that conversation with, is
3  that correct?
4  A    That's correct.
5  Q    To your knowledge, William
6  Jennings was aware that $180,000 was sitting
7  undeclared for seven or eight years and that
8  no action was taken with regard to it to your
9  knowledge, is that correct?
10     MR. KELLY:  I am going to
11  object to the form and I will
12  expand on it if you'd like me to,
13  otherwise he's not my witness.  I
14  can't direct him anything.
15     MR. TRAUB:  I would object.
16  You can answer if you know.
17  Don't guess, please.
18  A    Well, I don't know what Bill's
19  thought process was, but I know the amount is
20  still on the books.  Because it's still on the
21  books, there has been no financial consequence
22  to the income of the partners and until
23  something happens to it there wouldn't be so
24  it's continued to be on the books as a
25  payable.

Dawley

61

2  Q    Do you know what the Quality and
3  Review Committee is at Marks, Paneth & Shron?
4  A    No.
5  Q    Did you ever hear that phrase or
6  feature at Marks, Paneth & Shron?
7           MR. TRAUB:  We are going to
8      mark that as Exhibit 1, right?
9           MR. HAYWOODE:  It is okay,
10     yes.
11          This will be number 1 the
12     May 16th the letter.
13          (A May 16th letter was
14          marked as Plaintiff's
15          Exhibit 1, for
16          identification, as of this
17          date.)
18 Q    Did you ever hear of a Quality
19 Committee Review up there?
20 A    No.
21 Q    You never heard that any Quality
22 Review Committee or anybody at Marks, Paneth &
23 Shron, ever questioned how $180,000.00 just
24 sat on those books for eight years and nobody
25 questioned it?

LEX REPORTING SERVICE
800-608-6085

---

Dawley

62

2  A    No.
3           MR. TRAUB:  Objection to the
4      form.
5  Q    To your knowledge, you never heard
6  another question raised about it?
7  A    No.
8  Q    Did anyone ever talk to you since
9  that time and say do this or do that with it
10 that money or don't do anything with it; did
11 anyone else ever talk to you about it?
12 A    No.
13 Q    When the Cameron people came to
14 you, did you explain that whole story to them
15 as to what it was and how it came about?
16 A    I don't recall if I did or not.
17 We discussed so many accounting issues and
18 things that I couldn't tell you.
19 Q    Let me get to this, did there come
20 a time when Cameron, Pryce & Griffiths
21 indicated to you that there was approximately
22 a $4,000,000,000.00 disparity between what
23 they were able to justify in the books and
24 records kept by you, Dalton Management, and
25 the financial statement generated at the end

LEX REPORTING SERVICE
800-608-6085

---

Dawley

63

2  of the tax year 2006 by Marks, Paneth & Shron,
3  did they ever indicate that to you?
4           MR. KELLY:  Objection to
5      form.
6  A    There was some discussion that
7  they couldn't reconcile that I don't remember.
8  It was never specific.  It was just a total
9  figure that they said they couldn't reconcile
10 without any specifics so I didn't do anything
11 with it.
12 Q    What is Dalton's role, Dalton is
13 the accountant for these companies?
14          MR. TRAUB:  Objection to the
15     form.
16 Q    Dalton is the accountant for these
17 companies?
18 A    Dalton is the managing agents for
19 those companies.
20 Q    Dalton is responsible to keep the
21 primary books for these companies, is that
22 correct?
23 A    Yes.
24 Q    Dalton is responsible to keep the
25 documentation for the books that are

LEX REPORTING SERVICE
800-608-6085

---

Dawley

64

2  maintained by it, is that correct?
3  A    When you say documentation for
4  what?
5  Q    For all financial transactions.
6  A    Whatever we have.
7  Q    Is it not the responsibility of
8  Dalton to maintain all documents and records
9  pertaining to whatever transactions took
10 place?
11 A    We have invoices for all checks
12 written.  We have deposit tickets for all
13 deposits made.  I don't know what else you're
14 talking about.  That's what the managing
15 agents does.  They collect the revenues, they
16 bill the tenants, they took them to court when
17 they don't pay and we pay the bills.
18 Q    Sir, what is a daily trial
19 balance?
20 A    A daily trial balance?
21 Q    Yes.
22 A    You will have to define that for
23 me.
24 Q    Well, what is a trial balance?
25 A    Again you will need to define what

LEX REPORTING SERVICE
800-608-6085

Dawley
65

2  you mean by a trial balance.
3      Q     Sir, you took a degree in
4  accounting, is that correct?
5      A     Well, we had some problems between
6  Cameron's understanding of a trial balance on
7  the system and what we provide.
8          BJ Murray is the software that is
9  used by the company.  A lot of companies in
10  the city use it for property management.
11  That is what it was developed for and they
12  have to -- I want to have an understanding of
13  what is meant by trial balance and then I can
14  respond.
15      Q     Well, sir, you've been accounting
16  since 1967, is that correct?
17      A     Yes.
18      Q     You have been accounting since
19  1967?
20      A     Yes.
21      Q     It's your recollection and
22  testimony today, that you never heard the
23  phrase trial balance before Cameron, Price &
24  Griffiths raised it with you?
25          MR. TRAUB:  Objection.

LEX REPORTING SERVICE
800-608-6085

Dawley
66

2          Mischaracterizes his prior
3  testimony.
4      A     That isn't what I said.
5      I said --
6      Q     That's why I am asking the
7  question.
8      A     I can give you --
9      Q     I am waiting for you to tell me.
10          MR. HAYWOODE:  I am noting
11          that your counsel is commenting
12          that I am misstating what you
13          just said.  I am just inquiring
14          about what you just said so you
15          can make it clearer.
16      Q     Please, sir.
17      A     A trial balance is a listing of
18  the different accounts that are used on the
19  books and records at a specific time, usually
20  at the end of the month.  Also at the end of
21  the year.
22      Q     What's done?
23      A     We produce a trial balance every
24  month for every company and put it in the
25  file.

LEX REPORTING SERVICE
800-608-6085

Dawley
67

2      Q     So you say that's what a trial
3  balance is?
4      A     We produce a trial balance every
5  month at the end of each month.
6      Q     You, you're saying Dalton?
7      A     Dalton prepares it off the BJ
8  Murray System and files it in each month's
9  activity for every company.
10      Q     Do you recall Cameron, Pryce &
11  Griffiths saying to you that you don't have
12  trial balances, it's impossible for us to
13  recalculate your figures?
14          Do you recall if they said that to
15  you?
16      A     They did and I repeatedly tried to
17  explain to them how the BJ Murray system
18  works.  It's used by -- I don't know, over one
19  time it had over 500 clients, because the
20  other software that were available could not
21  produce the detail that was required for all
22  the subsidy programs that Manhattan has.
23          When I came to New York fifteen
24  years ago I looked at this system and it's
25  like, "There's got to be something better."  I

LEX REPORTING SERVICE
800-608-6085

Dawley
68

2  contacted several software companies.  One of
3  those companies was Yardi.  I asked their
4  sales people can you provide me this detail
5  and breakdown for all these subsidies?  They
6  couldn't.  Yardi subsequently bought BJ Murray
7  and now they have expanded their property
8  management software to accommodate these
9  various programs, but a trial balance is
10  prepared every month and filed every month.
11      Q     To your knowledge, is there
12  another system in which a trial balance would
13  be prepared more often than every month to
14  your knowledge?
15      A     You can probably run a trial
16  balance any time you want, but we run it at
17  the end of each month.
18      Q     To your knowledge, somewhere else
19  would they tend to run it every day, every
20  week or what?
21          MR. TRAUB:  Objection.
22      A     I have no idea.
23      Q     You have no idea?  You have no
24  experience with that?
25      A     No.

LEX REPORTING SERVICE
800-608-6085

Dawley

69

2  Q    Is this the first position you've
3  had that you function in where someone has
4  required a trial balance?
5  A    No.
6      We've had trial balances, but I've
7  always prepared a trial balance once a month.
8  Q    Once a month?
9  A    Yes.
10  Q    It hasn't been your practice to do
11  it anymore frequently than that?
12  A    No.
13  Q    This again is a question.
14      If someone came to do an audit and
15  they didn't see a more frequent trial balance,
16  would they have difficulty in completing the
17  audit that they were trying to complete?
18      MR. TRAUB:  Objection to the
19      form.
20  Q    Would it be easier to do it if the
21  trial balance was run every week or every two
22  weeks than if it was run every month?
23      MR. TRAUB:  Same objection.
24  A    When you do an audit you don't run
25  an audit from a trial balance.

LEX REPORTING SERVICE
800-608-6085

---

Dawley

70

2  Q    It wouldn't be of any use to you
3  at all?
4  A    No.
5  Q    The system that you used, does it
6  produce a yearly trial balance?
7  A    Yes.
8  Q    It does at the end of the year?
9  A    Yes.
10  Q    Did Cameron, Pryce & Griffiths ask
11  you to produce that yearly trial balance?
12  A    I think we did.  It's about that
13  thick.  (Indicating.)
14      MR. TRAUB:  Let the record
15      reflect --
16  A    About two inches thick.
17  Q    Is it your recollection that you
18  gave it to them?
19  A    I think we did.  I don't recall,
20  but I know we have monthly trial balances,
21  which are an accumulation of a yearly which
22  all of that was provided.
23  Q    Now, as you understand it, sir,
24  what is the role of Marks, Paneth & Shron as
25  opposed to Dalton Management?

LEX REPORTING SERVICE
800-608-6085

---

Dawley

71

2  A    They come in review the books,
3  make a determination if the different accounts
4  are correct.  If they are not they make
5  adjustments and produce a financial statement
6  Q    When they make the determination
7  as to if your accounts are correct, Dalton
8  accounts are correct, what if anything happens
9  then?
10  A    What do you mean what happens?
11  Q    What is the role of Marks, Paneth
12  & Shron, with regard to Dalton's books and
13  records?
14  A    To do an audit on the books.
15  Q    Do they have any other role in
16  that capacity?
17  A    What do you mean?
18  Q    Do they do anything other than do
19  the audit on the books?
20  A    That's what they are hired to do,
21  to do the audit.
22  Q    Are they hired for some other
23  purpose also?
24  A    We have hired them to help us with
25  the filing of a rent increase, like we just

LEX REPORTING SERVICE
800-608-6085

---

Dawley

72

2  did with Fifth and 106th that we just filed.
3  Q    Do you hire them for anything
4  else?
5  A    Tax return.
6  Q    Anything else?
7  A    Not that I recall.
8  Q    Well, sir, if Cameron, Pryce &
9  Griffiths say to you at some point, and I've
10  asked this question before, that your books
11  compared with the financial statement prepared
12  by Marks, Paneth & Shron show a
13  $4,000,000,000.00 discrepancy or did they
14  mention any amount of discrepancy between what
15  your records were showing and what Marks,
16  Paneth & Shron were showing in the financial
17  statement, did they ever say that to you?
18  A    In the BJ Murray system we keep
19  the books on a cash basis.  At the end of the
20  year in order to give a correct financial
21  picture of the company you have to put in
22  depreciation, amortization, payables,
23  receivables, the accruals.  Once that's done
24  then you do your financial statement.
25  Q    You're testifying then that Dalton

LEX REPORTING SERVICE
800-608-6085

Dawley

73

keeps its books on a cash basis, is that
correct?
    A    That's correct.
        Every dollar that comes in gets
recorded and every expense that's goes out
gets recorded.
    Q    So that Marks, Paneth & Shron are
making the financial statement on the accrual
basis, is that correct?
    A    That's what's required, yes.
    Q    So that as a result of that
someone looking to determine what the
actuality is of what's going on in the
company, would they look at your books on the
cash basis or would they go to Marks, Paneth &
Shron on the accrual basis to answer that
question?
    A    Okay.
        We provide a balance at the end of
the year for all the accounts on a sheet of
paper. There is a trial balance that has
those figures. There are adjustments made and
a final trial balance is produced and those
figures are used to produce a financial

LEX REPORTING SERVICE
800-608-6085

Dawley

74

statement. That trial balance with those
adjustments and those changes was given to
them for every company for every year that we
have so they could trace right from our books
to the accrual to the financial and everything
ties in so there is not $4,000,000,000.00 of
difference.
    Q    I am sorry?
    A    There is not $4,000,000,000.00 of
difference. It tracks perfectly.
    Q    It was never suggested to you that
there is? In other words, they didn't say to
you that we are looking at your books and we
are asking you for justification and you don't
have it?
    A    Oh, yes.
    Q    They did say that?
    A    No.
        They took our books and wanted to
get to the tax to the financial statement. I
gave them the trial balances.
    Q    Let me stop you there?
    A    Let me finish.
    Q    I don't understand what you're

LEX REPORTING SERVICE
800-608-6085

Dawley

75

saying?
    A    I know you don't.
    Q    They took your books and they
wanted to do what, sir?
    A    We took our books. We run a list,
a trial balance. You then adjust that trial
balance. One item you can adjust for is
depreciation. We didn't make the
determination of depreciation. Their tax
department does. Marks, Paneth & Shron's tax
department. That gets to be adjusted. That
puts depreciation on the final trial balance
that's used to produce the financial
statement. They were given all of that
information. They were given everything.
    Q    When you say they, they Cameron --
    A    Yes.
    Q    -- Griffiths & Pryce?
    A    Yes.
        They were given that information.
They were given all the work papers that were
there to show them and be able to track from
the trial balance to the financial statement
that was produced.

LEX REPORTING SERVICE
800-608-6085

Dawley

76

    Q    Is it the role of the auditor, to
suggest journal entry adjustments to Dalton as
the accountant?
    A    That's usually what transpires,
yes.
    Q    They did do that?
    A    Yes.
    Q    In 2006 that we were concerned
with?
    A    Yes.
    Q    When they suggest these journal
entries, is there some documentation or
writing that comes from them to Dalton as to
why they want you to make adjustments?
    A    There is a list of journal entries
that were attached to the information they
were given with an explanation of what was
debited and credited to get to the new
balance.
        MR. TRAUB: When you say
they?
        THE WITNESS: To Cameron,
Pryce & Griffiths.
        MR. TRAUB: I was telling

LEX REPORTING SERVICE
800-608-6085

Dawley

77

2　　him to clarify his pronouns for
3　　the record.
4　　**A**　　**Cameron, Pryce & Griffiths.**
5　　　　　MR. HAYWOODE:  Can you read
6　　back the last question and
7　　answer, please?
8　　　　　(Whereupon, the requested
9　　portion was read back by the
10　　reporter.)
11　　　　　MS. HAYWOODE:  Let me
12　　understand the answer.  Again
13　　counsel has clarified an answer
14　　with his witness while his
15　　witness was testifying.
16　　　　　What was the last answer?
17　　　　　MR. TRAUB:  I want to put on
18　　the record, I waited until my
19　　witness was finished answering
20　　and then I instructed that he
21　　should clarify pronouns so that
22　　the record is clear.  For some
23　　reason, Mr. Haywoode had an issue
24　　with my clarification statement.
25　　I stand by my instructions to the

LEX REPORTING SERVICE
800-608-6085

Dawley

78

2　　witness to try not to use
3　　pronouns and clarify who he is
4　　talking about so we can have a
5　　clear record.
6　　　　　(Whereupon, the requested
7　　portion was read back by the
8　　reporter.)
9　　　　　MR. HAYWOODE:  Mr. Dawley, I
10　　am going to show you a list of
11　　adjusting journal entry reports;
12　　one, two, three, four, five
13　　pages, that pertains to these
14　　investments.  We are going to
15　　mark the five pages Plaintiff's
16　　Exhibit 2.
17　　　　　(A five page list of
18　　　　　adjusting journal entries
19　　　　　were marked as Plaintiff's
20　　　　　Exhibit 2, for
21　　　　　identification, as of this
22　　　　　date.)
23　　**Q**　　Now, I understand that they
24　　pertain to Logan.  It pertains to Logan Plaza
25　　only.

LEX REPORTING SERVICE
800-608-6085

Dawley

79

2　　　　　MR. TRAUB:  I want you to
3　　look at all five pages.
4　　**A**　　**Okay.**
5　　**Q**　　Let me ask you first, Mr. Dawley,
6　　how many of those adjustments are depreciatio...
7　　adjustments?
8　　**A**　　**There is -- there is one**
9　　**depreciation.  There is one amortization.**
10　　**There is one depreciation.**
11　　**Q**　　If you would indicate which of the
12　　five pages?
13　　**A**　　**Journal entry 13 is depreciation.**
14　　**Q**　　Yes.
15　　**A**　　**$372,020.00.**
16　　**Q**　　That's Number 13 at Page 3?
17　　**A**　　**That would be Page 3.**
18　　**Q**　　What else?
19　　**A**　　**You said depreciation.  That's the**
20　　**depreciation entry.**
21　　**Q**　　Now, what is the total amount on
22　　that report, if you can tell from there, of
23　　the journal entry adjustments?
24　　**A**　　**I can't, because you'd have to add**
25　　**each one of them up.  You'd have to add all**

LEX REPORTING SERVICE
800-608-6085

Dawley

80

2　　**five pages up.**
3　　**Q**　　That's not done there?
4　　**A**　　**No, there is no total.  It's just**
5　　**by journal entry.**
6　　**Q**　　With regard to this one property,
7　　is it fair to say that they are 22 requests
8　　for adjustments of journal entires on the
9　　first page
10　　**A**　　**There is three adjustment entry.**
11　　**Q**　　I am sorry?
12　　**A**　　**There is three journal entries,**
13　　**not adjustment entries.**
14　　**Q**　　How many individual lines of
15　　journal adjustment entries are on that page?
16　　**A**　　**Twenty-two.**
17　　**Q**　　At Page 2 are there nineteen?
18　　**A**　　**Nineteen.**
19　　**Q**　　Are there thirteen on Page 3?
20　　**A**　　**Thirteen on Page 3.**
21　　**Q**　　Are there seventeen on Page 4?
22　　**A**　　**Seventeen on Page 4.**
23　　**Q**　　Twenty-four on Page 5?
24　　**A**　　**How many did you say?**
25　　**Q**　　Twenty-four?

LEX REPORTING SERVICE
800-608-6085

Dawley

81

2    A    Twenty-four on Page 5.
3    Q    Is it four or five?
4    A    Page 5.
     Q    Page 6 there is seven more there?
     A    There is seven on Page 6.
7    Q    Now, is that the form in which
8    these journal adjustments came to you?
9    A    Yes.
10   Q    Is there any other information,
11   which came to you with those journal
12   adjustments?
13   A    No.
14   Q    As to each of these journal
15   adjustments, was there any information
16   communicated to you in writing or in any other
17   way as to why the adjustments were being paid
18   other than the depreciation and accumulated
19   depreciation adjustments?  Is there anything
20   that came to you to explain why there was
21   done?
22   A    This was done to take the books.
23   Q    My question is did anything come
24   to you in writing from Marks, Paneth & Shron
25   to explain why these adjustments were made?

LEX REPORTING SERVICE
800-608-6085

Dawley

82

2         MR. TRAUB:  That was not
3    your prior question.
4         MR. HAYWOODE:  Then I
5    withdraw the prior question and I
6    put this question.
7    Q    Did anything come to you in
8    writing or any communicative form that is
9    memorialized, that exists telling you how
10   these changes were made?
11   A    Not that I recall.
12   Q    Did anyone come to you and meet
13   with you and tell you how and why these
14   changes were made?
15   A    No.
16   Q    Did you ever debate with Marks,
17   Paneth & Shron, or anyone from Marks, Paneth &
18   Shron, why or how these changes were made?
19   A    No.
20   Q    Did you ever communicate back to
21   Marks, Paneth & Shron, your acceptance as to
22   why these changes were made?
     A    I believe we signed off on them,
24   but I don't recall, no.
25   Q    Do you have such a document

LEX REPORTING SERVICE
800-608-6085

Dawley

83

2    indicating that you signed off on it?
3    A    Not with me.
4    Q    Do you maintain such a document
5    that you would have signed off on all these
6    changes on each of the buildings?
7    A    If it's -- if it's there then it
8    would be in a file.
9    Q    Sir, do you have a direct
10   recollection as you testified today that such
11   a response was actually made?
12   A    No.
13   Q    You don't?
14   A    No.
15   Q    So it's possible it wasn't made?
16   A    Possible.
17   Q    With regard now to this
18   information being provided in the tax year
19   2006, after the adjustments were made and
20   after the journal entries were suggested to
21   you by Marks, Paneth & Shron what if anything
22   did you do with regard to Dalton's books?
23   A    At the end of the year, I adjust
24   the balance sheet accounts to the balances
25   that were in agreement with the financial

LEX REPORTING SERVICE
800-608-6085

Dawley

84

2    statement that was produced, so that when I
3    start out the new year I had those balances on
4    the books.
5    Q    Did you change the journal entries
6    involved?
7    A    Did I do what?
8    Q    Did you change any journal entry
9    in Dalton books?
10   A    No.
11   Q    Did you do anything to make
12   Dalton's books, comply with the journal entry
13   adjustments that Marks, Paneth & Shron had
14   suggested to you?
15        MR. TRAUB:  Objection to the
16   form.
17   A    I just answered.
18   Q    I am sorry, sir?
19   A    I answered that in order to start
20   the new year, I have to have my balance sheet
21   accounts in agreement with the financial
22   statements that were produced at the end of
23   the prior year.  What I do at the end of the
24   year is I take those balance sheet accounts
25   and I adjust them so that they agree with the

LEX REPORTING SERVICE
800-608-6085

Dawley

85

2 financial statements that were produced at the
3 end of the year. I don't copy each of those
4 adjustments. It's a waste of my time, because
5 everything --
6    Q    You don't copy where, sir?
7    A    I don't make all of those
8 adjustments on our books one at time, because
9 it's a waste of time. All the income and
10 expense accounts at the end of the year get
11 zeroed out to the partner's equity. So all I
12 need to start my books at the beginning of the
13 year are the balance sheet accounts.
14    Q    When you say that your quarterly
15 information is correct, the information that
16 you provide, your quarterly reports?
17    A    Our information that we provide
18 internally is on a cash basis, not on an
19 accrual basis.
20    Q    It would never be congruent with
21 whatever Marks, Paneth & Shron was finalizing,
22 is that correct?
23    A    No.
24    Q    So that if someone would come 100
25 years from now.

Dawley

86

2    A    Right.
3    Q    Look at your cash basis records.
4    A    Right.
5    Q    They would never know the
6 actuality, from looking at your records, as to
7 what the end financial statement said, is that
8 correct?
9         MR. TRAUB: Objection to the
10 form.
11    A    No.
12    Q    That's not so?
13    A    You're not understanding.
14    Q    Well, tell me. My question is
15 simple.
16         You say that Marks, Paneth & Shron
17 suggested you use certain journal entry
18 adjustments and you say you did not waste your
19 time as I understand you, now correct me if I
20 am wrong, making those adjustments on the
21 actual books, so that Marks, Paneth & Shron
22 would show something in their books that
23 wouldn't be in your books, is that correct?
24         MR. TRAUB: Objection to the
25 form.

Dawley

87

2    Q    Do you understand the question?
3    A    Yeah, okay. You're not
4 understanding the answer, but that's okay.
5         My books are kept on a cash basis.
6 Those adjustments are made -- let me finish.
7 Those adjustments are made to put the books on
8 an accrual basis to reflect the activity of
9 the year on a correct financial audit basis.
10 When they are done I don't go back and change
11 all the income and expense accounts, because
12 I'm not going to use those when I start my new
13 year. The only thing I am going to use is the
14 balance sheet trial balance that I need to
15 start the new year. So I take my balances, I
16 adjust them to their balances at the end of
17 the year on the balance sheet only so I can
18 start my new year, because when I start my new
19 year all the money that comes in and all the
20 money that goes out on day one is zero. So if
21 I made all those adjustments, I would zero
22 them all out immediately. It's a waste of my
23 time to put them in and take them out to zero.
24    Q    If I were to look at the capital
25 accounts in the Dalton records would they be

Dawley

88

2 correct?
3    A    We have a partner's equity
4 account.
5    Q    Yes, your capital account.
6    A    Okay, that's whatever is on the
7 books at the end of the year.
8    Q    Which books, sir?
9    A    Whatever is adjusted for the audit
10 at the end of the year is the beginning
11 balance that I have for the next year.
12    Q    Sir, if I were to look at Dalton's
13 books, would it be correct, would it give me
14 correct information as to the capital account?
15         MR. TRAUB: Objection to the
16 form.
17    A    When?
18    Q    Now or any time between March of
19 20007 when this began, while Cameron Pryce &
20 Griffiths were looking at it, would they be
21 getting information or information that you
22 didn't correct because you didn't feel that
23 you had time to do that?
24    A    The capital account is one item on
25 a balance sheet. I know you don't know, but

Dawley
89

2    it is. At the end of the year --
3            MR. TRAUB:  Let him finish.
4        Q    I don't want you to worry about
what I don't know.  I want to hear what you
know and what you're saying, so again I don't
7    take umbrage you saying that I don't know.
8    Let's not assume that I don't know.
9            Let me ask you a simple question.
10    If I am asking for the truth as to what was
11    going on as to the capital account, can I look
12    at Dalton's records and find that out?
13        A    The capital account at the end of
14    the year is part of your balance sheet and the
15    capital account, the assets and liabilities in
16    the capital account, which make up the balance
17    sheet are all adjusted to the balances at the
18    end of the year to start the new year off.  So
19    if you look at our books on January 1st,
20    you're going to see all the balance sheet
21    accounts.  You're going to see the income and
22    expenses with zero.
23        Q    If I look at it before January
24    1st?
25        A    Right.

LEX REPORTING SERVICE
800-608-6085

Dawley
90

2        Q    Would I be able to tell what was
3    going on?
4        A    As to what?
5        Q    As to the actuality of the capital
6    accounts?
7        A    You should.
8        Q    You're saying you should?
9        A    You should.
10        Q    How would you do that?
11            How would it be possible to
12    ratiocinate what you did at the end of the
13    year if I am looking at these documents and
14    items before the end of the year?
15        A    The capital account during the
16    year is kept on a cash basis.  If you look at
17    the books and records, at any time during the
18    year, the capital account will reflect what
19    took place on a cash basis.
20            MR. HAYWOODE:  I am going to
21            show you a communication which
22            was Exhibit 1 from the last
                deposition sequence.  Let's just
                refer to it as Exhibit 1 from the
25            last one and I'll --

LEX REPORTING SERVICE
800-608-6085

Dawley
91

2            MR. TRAUB:  Let's mark it,
3            because I want to keep all the
4            Exhibits in order.  Plaintiff's 3
5            will be Exhibit 1 from the
6            deposition of February 3rd.
7            (A communication from
8            Cameron, Pryce & Griffiths
9            to Dalton was marked as
10            Plaintiff's Exhibit 3, for
11            identification, as of this
12            date.)
13        Q    I show you this communication and
14    I ask you if you recognize it or remember what
15    it was?
16        A    I know what it says, but I don't
17    remember it.
18        Q    You don't remember receiving it?
19        A    No.
20        Q    Just paraphrasing, what if
21    anything are they asking for there?
22        A    This is a communication from
23    Cameron Pryce and Griffiths to Dalton, c/o
24    Neale B. Seavey.
25        Q    Care of Neale Seavey?

LEX REPORTING SERVICE
800-608-6085

Dawley
92

2        A    Yes.
3        Q    Did it come to your attention?
4        A    I don't recall.
5        Q    Looking at the questions were
6    these questions that you were able to respond
7    to?
8        A    Some I think I could probably
9    find.  Some I wouldn't be able to.
10        Q    Which one, as you look at it now,
11    would you not be able to find?  Just refer to
12    the number.
13        A    Well, I think Number 1 one we have
14    journal entries.
15        Q    I am sorry, 1 asked for what?
16        A    Journal entries.
17        Q    That you could respond to?
18        A    I had journal entries.  Yeah, I
19    had the basis for it.  Deferred income, I
20    don't know what that even means.  I don't
21    recall any deferred income so I couldn't tell.
22    The mortgages I wouldn't have the loan
23    payable, which is Number 3 and 4.  The
24    accounts payable detail that's where the books
25    go from cash to accrual.  That would have been

LEX REPORTING SERVICE
800-608-6085

Dawley

93

2  a Marks, Paneth adjustment.  Number 6 accrued
3  expenses, again cash to accrual.  Number 7
4  accumulated amortization.  I wouldn't have
5  made that determination and number 8 allowance
6  for doubtful accounts I wouldn't have that
7  information.
8      Q     Let me ask you, sir, with regard
9  to which of these numbers would you say you
10 wouldn't have made that examination, what
11 number was that?
12     A     Well, Number 3 you asked for
13 mortgages and I wouldn't have -- I wouldn't
14 have the loan mortgages.  Number 4 is loan
15 payable.  I don't know which loan payable that
16 is.  If it's a mortgage loan payable I
17 wouldn't have that.
18     Q     It was as to the latter three that
19 you said?
20     A     Five an six are where you'd adjust
21 the books from cash to accrual.
22     Q     You said you would not have had
23 that information?
24     A     We have all the information that
25 would support and it would be given to the

Dawley

95

2      form.
3          If you understand the
4      question you can answer.
5      A     The audit is done by Marks,
6  Paneth & Shron.  They produce the financial --
7  the audit financial statement.  We provide
8  them with the beginning trial balance on a
9  cash basis.  It gets converted to accrual and
10 it's produced.
11     Q     In this conversion to accrual by
12 Marks, Paneth & Shron numbers are changed, is
13 that correct?
14     A     Yes.
15     Q     They are changed by virtue of
16 depreciation, amortization, things like that?
17     A     Yes.
18     Q     Right?
19     A     Right.
20     Q     The information is conveyed back
21 to you after this is done, is that correct?
22     A     Yes.
23     Q     You have to either approve of this
24 or disapprove of it, is that correct?
25     A     Yes.

Dawley

94

2  accountant in order to make that entry to put
3  that accrual on the books.  In order to put
4  accounts payable on the books at the end of
5  the year, which is a cash to accrual
6  adjustment, they have to get all the
7  information from us because they don't know
8  what's there.  So our accounts payable person
9  gets all the information together to support
10 what that accounts payable and accrued expense
11 payable is.  It comes from us.  It's not
12 something that is made up.
13     Q     Well, were you able to respond to
14 questions six, seven and eight in Exhibit 3,
15 which is Exhibit 1 from the first deposition?
16     A     Six, seven and eight those were
17 again the items that were on the accrual basis
18 that would have been in the work papers for
19 Marks, Paneth & Shron.
20     Q     Now, who is responsible for this
21 financial statement, is it Marks, Paneth &
22 Shron or is it Dalton?
23         MR. KELLY:  Objection to the
24     form.
25         MR. TRAUB:  Objection to the

Dawley

96

2      Q     There is no documentation that you
3  know of, in which you have approved of the
4  changes that have been made, is that correct?
5          MR. TRAUB:  When you say
6      you, are you talking about Mr.
7      Dawley himself?
8      Q     That Dalton approves that the
9  changes have been made, none that you know of,
10 correct?
11     A     I didn't approve anything in
12 writing.
13     Q     You're the chief executive officer
14 of Dalton?
15     A     I am the chief operating officer.
16     Q     Is that correct?
17     A     Right.
18     Q     You just said a few minutes ago on
19 the record, unless I'm not correct, that it's
20 sent to the accountant for the financial
21 statement, was that your testimony?
22         MR. TRAUB:  Objection to the
23     form.
24         MR. KELLY:  I am going to
25     object too.  I don't know what

Dawley

97

```
2    you're referring to.
3         MR. HAYWOODE:  The witness
4    just testified that this
     information is sent to the
     accountant for finalization.
7    Q    Was that your testimony?
8    A    We have to produce the information
9    and send it to them, so they have a basis to
10   approve for Marks, Paneth & Shron to do an
11   audit and produce a financial statement and a
12   tax return.
13   Q    So that it is Marks, Paneth &
14   Shron which is acting as an accountant here,
15   is that correct?
16        MR. TRAUB:  Objection to the
17   form.
18        MR. KELLY:  Objection to the
19   form.
20   A    I don't believe so.
21   Q    Well, when you refer to Marks,
22   Paneth & Shron as the accountant, sir, why do
23   you do that?
24        MR. TRAUB:  Objection to the
25   form.
```

Dawley

98

```
2    A    Let's see, how do I answer this?
3         MR. TRAUB:  Truthfully,
4    please.
5         THE WITNESS:  I am.
6         MR. HAYWOODE:  I heard
7    counsel say truthfully please.  I
8    appreciate the sentiment.  I know
9    it's difficult to exist.
10   A    Everything has been fruitful.
11        MR. HAYWOODE:  The lawyers
12   must stop and the witness must
13   speak.
14   Q    Please, sir, I am sorry.
15   A    We refer to all accounting firms
16   -- you refer to them as accounting firm not
17   audit firms.
18   Q    When you discuss the national
19   firms, you refer to them as accounting firm
20   not an audit firm?
21   A    So that is just a phrase.
22   Q    Is there some distinction between
     the accounting process and the auditing
24   process?
25   A    Yes, it's different.
```

Dawley

99

```
2    Q    I don't know, I am not an
3    accountant, but have you ever heard of Gagas?
4    A    No.
5    Q    G-A-G-A-S?
6    A    No.
7         Gapp.
8    Q    Or Gapp?
9    A    Gapp I have heard of.
10   Q    Yes.
11   A    It's been a long time.
12   Q    Well, I don't know, they make the
13   lawyers take refresher courses.
14   A    I haven't taken one in thirty
15   years.
16   Q    What are those regulations roughly
17   if you know, anything about them say anything
18   about the auditing or accounting process?
19   A    I couldn't tell you.
20   Q    Do they say anything about the
21   separation of the auditing process from the
22   accounting process?
23   A    I have no idea, 'cause I have not
24   looked at any of those forms you're talking
25   about.  A lot of it probably is new stuff and
```

Dawley

100

```
1    I haven't even looked at anything.  That's not
2    my function.
3    Q    You're from the old school?
4    A    Really old.
5    Q    Can I as an accountant both do the
6    accounting work and keep the accounting
7    materials and also be the auditor to your
8    understanding of the operation?
9    A    I couldn't do all the accounting
10   for Dalton and at the end of the year do an
11   audit and sign off on it, no.
12        MR. TRAUB:  Off the record.
13        (Whereupon, a discussion was
14   held off the record.)
15        (Whereupon, the requested
16   portion was read back by the
17   reporter.)
18   Q    Is it fair to say, sir, that you
19   didn't do all the accounting for Dalton with
20   regard to these four buildings?
21   A    We did all the accounting.
22   Q    Well, what if anything was Marks,
23   Paneth & Shron doing when they suggested to
24   you, let's see, sixty-one journal entries
```