Dawley

101

1
2 changes with regard to the Logan account
3 alone?
4          MR. TRAUB:  Objection to the
5          form.
6      Q     Only $370.00.00 of which had to do
7 with appreciation or depreciation.
8          On the basis of what was Marks,
9 Paneth & Shron making those other journal
10 entry adjustments?
11          MR. KELLY:  Objection.
12          MR. TRAUB:  Objection to the
13          form.
14          Improper use.  They weren't
15          journal entries.  Even your
16          accountant told you earlier.
17          MR. HAYWOODE:  Now, you're
18          testifying.
19          You object to the form and
20          your reason for it.
21          MR. KELLY:  I join in that
22          objection.
23      Q     There were adjustments being
24 suggested by Marks, Paneth & Shron, right?
25      A     Yes.

LEX REPORTING SERVICE
800-608-6085

---

Dawley

102

1
2      Q     There were sixty-one of them is
3 that, correct?  We just counted up
4 approximately.
5      A     I don't know how many there were.
6      Q     You didn't add them, but assuming
7 that we add the numbers I am coming to
8 sixty-one.  Maybe there is one or two less or
9 more or whatever.
10          Isn't that an excessive amount of
11 journal entries?
12          MR. TRAUB:  Again objection
13          to the misuse of the term journal
14          entry.
15      Q     Journal entry, suggestion for
16 adjustments.
17          MR. TRAUB:  Again same
18          objection.
19      Q     Isn't that a lot of suggestions to
20 the accountant that make these changes, isn't
21 that lot of them?
22      A     I don't think so.
23      Q     In your experience that is not
24 excessive?
25      A     Not when you change the books from

LEX REPORTING SERVICE
800-608-6085

---

Dawley

103

1
2 cash to accrual.
3      Q     You're saying all of those, if
4 there are sixty-one, their adjustments are the
5 result of the change from cash to accrual and
6 no one of them is just a blanket change in
7 figures in number?
8      A     I don't remember.
9          I didn't memorize them all, but
10 there may have been a reclassification from
11 like an expense account to a capital account,
12 so that you would depreciate it rather than
13 expense it during the current year.  I think
14 that has transpired.
15      Q     Now, getting back to this request.
16      A     Yes.
17      Q     You say these were not questions
18 that Dalton could answer.
19          With regard to those that they are
20 concerning, and you pointed to some of them
21 that Dalton couldn't answer, is that correct?
22      A     I think we went through which
23 ones.
24      Q     Yes, you did.  I am not going to
25 do that again.

LEX REPORTING SERVICE
800-608-6085

---

Dawley

104

1
2          But you have no recollection of
3 receiving that, is that correct?
4      A     No, I don't remember.
5          MR. HAYWOODE:  Now, I am
6          going to show you Exhibit 2 from
7          the deposition of February 3,
8          2008, which we will mark today as
9          Plaintiff's Exhibit 4.
10          (A response to questions
11          posed in Exhibit 3 was
12          marked as Plaintiff's
13          Exhibit 4, for
14          identification, as of this
15          date.)
16      A     Okay.
17      Q     Is that a response to the
18 questions that were posed in Exhibit 3?
19      A     It appears to be, yes.
20      Q     Now, the question was posed on
21 what day, May 10, 2007?
22      A     That's Exhibit 3, yes.
23      Q     Do you recall whether or not that
24 was a Thursday?
25      A     (No verbal response.)

LEX REPORTING SERVICE
800-608-6085

Dawley

105

2  Q   You don't recall?

3  A   **No.**

4  Q   If I suggest to you that was a
Thursday, is it reasonable to presume that
Dalton would receive that response on Friday
7  on the 11th?

8        MR. TRAUB:  Objection to

9              form.

10              Did he receive the Exhibit?

11  Q   It is reasonable to presume that
Dalton, would have received that request made
to it at least on the 11th?

14        MR. TRAUB:  You're talking

15              about Exhibit 3?

16        MR. HAYWOODE:  Yes.

17  A   **I don't know when I got it.  Could
18 have been the next day, could have been the
19 day after.  It depends whether Neale was in or
20 not because it was addressed to her.**

21  Q   On a Saturday or Sunday?

22  A   **She is not there a lot of times on
23 Friday, so I don't know.**

24  Q   But the answer was produced on the
25 15th, is that correct?

LEX REPORTING SERVICE
800-608-6085

Dawley

106

2  A   **Yes, it was.  That's the date on
3 the Exhibit 4.**

4  Q   If the 11th was a Thursday then
5 the 15th would have been Monday, is that
6 correct?

7  A   **I think that's right.**

8  Q   The request from Cameron, Pryce &
9 Griffiths was to Dalton originally, correct?

10  A   **Correct, right.**

11  Q   It would appear that the request
was immediately sent to Marks, Paneth & Shron
for response, is that correct?

14        MR. TRAUB:  Objection.

15  A   **I don't know.**

16  Q   Well, the response came from
17 Marks, Paneth & Shron, is that correct?

18  A   **Yes.**

19  Q   So is it reasonable to presume
20 that whoever got it at Dalton said give it to
21 Marks, Paneth & Shron?

22        MR. TRAUB:  Objection to

23              form.

24  A   **They could have.  I don't --**

25  Q   You have no idea?

LEX REPORTING SERVICE
800-608-6085

Dawley

107

2  A   **No.**

3  Q   Do you have any idea who would
4 have an idea?

5  A   **No.**

6  Q   With the exception of the loan
7 documents?

8  A   **Right.**

9  Q   Is this information that the
10 accountant should have had?

11  A   **You mean Marks, Paneth & Shron?**

12  Q   Who is the accountant?

13  A   **Well, I don't understand what
14 you're asking.**

15  Q   Isn't that Dalton's accountant?

16  A   **Dalton is the property managing
17 agent, yes.**

18  Q   Are they the accountant for this
19 account?

20  A   **They take care of books and
21 records, yes.**

22  Q   They are the accountant?

23  A   **Right.**

24  Q   Their work is reviewed by an
25 auditor?

LEX REPORTING SERVICE
800-608-6085

Dawley

108

2  A   **Yes.**

3  Q   Marks, Paneth & Shron is the
4 auditor?

5  A   **Yes.**

6  Q   The auditor sent in a team of
7 maybe fourteen people every now and then, they
8 look at your books and records and they make
9 suggestions based on their inquired
10 investigation to you as to journal
11 adjustments, is that correct?

12  A   **Yes.**

13  Q   Then as I understand the process,
14 but correct me I am not an accountant, you get
15 to talk to the auditor and say, "Well, we
16 agree with this and this and this and this,
17 but not that," but basically this is the
18 accountant's work.  The auditor is only making
19 commentary and suggesting changes, is that
20 correct?

21  A   **Yes.**

22  Q   In the keeping of these accounts,
23 is it not the case that it is the primary
24 accountant here, Dalton, who's supposed to
25 have all these back up material that Cameron,

LEX REPORTING SERVICE
800-608-6085

Dawley

109

2 Pryce & Griffiths is talking about, isn't that
3 correct?
4          MR. TRAUB: Objection to the
5 form.
6     A    You say we are supposed to have?
7     Q    I don't know. I am not an
8 accountant, sir. You tell me.
9     A    No, that was your question.
10    Q    Well, my question is isn't the
11 accountant supposed to have it?
12    A    We can have -- we have some of the
13 other information, but I don't know if we have
14 all of the information. I know we do have
15 copies of all their work papers.
16    Q    Let me ask you this, why would the
17 auditor, have any of the papers which are the
18 form and fabric of the affairs of Dalton
19 Management? Why would the auditor, who comes
20 in merely to look at it and make suggestions,
21 why would they have any of the papers?
22    A    The auditor has to have support in
23 their work papers in order to justify the
24 balances that they report on the financial
25 statements. So they are going to have support

LEX REPORTING SERVICE
800-608-6085

Dawley

110

2 in their work papers for all the different
3 entries -- I mean all the different balances.
4 They have to have that.
5    Q    Where do they get that supporting
6 documentation?
7    A    From us.
8    Q    Which means that you don't just
9 take your records and give it to them
10 wholesale, do you? I mean you make copies and
11 supply them to them, right?
12    A    Auditors come into the office and
13 they review our books and records. We make
14 copies of whatever they need, they put it into
15 their work paper, finalize it and produce the
16 audited financial statement.
17    Q    But the originals of the
18 documentation are still with Dalton, is that
19 correct?
20    A    That's correct.
21    Q    That being so why would the
22 request from Cameron, Pryce & Griffiths of May
23 10th have been almost immediately sent to
24 Marks, Paneth & Shron?
25    A    Because they had the adjustment,

LEX REPORTING SERVICE
800-608-6085

Dawley

111

2 adjustment to convert the accounting
3 information from cash to accrual in order to
4 produce the financial statement.
5    Q    But they were just asking for
6 documentation then in the communication of May
7 10th, isn't that so?
8    A    Okay.
9    Q    They are asking for documentation?
10    A    They asked for the finalized
11 figure.
12       For example, Number 5 for accounts
13 payable that was used in the audited financial
14 statement, we don't maintain our books on an
15 accrual basis so we don't have the back up for
16 that specific number broken out the same way
17 as they do, because they put it on an accrual
18 basis. We are on a cash basis. That at the
19 end of the year what they have on accounts
20 payable is never going to agree with what we
21 have, because they have to make adjustments to
22 it to pick up expenses that came in after the
23 end of the year in January that were for
24 December. They have to be added back in as an
25 expense in December and that's included in the

LEX REPORTING SERVICE
800-608-6085

Dawley

112

2 accounts payable.
3    Q    Again getting back to my previous
4 question to you, you would never know what was
5 going on financially by simply looking at
6 Dalton's books, is that correct?
7          MR. TRAUB: Objection to the
8 form.
9          MR. KELLY: Objection to the
10 form.
11    A    If you're familiar with the
12 accounting method of cash and accrual, you
13 should be able to as an educated accountant to
14 determine how it was adjusted from cash to
15 accrual.
16    Q    So that you don't understand the
17 request of May 10th, made by Cameron, Pryce &
18 Griffiths, to be a request for document to
19 support things?
20          MR. TRAUB: Objection to
21 form.
22    Q    You say that they are asking for a
23 finalized number in that request?
24    A    What they are asking for is a
25 list. For example, Number 5 accounts payable,

LEX REPORTING SERVICE
800-608-6085

Dawley

113

2 that would be a list of expenses that are not
3 paid at the end of the year. They asked for
4 the specific expenses that made up that
5 number. Our books are on a cash basis not
6 accrual. That's accrual adjustments. So
7 Marks, Paneth & Shron in their work papers
8 would have a sheet for that particular account
9 that would also for their review people to
10 determine if what the amount was and that it
11 was, you know, produced on the financial
12 statement.
13    Q    But they got all the documentation
14 from you, from Dalton?
15    A    They got all the information of
16 checks that we wrote and the invoices that
17 came in. After the end of the year we gave
18 those to them, so it could be converted to
19 accrual.
20    Q    You maintain copies of them?
21    A    We maintain the originals.
22    Q    So the information that Cameron,
23 Pryce & Griffiths asked you for it was in
24 Dalton's files, is that correct?
25    A    It was there for their review and

LEX REPORTING SERVICE
800-608-6085

Dawley

114

2 they can go through and they could look it up.
3 If they were doing an audit then they would be
4 produced. They should be doing the same
5 function that Marks, Paneth & Shron did by
6 looking at expenses that were paid for after
7 the end of the year that should have been
8 accrued and if they went through that they
9 would have found those same documents. They
10 would have made the same determination and
11 could have come up with the same figure.
12    Q    Why did you, Dalton, refer them to
13 Marks, Paneth & Shron to see documents that
14 were in position of the Dalton?
15    A    I was trying to cut the amount of
16 time down, they were going to have to spend to
17 find the same information.
18    Q    You were anticipating that they
19 wanted information as opposed to the specifics
20 of what they were asking you for, is that
21 correct?
22    A    I don't understand that.
23    Q    You said, "Hey look, it will save
24 them time to go get this from Marks, Paneth &
25 Shron, is that correct?

LEX REPORTING SERVICE
800-608-6085

Dawley

115

2    A    They want a specific figure that
3 will tie in with the financial statement.
4 Marks, Paneth & Shron has a work paper on that
5 particular account, that will show exactly
6 what the amount was which will tie in exactly
7 with the financial at the same time.
8    Q    They would never find that
9 information from simply talking to Dalton?
10    A    Not by talking to us. They would
11 have to go through and review all the checks
12 that were written after the end of the year,
13 look at all the invoices and determine whether
14 those invoices were for expenses incurred
15 prior to the end of the year and then they
16 would have to put them on accrual.
17    Q    If I said to you William Jennings
18 was of the opinion that Dalton could have
19 responded to that request, would you disagree
20 with that statement?
21    A    We could have, but it would have
22 taken quite some time.
23    Q    Now, in the course of the
24 inquiries made by Cameron, Pryce & Griffiths,
25 did anyone say to them at some point that,

LEX REPORTING SERVICE
800-608-6085

Dawley

116

2 "Look, you have to get this information from
3 Marks, Paneth & Shron, the auditor and you're
4 going to have to pay them for their time," did
5 anyone say that to them?
6        MR. TRAUB:  Objection to
7        form.
8    Q    To your knowledge, did anyone say
9 that to them?
10    A    I didn't say that to them.
11    Q    Do you know if anyone else said
12 that to them?
13    A    I don't know.
14    Q    Are you knowledgeable if a letter
15 was sent to them saying that?
16    A    No.
17    Q    Did you read the pleadings in this
18 case at all before coming here today?
19    A    No.
20    Q    You didn't?
21    A    No.
22    Q    It did not come to your attention
23 that a communication was sent by Cameron,
24 Pryce & Griffiths in or around November,
25 indicating that someone at Dalton had told

LEX REPORTING SERVICE
800-608-6085

Dawley

117

2  them that to get this information they had to
3  go to Marks, Paneth & Shron and that they
4  would have to pay Marks, Paneth & Shron, that
5  never came to your information or attention?
6          MR. TRAUB:  Objection to the
7      form.
8     A    The information that they
9  requested, specifically the balance on
10  accounts payable, would be easily obtained
11  from Marks, Paneth & Shron's work papers or
12  that they requested to be compensated for
13  that, I don't remember whether they requested
14  to be compensated for that.  I don't remember.
15     Q    Did anyone from Dalton tell
16  Cameron, Pryce & Griffiths you have to pay to
17  get that from them?
18     A    I don't remember.
19     Q    Who were the persons who dealt
20  with Cameron Pryce and Griffiths aside from
21  yourself at Dalton?
22     A    The accounts payable Veronica
23  Mackenzie.  I think Alonzo Rodgers provided
24  them with some information.  I believe I asked
25  Joan Mondesir to come up with some compliance

Dawley

118

2  issues and I think we had a -- we had a rent
3  increase that she had.
4     Q    Would any of those persons have
5  had the authority to say to the auditors, that
6  you have to pay Marks, Paneth & Shron for
7  their time in order to go to them and get the
8  information?
9     A    I can't imagine any one of them
10  saying anything like that.
11          MR. HAYWOODE:  I withdraw
12      that question.
13     Q    Is it not the case that most of
14  the material that Cameron, Pryce & Griffiths
15  were asking for they were being referred to
16  Marks, Paneth & Shron to get it?
17          MR. TRAUB:  Objection.
18     Q    Isn't that what took place here?
19          MR. TRAUB:  Objection to the
20      form.
21          Do you understand the
22      question?
23     A    Some of the information on some of
24  the accounts, specifically the account payable
25  account was -- would be more easily obtained

Dawley

119

2  from the work paper that Marks, Paneth & Shron
3  would have produced then trying to go back
4  through and pull out all of the invoices that
5  were there.  In a proper audit, if you were
6  doing an audit, you wouldn't look to an
7  auditor's work papers.  You would do your own
8  investigation, make your own determination and
9  looking through the invoices that were readily
10  available and determine whether or not that
11  figure was correct.
12     Q    When you say you, are you
13  referring to --
14     A    I am referring to Cameron, Pryce &
15  Griffiths.
16     Q    That they should have looked at
17  the auditor's papers?
18     A    They had all the information
19  available.  If they wanted to determine what
20  the accounts payable, in their opinion, should
21  be at the end of the year they could very
22  easily have gone through all the invoices that
23  were there and made a calculation of which
24  ones were appropriate to be classified as a
25  payable at the end of the year and then if

Dawley

120

2  there was a discrepancy maybe then we could
3  have talked about what the amount was and
4  researched that, but that wasn't the case.
5     Q    Did Marks, Paneth & Shron have all
6  of the documentation that Dalton maintained?
7     A    No.
8     Q    They only have things that their
9  auditors pulled out selectively, correct?
10     A    Yes.
11     Q    So that can I assume that when
12  Cameron, Price & Griffiths went to you and
13  looked at these documents that for the most
14  part they were asking for the exact same
15  selections that Marks, Paneth & Shron had
16  asked you for, is that correct?
17          MR. TRAUB:  Objection to the
18      form.
19          You mean in these letters or
20      over the six months?
21     Q    Over the six months they were
22  constantly asking for the same information
23  that Marks, Paneth & Shron had selected and
24  pulled out?
25     A    We didn't presume to chose the

Dawley

121

2 invoices. My accounts payable person wouldn't
3 begin to do that. Their determination would
4 not be considered as to what would be a proper
5 classification of a expenditure and a payable
6 for the end of the year. She would provide
7 access to all the invoices we paid. We would
8 -- we would provide access to all the checks
9 that were written and any checks that was
10 written there would be an invoice for it that
11 would be reviewable to determine whether that
12 was a year end expense or a new year expense
13 and all that information was there and readily
14 available.
15    Q    Dalton does not compile its own
16 financial statement before Marks, Paneth &
17 Shron issues one?
18         MR. KELLY: Objection to the
19     form.
20    A    What do you mean?
21    Q    Does Dalton compile its own
22 financial statement and say, "Look, on the
23 cash basis this is our financial statement.
24 This is what we have." Then do you convey that
25 to Marks, Paneth & Shron or do you just take

LEX REPORTING SERVICE
800-608-6085

Dawley

122

2 all the accumulated data and pass it all to
3 Marks, Paneth & Shron for them to finalize?
4 Which of those methods do you follow?
5         MR. KELLY: Objection to
6     form.
7    A    We provide the activity for the
8 entire year on a cash basis to Marks, Paneth &
9 Shron for review.
10    Q    Is there a reason that you
11 wouldn't keep your books on an accrual basis,
12 so that it would be congruent to what they are
13 doing?
14         MR. TRAUB: Objection to
15     form.
16         Who is they?
17    Q    To what Marks, Paneth & Shron are
18 doing there on an accrual basis, you're doing
19 it on a cash basis. Wouldn't it make more
20 sense if you converted to an accrual basis
21 only, so your work would be consonant with
22 their work?
23    A    With the new Yardi System, the new
24 software that we have been converting over to,
25 you have the option of producing an in-coming

LEX REPORTING SERVICE
800-608-6085

Dawley

123

2 income and expense income statement on a cash
3 or accrual basis. The reason they have that
4 option is because a lot of partners don't care
5 about accruals. They don't care how much
6 money you're billed. You bill the tenants.
7 They want to know -- only know how much money
8 you got in, how much money is spent and how
9 much money you have at the end of the month
10 for distribution to partners, so you'll find
11 that a lot of property management companies
12 provide a cash basis income and expense
13 monthly statement to the partners so that they
14 can determine how the cash is run.
15    Q    Dalton does that?
16    A    We do that on a cash basis.
17    Q    Is there any reason why you
18 couldn't also provide an accrual statement, so
19 that your work would be congruent with what
20 Marks, Paneth & Shron is doing?
21    A    With BJ Murray we chose to do it
22 on a cash basis and only convert once a year.
23    Q    By giving the ingredients to
24 Marks, Paneth & Shron?
25    A    To make that statement.

LEX REPORTING SERVICE
800-608-6085

Dawley

124

2    Q    By making no financial statement
3 yourself, by depending on Marks, Paneth &
4 Shron to complete the final statement, is that
5 correct, the only statement?
6         MR. TRAUB: Objection to
7     form.
8         MR. KELLY: Objection to
9     form.
10         MR. HAYWOODE: I will
11     withdraw it.
12    Q    The only end financial statement
13 being composed here is that of auditors Marks,
14 Paneth & Shron, is that correct?
15         MR. TRAUB: Objection to
16     form.
17         MR. KELLY: Objection to
18     form.
19    A    We produce on a monthly basis.
20 That is -- that is also included in the files
21 a financial statement on the cash basis.
22         MR. TRAUB: I think this is
23     a good time for a break.
24    Q    Under the terms of your management
25 contract, does it say that you should produce

LEX REPORTING SERVICE
800-608-6085

Dawley

125

2 your records under one form or the other?
3    A    Not that I know of.
4    Q    Under the terms of the DHCR
5 contract, does it restrict the amounts of
6 money that are payable to the managing
7 company?
8    A    DHCR, as well as all the other
9 agencies; HPD, HDC and HUD, all prescribe what
10 the management fee is to be. The amount of
11 the management fee on Fifth and 106th, DHCR
12 actually has a form that they tell us how much
13 we can pay. It's not calculable. It's a
14 specific amount.
15    Q    Are there not contracts, which say
16 how much money Dalton Management is supposed
17 to receive from each development in a year?
18    A    There is a management contract on
19 DHCR that they approve that they gave us.
20 It's like four years old now of how much we
21 can take out as a management fee.
22    Q    Does it also prescribe how much
23 should be paid to the auditor?
24    A    I believe there is an agreement in
25 there for the auditor.

LEX REPORTING SERVICE
800-608-6085

---

Dawley

126

2        Now, we have been reviewed by DHCR
3 and we are continually reviewed by DHCR. They
4 have a representative that comes in to do the
5 financial review. They come in a couple of
6 times a year and they look through our books
7 and records. They look at every check. They
8 check anything that they find that they want
9 to look at further. They check the invoice.
10 Excuse me, I am not done.
11        MR. HAYWOODE:  I move to
12        strike some of this testimony as
13        not responsive to my question,
14        but go ahead.
15    A    You asked. I am telling you.
16    Q    Don't mind that.
17    A    About seven years ago we paid a
18 $500.00 bonus to our property manager at
19 Lakeview. When they came in they caught that
20 $500.00 out of thousands of dollars that go
21 out of that company. On a monthly basis, over
22 a six month period, it's like three or four
23 million. We paid that $500.00 back. HPD
24 comes in on other properties. HDC comes in,
25 so we are audited on Church, Charles and

LEX REPORTING SERVICE
800-608-6085

---

Dawley

127

2 Logan. They go through those things with a
3 fine tooth comb and we don't have any
4 irregularities from any of those auditors.
5    Q    How much was Marks, Paneth & Shron
6 supposed to be paid in 2006 under the terms of
7 its auditing contract?
8        MR. TRAUB:  Objection to the
9        form.
10        MR. KELLY:  Objection to the
11        form.
12    A    I couldn't tell.
13    Q    If I suggest it was $34,000.00
14 would that refresh your recollection?
15        MR. TRAUB:  Objection to
16        form.
17        If you want to show him the
18        document you can.
19        MR. HAYWOODE:  I asked him
20        if it would refresh his
21        recollection.
22    A    I don't remember.
23    Q    If I suggest to you that you that
24 Marks, Paneth & Shron received $108,000.00 in
25 2006, would that refresh your recollection as

LEX REPORTING SERVICE
800-608-6085

---

Dawley

128

2 to the contract amount or the amount that they
3 received?
4        MR. TRAUB:  Again objection
5        to form.
6        MR. KELLY:  Objection.
7        MR. TRAUB:  If you want to
8        show him the contract, show him
9        the contract.
10        MR. HAYWOODE:  I asked for
11        his recollection.
12        MR. TRAUB:  I asked for a
13        break for half an hour.
14    Q    Would that refresh your
15 recollection, if I told you that they received
16 $108,000.00 in 2006 and that their contract
17 called for $34,000.00?
18        MR. KELLY:  Objection.
19        MR. TRAUB:  Objection to
20        form.
21    Q    Is that your recollection of what
22 took place?
23        MR. KELLY:  Objection.
24        MR. TRAUB:  Objection to
25        form.

LEX REPORTING SERVICE
800-608-6085

Dawley

129

2  A    First of all, I don't know if they
3  received $108,000.00 in 2006. If they did in
4  fact receive $108,000.00 it wouldn't have been
5  just for an audit. It would have also been
6  for the production of a rent increase
7  application.
8      Q    Do these contracts say that if any
9  sum, in addition to $5,000.00, is to be paid
10  to the auditor that permission has to be
11  obtained from DHCR to your knowledge?
12          MR. TRAUB: Again objection
13      to the form.
14          MR. KELLY: Objection to the
15      form.
16  A    Every expenditure that we get
17  into, where we have a large contract for
18  construction or anything else, we get approved
19  from DHCR.
20          MR. HAYWOODE: Move to
21      strike as not responsive.
22      Q    Do the contracts limit the amount
23  of outside payment in excess of $5,000.00
24  without DHCR approval to your knowledge?
25          MR. TRAUB: Objection to the

Dawley

130

2      form.
3          MR. KELLY: Objection to the
4      form.
5  A    I think it's ten.
6      Q    I am sorry?
7  A    I think it's $10,000.00.
8      Q    So more than $10,000.00 that is to
9  get approval to your recollection?
10  A    Okay.
11      Q    Was there any approval issue in
12  2006 that you know about?
13          MR. KELLY: Objection.
14          MR. TRAUB: Objection to
15      form.
16  A    I don't remember.
17      Q    Finally, isn't it a fact that the
18  books of records of Dalton recited in 2006
19  that Marks, Paneth & Shron receive $108,000.00
20  in that year?
21          MR. TRAUB: Objection to
22      form.
23          MR. KELLY: Objection to
24      form.
25  A    I couldn't begin to tell you. I

Dawley

131

2  don't remember.
3      Q    Did Dalton's books suggest that
4  $108,000.00 was paid to Marks, Paneth & Shron
5  in 2006?
6          MR. TRAUB: Objection.
7          Asked and answered.
8          MR. KELLY: Objection to
9      form.
10          MR. TRAUB: He just answered
11      it.
12  A    I don't know.
13      Q    You don't know, fine.
14          Is it not the fact that the
15  financial statement, simply reported fees
16  being paid to Marks, Paneth & Shron for
17  $34,000.00 and that the other money was listed
18  in the financial statement, the final
19  statement as consultant and other expenses?
20          MR. TRAUB: Objection to the
21      form.
22          MR. KELLY: Objection to the
23      form.
24      Q    Is that your recollection?
25  A    (No verbal response.)

Dawley

132

2          MR. HAYWOODE: We are
3  adjourned for lunch.
4          (Whereupon, a luncheon
5      recess was taken.)
6          MR. HAYWOODE: Gentlemen, I
7  want to mark this document as
8  Plaintiff's 5.
9          (A Logan Plaza document was
10      marked as Plaintiff's
11      Exhibit 5, for
12      identification, as of this
13      date.)
14      Q    With regard, sir, to Plaintiff's
15  5, which is a Logan Plaza Associates document
16  prepared for December 2006, would you look at
17  the document and tell me did you prepare that?
18  A    It could have been prepared in --
19  would have been prepared in our office. I
20  don't know if I personally prepared it.
21      Q    By whom?
22  A    December 2006 that probably was
23  produced by Veronica Mackenzie. We produce
24  one at the end of each month.
25      Q    Would that have been conveyed to

Dawley

**133**

2  Marks Paneth & Shron?
3  **A    Yes.**
4  Q    Do you have any independent
5  recollection of its preparation or its
6  conveyance to Marks, Paneth & Shron?
7  **A    No.**
8  Q    Did you ever read it before?
9  **A    I don't recall.**
10  Q    Sir, looking at the document I
11  direct your attention to the part which is
12  somewhat darkened on Page 5. I want you to
13  read it and tell me what you understand it to
14  say.
15  **A    There are three items. There is**
16  **-- the vendor is Dalton Management, the total**
17  **$181,927.02.**
18  Q    I direct your attention to the
19  earlier testimony when we started this
20  morning, is that the $180,000.00 that you
21  testified to earlier this morning?
22  **A    When we were talking about Logan**
23  **Plaza and $180,000 due to Dalton, yes.**
24  Q    This morning you testified that
25  the money was owed to Marion Scott or Prestige

Dawley

**134**

2  or Grenadier Management, is that correct?
3  **A    Yes.**
4  Q    That one of the Seavey's had
5  discussed that with you, is that correct?
6  **A    Yes.**
7  Q    And William Jennings, this had
8  come to his attention and he discussed it and
9  gave certain advice with regard to it, is that
10  correct?
11         MR. TRAUB: Objection to the
12         form.
13  Q    Was that pretty much what you
14  testified to?
15  **A    Well, advice to who?**
16  Q    To the Seavey's I presume. I
17  don't know.
18  **A    It's my understanding he indicated**
19  **what would transpire if they were to write it**
20  **off, yes.**
21  Q    This was money which originated
22  some time before the year 2000 I assume, is
23  that correct?
24  **A    As far as I know, yes.**
25  Q    Now, looking at that document how

Dawley

**135**

2  does it describe the money?
3  **A    One of the items it says January**
4  **1997 to June of 1997 fees. It says July 1997**
5  **to March 1998 fees and it says April 1998 to**
6  **June 1998 fees.**
7  Q    Does it further characterize that
8  money as to what it is?
9  **A    What do you mean characterize?**
10  Q    Well, does it say anything else
11  about the money?
12  **A    It's unpaid.**
13  Q    Does it say anything else about
14  the money?
15  **A    I don't know what you're asking.**
16  Q    Is there any other identifying
17  feature in that information concerning that
18  money?
19         MR. TRAUB: Other than what
20         he's testified about?
21         MR. HAYWOODE: Yes.
22  **A    I don't see anything.**
23  Q    I direct your attention to the
24  column on the extreme left, sir, under the
25  heading of vendor.

Dawley

**136**

2  **A    Yes, we already discussed that it**
3  **was Dalton Management.**
4  Q    So that if someone were to look at
5  that document by way of audit or anything else
6  they would conclude that this was money owed
7  to Dalton Management, is that correct?
8         MR. TRAUB: Objection to the
9         form.
10         Are you asking him what
11         someone would conclude other than
12         him?
13  Q    Well, the document says that the
14  money is owed to Dalton Management, isn't that
15  correct?
16  **A    This is a list of unpaid, which is**
17  **payables that shows that there is 181,927.02**
18  **that is unpaid that is due to Dalton**
19  **Management.**
20  Q    But isn't that the same money that
21  you testified earlier this morning was owed to
22  either Prestige or Marion Scott or Grenadier
23  Management?
24  **A    That's correct.**
25  Q    You knew it was owed at that time

Dawley

137

2  to one of those three organizations, is that
3  correct?
4      A    Yes.
    Q    William Jennings knew it was owed
to one of those three organizations at that
7  time, is that correct?
8            MR. TRAUB:  Objection to the
9  form.
10      A    I don't know what Bill knows.
11      Q    Well, he certainly had discussed
12  the matter with one of the Seavey's according
13  to your testimony, is that correct?
14      A    What I was told is that Bill
15  Jennings told them, the Seavey's, that there
16  was an amount due of $181,000.00 and that if
17  they wanted to write it off they would have to
18  pick it up as income, 'cause it had been taken
19  as an expense in those prior years.
20      Q    Sir, did you or anyone at Marks,
21  Paneth & Shron have the consciousness at the
22  time this entry was generated that this money
23  was not owed to Dalton management, but that it
24  was owed to either Grenadier Marion Scott or
25  Prestige?

LEX REPORTING SERVICE
800-608-6085

---

Dawley

138

2            MR. TRAUB:  Objection to
3  form.
4            MR. KELLY:  Objection to
5  form.
6            MR. TRAUB:  Already asked
7  and answered.
8      A    You got to ask it again.  I got
9  too many objections.  I forgot what you asked.
10            MR. HAYWOODE:  Asked and
11  answered is not an objection
12  anymore.
13      Q    Didn't you know when you looked at
14  that entry and Dalton's name was on it and
15  didn't William Jennings or somebody at Marks,
16  Paneth & Shron know when they looked at that
17  entry that this money being listed as owed to
18  Dalton was in fact not owed to Dalton?
19            MR. TRAUB:  Objection to
20  form.
21            Asked and answered.
22            MR. KELLY:  Objection to
form.
    A    When this was put on the books it
25  was -- we knew it was owed to Dalton, but we

LEX REPORTING SERVICE
800-608-6085

---

Dawley

139

2  knew that there was an amount that had been
3  expensed in prior years that was due and in
4  the same amount.  So we classified it as due
5  to Dalton, because if we didn't classify it as
6  a payable it would have to be picked up as
7  income and each of the partners would have to
8  pick up $90,000.00 of income so Dalton was
9  used as the vendor to be payable to.
10      Q    Look, and I know I am not an
11  accountant, but if I owe money to Abraham &
12  Strauss and to Bloomingdales and I know that
13  they haven't come around to pick up that money
14  can I carry it on my books as a receivable
15  payable to Macys?
16            MR. TRAUB:  Objection to
17  form.
18            MR. KELLY:  Objection to
19  form.
20            MR. TRAUB:  Improper
21  hypothetical.
22      A    I really don't know what you're
23  trying to ask.  I have tried to answer this
24  every way that I can.
25      Q    I will ask it again.

LEX REPORTING SERVICE
800-608-6085

---

Dawley

140

2      A    We discussed it, I mean, forever.
3      Q    Suppose I was the accountant or
4  the auditor and I wrote my name as the vendor
5  on that receivable, wouldn't that suggest that
6  at some point in time that money could
7  possibly be collected by me?
8            MR. TRAUB:  Objection to the
9  form.
10            MR. KELLY:  Objection to
11  form.
12            MR. TRAUB:  It calls for a
13  legal conclusion.
14      A    No, it calls for an accounting
15  conclusion.  You have your objection.
16      Q    Wouldn't that create a
17  precondition for somebody to come around and
18  say give the money to Haywoode and be done
19  with it?
20      A    Your hypotheticals are great.
21      Q    Are they true?  I don't want to be
22  great.  I want it to be true.
23      A    That isn't the situation the
24  Yankees and Mets, A&S and Bloomingdales, that
25  isn't even considered.

LEX REPORTING SERVICE
800-608-6085

Dawley

141

1
2       **Dalton Management I was told had**
3   **an agreement with John Edmonds. They were**
4   **going to if they got the money and they paid**
5   **it they would split it 50/50. Now, we could**
6   **have put John Edmonds on that too and he would**
7   **have made the same agreement to pay Dalton**
8   **their 50 percent, didn't make any difference**
9   **to me one way or the other.**
10          MR. HAYWOODE: I move to
11      strike that part of the testimony
12      which is speculation as to what
13      was done here.
14          MR. TRAUB: I think it was a
15      hypothetical. I think it
16      answered your hypothetical.
17          MR. HAYWOODE: I appreciate
18      it's a hypothetical answer.
19   **A    Better than the Mets and the New**
20   **York Yankees.**
21   **Q**    Let's deal with what we know.
22          Had we put the Mets or the Giants
23   or the Cardinal's name as the vendor on that
24   deck, that would have been the first predicate
25   step to transferring $181,000.00 to the Mets,

LEX REPORTING SERVICE
800-608-6085

Dawley

143

1
2   I can put down Goofy. Goofy isn't going to
3   come in and make a claim for $180,000 if he
4   isn't owed the money.
5       **Q**    But you indicated it was the
6   expectation that eventually Dalton would claim
7   the money?
8          MR. TRAUB: Objection to
9          form.
10          Let him finish his answer
11          before you interrupt him with
12          another question.
13   **Q**    Were you finished?
14   **A    No.**
15          **There was an agreement. My**
16   **understanding was the agreement was between**
17   **the Seavey's and John Edmonds that the**
18   **$180,000 they were both aware of was due to a**
19   **prior management company. Which one I don't**
20   **remember, don't care. So they said let's put**
21   **it on the books and leave it on the books. If**
22   **we don't leave it on the books then they will**
23   **each have to pick up $90,000.00 of income on**
24   **their taxes. I am not done. By putting this**
25   **under Dalton, it could have been just as**

LEX REPORTING SERVICE
800-608-6085

Dawley

142

1
2   Giants, Yankees, A&S, M. Douglas Haywoode or
3   anybody else that I named as a vendor. That
4   would have been the first predicate step in
5   establishing a claim to $180,000, would it not
6   in someone who wasn't owed the money, isn't
7   that so?
8          MR. TRAUB: Objection to
9          form and calls for a legal
10          conclusion.
11          MR. KELLY: Objection to
12          form.
13          MR. HAYWOODE: No, it calls
14          for an accounting conclusion.
15   **Q**    As a matter of accounting, isn't
16   that a first predicate step to allow whoever's
17   name you wrote there to come in and claim that money,
18   wouldn't it?
19          MR. TRAUB: Again objection
20          to form. It calls for a legal
21          conclusion.
22          MR. KELLY: Objection.
23   **A    People can't come in and say you**
24   **owe me $100,000.00 without some sort of proof**
25   **and verification. I can put any name I want.**

LEX REPORTING SERVICE
800-608-6085

Dawley

144

1
2   **easily been Dalton Edmonds, Edmonds Dalton,**
3   **could be anything, any combination of the**
4   **partners, I didn't care, because the partners**
5   **owned the company. The money was due the**
6   **partners. It wasn't due to the Mets, the**
7   **Giants, the Yankees or anybody else. Nobody**
8   **else's name appeared there. It was only**
9   **Dalton and their agreement was, as I**
10  **understood that agreement, that they would**
11  **split the funds so they were partners. It**
12  **didn't make any difference to me one way or**
13  **the other.**
14      **Q**    Well, sir, do you agree with me
15  that the worker accounting at some point is
16  tangent to reality and the truth?
17          MR. TRAUB: Objection to the
18          form.
19          MR. KELLY: Objection to the
20          form.
21      **Q**    Do you agree with me that what I
22  do as an accountant has got to be true
23  somewhere either in the world of accruals or
24  in the world of cash?
25          MR. TRAUB: Objection to

LEX REPORTING SERVICE
800-608-6085

Dawley

145

```
 1
 2        form.
 3     Q    Got to be the truth, right?
 4     A    Simple answer, yes.
 5     Q    So that it was not true that
 6  Dalton owned that money was it?
 7            MR. TRAUB:  Objection to the
 8       form.
 9            MR. KELLY:  Objection.
10            MR. TRAUB:  Asked and
11       answered.
12            MR. HAYWOODE:  That's not an
13       objection asked and answered.
14            MR. TRAUB:  I don't need you
15       to argue with me about my
16       objections.
17            MR. HAYWOODE:  You make it
18       repeatedly, but that's not an
19       objection that you're allowed to
20       make.
21            MR. TRAUB:  Let me tell you
22       I am here to do three things;
23       number one, make sure that your
24       questions are appropriate and
25       clear.  Number two, keep you from
```

LEX REPORTING SERVICE
800-608-6085

Dawley

146

```
 2       badgering the witness with the
 3       same question for over an hour
 4       and three, to protect the
 5       integrity of the record.  I think
 6       I am doing a good job with all of
 7       that in keeping you in line.
 8       When I make an objection you
 9       don't need to argue with me about
10       my objections.
11            MR. HAYWOODE:  Just say I
12       object and the witness is
13       directed to answer or the witness
14       may not answer.  That is what the
15       new regulations are about.
16            MR. TRAUB:  My objection
17       doesn't need you to respond to
18       me.
19            MR. HAYWOODE:  Your
20       objections should not be on this
21       record in depth.  Lawyers
22       objections, yours or mine, should
23       not be having colloquy on the
24       record.  It has nothing to do
25       with the purpose of this
```

LEX REPORTING SERVICE
800-608-6085

Dawley

147

```
 1
 2       deposition.  We hear the
 3       questioner's voice and the
 4       witness's voice and the
 5       attorney's voice saying objection
 6       or I won't allow him to answer.
 7       If it isn't that you shouldn't be
 8       speaking, Darren.
 9            MR. TRAUB:  I made my
10       objection.  You decided to make
11       it into something else.  For
12       whatever reason you want to argue
13       with me.
14            MR. HAYWOODE:  I want to get
15       out of here some time.
16            MR. TRAUB:  Stop responding
17       to my objections, because I am
18       not making them for you.
19            MR. HAYWOODE:  What was the
20       last question?
21            The only objection that you
22       make for the record is I object
23       to it and you might say it's not
24       relevant if you wish.
25            MR. TRAUB:  I can say asked
```

LEX REPORTING SERVICE
800-608-6085

Dawley

148

```
 1
 2       and answered.
 3            MR. HAYWOODE:  It's not
 4       relevant, that's it.
 5            MR. TRAUB:  I am allowed to
 6       say asked and answered.
 7            Are you debating with me?
 8       He's here to answer your
 9       questions and I am here --
10            MR. HAYWOODE:  I am not
11       debating with you.
12            Read back my last question.
13            (Whereupon, the requested
14       portion was read back by the
15       reporter.)
16     A    That's true, yes.
17     Q    The statement is a fiction?
18            MR. TRAUB:  Objection.
19     Q    It wasn't true?
20            MR. TRAUB:  Objection to the
21       form.
22            MR. KELLY:  Objection to the
23       form.
24     Q    It wasn't true?
25            MR. TRAUB:  Objection to the
```

LEX REPORTING SERVICE
800-608-6085

Dawley
149

2  form.
3     MR. KELLY:  Objection to the
4  form.
5  Q   It wasn't true?
6     MR. TRAUB:  You can answer
7  the question.
8  A   I know, but --
9     MR. TRAUB:  You don't need
10  to repeat the question every time
11  we make an objection.
12  Q   It wasn't true?
13     MR. TRAUB:  Objection to the
14  form.
15     MR. KELLY:  Objection to the
16  form.
17  A   **This statement, that one line**
18  **item, is a line item that you spoke about**
19  **Dalton Management that you just asked was not**
20  **true to Dalton Management and I said that's**
21  **correct.**
22  Q   It wasn't true?
23     MR. TRAUB:  Objection to the
24  form.
25     MR. KELLY:  Objection to the
LEX REPORTING SERVICE
800-608-6085

Dawley
150

2  form.
3  A   **It wasn't due to Dalton**
4  **Management.**
5  Q   The statement wasn't true, is it
6  fair to say that?
7     MR. TRAUB:  Now, you're
8  badgering the witness.  You don't
9  have to answer anymore.
10  A   **Only with regard to that one item.**
11  Q   This item though was reported to
12  the partnership and to DHCR and everybody
13  else, is that correct?
14  A   **This doesn't go to DHCR.**
15  Q   But it was there for DHCR to
16  review if as you testified previously they
17  came in to review it, was it not?
18  A   **Yes.**
19  Q   It was given to Marks, Paneth &
20  Shron, correct?
21  A   **Yes.**
22  Q   They knew it wasn't true, didn't
23  they?
24     MR. TRAUB:  Objection to the
25  form.
LEX REPORTING SERVICE
800-608-6085

Dawley
151

2     MR. KELLY:  Objection.
3  A   **I don't know what they knew.**
4  Q   William Jennings had discussed it
5  with one of the Seavey's, is that correct?
6  A   **That's correct.**
7  Q   $181,000.00 just passed along for
8  eight years and is still passing along waiting
9  for someone to lay claim to it, is that
10  correct?
11  A   **It's waiting for the partners to**
12  **make a decision on what they are going to do**
13  **with it.**
14  Q   You say it's lawful for the
15  partners to defer that decision ad infinitum?
16     MR. HAYWOODE:  Objection.
17     MR. KELLY:  Objection.
18  A   **I don't know about lawful, but the**
19  **partners can put a payable on the record and**
20  **leave it there.**
21  Q   In the intervening period should
22  any question arise, there is documented
23  evidence provided by Dalton and acquiesced by
24  Marks, Paneth & Shron that the money ought to
25  go to Dalton?
LEX REPORTING SERVICE
800-608-6085

Dawley
152

2     MR. KELLY:  Objection to the
3  form.
4     MR. TRAUB:  Objection to the
5  form.
6  Q   There is documentary evidence now,
7  whether it's true or not, there is documentary
8  evidence that that money ought to go to
9  Dalton?
10     MR. TRAUB:  Objection to
11  form.
12     MR. KELLY:  Objection to
13  form.
14  A   **The partners agreed the money**
15  **should go on the books and if it was ever**
16  **written or disbursed off it would be split**
17  **50/50.**
18  Q   You didn't hear John Edmonds, hear
19  any agreement with anybody to that effect, is
20  that correct?
21  A   **That's correct.**
22  Q   All you know about that is what
23  one of the Seavey's told to you, is that
24  correct?
25  A   **That's correct.**
LEX REPORTING SERVICE
800-608-6085

Dawley

153

2  Q   All we know about the facts is
3  that Dalton's name was put on their account,
4  is that correct?
5  A   That's correct.
6  Q   John Edmonds has no part of
7  Dalton, is that correct?
8  A   No, he does not own Dalton.
9  Q   Is it not a fact that under the
10 terms of the management contract --
11         MR. TRAUB:  Which management
12         contract?
13 Q   With the four investments, that
14 front-line manager's costs are to be born by
15 the management company Dalton?
16 A   No.
17 Q   Not by the partnership, is that
18 not a fact?
19 A   No.
20 Q   What is the actuality of that
21 circumstance?
22 A   Well, I mean can you be more
23 specific which circumstances?
24 Q   Well, should the partnership be
25 charged, can the partnership be charged with

LEX REPORTING SERVICE
800-608-6085

Dawley

154

2  central office costs?
3  A   Yes, in some of the partnerships,
4  not all of them.
5  Q   Well, with regard to the four
6  investments that John Edmonds has an interest
7  with the Seavey's.
8  A   Right.
9  Q   Can the salaries of yourself, Ms.
10 Mondesir and the others be given to the
11 partnerships?
12 A   What do you mean given?
13 Q   Should they pay a portion of your
14 salaries?
15        MR. KELLY:  Objection to
16        form.
17 A   DHCR does not pay.  They only what
18 their agreement calls for.  There is nothing
19 over and above that or any calculation or any
20 percentages of the salaries charged to Fifth
21 and 106th Street Associates, which is DHCR.
22 Q   I show you this page Number 8.  I
23 am going to mark this for identification as
24 Plaintiff's Exhibit 6.  It's from the Logan
25 Plaza agreement.  I direct your attention to

LEX REPORTING SERVICE
800-608-6085

Dawley

155

2  Paragraph I, which reads, except as otherwise
3  provided in this agreement all of the agents
4  home office, bookkeeping, clerical and other
5  management payroll and overhead expenses
6  including, but not limited to cost, office
7  supplies, and equipment, postage,
8  transportation for managerial personnel and
9  telephone services will be born by the agents
10 out of his own funds and will not be treated
11 as project expenses.
12        I show you this document and ask
13 you if you recognize it and then your counsel
14 has an objection.
15        MR. TRAUB:  I would like to
16        mark the entire agreement not
17        just this one page, especially
18        because it says here except as
19        otherwise provided in this
20        agreement.  I would like the full
21        agreement on the record since
22        this is something else that
23        appears to be relevant.
24        MR. KELLY:  I join in that
25        request.

LEX REPORTING SERVICE
800-608-6085

Dawley

156

2        MR. HAYWOODE:  At this
3        point, pursuant to counsel's
4        objection, I am go to ask the
5        court reporter to mark this as
6        Plaintiff's Exhibit 6.
7        We are marking the entire
8        housing management agreement of
9        January 3, 2000 with Logan Plaza
10       Associates as Plaintiff's Exhibit
11       6.
12        (The entire Logan Plaza
13        housing agreement of
14        1/2/2000 was marked as
15        Plaintiff's Exhibit 6, for
16        identification, as of this
17        date.)
18 Q   Now, with regard to Exhibit 6,
19 Page 8, we just read.
20 A   I didn't read it, but that's okay.
21 Q   I am going to leave it here for
22 you to look at Page 8 and I'm going to take
23 out for the time being Page 5.  Just go down
24 two if you will, sir, and get to Page 8 so you
25 can read it.

LEX REPORTING SERVICE
800-608-6085

Dawley

157

2  A  Just the one paragraph?
3  Q  Yes, that is just the one that's
4  darkened.
5  Now, with regard to Page 8 the
6  part that we directed your attention to?
7  A  Right.
8  Q  That doesn't suggest that the
9  project would share in the expenses of the
10  central office personnel, does it?  And yes or
11  no might get along more quickly, but if there
12  is an answer for it.
13  **A  This is a two part agreement that**
14  **speaks to the management fee.  This was -- HUD**
15  **regulation and calculation applies to all**
16  **three of the projects, Church, Charles and**
17  **Logan.  It does not apply to Lakeview or Fifth**
18  **and 106th because they are regulated by DHCR.**
19  **On HUD regulations you're allowed to charge as**
20  **a management fee $44.00 per unit per-month.**
21  **You're also allowed to charge what's referred**
22  **to as front-line expenditures.  Calculation of**
23  **the front-line expenditures is very specific.**
24  **We've been audited on the front-line**
25  **expenditures by both DHCR, HUD and HDC.**

LEX REPORTING SERVICE
800-608-6085

---

Dawley

158

2  **James Tefuro from HDC was the**
3  **first one that came in.  I went through it**
4  **with him personally how to make the**
5  **calculations so they would be acceptable to**
6  **the agencies.  His instructions were that you**
7  **took your salary of people that were involved**
8  **in the management of the companies and you**
9  **would divide them by the number of units that**
10  **you managed.  You would also take certain**
11  **expenditures that would be allowed to go in as**
12  **a expense and you would allocate those by the**
13  **number of units in each property.  Those**
14  **expenses are in addition to salary which is**
15  **one item, payroll taxes, office expenses, ten**
16  **percent of telephone and medical expenses.**
17  Q  Would you spell for the record the
18  name of this gentleman who told you this from
19  DHCR?
20  A  T-E-F-U-R-O.
21  Q  Is he still employed at DHCR?
22  A  Yes.
23  Q  When did he tell you this?
24  **A  Just after we took it over in**
25  **2000.  He was the first one that came in to**

LEX REPORTING SERVICE
800-608-6085

---

Dawley

159

2  look at our books and look at every check we
3  wrote.  We have continued to use that same
4  procedure for the last eight plus years, at
5  which time we have been audited by all the
6  agencies numerous times without any question
7  that these were improper or improperly
8  calculated.  We've continued to use the same
9  procedures for the last eight years, which is
10  in line with this agreement.
11  Q  Do you see on Page 5 in Paragraph
12  13-B, anything which would support the policy
13  that you say Mr. Tefuro told you was
14  acceptable?
15  MR. TRAUB:  Objection to
16  form.
17  A  Let's read it.
18  The owner will reimburse the
19  agent, which is Dalton Management for
20  compensation including fringe benefits,
21  payroll taxes, medical expenses, payable to
22  front-line management employees such as
23  project manager.  Our project managers in the
24  field, clerical and bookkeeping personnel,
25  accounts payable, our compliance officer, our

LEX REPORTING SERVICE
800-608-6085

---

Dawley

160

2  payroll clerk, our assistant controller and
3  myself all fall under that category.
4  Maintenance employees, we didn't have
5  in-resident superintendents.  We don't have
6  any social service directors.  We don't have
7  any for all state, local and federal taxes,
8  payroll taxes including, but not limited to
9  social security taxes, employment insurance
10  and workman's compensation insurance, all of
11  which are included in front-line incident to
12  the employment of such personnel, the people I
13  so mentioned.  Such reimbursements will be
14  paid out of the rental agency account and will
15  be treated as project expenses.  For this
16  purpose the rental value of any dwelling unit
17  furnished rent free for the resident
18  superintendent will not be considered a part
19  of their compensation, but will be treated as
20  a project expense, which we don't have that
21  problem, because we don't have a
22  superintendent on our payroll.  He's on the
23  building payroll.
24  MR. HAYWOODE:  Sir, I move
25  to strike so much of that answer

LEX REPORTING SERVICE
800-608-6085

Dawley

161

1
2    which is not responsive to the
3    question.
4    **Q**   Did you say that the paragraph on
5    Page 5 it supports the policy that you just
6    described or does it not?
7    **A   Supports it.**
8    **Q**   It supports it?
9    **A   Supports it.**
10    **Q**   In your interpretation?
11    **A   Yes.**
12    **Q**   You say that front-line personnel
13    such as the superintendent, who's mentioned on
14    Page 5, and the social worker, you say that
15    those people are in the category of persons
16    who would be in the central office?
17    **A   No.**
18        MR. TRAUB:  Objection.
19    **A   I said those people we don't**
20    **consider, because we don't employ a**
21    **superintendent on Dalton payroll.  We don't**
22    **employee a social services director on the**
23    **building payroll.  In fact, we don't employ a**
24    **social services director any place.  The**
25    **superintendent is in each building and is**

LEX REPORTING SERVICE
800-608-6085

---

Dawley

162

1
2    **under a union contract with 32BJ and is paid**
3    **under that union contract by the building**
4    **directly.**
5    **Q**   So you maintain that the authority
6    or the system that Mr. Tefuro told you about
7    exists in that in that passage of Page 5,
8    which is the item --
9        MR. TRAUB:  13-B.
10    **Q**   13-B you say that's the authority
11    for you doing this?
12    **A   Yes.**
13    **Q**   Now, it appears that agreement you
14    just read, given your interpretation and the
15    differences between Page 8 and Page 5, seem to
16    suggest some dissonance, some disparity, does
17    it not?
18        MR. TRAUB:  Objection to
19    form.
20        MR. KELLY:  Objection to
21    form.
22        MR. TRAUB:  Calls for a
23    legal conclusion.
24        MR. HAYWOODE:  No, it calls
25    for an opinion by a person who's

LEX REPORTING SERVICE
800-608-6085

---

Dawley

163

1
2    in building management.
3        MR. TRAUB:  I don't need you
4    to argue with my objection.
5        MR. HAYWOODE:  You know,
6    Darren --
7        MR. TRAUB:  Here you go
8    again.
9        MR. HAYWOODE:  You're making
10    them though.  I am answering
11    them.  None of us should be
12    speaking.  Just say I object.
13        MR. TRAUB:  I do and then
14    you want to respond to me again.
15        MR. HAYWOODE:  But then you
16    gave a reason.  You don't need to
17    elaborate.
18    **Q**   In your opinion, sir, you say
19    you're not a lawyer.  I am not an accountant.
20    I'm not a fighter pilot.  You know, I make
21    common sense judgements.  I can't evening
22    advise anybody as to the law.  I can advise
23    them, but you know.
24    **A   On Page 8, Item 5 it starts off --**
25    **Exhibit says except as otherwise provided in**

LEX REPORTING SERVICE
800-608-6085

---

Dawley

164

1
2    **this agreement.**
3    **Q**   Okay.
4    **A   The except as otherwise provided**
5    **in this agreement means to me that the --**
6    **Q**   Page 5.
7    **A   I am looking at that item 13-B is**
8    **the except as otherwise provided.**
9    **Q**   Okay.
10        MR. HAYWOODE:  I am going to
11    ask the reporter to mark this
12    document as Plaintiff's Exhibit
13    7, which is the retainer
14    agreement for auditing services
15    from Marks, Paneth & Shron with
16    Fifth and 106th Street
17    Corporation, which would be
18    Plaintiff's Exhibit 7.
19        (A retainer agreement for
20    auditing services from
21    Marks, Paneth & Shron was
22    marked as Plaintiff's
23    Exhibit 7, for
24    identification, as of this
25    date.)

LEX REPORTING SERVICE
800-608-6085

Dawley

165

2      MR. KELLY:  Can we have a
3  year on it?
4      THE WITNESS:  December 31,
5  2004.  This is 2004.
6      Q    Sir, that's basically the
7  agreement that was made by Marks, Paneth &
8  Shron in 2004 which would have been issued in
9  2005.  That's the agreement --
10     MR. TRAUB:  For which
11 company?
12     MR. HAYWOODE:  Marks, Paneth
13 & Shron.
14     MR. TRAUB:  And who?
15     MR. HAYWOODE:  Fifth and
16 106th Street Associates.
17     MR. KELLY:  I will object to
18 form.
19     Q    Has that agreement changed
20 basically for 2006 or is it pretty much the
21 same?
22     A    I have no idea.
23     Q    I direct your attention to Page 2,
24 the second part of Paragraph three and ask you
25 to read it and tell me what it says?

Dawley

166

2      A    Second paragraph says, we will
3  immediately notify DHCR in writing of any
4  indication of noncompliance, legal acts or
5  irregularities with respect to the operation
6  of this housing company.  Further, we will
7  provide DHCR with copies of any correspondence
8  issued concerning any errors or significant
9  deficiencies or failures in the design or
10 operation of the internal control structure.
11 Written notification to DHCR will also be made
12 of oral communication to the company or its
13 representative concerning any of these
14 matters.  However, notification of DHCR need
15 not be made for matters clearly
16 inconsequential to the sound financial
17 operation of the housing company.
18     Q    I just want to briefly direct your
19 attention again to the $181,000.00.
20     The discussion that you had with
21 one of the Seavey's about it first, did you
22 feel yourself bound by this obligation of
23 Marks, Paneth & Shron?
24     A    Well, this is --
25     MR. KELLY:  Objection to

Dawley

167

2      form.
3      A    This is for Fifth and 106th Street
4  Associates and the $180,000 at issue is on
5  Logan Plaza.
6      Q    But DHCR is concerned with Logan
7  Plaza also, is it not?
8      A    No.
9      Q    In no way?
10     A    No.
11     Q    So that it's your position then
12 that the problem of $181,000.00, since it was
13 in Logan Plaza and not in Fifth and 106th
14 Street, should not be touched by the purview
15 or the pale of this agreement?
16     MR. TRAUB:  Objection to the
17 form.
18     MR. KELLY:  Join.
19     A    Well, this agreement is a retainer
20 agreement for Fifth and 106th Street
21 Associates not Logan Plaza.
22     Q    You say that nothing that is said
23 here, ought to apply to anything that has to
24 do with Logan Plaza in your interpretation;
25 that is your position?

Dawley

168

2      A    You would have a separate
3  agreement for Logan Plaza.
4      Q    You did not see it as your duty to
5  report what you knew about the $181,000.00 to
6  DHCR or any other regulatory agency, is that
7  correct?
8      MR. TRAUB:  Objection to the
9  form.
10     MR. KELLY:  Objection to
11 form.
12     A    No.
13     Q    So far as you know, Mr. Jennings
14 did not report that incident or his knowledge
15 of it to DHCR or any of the other regulatory
16 agencies?
17     MR. TRAUB:  Objection to
18 form.
19     MR. KELLY:  Join.
20     A    I don't know what he reported to
21 them.
22     Q    You never requested that he do so?
23     MR. TRAUB:  Objection to the
24 form.
25     MR. KELLY:  Objection to the

Dawley

169

1
2          form.
3     A     **No.**
4          MR. HAYWOODE:  Let me refer
you now and look at a document
which was Exhibit 12 at the
7     deposition of February 3rd and
8     ask that it be marked as
9     Plaintiff's Exhibit 8.
10          (Two sets of requests was
11          marked as Plaintiff's
12          Exhibit 8, for
13          identification, as of this
14          date.)
15     Q     I am going to direct your
16 attention, sir, to some of these questions
17 that were raised previously on discovery.
18          Isn't it a fact that almost all
19 the negotiations between Cameron, Pryce &
20 Griffiths with Dalton were conducted with you
21 and not with Mondesir or Alonzo or the other
22 people, isn't that the fact?
23          MR. KELLY:  Objection to
24     form.
25          MR. TRAUB:  Objection to

Dawley

170

1
2          form.
3          Can you clarify
4          negotiations?
5     Q     All their requests were with you
6 and not the others?
7          MR. TRAUB:  During the six
8          month audit and then their
9          requests?
10     Q     Between March and up until today,
11 isn't it true that all of that was with you?
12     A     **Most of them, most of them.**
13     Q     So is it fair to say that almost
14 all the inquiries that they made came to you?
15          MR. TRAUB:  Objection to the
16          form.
17     A     **I would think so.**
18     Q     Do you recall an inquiry
19 concerning a security payroll contract of
20 $100,368.00 paid in 2006 under account number
21 6530.  Do you recall this inquiry in the
22 support for the security payroll contract of
23 $100,000.00; do you recall that request at
24 all?
25          MR. TRAUB:  Objection to

Dawley

171

1
2          form.
3          Which building?
4     A     **Which building?**
5     Q     Let's see, was this Charles Hill
6 or Church Home?
7          You don't recall it?
8     A     **No.**
9     Q     Is there a security company,
10 functioning at one of the four investments,
11 that's functioning without a contract?
12     A     **Yes.**
13     Q     Which development is that?
14     A     **Lakeview doesn't have a contract.**
15 **I believe it has expired.**
16     Q     Do any of the other building not
17 have a contract?
18     A     **I'm not sure.**
19     Q     The security company at Lakeview,
20 is there a licensed watch guard agency
21 company?
22     A     **As far as I know.**
23     Q     What is the name of it, sir?
24     A     **Howard Security.**
25     Q     Howard?

Dawley

172

1
2     A     **Howard.**
3     Q     Who is the director of it, if you
4 know?
5     A     **I don't know.**
6     Q     Did they obtain this situation by
7 bid?
8     A     **Originally they did.**
9          **It was bid under DHCR rules.  It**
10 **was advertised.  It was approved and they had**
11 **a five year contract.**
12     Q     The five years has expired?
13     A     **Yes.**
14     Q     Is there some reason that the
15 contract is not renewed?
16     A     **The building was in negotiations**
17 **to buy out the program.  They had a tentative**
18 **offer to sell it and the new owner didn't want**
19 **to have us signing a new five year contract so**
20 **we didn't.**
21     Q     You had mentioned Seavey buildings
22 operating with security companies that don't
23 have contracts?
24     A     **I am not sure.**
25     Q     Is that information you can check

Dawley

173

2 and then supply to us when the transcript is
3 returned to you?
4      MR. TRAUB:  If you can put a
5      request in writing to a letter we
6      will take it under advisement at
7      this time.
8      MR. HAYWOODE:  I put it here
9      on the record and ask that a
10     space be left for the production
11     of such information if you're of
12     mind to produce it at that time.
13     MR. TRAUB:  I am not going
14     to have the burden of reading
15     through the record to figure out
16     what it is that you want, so
17     again if at the end of this you
18     want certain documents you can
19     put it in a letter to us and we
20     will take it under advisement
21     that way.
22     MR. HAYWOODE:  Well, I would
23     ask that in reading the
24     transcript that you provide it,
25     but whatever.

LEX REPORTING SERVICE
800-608-6085

---

Dawley

174

2      MR. TRAUB:  I made my
3      request on the record.
4 (INSERT):
5      Q    Did it come to your attention a
6 request concerning a workers compensation
7 policy, which had a bill for $12,476.03 which
8 recited a payment of $12,476.03 whereas the
9 actual bill for the policy was $9,084.60.
10     Do you recall Cameron, Pryce &
11 Griffiths raising this question with you?
12     A    No, I don't.
13     Q    Did you at any time discuss with
14 counsel or anyone else, the discovery requests
15 that were made in this action before Judge
16 Baer?
17     MR. TRAUB:  Objection to the
18     form as it asks for
19     attorney/client privilege
20     information, so I am going to
21     instruct the witness to the
22     extent that your answer calls for
23     conversations you had with legal
24     counsel or made at the request of
25     legal counsel you don't answer

LEX REPORTING SERVICE
800-608-6085

---

Dawley

175

2      that question?
3      MR. HAYWOODE:  I don't want
4      to know anything that counsel
5      said to you or you said to
6      counsel.  I just want to know if
7      anyone discussed with you the
8      fact that these discovery
9      requests were made?
10     MR. TRAUB:  You're saying
11     other than counsel?
12     Q    Just a minute, if anyone discussed
13 with you, anyone, that discovery requests were
14 made both before Judge Baer and Magistrate
15 Francis concerning this information?  Did
16 anyone discuss that with you before you came
17 here today?
18     MR. TRAUB:  Again I am
19     objecting to the form.  That's
20     not proper and again to the
21     extent that your response would
22     be response with counsel then
23     you're not to answer that
24     question even whether or not we
25     had the conversation.

LEX REPORTING SERVICE
800-608-6085

---

Dawley

176

2      Q    Did anyone discuss with you our
3 discovery demands and the fact that we were
4 looking for support for the claim that
5 $12,476.00 was paid in 2006 when the policy
6 recited $9,000?  No one discussed that with
7 you, no one approached you to get an answer
8 that question?
9      MR. TRAUB:  Objection to the
10     form.
11     A    I don't remember.
12     Q    But if they had asked you that's
13 information that you could get, is it not?
14     A    Yes.
15     Q    Now, let's see with respect to
16 building and liability insurance premiums, did
17 it come to your attention that there was an
18 inquiry concerning whether any excess
19 insurance premium payments were returned and
20 that they wanted to know the names of the
21 brokers involved and to get checks and face
22 sheets of policies which allege prepayments
23 were made, did that inquiry come to your
24 attention at any time?
25     A    I don't recall, but if they had

LEX REPORTING SERVICE
800-608-6085

Dawley

177

asked for any of that information --

Q   You could have supplied it?

A   It would have been easily provided at the site.  I mean at our office.

Q   Further, it's the allegation that the general ledger entries are not consistent with the document produced in response to that particular request.

Did that come to your attention at any time?

MR. TRAUB:  Objection to the form.

MR. KELLY:  Join.

A   I don't think the question makes sense as asked, no.

Q   You never heard that?

A   Well, I don't know what you're referring to.  I mean it doesn't make sense.

Q   The statement that the general ledger entries were not consistent with documents produced, concerning the building and liability insurance company policies, that was never brought to your attention?

A   That doesn't make sense, because

LEX REPORTING SERVICE
800-608-6085

---

Dawley

178

the entries that we have for any payments we had invoices for so I don't know what -- it doesn't make sense.

Q   There was a claim that a utility deposit was paid for $4,205.00.  Now, all of this coming from the same document and cancelled checks were requested and not produced.

Did that inquiry ever come to your attention?

MR. TRAUB:  Objection to form.

MR. KELLY:  Objection to form.

A   Well, first if there was payment made for any item there is the cancelled check for it or it wasn't paid.

Q   But no one ever said to you that either Cameron, Pryce & Griffiths or Mel Haywoode were looking for this document and had taken the trouble to go to Judge Baer and print it out and to say so and to submit it again to Judge Francis and to say so, no one ever say that to you?

LEX REPORTING SERVICE
800-608-6085

---

Dawley

179

MR. TRAUB:  Objection to form.

Q   Had it ever come to your attention that one of the representations made before Judge Baer was, "Well, that's information you will get on a deposition?  Did that come to your attention that had been said?

MR. KELLY:  Objection to form.

MR. TRAUB:  Again objection to form.

A   No.

Q   Yet no one ever talked to you about any of these requests?

A   No.

MR. KELLY:  Objection to form.

MR. TRAUB:  Objection to form.

A   Not that I remember, no.

MR. TRAUB:  Mel, you were pointing up and down at the request.  I just want to state Exhibit 8, which previously was

LEX REPORTING SERVICE
800-608-6085

---

Dawley

180

Exhibit 12 at the last deposition, contains two sets of requests.  The first set that was actually produced and then Exhibit 12 contains items in brackets that expound on the first request.  I just want to clarify whether or not you're talking about the actual request number or the requests that are in brackets?

MR. HAYWOODE:  I am talking about the requests that are in brackets, because the documents in the notice to produce in interrogatories, a failure to respond was served on all parties and was produced to Judge Baer and was produced to Magistrate Francis in consideration.  I'm talking about the document in the form that it presently exists in.

MR. TRAUB:  I just want to state on the record, that

LEX REPORTING SERVICE
800-608-6085

Dawley

181

2  Magistrate Francis's order does
3  not rule one way or the other if
4  you made a request on that and
5  Judge Baer, his instructions were
6  to the extent that you believe
7  there was something that was not
8  fully responded to, to put it in
9  a letter to Judge Baer, which is
10 what that form was for him to
11 take under advisement and we have
12 not received a ruling on the
13 court on that either. Those do
14 not constitute, at least in my
15 opinion, discovery requests on
16 the defendants in this matter,
17 the stuff that are in the
18 brackets.
19    MR. HAYWOODE: But now for
20 the record, Darren, you said to
21 me that this is information which
22 can be produced on deposition.
23 So that I presumed that there is
24 another witness coming from
25 Dalton -- just a minute, who will

Dawley

182

2  respond to the questions that we
3  had at some point.
4     MR. TRAUB: Can I see
5  Exhibit Number 8 real quick?
6     MR. HAYWOODE: (Handing.)
7     MR. TRAUB: For instance, my
8  comments some of this stuff could
9  be obtained in deposition. For
10 instance, in response to Number 5
11 you have in brackets, were there
12 any excess returns? What are the
13 names of the brokers involved?
14 The general ledger entries are
15 not consistent with documents
16 produced in response to this
17 request.
18    The point of my comments,
19 you can get this stuff on
20 deposition, was what are the
21 names of the broker involved, do
22 you remember? Why are the
23 general ledgers not consistent?
24 So my point was that you had
25 either received all of the

Dawley

183

2  documents at least from my
3  clients or that your questions
4  appeared to, for instance, this
5  is unclear. Your questions about
6  something being unclear or
7  nothing is produced in
8  explanation. The explanation
9  could be garnered through an
10 appropriate deposition request
11 and as to your request as to
12 whether or not any additional
13 clients of mine will appear for
14 deposition I believe you did
15 notice Phyllis, Bob, Avery, Neale
16 and I have made them available
17 for deposition.
18    MR. HAYWOODE: My point is
19 that I assume that at some point,
20 some of these witnesses are going
21 to be shown these inquiries and
22 told to either respond to them or
23 not. My concern is that we have
24 matters going before Judge
25 Francis talking about deposition

Dawley

184

2  at a time when there doesn't
3  appear to be any indication that
4  any effort was expended by anyone
5  to respond to the questions that
6  we put before both judges.
7     MR. TRAUB: That is my
8  problem. We went over this at
9  the last deposition. Your stuff
10 in brackets is not a discovery
11 request propounded under the
12 federal rules. Your stuff in
13 brackets is in response to Judge
14 Baer's request to you to give to
15 the court what you believe you
16 did not obtain in response to the
17 discovery.
18    MR. HAYWOODE: All right, I
19 am just hearing what you're
20 saying that somewhere, somehow
21 the Court of Darren Traub, which
22 is a formidable court, determined
23 the application and determined
24 that no response should be made
25 to those questions. I am being a

little factitious.

MR. TRAUB: What I received in the mail from you was a discovery request similar to Exhibit 8, except that it did not have the items in brackets and then in response to your statement to Judge Baer that you did not receive any documents Mr. Kelly and I stood up and told Judge Baer that that is not true. We have produced between both of our clients a total of sixteen boxes. That was all the discovery that we had. Then Judge Baer asked you if you contend that you did not get something in response to discovery to please put it in a letter.

MR. HAYWOODE: He said make a motion.

MR. TRAUB: His response at that time in the courtroom was

put it in a letter to him and he will take it under advisement and that is what we have.

MR. HAYWOODE: This document was served on you prior to you going to Judge Baer and it was served on you a second time at the time it was submitted to Magistrate Francis, so that these were served on both counsel in this form indicating these were the additional questions that we had.

MR. TRAUB: But in response to Judge Baer's request for you to show him what you contend you didn't receive that's not additional discovery requests. At least we are not taking it as such. If you want to put them in additional discovery form we will be more than happy to respond to them.

Q    With regard to these questions,

did anyone discuss with you that regarding Lakeview that there is a note payable to Robin Seavey in the amount of $29,915.16 and that Cameron, Pryce & Griffiths had stated that no document or support is given for this loan transaction or why it was necessary given the positive cash flow of that development?

Did that question ever come to your attention?

MR. KELLY: Objection to form.

A    That particular amount I have found out had something to do with a closing or refinancing and that it was monies that were left after they got through taking care of all the different classifications. That's the best I can explain it, because I don't have any documentation for that amount. It's been on books for a long time. I have never adjusted or changed it.

Q    Is the note being re-paid to your knowledge?

A    No, it has not been paid. No money has been paid, no interest has been

accrued. No interest, as far as I know, is even on the note and nothing has happened to it. It's just sitting there.

Q    Would I be correct in presuming that Robert W. Seavey, would have had to have loaned money to Lakeview in order for such a note to generate?

MR. TRAUB: Objection to the form.

MR. KELLY: Join.

A    There is an indication on the books to Rob Seavey in the amount of $29,000 something. To have a payment for that this has to be some type of obligation. Whether that obligation was money he loaned, services he did or a myriad of other things, which I can't even begin to think of, is how it got there. It doesn't necessarily have to be because somebody loaned you the money. It could have been for services rendered.

Q    Would the corporation, to your knowledge, have written a note to Robert Seavey because of service that he rendered?

MR. TRAUB: Objection to

Dawley

189

2  form.
3      MR. KELLY:  Objection.
4  A    I don't know.
5      I am saying it could have come up
6  for a myriad of different reasons.
7      MR. TRAUB:  I don't want you
8  to guess.
9  A    I don't know.
10      MR. TRAUB:  I am entitled to
11  tell the witness not to guess.
12  You know that I am.
13      MR. HAYWOODE:  You can say
14  anything to any witness, tell him
15  anything.  You can tell him don't
16  slide when you're coming into
17  third base too, I don't know, but
18  not during the deposition as I
19  understand it.
20      MR. TRAUB:  I can instruct
21  my witness not to guess and I
22  stand on my objection on the
23  record and if you object -- you
24  can keep laughing at me just like
25  you've been laughing at me all

LEX REPORTING SERVICE
800-608-6085

Dawley

190

2  day.
3      MR. HAYWOODE:  Since I met
4  you I have always said I am
5  impressed by you.  I like you
6  guys.  You're a fine lawyer.  If
7  I'm laughing or something like
8  that, believe me, it's not in any
9  kind of derision of you, because
10  I am most impressed by the
11  quality and the demeanor of all
12  counsel in this action so far.
13  So I am not being derisive.  I am
14  not being critical and I know of
15  no reason why I should be
16  critical of either of you guys.
17  Let's get that straight.
18  Q    The next question the 2006
19  financial statement you had stated $34,000.00
20  was paid to the auditors, Mark Paneth and
21  Shron that fiscal year when in actuality it
22  was $180,000.  We mentioned this and the
23  question was why.  I recall that you indicated
24  that there were other services performed
25  previously, is that correct?

LEX REPORTING SERVICE
800-608-6085

Dawley

191

2  A    I am assuming that they were, yes.
3  Q    I am going to show you again
4  Plaintiff's Exhibit 4 from the examination of
5  February 3rd.
6      (A copy of the general
7      ledger expense sheet was
8      marked as Plaintiff's
9      Exhibit 9, for
10      identification, as of this
11      date.)
12  Q    I direct your attention to Exhibit
13  9.
14      Is that a copy of the general
15  ledger expense sheet done by Dalton
16  Management?
17  A    Yes, it is.
18  Q    Looking at that sheet, sir, does
19  it show the amounts of money paid to Marks,
20  Paneth & Shron in 2006?
21  A    Yes, it does.
22  Q    How much is that?
23  A    Total is $108,525.45.
24  Q    That's the ledger that you
25  generated and submitted to Marks, Paneth &

LEX REPORTING SERVICE
800-608-6085

Dawley

192

2  Shron for their audit, is that correct?
3  A    That would have been, yes.
4  Q    Were there adjustment journal
5  entries made in the final statement, in the
6  financial statement with regard to that money?
7      MR. TRAUB:  Objection to
8      form.
9  A    Without seeing the rest of the
10  financial information I can't tell you.
11      MR. HAYWOODE:  I ask you to
12      mark this as Plaintiff's Exhibit
13      10.
14      (One page of journal entries
15      for the fiscal year ending
16      12/31/2006 was marked as
17      Plaintiff's Exhibit 10, for
18      identification, as of this
19      date.)
20  Q    Would you take a look at
21  Plaintiff's 10 and tell us what that document
22  is.
23  A    This one page of journal entries
24  for the fiscal year ending -- calendar year
25  ending 12/31/2006.

LEX REPORTING SERVICE
800-608-6085

Dawley

193

```
 2    Q    Who is the document generated by?
 3    A    Which one?
 4    Q    Ten.
      A    That's the adjusting journal
      entries. They were done by Marks, Paneth &
 7    Shron.
 8    Q    I want you to compare the general
 9    leger recommendations from Dalton, which
10    listed the accounting fees paid to Marks,
11    Paneth & Shron as $108,000.00 and compare the
12    figure that's contained in the financial
13    statement generated by Marks, Paneth & Shron
14    as to what they received?
15             MR. KELLY:  Objection to
16       form.
17    A    This isn't all the journal
18    entries.  I don't know if there were anymore
19    journal entries that were made in addition to
20    this one, but there is one journal entry that
21    reclassified fees $82,909.00 from account 6220
22    to account 6204.
23    Q    What is account 6204?
24    A    Management consulting.
25    Q    It's fair to say that what you
```

LEX REPORTING SERVICE
800-608-6085

Dawley

194

```
 2    just told me is that a journal entry
 3    adjustment was made, which put at least
 4    $82,000.00 of this money into another
 5    category, is that correct?
 6             MR. TRAUB:  Objection to
 7       form.
 8             MR. KELLY:  Objection to
 9       form.
10    A    It reclassified $82,909.00 from
11    accounting to management consultant.
12    Q    On Exhibit 10 does it list what
13    was paid to Marks, Paneth & Shron as auditing
14    fees?
15    A    No.
16    Q    So that no where on Exhibit 10
17    does it show that Marks, Paneth & Shron
18    received auditing fees?
19    A    Exhibit 10 is a journal entry.  It
20    says here journal entry number 8.
21    Q    I am sorry, when you say it is
22    journal entry number 8 what are you
23    indicating, sir?
24    A    This is journal entry number 8.
25    This is part of journal entry number 8 that
```

LEX REPORTING SERVICE
800-608-6085

Dawley

195

```
 2    you told me to recite and I don't know what
 3    else you want to know.
 4    Q    In the financial statement, is
 5    there any comments in there which mention the
 6    $34,000.00?
 7             MR. KELLY:  Objection to
 8       form.
 9    A    Well, you said financial
10    statement?
11    Q    Yes, is there any?
12    A    These aren't financial statements.
13             MR. TRAUB:  This item being
14       Exhibit 10.
15    A    There is nothing here that shows
16    what the audit fee is.
17    Q    Would that be shown someplace
18    else?
19    A    Well, this is the total cash
20    disbursements that were made.
21    Q    That's in the general ledger?
22             MR. TRAUB:  For the record,
23       you're pointing at Exhibit 9 now?
24             MR. HAYWOODE:  Indicating
25       Exhibit 9.
```

LEX REPORTING SERVICE
800-608-6085

Dawley

196

```
 2    Q    Is it fair to say that Dalton said
 3    that Marks, Paneth & Shron got $108,000.00 in
 4    2006 and that Marks, Paneth & Shron did a
 5    journal adjustment to say something else?
 6             MR. KELLY:  Objection to
 7       form.
 8             MR. TRAUB:  Objection to
 9       form.
10    Would that be fair to say.
11    A    What the entry does is it
12    reclassified.
13    Q    $82,000.00?
14    A    Right.
15    Q    What does it do with the remaining
16    $34,000.00, if anything?
17    A    If you read the captions on the
18    general ledger under the caption accounting
19    you will see that expenditures were for tax
20    analysis, tax preparation, IRS tax examination
21    and then I have to various, which I'd have to
22    look at invoice to see what they were for.
23    Q    How much money is covered by the
24    various?
25    A    About $24,000.00.
```

LEX REPORTING SERVICE
800-608-6085

Dawley

197

2    **Q**    There was a closing that took
3  place in 2004 and a sum of $322,000.00 was
4  transferred from Church Homes, as I recall, to
5  account number 2.
6    **A**    **Wait, wait, wait I am confused.**
7    **Q**    Do you have any recollection of
8  that?
9    **A**    **Wait, wait, this is this is Fifth**
10  **and 106th.**
11    **Q**    Okay.
12    **A**    **You're done with this?**
13    **Q**    Yes.
14    This $82,000.00 what is the
15  historiography or the anthropology if you will
16  of that money, where did it come from?
17    **A**    **Wait, wait.**
18    **Q**    This $82,000.00 consultant fees
19  and what else; various and what else?
20        MR. TRAUB:  Objection to the
21    form.
22        MR. KELLY:  Join.
23    **A**    **It says IRS tax examination, tax**
24  **preparation and tax analysis.**
25    **Q**    Does it say when those services

LEX REPORTING SERVICE
800-608-6085

---

Dawley

198

2  were provided?
3    **A**    **The tax analysis was for years**
4  **2001 to 2004.  Tax preparation was 2003 and**
5  **the IRS tax examination doesn't have a year.**
6  **We'd have to look at the specific invoices.**
7    **Q**    There is no chance that the tax
8  analysis referred to in that money, could have
9  been performed by Grenadier Management or
10  Marion Scott or anybody else, is there?
11    **A**    **Probably not.**
12    **Not the New York Yankees or the**
13  **Boston Red Sox or Edmonds.**
14    **Q**    Touché?
15        MR. HAYWOODE:  Please mark
16    this as Plaintiff's Exhibit 11.
17        (An annual financial
18        statement was marked as
19        Plaintiff's Exhibit 11, for
20        identification, as of this
21        date.)
22    **Q**    I am going to ask you, sir, if you
23  recognize what that document is?
24    **A**    **Let's see it's Page 26 to 27.  It**
25  **appears to be the annual financial**

LEX REPORTING SERVICE
800-608-6085

---

Dawley

199

2  statement, but I can't tell what year.
3    **Q**    Who is it generated by?
4    **A**    **This is generated by the Marks,**
5  **Paneth & Shron.**
6    **Q**    Is it fair to say that document
7  suggests that the total value or amount of
8  money that was paid to Marks, Paneth & Shron
9  in 2006?
10        MR. TRAUB:  Objection to
11    form.
12    **Q**    It says Marks, Paneth & Shron,
13  LLP.  It says retainer and then under the
14  classification of accounting it says
15  $34,155.00.
16    Was that document produced for
17  DHCR?
18    **A**    **Yes.**
19    **Q**    Does HUD get involved in any way
20  in that document?
21    **A**    **I don't think HUD gets a copy.**
22  **They might get one.  We send them to about**
23  **four or five different agencies.**
24    **Q**    How do you send it?
25    **A**    **By mail.**

LEX REPORTING SERVICE
800-608-6085

---

Dawley

200

2    **Q**    You do that in all instances, is
3  that correct?
4    **A**    **Yes.**
5    **Q**    Is there a reason why that form
6  doesn't include the other $82,000.00
7  consultant fees?
8        MR. KELLY:  Objection to
9    form.
10    **A**    **The reason why it doesn't?**
11    **Q**    Yes.
12    **A**    **I have no -- no, I don't know.  I**
13  **have no idea.**
14    **Q**    Who made the determination to
15  reduce the amount of monies reported in
16  Dalton's general ledger as $108,000.00 to
17  $34,000.00 in the financial statement, who
18  made that determination?
19        MR. TRAUB:  Objection to the
20    form.
21        MR. KELLY:  Objection to
22    form.
23    **A**    **The journal entry that you pointed**
24  **out in Exhibit 10, which we classified**
25  **$82,000.00, was produced by Marks, Paneth &**

LEX REPORTING SERVICE
800-608-6085