UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
JOHN L. EDMONDS, INDIVIDUALLY AND AS A MANAGING
GENERAL PARTNER OF FIFTH AND 106TH STREET HOUSING
COMPANY, INC., LOGAN PLAZA ASSOCIATES, LP,
CHARLES H. ASSOCIATES a/k/a CHARLES H. HILL
ASSOCIATES, LP AND AS A LIMITED PARTNER
OF CHURCH HOME ASSOCIATES, LP,
                              Plaintiffs;

     -against-

ROBERT W. SEAVEY, INDIVIDUALLY AND AS A GENERAL
PARTNER OF FIFTH AND 106TH STREET ASSOCIATES, LP,
LOGAN PLAZA ASSOCIATES, LP, CHARLES HILL ASSOCIATES,
CHARLES HILL ASSOCIATES, LP AND AS A LIMITED PARTNER
OF CHURCH HOME ASSOCIATES, LP; PHYLLIS M. SEAVEY
INDIVIDUALLY AND AS OWNER, MANAGER AND MEMBER OF
DALTON MANAGEMENT COMPANY LLC; AVERY B. SEAVEY,
INDIVIDUALLY AND AS A GENERAL PARTNER OF LOGAN PLAZA
ASSOCIATES, LP, CHURCH HOME ASSOCIATES AND OWNER OF
DALTON MANAGEMENT COMPANY, LLC; NEALE B. SEAVEY,
INDIVIDUALLY AND AS OWNER, MANAGER AND MEMBER OF
DALTON MANAGEMENT COMPANY, LLC; AND RONALD DAWLEY
AS CHIEF EXECUTIVE OFFICER OF DALTON MANAGEMENT
COMPANY, LLC; DALTON MANAGEMENT COMPANY, LLC, THE
SEAVEY ORGANIZATION, and MARKS PANETH & SHRON,
Auditors,
                              Defendants.
- - - - - - - - - - - - - - - - - -x
                    71 Maple Street
                    Brooklyn, New York

WILLIAM H. JENNINGS

                    February 3, 2008
                    10:31 a.m.

DEPOSITION of MARKS PANETH & SHRON, a Defendant
in the above-entitled action, by WILLIAM H.
JENNINGS, held at the above time and place, pursuant
to Order, taken before Sima D. Losey, a reporter and
Notary Public within and for the State of New York.

3

A p p e a r a n c e s :

M. DOUGLAS HAYWOODE, ESQ.
     Attorney for Plaintiffs
     71 Maple Street
     Brooklyn, New York 11225

HERRICK, FEINSTEIN, LLP
     Attorneys for Defendants
     2 Park Avenue
     New York, New York 10016
BY: M. DARREN TRAUB, ESQ.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
     Attorneys for Defendants
     MARKS PANETH & SHRON
     3 Gannett Drive
     White Plains, New York 10604
BY: WILLIAM J. KELLY, ESQ.

ALSO PRESENT:

     Orley Cameron
     Sandra Griffiths
     Adam Pryce
     John Edmonds

4

1
2              S T I P U L A T I O N S
3        IT IS HEREBY STIPULATED AND AGREED by and
4   between the attorneys for the respective
5   parties herein, that filing, sealing and
6   certification be and the same are hereby
7   waived.
8
9        IT IS FURTHER STIPULATED AND AGREED that
10  all objections, except as to the form of the
11  question shall be reserved to the time of the
12  trial.
13
14       IT IS FURTHER STIPULATED AND AGREED that
15  the within deposition may be signed and sworn
16  to before any officer authorized to administer
17  an oath, with the same force and effect as if
18  signed and sworn to before the Court.
19
20
21
22
23
24
25
26

```
                                          5
 1
 2   W I L L I A M   H   J E N N I N G S, the
 3        witness herein, having first been
 4        duly sworn by a Notary Public of the
 5        State of New York, was examined and
 6        testified as follows:
 7   EXAMINATION BY
 8   MR. HAYWOODE:
 9        Q    State your name for the record,
10   please.
11        A    William H. Jennings.
12        Q    State your address for the
13   record, please.
14        A    7 Enfield Lane, Hauppauge, New
15   York 11788.
16        Q    Mr. Jennings, you've been deposed
17   previously?
18        A    For?
19        Q    For any matter.
20        A    Yes.
21        Q    So then you understand that I'm
22   going to put questions to you, you'll
23   listen to the question and then make
24   your response.
25             If your counsel has an objection
```

LEX REPORTING SERVICE
800-608-6085

```
                   W. H. Jennings          6
 1
 2   he will state it for the record.
 3   Functioning under new rules restrains
 4   all the lawyers and I believe with rare
 5   exceptions most questions you have to
 6   respond to and the lawyers have to deal
 7   with it later.
 8             If there's something that I say
 9   that you don't understand, say so and
10   we'll try to get your response with as
11   much fidelity as we possibly can.
12        Q    All right, now, sir, you are
13   employed by Marks Paneth & Shron?
14        A    Yes.
15        Q    When did you first become
16   employed by them?
17        A    October of 1979.
18        Q    In what capacity did you join the
19   firm?
20        A    Entry-level.
21        Q    As an entry-level person what
22   were your duties then?
23        A    Whatever I was delegated.
24        Q    Generally, what were you
25   delegated?
```

LEX REPORTING SERVICE
800-608-6085

```
                   W. H. Jennings          7
 1
 2        A    Bank reconciliations, basic work
 3   as an entry-level.  I was more in a
 4   training stage.
 5        Q    What position do you hold with
 6   Marks Paneth & Shron now?
 7        A    Partner.
 8        Q    How many partners are there?
 9        A    I believe there's sixty.
10        Q    As a partner, sir, what is your
11   duty or responsibility in the firm?
12        A    I have a book of business and my
13   responsibility is to review tax returns,
14   financial statements before they're
15   issued.
16        Q    The partners in the firm, the
17   primary partners, let's see, Marks, Mr.
18   Marks, what is the first name?
19        A    George Marks.
20        Q    How long has he been a partner in
21   the firm?
22        A    I believe he may be deceased.
23        Q    You believe that?
24        A    Yes.
25        Q    Not to make light of it but news
```

LEX REPORTING SERVICE
800-608-6085

```
                   W. H. Jennings          8
 1
 2   travels slowly.
 3        A    He wasn't there when I started.
 4        Q    When you started he wasn't there,
 5   okay.
 6             And Paneth?
 7        A    Don't know anything about him.
 8        Q    Know nothing of him?
 9        A    He's not with the firm now.
10        Q    But his name is there?
11        A    Yes.
12        Q    And Mr. Shron?
13        A    Passed away two weeks ago.
14        Q    Did he?
15        A    Yes.
16        Q    Oh, and that's William Shron?
17        A    Correct.
18        Q    When did the firm, if you know,
19   become Marks Paneth & Shron?
20        A    January 1, 2000.
21        Q    And prior to that day who were
22   you working for?
23        A    Marks Shron and Company.
24        Q    When did Marks and Shron join
25   together, if you know?
```

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings                     9

2  A   I don't know.

3  Q   Do you have any information which
4  you might speculate as to?

5  A   I think it was in the 40s.

6  Q   So to your knowledge Marks and
7  Shron have functioned together possibly
8  from the 40s?

9  A   That's correct.

10  Q   Did there come a time when the
11  accounts for the four buildings that
12  we're concerned with, Caanan, Charles
13  Hill, Logan and Fifth and 106th Street,
14  did there come a time when those
15  accounts came to the firm?

16  A   Yes, absolutely.

17  Q   When, if you recall, was that?

18  A   Charles H. Housing was, I
19  believe, 1984.

20  Q   Who brought that account to the
21  firm?

22  A   Arthur Goldman.

23  Q   And he is a partner?

24  A   He's deceased.

25  Q   Was he a partner in life?

---

W. H. Jennings                     10

2  A   Yes.

3  Q   And as to Logan and the others?

4  A   Logan Plaza, I'm not sure the
5  date on Logan Plaza. I'm not sure.

6  Q   To the best of your recollection.

7  A   I know that was a later job.
8  Logan came in after Charles H. so maybe
9  '91.

10  Q   And Church Homes?

11  A   Church Homes came through another
12  accounting firm.

13  Q   Do you recall the name of that
14  firm?

15  A   No, I don't.

16  Q   Approximately when was that?

17  A   That was probably around 1990.

18  Q   Now, did that firm dissolve or
19  something and transfer the account or
20  did someone simply recruit the account
21  from that firm?

22  A   I believe it was recruited. I
23  can't speak on behalf of the deceased.

24  Q   Do you have any idea, was that
25  Mr. Goldman again?

---

W. H. Jennings                     11

2  A   Yes, Mr. Goldman. I worked for
3  Mr. Goldman.

4  Q   You worked for Mr. Goldman at
5  that time?

6  A   He had a massive heart attack at
7  forty three.

8  Q   That's tragic.

9  And finally, Fifth and 106th
10  Street?

11  A   That's an older job. That's
12  probably been with the firm -- I'm not
13  sure. It predates me to the early 70s.

14  Q   And in the early 70s, to the best
15  of your knowledge, when the firm was
16  retained who were the partners then?

17  A   The partners of the firm?

18  Q   Yes.

19  A   Bill Shron, Robert Muller, Arnold
20  Rubin, Bert Rosen and Al Goldberg.

21  Q   But the Fifth Avenue account was
22  retained by William Shron; is that
23  correct?

24  A   I don't know.

25  Q   Do you personally know Robert W.

---

W. H. Jennings                     12

2  Seavey who is a defendant in this action
3  or Phyllis Seavey?

4  A   Yes.

5  Q   When, if you recall, did you
6  first meet them?

7  A   Probably 1990.

8  Q   Do you recall the circumstances
9  in which you were first introduced to
10  them?

11  A   I was introduced to them by Mr.
12  Goldman because I became his manager.

13  Q   Was that at the time that you
14  began your business relationship with
15  them?

16  A   Yes.

17  Q   Did you ever have a conversation
18  with Mr. Shron about Robert Seavey or
19  Phyllis Seavey?

20  A   No.

21  Q   Did William Shron ever indicate
22  to you that he knew Robert Seavey in
23  1973?

24  A   No.

25  Q   Now, in the years that you first

W. H. Jennings                    13

1
2  came to represent the Seaveys in these
3  four developments, in what capacity did
4  you work with them?
5     A   Well, originally I supervised the
6  jobs and then as I worked my way up I
7  became a manager for Mr. Goldman.  I
8  became a partner January 1, 1991.  Mr.
9  Goldman passed away on October 23, 1991
10  and I succeeded him as the partner on
11  those accounts.
12     Q   What services, if any, did you
13  provide to the Seaveys in these
14  developments?
15     A   Auditing, tax returns, tax
16  projections, RPIE, real property income
17  and expense reports, certioraris.
18     Q   Now, this real property income
19  expense projections, what does that
20  consist of?
21     A   It's a statement to, I believe
22  it's the City of New York to give them
23  the detailed information on the income
24  and expenses of the development for
25  purposes of them to set the tax base,

W. H. Jennings                    14

1
2  real estate tax base.  It's required.
3     MR. KELLY:  Just to clarify,
4  your question was the Seaveys?
5     MR. HAYWOODE:  I'm sorry?
6     MR. KELLY:  Your original
7  question had to do with the work
8  performed for the Seaveys?
9     MR. HAYWOODE:  For the Seaveys
10  with regard to these
11  developments.
12     MR. KELLY:  With regards to
13  these developments, okay.
14     Q   Well, as Mr. Kelly raises it, did
15  you do work for the Seaveys with regard
16  to any other developments prior to this?
17     A   Yes.
18     Q   What were those developments?
19     A   University Riverview.  All their
20  real estate work.  Anything that
21  required auditing -- University
22  Riverview -- because that's my
23  expertise.
24     Q   How many units at University
25  Riverview?

W. H. Jennings                    15

1
2     A   I don't know off the top of my
3  head.
4     Q   To the best of your recollection.
5     A   Two hundred, maybe.
6     Q   What other developments?
7     A   Sand Realty, S&H Realty, Bethune
8  Towers, B-E-T-H-U-N-E.  I have 236
9  clients to it's hard for me to recollect
10  specifically the ones I handled for the
11  Seaveys.
12     Q   Are you aware that at some
13  previous time we submitted an
14  interrogatory to your attorneys asking
15  for a list of the developments owned by
16  the Seaveys that Marks Paneth & Shron
17  serviced?  Are you aware of that
18  request?
19     A   No.
20     Q   If I leave a space are you able
21  to supply to us within ten days. --
22     MR. KELLY:  I'm comfortable
23  with that request.
24     Q   -- the names of each development
25  serviced by Marks Paneth & Shron with

W. H. Jennings                    16

1
2  regard to the Seaveys.
3  (INSERT):
4     MR. TRAUB:  I just want to
5  state on the record since you
6  brought that up that we did
7  object that request on the
8  grounds of relevancy.  I believe
9  you raised that same request with
10  Judge Baer.  Although Judge Baer
11  did not make a ruling he also
12  questioned the relevancy on that
13  matter so I just want to renew my
14  objection for the record on that
15  request and we don't need to get
16  in an argument on it.
17     MR. HAYWOODE:  Yes, I recall
18  Judge Baer saying what was the
19  relevancy of it.  I recall making
20  a statement to him and I recall
21  him looking and saying, "well,
22  okay, go ahead," indicating to my
23  view that, yes, okay, I hear what
24  you're saying.
25     MR. TRAUB:  Just for the

W. H. Jennings                    17

record, I agree that he may have
asked the relevancy.  I agree you
made a statement as to what you
believe the relevancy was.  I
don't recall him saying okay, go
ahead but --
     MR. HAYWOODE:  But I clearly
recall it.
     MR. TRAUB:  Again, we're going
to have a difference of opinion
on that one but I don't want to
get sidetracked.  I just want to
put my objection on the record.
     Q   Some of these developments that
you're mentioning, they're not Michelama
or developments such as Lakeview or
Charles Hill; is that correct?  Some of
the developments you've represented the
Seaveys in, they're just ordinary --
     A   Some of them are, some of them
aren't, yes.  I have a real estate tax
expertise.  They're all real estate.
     Q   Is it fair to say that you
represent Phyllis and Robert Seavey in

W. H. Jennings                    18

fourteen developments that are Michelama
or type development?
     MR. TRAUB:  Just for the
record, you're including the four
partnerships that are at issue in
this section?
     MR. HAYWOODE:  Yes, including
the four that are here.
     A   It's possible.
     Q   You have ten others?
     A   It's possible.
     Q   You mean you might have twelve
others?
     A   I might have six others.
     Q   We sent requests for the
production of information to your
attorneys and we've requested, among
other things, a listing of these
developments and did that information
ever come to you?
     A   No.
     Q   Is there anybody else at Marks
Paneth & Shron who would have received
that request who might know the

W. H. Jennings                    19

information?
     A   No.
     Q   No one else?
     A   Not to my knowledge.
     Q   So that how would one determine
that if it became an issue that had to
be answered, how would that be
furthered?
     A   I don't understand.
     Q   In other words, what do you have
to do, where would you have to go to
find out how many Seavey developments
Marks Paneth & Shron represent?
     A   No, I have a client list.
     Q   Oh, so you would just have to
look at that list; is that correct?
     A   That's correct.
     Q   And that list is maintained in
the office?
     A   Correct.
     Q   So that it would be possible then
for you to provide it in the ten days
that we mentioned, right?
     A   Yes.

W. H. Jennings                    20

     MR. KELLY:  And as I said, I
was comfortable with that
request.
     MR. TRAUB:  And again, I made
an objection to it.
     Q   Now, let's see, what is GAGAS,
the Yellow Book?
     A   Generally accepted government
auditing standards.
     Q   Are you familiar with provision
3.13, Mr. Jennings?
     A   No.
     Q   Let me read it to you.
     Before an audit organization
agrees to perform non audit services it
should carefully consider the
requirements of paragraph 3.04.  The
auditors should avoid situations that
could lead reasonable third parties with
knowledge of the relevant facts and
circumstances to conclude that auditors
are not able to maintain independence in
conducting audits.
     Have you ever heard of that?

W. H. Jennings                    21

```
 2      A   Yes.
 3      Q   You're fully familiar with that?
 4      A   Yes.
 5      Q   And your organization functions
 6   in accordance with the GAGAS Yellow Book
 7   requirements?
 8      A   Absolutely.
 9      Q   In all respects?
10      A   We have a quality review
11   department specifically designed for
12   that.
13      Q   Within Marks Paneth & Shron?
14      A   Within Marks Paneth & Shron.
15      Q   Is there any external review?
16      A   Yes, we have peer review.
17      Q   Peer review by other agencies?
18      A   Yes.
19      Q   Other accountants?
20      A   Yes.
21      Q   Who does that peer review?
22      A   I couldn't tell you.  It was just
23   completed about a month ago, our latest
24   peer review.
25      Q   Do you change the reviewer from
```

W. H. Jennings                    22

```
 2   year to year?
 3      A   Yes.
 4      Q   What is the purpose that you
 5   change the reviewer from year to year?
 6      A   Really I believe, I don't know
 7   because the quality review department
 8   handles that, but I would assume it's to
 9   maintain some kind of independent
10   opinion on our peer review.
11      Q   So this is done in the interest
12   of independence?
13      A   I believe so.
14      Q   What is the urgency of
15   independence in the function of the
16   auditor?
17      A   Well, I think my profession wants
18   to insure that accountants are
19   independent with respect to the audit.
20      Q   For what reason, sir?
21      A   To prevent any issues that may
22   come up or any outside influences that
23   may influence the auditor to compromise
24   his judgment in performing the audit.
25      Q   What are some of the things that
```

W. H. Jennings                    23

```
 2   might compromise an auditor in
 3   performing his function as to his
 4   judgment?
 5      A   Well, one of the biggest issues I
 6   know is that if they owe you a
 7   significant amount of fees my profession
 8   has taken the position that that issue
 9   may compromise the auditor's judgment.
10      Q   Is there anything else that might
11   compromise an auditor's judgment
12   typically?
13      A   I guess certain relationships
14   with the clients.
15      Q   Such as what?
16      A   Such as what?  I can't think of
17   anything offhand.
18      Q   Let me continue reading 3.13.
19          Audit organizations should not
20   provide non audit services that involve
21   performing management functions or
22   making management decisions and audit
23   organizations should not audit their own
24   work or provide non audit services in
25   situations where the non audit services
```

W. H. Jennings                    24

```
 2   are significant/material to the subject
 3   matter of audits.  If the audit
 4   organization makes the determination
 5   that the non audit service does not
 6   violate these principles it should
 7   comply with all the safeguards stated in
 8   paragraph 3.17, which we won't go
 9   through at this point.
10          3.14 says audit organizations
11   should not perform management functions,
12   make management decisions or create a
13   situation that impairs the audits
14   organization's independence, both in
15   fact and in appearance.
16          You're familiar with those
17   regulations?
18      A   Yes.
19      Q   And Marks Paneth & Shron operate
20   and have always operated pursuant to
21   those guidelines and regulations?
22      A   Yes.
23      Q   And specifically with regard to
24   the developments that we are concerned
25   with, the immediate four and the other
```

W. H. Jennings                          25

2  ten, assuming that is the number, Marks
3  Paneth & Shron have always followed that
4  rule; is that correct?
5      A   Yes.
6          MR. TRAUB:  I'm just going to
7      object to the extent that your
8      question insinuates that the
9      other ten are part of this case.
10         MR. HAYWOODE:  I will
11     recognize and note it for the
12     record that you have a continuing
13     objection.
14         MR. TRAUB:  Okay.
15         MR. HAYWOODE:  It's for the
16     mention of the other ten.
17         MR. TRAUB:  It's not the
18     mention.
19         MR. HAYWOODE:  But I'm going
20     to get them in if it takes all
21     summer.
22         MR. TRAUB:  My objection as
23     noted on the record, was not to
24     your mentioning the other ten, it
25     was to the extent that your

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings                          26

2  question implied that the other
3  ten were concerned in this case
4  when I'll just note that the
5  caption in this case relates to
6  four of the --
7          MR. HAYWOODE:  We can
8      stipulate, Darren, that the other
9      ten are not presently parties in
10     this action.
11         MR. TRAUB:  Again, I'm not
12     looking for a stipulation, I'm
13     just objecting to the form of the
14     question.  Again, not meaning to
15     get sidetracked on any arguments
16     or long-winded statements here.
17     Q   Has any of the four developments
18 ever owed Marks Paneth & Shron monies at
19 the end of any particular fiscal year?
20     A   Yes.
21     Q   When did that occur and how much
22 money was it, if you remember?
23     A   I don't recall.  It wasn't enough
24 to jeopardize our independence.
25     Q   Well, how much money would not be

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings                          27

2  enough to jeopardize your independence?
3      A   A year's worth of fees.
4      Q   What were the fees that Marks
5  Paneth & Shron received?
6      A   Each audit was approximately
7  $24,000 for the audit.
8      Q   Each building charged $24,000 for
9  each audit?
10     A   Correct.
11     Q   If I suggest to you that the
12 Lakeview contract was for $34,000, would
13 that refresh your recollection?
14     A   Yes, Lakeview was DHCR, Division
15 of Housing and Community Renewal.
16     Q   Now, Mr. Jennings, you know Orley
17 Cameron and Ms. Griffiths and Mr. Pryce?
18     A   I spoke to them on the phone.
19     Q   On the phone?
20     A   To Orley and Ms. Griffiths.
21     Q   Okay.
22     A   We had an issue on Logan.
23     Q   And you're aware that in the
24 beginning of March of 2007 they were
25 trying to get certain information to

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings                          28

2  assist John Edmonds.
3          Have you met John Edmonds?
4      A   Yes, many times.  I know John
5  well.
6      Q   And you know they were trying to
7  get information from the audit?
8      A   Yes.
9      Q   The audit they were doing?
10     A   Yes.
11     Q   Did you receive communications
12 from them concerning data that they
13 wished to get?
14     A   Yes.
15     Q   And without pointing to them,
16 because they're part of the pleading
17 that the lawyers have exchanged, is it
18 fair to say that they were making
19 requests for documentation, various
20 samplings of the ledger, the general
21 ledger, that was maintained by Dalton
22 Management, did it come to your
23 attention anything like that?
24     A   I don't know.  I wasn't there.
25     Q   You know Mr. Ron Dawley?

LEX REPORTING SERVICE
800-608-6085

```
                    W. H. Jennings          29
```

2  A   Yes.

3  Q   Who is he?

4  A   He's the controller at Dalton

5  Management.

6  Q   How long has Mr. Dawley, to your

7  knowledge, functioned as a controller

8  for Dalton Management?

9  A   I believe since about 2000.

10  Q   And you've worked with him?

11  A   Yes.

12  Q   Now, tell me, in performing the

13  audit function, what exactly is it that

14  Marks Paneth & Shron do in conjunction

15  with or as opposed to Dalton Management,

16  what do you do?

17  A   We receive their year-end

18  package, we call it, which includes

19  their general ledger, usually an

20  accounts payable subsidiary ledger,

21  accounts receivable subsidiary ledger.

22  At that point we plan the audit,

23  determine what confirmations have to be

24  mailed out, we have what's called a

25  brainstorming session with the staff

```
                    W. H. Jennings          30
```

2  involved.

3  Q   Is that your staff, Mr. Jennings?

4  A   That's correct, my staff.

5  Q   How many people do you work with

6  in doing that from your staff?

7  A   There's fourteen.

8  Q   I see.  Go ahead.

9  A   At that point I suggest to them

10  what areas I would like to focus on

11  based on what's called a flux review

12  which is a fluctuation review from last

13  year to this year.  We look at the prior

14  year's financial statements if there

15  were any issues, compliance issues that

16  need to be addressed in the current year

17  then my staff goes out in the field,

18  does some sampling and comes back to the

19  office.  Afterwards, we discuss any

20  findings or proposed adjustments and

21  then we usually draft an audit and wrap

22  it up.  Well, it goes to quality review.

23  It has to go through QR.  I am not the

24  final say.

25  Q   How long does that process take,

```
                    W. H. Jennings          31
```

2  generally?

3  A   About four weeks.

4  Q   And you perform those functions

5  for the four buildings involved in this

6  action for the last ten years or so?

7  A   Marks Paneth does, yes.

8  Q   Did it come to your attention,

9  Mr. Jennings, after the Cameron, Pryce &

10  Griffiths firm began its audit that they

11  were of the impression that they were

12  not receiving information from which

13  they could proceed with their sampling?

14  Did that come to your attention?

15  A   I received an information

16  request.

17  Q   Approximately when was that, if

18  you recall?

19  A   I know it was in May so May of --

20  I'm pretty sure it was in May so

21  whatever year that was.

22  Q   What, if any, information did

23  they ask you for?

24  A   The initial request was on Logan

25  Plaza.

```
                    W. H. Jennings          32
```

2  Q   What information, if any, did

3  they ask you for?

4  A   I don't know specifically.  The

5  only issue that stands out is the

6  amortization of the cancellation of debt

7  income which we had a discussion about.

8  Q   What is a trial balance?

9  A   A trial balance is a, if you want

10  to say, balances of accounts that come

11  off the general ledger and that's how we

12  do our flux review.

13  Q   So that Marks Paneth & Shron

14  would work from trial balances?

15  A   Yes.

16  Q   And in the ten years that you

17  worked with the four defendant

18  corporations here or any other

19  corporation where Dalton Management was

20  involved did Dalton provide you with a

21  trial balance to the work that they had

22  done?

23  A   Yes, I believe they did.

24  Q   Do you personally know that?

25  A   No.

W. H. Jennings 33

```
 1                W. H. Jennings            33
 2       Q    Who are the members of your staff
 3   who would know that?
 4       A    Probably my manager.
 5       Q    Who is that?
 6       A    Joanne Chiu, C-H-I-U.
 7       Q    Would it refresh your
 8   recollection if I say to you that Mr.
 9   Cameron had written or had advised you
10   at any time that Dalton Management
11   didn't have trial balances?
12       A    No.
13       Q    That never came to your
14   attention?
15       A    No.
16       Q    Would you be able to audit the
17   books and records of any entity that
18   didn't keep or run trial balances?
19       A    Yes.
20       Q    What would you have to do in
21   order to do that?
22       A    We'd have to use alternative
23   procedures.
24       Q    Which would be what?
25       A    Use the general ledger as their
```

W. H. Jennings 34

```
 1   trial balance.
 2       Q    Am I correct in assuming, I'm not
 3   an accountant, am I correct in assuming
 4   that you would have to go back to square
 5   one?
 6       A    No.
 7       Q    And work from square one to re-
 8   create your trial balances?
 9       A    Absolutely not.
10       Q    How would you --
11       A    They have ending numbers in each
12   account and all you do is take those
13   ending numbers and put it in a
14   comparison schedule with the prior year.
15       Q    So that if you were not presented
16   with a trial balance by the accounting
17   company would that not make your job any
18   more difficult or would it make it more
19   difficult?
20       A    No effect.
21       Q    No effect whatsoever?
22       A    No effect whatsoever.
23       Q    You wouldn't have to do more work
24   because there were no trial balances?
25
```

W. H. Jennings 35

```
 1                W. H. Jennings            35
 2       A    No, it's not uncommon.
 3       Q    It's not uncommon?
 4       A    In the industry.
 5       Q    Is it desirable or preferable
 6   that accountants use trial balances?
 7       A    Yes, it's desirable.
 8       Q    Why would it be desirable?
 9       A    Because we want to compare it to
10   the prior year to plan the audit.
11       Q    And in terms of sampling various
12   transactions the trial balance would
13   also be helpful?
14       A    It's one tool that we use.
15       Q    So that you'd rather see it than
16   not; is it fair to say that?
17       A    Yes.
18       Q    But it had never come to your
19   attention that Mr. Cameron was stating
20   that he did not see trial balances in
21   the work done by Dalton Management; am I
22   correct?
23       A    That's correct.
24       Q    Now, how many times, if you
25   remember, did Mr. Cameron or his
```

W. H. Jennings 36

```
 1                W. H. Jennings            36
 2   associates come to you or contact you or
 3   make inquiries of you with regard to the
 4   audit they were performing; do you
 5   recall?
 6       A    The history that I recall is that
 7   they made an information request on
 8   Logan.  We responded within three days.
 9       Q    When you say, "we responded," who
10   actually responded?
11       A    Marks Paneth & Shron.
12       Q    What was the inquiry, if you
13   recall, that they made on Logan?
14       A    I don't recall.
15            MR. KELLY:  Did you finish
16       your answer to the question?
17            THE WITNESS:  No, I didn't
18       finish.
19            MR. KELLY:  Do you mind if he
20       finished his answer?
21            MR. HAYWOODE:  Sure.
22       A    Subsequent to that I had a
23   subsequent inquiry on Logan from Mr.
24   Cameron's firm and at that point I felt
25   in order to expedite this I called him
```

W. H. Jennings                    37

```
 1
 2   and I spoke to him about that it would
 3   be much easier for us and expeditious
 4   and less costly if we just, I knew he
 5   was looking at several jobs and I felt
 6   it was important that if he had
 7   questions on all the jobs that when he
 8   was finished with his review or audit I
 9   wasn't aware of exactly what their
10   engagement was but once he was completed
11   with that that it would be cost
12   effective if we just sat down at a table
13   and went through everything at one shot
14   with the managing agent, whatever
15   questions they had we could probably
16   resolve in one sitting.
17        At that point we had a discussion
18   about a cancellation of debt in the
19   amortization of debt. I remember that
20   conversation clearly. I believe his
21   associate came in at that point.
22        The next communication that I
23   recall receiving was a demand for
24   additional information by a date in
25   November on all the jobs that we have to
```

W. H. Jennings                    38

```
 1
 2   get this otherwise we have to -- it was
 3   somewhat a threatening letter which I
 4   took exception to because I believe very
 5   strongly we never withheld anything to
 6   the extent we had that.
 7        At that point in time I called
 8   Mr. Orley's office and I asked to speak
 9   to him. He wasn't available. I left a
10   message with his secretary. He hadn't
11   gotten back to me so then I called --
12   Q.  Not to interrupt you and please
13   pick up later, but when you say, "a
14   threatening letter," what did the letter
15   say?
16   A.  Well, it demanded information by
17   a certain date otherwise they were going
18   to take further action.
19   Q.  What was the action?
20   A.  They were going to tell their
21   client that they were unable to get any
22   information from my firm.
23   Q.  And you view that as a threat?
24   A.  I do because I never did anything
25   to hold back information but let me
```

W. H. Jennings                    39

```
 1
 2   finish.
 3   Q.  Please, go ahead.
 4   A.  At that point in time I was
 5   troubled because I felt I had a very
 6   good relationship with Mr. Edmonds. I
 7   called him. I spoke to his secretary;
 8   she gave me his telephone number. I
 9   called Mr. Edmonds, I spoke to him
10   personally. I explained the situation
11   to him and I told him, "John I'm
12   perfectly willing to have this
13   information put together but I'm going
14   away for two weeks." I'm involved with
15   an international accounting firm. I
16   even told him I could send him my
17   itinerary. I'm going to be gone for two
18   weeks. There is no way I could respond
19   for this date. It is impossible.
20   Q.  Yes, you were going to Europe, as
21   I recall.
22   A.  Yes, and he said to me, "don't
23   worry about it. I'll speak to my
24   accountants and just relax, it's okay,"
25   and that was really the last
```

W. H. Jennings                    40

```
 1
 2   communication that I had and at that
 3   point I left instructions for my staff
 4   to look through the information request
 5   in my absence to the extent that we had
 6   the information available because a lot
 7   of the documents we don't have but to
 8   the extent available, prepare all the
 9   information and when I got back I would
10   look at it and that was it.
11        MR. HAYWOODE:  I'm going to
12        ask that these two letters be
13        marked for identification by the
14        reporter.
15        (A letter dated May 10, 2007
16        to Dalton Management was
17        marked as Plaintiff's Exhibit
18        1 for identification, as of
19        this date.)
20        (A response on May 15, 2007 to
21        Ron Dawley from William
22        Jennings was marked as
23        Plaintiff's Exhibit 2 for
24        identification, as of this
25        date.)
```

W. H. Jennings                    41

1

2      Q   In Plaintiff's Exhibit 1 Cameron,

3   Griffiths & Pryce are requesting with

4   regard to distribution the basis and

5   supporting documentation for the journal

6   entries closing out the retained

7   earnings account and adjusting the

8   partner capital account.

9          They inquire secondly about

10   deferred income, the information to

11   support the canceled debt recorded in

12   the financial statement.

13          Three, with regard to mortgages

14   they ask for the loan agreements to

15   support all three mortgages.

16          The fourth is loan payable, the

17   supporting documents for loan payable in

18   accordance with your account number 2340

19   of your financial statement.

20          Five, accounts payable, the

21   details to support accounts payable to

22   accounts 2110 of your financial

23   statement.

24          Six, the accrued expenses that

25   detail to support accrued expenses in

---

W. H. Jennings                    42

1

2   your account 2120.

3          Seven, the accumulated

4   amortization cost, the supporting

5   documentation schedule in account 1535.

6          In eight, the allowance for

7   doubtful account, the supporting detail

8   in account number 1131.  Provide the

9   general ledger for your financial

10   statement.

11          Do you recall receiving

12   Plaintiff's 1?

13          MR. KELLY:  I'm going to

14          object to the form of that

15          question to the extent you called

16          it your accounts or your

17          financial statements implying

18          that they were his or Marks

19          Paneth & Shron's financial

20          statements as opposed to the --

21          MR. HAYWOODE:  So you object

22          to form?

23          MR. KELLY:  Correct.

24      Q   Well, first of all, sir, do you

25   recall receiving the letter?

---

W. H. Jennings                    43

1

2      A   Yes.

3      Q   When you read those words what

4   did you understand them to be asking

5   for, your financial statement, Marks

6   Paneth & Shron's financial statement or

7   the general ledger that Dalton

8   maintained?

9      A   The general ledger that Dalton

10   maintained.

11      Q   So that it's fair to say that on

12   the face of it it appears that Cameron

13   Griffiths & Pryce made a request of

14   Dalton for information that was on the

15   general ledger; is that correct?

16      A   Correct.

17      Q   And that was on May 10th; is that

18   correct?

19      A   Correct.

20      Q   Now I show you Plaintiff's

21   Exhibit 2 which is a communication from

22   you to Ron Dawley.

23      A   Correct.

24      Q   And I'm going to read it.

25          One, distribution adjustment.

---

W. H. Jennings                    44

1

2   This was made to agree opening capital.

3   Postings to close out the prior year net

4   income are different for GAAP than the

5   current computer system.

6          Two, deferred income, see note

7   five.  This occurred in 2002 with the

8   old limited partner.  The amount was

9   amortized for GAAP but picked up as

10   income in 2002 by the old ninety eight

11   percent limited partner.  See attached

12   2002 tax return in K1 as requested by

13   the limited partner.

14          Three, see attachment.

15          Four, loan payable, see

16   attachment number four and note five.

17          Five, accounts payable, see

18   attachment number five.  Note that this

19   includes unpaid management fees prior to

20   2000 that due to project financial

21   hardship at that time were not taken to

22   help the project's cash flow.  These

23   fees were not extra fees but those

24   allowable.

25          Six and eight, see attachments.

W. H. Jennings                45

1
2  Please note that bad debts reflect
3  vacated tenant arrears.  These are
4  deemed uncollectible due to the unlikely
5  chance of recovery.  If you need
6  anything further, please call.
7        Is that the response you made on
8  May 15th to Ron Dawley?
9     A  Yes.
10    Q  Word for word?
11    A  Yes.
12    Q  How long did it take you to draft
13 the response to Ron Dawley, which is
14 Plaintiff's 2?
15    A  I don't know.
16    Q  Roughly, if you had to recall?
17    A  I don't know.
18    Q  Would it have taken two or three
19 days, four days, ten days?
20    A  Don't know.  Depends on the
21 compilation of information from my
22 staff.
23    Q  Let me direct your attention to
24 the dates on those letters.  One was May
25 10th on which Dawley received it and

W. H. Jennings                46

1
2  your response was five days later; is
3  that correct?
4        MR. TRAUB:  I'm going to
5     object to the extent that you're
6     surmising that on May 10th that
7     Dalton received it.  On May 10th
8     is the date of the letter but not
9     necessarily reflective of the
10    date that Dalton received it.
11       MR. HAYWOODE:  I'm accordingly
12    corrected there.  If it was
13    transmitted the 10th so then
14    Dalton might not have received it
15    until the 11th or 12th or even
16    the 13th or the 14th if it was a
17    Saturday and Sunday or if it was
18    a holiday intervening.  They
19    might not have received it until,
20    well --
21       MR. TRAUB:  Certainly before
22    the 15th.
23       MR. HAYWOODE:  We know that
24    Bill Jennings received it by the
25    15th because that's when he

W. H. Jennings                47

1
2        responded so assuming in less
3     than five days or much less Bill
4     Jennings responded; is it fair to
5     say that?
6        MR. TRAUB:  Again, I'm not the
7     one answering the questions here.
8     I'm just making my objection for
9     the record.
10       MR. HAYWOODE:  Your objection
11    is noted and I've corrected it.
12    Q  Is it fair to say that in this
13 space, and I don't know if a Saturday
14 and Sunday intervened there, but between
15 the 10th and the 15th of May you
16 responded to that information?
17    A  Yes.
18    Q  And you responded in detail; is
19 that correct?
20    A  Yes.
21    Q  Now, had it come to your
22 attention that Cameron, Griffiths &
23 Pryce had been making requests to Dalton
24 Management for things like trial
25 balances and documentations of support

W. H. Jennings                48

1
2  and all nature of routine documentation
3  and that they had been told by Dawley
4  you have to go to Marks Paneth & Shron
5  to get that; did that come to your
6  attention?
7     A  No.
8     Q  Dawley never sent them to you?
9     A  No.
10    Q  Did it come to your attention
11 that someone at Marks Paneth & Shron at
12 one point said to Cameron, Pryce &
13 Griffiths that if you want information,
14 for instance, concerning the employee or
15 personal records or the allocation of
16 monies paid to Dalton personnel by each
17 corporation you have to pay Marks Paneth
18 & Shron to obtain that information, did
19 that ever come to your attention?
20    A  No.
21    Q  Did you ever tell Dalton
22 Management that?
23    A  No.
24    Q  Did anyone, to your knowledge, in
25 Marks Paneth & Shron ever convey that

W. H. Jennings                    49

2  thought to Dalton Management?
3      A   No, we had discussed payment of
4  the fees to put all this information
5  together with Ron Dawley.
6      Q   So that you stated to Dawley that
7  Marks Paneth & Shron would charge the
8  partnership?
9      A   No.
10     Q   Well, who was going to pay for
11  the accumulation of this information, to
12  your knowledge?
13     A   I don't know.  That's the
14  question I had.
15     Q   You had the question at the time
16  and what, if anything, did you do about
17  having that question; did you
18  communicate that thought to anybody?
19     A   Just to Ron.
20     Q   What, if anything, did you say to
21  him?
22     A   I just said, "we're accumulating
23  a lot of time on these jobs.  You have
24  to find out who is going to be
25  responsible for payment of this."

W. H. Jennings                    50

2      Q   And what did he say to you?
3      A   "Okay."
4      Q   Is it fair to say that in the
5  wake of that conversation he advised the
6  accountants that if you want that
7  information you have to pay for it?
8      A   I don't know.
9      Q   You have no idea?
10     A   No.
11     Q   Now, once again, you testified to
12  the role of the audit and you say it is
13  to send out perhaps fourteen assistants,
14  perhaps more or less, and to sample the
15  work of the accountant on the job; is
16  that correct?
17         MR. KELLY:  I'm going to
18         object to the form.
19         I'm not sure that's exactly
20         what he testified but I'll let
21         him answer.
22     Q   Do you understand my question in
23  that form?
24     A   I believe so, yes.
25     Q   Can you answer it?

W. H. Jennings                    51

2      A   Yes.
3      Q   Pease, sir.
4      A   This or any other job we sample
5  and make inquiries as to the validity of
6  the numbers presented to us by
7  management.
8      Q   Okay, and you don't go out and
9  start in January 1st and then work
10  through December 31st and check every
11  single thing that they do?
12     A   Absolutely not.
13     Q   And to your information that
14  wasn't what Cameron, Pryce & Griffiths
15  were doing either; is that correct?
16     A   I am not aware of what they were
17  doing.
18     Q   But generally, if you were asked
19  to, well, do an audit as you did it
20  would be standard procedure for an
21  auditor to say, look, I'm going to
22  choose selected areas, you testified to
23  that before; is that correct?
24     A   Yes.
25     Q   And I'm going to look at the.

W. H. Jennings                    52

2  profile from last year and I'm going to
3  test in certain areas to see if those
4  numbers are coming up true and it's like
5  the Internal Revenue Service, right?
6  They look at your return and they say,
7  well, we're going to look at this one,
8  and we might not necessarily go through
9  every single thing; is that correct?
10     A   Yes, but there are certain
11  requirements that we're responsible for
12  to look at internal controls to make
13  sure they're functioning.
14     Q   You look at contracts too?
15     A   Contracts.
16     Q   To see that there's compliance
17  with the contracts and the vendors?
18     A   Correct, we may actually have
19  copies of those, request copies of those
20  from management to have in our files.
21     Q   With regards to, I believe it was
22  Lakeview or Logan, was there a security
23  company functioning there without any
24  contract, to your recollection?
25     A   Not to my recollection.

W. H. Jennings                    53

2   Q   Are you aware that we requested
3   the production of the contract for a
4   security company which was not produced
5   as yet but you know nothing about that?
6   A   No.
7   Q   So so far as you're concerned
8   everyone functioning at these four
9   developments had a contract at least; is
10  that correct?
11  A   To my knowledge, based on our
12  procedures.
13  Q   Now, in performing the audit all
14  Marks Paneth & Shron would do is come
15  and sample information provided by
16  Dalton; is that correct?
17  A   Sample, test, confirm, inquire.
18  Q   And send for quality review?
19  A   Correct.
20  Q   And everything that Marks Paneth
21  & Shron looks at would be something that
22  Dalton Management produced and
23  maintained; is that correct?
24  A   Yes.
25      MR. KELLY:   If I may talk to

W. H. Jennings                    54

2   the witness?
3       MR. HAYWOODE:  No.
4       MR. KELLY:   I'll tell you what
5   I'm going to talk to him about.
6       MR. HAYWOODE:   I prefer you
7   don't at this point.
8       MR. KELLY:   All right.
9       MR. HAYWOODE:   I mean, we can
10  take a break but let me take a
11  little while here.
12  Q   Why, if you know, would Ron
13  Dawley have to go to Marks Paneth &
14  Shron to get information in response to
15  Plaintiff's 1 which should have been in
16  his possession?
17  A   Beats the heck out of me.  I'll
18  be honest with you.  I'll call it lazy.
19  Q   So that what you're indicating is
20  that Ron Dawley had all this information
21  but he said why should I hurt myself if
22  I can pass this on to Marks Paneth &
23  Shron and let them exercise themselves
24  for money?
25  A   Yes.

W. H. Jennings                    55

2   Q   That's what he did?
3   A   For what?
4   Q   You're saying that that's the
5   attitude, I'm characterizing it
6   colorfully, that's not your testimony,
7   but for the most part that's what he
8   did, he just said let Marks Paneth &
9   Shron deal with it?
10  A   Very common in my industry.
11  Q   And if the accountant had all
12  this information at his fingertips why
13  would he tell a partner for whom he
14  worked that go bother the auditors?  Why
15  would he do that if he had it?
16  A   Why would who?
17  Q   Dawley or anybody working for
18  Dalton.  Why would they even want the
19  auditors approached with that?
20  A   Lazy.  My industry, it's not
21  uncommon.  I have clients who are
22  controllers and owners and say, you
23  know, do you have a copy of this because
24  I don't want to open my file.  I don't
25  want to walk ten feet to get it.  It's a

W. H. Jennings                    56

2   very common practice.
3   Q   Mr. Jennings, this wasn't the
4   only time that Ron Dawley referred these
5   accountants to you; was it?  They
6   repeatedly referred them to you, isn't
7   that correct?
8   A   Yes.
9   Q   And the accountant sent letters,
10  I'm not going to introduce them at this
11  time but I believe everyone has received
12  them in the pleadings in the order to
13  show causes exhibits, they sent letters
14  saying we can't get to first base here.
15  There is no trial balance.  The
16  documentation and support for the audit
17  that we're trying to complete they were
18  commissioned to do audits on two or
19  three years and they couldn't even get
20  out a 2006.  Did they tell you that?
21  A   No.
22  Q   Well, did you wonder at the time
23  when you said to John Edmonds, look, I'm
24  going to Europe, I've got business,
25  whatever, did you wonder why the

W. H. Jennings                                      57

2 auditors would have to wait for you to
3 come back from Europe to get information
4 that they could have gotten from Ron
5 Dawley and Dalton Management?  Did you
6 wonder about that?
7     A.  No.
8     Q.  I mean, laziness is one thing,
9 right, but didn't this seem beyond
10 laziness to you that Dalton was
11 constantly sending these people to Marks
12 Shron, the auditor, in order to do this?
13     A.  No, it's not unusual in my
14 industry.
15     Q.  And that Dawley and Dalton were
16 content to say, "don't bother us, we
17 don't have it.  Fight with Marks Shron,
18 they have it"?
19     A.  It's not uncommon.
20     Q.  But suffice to say that you did
21 have the information to respond on May
22 15th, 2007?
23     A.  That's correct.
24     Q.  And you say that Ron Dawley had
25 it too?

---

W. H. Jennings                                      58

2     A.  Yes, he should have.
3     Q.  He should have had it?
4     A.  Yes, because mortgages, documents
5 like that, proposed journal entries, he
6 has them.  We get the information from
7 him.
8     Q.  And you keep it?
9     A.  We have to.
10     Q.  Supporting documents?
11     A.  We have to.
12     Q.  But you would only keep
13 supporting documents on particular areas
14 where you audited and sampled; is that
15 correct?
16     A.  Not necessarily.  We need
17 mortgage documents that were maybe
18 twenty years old.  We keep them in our
19 permanent files.
20     Q.  Are you aware that these
21 accountants made a request for a series
22 of documents before Judge Baer for
23 documents that were not provided or that
24 Dalton suggested that they just didn't
25 have?

---

W. H. Jennings                                      59

2     MR. TRAUB:  I'm just going to
3 object to the form of the
4 question and the commentary in
5 there that does misstate Judge
6 Baer's directives and Dalton's
7 responses to any written
8 discovery request that were
9 propounded pursuant to federal
10 civil procedure 33 and 34.
11     Q.  If these accountants were to say
12 that Ron Dawley said to them he didn't
13 have this detail they would either be
14 mistaken or lying, to your knowledge; is
15 that correct?
16     A.  Who would be mistaken or lying?
17     Q.  These accountants, Cameron
18 Griffiths & Pryce.  If they said that
19 Ron Dawley said to them that he just
20 didn't have this information, that
21 you've got to go Marks Paneth & Shron to
22 get it, they would either be mistaken or
23 lying; is that correct, to your
24 knowledge?
25     A.  No.

---

W. H. Jennings                                      60

2     Q.  Was it possible that Dawley
3 didn't have any of this?
4     A.  No.
5     Q.  What makes you certain that
6 Dawley didn't have any of these
7 documents or details?
8     A.  We get our documents from the
9 managing agent.  We do not create
10 documents.  Our documentation is
11 received from the managing agent.  I
12 wasn't privy to the conversation.  I
13 don't know what the discussion was
14 between them.  I cannot give you an
15 answer as to what transpired between
16 them.
17     Q.  You didn't bring with you today
18 your financial statement report; did
19 you?
20     A.  No.
21     Q.  I don't want to mark it at this
22 point but I'm going to read from the
23 independent auditors report about Marks
24 Paneth & Shron, not the entire thing but
25 the third paragraph where you say, "in

W. H. Jennings                    61

2  our opinion the financial statements
3  referred to above present fairly in all
4  material respects the financial position
5  of Fifth and 106th Street Association as
6  of December 31st 2006 and 2005 and the
7  results of its operation and its cash
8  flows from year end of December 31, 2006
9  in conformity with accounting principles
10  generally accepted in the United States
11  of America."  The document is dated
12  September 14, 2007, entitled Independent
13  Auditors Report.  Would that fairly
14  represent the representation by Marks
15  Paneth & Shron's report?
16     A  Yes.
17     Q  These audit reports, they're
18  provided to the United States Private
19  Housing and Urban Development?
20     A  Which job are you referring to?
21     Q  The four corporations that we're
22  concerned with.
23     A  Different reporting agencies.
24     Q  What agency received these
25  reports?

W. H. Jennings                    62

2     A  Some of them had to be reported
3  to HUD.
4     Q  Housing and Urban Development.
5     A  And Fifth and 106th Street is
6  Division of Housing, DHCR.
7     Q  Division of Housing and Community
8  Renewal?
9     A  Correct.
10     Q  Any other agencies receive these
11  audit reports?
12     A  No, not to my knowledge.
13     Q  Do they receive them in one copy
14  or do they receive multiple copies?
15     A  I don't know.  The final
16  financials are transmitted to the
17  managing agent.
18     Q  Of the developments?
19     A  Correct.
20     Q  And then the developments
21  communicate them to these agencies?
22     A  Yes.
23     Q  Do the agencies ever contact
24  Marks Paneth & Shron to confirm you
25  really did this right and they didn't

W. H. Jennings                    63

2  make it up?
3     A  No.
4     Q  They don't contact you?
5     A  No, very rarely.
6     Q  You never submit any documents to
7  HUD and to DHCR or any other agency?
8     A  We do an electronic filing for
9  HUD.
10     Q  An electronic filing?
11     A  Yes, HUD requires if they have an
12  insured mortgage that the financial
13  statement be electronically filed.
14     Q  Is that by wire?
15     A  Internet.
16     Q  I'm going to show you a document
17  which I believe is contained in the
18  report that you submitted at least to
19  DHCR and ask you if you recognize it?
20        MR. TRAUB:  Is it this entire
21     thing?
22        MR. HAYWOODE:  No, just that
23     page.
24        MR. TRAUB:  Just this one
25     page?

W. H. Jennings                    64

2        MR. HAYWOODE:  Yes.
3     And this will be Exhibit 3.
4        MR. HAYWOODE:  This will be
5     three, yes.
6        (A certified annual financial
7     and operating report was
8     marked as Plaintiff's Exhibits
9     3 for identification, as of
10     this date.)
11        (A cumulative general ledger
12     was marked as Plaintiff's
13     Exhibit 4 for identification,
14     as of this date.)
15     Q  What is Exhibit 3?
16     A  A statement of the audit fee,
17  paid Marks Paneth & Shron.
18     Q  Is it restricted to any
19  particular year?
20     A  I don't know what year you're
21  looking at.
22     Q  The financial statement that I
23  read from was 2006.  Would that refresh
24  your recollection if that would be for
25  2006?

W. H. Jennings    65

```
 1
 2      A   It could be 2006.  It could be
 3   2005.  It could be 2007.
 4          MR. TRAUB:  Just to make the
 5      record clear, do you want to just
 6      show him the whole packet?  We
 7      don't have to mark it as an
 8      exhibit but just so we can see
 9      which packet it came from and
10      maybe that will help clarify what
11      this statement is.
12      Q   Mr. Jennings, I show you this
13   financial statement which has the date
14   December 31st, 2006 and ask you if that
15   refreshes your recollection, sir, that
16   the statement comes from --
17      A   Yes, I agree.
18      Q   In 2006 what was the fee paid to
19   Marks Shron?
20      A   The audit fee was $34,155.
21      Q   And that's --
22      A   That's what was billed.
23      Q   Did they pay that eventually?
24      A   Eventually, yes.
25      Q   Did they pay it timely?
```

W. H. Jennings    66

```
 1
 2      A   I don't recollect.
 3      Q   Now, this financial statement was
 4   submitted to the Department of Housing
 5   and Community Renewal?
 6      A   That's correct.
 7      Q   And it was submitted to Housing
 8   and Urban Development?
 9      A   That I don't know.  I don't
10   believe so.
11      Q   But at the time that you prepared
12   that document and sent it to the
13   management or to whomever you sent it
14   you knew that it would be received at
15   some point by the Department of Housing
16   and Community Renewal?
17      A   That's correct.
18      Q   And that it might be reviewed by
19   Housing and Urban Development; you knew
20   that possibility?
21      A   Possibility, yes.
22      Q   And as you look at that document
23   today do you stand by the truth of it?
24      A   Yes.
25      Q   Now, I show you Plaintiff's 4
```

W. H. Jennings    67

```
 1
 2   which is a cumulative general ledger
 3   which recites among other items that
 4   account number 16220 sums of money paid
 5   to a vendor?
 6      A   Yes.
 7          MR. KELLY:  Mel, just so the
 8      record's clear, at least my copy
 9      of Plaintiff's Exhibit 4 has some
10      handwritten notes on it, some
11      circles and some fees.  Can we --
12          MR. HAYWOODE:  No idea.
13          MR. TRAUB:  I didn't know if
14      that
15      was --
16          MR. HAYWOODE:  I'm not
17      introducing it for the circles
18      and comments.  I'm only
19      introducing it for the printed
20      matter.
21          MR. TRAUB:  Just so the record
22      was clear, I just wanted to ask
23      if you knew who those markings
24      came from.
25          MR. HAYWOODE:  Well, it wasn't
```

W. H. Jennings    68

```
 1
 2   done in my presence.  I don't
 3   know.  Perhaps the accountants
 4   did it.  I don't know.  Maybe we
 5   have some children that hang out
 6   around here with pencils that
 7   might have done it but I doubt
 8   it.
 9          May we proceed, Darren?
10          MR. TRAUB:  Yes.
11      Q   What is that document?
12      A   This is the general ledger.
13      Q   Who's general ledger?
14      A   Dalton's.
15      Q   With regard to item 16220 what,
16   if anything, does it say?
17      A   It shows the total amount paid
18   Marks Paneth & Shron for that calendar
19   year.
20      Q   And that's 2006?
21      A   Correct.
22      Q   What is the amount of money that
23   the general ledger suggests was paid to
24   Marks Paneth & Shron?
25      A   $108,525.
```

W. H. Jennings                                    69

    Q   And $.45?

    A   Correct.

    Q   Which comes first, the general
ledger or the audit?

    A   The general ledger.

    Q   And you testified previously that
the audit is dependent on the general
ledger for what it says; is that
correct?

    A   Correct.

    Q   Is it a statement of truth that
Marks Paneth & Shron received in 2006
$108,525.45?

    A   According to their cash basis
general ledger, yes.

    Q   But is the statement true?  Is it
true?

    A   According to their general
ledger, yes.

    Q   Well, sir, according to Marks
Paneth & Shron's records is it true that
they paid Marks Paneth & Shron
$108,525.45 in 2006?

    A   I don't have Marks Paneth &

---

W. H. Jennings                                    70

Shron's records here.

    Q   So are you saying that there is a
possibility this isn't true?

    A   It's possible, yes.  This is a
cash basis.

    Q   As opposed to?

    A   The financial statements are on
an accrual business.

    Q   On which of these bases is the
accounting done by Dalton?

    A   This particular case their
general ledger says it's a cash basis.

    Q   I know with a corporation you
have to do an accrual basis; is that
correct?

    A   With a partnership, yes.

    Q   Was there some determination made
by the partnership that the cash basis
accounting would be converted to an
accrual accounting?

    A   We proposed -- their journal
entries proposed to adjust the books and
records on any audit.

    Q   Let me understand what you just.

---

W. H. Jennings                                    71

said, Mr. Jennings.  We, meaning Marks
Paneth & Shron, propose what, sir?

    A   Journal entries.

    Q   Journal entries.  And what is a
journal entry?

    A   A journal entry is a proposal
that Marks Paneth & Shron makes, the
auditor makes, to either correct or
reclassify or make the financial
statements in accordance with GAAP.

    Q   So that do you have an
independent recollection that that
request was made of Dalton Management in
this instance?

    A   No.

    Q   Is there any written record of
such a request being made by Dalton
Management in this instance?

    A   We would propose journal entries
and transmit them to them.

    Q   Is it your recollection that you
actually transmitted a journal entry
request to Dalton in this instance?

    A   Yes, it would be.

---

W. H. Jennings                                    72

    Q   You're certain of that?

    A   Fairly certain.

    Q   I would call for the production
--

    A   It's standard procedure.

    Q   But the maintenance of trial
balances is standard procedure in many
places too in accounting; isn't that
correct?

    A   Yes.

    Q   But apart from what should have
happened and what is standard procedure
do you have an independent recollection
that a proposal for journal entry change
was sent to Dalton by Marks Paneth &
Shron?  Do you have an independent
knowledge of that?

    A   No.

    Q   Is that information you can
retrieve from your records?

    A   Yes.

         MR. HAYWOODE:  I would call
    for the production of that
    proposal in ten days.

W. H. Jennings                    73

MR. TRAUB:  Well, I would say
that they were made available
already when the audit work
papers were made available for
inspection and they would have
been included as part of the
audit work papers.

MR. HAYWOODE:  You know, we
have a dispute going before Judge
Francis because the methodology
of sending in boxloads isn't
complying with discovery demands.
At least I understand --

MR. TRAUB:  Absolutely not.

MR. HAYWOODE:  I understand
that may be your position.

MR. TRAUB:  That's not even
close to my position.

MR. HAYWOODE:  Notwithstanding
that it might have been supplied
before are you able to singularly
go and put your hand on this
document and then to provide it
to us in ten days, albeit a

---

W. H. Jennings                    74

second time?

MR. KELLY:  I don't know the
answer to that.

MR. TRAUB:  Just so the record
is clear, my objection was not to
the production of documents
through quote on quote boxloads
of documents.  My problem with
your discovery responses was the
lack of documents that I felt
should have been in that box.

MR. HAYWOODE:  Subjectively.

MR. TRAUB:  Subjectively or at
least a clarification that those
documents did not exist.  It was
not to the method of production.

MR. KELLY:  I will not be able
to answer that until I review the
documents back at my office.

MR. HAYWOODE:  All right, so
that you may need more than ten
days.

MR. KELLY:  Yes.  I don't
know, is my answer.

---

W. H. Jennings                    75

MR. HAYWOODE:  But you will
supply it within a reasonable
time.

MR. KELLY:  Or I will make the
documents available again for you
guys to find it.

MR. HAYWOODE:  I'm going to
call for the production of the
documents and let's say --

MR. KELLY:  We'll agree to
discuss this afterwards.

MR. HAYWOODE:  I appreciate,
counsel, what you're telling me.

Q  How does that work, Mr. Jennings,
assuming that Marks Paneth & Shron
received $108,000 in 2006 in what way
under the accrual system do you say that
money should be reported or should be
reflected in the financial statement?

A  It appears to be for prior years,
2004, 2003, 2002.  There was a three
year tax exam.  I did not handle that
but I know that spanned three years.  We
received a note change.  I don't know

---

W. H. Jennings                    76

what year that ended so typically those
amounts would be accrued in a prior
period.

Q  So it's your testimony that Marks
Paneth & Shron received a fee of
$34,000?

A  For the audit.

Q  And can I assume that that other
seventy four somewhat thousand dollars
was money that had accrued in previous
years?

A  It's possible, yes.  It's very
likely that it accrued in prior years.

Q  Well, it would almost have to be
a certainty; is that correct?

A  It depends on when it was billed.

Q  So that I call your attention
again to our discussion about GAGAS and
particularly your testimony concerning
accountants being owed large sums of
money by their auditee, if that's a
word, or the company that they're
auditing.  Are you telling me that in
2006 when Marks Paneth & Shron sat down

W. H. Jennings                    77

1
2  to do an audit on what records Dalton
3  Management produced to them that as they
4  were doing it they were owed $74,000 by
5  the Seavey group or the four
6  developments that we're concerned with?
7      A    Not the four developments.  Fifth
8  and 106th.  This particular development.
9      Q    So that the other three may have
10  owed money also; is that correct?
11      A    That's correct.
12      Q    So that it's fair to say that at
13  the time that you were auditing Fifth
14  and 106th Street Corporation in 2006 the
15  Seavey group might have owed Marks
16  Paneth & Shron $100,000; is that
17  correct?
18      A    It's possible.
19      Q    Would you consider that to be
20  material and substantial?
21      A    It depends on what period those
22  fees were for and it if was billed.
23      Q    Well, I direct your attention now
24  to Plaintiff's 4 where I see years
25  listed here and it started in 2001, 2004

W. H. Jennings                    78

1
2  tax analysis $25,000, 2003 tax
3  preparation $7,800 and then July to June
4  2005 to 2006.  So it appears that at
5  least $25,000 of this money was
6  outstanding since presumably January of
7  2001, sometime in 2001; is that correct?
8      A    That may be when the tax exam
9  began but typically tax exams, unless it
10  really builds up a tremendous amount of
11  time, I mean hundreds of thousands of
12  dollars, it wouldn't be billed until the
13  conclusion of the tax examination.
14      Q    Now, specifically with regard to
15  the GAGAS rules and your quality review
16  committee, was the quality review
17  committee aware at that time that this
18  audit was performed that a minimum of
19  $75,000 and possibly more than $100,000
20  was owed by this client to Marks Paneth
21  & Shron at the time you were doing an
22  audit at their work?
23          MR. KELLY:  I'm going to
24      object to that.  The form of that
25      question is completely using

W. H. Jennings                    79

1
2      improper terms, making the
3      question itself misleading.
4          If you want to use the correct
5      terms --
6          MR. HAYWOODE:  The witness can
7      answer.  That's not a proper
8      objection on 221.  Are you
9      directing him not to answer?
10          MR. KELLY:  Objection as to
11      form.  If you restate the
12      question using the correct terms
13      and the correct dates then, yes.
14      Q    In 2006 when you submitted this
15  audit to quality review in Marks Paneth
16  & Shron were they aware that this audit
17  was performed while these companies owed
18  Marks Paneth & Shron anywhere from
19  $74,000 to over $100,000?  Were they
20  aware of that?
21      A    It wasn't outstanding.
22      Q    Were they aware that there was
23  such a debt?
24      A    There was no debt.
25      Q    Well, were they aware that that

W. H. Jennings                    80

1
2  money had been paid to them and had
3  accumulated from 2001?
4          MR. TRAUB:  Objection.  That
5      mischaracterizes the prior
6      testimony or testimony of
7      what this 2001 to 2004 tax
8      analysis was.  And just so we're
9      clear, Mel, I am objecting not
10      just to the form but to your
11      insinuation that this was
12      outstanding from 2001 when that
13      is not what his testimony was.
14          MR. HAYWOODE:  An objection to
15      insinuation is not credible under
16      221.  Lawyers can insinuate
17      anything.  And the tone of
18      whatever insinuation I may make
19      isn't coming across on this
20      record.
21          MR. TRAUB:  Which is why, Mel,
22      I'm actually here to keep a clean
23      record, as I know you are.
24          MR. HAYWOODE:  Not as to tone
25      and not as to insinuation.

W. H. Jennings                                    81

1
2        MR. TRAUB:  Absolutely.  As to
3    prior testimony, to
4    mischaracterization of prior
5    testimony and to an insinuation
6    of what my client's involvement
7    was that something was out to
8    2001.  He did not testify that
9    this was outstanding in 2001 and
10   your mischaracterization of
11   either his testimony or the
12   insinuation of what an act that
13   my client did is in fact a proper
14   objection.  It's on the record.
15   Q    Mr. Jennings, let's go back.
16   What is all this telling us, the 2001,
17   you tell me, I don't know, tax analysis
18   2001 to 2004, let's see, tax preparation
19   2003 $7,800, various PR, what is that;
20   promotions?  In Exhibit 4, what is PR,
21   950920?  What is that various PR?
22   A    I don't know.
23   Q    Do you have any idea?
24   A    No.
25   Q    But the money is good, 950920?

W. H. Jennings                                    82

1
2    A    Correct.
3    Q    And $15,000 from October, let's
4    see, I don't know, from October 2000 to
5    July 2, what are these items?  What do
6    they look to be?  Do you have any idea?
7    A    All I know is that my firm
8    handled the tax exam.  There were some
9    analyses requested by Mr. Edmonds
10   regarding the opt out and the viability
11   of an opt out, that I know, whether it
12   was viable because in this particular
13   case Fifth and 106th has a 236 interest
14   reduction subsidy which means that they
15   have a one percent subsidized mortgage.
16   If they lose that mortgage that'll be a
17   tremendous expense to the project.  If
18   they opt out they have to make sure that
19   the market rents that were provided to
20   me would cover it so this might have had
21   to do with an opt out computation.  I'd
22   have to look because obviously this PR
23   is cut off.  This time and billing comes
24   right off our time runs.
25   Q    Sir, are you finished?

W. H. Jennings                                    83

1
2    A    There is documentation on all the
3    time.
4    Q    It is a fact the $108,525.45 was
5    paid to Marks Paneth & Shron in the real
6    world as opposed to the world of accrual
7    or cash--
8    A    I repeat --
9    Q    -- in 2006?
10   A    According to Dalton's records
11   that is a correct statement.
12   Q    And sir, according to Marks
13   Paneth & Shron's records --
14   A    I do not audit Marks Paneth &
15   Shron's records.  I am a partner.  One
16   of sixty.  I am not the administrative
17   partner.  I am not the accounts
18   receivable clerk.  I do not handle Marks
19   Paneth & Shron's books so you're asking
20   me to make --
21   Q    Is there an accounts receivable
22   clerk who can answer this question?
23   A    Probably can, yes.
24   Q    Can you tell me who that is?
25   A    I don't know really anybody in

W. H. Jennings                                    84

1
2    bookkeeping so I can't --
3    Q    Well, perhaps you will inquire
4    and tell Mr. Kelly and he'll provide me
5    the names in ten days?
6    (INSERT):
7        MR. KELLY:  Perhaps.
8        MR. TRAUB:  If I can make a
9    suggestion, and again, this is a
10   means of helping.
11       MR. HAYWOODE:  Hold on, wait.
12   Off the record.
13       MR. TRAUB:  No, I'm not off
14   the record.
15       MR. HAYWOODE:  If it's a
16   suggestion, I want to go off the
17   record.
18       MR. TRAUB:  I'm not off the
19   record with my suggestions, Mel.
20   I want my suggestion on the
21   record.
22       MR. HAYWOODE:  221 doesn't
23   allow the lawyer to testify or
24   make long arguments or
25   statements.  Is this something

W. H. Jennings                    85

```
1                 W. H. Jennings          85
2    that we need to hear?
3         MR. TRAUB:  No, what my
4    suggestion is, and it's on the
5    record --
6         MR. HAYWOODE:  No, no.  If
7    it's not testimony, if it's not
8    an objection, I want it off the
9    record.
10        MR. TRAUB:  Mel, I want it on
11   the record and I'm entitled to
12   have my statements on the record.
13        MR. HAYWOODE:  No, no, no, no.
14        MR. TRAUB:  Absolutely and
15   Mel, my statement on the record
16   is to help everyone and it's not
17   testimony about this.
18        MR. HAYWOODE:  Can we hear it
19   first off the record?
20        MR. TRAUB:  No, I'm going to
21   put it on the record.
22        MR. HAYWOODE:  Well, I object
23   to it.
24        MR. TRAUB:  Then you can
25   object to it.  Your objection's
```

```
1                 W. H. Jennings          86
2    on the record.  That's nice.
3         My suggestion is to help
4    things.  Any questions that you
5    have or follow up information,
6    why don't you put in a letter to
7    Mr. Kelly and then after this
8    they can then take it under
9    advisement rather than trying to
10   make requests now that he may
11   then either forget and then
12   you're going to assume that he's
13   not answering or something so my
14   suggestion was you've made your
15   request on the record and then
16   maybe after this you can put in a
17   letter to everyone what
18   information you feel you didn't
19   receive or you would like to
20   receive within ten days.
21        MR. HAYWOODE:  I'd rather do
22   it in accordance with the usual
23   stipulations.  There'll be a
24   record produced here, he'll see a
25   space and we ask for the keeping
```

```
1                 W. H. Jennings          87
2    of the space now so that when the
3    record is executed by his client
4    he will see that this is
5    something that has to be done.
6         MR. KELLY:  Right but here's
7    two things; you may not get the
8    record within ten days and number
9    two Mel, I don't know what these
10   usual stipulations you keep
11   referring to are.
12        MR. HAYWOODE:  This is getting
13   to be, I mean, again, I don't
14   mind talking but this has nothing
15   to do with what we're here for
16   today.
17        MR. TRAUB:  It actually does,
18   Mel, because you said usual
19   stipulations, I don't know what
20   those usual stipulations are.
21   This is the first deposition any
22   of us have ever had together so
23   what are these usual stipulations
24   that you're referring to?
25        MR. HAYWOODE:  I'm going to
```

```
1                 W. H. Jennings          88
2    refer you to the practice of the
3    last hundred and fifty years of
4    the bar, okay?  Now, this young
5    lady will tell you what the
6    stipulations are.
7         MR. TRAUB:  Do you know what
8    they are?
9         MR. HAYWOODE:  Darren, please,
10   I mean, again, I realize things
11   well up here, it happens every
12   time, okay, but it's not
13   appropriate.
14        MR. TRAUB:  I stand by my
15   statements.
16        MR. HAYWOODE:  I receive them
17   but I'd rather do it the other
18   way, okay.
19        MR. TRAUB:  Again, these
20   weren't directed to me so it was
21   just my suggestion.
22        MR. HAYWOODE:  In fact, it's
23   Bill Kelly's objection and he's
24   not making it.
25        MR. KELLY:  I haven't had the
```

W. H. Jennings                    89

2   chance to speak yet

3         MR. HAYWOODE:  Now, let's hear

4   Bill Kelly's objection.

5         MR. KELLY:  What are the usual

6   stipulations that we have on the

7   record?

8         (Whereupon, a brief discussion

9   was held off the record.)

10        Q   There was a discussion off the

11  record in which counsel suggested ways

12  in which the $105,000 could have been

13  accrued or accumulated and does that

14  refresh your recollection, Mr. Jennings,

15  as to how that $105,000 was actually

16  accumulated?

17        A   It could have been accrued, yes.

18        Q   All in the one year?

19        A   It's possible but not necessarily

20  factual.  I'd have to look at the facts.

21        Q   If we look in the volumes of

22  other records that were presented to us

23  might we find, for instance, that one of

24  those items was billed in 2002?

25        A   It's possible, yes.  We keep work

---

W. H. Jennings                    90

2   in process reports, detailed reports, by

3   hour, by employee, etcetera, by account,

4   by service, very detailed records.  The

5   determination of when it's billed,

6   that's discretionary.

7         Q   So that your testimony is that

8   Marks Paneth & Shron could have

9   performed services anytime between 2001

10  and 2003 or whatever and not billed them

11  to this client until 2006; is that

12  correct?

13        A   Yes.

14        Q   In looking at the general ledger,

15  the general ledger showed that Dalton

16  Management chose to reflect all that

17  money as being paid in 2006; is that

18  correct?

19        A   That's correct.

20        Q   Who made the determination to

21  report to DHCR the $34,000 and to

22  withhold from them the information

23  concerning the additional $74,000, who

24  made that determination?

25        A   Based on our audit procedures.

---

W. H. Jennings                    91

2   Your $34,155 represents the audit fee.

3         Q   Under your contract with the

4   housing company -- are you familiar with

5   the contract?

6         A   Yes.

7         Q   It sets forth an amount of money

8   that the company is to receive; is that

9   correct?

10        A   Yes, for accounting services.

11        Q   Does it speak of any process to

12  be followed if monies in excess of the

13  accounting services is to be paid?

14        A   Yes.

15        Q   What, if anything, do you recall

16  that it says about such money?

17        A   You need the approval of DHCR.

18        Q   So that it's fair to say that

19  before the money was paid to Marks,

20  Paneth & Shron that they obtained the

21  approval of DHCR?

22        A   The accounting services, not the

23  tax services.

24        Q   Did Marks Paneth & Shron seek or

25  receive any approval from DHCR for the

---

W. H. Jennings                    92

2   payment of $74,000 in 2006?

3         A   For the accounting services, the

4   audit services, not the tax services.

5         Q   Did they receive any approval or

6   authorization from DHCR for the payment

7   of $74,000 in addition to the accounting

8   and to the audit services and 2006?

9         A   For the accounting services, not

10  the tax services.

11        Q   You received an authorization for

12  the $74,000?

13        A   No, not for the tax services.

14        Q   Did you apply for an

15  authorization for the $74,000?

16        A   It wasn't necessary.  It was for

17  tax services.  That was a tax exempt.

18  The tax services is not covered by the

19  retainer.

20        Q   It not being necessary, sir, is

21  that the reason that only $34,000 was

22  reported to DHCR?

23        A   No, if there were other payments

24  made it would be disclosed in a separate

25  line item but I'd have to look at every

W. H. Jennings                93

1
2    single financial statement to see when
3    it was accrued.
4        Q   Well, we know that the general
5    ledger reported it all at $105,000
6    payable to Marks Paneth & Shron; is that
7    correct?  That's what the general ledger
8    did.
9        A   That was paid.
10       Q   Yes, but that's how the general
11   ledger produced and reported it.
12       A   That's not GAAP.
13       Q   Who made that decision to report
14   $34,000 and to place the balance of the
15   $74,000 in different categories?
16       A   It may not be in different
17   categories.  It may have been accrued in
18   prior years and it doesn't show up in
19   2006.  It could have been 2005, it could
20   have been 2004.  I mean, I'd have to
21   look at the work papers to make that
22   determination.  You're asking me a
23   question I cannot answer.
24       Q   Whatever the answer is, it is
25   certain that Dalton Management didn't

W. H. Jennings                94

1
2    make that determination; is that
3    correct?  Dalton didn't make it.  Dalton
4    put in the general ledger $105,000,
5    right?
6        A   We proposed adjustments to make
7    the financial statements in accordance
8    with --
9        Q   And did Dalton agree and accept
10   those adjustments?
11       A   They would have to.  They're
12   their financial statements.
13       Q   But did they?
14       A   They would have to.
15       Q   They would have to accept it --
16       A   Yes.
17       Q   -- purely because Marks Paneth &
18   Shron --
19       A   No.
20       Q   -- proposed it?
21       A   We propose journal entries.  They
22   have to agree to the journal entries.
23       Q   And there's no writing --
24       A   No.
25           MR. KELLY:  Let him finish his

W. H. Jennings                95

1
2        question.
3        Q   -- that would memorialize this
4    suggestion or proposal or this
5    acceptance or acquiescence, nothing?
6        A   No.
7        Q   Now, when they accepted this in
8    2006 is it fair to say that Dalton
9    Management should have immediately
10   amended its general ledger?
11       A   If they agreed to the proposed
12   journal entries?
13       Q   Yes.
14       A   Yes.
15       Q   They would have amended and
16   changed their general ledger?
17       A   For the prior year, that's
18   correct.
19       Q   So that when Cameron, Pryce &
20   Griffiths looked at their books in March
21   of 2007 they should have seen that
22   change to the general ledger; is that
23   correct?
24       A   That's correct.
25       Q   But they didn't.  They didn't see

W. H. Jennings                96

1
2    it in March of 2007.  The change wasn't
3    made by Dalton.  Does that refresh your
4    recollection as to what you just
5    testified to?
6        A   I don't know what their
7    procedures were internally, as far as
8    that was concerned.  They would have to
9    make it at the end of 2006 to correct
10   2006 based on the approved journal
11   entries.  If it was made in 2007 the
12   only thing it would affect would be the
13   balance sheet accounts.  It wouldn't
14   affect any profit and loss statement
15   because part of its capital accounts
16   would already be closed out.
17           MR. HAYWOODE:  Let's have this
18       marked.
19           (A financial statement was
20       marked as Plaintiff's Exhibit
21       5 for identification, as of
22       this date.)
23       Q   Now, I'm not going to mark this
24   exhibit but it is a document which
25   appears to be a bill from Marks Paneth &

W. H. Jennings                                    97

1
2  Shron.  It appears to have generated in
3  or about March 31, 2002.  It suggests a
4  series of billing -- I'm sorry August
5  28, 2002 is the date that invoice number
6  103442 was issued.  And it reflects
7  certain numbers.  Does that refresh your
8  recollection that the monies paid in
9  2006 were originally billed in 2002 as
10 to that amount?
11      A   Yes.
12      Q   It was billed in 2002?
13      A   It appears so.
14      Q   So it's fair to say then that the
15 monies paid in 2006 have been
16 outstanding for four years?
17      A   It appears so, yes.
18      MR. TRAUB:  Just for
19  clarification, when you say,
20  "monies," you mean $15,000?
21      MR. HAYWOODE:  Whatever is
22  reflected in the document.
23      MR. TRAUB:  Since the document
24  is not marked as an exhibit I
25  just wanted you

W. H. Jennings                                    98

1  to --
2      MR. HAYWOODE:  Sure, I
3  acknowledge your point, Darren.
4      MR. TRAUB:  Thank you.
5      MR. KELLY:  I'm sorry I was
6  reading the document during that.
7  You were saying?
8      MR. TRAUB:  Well, I was just
9  saying because the document is
10 not marked as an exhibit the term
11 monies is just the $15,000.
12 That's what the witness was
13 testifying about.
14      MR. KELLY:  Okay.
15      Q   Now, I direct your attention,
16 sir, to Plaintiff's 5 which is a
17 document generated by Marks Paneth &
18 Shron; is that correct?
19      A   Yes.
20      Q   I direct your attention to
21 account number 6210 which appears twice
22 in the column at the bottom.  I'm sorry,
23 is it twice or three times?  I'm sorry,
24 they're two different items, 6204 and
25

W. H. Jennings                                    99

1  item 6220.  Do you see those items?
2      A   Yes.
3      Q   Now, the first item is reported
4  as an adjustment journal entry and a
5  reclassification; is that correct?  It's
6  in that column, both items?
7      A   Yes.
8      Q   And $82,909 is reported as a
9  management consultant fee; is that
10 correct?
11      A   Yes.
12      Q   And then in a second column
13 $82,909 is reported as an audit expense;
14 is that correct?
15      A   A credit to audit expense.
16      Q   So that you're saying that you
17 credited the audit expense account which
18 is to say that you removed it from the
19 audit expense account?
20      A   Correct, where it didn't belong.
21      Q   It didn't belong there?
22      A   No.
23      Q   And then you put it in the
24 management consulting column?
25

W. H. Jennings                                    100

1      A   That's correct.
2      Q   Did you propose a journal entry
3  for that change?
4      A   Yes.
5      Q   Was the general ledger changed by
6  Dalton Management?
7      A   I don't know.
8      Q   You testified before that it was
9  essential that these changes be
10 generated through Dalton Management so
11 that in the next year your books and
12 your financial statement and the general
13 ledger would all be on the same page,
14 sort of speak; is that correct?
15      A   That's correct but you have to
16 understand the process if you don't go
17 back to prior general ledgers.  If he
18 should have made these entries I
19 wouldn't be aware if he did or didn't.
20 We work off the trial balance.  We do
21 not make original entries.  We do not do
22 bookkeeping.
23      Q   But we do know that when the
24 Cameron, Pryce & Griffiths got to them
25