W. H. Jennings                                                                                         101

in March of 2007 the general ledgers did not reflect these journal entries?

A  This wouldn't be reflected in 2007, as you see it.

Q  But it should have been put on the books immediately with the receipt of your journal entries; shouldn't it?

A  In the perfect world, which very rarely happens, he would have recorded these journal entries in 2006 to close out his old books. We do not verify that. That's not part of our procedures. If he made these adjustments, these proposed adjustments after they agreed to them, in his books of records in 2007 anything that affects the profit and loss, the profit and loss you have to understand has already been closed out to partner's capital. You will not see these journal entries in 2007.

Q  When would you see them?

A  You should have seen them and I don't know if you did, when he closed

W. H. Jennings                                                                                         102

out 2006. You'd have to go back to his old general ledger in 2006.

Q  Sir, these people would have been looking at the 2006 records of Dalton Management.

A  I am not aware of what they did or what they looked at.

Q  In fact, you have no idea what, if anything, Dalton Management has or doesn't have or what they do or don't do? You don't have any idea really; do you?

A  But you're asking me a specific procedure. You're asking me specifically about this journal entry. I'm telling you what should have happened. If you knew how an audit worked, we would not go back to their general ledger for 2006 to make sure they make these entries.

Q  Is there any --

A  Let me finish.

The profit and loss is closed out at the end of the year. At the end of

W. H. Jennings                                                                                         103

the year there's no profit or loss anymore. It's closed out to partner's capital, as adjusted. So therefore when you look at a trial balance you'll no longer see a profit and loss as of 1/1/09, I'll use. We're auditing 12/31/08. As of 1/1/09 you'll only see balance sheet accounts. You will not see auditing expense or management consultants. There will be no entries in those accounts.

So therefore, what you're saying is not a procedure that I would look at to look at the prior year to see how he closed it out.

My job is to make sure the financial statements are as accurate as reasonably possible. We don't look at a hundred percent of the transactions. We test transactions. I take an overview of the financial statement to make sure it's not material or misleading.

Q  Mr. Jennings, now, quite apart from the question of what Marks Paneth &

W. H. Jennings                                                                                         104

Shron could be held responsible for, and apart from the question of whether Marks Paneth & Shron should have gone back and investigated the books of Dalton we do agree that Dalton, if it was doing accounting here, had a duty to make that journal entry and to show it in their general ledger?

A  Yes, in 2006.

Q  And if they had done it in 2006 or any other time then Cameron, Pryce & Griffiths would have seen it?

A  But they wouldn't have seen this journal entry that you're showing me.

Q  They would have seen the change that was the result of your proposal; isn't that correct?

A  Is this the whole journal entry?

Q  If Dalton did it, they should have seen it in the general ledger; is that correct?

A  Is this the whole journal entry?

Q  Is this the whole journal entry?

A  Number eight, it looks like it

W. H. Jennings    105

may end. Is that all of eight because you see how it cuts off at the bottom? I just want to make sure that I'm not making a statement based on what I'm being shown.

Q   Let the record show that we're showing the items that Mr. Jennings has requested which is this following sheet to Plaintiff's 5.

A   Okay, every single one of these entries are reclass entries. That means the bottom line of the trial balance, if they showed $100,000 of net income hypothetically before this journal entry was made they would still show $100,000 of net income after the journal entry was made because every one of these are just reclasses from one expense account to another expense account.

Q   Yes, it doesn't change the results.

A   Correct, so therefore --

Q   But, sir, should they not have recorded the change --

LEX REPORTING SERVICE
800-608-6085

---

W. H. Jennings    106

A   In 2006, yes.

Q   -- if they were keeping books and records.

A   Right, if you made the adjustments in 2007 you would not see that journal entry.

Q   In looking at the material from Dalton Management and your people looked at it for how many years now? How many years did you audit this account?

A   Under Dalton Management?

Q   Yes.

A   When did they take over? 2001, I believe so six years.

Q   In looking at their account did you generally find their accounts to be maintained or not maintained at all?

A   Maintained.

Q   So that you did on occasion make inspections or make observations of their bookkeeping and what they were doing; is that correct?

A   That's correct.

Q   And you observed that since 2001

LEX REPORTING SERVICE
800-608-6085

---

W. H. Jennings    107

that they never kept trial balances and never made a proposal about that?

A   Yes, it's a possibility.

Q   And you observed that as these accountants asked them for document after document that they said they didn't have it and that they were referring the accountants to you and did that suggest to you that Dalton's books may be less than correct?

A   No, as I stated before, in my profession it's not unusual for clients to pick up the phone rather than to walk over five feet to a filing cabinet and collect documents.

Q   Repeatedly, Mr. Jennings?

A   Repeatedly, yes.

Q   Repeatedly?

A   Repeatedly.

MR. KELLY:   Can you clarify; repeatedly?

THE WITNESS:   Repeatedly.

A   I have 238 clients and I'm telling you, 200 of them do the same

LEX REPORTING SERVICE
800-608-6085

---

W. H. Jennings    108

thing.

Q   Well, you don't have time to do anything else, do you?

A   That's why I have staff.

Q   That's a lot of money?

A   That's why we eat a lot of time. That's why our realization is only seventy percent, not a hundred percent. You go through those work reports and you see looking for files, send document.

Q   Now, there came a time when Cameron, Griffiths & Pryce in addressing your request began to direct all their requests to you, to Marks Paneth & Shron, around August 14, 2007, there came a time when they began to direct all their requests to you and simply copying Dalton; is that correct?

A   I don't remember getting anything personally after the initial inquiry, the second inquiry from Logan.

Q   But your staff may have?

A   They may have, yes. Most of my

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings 109

correspondents came through Dalton that's why I responded to Dalton.

Q I'm looking at a communication from Cameron, Griffiths, again, I'm not going to mark it at this point, dated August 14, 2007 to Marks Paneth & Shron cc Dalton management, "please provide the following items that we need as part of our audit. One, Lakeview, original agreement for the note payable to Seavey, $29,915.16." Do you recall getting that request?

A No.

Q "Two, 2006 financial statements and HUD report." Do you recall getting that request?

A No.

Q Who in your office would have received this request if it simply came to Marks Paneth & Shron?

A I don't know.

Q "Three, mortgage notes." Do you recall being asked for that?

A No.

LEX REPORTING SERVICE
800-608-6085

---

W. H. Jennings 110

Q "Four, the final general ledger trial balance reflecting twelve months of transactions." Do you recall getting that request?

A It's not necessary to go through every single line item. I didn't get this information request, like I explained earlier.

Q None of them?

A I received a request from originally on Logan, we responded to it. I got a second request on Logan. I called Orley and I explained to him, listen, it would be better if we just, I know you're looking at a lot of jobs etcetera and if we just sat down at some point to just sit down and go through all the issues at one time.

MR. HAYWOODE: Let's mark this.

(A request list to Marks Paneth & Shron from Cameron, Griffiths & Pryce was marked as Plaintiff's Exhibit 6 for

LEX REPORTING SERVICE
800-608-6085

---

W. H. Jennings 111

identification, as of this date.)

Q Mr. Jennings, I'm going to ask you to look down this whole list of Plaintiff's 6, rather than my reading it.

Explanation support for the prepaid insurance, statements for investments, account statement for Chase Money Market, cash op, Citibank, number eight, Nine, schedule for allowance of doubtful account, ten, commercial lease contract with electric corp and so on. All these documents and Cameron, Griffiths & Pryce are asking Marks Paneth & Shron for it and only ccing Dalton? That's what it appears to be.

A Yes, that's what it appears.

Q You had previously received letters from them saying we can't get anything from Dalton; is that correct?

A I'm not sure of that. Like I said, the only two letters I know about or the first that I can recall, let's

LEX REPORTING SERVICE
800-608-6085

---

W. H. Jennings 112

put it that way, are the Logan, the first response and the second letter and that's when I called Orley.

Q Who else was fielding these requests aside from you, from Marks Paneth & Shron?

A They would have come to my attention.

Q They would have come to your attention?

A Yes.

Q So that it's reasonable to presume that in the natural course of events you would have seen this request too; is that correct?

A Under normal circumstances, yes.

I know there was a request for information which I referred to before just before I was about to leave and I flipped through it quickly and saw the extent of the amount and that's when I tried to make contact with Orley and in turn then I called Mr. Edmonds and I asked my staff to handle whatever

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings    113

requests, whatever information we had available to cooperate and in my absence put together and leave there for me upon my return.

Q  Mr. Jennings, as a result of your audit and since you were only acting as an auditor why would Marks Paneth & Shron have had all those documents?

A  I don't know the circumstances as to why they were requesting it from us. I wasn't privy to those --

Q  Why would Marks Paneth & Shron even have had all those documents given that you were only the auditor?

A  I have no idea why they made that request of us.

Q  But why would you have had them, sir? In your audit you wouldn't keep all of this backup material; would you? I mean, would you?

A  I'm not aware of a note payable to Mr. Seavey, first of all.

Q  Well, sir, as opposed to taking individual items --

W. H. Jennings    114

A  But I have to.

Q  The totality of them --

A  But you're asking a question about all this information and I don't know why he would ask for them. We wouldn't have commercial leases. We may have a copy of maybe one or two pages of it for our audit process. We wouldn't have a whole lease. We wouldn't have a note payable to Mr. Seavey. I don't even recollect. 2006 financial statements, I mean, I got to be honest, that's absurd to ask us for. They have them. They mailed them out.

Q  Who is they?

A  The management agent.

Q  Dalton had it?

A  Yes.

Q  But you didn't see what Dalton had? What you're saying, sir, is Dalton should have had them; is that correct?

A  Right, we know we sent them.

Q  You sent them to Dalton?

A  Yes.

W. H. Jennings    115

Q  But what they did with it after that, you don't know?

A  You know what, I've been in post audit close out conferences with them where we had to refer to prior year financial statements and they would go back, Earline would say, go back, Mr. Seavey's secretary --

Q  I know Earline.

A  She would say, what do you need? Here it is. Same thing with mortgage notes, general ledger. I mean, we wouldn't even have the general ledger. Account statements, I mean, this is all things that they would have there, should have there.

Q  Do you have any idea, Mr. Jennings, why between March of 2007 and November of 2007 Cameron, Griffiths & Pryce could not get this information from Dalton Management? Do you have any idea why it would take them that long?

MR. TRAUB:  Objection. Assumes facts not in evidence.

W. H. Jennings    116

MR. HAYWOODE:  Well, I'm going to suggest, and I don't want to have to pull at this, but the order to show cause as part of the pleadings is in evidence and the order to show cause is replete with every request and I believe there were fourteen of them made by the accountants to Marks Paneth & Shron and/or Dalton seeking this information.

MR. TRAUB:  My point is the fact that they've asked for the information doesn't show that they in fact never really received it before this. It just shows that they're asking for it.

MR. HAYWOODE:  Who is, "they," Darren?

MR. TRAUB:  Cameron, Griffiths & Pryce.

The fact that they're asking for this does not in fact show that they have never received it.

```
                              W. H. Jennings                117
```

As you know it is Dalton Management's position that they did receive all of this over their six-month inspection of the books and records that occurred prior to this.

   MR. HAYWOODE: All right, Darren, that's an offer of proof that you're making now for the record because you can't testify to that and that means that if and when you produce people from Dalton Management they're going to tell us then that they supplied this information and that Cameron, Griffiths & Pryce was just asking them day after day just to be annoying. I mean, is that your offer of proof? Is that what you're telling me your clients are going to testify to?

   MR. TRAUB: I don't need offer of proof. My point was that I made an objection. You said you

```
                              W. H. Jennings                118
```

want to pull out the order to show cause. The order to show cause, again, merely attaches this and my point is that what you can show is that they've asked for these records but I think it assumes facts in evidence that they never received these and that's my point and it's just, again, an objection to the form. I don't mean to sit here and debate this with you.

   Q But Mr. Jennings, those are all documents that Dalton should have had, isn't that correct?
   A Yes.
   Q Did you ever have occasion to review Dalton's contract with these developments?
   A Yes, during the audit process.
   Q What is roughly the compensation that Dalton receives for the doing of all this work?
   A It depends on the type of job.

```
                              W. H. Jennings                119
```

The division of Housing Community and Renewal has a fixed contract with them for three different types of fees.

   HUD is a little unique. HUD has gone through quite a transition over the last several years because of the marked to mark program. Originally it was $59 per unit per month then it changed to $42 per unit per month plus front line costs and then when they opted out or the insured mortgage was paid off and it went mark to market HUD allowed them to take a percentage of fees based on what the previous percentage was because with mark to market you have to understand that some of these rents went up a significant amount of dollars. They had HUD grants before and they went up to market rents so there was actually, I guess it wasn't Dalton, but there were quite a few HUD owners that went to HUD and say, listen, before we were getting six percent so just because the rents went up it doesn't mean we're not still

```
                              W. H. Jennings                120
```

entitled to the six percent so therefore we should still be entitled to a six percent fee.

   Q Sir, is it a fact that Dalton collects twenty percent of the $15 million dollars that these four buildings take in, approximately?
   A I don't know off the top of my head.
   Q Well, what percentage, off the top of your head, would they take of the $15 million that these projects take in?
   A I wouldn't know percentage wise but I know on all the real estate development I audit that once they opted out and it went mark to market the typical rage would be anywhere from $62 per unit per month to as high as $90 per unit per month.
   Q What do you estimate they paid in 2006?
   A I don't know.
   Q If I say to you that it was between 2.5 and 3 million dollars does

W. H. Jennings                                                121

that sound right?
    A   I don't know.
    Q   Would you have any idea?
    A   I'd have to look at the audits?
    Q   But assuming twenty percent, would that be an outrageous figure?
    A   It seems high, yes.
    Q   So what percentage do you think would be more in line with the norm?
    A   I'd have to go stick to the formulas. Reasonable would be between $60 and $89 per unit per month.
    Q   Which would result in how much a year?
    A   I don't know. It depends on the number of units.
    Q   How many units in Lakeview?
    A   Four hundred and change, I believe. Well, no, Lakeview is different. That's DHCR. That's Division of Housing. You can't use Lakeview as an example. You're talking about apples and oranges here.
    Q   It is fair to suggest though that

W. H. Jennings                                                122

Dalton is receiving somewhere between $2 million and $3 million a year for its accounting services?
    A   I can't --
    Q   You have no idea?
    A   For what?
    Q   For its accounting services, you have no idea?
        MR. KELLY:  Objection.
    A   That doesn't make sense.
    Q   What doesn't make sense?
    A   Two million dollars for the accounting services?
    Q   For all of the four buildings.
        MR. KELLY:  You mean management services?
    Q   I'm sorry, management services.
    A   I can't say. I don't know.
    Q   You have no idea?
    A   No.
    Q   And part of the managing services is that they should be front line accountants; isn't that correct?
    A   Front line?

W. H. Jennings                                                123

    Q   They should be accounting too; isn't that correct?
    A   Accounting?
    Q   They should be accountants?
    A   You have to rephrase that. I don't understand what you're talking about.
    Q   Dalton Management with regard to these buildings should be the accountant also; is that correct?
    A   The bookkeepers, yes.
    Q   They should be keeping all the books?
    A   Correct.
    Q   And the records?
    A   Correct.
    Q   And everything else?
    A   Correct.
    Q   And all the auditor had to do is come in and look at a sample and go through it and say, "okay, fine, this is important, that's important, that's important, you passed the test." Have I described systemically what happens?

W. H. Jennings                                                124

    A   Except for adjustments, proposed adjustments.
    Q   Except for the proposed adjustment that you make. When you make a proposed adjustment you would put it in writing to them, right?
    A   No.
    Q   How would you communicate it?
    A   We had a post-audit conference.
    Q   With who?
    A   With management.
    Q   And who would represent management?
    A   It depends on who was there at the time.
    Q   To your recollection who represented management in 2006?
    A   It could be typically Ron Dawley. Typically we'd go over it with Ron Dawley.
    Q   And he'd be the only one?
    A   Typically.
    Q   Who else might you go over it with?

W. H. Jennings    125

    A   Neale Seavey might have been part of it.
    Q   Neale Seavey and who else?
    A   That's about it.
    Q   So it was either Ron Dawley or Neale Seavey.
    A   Unless we had some site issues.
    Q   Never Avery; is that correct?
    A   They might have gone over. Avery might have sat in at times.
    Q   Robert has sat in?
    A   No, typically Robert would not sit in.
    Q   What about Phyllis?
    A   Phyllis would occasionally sit in, yes.
    Q   And all these proposals would be proposed to them in a conference?
    A   Correct.
    Q   Are there minutes taken of this conference?
    A   No.
    Q   And then whoever sat in, Ron Dawley or Phyllis Seavey or Neale, would

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings    126

any of them say, "good, fine, we're going to go back and we're going to correct the general ledger"?
    A   No.
    Q   But they would have known that had to be done, right?
    A   I assume so, yes.
    Q   And they would know that if it wasn't done that someone coming in to audit, as Mr. Cameron's organization did, wouldn't know where to begin; is that correct? If all the changes, if all the journal change proposals were not reported in those books it would be impossible for anyone to really audit and to know what's going on; is that correct?
    A   The agreed upon, yes.
    Q   They might calculate figures from their audit based on what they could see and they might turn out some $7 to $8 million dollars short in terms of being able to justify the expense issues from the actuality of the figures that you

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings    127

propound, that would have been possible, right?
    A   It is possible, yes.
    Q   And if that happened would that change your opinion as to the quality of care that Dalton was given to these records?
    A   No.
    Q   Sir --
    A   It's common, it's very common in the industry that this occurs and they have to approve the journal entries. They are supposed to make the journal entries. It's common practice.
    Q   Did Dalton keep these things or did they not?
    A   Keep what things?
    Q   The book, the records?
    A   Yes, they did.
    Q   But you never saw it and you can't verify it and the indication on form of communications is that people were coming to Marks Paneth & Shron and asking for it and not asking Dalton and

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings    128

the letters in the pleadings are saying we can't get this information from Dalton and that's why we're coming to Marks Paneth & Shron?
    MR. KELLY: Objection.
    You don't need to answer that.
    Q   Was that information that reached you or was it not?
    MR. KELLY: Objection.
    What are you referring to in your question?
    MR. HAYWOODE: The information that I said, that everyone was looking for Marks Paneth & Shron and not for Dalton?
    A   But I can't say why they were looking for us. I don't know what transpired on that end.
    Q   But you were answering; is that correct?
    A   I answered Logan.
    Q   You say you only answered once?
    A   That's it.
    Q   And you didn't answer any other

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings                                    129

time?
  A   No, I explained to you what happened. Let's go through this again. I got an inquiry on Logan. We answered the question a few days later. We got another inquiry on Logan a few months later. I called Orley. I explained to him that it would be easier, I know they're looking at a lot of jobs, just to sit down when they have all their questions compiled to save time and energy and money and sit down and go through all the information.
        The next time I heard, to my recollection, was just before I was about to go away and it was a demand for information, implying that I wasn't cooperating in the past which is not true, I would comply with any requests that's made as long as it's authorized by the owners. I then called Mr. Edmonds and explained to him the situation. He said to me, "Bill, don't worry. I will speak to the accountant."

---

W. H. Jennings                                    130

That was the last communication I had until this lawsuit.
  Q   Now, with regards to Lakeview, your audit contract for $34,155; is that correct?
  A   That's correct.
  Q   But $108,000 was paid, approximately $74,000 more; is that correct?
  A   Correct.
  Q   Who made the decision to reclassify the audit payments in excess of the contracted amounts from audit fees to management fees?
        MR. TRAUB:  Objection to the form.
  Q   I'm sorry, to management consulting fees, who made that decision?
        MR. TRAUB:  Same objection. It assumes facts not in evidence.
        You haven't shown the $74,000 is the same as the $82,000. The numbers don't match.

---

W. H. Jennings                                    131

        MR. HAYWOODE:  My question to the witness, the witness testified previously that the auditing contract was $34,155. We had a substantial testimony to that.
        MR. TRAUB:  My --
        MR. HAYWOODE:  We have substantial testimony and in this record by identification is the fact that the general ledger reported $108,000 was paid.
        MR. TRAUB:  My point is $108,000 minus the $34,000 is $74,000. It's not $82,909 which is the amount --
        MR. HAYWOODE:  What does $82,909 got to do with this? That was something else.
        MR. TRAUB:  That's the money that you just said was classified from audit to management fees. You're making a jump from one set of numbers to another.

---

W. H. Jennings                                    132

        MR. HAYWOODE:  Well, now, again, that's your objection.
  Q   Was $74,000 reclassified to management consulting fees, sir?
  A   I don't know that. I would assume so.
  Q   You would assume so?
  A   I would assume so.
  Q   Who made that determination to do that if it was so?
  A   It would have been done by the field auditor and then reviewed by me and then approved by as part of our proposed journal entries because those did not represent audit fees.
  Q   So that Marks Paneth & Shron would have made that determination; is that correct?
  A   Based on that proposed journal entry, yes.
  Q   Now, with Church Home, the audit fee contract called for $39,769 and an additional $2,000 was accrued. A total of $41,769 was paid in 2006 to Marks.

```
                W. H. Jennings              133
Paneth & Shron by Church Home.
       The $24,000 was reported in the
financial statement; is that correct?
    A   As the audit fee.
    Q   And $17,769 was reclassified to
management expenses; is that your
recollection?
    A   Probably management consultant
expenses.
    Q   Who made the determination to
transfer that excess account, $17,769,
to management expense?
    A   The field auditor because those
expenses represent non audit fees.
    Q   When you say, "the field
auditor," you are referring to someone
working for Marks Paneth & Shron; is
that correct?
    A   That's correct.
    Q   It was approved by his supervisor
and ultimately you, I presume; is that
correct?
    A   Correct.
    Q   And it was passed onto your
```

```
                W. H. Jennings              134
quality review committee and they review
the quality of it; is that correct?
    A   Correct.
    Q   Logan Plaza, audit fees were
$36,694.  That was paid for accounting
in 2006.  $2000 was accrued, making a
total of $38,694.  $24,000 was recorded
in the financial statement.  The
difference of $12,694 was charged to
management consultant expense.  Who made
that decision; same people?
    A   Same people.
    Q   Charles Hill Housing, audit fees
$36,616 was disbursed.  The additional
amount of $2,000 was accrued making the
total paid in 2006 $38,616.  $24,000 was
recorded.  Same people made that
decision?
    A   Yes.
    Q   All from Marks Paneth & Shron?
    A   Yes.
    Q   And you say that the appropriate
journal entries were directed by you but
you don't know whether Dalton recorded
```

```
                W. H. Jennings              135
them or not?
    A   Correct.
    Q   And nobody ever checked?
    A   There's no reason to check.
    Q   So that if any accountants like
Cameron, Griffiths & Pryce were to go
and look at the books of this
corporation they would say, as we said
in Brooklyn, how come one figure is
being reported to DHCR and HUD and
another figure is in the general ledger?
They would see that assuming that Dalton
didn't do what it was supposed to do; is
that correct?
    A   Yes, they would see it in the
journal entries where it was reclassed.
    Q   And in that way they could build
up together with other thing seven or
eight million dollars that they can't
justify.  What happened here?  Why are
the numbers in the financial statement
-- well, let me sat it this way --
    A   We did not change the total
expenses.
```

```
                W. H. Jennings              136
    Q   Let me say it this way, in this
process, assuming the general ledger was
saying one thing and was not reflecting
the increases being reported in the
financial statement by Marks Paneth &
Shron it is possible that a lot of money
here could appear unaccounted for; is
that correct?  It may not be anybody
took it, but it would appear unaccounted
for?
    A   Not for reclassification.  If you
reclassify one expense to another
expense the net effect is zero.  It's
still zero.
    Q   I didn't major in math.  I
understand that if I reclassify
something, if I buy shoes and move it
out of the shoes column and put it in
the haberdashery column, I'm not going
to change the result but if I buy shoes
for $108,000 and then I put it in the
$34,000 column then I'm going to come up
with $74,000 difference, right?
    A   Not if you add it all up because
```

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings    137

now it's not high heels, it's sneakers and it's still the same amount of money.

Q Except that if I'm doing my addition in the general ledger and I'm not changing my general ledger to reflect journal entries increasing the amount of money, anyone looking at my general ledger wouldn't know where all this other money was going; isn't that so?

A No, you're adding wrong.

Q Well --

A You're adding wrong. If you're taking from one category of expense, to the other category of expense, the expenses in total is still the same.

Q Should not Marks Paneth & Shron have recorded $105,000 income in 2006 that they took as either audit fees or consultant fees?

A It was disclosed.

MR. KELLY: Objection. You just asked if Marks Paneth & Shron should report it?

---

W. H. Jennings    138

MR. HAYWOODE: Yes, in the financial statement. In the statement to HUD and DHCR should they have reported it?

MR. KELLY: With that clarification you can ask that.

Q And in the disclosure statement should they have reported it there?

A What disclosure statement?

Q The disclosure statements that you make to the regulatory agencies?

A It is disclosed. It's in the profit and loss.

Q The $105,000?

A We're not a related party.

Q Should you not have told the state and is not the purpose of the state in asking that you get permission to receive more money for the audit to see if you're getting more money than the $34,000?

A Not audit fees.

Q Sir, let's think GAGAS now. Let's look at the GAGAS regulations and

---

W. H. Jennings    139

we've talked about independence and you testified to the conduct and behavior of Marks Paneth & Shron here and you're human beings, so I don't say it in an accusatory way but look, should not Marks Paneth & Shron have gone to HUD or DHCR and say, "look, in addition to the $34,000 from auditing we're getting paid because these four corporations are accruing debts since 2002 which they owe us with the result of which that in one year we collected $105,000 and we make a full disclosure of that but we weren't influenced by that"? Shouldn't you have at least had to make that presentation to DHCR or HUD given the regulations and given the rules?

A No.

Q Not at all?

A No.

Q You say there was perfectly nothing wrong with you accumulating debts from these corporations, these four, which justify the receipt of

---

W. H. Jennings    140

$74,000 more than your contract called for without any request to HUD and without any request to DHCR, you say that that was proper procedure?

A Yes.

MR. KELLY: Objection to form.

MR. TRAUB: Objection to form.

MR. HAYWOODE: He's already answered it.

MR. TRAUB: I still get to get my objection on the record.

I said objection, I need to tell what it is.

MR. HAYWOODE: Do you have to say what the form is? You object to the form. Isn't that sufficient?

MR. TRAUB: No, it's not. My objection is that you're classification of $74,000 in debt is contrary to the prior testimony. It assumes facts not in evidence.

MR. HAYWOODE: Well, I think

```
                W. H. Jennings                141
```

it does but whatever.
            MR. KELLY: And I'm objecting
to form and I'll take your advice
and not bother you with my
explanation and I'll instruct the
witness not to answer.
            MR. TRAUB: Mel, it's almost
2:00. I don't know how much more
you have and whether or not we
should take a lunch break.
            MR. HAYWOODE: Yes, I just
paused to think if maybe we
should take a break.
            How does everybody feel? Is
everybody up for this? We're
supposed to go on tomorrow too.
            MR. KELLY: What? I didn't
understand we were going until
tomorrow.
            MR. HAYWOODE: Well, we got
two days here set aside.
            MR. KELLY: Yes, the order
said 3rd or 4th or other
agreeable date.

```
            LEX REPORTING SERVICE
              800-608-6085
```

```
                W. H. Jennings                142
```

            MR. HAYWOODE: Well, Darren is
here. He's leaving on the 5th so
we're not going to be able to do
anything when he's not here.
            MR. KELLY: My point is not
the scheduling issue. My point
is he's available for one day of
deposition pursuant to local
rules and the court order said 3
or 4 or other mutual agreeable
date. Not 3 and 4 and other days
if necessary.
            MR. TRAUB: There's only seven
hours allowed of testimony under
the federal rules.
            MR. HAYWOODE: I thought it
was ten.
            MR. TRAUB: No, seven hours.
            MR. HAYWOODE: I'm sorry,
eight.
            MR. TRAUB: Seven. One day of
seven.
            So if you want to take a lunch
break and get your thoughts

```
            LEX REPORTING SERVICE
              800-608-6085
```

```
                W. H. Jennings                143
```

together and then come back I
think that's --
            MR. HAYWOODE: You want to do
all this in one day?
            MR. TRAUB: Yes. I was under
the impression that it was one
day, that it was today starting
at ten o'clock. I did not set
aside tomorrow as well. The e-
mail said either available either
the 3rd or the 4th and then I
believe his response e-mail was,
"we're available on the 3rd," and
you said that's confirmed.
            MR. HAYWOODE: Then we'll take
a break and we'll reconvene.
            (Whereupon, a recess was
taken.)
        Q   Mr. Jennings, you say that
William Shron passed away two weeks ago
or so?
        A   Yes.
        Q   Our condolences, of course.
        A   Thank you.

```
            LEX REPORTING SERVICE
              800-608-6085
```

```
                W. H. Jennings                144
```

        Q   Was Mr. Shron the personal
accountant for the Seaveys as well as
the accountant for these four
development?
        A   I wouldn't know.
        Q   But he has known Robert Seavey
since 1973; is that correct?
        A   I wouldn't know.
        Q   He did do personal work for Mr.
Seavey, in your earlier testimony, on
buildings other than these four
buildings; is that correct?
            MR. KELLY: Objection to form.
        Q   He did do work on buildings other
than these four buildings for Mr.
Seavey; is that correct?
            MR. KELLY: You can answer.
        A   To my knowledge, yes.
        Q   And that predated even the 1990
contracts for the four buildings; is
that correct?
        A   Yes.
        Q   Of the fourteen buildings, and I
may have asked this before, that the

```
            LEX REPORTING SERVICE
              800-608-6085
```

**W. H. Jennings** — Page 145

```
 1                W. H. Jennings                145
 2   Seavey group has interest in, is Dalton
 3   Management the management company for
 4   all of those other buildings?
 5        A    I believe so since 2000, 2001.
 6        Q    Is Marks Paneth & Shron the
 7   auditor for all those other buildings?
 8        A    Yes, I believe so.
 9        Q    And Marks Paneth & Shron may do
10   tax work under the contract for those
11   building; is that correct?
12        A    That's correct.
13        Q    Are you aware in any way as to
14   the formula through which the Dalton
15   employees are reimbursed by the
16   developments for their services? Are
17   you aware of any formula that's used to
18   do that?
19        A    The front line cost; is that what
20   you're referring to?
21        Q    Yes.
22        A    Yes.
23        Q    Under the Lakeview, Fifth and
24   106th Street agreement, that agreement
25   does call for front line people, on site
```

LEX REPORTING SERVICE
800-608-6085

**W. H. Jennings** — Page 146

```
 1                W. H. Jennings                146
 2   people to be paid by the partnership?
 3        A    That's a contractual agreement
 4   with -- the Division of Housing, as I
 5   explained before, has a specific
 6   management agreement. It doesn't go
 7   with HUD formulas. You're mixing up HUD
 8   formulas with DHCR formulas.
 9        Q    Well, I didn't say anything about
10   HUD.
11        A    But you're referring to front
12   line costs. Front line costs is a term
13   that I use when referring to HUD.
14        Q    Do the contracts that pertain, to
15   your knowledge, to the employment of
16   Dalton call for the partnerships or
17   buildings at which Dalton is servicing
18   to contribute only to the personnel on-
19   site or do they also cover the expense
20   of persons like Ron Dawley?
21        A    To my knowledge, I don't recall.
22        Q    In your review of Logan Plaza did
23   it come to your information that
24   Cameron, Griffiths & Pryce in their
25   testing of the accounts noted that
```

LEX REPORTING SERVICE
800-608-6085

**W. H. Jennings** — Page 147

```
 1                W. H. Jennings                147
 2   $181,000 was listed in the general
 3   ledger and disclosed on the financial
 4   statement as an amount owing to Dalton
 5   Management?
 6        A    Yes, I am aware of that.
 7        Q    Did it subsequently develop an
 8   inquiry by Cameron, Griffiths & Pryce
 9   that the money really should have been
10   payable to the partners?
11        A    I don't recall that.
12        Q    Is this not a fact that both
13   Seavey and John Edmonds confirmed that
14   the $181,000 was due to the partners?
15        A    Not to my knowledge.
16        Q    And the payment was not
17   reclassified then, to your knowledge, to
18   be paid to the partners?
19        A    Not to my knowledge.
20        Q    Do you recall that these payments
21   were listed in the accounts payable
22   schedule in the general ledger?
23        A    Yes.
24        Q    Should they not better have been
25   reclassified as distribution if it was
```

LEX REPORTING SERVICE
800-608-6085

**W. H. Jennings** — Page 148

```
 1                W. H. Jennings                148
 2   payable to the partners?
 3        A    It wasn't payable to the
 4   partners. It was payable to the
 5   management company representing unpaid
 6   management fees during a period that
 7   Logan couldn't afford to pay the
 8   management fee.
 9        Q    So that you say that the money
10   was owed to Dalton?
11             MR. HAYWOODE: Off the record.
12             (Whereupon, a brief discussion
13        was held off the record.)
14        Q    Did it come to your attention in
15   2006 with regard to Church Home that
16   management fees were overcharged by
17   $1,396?
18        A    Yes.
19        Q    And that it accumulated to
20   $11,169 in that year?
21        A    I'm not sure of the amounts
22   you're representing but I know there was
23   a management fee issued at Church Home
24   that we uncovered.
25        Q    And it came to your knowledge
```

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings    149

that 2004 and 2005 overcharges totaled
$39,088?
    A    I don't know if I can verify the
amount but I know there were overcharges
which was discovered upon our audit.
    Q    Is it a fact that the $33,506 was
incorrectly used or that the $11,169
from 2006 to offset the management fee
of $121,795 which was disbursed?
    A    I'm aware that I'm pretty sure it
was repaid, the overcharge, because we
notified them of that in our management
audit.
    Q    Did Dalton Management in that
year pay itself fees designated as
overages totaling $64,052 for the three
years, 2006, 2005 and 2004 which overage
was not supported by their management
contract?
    A    I'm not aware of that.
    Q    But their management contract
called for $24,000; is that correct?
    A    I can't quote numbers.
    Q    And the financial statement

W. H. Jennings    150

recorded fees received by Marks Paneth &
Shron was $24,000 for that year; is that
correct?
    A    If that's what the financial
statements says.  It's very difficult
for me to recall specific numbers.
You're asking me to recall specific
numbers.
    Q    Were you told by your attorney to
bring books and records to the
deposition?
         MR. KELLY:  I'm going to
    object to that.  Any
    communications between myself and
    my client are protected by the
    attorney-client privilege.
    Q    Did anyone suggest that you bring
your books and records so that you might
examine them during the deposition?
         MR. KELLY:  I'm going to
    object to the extent that that
    question is just a rephrasing of
    a question designed to illicit
    attorney-client communications.

W. H. Jennings    151

         (Church Home Associates
         deferred mortgage costs
         statement was marked as
         Plaintiff's Exhibits 7 for
         identification, as of this
         date.)
         (An invoice dated 6/9/05 to
         Dalton Management from Marks
         Paneth & Shron was marked as
         Plaintiff's Exhibit 8 for
         identification, as of this
         date.)
         (Church Home Associates
         management fee overage
         calculation dated 12/31/06 was
         marked as Plaintiff's Exhibit
         9 for identification, as of
         this date.)
    Q    Let me show you 9 which is the
overage calculation, Mr. Jennings.  Who
calculated number 9?
    A    My staff.
    Q    Your staff?
    A    Yes.

W. H. Jennings    152

    Q    Which is to say that Marks Paneth
& Shron did it; is that correct?
    A    Yes.
    Q    In the previous audits that you
did you did not pick up or see that
Dalton Management was receiving monies
in excess of its contractual balance; is
that correct?
    A    I think that's a fair statement,
yes.
    Q    With regards to Plaintiff's
Exhibit 8, this is a bill submitted by
Marks Paneth & Shron to Caanan IV on
June 9, 2005 for special consulting
regarding refinancing transaction of a
new mortgage and the payoff of existing
debt budgets concerning surplus cash,
limited partners request, property tax
arrears and other matters and that bill
is $32,588; is that correct?
         MR. KELLY:  The witness hasn't
    been given the exhibit yet.
         MR. HAYWOODE:  I'm sorry.
    This is number 8.

W. H. Jennings          153

Q  The number's $32,588; is that correct, sir, the additional billable time?
A  That's correct.
Q  And the figure of $3,811 is deducted as non billable. Is that because it's covered by the auditing contract?
A  No, that's typically when I reviewed the work in process if it's for time that I believe can't be billed such as I referred to before, you know, looking for files, two hours, etcetera, I pull it out. It's a discretion area.
Q  And then there's a courtesy discount in addition to that?
A  Correct.
Q  What is the nature of that?
A  Typically, all my long-term clients I give them a discount for the billable time. It's a courtesy.
Q  And it's fair to say that the Seavey group and the Seaveys, these developments and all of the fourteen

W. H. Jennings          154

developments are a long time client; is that correct?
A  Yes.
Q  On the 30.13, the Yellow Book GAGAS regulations isn't there a suggestion that auditors should be changed every three or four years or something to that affect, in the updated regulations; are you familiar with any such rule?
A  No, I'm not.
Q  There is no likelihood that the fact that one auditor has worked with anywhere from four to fourteen developments for ten years there is no likelihood that that might destroy any independence or individuality that the accountant might exercise in auditing their books and records?
    MR. KELLY: Objection.
    That's not a question.
    MR. HAYWOODE: Does the witness understand it?
    MR. KELLY: That's not a

W. H. Jennings          155

    question. I'm not going to let him respond to a statement you're making.
    MR. HAYWOODE: Are you directing him not to answer?
    MR. KELLY: There is no question to answer so I'm directing him not to make a statement on the record in response to a statement you made.
Q  Do you understand the question that I pose?
    MR. TRAUB: Can you rephrase it just to clarify rather than go back and forth?
    MR. HAYWOODE: All right, let's do that, Darren.
Q  Say it this way, your quality review committee, did it ever occur to them that there might be some loss of individuality or independence if you were with one client for ten years if that client had fourteen major developments and if you did tax work for

W. H. Jennings          156

that client and if your partners had been associated and done personal work with those clients for a period which may extend back to 1973, did anybody say that, "wait a minute, we're too close to these people"; no one said that at Marks Paneth & Shron?
    MR. KELLY: I'm going to object to the form of that question as being compound.
    MR. HAYWOODE: Well, I'll read it back the third time for the jury one day.
Q  Did anyone feel that the association with the Seavey group that I just outlined would destroy individuality, would destroy the ability of Marks Paneth & Shron to do an impartial view of what financing they were doing? Did anyone say anything about that? Did any red flags go up? Did the quality and review people say anything about it?
    MR. KELLY: Objection again.

W. H. Jennings    157

You're compounding the question.
Q    Well, let's take them one at a time, sir. Did anybody say anything about this?
A    No.
Q    Of the fourteen developments that you worked with the Seavey group and Edmonds on what is the combined approximate monies that are received from those fourteen developments in any one-year, approximately?
A    $300,000.
Q    Would this be considered an insubstantial retainer by the agency?
A    What agency?
Q    By Marks Paneth & Shron, would you consider this an incidental account, an unsubstantial account?
A    It's a large account but it's not material to the firm.
Q    $300,000?
A    $300,000.
Q    This balance due of $23,000, this

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings    158

is related to a mortgage transaction that took place previously to June 9th of 2005?
A    That's correct.
Q    Is it not a fact that that mortgage transaction took place in 2004, almost a year before?
A    It's possible.
Q    Is it not a fact that that's what occurred?
A    I don't have the mortgage documents in front of me.
Q    Was the custom of Marks Paneth & Shron to wait a year to bill these developments for fees that it had justly earned? Was it the practice to do that?
A    It's a possibility. I don't know if it's a practice.
Q    And the fees that are referred to are listed on exhibit 7 -- do you have Exhibit 7?
    MR. KELLY:    The witness does not have the marked Exhibit 7.
Q    -- on Exhibit 7 at the last line

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings    159

and as professional fees; is that correct?
A    That's correct.
Q    Except that that line lists $22,022; is that correct?
A    That's correct.
Q    So that $1,000 is taken off from the total on Exhibit 8 and could you tell us why that was done?
A    It would have to do with the refinancing of the mortgage. I'd have to look at the work in process to actually determine.
Q    Is there a reason that this $22,000 was recorded in an amortization schedule as opposed to a professional fee schedule?
A    It's like legal fees associated with the refinancing of the mortgage. It would be deferred over the life of the mortgage. Lease fees are over the life of the lease. It would be deferred over the life of the lease or for other professional fees associated with that

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings    160

refinance would be deferred and properly amortized over the life of the mortgage where the asset turns into a liability.
Q    You say that the payoff of existing debts, budgets, surplus cash and limited partners request, property tax arrears and other matters are related to the mortgage?
A    It could be a coincidence. I'll have to look at the work in process because I'd have to look at the actual work and see how that amount was extracted to be deferred.
Q    But the new mortgage is separately stated and listed in Exhibit 8; is that correct?
A    That's correct.
Q    And I presume that in reporting to DHCR and HUD or whoever might be interested the monies were not reported as professional fees but were placed in some other category; is that correct?
A    Correct.
Q    And no request for a variance

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings                                                      161

from DHCR or HUD were obtained --
   A   Not required.
   Q   -- as would allow for the receipt
of monies in addition to the retainer in
this circumstance?
   A   It's not required.
   Q   And you say that the regulations
that pertained in the provisions of the
contract you have do not require you to
obtain permission for such a transfer?
   A   No, only from the -- rephrase the
question.  Repeat the question.
   Q   That the regulations and
contracts that you operated on did not
require you to report this as a fee?
   A   That's correct.
   Q   Now, Cameron, Griffiths & Pryce
has requested a copy of the engagement
letter between Dalton Management and
Church Home and they were advised that
they had to get that from Marks Paneth &
Shron; is that correct?
   A   I'm not aware of that.
   Q   Do you know of any reason why

LEX REPORTING SERVICE
800-608-6085

---

W. H. Jennings                                                      162

Dalton Management would not have been
able to provide the engagement letter?
   A   No.
   Q   Are you aware that in
interrogatories submitted to both Mr.
Traub's office and Mr. Kelly's office we
had asked for the production of that
document?
   A   I'm not aware.
   Q   And you are not aware that to
this date we have not received such a
document?
   A   I'm not aware of that.
   Q   Are you aware that Dalton
Management charged Logan Plaza
Associates $46,611 for office salaries
and other central office expenses in
2006 contrary to the management contract
which calls for payments of people on
site?
   A   No.
   Q   Is it your recollection that the
management agreement with Logan recites
that all of the agents, home office,

LEX REPORTING SERVICE
800-608-6085

---

W. H. Jennings                                                      163

bookkeeping, clerical, payroll and other
management payroll and overhead expenses
including, but not limited to, cost,
office supplies and equipment, postage,
transportation for managerial personnel
and telephone services are to be borne
by the agent, Dalton, out of its own
funds and not to be treated as a project
expense as paragraph 16 section 1.  Are
you aware of that?
   A   No.
   Q   Are you aware that Dalton
allocates a portion of its central
office cost such as wages, computer,
telephone, office, travel, medical and
payroll taxes to Logan Plaza contrary to
the management contract and that the
amount paid in 2006 was $46,611?
       MR. KELLY:  Objection to the
   form.
   Q   Do you understand the question,
sir?  Are you aware that that happened?
   A   No, not the specifics.
   Q   We talked before about Lakeview,

LEX REPORTING SERVICE
800-608-6085

---

W. H. Jennings                                                      164

directing your attention to the
Lakeview.  We discussed that $108,585
was paid to Marks Paneth & Shron and
that $8,539 was accrued, making a total
of $117,067 for audit services and that
the engagement letters for 2004, 2005
and 2006 suggested the on the financial
statements reported $34,155 for these
services.  Are you aware that that
happened?
   A   I'm not aware of the specific
numbers but again, you're mixing up
audit fee with consulting fees, with tax
preparation fees, with tax examination
fees, tax projections.  You're mixing
apples and oranges.
   Q   And you're saying that on the
accrual method you wouldn't have to
declare the total $117,000 as
professional fees being paid to Marks
Paneth & Shron?
   A   No.
   Q   You're not saying that?
   A   Ask again.

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings                                                        165

Q   So that you're saying that because you were doing the accounting on the accrual basis you did not have to report the entire $117,000 paid in 2006 said to have been accrued from between 2002 to 2006?  You're saying that because you're doing it on the accrual basis you didn't have to say that?

A   That's not what I said.

Q   Okay.

A   I said because it's on an accrual basis and the general ledger that you showed me said a cash general ledger I could not answer you as to the specifics.  I don't know when it was accrued.

You're throwing numbers at me that I have no ability to recollect.

Q   Sir, do you need time to go back and look at the books that we have here today, I mean, we have them, you can look at them or you might consult your own.  These are the documents that were delivered by your attorney in a box, I
W. H. Jennings                                                        166

take it, because Dalton doesn't have it and if you need to look at this and then come back and then you can tell us the truth or you can tell us what you might then have knowledge of.  Would you like time to do that?

A   Of the specifics, you're talking about?

Q   Yes, so that I would ask then that, again, at this point that the record be marked and that you consult, on the advice of counsel of course, in your records to determine what the answers should be and then add it as a postscript.

A   Your question is misleading though.

Q   Go ahead.

A   You asked about whether it was done that way because of an accrual.  You're mixing apples and oranges.  It was disclosed as management consultant fees, which I believe it was.  It's because we did other work --

W. H. Jennings                                                        167

Q   In the financial statement?

A   Yes -- other than the audit fee.

You also asked me what period, if it was paid this year, why didn't it show up?  I don't know what adjustments were made as far as an accrual basis, when they were accrued.  The fact that when they were paid is not reflective of when they would be reported in a financial statement.

Q   But you testified that it need not be reported as a professional fee.  That was your understanding then?

A   Correct.

Q   And that is your contention now?

A   Yes, because the agreement is audit fees.

Q   Now, is it not a fact that the payments for the previous years should have been accrued in the financial statement, should have been marked accrued in the financial statement?

A   If they were billed by my firm, as of when they were billed, yes.

W. H. Jennings                                                        168

Q   And to your information were these expenses accrued in the financial statements of the previous years?

A   I do not know.

Q   Can you check that and come back and let us know, yes or no, as to that question?

MR. KELLY:  I'm going to object to any instructing of my client to do or what not to do.  He'll hopefully follow his own lawyer's advice on what he should do and not do in connection with this lawsuit.

MR. HAYWOODE:  Well, is that a Fifth Amendment objection that might incriminate him?

MR. KELLY:  Is that a joke?

MR. HAYWOODE:  Not really.  I don't know.  Are you saying that it's optional?  I advised him with this.  I can't direct him.

MR. KELLY:  Well, that's a difference.

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings       169

MR. HAYWOODE: I advised the witness to cure the uncertainty if he can do so and to addend the record with whatever statement might cure the situation.

MR. TRAUB: Well, one of the problems --

MR. HAYWOODE: Just a minute. Or he may leave it standing the way it is.

MR. KELLY: When I receive the record and I see what information needs to be provided, I will give the appropriate advice at that time.

At this time he can't follow any of your instructions or directions.

MR. HAYWOODE: Well, dear God, it is not an instruction. It is not direction. It is the request for information which might lead us to a clearer truth. That's all it is.

W. H. Jennings       170

MR. TRAUB: Again, I'm just throwing this out there to try to help move things along and not do this one way or the other, but maybe there is a specific place that you can ask him, you know, if you were to look at your records where would they be and maybe you have those records here that were produced previously and we can get those in front of him rather than say go back to your office and look them up. If it's a certain page or certain records that he would look at and they're not one of the eight exhibits or nine exhibits, maybe they're another one and we can get that in front of him.

MR. HAYWOODE: The problem, Mr. Traub, is that as a matter of judicial efficiency or if I sent someone to look through the pages I would have no idea what

W. H. Jennings       171

documents we were looking for and there is a possibility they might not exist and the witness himself would have every idea of where it might be and it would take him much less time to get it.

MR. TRAUB: I agree but I also think that you're then trying to improperly expand the scope of the deposition beyond the seven hours by giving him homework assignments but again, that's just my take on it. I understand that you disagree.

MR. HAYWOODE: I can't do any more than a federal judge will let me do.

MR. TRAUB: That's why I was just wondering if we could try to move it.

MR. HAYWOODE: And Mr. Jennings is ably protected by counsel, esteemed counsel.

MR. TRAUB: Mine was merely a

W. H. Jennings       172

suggestion just like yours. It wasn't taken as a directive or an instruction or even a request.

MR. HAYWOODE: Thank you, Darren.

Q  Similar occurrences for Lakeview and Logan and Charles Hill; is that correct?

MR. KELLY: Objection. What similar are you referring to because you withdrew the last question?

Q  All right, I'll go through it. With regard to Charles Hill Housing $36,616 was disbursed, in addition $2,000 was accrued, making a total of $38,616 for audit services in 2006. The final adjusted journal entry was the $24,000 for the services and once again no engagement letter or contract was provided. It appears that the audit expense for 2006 exceeded the contract amount by $14,616 plus $2,000 which was accrued to be paid in

W. H. Jennings                                          173

subsequent periods. Is that a fact of what happened?

A    No, you keep making an incorrect statement when you equate all of the fees as audit fees. They're not all audit fees. We did a lot of consulting work. I'll go through it again. Tax examinations, RPIE, certiorari proceedings, tax projections, buyout computations, mark to market conversions. You keep saying the same thing, audit fees, audit fees. You keep making them synonymous. An audit fee is an audit fee. It says on the financial statement audit fee. Then there's management consulting fee. I'll give you an example. If they hired me to do the audit and your accountants to do all the other consulting fees there would still be the same amount of fee expense in the audit line and the same amount in management consultant fees, then we would not be having this discussion.

Q    But, now, the taxes are also

W. H. Jennings                                          174

included in the audit fee, right?

A    But that's an incidental cost for tax return. With the discount, the courtesy discount and the pulling out of that, anything that we billed in excess was completely disregarded.

Q    And once again, it's your position that other than audit fees need not be reported to DHCR or HUD and that no variants need be obtained from them in the taking of such fees?

A    That is my impression, yes. Taking of earned fees.

Q    With regard to your proposed journal entries in 2006, with regard to Lakeview alone there were a total of twenty five or twenty six proposed journal entry changes to the work that Dalton was doing; is that correct?

A    If you show me those journal entries and there's twenty six then I agree.

    MR. HAYWOODE: Let the record show that we are showing the

W. H. Jennings                                          175

    journal entries to Mr. Jennings and the financial statement, I believe, that was written by Marks Paneth & Shron.

A    Twenty five journal entries; is that what you said?

Q    Count them, sir. I don't know if it's twenty five, twenty six.

A    It says twenty five.

Q    Is that a commonplace thing that the auditor would make twenty five journal entries in one year's situation with one housing company to a bookkeeping or accounting company; is that common or is that a bit unusual?

A    Absolutely.

Q    So that you say that if we were to look at any of the buildings that you service with Dalton I would find the same percentage, the same proportion of journal entry proposal changes?

A    In some cases, yes.

Q    In all the Dalton buildings?

A    In some cases, yes. Not

W. H. Jennings                                          176

necessarily all. In all the jobs I audit you'll see the same thing. You'll see a lot of journal entries.

Q    So that it's your testimony that all of the companies that do the bookkeeping and for which you do the auditing require you to do extensive journal entries?

A    In the past that is a correct statement.

Q    And you testified before that in subsequent years it is not your responsibility to see that the bookkeeping management company makes the changes that you proposed in their general ledger, you said that's not your responsibility; is that correct?

A    For the prior year.

Q    And for any prior year you say that's not your responsibility?

A    Correct, I don't look at their general ledger for the prior year.

Q    But don't you need to see that those changes are in the general ledger

```
1                W. H. Jennings              177
2   for the prior year in going forward?
3       A   No.
4       Q   In no way?
5       A   No way.
6       Q   Are you aware that during the
7   audit conducted by Cameron, Griffiths &
8   Pryce that they had found the internal
9   accounting control systems of Dalton to
10  lack liability; were you aware that they
11  had said that?
12      A   No, I'm not aware of that.
13      Q   Would it be your opinion that
14  they lacked reliability also?
15      A   Our recent sasses that have come
16  out in the last year would indicate that
17  when we make that many adjusting journal
18  entries it is an internal control
19  deficiency.  That is a correct
20  statement.
21      Q   Is there not a problem when
22  adjusting journal entries from income
23  and expenses are lumped in a
24  distribution account rather than in an
25  individual account?
```

```
1                W. H. Jennings              178
2       A   Can you repeat that?
3       Q   Is it also misleading or
4   confusing when adjustments of journal
5   entries for income and expenses are all
6   lumped in the distribution account
7   rather than in an individual account?
8       A   No, not to the extent you may be
9   thinking.
10      Q   Does that distort the actual
11  balances in the accounts?
12      A   No.  If you recall in my previous
13  testimony I explained to you that the
14  profit loss accounts are closed out at
15  the end of the year.  If you made these
16  adjustments in the subsequent year,
17  after 2006 was closed and he made them
18  in March of 2007, he would have taken
19  all the P and L accounts and closed it
20  to a capital account.  If he deemed it
21  to be a distribution account, simply
22  semantics.  It's not misleading because
23  that's an account that would be closed
24  out to capital anyway.
25      Q   But in subsequent years Dalton's
```

```
1                W. H. Jennings              179
2   work has been deemed deficient?
3           MR. TRAUB:  Objection to form.
4       Deemed by whom?
5           MR. HAYWOODE:  The witness's
6       testimony.
7       A   It's an internal control comment
8   based on recent sasses.
9       Q   Who made the internal control
10  comment?
11      A   We do.
12      Q   Marks Paneth & Shron?
13      A   Marks, Paneth & Shron.  On them
14  and all our clients to the extent that
15  we had to make what's deemed excessive
16  journal entries.  And excessive journal
17  entries do not include depreciation or
18  amortization.  And in some de minimis
19  journal entries that auditors have a
20  tendency to make for immaterial and outs
21  so those are disqualified by our QR
22  department in making that determination.
23          So it is possible you can have
24  twenty five journal entries and to a
25  layman they may say that's excessive but
```

```
1                W. H. Jennings              180
2   when you look at the content of those
3   journal entries, such as reclasses,
4   things like that, where you're
5   reclassing from, like you said before,
6   shoes to boots or shoes to sneakers,
7   that wouldn't necessarily be deemed,
8   that's cosmetic so when you narrow it
9   down and eliminate a lot of the
10  adjusting journal entries that were made
11  because they were maybe deemed
12  unnecessary due to materiality, that
13  twenty five could come down to ten and
14  all our clients were notified of this,
15  when the sass came out and hopefully
16  they learned.
17      Q   Cameron, Griffiths & Pryce found
18  that Dalton records income and expense
19  accruals and adjusting journal entries
20  to the distribution account, as example,
21  Lakeview's ledger recorded legal fees of
22  $104,182 but the auditor's adjusting
23  entries recorded legal fees of $141,050.
24  The difference of $36,586 is not
25  classified in the general ledger but is
```