W. H. Jennings                    181

```
 1
 2   netted with other items and booked in
 3   the partners distribution.  Is that an
 4   acceptable practice for Dalton?
 5       A   Not based on its face what you're
 6   telling me.
 7       Q   Water and sewer recorded on the
 8   auditor's adjusting journal statement
 9   reported zero dollars but as in the
10   first example the amount is netted with
11   other amounts and recorded as a
12   distribution?
13       A   That makes absolutely no sense to
14   me.
15       Q   Well, if again, the water and
16   sewer charge was netted and put in zero
17   dollars a distribution column would that
18   not tend to distort account balances?
19       A   Well, it depends on what the
20   facts and circumstances are.  If the
21   facts and circumstances are deemed to be
22   that they're looking at 2007 and these
23   are adjustments for 2006 then it is
24   possible because he closed out the P and
25   L, the profit and loss, as I've stated
```

W. H. Jennings                    182

```
 1
 2   several times before, to this
 3   distribution account which he deemed to
 4   equate to a capital account which in my
 5   mind if that is the case it distorts
 6   nothing.
 7       If you're telling me that for
 8   that year that there was absolutely no
 9   water and sewer expense on the books and
10   records then I would have issue with it
11   but I think you're mixing up the fact.
12   Based on what you're telling me now it
13   appears that Mr. Dawley is making the
14   adjustments in a subsequent year.
15       Q   Again, if these things are being
16   made in a subsequent year why wouldn't
17   he be able to print the detail of the
18   current year?
19       A   If you have the general ledger
20   and you have the adjustments in your
21   possession then there should be no
22   question as to where these expenses
23   went.
24       Q   But if the general ledger does
25   not contain all of the proposed journal
```

W. H. Jennings                    183

```
 1
 2   entries then you'd be totally lost,
 3   right?
 4       A   No, not at all.
 5       Q   Well, you'd have to see his
 6   financial statement, you'd have to see
 7   the audit report.
 8       A   The audit report is the final
 9   document.  That is the report.  You
10   start with the general ledger, a trial
11   balance is taken off and adjustments are
12   proposed and if they are accepted those
13   adjustments are made to the trial
14   balance to arrive in a financial
15   statement.  And if you have those
16   documents, the general ledger and the
17   adjusting journal entries it's very easy
18   to have a trial as to what transpired.
19       Q   But the problem that these
20   accountants had was that Dalton had no
21   evidentiary information to support the
22   changes, that they were just being
23   presented as a fait accompli, as a done
24   deal.  They were just being, well, this
25   is what it is to Dalton and Dalton
```

W. H. Jennings                    184

```
 1
 2   didn't seem to know why, how, where nor
 3   did they appear to care what was being
 4   done with these journal entries; isn't
 5   that the case?
 6       A   I'd have to defer to Orley.  I
 7   mean the fact that he wouldn't produce
 8   mortgage documents that are in his
 9   possession.
10       Q   But you don't know them to be in
11   his possession?
12       A   They have to be in his
13   possession.
14       Q   They should be in his possession,
15   we all agree on that, right?
16       A   Otherwise they wouldn't have a
17   copy of the important pages.
18       Q   Is there a likelihood that they
19   simply passed that material onto Marks
20   Paneth & Shron and let you sort it out?
21       A   Absolutely not.
22       Q   Well, with the dearth of
23   information that the accountants have
24   testified to that Dalton had or at least
25   said it had in its possession and with
```

W. H. Jennings                185

```
 1
 2   its willingness to just pass any request
 3   onto Marks Paneth & Shron and with your
 4   compliance in responding to these
 5   requests would it at some point suggest
 6   or infer that Dalton really wasn't in
 7   the business of keeping these materials?
 8      A   No.
 9      Q   They certainly weren't keeping it
10   well.
11      A   That's a matter of opinion.  My
12   belief is that they had the documents.
13   They were keeping them and it's not my
14   only client who defers to the
15   accountants because it's much easier to
16   call up an accountant and say, "produce
17   this document for me.  I need you to send
18   it to XYZ," rather than the typical
19   excuse is, "I don't want to go to my
20   file."
21      Q   In point in fact because the process of
22   such it becomes much easier to let the
23   auditors do the accounting; doesn't it?
24      A   No.
25      Q   When an excessive, if it is
```

W. H. Jennings                186

```
 1
 2   excessive, number of journal entries are
 3   made by an auditor and the general
 4   ledger is rendered irrelevant to the
 5   final statement, at what point do we
 6   conclude that it is the auditor doing
 7   the accounting and not Dalton
 8   Management?
 9      A   It may be a deficiency in
10   internal control but it's not accounting
11   or bookkeeping, if that's what you're
12   inferring.
13      Q   The experience reported by
14   Cameron, Griffiths & Pryce suggests that
15   there was no control at Dalton on any of
16   this and that all of it was being given
17   to Marks Paneth & Shron and that Marks
18   Paneth & Shron was doing it?
19      MR. TRAUB:  Can we mark that
20   report as an exhibit?
21      MR. HAYWOODE:  I'm sorry?
22      MR. TRAUB:  Can we mark that
23   report as an exhibit?
24      MR. HAYWOODE:  I will
25   certainly make it available to
```

W. H. Jennings                187

```
 1
 2   you.  I don't want to mark it on
 3   the record but I will make it
 4   available to you because we had
 5   it classified as a work product
 6   but I have no problem giving it
 7   directly to counsel.  I don't see
 8   any reason why it should be in
 9   this record because he's
10   testified about it.
11      MR. TRAUB:  I just want to
12   state that we've asked for that
13   in our discovery request.  That
14   was also the subject of our
15   deficiency letter and Judge
16   Francis' subsequent order and we
17   still have not received the
18   report that you just referred to.
19      MR. HAYWOODE:  Well, this is
20   work product.
21      MR. TRAUB:  The work product
22   of the accounting firm is the
23   exact subject matter of this
24   entire complaint and you can't
25   then hide behind work product
```

W. H. Jennings                188

```
 1
 2   when you're referring to reports
 3   of the accountants that have
 4   started this entire complaint.
 5   It's not work product.
 6      MR. HAYWOODE:  Well, I'm
 7   certainly going to provide it to
 8   you.
 9      MR. TRAUB:  Okay.
10      MR. HAYWOODE:  I disagree with
11   you.  I think it's work product
12   as we specifically requested that
13   it has specific items but however
14   that is I have no objection to
15   providing you with copies of it.
16      Q   The fact that the consulting
17   monies raised on these contracts, on
18   these consultant fees and what not, so
19   far exceed the audit fees, do you see
20   that as tending to work against
21   independent analyses?
22      A   No.
23      Q   And the fact that there are
24   fourteen such developments and possibly
25   others concerned with this client
```

W. H. Jennings                189

1
2  generating what you recall to be
3  $300,000 a year, though it sounds like a
4  little more than that, that doesn't
5  create the tendency in Marks Paneth &
6  Shron to go beyond its normal
7  obligations and to do things that
8  otherwise might not have been done?
9     A   Absolutely not.
10     Q   Now, did it come to your
11  attention that Cameron, Griffiths &
12  Pryce found that Dalton Management takes
13  no responsibility for the excessive
14  journal entries recorded for each
15  partnership and that when asked to
16  explain they simply responded the
17  auditor made those entries and will have
18  to explain them; did that come to your
19  attention that Dalton was saying that?
20     A   No, because we have a management
21  representation letter that says just the
22  opposite.
23     Q   And that Mr. Dawley stated to
24  Cameron, Griffiths & Pryce that the
25  reason he can't trace the journal

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings                190

1
2  entries to the general ledger is that he
3  booked them against the distribution
4  accounts?
5     A   But again, if he's referring to
6  the prior year journal entries he's
7  closing out the profit and loss and
8  that's how he's recorded these journal
9  entries.
10     Q   Did it come to your attention
11  that Cameron, Griffiths & Pryce saw no
12  indication on the journal entries that
13  Dalton approved any of the entries which
14  were made by the auditor?
15     A   I have to look at the management
16  representation letter.
17     Q   Now, directing your attention to
18  Church Home, in the money market account
19  carrying a balance of $49,614 after
20  Dalton wrote a check for $322,221
21  representing a distribution made to the
22  partners.  The check was taken from one
23  account and was deposited in an account
24  called Church Home Associates Two.  Are
25  you familiar with such an account?

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings                191

1
2     A   Yes.
3     Q   How many accounts does Church
4  Home maintain?
5     A   There's and operating account and
6  there's a distribution account.
7     Q   As it was not recorded in the
8  general ledger it was not subject to
9  audit testing and Dawley said he had no
10  access to this bank statement.
11     A   The statement is not true.
12     MR. KELLY: Wait for him to ask
13     a question, then answer.
14     Q   So that in your opinion Dawley
15  did have access to that statement?
16     A   Yes.
17     Q   But as a matter of propriety in
18  doing things right it is a fact, is it
19  not, that all transactions pertaining to
20  the partnership ought to be in the
21  general ledger, that is a fact; is that
22  correct?
23     A   Yes.
24     MR. TRAUB:  I'm just going to
25     go back on the record again and

LEX REPORTING SERVICE
000-608-6085

W. H. Jennings                192

1
2  just state that if you were just
3  reading from the report of
4  Cameron, Griffiths & Pryce that
5  that report was supposed to have
6  been produced on Friday and if
7  you have it here we would like a
8  copy before we leave.
9     MR. HAYWOODE:  Darren, I take
10  exception to your statement that
11  it should have been produced on
12  Friday, but as I say, I'm going
13  to produce them to you right now.
14     MR. KELLY:   Thank you.
15     MR. HAYWOODE:  Let's mark this
16  and this page and then we'll make
17  copies of this report.
18     (Caanan IV distributions for
19  year ending 12/31/06 was
20  marked as Plaintiffs' Exhibits
21  10 for identification, as of
22  this date.)
23     (Logan Plaza Associates
24  adjusting journal entries
25  report was marked as

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings                193

1

2          Plaintiff's Exhibit 11 for

3          identification, as of this

4          date.)

5    Q   Mr. Jennings, I show you Exhibit

6    10.  With regards to Caanan IV the

7    document recites a distribution which

8    shows a total of $312,221.01 and the

9    document did not go through the general

10   ledger.  This came out of the Caanan II

11   account but it came out of the Caanan II

12   account as $322,221, you may recall.

13   What happened to the other $10,000 for

14   purposes of this distribution, if you

15   know?

16   A   $10,000 according to the

17   partnership agreement is a fee paid off

18   the top as a general partner fee.  The

19   distributions on Caanan IV are limited

20   to surplus cash for the prior year.  The

21   regulations require them to do a surplus

22   cash computation every year.  They

23   cannot distribute more than the surplus

24   cash.  If these payments were indeed

25   made in 2006, that means you would look

---

W. H. Jennings                194

1

2    at the 2005 financial statement and see

3    what the surplus cash was determined,

4    was certified to.

5        $322,000 rings a bell with me so

6    of the $322,221 pursuant to the

7    partnership agreement, the surplus cash

8    how they distribute it there are no

9    restrictions, according to HUD.  Once

10   that surplus cash is due to the partners

11   they may have a responsibility to pay it

12   to the partners but they can do anything

13   they want with it.

14       In this case the $10,000 in the

15   partnership agreement is, and this is

16   very common practice, the $10,000 comes

17   off the top of the surplus cash, the

18   $322,000 is paid to the general partner

19   as a general partner fee.  The balance

20   is distributed in accordance with the

21   profit and loss percentage to the

22   limited partners.

23       MR. TRAUB:  Mel, can we just

24   clarify on the record whose

25   handwriting the middle is, if you

---

W. H. Jennings                195

1

2    know.

3        MR. HAYWOODE:  I have no idea.

4    I'm going to assume that it was

5    one of the peoples who handled

6    these inquiries for us.

7        MR. TRAUB:  I just wanted to

8    make sure that it wasn't a Seavey

9    handwriting or a Marks Paneth &

10   Shron.

11       MR. HAYWOODE:  It may have

12   been some of the people in my

13   office.  I can't be sure.

14       MR. TRAUB:  Okay, thank you.

15   Q   Now, let's see, in Exhibit 11,

16   Mr. Jennings, --

17       MR. KELLY:  Exhibit 11 hasn't

18   been given to the witness yes.

19   Q   There is from Logan Plaza, and we

20   raised this earlier, a distribution

21   listed as $665,185, yet the actual

22   distribution made to the partners for

23   Logan in 2006 was $260,000 of which John

24   admits to have and the Seavey interest

25   took the other half.  How does the

---

W. H. Jennings                196

1

2    distribution read $665,185 when in point

3    in fact it only shows $260,000 being

4    paid up?

5    A   If you had been in my profession

6    you would know that it's a credit to

7    distribution therefore it couldn't have

8    been a distribution because if it was a

9    distribution it would have had a debit

10   balance.  So first of all, let's --

11   Q   Let me stop you for a second.

12       So that you mentioned something

13   called a credit distribution and that is

14   different, I believe, in kind from a

15   distribution; is that correct?

16   A   Incorrect.

17   Q   Okay, go ahead.

18   A   This is what we discussed several

19   times before.  As a matter of fact, you

20   brought this up.  Why do they charge

21   these expenses to distributions?

22   Because when they close out the prior

23   year it appears that they charge

24   everything to a distribution account.

25   This is a close out of the distribution.

W. H. Jennings                    197

2  This came from your examination.  Why
3  these charges --
4      Q   Let me stop you again.  Are you
5  saying that Dalton did this?
6      A   Dalton did what?
7      Q   Marked this distribution as
8  $665,000 or is that something Marks
9  Paneth & Shron did?
10     A   It's not a distribution.  This is
11 accounting.
12     Q   Who structured it in this way;
13 Dalton or Marks Paneth & Shron?
14     A   These are all capital counts.  If
15 you look at partners capital, retained
16 earnings, distribution, accumulated
17 income at loss, partners capital, rent
18 income apartments, these are all capital
19 accounts.  This is what I referred to
20 before.  To agree the prior year's
21 capital when Mr. Dawley, and I'm making
22 an assumption, closes out the prior year
23 profit loss he charges it to a
24 distribution account.  We discussed this
25 before.  When we see that we're required

---

W. H. Jennings                    198

2  to correct that to make it a partners
3  capital account.  That's all that is.
4      Q   When you see it you make the
5  automatic signal to say well, this has
6  to go onto a capital account for
7  purposes of closing it out?
8      A   We propose -- these are
9  corrections --
10     Q   You propose it?
11     A   Correct.  This is a correction
12 entry.  This is not a cash flow issue.
13     Q   No, it has nothing to do with the
14 actual cash flow.
15     A   It has nothing to do with cash
16 flow.
17     Q   It only looks like it's money but
18 it says distribution.
19     A   Well, as soon as I saw it, I see
20 it's a credit, I know it's not that.
21     Q   So that's that.
22         Let me just take a second here
23 because I want to find my depositions.
24         (A notice to produce with
25         first interrogatories failures

---

W. H. Jennings                    199

2      to respond was marked as
3      Plaintiff's Exhibit 12 for
4      identification, as of this
5      date.)
6      MR. HAYWOODE:  Let the record
7  reflect that a document which
8  I've just received which is dated
9  12/12/2007, generated and
10 designated as attorney's work
11 product is being given to Mr.
12 Traub and Mr. Kelly at Mr.
13 Traub's request and I don't
14 object to it except to say that
15 although it's work product
16 there's every reason why it
17 should be surrendered.
18     MR. TRAUB:  And we appreciate
19 the turnover.  I just want to
20 point out that it is directed to
21 Logan Plaza Associates, Fifth and
22 106th Street Associates, Charles
23 Hill Housing and Church Home
24 Associates and the very first
25 sentence of the second paragraph

---

W. H. Jennings                    200

2      says this report is intended
3  solely for the information and
4  use of management and others
5  within the organization.  If you
6  go to management that would
7  certainly be the Seaveys and
8  Dalton Management and those
9  within the organization being
10 these four so we dispute it being
11 work product but at the same time
12 it appears to be a non issue now
13 since you've turned it over.
14     MR. HAYWOODE:  Well, there's a
15 question of who hired Cameron,
16 Griffiths & Pryce but I haven't
17 displeased you; have I?
18     MR. TRAUB:  Like I said --
19     MR. HAYWOODE:  And I say
20 again, it's my practice that many
21 things, personal injuries,
22 whatever else, I don't withhold
23 documents that are relevant to
24 the issue.  Let's see it.  And so
25 much for that.  But you are an

W. H. Jennings                201

excellent counsel, sharp eyes and
intellect.

MR. TRAUB:  I'm glad that's on
the record because I plan to show
that in my review at the end of
the year.

MR. HAYWOODE:  Why not?

MR. TRAUB:  I may even ask you
to notarize that sentence.

MR. KELLY:  Can we go off the
record, please?

(Whereupon, a brief discussion
was held off the record.)

MR. HAYWOODE:  Let the record
show that this is a document
previously served on both
attorneys, the name of which is
notice to produce with first
interrogatories failures to
respond.

MR. KELLY:  Do you have pages
one through five, by any chance?
They don't seem to be attached.

MR. HAYWOODE:  No, they're not

---

W. H. Jennings                202

because they are the introductory
material.  You have them.

MR. TRAUB:  Can we just put
the first page, the cover sheet
on?  I'm okay without pages two
through five but if we could at
least just do the cover sheet I
think that would --

MR. HAYWOODE:  Certainly.

MR. TRAUB:  We can move
forward while they're copying
that.  I don't think that's going
to mess anything up.

Q  Mr. Jennings, on July 1 we sent a
request for a notice to produce
interrogatories to all counsel.  It was
sent back because we had mentioned or
there was language in it that referred
to another case in the introductory
portion and resubmitted it, I recall,
sometime around July 23 although that
may not be correct and it was presented
to Judge Baer and I believe that was
September 16th or 18th at the scheduling

---

W. H. Jennings                203

conference.

MR. TRAUB:  I'm not sure what
the exact date is but somewhere
around there.  That sounds fine.

Q  And it recited, you will see, the
questions we've asked and it recited the
unreadiness that we had with the
responses.  I just want to go through
them to see if you might supply or know
the answers to any of these questions.

On page six, where it says,
"produce," we asked for copies of all
reports related to REAC inspections for
each of the developments covering the
last five years with all attendant
memorandae and communications.

Are you in possession of any
information concerning these REAC
inspections and evaluations of these
buildings, of the four buildings?

A  We are required to as part of our
audit process.

Q  Are you able to provide full
documents concerning the history of the

---

W. H. Jennings                204

REAC circumstance of whatever's going on
there?

A  Yes.

MR. HAYWOODE:  I would request
of Mr. Kelly that they be
submitted.

MR. KELLY:  If I just may ask
my client a question?

(Whereupon, a brief discussion
was held off the record.)

MR. KELLY:  I'm ready to
continue.

Q  And I call your attention to the
fact that in the underlying part where
we cite our unreadiness we say only the
original findings were produced with no
reinspection or follow up for Lakeview.
No documents were presented, it says
indicting but it means indicating any
curing of the defects in the wake of the
HUD findings.

MR. HAYWOODE:  Whenever you
have that you can produce it.  We
call for the production.  The

---

**Page 205**

W. H. Jennings    205

same thing of Darren Traub. If you both have anything more on REAC, if I could see it.

Q    These were submitted to Magistrate Francis, but I guess when we said that it would be addressed at depositions he said, "well, fine, do the depositions but we can save some time too if you have the documents."

The next one is 2; security payroll, $100,368 paid in 2006. Account number 6530. No security contract was produced and it's paid presumably to a licensed company without benefit of a written contract. If you have such a contract, either of you, I would like to see it. We have a detective agency, a security company that functions here and we won't go near the water without a contract and I'm curious as to who did. And were they licensed?

Number 4; workers compensation insurance policy of $12,000 paid in 2006. The actual bill for the policy is

LEX REPORTING SERVICE
800-608-6085

**Page 206**

W. H. Jennings    206

$9,084.60. If there's some explanation for it we would like to see it.

Number 5; building and liability insurance. Were any excess premiums returned? What are the names of the brokers involved? Provide checks and face sheet of policies for which it is alleged prepayments were paid. The general ledger entries are not consistent with documents produced in response to this request. If there's an answer, we'd like to get it.

Number 6; support for item number 1590, account number 1590, utility deposit for $4,205. No canceled checks are produced in support of this amount.

MR. KELLY:    Excuse me for interrupting but are you asking this particular witness any questions or are you just --

MR. HAYWOODE:    Yes, yes. The question being that if you have any these items or if Mr. Traub has them, we'd like to see them

LEX REPORTING SERVICE
800-608-6085

**Page 207**

W. H. Jennings    207

since July 1st.

Q    There is also a figure of $261,639. No canceled checks or other support is offered in verification of this expense. I see it's listed as 1900, other assets.

Then account 040-2150, accrued real estate tax payable $37,000.

MR. TRAUB:    Mel, can we just stipulate that your question is going to be to the extent that the witness has any of the stuff identified in Plaintiff's Exhibit 12 that you want him to produce it.

MR. HAYWOODE:    All right.

Q    No check or statement is provided to support this expense.

MR. HAYWOODE:    Off the record.

(Whereupon, a brief discussion was held off the record.)

Q    There's an expense on account payable, account number 040-2110, $6,747 and no support was offered or provided

LEX REPORTING SERVICE
800-608-6085

**Page 208**

W. H. Jennings    208

for this and once again we've made three or four requests for the original agreement for the note payable to Robert Seavey of $29,915.16.

MR. HAYWOODE:    Off the record.

(Whereupon, a brief discussion was held off the record.)

Q    We want any support for this. And the other question is why was it necessary to borrow the money from the corporation or for him to advance the money on behalf of the corporation which is the main question, given the fact that it had a positive cash flow. That's what everybody had a question about. That's number one and number two --

MR. KELLY:    Hold on. Is that a question you want him to try to answer right now?

MR. HAYWOODE:    Well, can he?

A    My knowledge of this is it's a misclassification on the general ledger. There is no note payable to Robert

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings                    209

1
2  Seavey for $29,915 that I'm aware of.
3       Q   So you're saying that Dalton put
4  that in the general ledger by accident?
5       A   Their general ledger shows loan
6  payable general partner.  That's where
7  that amount shows up and it is not a
8  loan payable to the general partner.
9       Q   Is someone collecting payments?
10      A   It has something to do with a
11  section 32 advance under the mortgage
12  that was advanced about probably twelve
13  or fifteen years ago.  It was under the
14  materiality limits so we never looked
15  into it.
16      Q   Well, I can't imagine anyone but
17  Bob Seavey collecting the payment but
18  maybe he'll tell us more.
19          We've covered the information in
20  number two about the payment of $108,000
21  under the Marks Paneth & Shron contract.
22          We've asked for the general
23  ledger trial balance reflecting twelve
24  months of transactions for any of the
25  developments from 2006 and 2007 and we

W. H. Jennings                    210

1
2  say that the trial balances are not
3  reflected rendering any audit extremely
4  difficult in violation of basic
5  accounting principles and standards.  So
6  if somebody's got a book out there for a
7  general ledger for Dalton that has trial
8  balances we'd like to see that book and
9  not the one they pretend to keep, my
10  editorial statement.
11         Citibank account $1,781, not
12  provided.  Explanation for prepaid
13  expenses of $17,448.25 under 100-1200
14  not provided.
15         Support for the prepaid real
16  estate tax of $443,810.76 account 100-
17  1200, no checks are provided in support
18  of the payment, only printouts from the
19  Department of Finance with inconsistent
20  figures.
21         Support for the prepaid water
22  sewer of $333,702.13 account 100-1230,
23  no support tendered for the claim.
24  17; explanation and support for the
25  deferred operating expenses of

W. H. Jennings                    211

1
2  $179,338.03 account 100-1540, no
3  support, details or names of brokers is
4  provided.
5         An expenditure of $303,872, no
6  invoices were presented or checks to
7  confirm the expenditure.  No checks
8  provided as proof of payment of the
9  account.
10        Under 21, a general liability and
11  commercial property insurance policy and
12  premium for June 2005 to June 2007.
13  Policy is presented but the premium
14  shown does not square with the general
15  ledger.
16        Twelve month statements for the
17  money market account-GL account number
18  1115.  Also provide the verification
19  contact, the bank address and contact
20  name and telephone number.  Nothing was
21  produced in response to this request.
22        Detailed schedule for the
23  distribution of $322,221, you addressed
24  that here.  Number two response to that
25  request for $322,000, that's satisfied.

W. H. Jennings                    212

1
2  5; the 2006 audited financial
3  statement disclosed management fees
4  earned of $76,588.  The GL, on the other
5  hand, recorded cash disbursed totaling
6  $103,323.  Please explain and document
7  the journal entries for the difference.
8  Nothing was produced.  And the mortgage
9  note and closing statement supporting
10  the mortgage costs, no explanations are
11  provided, and we discussed this before,
12  for the expenses charged which appear
13  co-mingled with unrelated management
14  consultant accruals.  Where was the
15  royal abstract refund of excess payment
16  check in the amount of $29,585.31,
17  deposited by management and how was it
18  employed?  Please provide all written
19  requests for payments to Marks Paneth &
20  Shron in excess of $5,000 of the fees
21  charged for auditing, if there are any
22  and we've covered that before.
23        Now, regarding Logan Plaza we
24  talk about the $665,185 that you just
25  testified to, Mr. Jennings, and the

W. H. Jennings                    213

2  $925,000 is claimed as capital
3  distribution when the actual sum was
4  $260,000 and you've addressed it.
5       Personnel files to determine how
6  and who at Dalton Management is paid by
7  these four developments and why off side
8  people are being paid requested for:
9  Michael Hill, Joyce Murphy, Cheryl
10 Labelle, Alonzo Rodgers, Joan Mondesir,
11 David Givens and Ronald Dawley. Nothing
12 has been produced.
13      And here's our famous question
14 about the ownership interest of the
15 various parties and we're before Judge
16 Francis and the statement is that we
17 haven't given specific answers but I
18 note that since July 1st no definitive
19 response was provided to our requests
20 setting forth stately the ownership
21 interest, though, Darren Traub, you did
22 give to me the statements indicating the
23 possibility that Mr. Edmonds' interest
24 might be reduced.
25      MR. TRAUB:  And I think we did

---

W. H. Jennings                    214

2  give you a handwritten statement
3  that our production, specifically
4  with regards to E 1 on page 12.
5  I will state definitively that it
6  was in our document production.
7       MR. HAYWOODE:  At some point
8  we're going to ask that the
9  papers be produced and we're
10 going to ask that it be
11 individuated out if it's
12 possible, and produced.
13      MR. TRAUB:  It's different
14 than that.  It's a handwritten
15 chart.  As a matter of fact, I
16 know it was in there because I
17 actually put it on top of the
18 entire box but to make it easier
19 I'll see if I can easily locate
20 it and if I can I will produce it
21 individually.
22      MR. HAYWOODE:  I appreciate
23 that and hopefully we will work
24 out all those other concerns.
25 Q.  I'm out except for this, Mr.

---

W. H. Jennings                    215

2  Jennings, with regards to the four
3  developments, it appears on the
4  statements contained in the pleadings
5  and everywhere else, it doesn't appear
6  that Dalton Management is really keeping
7  the books and records of these
8  developments; is that not a fact?
9       A  No, that is not the fact.
10      Q  By the number of excessive
11 journal entries and changes which Dalton
12 Management appears not conversant with
13 and not to really be interested in and
14 which they don't amend their general
15 ledgers concerning it would appear that
16 the Dalton Management people have
17 assumed and concluded that these records
18 are being kept and maintained by Marks
19 Paneth & Shron and not by Dalton in any
20 respect; is that not a fact?
21      A  Not a fact.
22      Q  Now, you're not just saying that
23 because Mr. Traub was shaking his head
24 no, right?
25      A  I didn't even notice.  We don't

---

W. H. Jennings                    216

2  keep general ledgers.  We don't keep
3  accounts payable schedules.  We don't
4  keep tenant rent rolls.  We do not keep
5  paid bills.  We do not approve bills.
6  We don't sign checks.
7       Q  And it is not a fact that if we
8  were to inquire into every building
9  where Dalton exists, the fourteen or
10 whatever the number is and where you
11 audit for Dalton it is not a fact that
12 we would find the same laissez faire, I
13 don't really give a darn attitude in
14 Dalton and that all issues and questions
15 are going to be given to Marks Paneth &
16 Shron for response; that is not a fact?
17      MR. TRAUB:  Objection to form.
18 It's argumentative.  If you're
19 going to characterize it as
20 laissez faire and go completely
21 against his testimony and records
22 of the entire day then that's
23 argumentative.
24      MR. HAYWOODE:  That's why the
25 witness said they were lazy.  I

W. H. Jennings                    217

1
2   sort of cleaned it up a little
3   bit and said they were picking
4   daffodils.
5       MR. TRAUB:  Not with regards
6   to record keeping he did not,
7   Mel.  His comment, in matter of
8   fact, and the court reporter can
9   read it back, his comment that
10  they were lazy was when the fact
11  that rather than look for a
12  document to produce to Cameron,
13  Griffiths & Pryce that they refer
14  them over to Marks Paneth &
15  Shron.  It certainly was not with
16  respect to their bookkeeping, to
17  their accounting, to their
18  general ledger, maintenance or to
19  making any recommendations or
20  journal entries to the extent
21  though that that was what you
22  were implying.
23      MR. HAYWOODE:  Your argument
24  is to the affect that Dalton had
25  those books all along.

W. H. Jennings                    218

1
2       MR. TRAUB:  I'm not making any
3   argument.  My argument is that
4   your question is inappropriate.
5       MR. HAYWOODE:  But the case
6   suggests a strong likelihood that
7   they had none of it and didn't
8   care.
9       MR. TRAUB:  Not only is that
10  not the evidence but that's not
11  what the testimony of today was.
12      MR. KELLY:  I join in the
13  objection.
14      MR. TRAUB:  I have some
15  questions if you're done.
16      MR. HAYWOODE:  You're going to
17  redirect?
18      MR. TRAUB:  Yes, it's not my
19  witness.  I'm actually going to do
20  direct.  This is not my witness.
21  EXAMINATION BY
22  MR. TRAUB:
23      Q  Mr. Jennings, I just have a few
24  questions for you.
25         You testified earlier that it is

W. H. Jennings                    219

1
2   not unusual for a client to refer
3   accounting or auditing questions to
4   Marks Paneth & Shron; is that correct?
5       A  That's correct.
6       Q  Is it fair to say it's almost
7   standard practice with some of your
8   clients?
9       A  Yes.
10      Q  And I believe earlier you
11  testified, and you'll correct my numbers
12  --
13      MR. HAYWOODE:  My objection is
14  to the leading nature of the
15  question but go ahead.
16      MR. TRAUB:  He's not my
17  witness.  I can cross examine and
18  lead him, Mel.  You know the
19  rules.  This is not my witness.
20      MR. HAYWOODE:  I don't believe
21  you can lead a codefendant but go
22  ahead.
23      MR. TRAUB:  It's not my party.
24  This is not my witness, Mel.
25      Q  As a matter of fact, I believe

W. H. Jennings                    220

1
2   you testified that out of roughly 236 of
3   your clients probably 200 would do
4   something like this?
5       A  Absolutely.
6       MR. HAYWOODE:  Well, note my
7   objection because I don't recall
8   that testimony at all but go
9   ahead.
10      Q  Was that your earlier testimony?
11      A  Yes, I referred to how many
12  clients I had, yes.
13      Q  Thank you.
14         Earlier you also testified that
15  Marks Paneth & Shron receives roughly
16  $300,000 in retainer and you testified
17  that it's large but not a substantial
18  amount; is that correct?
19      A  That's correct.
20      Q  What would Marks Paneth & Shron
21  consider to be a substantial amount?
22      MR. KELLY:  Objection.  I'm
23  instructing the witness not to
24  answer.  Their billings are not
25  relevant to this.

W. H. Jennings                221

1

2    Q  I'm not asking for a specific
3  client, I'm not even asking for a
4  specific retainer that you received but
5  if you say that something is not
6  substantial, what would you consider to
7  be substantial?
8    A  I don't know if I used the word
9  substantial.  I might have said material
10  to the firm as a whole.  I would
11  probably use $800,000.
12    Q  If you can turn with me to
13  Exhibit 4.
14      MR. KELLY:  I think that may
15      be one that you took back, Mel,
16      but I have a copy here that I'm
17      willing to give the witness
18      instead.
19      MR. TRAUB:  Thank you.
20    Q  Are you with me on Exhibit 4?
21    A  Yes.
22    Q  Can you turn to the second
23  general paragraph, it's the 100
24  accounting?
25    A  Yes.

W. H. Jennings                222

1

2    Q  Go with me to the fifth line item
3  down, the one that's 2001 to 2004 tax
4  analysis.
5    A  Uh-huh.
6    Q  Is it possible that that was tax
7  analysis performed on the years 2001 and
8  2004 that occurred either in 2005 or
9  2006 and not necessarily tax analysis
10  that was performed in 2001?
11      MR. HAYWOODE:  My objection
12      that anything is possible but go
13      ahead.
14    A  It is possible, yes.
15    Q  Is that considered an auditing
16  expense?
17    A  No.
18    Q  With respect to 2003 tax prep and
19  I presume that's tax preparation, is
20  that considered to be an auditing
21  expense?
22    A  No.
23    Q  And if you go down to the next
24  line July 5 through June of 2006,
25  various PR.  Is that considered an

W. H. Jennings                223

1

2  auditing expense?
3    A  You know, I have to be honest,
4  it's a cut off.  I don't know.
5    Q  Is it possible that that's
6  various tax projections?
7    A  Yes.
8      MR. HAYWOODE:  Objection that
9      anything is possible.
10    Q  Would that be considered to be an
11  auditing expense?
12    A  No.
13      MR. HAYWOODE:  Let me see if I
14      can save time here.  The witness
15      was shown a bill of August 28,
16      2002 which generated the money
17      that you're talking about.
18      MR. TRAUB:  No, that's not
19      correct.  What that bill that you
20      showed him --
21      MR. HAYWOODE:  It stated that
22      it was billed in 2002.
23      MR. TRAUB:  No, that was my
24      objection at that point.  The
25      bill you showed him was October

W. H. Jennings                224

1

2  2000 through July 2002 and that
3  was $15,000.  That's not the line
4  items that I pointed out.
5      MR. HAYWOODE:  Well, all
6      right.  You'll mark it into
7      evidence as number 13 then.
8      MR. TRAUB:  My point is
9      there's no way that it could have
10      been because that line item is
11      July '05 through June of '06, and
12      again --
13      MR. HAYWOODE:  The witness
14      answered this question and said
15      yes.
16      MR. TRAUB:  No, Mel, he did
17      not.
18      Maybe this is kind of the
19      issue that we have going for this
20      is that the accounting questions
21      were not accurate and that was my
22      objection, as a matter of fact,
23      when you did this specific
24      question.
25    Q  With respect to the next one, the

W. H. Jennings                    225

2  October 2000 through July 2002, various
3  PR, is that an auditing expense?
4      A    This is the managing agent's
5  description.
6      Q    Okay.
7      A    I have to -- I can't --
8      Q    Without looking at something
9  different?
10     A    It is possible that I had nothing
11 to do with this billing personally.
12     Q    What would you look at to
13 determine what this actually refers to?
14     A    I'd have to look at the actual
15 invoice.
16     Q    With respect to the next line
17 item, IRS tax examination, would that be
18 considered an auditing expense?
19     A    No, that was a three year tax
20 examination.
21     Q    Were any of these items that
22 you've just listed that were not
23 auditing expenses performed at the
24 request of John Edmonds?
25     A    I know one was, yes.

W. H. Jennings                    226

2      Q    Which one was that?
3      A    The 2001 to 2004 tax analysis.
4      Q    The fact that all of these are
5  appearing in the balance sheet and if
6  you look under where the posted date,
7  does that indicate the date that a check
8  would have been paid or wired?
9      A    They're not on the balance sheet.
10     Q    I'm sorry, what is this?
11     A    The general ledgers.
12     Q    I'm sorry, the fact that these
13 are in the general ledger and have a
14 posted date does that reflect that these
15 were actually payments made within 2006?
16     A    Yes, I believe so.
17     Q    So then the amount of $108,525.45
18 would not have been due and owed to
19 Marks Paneth & Shron at the time that
20 Marks Paneth & Shron did the auditing of
21 the 2006 books; is that correct?
22     A    That's correct.
23         MR. HAYWOODE:  Objection.
24     Q    Mr. Haywoode showed you earlier
25 that there was a statement that $15,000

W. H. Jennings                    227

2  was still reflected as an invoice due
3  from 2002.  Did the fact that $15,000
4  may have been due to Marks Paneth &
5  Shron influence or color your judgment
6  or Marks Paneth & Shron's judgment with
7  respect to its work or auditing
8  performed for the management company or
9  any of the projects in 2003?
10     A    Absolutely not.
11     Q    Same question for 2004.
12     A    Absolutely not.
13     Q    Same question for 2005.
14     A    Absolutely not.
15     Q    And same question for 2006.
16     A    Absolutely not.
17     Q    You also pointed out that you
18 discovered an overage and at times some
19 other problems during your auditing.
20 When you discovered those overage or
21 problems did you bring that to Dalton's
22 attention?
23     A    Yes.
24     Q    Did you make recommendations on
25 how to fix the issues that you

W. H. Jennings                    228

2  discovered?
3      A    We asserted that it must be paid
4  back.
5      Q    Do you know whether or not it was
6  paid back?
7      A    I don't know for a fact.
8      Q    Would you look somewhere to
9  determine a fact whether or not it
10 was paid back?
11     A    It would have been a finding in
12 question cost on the financial if it
13 wasn't paid back and it might have been
14 a finding in question cost even if it
15 wasn't paid back, the fact that it
16 occurred.
17     Q    And did that occur with respect
18 to the issue Church the $39,000 that we
19 pointed out I believe in Exhibit 9, in
20 other words, with the overcharges you
21 found reflected in Exhibit 9, you made
22 recommendations on how to rectify the
23 overage payments?
24     A    If we discovered it during audit
25 and at that point of discovery we would

W. H. Jennings                          229

2  compile it in a management letter and or
3  make an assertion in the internal
4  control portion of the financial
5  statements.
6      Q   After you do an audit and you
7  make certain recommendations on
8  reclassification of general ledger
9  items, does that reclassification change
10 or affect the bottom line in any way?
11     A   It may.
12     Q   What do you mean, "it may,"  In
13 what circumstance would it?
14     A   In the circumstance of real
15 estate taxes or water and sewer.  If
16 there was a payment made December 31st
17 that really pertains to the prospective
18 period that would be a proposed journal
19 entry to reclass to prepaid expenses.
20     Q   Do you know if any such
21 reclassification with respect to the
22 example that you just gave occurred with
23 any of the partnerships or Dalton
24 Management?
25     A   It's possible and those payments

W. H. Jennings                          230

2  are a matter of public record because
3  it's on the Internet.
4      Q   But with the reclassifications
5  that we saw today, in other words,
6  changing auditing to management or
7  changing without giving any specifics
8  some of the changes referred on
9  Plaintiff's Exhibit 5, would any of that
10 affect the bottom line?
11     A   You have to look at the specific
12 journal entries.  Like the one that we
13 referred to when we were talking about,
14 when we got into the discussion about
15 shoes, that had no effect on the profit
16 and loss, the bottom line.
17     Q   What about the changing of fee
18 that was listed as audit to management
19 consultant fee; would that have changed
20 the bottom line?
21     A   No effect on the bottom one.
22     Q   If no one went back and
23 reclassified the general ledger items
24 pursuant to Marks Paneth & Shron's
25 recommendations and instructions and yet

W. H. Jennings                          231

2  they were still given the financial
3  statements that showed where the
4  suggestions and instructions came from,
5  could you perform an audit on the books
6  and records?
7          MR. KELLY:  I'm going to
8      object to the extent that the
9      question had recommendations and
10     instructions and provided that
11     instructions is removed from the
12     question, I'll let the question
13     stand.
14         MR. TRAUB:  I'll restate it.
15     Q   You've testified earlier that
16 sometimes when going through the audit
17 that Marks Paneth & Shron would make
18 recommendations as to reclassifications
19 of certain general ledger items; is that
20 correct?
21         MR. HAYWOODE:  Mr. Traub,
22     we're going beyond the scope of
23     any redirect of what I did.  Is
24     this your examination?
25         MR. TRAUB:  This is exactly

W. H. Jennings                          232

2  what your questions were.  This
3  is directed directly to your --
4          MR. HAYWOODE:  You can go on
5      for another hour and a half if
6      you want but this should be your
7      examination then.
8          MR. TRAUB:  I'm entitled to
9      ask this witness questions.
10         MR. HAYWOODE:  Go ahead.
11         MR. TRAUB:  Thank you.
12     Q   Even if the general ledger items
13 had not been made pursuant to Marks
14 Paneth & Shron's recommendations is it
15 still possible to conduct an audit on
16 the books and records of the company?
17     A   It's a confusing question.
18     Q   Let me ask you in another way.
19     Marks Paneth & Shron made certain
20 recommendations as to changes of general
21 ledger items.  If those
22 reclassifications did not occur in the
23 actual general ledger but someone
24 conducting an audit had, say, for
25 example, the financial statement

W. H. Jennings                    233

1
2  reflected in Plaintiff's Exhibit 5 and
3  similar documents showing where the
4  recommendations were, could one still
5  conduct an audit?
6     A  Yes.
7     Q  And you testified earlier that
8  you had had discussions with Cameron,
9  Griffiths & Pryce about some of the
10 various letters and question that they
11 had directed to at first Dalton
12 Management and then Marks Paneth & Shron
13 and you even had invited, I believe,
14 Orley to talk to you.  Did he ever take
15 you up on that offer?
16    A  No.
17    Q  In your opinion had they taken
18 you up on that offer do you think that
19 you could have walked them through some
20 of their --
21       MR. HAYWOODE:  Objection.
22    Speculative.
23    Q  -- questions and answers?
24    A  Absolutely.
25    Q  Do you or anyone at Marks Paneth

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings                    234

1
2  & Shron make any management decisions
3  for either Dalton Management or the four
4  partnerships at issue here?
5     A  Absolutely not.
6     Q  Are you or anyone at Marks Paneth
7  & Shron employed by either Dalton
8  Management or the four partnerships at
9  issue here?
10    A  No.
11    Q  Are you or are anyone at Marks
12 Paneth & Shron an officer or director or
13 manager of either Dalton Management or
14 any of the four companies at issue here?
15    A  No.
16    Q  Has anyone at Dalton Management
17 or either of the four partnerships ever
18 asked you or anyone at Marks Paneth &
19 Shron to forge, doctor or otherwise
20 interface fraudulent information into an
21 audit or the books and records of any of
22 the partnerships?
23    A  No, not to my knowledge.
24    Q  Have you or anyone at Marks
25 Paneth & Shron, to your knowledge, ever

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings                    235

1
2  suggested or volunteered that you would
3  cook, doctor or forge some of the books?
4     A  Absolutely not.
5     Q  Are you aware of any monies or
6  payments that are funneled through
7  Dalton Management, say, out of these
8  four partnerships into any other
9  companies?
10    A  No.
11       MR. TRAUB:  I have nothing
12    further.
13 FURTHER EXAMINATION BY
14 MR. HAYWOODE:
15       MR. HAYWOODE:  I'll have this
16    marked as Exhibit 13.  I showed
17    it to you before.
18       (A bill from Marks Paneth &
19    Shron dated 8/28/02 was marked
20    as Plaintiff's Exhibit 13 for
21    identification, as of this
22    date.)
23    Q  Let me show you Exhibit 13 for
24 identification which is the bill from
25 Marks Paneth & Shron of August 28, 2002

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings                    236

1
2  that I referred you to in your previous
3  testimony which indicated that the
4  monies which were paid in 2006 were in
5  fact billed by Marks Paneth & Shron on
6  August 28, 2002; do you recall looking
7  at this previously, sir?
8     A  Yes.
9     Q  And it is a fact that whatever is
10 reflected in that bill was billed in
11 2002; is that correct?
12    A  It appears so, yes.
13    Q  And that it wasn't until 2006
14 without regard to accruing money and
15 what not that the actual money was paid
16 to Marks Paneth & Shron; is that
17 correct?
18    A  It appears so, yes.
19    Q  And now, finally, was this money
20 accrued in 2002 in the report?
21    A  No.
22    Q  Is there a reason why it wasn't
23 accrued?
24    A  It could have been several
25 reasons.  It could have been overlooked,

LEX REPORTING SERVICE
800-608-6085

W. H. Jennings                    237

1  it's below materiality limit that we
2  set, Fifth and 106th Street has a much
3  higher materiality limit, it could have
4  been billed by another partner who set
5  up a separate account if they were
6  performing other services. There are
7  several possibilities.
8      Q   Now, you have a minimum of
9  fourteen and possibly more developments
10  in which Marks Paneth & Shron or Mr.
11  Shron in his life alone have represented
12  the Seavey group since 1973 or
13  thereabout and you say that the total
14  income from all of those developments is
15  $300,000?
16      MR. KELLY:  Objection.
17      Total income since 1973?
18      MR. HAYWOODE:  No.
19      Q   Presently it's $300,000 for all
20  of those developments?
21      A   Approximately.
22      Q   From all fourteen or possibly the
23  others where you're servicing the
24  Seaveys $300,000?
25

W. H. Jennings                    238

1      A   That sounds about right.
2      Q   It isn't in excess of $500,000?
3      A   I don't believe so.
4      Q   Is there any other client that
5  you have that you're defending fourteen
6  to fifteen to sixteen large housing
7  developments for that you're servicing?
8      A   Yes.
9      Q   You as a partner?
10      MR. KELLY:  I'm going to
11      caution the --
12      Q   Do you have any other clients --
13      MR. KELLY:  I'm going to
14      caution the witness not to
15      divulge any confidential
16      information about specific
17      clients but he may answer the
18      question in a general sense.
19      Q   I don't need to know the name or
20  the name of any fifteen of them but how
21  many such clients do you have that have
22  sixteen, seventeen developments, you
23  individually as a partner?
24      A   That I review that have fifteen
25

W. H. Jennings                    239

1  or sixteen. I know of at least one.
2  There are quite a few others but they're
3  not fifteen or sixteen.
4      Q   So nobody else as large?
5      A   I have larger accounts.
6      Q   There may be one.
7      A   I have larger accounts but
8  they're --
9      Q   Well, as these accounts go, this
10  is a large and substantial account,
11  isn't it?
12      MR. KELLY:  Objection.
13      Misstates prior testimony.
14      Q   As these accounts go, this is a
15  large and substantial account; is it
16  not?
17      MR. KELLY:  Same objection.
18      A   To the firm or to me personally?
19      Q   To you personally.
20      A   Not particularly. I have
21  $3,000,000 worth of billings.
22      Q   And the account then is not of
23  such a nature that your servicing of it
24  in so many ways for so long a time might
25

W. H. Jennings                    240

1  impair your individual action in terms
2  of the service being provided?
3      A   You don't know me very well.
4  Absolutely not. I have a higher
5  authority to deal with.
6      Q   And the amount of money generated
7  by this firm and by the individuals and
8  I'm assuming now that the billings we're
9  talking about are not just the service
10  contracts or the audits but all the
11  accessory things that you do for these
12  buildings, that amount of money could
13  not persuade you to provide the auditing
14  services and the accounting services for
15  these developments?
16      A   Can you repeat that?
17      Q   I said that the large amount of
18  money involved doesn't tempt Marks
19  Paneth & Shron, you and your associates,
20  to perform the accounting services as
21  well as the auditing services on these
22  buildings?
23      A   I swear to God on my children,
24  absolutely not.
25

W. H. Jennings          241

1
2    Q  Well, God and your children not
3  being a part of this --
4    A  You know, you've asked it three
5  times.  I answered you three times.  You
6  are questioning my integrity and I take
7  exception to that.  I said absolutely
8  not.  We're a $96 million firm.  I have
9  been a partner.  I have been with the
10  firm for thirty one years and my
11  reputation is much more important to me
12  than any accounting fees.  I would
13  rather walk away from a job, which I've
14  done several times, if there was any
15  defalcation or integrity issue.  I do a
16  lot of volunteer work, okay.  I save a
17  lot of people's lives, okay, a lot of
18  people's lives pro bono and I take pride
19  in my integrity.
20    Q  On the GAGAS, sir --
21    A  That is what I am about.
22    Q  On the GAGAS wouldn't it be wise
23  for Marks Paneth & Shron to walk away
24  from these accounts for a little time
25  under the GAGAS provisions?

W. H. Jennings          242

1
2    A  No.
3    MR. HAYWOODE:  No further
4  questions.
5    MR. KELLY:  I'm just going to
6  clarify something that was
7  brought up on your questioning.
8  EXAMINATION BY
9  MR. KELLY:
10    Q  Referring to Exhibit 13, do you
11  see the date of this invoice?
12    A  Yes.
13    Q  What's the date of this invoice?
14    A  August 28, 2002.
15    Q  And on the last page of this
16  exhibit do you see the entries for the
17  totals, the first one being $115,000?
18    A  Yes.
19    Q  Do you see the two entries below
20  that?
21    A  Yes.
22    Q  Do you see that those two entries
23  are in brackets?
24    A  Yes.
25    Q  What do those brackets mean?

W. H. Jennings          243

1
2    A  Credits.
3    Q  What do you mean by credits?
4    A  I don't know.  It's not detailed.
5    Q  When you say, "credits," do you
6  mean that it either this amount was paid
7  or some other event happened such that
8  that amount was no longer due?
9    A  First of all, this bill doesn't
10  add up $115,000.
11    Q  I'll represent to you we've taken
12  out the middle pages to be as of
13  reference.
14    A  Oh, okay.  I can't say.  I'd have
15  to look at the original documentation if
16  we still have it when I was billed back
17  in 2002.
18    MR. HAYWOODE:  If the witness
19  wishes to amend this record upon
20  consulting his own files, I have
21  no problem.
22    Q  And the bottom line number on
23  this exhibit of $15,000, does that mean
24  in accordance with this invoice $15,000
25  was due?

W. H. Jennings          244

1
2    A  Yes.
3    Q  It does not mean $115,505 is due
4  as one of the numbers above that
5  indicates?
6    A  That's correct.
7    MR. KELLY:  I have no further
8  questions.
9    MR. TRAUB:  I just have one
10  quick follow up.
11  FURTHER EXAMINATION BY
12  MR. TRAUB:
13    Q  When I asked you whether or not
14  if $15,000 on the book colored your
15  judgment in 2003, 4, 5 and 6 and you
16  testified, "no," you were understanding
17  I was referring to this $15,000 that was
18  showed to you earlier; is that correct?
19    MR. HAYWOODE:  Objection to
20  the fact that it's leading and
21  suggesting and based on the facts,
22  the payment was $105,000 and some
23  portion of it was billed in 1982
24  and that carried over.
25    Q  You can still answer my questions

W. H. Jennings                    245

1  since that had nothing to do with it.
2         Did you understand that when I
3  asked you whether $15,000 being on the
4  books and records from 2003 through 2006
5  would color your judgment you understood
6  that I was referring to this $15,000; is
7  that correct.
8      A   I didn't understand that, no,
9  but, yes, that could not.
10     Q   Thank you.
11         MR. HAYWOODE:  Whereupon, the
12     deposition of this witness has
13     concluded.
14         MR. EDMONDS:  Except with my
15     counsel's permission I would like
16     to ask one or two questions of
17     Mr. Jennings.
18         MR. HAYWOODE:  I will
19     certainly consent. He is an
20     attorney.
21         MR. TRAUB:  Is he an attorney
22     of record in this case though?
23         MR. HAYWOODE:  He is a party.
24         MR. KELLY:  That doesn't make

W. H. Jennings                    246

1  him entitled to ask questions of
2  a defendant.
3         Off the record.
4         (Whereupon, a brief discussion
5     was held off the record.)
6         MR. KELLY:  Mr. Edmonds has
7     asked to ask the witness
8     questions. I have agreed to
9     listen to the question on the
10    condition that my previous
11    stipulation regarding holding
12    objections is suspended during
13    this brief examination and I,
14    again, counsel my witness to wait
15    until I have a chance to hear the
16    question before answering.
17        MR. EDMONDS:  Does the
18    accounting firm that you are a
19    partner in prepare annual tax
20    returns for Robert Seavey or any
21    member of the Seavey family or
22    ABNS Corporation, that is annual
23    tax returns, both the federal,
24    state and the city?

W. H. Jennings                    247

1         MR. KELLY:  I'll let the
2     witness answer that question.
3         THE WITNESS:  We have nothing
4     to do with Phyllis Seavey's
5     personal return. We have nothing
6     to do with Robert Seavey's
7     personal return. We have nothing
8     to do with the Seavey and Seavey
9     organization. We have nothing to
10    do with Neale Seavey's personal
11    return. The only personal return
12    that I prepared is Avery Seavey
13    and that's only in the last two
14    years because he developed a
15    construction company.
16        MR. EDMONDS:  When you say,
17    personal return of Avery Seavey,
18    is it under the caption or under
19    the name of the firm ABNS
20    Corporation?
21        THE WITNESS:  No.
22        MR. EDMONDS:  Just it's under
23    the name Avery Seavey?
24        THE WITNESS:  Yes, that's

W. H. Jennings                    248

1  correct. Only because I've only
2  been doing him the last two
3  years.
4         MR. EDMONDS:  Thank you very
5     much.
6         MR. HAYWOODE:  Whereupon the
7     deposition is concluded.
8               -oOo-
9         (Whereupon, the examination of
10    William H. Jennings was concluded
11    at 5:19 p.m.)
12
13
14    _____
15           WILLIAM H. JENNINGS
16
17  Subscribed and sworn to
18  before me this _____ day
19  of _____, 2009.
20  _____
21  NOTARY PUBLIC

249

I N D E X

WITNESS          EXAMINATION BY        PAGE

William Jennings  Mr. Haywoode    5, 235

                  Mr. Traub      218,244

                  Mr. Kelly        242

            EXHIBITS

PLAINTIFFS'                           PAGE

1.    Letter dated 5/10/07 to Dalton
      Management                        40

2.    May 15th response from
      Mr. Jennings to Mr. Dawley        40

3.    Certified annual financial and
      operating report                  64

4.    Cumulative general ledger  64

5.    Financial statement           96

6.    Request list to Marks Paneth &
      Shron from Cameron, Griffiths &
      Pryce                            110

7.    Church Home Associates deferred
      mortgage costs                   151

8.    Invoice to Dalton Management from
      Marks Paneth & Shron             151

250

(Index Continued)

            EXHIBITS

PLAINTIFFS'                           PAGE

9     Church Home Associates managing
      fee overage calculation     151

10    Logan Plaza Associates adjusting
      journal entries report       192

11    Caanan IV distributions for year
      ending 12/31/06              192

12    Notice to produce with first
      interrogatories failure to
      respond                      199

13    Bill from Marks Paneth & Shron
      8/22/02                      235


      REQUESTS FOR PRODUCTION

DESCRIPTION                           PAGE

Proposal for journal entry change   72

Documents identified in Plaintiff's
Exhibit 12                          204

251

(Index Continued)

            INSERTS

DESCRIPTION                           PAGE

Names of all developments serviced by
Marks Paneth & Shron with regard to
Seaveys                             16

Names of accounts receivable clerks  84

252

C E R T I F I C A T E

I, SIMA D. LOWY, a Reporter and
Notary Public within and for the State
of New York, do hereby certify:

That the witness(es) whose testimony
is hereinbefore set forth was duly sworn
by me, and the foregoing transcript is a
true record of the testimony given by
such witness(es).

I further certify that I am not
related to any of the parties to this
action by blood or marriage, and that I
am in no way interested in the outcome
of this matter.

-------------------------------
SIMA D. LOWY

253

## ERRATA SHEET

The following are my corrections to the
attached transcript:

PAGE    LINE    SHOULD READ

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____