AMENDED AGREEMENT

OF

LIMITED PARTNERSHIP

OF

FIFTH AND 106TH ST. ASSOCIATES

-between-

106TH ST. HOUSES, INC. (hereafter "Housing Company"), a
corporation organized pursuant to the provisions of the
Limited-Profit Housing Companies Law (Article II of the
Private Housing Finance Law of the State of New York),
having its principal office c/o Urban Development Corporation
of the State of New York (hereafter "UDC"), 1345 Avenue of
the Americas, New York, New York 10019

-and-

GLICK AFFILIATES (hereafter "GLICK"), a New York partnership
having its principal office at 3000 Marcus Avenue, Lake
Success, New York; and ROBERT W. SEAVEY (hereafter "SEAVEY").
residing at 15 West 81st Street, New York, New York 10024,
and JOHN L. EDMONDS (hereafter "EDMONDS"), residing at 222
West 116th Street, New York, New York 10026,

> (GLICK, SEAVEY and EDMONDS are hereafter col-
> lectively called the "Managing General Partner"
> or the "Managing General Partners" and Housing
> Company, GLICK, SEAVEY and EDMONDS are hereafter
> collectively called the "General Partner" or
> the "General Partners")

-and-

each party or person who shall at any time become a party to this Agreement by signing the Agreement and the Schedule of Partners attached hereto (such persons are herein collectively referred to as the Limited Partners).

> (All Partners in FIFTH AND 106TH ST. ASSOCIATES, both General and Limited, are hereafter collectively referred to as "Partners".)

## FORMATION AND PURPOSE

1.  The undersigned hereby continue the partnership heretofore formed under a partnership agreement dated June 13, 1973, and amended to become a limited partnership as of January 2, 1974, the partnership to remain a limited partnership subject to the provisions of Article 8 of the Partnership Law of the State of New York.

2.  The name of the Partnership is FIFTH AND 106TH ST. ASSOCIATES.

3.  The principal office and place of business of the Partnership shall be at c/o Robert W. Seavey, 500 Fifth Avenue, New York, New York 10036 or at such other location as may hereafter be determined by the Managing General Partner who shall promptly give notice to the other Partners of any change in the principal office or place of business.

2

4.  The term of the Partnership commenced on June 13, 1973, and shall terminate on December 31, 2023, unless the Partnership is sooner dissolved in accordance with the terms and provisions of this Agreement.

5.  The purpose of the Partnership is to provide capital for use in the development of a multi-family rental housing project designated as a UDC rental housing project, known as 106th Street Houses, located between Fifth and Madison Avenues, and between 106th and 107th Streets, in the County, City and State of New York, containing approximately 446 dwelling units (hereafter the "Property" or "Project") and, in connection therewith, to develop, acquire, construct, manage and operate the Project.

(a)  The purpose of the Partnership shall be deemed to include, but not be limited to:

(i)  the acquisition and holding of beneficial ownership of the Property;

(ii)  the securing of a Mortgage Loan from UDC (hereafter the "Mortgage" or "Mortgage Loan"), and receiving the proceeds thereof;

(iii)  the construction and other development of the Project utilizing the proceeds of, and in accordance with, the Mortgage Loan;

(iv)  the operation, management, maintenance and the providing of services to the Project; and

(v)  the sale, lease or other disposition of the Project.

(b)  The Partnership heretofore authorized and hereby authorizes the Housing Company, as one of its General Partners, and the Housing Company heretofore authorized and hereby agrees to:

(i)  acquire and hold legal title to the Property and the Project, on behalf of the Partnership, which shall have the equitable interest therein; and

(ii)  execute the building loan agreement, note and mortgage (hereafter "Mortgage Loan Documents") pursuant to which the Mortgage Loan will be made, the Construction Contract and other basic UDC documents including, but not limited to, the Equity and Regulatory Agreement, (hereafter "Basic UDC Documents") with respect thereto, as general partner of, and on behalf of the Partnership.

(iii)  execute and record a Declaration of interest(s), approved by UDC, setting forth, among other things, the legal and equitable in-

4

terest of the Partnership in the Project and proceeds of the Mortgage Loan.

(c)  The Housing Company confirms, ratifies, agrees and acknowledges that:

(i)  all obligations and rights it incurs, or acquires, or has incurred or acquired under the Basic UDC Documents, are and have been incurred, or acquired by it, as General Partner of, and on behalf of, the Partnership and that any action it takes in regard to the Project, is taken as a General Partner of, and on behalf of, the Partnership, except insofar as the Basic UDC Documents require the Housing Company to assume the rights, powers and authority of the Managing General Partners of the Partnership under section "9(c)" hereof; and

(ii)  except as aforesaid, it will not engage in any business or other activities or hold or own any property (or any legal or equitable interest therein).

(d) ˙ During the Supervisory Period, as defined in the Basic UDC Documents (the "Supervisory Period"), the business of the Partnership shall be conducted in conformity with the requirements of:

(i)   Article II of the Private Housing Finance Law of the State of New York (hereafter "PHFL");

(ii)   the New York State Urban Development Corporation Act (hereafter "UDC Act"); and

(iii)   the Basic UDC Documents.

(e)   All receipts of the Partnership (including checks for advances on the Mortgage Loan, partners' capital contributions and rental receipts from the operation of the Project) shall be deposited directly in one or more Partnership bank accounts.   Checks for advances on the Mortgage Loan which are made payable to the order of Housing Company shall be endorsed by Housing Company and then deposited in a Partnership bank account.   All expenditures by the Partnership (including expenditures for the development and operation of the Project) shall be made from said accounts.   Bank accounts of Housing Company may in no event be used.

(f)   The Partners acknowledge that:

(i)   the Project has been initiated to serve a public purpose in furtherance of the objectives of the UDC Act and the PHFL; and

6

(ii)  UDC has consented to the development of the Project by the Partnership in order to facilitate the investment of private capital in furtherance of such public purpose.

(g)  Immediately after the execution of this Agreement, the General Partners shall file with the Internal Revenue Service a Form 56, Notice of Fiduciary Relationship, notifying the Service that the Housing Company is acting in all respects with regard to the Project as a General Partner of, and on behalf of, the Partnership.

## CAPITAL CONTRIBUTIONS

6.    (a)  The Contribution of each Partner, as set forth upon the annexed Schedule of Partners (hereafter "Schedule"), shall be made in accordance with this Agreement.

(b)  The Class A and Class B Limited Partners shall be obligated to make their Contributions, as set forth upon the Schedule, in the amounts therein stated, as follows:

(i)  $1,050,947 by the Class A Limited Partners only within seven (7) days after written notice of the issuance by UDC of

a temporary or permanent certificate of occupancy for 95% of the units in the Project. The obligation hereunder shall be secured by the Class A Limited Partners delivering to the Partnership, simultaneously with the execution hereof, Irrevocable Commercial Letter(s) of Credit, in form acceptable to UDC, drawn for the account of the Partnership in favor of UDC in the amount of $1,050,947.

(ii)  $630,568.00 by the Class B Limited Partners only within seven (7) days after written notice of the issuance by UDC of a temporary or permanent certificate of occupancy for 95% of the units in the Project.  The obligation hereunder shall be secured by the Class B Limited Partners delivering to the Partnership, simultaneously with the execution hereof, Irrevocable Commercial Letter(s) of Credit, in form acceptable to UDC, drawn for the account of the Partnership in favor of UDC in the amount of $630,568.00.  The Class B Limited Partners shall make an addi-

tional Contribution in an amount equal to the interest charged by UDC from and after July 1, 1974 on a sum of $630,568.00, which additional Contribution shall be payable as same shall be required from the Partnership by UDC pursuant to the Development Letter.

(c)   The Class B Limited Partners also shall be obligated to make the following Contribution, as set forth upon the Schedule, in the amounts therein stated:

$203,429.04, of which $59,333.47 shall be paid upon the signing of this Agreement and the balance in seventeen (17) equal monthly install- ments of $8,476.21, first payable on the first day of August, 1974 and thereafter on the first day of each of the sixteen (16) succeeding months.  The Contribution above referred to shall be secured by the Class B Limited Partners delivering to the Partnership, simultaneously with the execution hereof, Irrevocable Commercial Letter(s) of Credit, in form acceptable to the Partnership, drawn for the account of the Partnership in the amount of $144,095.57 and reducing periodically as the pay- ments above described in this subparagraph are made.

9

Each of the above installments of Contribution shall
be conditioned upon:  (i) the Partnership being the owner of
the Project pursuant to the provisions of subparagraph "9(j)"
and (ii) there having been no default by the Managing General
Partner under the agreement referred to in subparagraph "9(i)"
and (iii) in the event UDC shall not have issued a temporary
or permanent certificate of occupancy for at least 95% of the
units in the Project within forty-eight (48) months from the
date of initial mortgage closing, then and in such event all
sums paid pursuant to subparagraph "6(c)" shall upon demand by
the Class B Limited Partners be forthwith returned to the Class
B Limited Partners and the Letter(s) of Credit issued pursuant
to subparagraphs "6(b)(i)", "6(b)(ii)" and "6(c)", shall upon
demand by the Class A and Class B Limited Partners, as the case
may be, be forthwith returned to the Class A and Class Limited
Partners and the Class A and Class B Limited Partners shall with-
draw from the Partnership and have no interest in partnership
income or loss.

(d)  In the event that subsequent to the
initial mortgage closing the Mortgage upon the Partnership
Property is decreased due to decreased project costs, and,
as a result thereof, the mortgagee and/or governmental
authority authorizes a reduction in the "equity contribution"
theretofore required of the Partnership, all Partners, both
Limited and General, shall be entitled to a portion of such

10

reduced equity contribution, which portion shall be calculated
pro rata on the basis of each Partner's then interest in the
distributions of the Partnership in accordance with sub-
paragraph "8(b)".

(e)  In the event that subsequent to the
Initial Mortgage Closing, the Mortgage upon the Partnership
property is increased due to increased project costs and, as
a result thereof, the Mortgagee and/or Governmental Authority
authorizes or directs an increase in the equity contribution
theretofore required of the Partnership, all Partners, both
Limited and General, shall contribute a portion of the
required equity contribution (hereinafter "Additional
Contribution"), which portion shall be calculated pro rata
on the basis of each Partner's then interest in the distri-
butions of the Project in accordance with subparagraph
"8(b)".

The term "equity contribution", as used in
this Agreement, and more particularly in the above subpara-
graphs "6(d)" and "6(e)", is herein defined to mean the
difference between the total cost of the Partnership's
Project, as approved by UDC or other governmental agency,
and the dollar amount of the Mortgage.

11

(f)  Except as provided in this paragraph "6", no Limited Partner shall be required or obligated to make any further capital contribution to the Partnership.

(g)  Robert W. Seavey and John L. Edmonds each shall have contributed $1,000 worth of property to the capital of the Partnership and Glick shall have contributed $100 worth of property to the capital of the Partnership. A Partner's capital account shall be increased by (i) his contribution plus (ii) his share of Partnership income and gain and shall be decreased by (iii) his share of partnership loss and (iv) cash distributions.

### MANAGEMENT COMPENSATION FEE AND PROJECT DEVELOPMENT FEE

7.  The Partnership shall pay ~~Glick, Seavey and Edmonds~~ for services heretofore rendered prior and during the construction of the Project and for obtaining a construction loan for the Project a total compensation of $203,429.04.

(a)  To Glick, the sum of $203,429.04 to be paid, as and when received by the Partnership out of the Contributions received pursuant to subparagraph "6(c)" above.

12

(b)   The obligation to make the above described payments may be evidenced by non-interest bearing Partnership notes.   There shall be no personal liability on the part of any General Partner to make any of such payments.

(c)   The above compensation payable by the Partnership to Glick, Seavey and Edmonds shall be made without regard to the income of the Partnership.

(d)   The Partnership shall be obligated to make payments to Glick, Seavey and Edmonds pursuant to this paragraph "7", unless:

(i)   the Partnership is no longer the owner of the Project pursuant to the provisions of subparagraph "9(j)", or

(ii)   there is a default under the Managing General Partners' obligations referred to in subparagraph "9(i)".

(e)   For their services hereunder, subject to UDC approval, the Managing General Partner shall receive a special fee without regard to the income of the Partnership at the rate of $10,000.00 per annum, payable on a cumulative basis, out of the first available cash flow of the Project, calculated and payable from the date of initial occupancy of

13

~~the second building to be constructed.~~  This special fee
shall be treated as an expense of the Partnership for all
purposes of this Agreement.

## DISTRIBUTIONS AND ALLOCATION OF INCOME AND LOSSES

8.  (a) For the purposes of this Agreement, the
following definition shall prevail: / "Distribution(s)" -
cash or other property received by the Partnership from any
source, including, but not limited to, sale of the Partner-
ship Property, refinancing of the Mortgage, excess insurance
proceeds, funds obtained as a result of the release of any
reserve account being maintained by, for or on behalf of the
Partnership, net income, and cash flow of the Property
distributable to the Partners in accordance with this Agree-
ment/ the provisions of the ~~PHFL~~ and/or the UDC Act, and the
~~Basic UDC~~ Documents.

(b)  All distributions, subject to the
provisions of subparagraph "7(e)", by the Partnership shall
be allocated among the Partners in accordance with the
Schedule annexed hereto and as follows:

        Managing General Partners -  15%

        Limited Partners          -  85%

14

(i)  The distributions allocated to the Limited Partners shall be allocated so that the Class A Limited Partners described in the Schedule shall receive the first 75% of the distributions allocated for all Limited Partners (i.e., 63.75% of all distributions), but in no event shall the Class A Limited Partners receive less than $33,823.84 per annum from all sums distributed to the Limited Partners, if such sum or a greater sum is available for and distributed to the Limited Partners.  As between the Class A and Class B Limited Partners, the aforesaid minimum sum of $33,823.84 per annum above stated shall be paid on a cumulative basis during the entire term of this Agreement so that no distributions shall be made to the Class B Limited Partners unless and until such time as all distributions due to the Class A Limited Partners are fully paid.  Nothing contained herein shall be construed as a guarantee from the Partnership or the General Partners that any such sum shall be available for distribution to the Class A Limited Partners.

15

(ii)   The remaining 25% of the distributions allocated for all Limited Partners (i.e., 21.25% of all distributions) shall be distributed to the Class B Limited Partners described in the Schedule, provided, however, that in no event shall the Class B Limited Partners receive any distributions during any period of time during which there may be distributions due and owing to the Class A Limited Partners on the cumulative preferred basis described in subparagraph "(i)" above.

(c)   Notwithstanding the above, any distribution by the Partnership from cash or other property realized upon the sale or other disposition of any Partnership property, from the proceeds of the refinancing of the mortgage, or the placing of an additional mortgage on the property, shall be allocated as follows and in the following priority:

(i) to the repayment of any loans (including interest thereon) made by the Partners to the Partnership, if any, and such repayment shall be made in accordance with subparagraph "9(f)";

16

(ii) to the payment to the Managing General Partners of the amounts, if any, due them or any one of them, pursuant to subparagraph "7(e)" hereof;

(iii) to the Class A Limited Partners to the extent of said Class A Limited Partners' unreturned Contributions or Additional Contributions. For this purpose and for the purpose of this Agreement, unreturned Contributions or Additional Contributions shall mean all contributions to capital less any distributions made pursuant to subparagraphs "8(b)(i)" and "8(b)(ii)".

(iv) to the Class B Limited Partners to the extent of said Class B Limited Partners' unreturned Contributions or Additional Contributions;

(v) to the General Partners to the extent of said General Partners' unreturned Contributions or Additional Contributions made pursuant to this Agreement, if any;

(vi) the balance of such proceeds, if any, shall be paid to the Partners in the ratios heretofore set forth for distributions in subparagraph "8(b)".

(d)    For purposes of this Agreement and for Federal, state and local income tax purposes, the profits and losses (including gains and losses from sale of the property) shall be allocated among the Partners as follows:

Managing General Partners - 15%
Limited Partners         - 85%

(i) The Class A Limited Partners shall be charged or credited and their capital accounts shall be debited or credited, as the case may be, with 25% of the 85% allocated above to Limited Partners (i.e., 21.25% of all income, deductions and credits of the Partnership).

(ii)    The Class B Limited Partners shall be charged or credited and their capital accounts shall be debited or credited, as the case may be, with 75% of the 85% allocated above to Limited Partners (i.e., 63.75% of all income, deductions and credits of the Partnership).

(e)    (i) "Cash Flow of the Partnership" is herein defined to mean (A) the net income or losses after taxes (if any) of the Partnership as determined in accordance with the accounting standards now or hereafter established by any regulation or accounting Manual issued by UDC, to the extent that such accounting standards are applicable, and in accordance with generally accepted accounting principles, con-

18

sistently applied using the accrual basis of accounting, to the extent that said UDC accounting standards are not applicable; plus (B) depreciation and other non-cash charges deducted in determining such net income; minus (C) principal payments on the Mortgage Loan, sums allocated to property replacement reserves, to contingency reserves and to any reserves or escrow or sinking fund account(s) required by UDC, capital expenditures made other than from such reserves, and any sums required to maintain a reasonable working capital as determined by UDC. Cash Flow shall not include any capital contributions to the Partnership. Cash Flow shall be determined separately for each fiscal year and not cumulatively.

(ii)  The Cash Flow of the Partnership shall be distributed to the Partners in accordance with paragraph "8", within a reasonable time after the end of each fiscal year, subject, however, during the supervising period, to the PHFL, the UDC Act and the Basic UDC Documents.

(f)  If any property other than cash is distributed in a liquidation pursuant to paragraph "12" of

19

this Agreement, it shall be distributed in the same manner as cash.

(g)  (i)  At the expense of the Partnership, the Partnership's certified public accountants shall prepare for each year of the Partnership, within 90 days after the close of each such year, (X) annual reports of the Partnership, including a year-end balance sheet, an annual profit and loss statement, and an annual statement of cash receipts and disbursements, (Y) annual statements indicating the share of each Partner of the net income, net loss, depreciation and other relevant items of the Partnership for such year for Federal income tax purposes, and (Z) all federal, state and local income tax returns and information returns. which the Partnership is required to file.

(ii)  The Managing General Partners shall at all times during the terms of the Partnership accurately record or cause to be recorded each transaction of the Partnership, including all transactions relating to the operation of the Project, and keep or cause to be kept full and accurate books of the Partnership.  Such books, and a certified copy of the Certificate of Limited Partnership and all amendments thereto, shall be kept at the principal office of the

20

Partnership and shall be open for inspection and examination during normal business hours by the Limited Partners and their duly authorized representatives.

(iii)  The Managing General Partners will cause the Partnership, for income tax purposes, during the construction period of the Project to deduct Mortgage interest, rent, real estate taxes or their equivalent, and all other carrying charges, expenses and deductions permitted by the Internal Revenue Code of 1954, as amended ("Code"), and will not have the Partnership elect to capitalize said items.  The Managing General Partner will thereafter cause the Partnership, for income tax purposes, to elect to use the sum of the years digit method of depreciation, or such other method as may now or hereafter be permitted by law which would enable the Partnership to take the greatest amount of depreciation in the shortest time.  The Managing General Partners will cause the Partnership to adopt and maintain the accrual basis of accounting for income tax purposes.  At the request of any Partner, the Managing General Partners will cause the Partnership to make an election under Section 754 of the Code.

(iv)  On or before March 30 of each and every
year the General Partners shall forward to each of
the Limited Partners a true copy of the Partnership's
Information Return filed with the Internal Revenue
Service for the preceding calendar year.

(h)  Each Partner's percentage share of dis-
tributions and allocation of Profits and losses of the
Partnership is and shall be as set forth upon the Schedule
of Partners annexed hereto provided, however, that the first
$~~669,890~~ *7/7,996* of losses shall be first allocated *1% to the General Partners and 99%* to the Limited
Partners and thereafter all profits and losses of the Partner-
ship shall be allocated as provided in subparagraph "8(b)".

GENERAL PARTNERS' POWERS AND DUTIES

9.    (a)  Subject to the right of the Limited
Partners to consent to certain acts under subparagraph
"9(d)" hereof, and prior to the end of the Supervisory
Period subject to the requirements of the PHFL, the UDC Act
and the Basic UDC Documents, the General Partners shall have
the same rights and powers as the general partners in a
limited partnership formed under the Partnership Law of the
State of New York, all exercisable solely on behalf of the
Partnership for project purposes, including, but not limited
to, the powers to:

(i) develop plans and cost estimates;

22

(ii)   enter into (or accept assignments from UDC of) the Basic UDC Documents and architect's agreement, attorney's agreement, accountant's agreement, managing agent's agreement, and other agreements;

(iii)   acquire, by purchase or otherwise, or sell or otherwise dispose of real property and personal property, and any interests therein, and to execute any documents in connection therewith;

(iv)   execute and deliver leases and sub-leases of units in the Project;

(v)   execute and deliver agreements with the United States Department of Housing and Urban Development for interest reduction payments under Section 236 of the National Housing Act and/or rent supplement payments pursuant to Section 101 of the Housing and Urban Development Act of 1965;

(vi)   obtain loans (secured and unsecured) from Partners, and persons other than Partners, and to secure the same by mortgaging or granting security interests in all or any part of the Partnership's property, and to repay, refinance, increase, modify or extend any such loan;

23

(vii) alter or improve the Project;

(viii) determine the timing and amount of distributions to be made by the Partnership to the Partners (other than upon dissolution of the Partnership), and the manner of making distributions of property upon dissolution of the Partnership under paragraph "13" hereof;

(ix) to the extent practicable, provided that funds are available for same, attempt to make distributions at least once a year; and

(x)  make construction decisions but such power shall be exercised by Glick only;

(xi) take all other action, and execute any and all other contracts, documents or instruments authorized by other provisions of this Agreement, or which they deem appropriate to carry out the intents and purposes of this Agreement.

(b)  Except as set forth in subparagraph "9(c)" hereof, all powers and rights of the General Partners under subparagraph "9(a)", and the other provisions of this Agreement, shall be vested exclusively in the Managing General Partner and upon direction of the Managing General Partner, the Housing Company shall take any action authorized under

24

subparagraphs "5(b)" and "9(a)" hereof.  The Managing General Partner agrees that during the term of the Partnership (except during any period in which the Managing General Partner's power under subparagraph "9(a)" are terminated, or suspended under subparagraph "9(c)") it will exercise its powers with reasonable skill and care.  The Managing General Partners shall act unanimously at all times; otherwise their actions shall be null and void.

(c)  (i) Prior to the end of the Supervisory Period, the Housing Company shall be responsible to UDC as General Partner of the Partnership, for assuring that the Partnership's development, management and operation of the Project are in conformity with the requirements of the PHFL, the UDC Act, and the Basic UDC Documents.  In recognition of such responsibility, the Housing Company, in its discretion, is hereby granted the right, from time to time, and whether or not such right has previously been exercised for any period, prior to the end of the Supervisory Period, to suspend or terminate the rights, powers and authority of the Managing General Partner (or any substituted additional or successor managing general partner) specified in paragraph "9(b)" above and to itself assume such rights, powers

25

and authority, provided, however, that such right of the
Housing Company to take over the rights, powers and authority
of the Managing General Partner (or any substituted or
successor managing general partners) may be exercised only
upon, and in accordance with, the written direction given by
UDC pursuant to the Basic UDC Documents.

In the event of such a suspension or termination,
all of the rights, powers and authority of the Managing
General Partners hereunder shall be exercised exclusively by
Housing Company, as general partner of, or on behalf of the
Partnership, until the earliest of: (i) such time as UDC
determines that such rights, powers, and authority may
revert to the Managing General Partner; or (ii) the end of
the Supervisory Period.

(c)  (ii)  In the event of any default under
the Basic UDC Documents, the Construction Contract, the UDC
Regulations for Residential Rental Projects, or any other
Agreement executed at the Closing, UDC may upon ten days'
written notice prior to the completion of construction under
the construction contract require the Partnership to termi-
nate any managing general partner as managing general partner
and to transfer his or its duties as managing general partner
within thirty days of the date of such notice to another or
additional general partner of the Partnership designated by

26

the remaining general partner(s) and satisfactory to UDC. In the event of the failure of the Partnership to designate such other or additional partner within such 30-day period, UDC shall promptly thereafter designate such other or additional partner as it may approve.

Any such additional partner shall be admitted to the Partnership, and any such other or additional partner shall serve as a managing general partner, from and after the effective date of such designation approved by UDC. Any partner so terminated shall be entitled to no further compensation for its service as managing general partner or as Developer after the date of such termination.

(d) The Limited Partners shall have no rights to participate in the management of the Partnership, provided however, that notwithstanding any other provisions of this Agreement, the General Partners shall not, without the written consent of Limited Partners whose percentage interest in the Partnership at that time exceeds sixty (60%) percent of the then aggregate percentage of profit and loss ratio of all the Limited Partners in the Partnership, do any of the following acts:

27

R-1

(i)   change the general character of the Partnership's business as provided in paragraph "5" hereof, or take any action with respect to the Partnership not authorized by subparagraph "9(a)"; or

(ii)   sell, transfer or assign all, or any part, of the Partnership's equitable interest in the Project; or

(iii)   amend the Mortgage (except an increase authorized by UDC) or place a new mortgage upon the Project; or

(iv)   lease all or substantially all of the Project to a single tenant.

During the Supervisory Period, said acts shall require the consent of UDC to the extent and in the manner specified in the Basic UDC Documents.

(e)   The fact that a Partner is directly or indirectly interested in, or connected with, any person employed or retained by the Partnership to render, or per- form, a service, or from which, or whom, the Partnership may buy property, shall not prohibit the General Partners from

28

employing, retaining or dealing with such person, provided that payment for same is at competitive rates, *and, where required, approved by upc*

(f)  If the Partners advance any funds to the Partnership in excess of the proceeds of the Mortgage, the capital and the income of the Partnership in order to operate the Project after its completion, such funds shall be treated as loans to the Partnership, bearing interest at the rate of 6% per annum.  Such loans shall be repaid out of the income of the Partnership before any distribution is made to any of the Partners pursuant to paragraph "8", but no such loans shall be repaid to any General Partner so long as the Partnership is indebted to any Limited Partner for such additional loans.  Notwithstanding the foregoing, no General or Limited Partner shall be required or obligated to make any such loans.

(g)  The Managing General Partner agrees that it will not resign or retire for a period of fifteen (15) years from the commencement date of this Partnership, except for the withdrawal of Glick pursuant to paragraph 12. However, the Partners hereto, by their execution hereof, consent to the admission by the Managing General Partner,

29

acting for the Partnership, of an Additional General Partner as Managing General Partner provided, however, that the admission of such Managing General Partner shall be approved by UDC.  Upon its admission as an Additional General Partner, the Additional General Partner shall have all the rights, duties and obligations of the Managing General Partner under the terms of this Agreement, it being understood and agreed that the Managing General Partner shall remain obligated for the performance of all of its obligations under this Agreement.

(h)  No additional General Partner shall be admitted except upon fifteen (15) days' prior written notice to the Limited Partners.

(i)  The Managing General Partner represents to the Limited Partners that the Partnership has received 100% payment and 100% performance bonds from Glick Construction Corp. and Glick Affiliates ("General Contractor") assuring as set forth therein the completion of the Project. Copies of same have been delivered to the Limited Partners. The Managing General Partners jointly and severally agree to

30

enforce the obligations contained in said payment and per-
formance bonds and in the construction contract between the
Housing Company, as General Partner of the Partnership, and
the General Contractor.

(j)  In the event that during the two-year
period commencing with the date of the granting of the temp-
orary certificate of occupancy UDC or any other Governmental
Authority shall have completed mortgage foreclosure proceedings
resulting in the fact that the Partnership is no longer the
equitable, beneficial or actual owner of the Project (the
"Event"), the Managing General Partner shall purchase from
the Limited Partners all of their interest in the Partner-
ship and its assets, upon the following terms and conditions:

(i)  The date for purchase ("Closing
Date") shall be designated by the Managing General
Partner upon notice sent to the Limited Partners,
no later than sixty (60) days after the Managing
General Partner has notice of the Event, such date
to be not less than ten (10) days from the date of
the notice nor more than sixty (60) days therefrom.

(ii)   The Purchase Price shall be an amount equal to the Net Capital Contributions which were made in cash to the Partnership by the Limited Partners reduced by any Distributions received by them to such date from any source whatsoever.

(iii)   On the Closing Date, the Managing General Partner shall execute a non-interest bearing note in favor of each of the Limited Partners for the amount of the respective Purchase Price.   The note shall be due and payable in two (2) equal installments.   The first of said installments shall be due and payable on a date 90 days following the Closing Date and the second of such installments shall be due and payable 180 days following the Closing Date.

(iv)   On the Closing Date, the Limited Partners shall deliver to the Managing General Partner an assignment of all of the Limited Partners' right, title and interest in the Partnership and all of its assets and the Letters of Credit delivered

32

by the Limited Partners to the Partnership shall be returned to the Limited Partners.

(v)  The parties shall, in addition thereto, execute and deliver to each other and the Partnership such other documents as may be reasonably requested by their respective counsel and counsel for the Partnership and also any documents requested by the UDC in connection therewith.

(vi)  The sole remedy of the Limited Partners in the event of foreclosure and divestiture of title shall be as set forth in this subparagraph "9(j)" and the subparagraphs thereof.

33

## LIMITED PARTNERS' RESTRICTIONS
## AND LIMITATIONS

10.   Limited Partners shall have no rights other than those expressly provided for herein or granted by law where not inconsistent with a valid provision hereof.

11.   (a)   Except as provided in subparagraph "(b)", a Limited Partner shall not be permitted to transfer all or any part of his interest in this Partnership without the prior written approval of the Managing General Partners.

(b)   A Limited Partner shall be permitted to transfer all or any part of his interest in this Partnership to any of the following:

(i) Members of his immediate family or their descendants; or to a trust for the benefit of one or more of such persons;

(ii) Another Limited Partner;

(iii) To a corporation, 51% of the voting stock of which is owned by such Limited Partner or to the parent corporation of such Limited Partner or the nominee of such Partner, members of his immediate family or their direct descendants; or to a trust for the benefit of one or more of such persons;

(iv) A charity or organization which is exempt from payment of income taxes pursuant to Section 501(c)(3) of the Code (or its successor Section).

(c) Except for a transfer permitted in subparagraph "(a)" of this paragraph "11", no assignee of a Limited Partner shall become a Limited Partner in this Partnership without first obtaining the written consent of the Managing General Partner.

(d) No transferee of all or any part of an interest, whether by death, operation of law or otherwise, shall be admitted to the Partnership as a Limited Partner without executing this Agreement and such other instruments as may be required by law or as the General Partners shall deem necessary or desirable to confirm the undertaking of such transferee to be bound by all the terms and provisions of this Agreement and to pay all reasonable expenses incurred by the Partnership in connection with the transfer, including, but not limited to, the cost of preparation, filing and publishing such amendments to the Certificate of Limited Partnership ("Certificate") as may be required by law or such other instruments as the General Partners may deem necessary or desirable. Notwithstanding any provision

35

of this Agreement, the admission of any such transferee to the Partnership as a Limited Partner shall not be effective until the Certificate is properly filed.

(e)  No Limited Partner shall sell, mortgage, pledge, hypothecate, transfer, assign or otherwise dispose of all or any part of his or its interest without the prior written consent of the Managing General Partner, which consent may be withheld in the sole discretion of the Managing General Partner.

(f)  No transfer of an interest or any part thereof shall be made to a person who is not a citizen of the United States.

(g)  No transfer of an interest or any part thereof shall be valid or effective unless it shall be made in accordance with the provisions of this Agreement.

(h)  Notwithstanding anything in this Agreement to the contrary during the Supervisory Period the transfer of an interest in the Partnership is subject to the approval of UDC and the transferor shall, prior to and as a condition of making a transfer, obtain the written approval therefor from UDC.

36

## TRANSFER OF GENERAL PARTNERSHIP INTEREST

*Subject to approval of UDC which approval shall not unreasonably withheld*

12.   (a)  Within sixty (60) days after certifica-

tion of the mortgage amount by the UDC, Glick shall sell

his General Partner's interest in the Partnership to Seavey

and Edmonds and shall withdraw as a General Partner in the

Partnership, and Seavey and Edmonds shall buy from Glick

his General Partner's interest in the Partnership for

$20,760.20.  Such sale shall be deemed and construed to have

taken place at the time of delivery to Glick by Seavey and

Edmonds of the aforesaid sum of $20,760.20 by good certified

check.  Glick shall evidence such sale by executing the

Partnership Agreement in the space provided therefor on page

52 hereof.  Such execution shall take place at the then

principal office of the Partnership or at such other place

as the Managing General Partners may agree upon.  Notwith-

standing Glick's failure to evidence such sale and withdrawal

by execution of this Agreement in the space below provided,

such sale shall be deemed and construed to have taken place

at the time of delivery to Glick of the aforedescribed good

and certified check in the sum of $20,760.20.


## DISSOLUTION

13.   (a)  The Partnership shall be dissolved upon

the expiration of its term as provided in this Agreement, or

prior thereto, upon the failure to acquire the Property, upon the sale of all or substantially all of the Partnership Property or upon the withdrawal from the Partnership, (other than by Glick pursuant to paragraph 12 hereof) bankruptcy, insolvency or death of a General Partner. Notwithstanding the foregoing, if the event of dissolution is withdrawal from the Partnership, bankruptcy, insanity or death of any General Partner prior to the date which is ten years from the date hereof, if such Partner is not the then sole remaining General Partner, the remaining General Partner shall continue the business of the Partnership upon substantially the same terms and conditions as are set forth in this Agreement, provided, however, that if such remaining General Partner shall retire or withdraw and not continue the Partnership, such General Partner shall be liable to the Limited Partners for such damages as they shall suffer.

(b)  Upon dissolution, all certificates or notices thereof required by law shall be filed and the Partnership business shall be concluded.

(c) . The Partnership's accountants shall prepare and furnish to each Partner a statement setting forth the assets and liabilities of the Partnership as

of the date of complete liquidation.  Upon complete distri-
bution of the Partnership property, the Limited Partners
shall cease to be such and the General Partners shall
execute, acknowledge and cause to be filed all certificates
necessary to terminate the Partnership.

(d)  A reasonable time shall be allowed for
the orderly liquidation of the Partnership property, the
discharge of liabilities to creditors and the distribution
of Partnership property to the Partners.

(e)  Upon the withdrawal from the Partner-
ship, bankruptcy or insolvency of a General Partner, such
General Partner shall cease to function or have any autho-
rity as a General Partner, or to have any right to act for
or bind the Partnership.  In the event this Partnership is
to be dissolved by reason of the occurrence of an event
described in the preceding sentence and the other General
Partners do not intend to continue the Partnership, then, if
Limited Partners who in the aggregate have contributed not
less than 51% of the Limited Partners' capital signify in
writing to all Limited Partners their desire to form a
successor partnership for the purpose of continuing the
Partnership with a new general partner, they shall be en-
titled to continue the business of the Partnership under its

present name, if, within sixty (60) days after the happening of such event of dissolution, they enter into a new partnership agreement for that purpose.

If such successor partnership is so formed, the General Partner (other than the Housing Company) shall forthwith, upon receipt of notice of the formation of such successor partnership, resign as General Partner of the Partnership and will obtain the resignation of its designees and nominees, if any, as officers and directors of the Housing Company and turn over such resignations and all books, records, files, documents and other assets of the Partnership and of the Housing Company in their possession and under their control to the successor general partner and/or officers and directors, as the case may be. In addition, simultaneously therewith: (i) said General Partner and said officers and directors shall execute and deliver to the Partnership and to the Housing Company general releases with respect to any and all liabilities, claims, damages, rights or causes of action which they, or any of them, may have had against the Partnership and the Housing Company; and (ii) said General Partner shall transfer and assign to the successor general partner, without payment or compensation of any kind whatsoever, all of its right, title and interest in the

aforementioned liabilities and obligations, and, at the expiration of such period as the General Partners shall deem advisable to distribute the balance thereafter remaining in the manner here-inafter provided.

(iii)  to the repayment of any loans or advances that may have been made by any of the Part-ners, but if the amount available for such repayment shall be insufficient, then pro rata on account thereof;

(iv)  to the payment to the Managing General Partners of the amounts, if any, due them or any one of them, pursuant to subparagraph "7(e)";

(v)  to the repayment pro rata of any and all sums remaining in the capital accounts of any of the Partners to the extent that same represents unreturned Contributions or Additional Contributions;

(vi)  the balance of said assets, if any, shall be divided among the Partners in the ratios heretofore set forth for distributions and profits in subparagraph "8(b)"; and

(vii)  in the event that the assets of the Partnership available for distribution are not

sufficient to satisfy in full the rights of the Partners, as hereinabove set forth, the Limited Partners shall not have any further right or claim against the General Partners.

(g)  Notwithstanding anything herein to the contrary, Housing Company shall not have the right to retire from the Partnership.  If a General Partner shall withdraw from the Partnership, become insolvent or bankrupt prior to the date ten (10) years from issuance of a Certificate of Occupancy for the Project, the remaining General Partners shall continue the Partnership until such date unless it shall have received the consent from Limited Partners whose then percentage interest in the Partnership, in the aggregate, exceeds 60% of the then aggregate percentages of all the Limited Partners therein, to dissolve the Partnership.

(h)  Notwithstanding anything herein to the contrary (i) in the event UDC directs the Housing Company as General Partner of the Partnership to take over and assume all powers, rights and authority of Managing General Partner of the Partnership pursuant to the provisions of Section 4.2(b) of the Equity and Regulatory Agreement for the Project and the Housing Company actually does so take over, and

43

assumes the powers, rights and authority of Managing General Partner, or (ii) if the holder of the Mortgage shall declare a default under the Mortgage by virtue of any action or inaction of the General Partners or the Partnership, then, and in either of such events, if such condition exists for a period of thirty (30) days without the General Partners obtaining a revocation or waiver of the action taken by UDC or of the defaults complained of under the Mortgage, or without the commencement of any action of the Managing General Partner or its successor general partner to cure any such take-over or default, the Limited Partners who have contributed not less than 51% of capital (subject to the approval of UDC and the provisions of subparagraphs "9(c)", "9(d)" and "11(b)" hereof) shall have the following rights:

(Y) to remove the General Partner (other than the Housing Company) as a general partner of the Partnership and to remove its designees and nominees, if any, as officers and directors of the Housing Company;

(Z) to designate a new General Partner or General Partners for the Partnership and to elect new officers and directors of the Housing Company.

(i) In the event that the Limited Partners determine, as aforesaid, to elect to exercise their

rights under "(h)" above, the General Partner (other than the Housing Company) shall forthwith upon receipt of notice of said election resign as General Partner of the Partnership and will obtain the resignations of its designees and nominees as officers and directors of the Housing Company, and turn over such resignations and all books, records, files, documents and all other assets of the Partnership and of the Housing Company in their possession or under their control to the successor general partner and/or officers and directors, as the case may be.

(ii) Simultaneously therewith, (A) said General Partner and said officers and directors shall execute and deliver to the Partnership and to the Housing Company general releases with respect to any and all liabilities, claims, damages, rights or cause of action which they or any of them may have or have had against the Partnership and the Housing Company, and (B) said General Partner shall transfer and assign without payment or compensation of any kind whatsoever, all of its right, title and interest in the Partnership and all of its property, income, distributions, capital and other assets to its successor general partner.

45

(iii) To implement the rights set forth in subsection "(h)" "(Y)" and "(Z)" above, each of the Limited Partners consents to the substitution of the general partner designated by the Limited Partners pursuant to the provisions of subparagraph (h) above.  Each Limited Partner does hereby irrevocably constitute and appoint the newly substituted general partner (or either one of them, if there are two) as his (or its) true and lawful attorney in his (or its) name, place and stead to execute such consent and to make, execute, acknowledge and file any certificates amending the Certificate of Limited Partnership as may be required under the New York Partnership Law to reflect such substitution of the original General Partner.

(i)  Notwithstanding anything herein to the contrary, any distribution as a result of dissolution and any other action taken during dissolution shall be subject to the applicable provisions of the Basic UDC Documents.

CAPITAL WITHDRAWALS

14.  Except as provided in this Agreement, the Partnership shall make no distributions of capital to the Partners or pay the Partners any fees.

46

## GENERAL PROVISIONS

15.   (a)   All notices or offers required or permitted pursuant to this Agreement shall be in writing and shall be deemed to be sufficiently given or served for all purposes when sent by certified or registered mail (i) by any Limited Partner to the Partnership and the General Partners, c/o Robert W. Seavey, 500 Fifth Avenue, New York, New York with copy thereof to Glick Affiliates, 3000 Marcus Avenue, Lake Success, New York, or to such other address as Glick Affiliates and/or Robert W. Seavey, as the case may be, may hereafter specify by notice to the Limited Partners, or (ii) by any other person to the Partnership or the General Partners at the address of the General Partners set forth in paragraph "3" of this Agreement, or (iii) to any Limited Partner at his address as set forth in the Schedule or to such other address as any Limited Partner may hereafter specify by notice to the Partnership.

(b)   (1)   Any dispute or controversy between Partners *(except the Housing Company)* arising out of, or in connection with, the Partnership, shall be determined and settled by arbitration in the State of New York by and pursuant to the then rules of the American Arbitration Association or any successor organization

thereto.   Any award rendered thereunder shall be final and

in any court of competent jurisdiction, in accordance with

the laws of the State of New York.

(c)   The Limited Partners signatory hereto

each acknowledge the following:

(1)   He or it understands that (i) all

statements, information, data and figures describing

or relating in any way to transactions contemplated

by the Partnership have been based upon informa-

tion obtained by the Partnership from sources

which it deems reliable, and (ii) any projected

or estimated figures of income expenses, deprecia-

tion and operations are estimates and opinions only

and are not warranted or guaranteed;

(2)   The Managing General Partner has

represented that there are no present material

defaults under the Basic UDC Documents and that

any certification delivered by the Managing

General Partner to the Limited Partners simul-

taneously with the execution hereof is true and

correct.

(3)   None of the General Partners, the

Partnership, any other Limited Partner or any other

48

person acting for or on behalf of the Partnership has made any representations or warranties of any kind or nature to induce him to enter into this Agreement except as herein provided or as elsewhere provided in writing. It is understood and agreed that neither the General Partners, the Partnership, any other Limited Partner nor any other person acting for or on behalf of the Partnership shall be liable to or bound in any manner by representations, information or data furnished by any broker, agent, employee or other person unless specifically set forth herein.

(d) This Agreement, except as otherwise herein provided, shall be binding upon, and inure to the benefit of, the Partners and their personal representatives, successors and assigns.

(e) This Agreement cannot be changed, altered, modified or amended without the consent of the UDC, so long as the Project is subject to the applicable provisions of the PHFL, the UDC Act and the Basic UDC Documents (except for substitution of a limited partner).

49

(f)   This Agreement may be executed in any number of counterparts and all of such counterparts taken together shall for all purposes constitute one Agreement, binding on all the Partners, notwithstanding that all Partners are not signatories to the same counterpart.

(g)   The Limited Partners irrevocably constitute and appoint the Managing General Partner as their true and lawful attorney, in the name, place and stead of any Limited Partner to make, execute, acknowledge, deliver and file all instruments which may be required by any Governmental Authority, or which the Managing General Partner or UDC shall deem necessary or desirable for Partnership purposes; including, but not limited to, the Certificate, amendments or modifications thereto and a cancellation thereof upon termination of the Partnership as provided in this Agreement; provided, however, such power shall be exercised only in accordance with the provisions of this Agreement.  It is expressly intended by the Limited Partners that said power of attorney is coupled with an interest and that it shall survive the Permitted Transfer by any Limited Partner or the whole or any part of its interest.

50

IN WITNESS WHEREOF, this Agreement has been executed by the Partners this 9ᵗʰ day of *August*, 1974.

GENERAL PARTNERS:                    106TH ST. HOUSES, INC.

                                     By: _____

                                     GLICK AFFILIATES

                                     By: _____


                                     _____
                                          ROBERT W. SEAVEY

                                     _____
                                          JOHN L. EDMONDS

LIMITED PARTNERS:                    MARS ASSOCIATES, INC. and
                                     NORMEL CONSTRUCTION CORP., a
                                     Joint Venture


                                     By: MARS ASSOC., INC.

                                     By: _____

                                     _____
                                          SAMUEL SINGER

51

_____
GEORGE KLEINMAN

_____
MARTIN SINGER

_____
JOSEPH L. BRANDES

        The undersigned hereby withdraws as partner of
FIFTH AND 106TH ST. ASSOCIATES.


                  JERROLD I. HIRSCHEN

_____


Dated:     New York, New York
          ~~June~~ , 1974

        Pursuant to Paragraph 12, the undersigned acknow-
ledges receipt of $20,760.20 and withdraws as a general partner
in the Partnership.


                  GLICK AFFILIATES


                  By:_____
                      REUBEN GLICK



STATE OF NEW YORK    )

COUNTY OF *illegible*  )    ss.:

On the *illegible* day of ~~June~~ *August*, 1974, before me personally came GEORGE KLEINMAN, to me known to be the individual described in and who executed the foregoing instrument, and acknowledged that he executed the same.

*signature*

GERALD H. LITWIN
*illegible*
Commission Expires March 30, 19__ 76

STATE OF NEW YORK    )

COUNTY OF *illegible*  )    ss.:

On the *illegible* day of ~~June~~ *August*, 1974, before me personally came MARTIN SINGER, to me known to be the individual in and who executed the foregoing instrument, and acknowledged that he executed the same.

*signature*

STATE OF NEW YORK    )

COUNTY OF *illegible*  )    ss.:

On the *illegible* day of ~~June~~ *August*, 1974, before me personally came JOSEPH L. BRANDES, to me known to be the individual described in and who executed the foregoing instrument, and acknowledged that he executed the same.

*signature*

Notary GERALD H. LITWIN
*illegible*
Commission Expires March 30, 19__ 76

STATE OF NEW YORK )
                    : ss.:
COUNTY OF       )

         On the *August* 9th day of ~~June~~, 1974, before me personally came ROBERT W. SEAVEY, to me known to be the individual described in and who executed the foregoing instrument, and acknowledged that he executed the same.

*Gerald H. Litwin*
GERALD H. LITWIN
Notary Public, State of New York
No. 31-7572234
Qualified in New York County
Commission Expires March 30, 19 76

STATE OF NEW YORK )
                    : ss.:
COUNTY OF *New York* )

         On the *August* 9th day of ~~June~~, 1974, before me personally came JOHN L. EDMONDS, to me known to be the individual described in and who executed the foregoing instrument, and acknowledged that he executed the same.

*Gerald H. Litwin*
GERALD H. LITWIN
Notary Public, State of New York
No. 31-7572234
Qualified in New York County
Commission Expires March 30, 19 76

STATE OF NEW YORK )
                    : ss.:
COUNTY OF *New York* )

         On the *August* 9th day of ~~June~~, 1974, before me personally came SAMUEL SINGER, to me known to be the individual described in and who executed the foregoing instrument, and acknowledged that he executed the same.

*Gerald H. Litwin*
GERALD H. LITWIN

Commission Expires March 30, 19 76

STATE OF NEW YORK  )
                    :  ss.:
COUNTY OF *penbert*  )

On the 2²ᵗ day of ~~June~~, 1974, before me personally came JERROLD I. HIRSCHEN, to me known to be the individual described in and who executed the foregoing instrument, and acknowledged that he executed the same.

_Gerald H. Litwin_

GERALD H. LITWIN ... York
Notary ...
Qu... ... 19_26
Commission Expires March 30, 19__

STATE OF NEW YORK  )
                    :  ss.:
COUNTY OF *N.Y.*   )

On the 3ʳᵈ day of ~~June~~, 1974, before me personally came JOSEPH V. FIOCCA, to me known, who, being by me duly sworn, did depose and say that he resides at ..........................; that he is the *V-P* of 106TH ST. HOUSES, INC., the corporation described in and which executed the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the board of directors of said corporation, and that he signed his name thereto by like order.

_Gerald H. Litwin_

GERALD H. LITWIN
Notary Public, State of New York
No. 31... 70354
Quali... in New York County
Commission Expires March 30, 19__

STATE OF NEW YORK )
COUNTY OF *illegible* ) ss.:

On the *4th* day of ~~June~~ *August*, 1974, before me personally came MARTIN SINGER, to me known, who, being by me duly sworn, did depose and say that he resides at *16 Deer Ridge Circle purchase N.Y.* that he is the *President* of MARS ASSOCIATES INC., the corporation described in and which executed the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it is in fact acting as a joint venturer with NORMEL CONSTRUCTION CORP.; that it was so affixed by order of the board of directors of said corporation, and that he signed his name thereto by like order.

*signature*

GERALD H. LITWIN
Notary Public, State of New York
No. 31-772234
Qualified in New York County
Commission Expires March 30, 19__

STATE OF NEW YORK )
COUNTY OF *illegible* ) ss.:

On the *4th* day of ~~June~~ *August*, 1974, before me personally came MARTIN SINGER, to me known, who, being by me duly sworn, did depose and say that he resides at *1060 Fifth Avenue N.Y.C.* that he is the *President* of NORMEL CONSTRUCTION CORP., the corporation described in and which executed the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it is in fact acting as a joint venturer with MARS ASSOCIATES, INC; that it was so affixed by order of the board of directors of said corporation, and that he signed his name thereto by like order.

*signature*

Commission Expires *illegible*

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF *new york* )

On the 22nd day of June, 1974, before me personally came Reuben Glick, to me known, who, being by me duly sworn, did depose and say that he resides at 48 Shore Drive, Kings Point, New York; that he is a partner of GLICK AFFILIATES, the partnership described in and which executed the foregoing instrument; that he has been authorized by said Partnership to execute the foregoing instrument, and that he signed his name pursuant to said authority.

_Gerald H. Litwin_

GERALD H. LITWIN
Notary ... w York
Qu... ...
Commission Expires March 30, 19 76

106th Street

Draft 11/15/81

## OPERATING ESCROW ACCOUNTS
### SUMMARY

At FMD, the OEF Accounts must be current with the exception of a $125,000 arrearage in the Replacement Reserve Portion of the OEF Account. The $125,000 Reserve for Replacement Arrearage will be brought current in September 1982 from Flexible Subsidy monies.

The following is a chart showing the OEF Accounts as of 11/1/81 per DHCR

| OEF Accounts | Monthly Amount | Annual Amount | Balance | Arrears B | Flexible Subsidy Loan | Arrearages* |
|---|---|---|---|---|---|---|
| Balance | $ 7,085 | $ 85,020 | $ 0 | $ 92,105.00 | $ 0 | $ 92,105.00 |
| Water/Sewer | 1,850 | 22,200 | 0 | 24,050.00 | 0 | 24,050.00 |
| Real Estate Taxes | 11,415 | 136,980 | 0 | 158,453.00 | 0 | 158,453.00 |
| Painting & Decorating | 4,140 | 49,680 | 19,059.35 | 200,706.66 | 0 | 200,706.66 |
| Replacement Reserves | 6,185 | 74,220 | 83,181.25 | 136,070.00 | 125,000 | 11,070.00 |
| Contingency | 0 | 0 | 0 | 0 | 0 | 0 |
| Contingency | 0 | 0 | 0 | 0 | 0 | 0 |
| Encumbered Funds | 0 | 0 | 8,853.02 (A) | 0 | 0 | 0 |
| Total | $30,675 | $368,100 | 111,093.62 | 611,384.66 | $125,000 | 486,384.66* |

) Must be paid from Project Funds or Owner at FMD or deferred by DHCR per written agreement or cleared by DHCR per letter from DHCR.

) Based on Figures provided by DHCR as of 9/30/81 plus october paymnet assumed not to be made.

) Encumbered for Oil Burners

It should be noted that although not shown above, the Title Report indicates that the shelter rent payment due 7/1/78 - 30/79 in the amount of $9,020.96 is delinquent. This $9,020.96 must be paid prior to FMD.

## SCHEDULE OF PARTNERS

| Limited Partners | Cash Contribution | Allocation of Distribution | Allocation of Profits and Losses |
|---|---|---|---|

**CLASS B LIMITED PARTNERS**
-Continued-

Martin Singer
16 Rock Ridge Circle
New Rochelle, New York

(iii) For the purposes described in paragraph 6(c) of the annexed Limited Partnership Agreement.

$50,857.26

*Martin Singer*

Date Executed: 04/14/??

TOTAL Contributions from each Class B Limited Partner

$208,499.26                See Page 3 of this Schedule            See Page 3 of this Schedule

Joseph L. Brandes
20 Rock Ridge Circle
New Rochelle, New York

Total Contributions from all Class B limited partners ($208,499.28 X 4).

$813,997.04

*Joseph L. Brandes*

Date Executed: 04/1/??

ℓ-1.

SCHEDULE OF PARTNERS

Page 1 of 4

| General Partners | Cash Contribution | Allocation of Distributions | Allocation of Profits and Losses |
|---|---|---|---|
| 106th St. Houses, Inc.<br><br>Click Affiliates | $ 100.<br><br>-0- | -0-<br><br>One thirtieth (1/30) of all distributions [including income pursuant to paragraph 7(e) of the annexed Limited Partnership Agreement] allocated to managing general partners until paragraph 12 is effective, and then zero. | -0-<br><br>One thirtieth (1/30) of all profits and losses allocated to the managing general partners until paragraph 12 is effective and then zero. |
| Robert W. Seavey | $1,000. | Twenty nine sixtieths (29/60) of all distributions [including income pursuant to paragraph 7(e) of the annexed Limited Partnership Agreement] allocated to managing general partners until paragraph 12 is effective, and then one-half. (1/2) | Twenty nine sixtieths (29/60) of all profits and losses allocated to the managing general partners until paragraph 12 is effective, then one-half (1/2). |
| John L. Edmonds | $1,000. | Twenty nine sixtieths (29/60) of all distributions [including income pursuant to paragraph 7(e) of the annexed Limited Partnership Agreement] allocated to managing general partners until paragraph 12 is effective, and then one-half (1/2). | Twenty nine sixtieths (29/60) of all profits and losses allocated to the managing general partners until paragraph 12 is effective, then one-half (1/2). |

SCHEDULE OF PARTNERS

| Limited Partners | Cash Contribution | Allocation of Distribution | Allocation of Profits and Losses |
|---|---|---|---|
| Mars Associates, Inc. and Normel Construction Corp., a Joint Venture 25 Colgni Avenue .ew Rochelle, New York | (i) For the purposes described in and pursuant to paragraphs 6(b)(i) of the annexed Limited Partnership Agreement.......... $1,050,947.00 | All distributions to the Class A Limited Partners shall be made pursuant to paragraphs 8(b)(i) and 8(c) of the annexed Limited Partnership Agreement. | All allocations of profits and losses to the Class A Limited Partners shall be made pursuant to paragraph 8(d)(i) of the annexed Limited Partnership Agreement. |

BY: [signature]

BY: [signature]
    Samuel Singer, Pres.

Date Executed: [handwritten] '74

(ii) For the purposes described in and pursuant to paragraph 6(b)(ii) of the annexed Limited Partnership Agreement.................

$ -0-

(iii) For the purposes described in and pursuant to paragraph 6(c) of the annexed Limited Partnership Agreement.................

$ -0-

TOTAL Contributions from Class A Limited Partners----    $1,050,947.00

## SCHEDULE OF PARTNERS

| Limited Partners | Cash Contribution | Allocation of Distribution | Allocation of Profits and Losses |
|---|---|---|---|
| Each of the Class B limited partners shall make the following contributions: | | All distributions to the Class B limited partners shall be made so that each of the Class B limited partners receives on each distribution an amount equal to that of every other Class B limited partner. | All allocations of profits and losses to the Class B limited partners shall be made so that each of the Class B limited partners receives an allocation equal to that of every other Class B limited partner. Such allocation shall be made pursuant to paragraph 8(d)(ii) of the annexed Limited Partnership Agreement. |
| (i) For the purposes described in paragraph 6(b)(i) of the annexed Class B Limited Partnership Agreement.......... | $ -0- | Such distributions shall be made pursuant to paragraph 8(b)(ii) and 8(c) of the annexed Limited Partnership Agreement. | |

### CLASS B LIMITED PARTNERS

Samuel Singer
'050 Fifth Avenue
New York, New York

Samuel Singer

Date Executed:

George Kleinman
242 Robert Drive
New Rochelle, New York

George Kleinman

Date Executed:

(ii) For the purpose described in paragraph 6(b)(ii) of the annexed Limited Partnership Agreement................
$157,642.00

Page 3 of 4