# HOUSING MANAGEMENT AGREEMENT

This Agreement is made this 3rd day of January 2000 between

**CHURCH HOMES ASSOCIATES**

(the "Owner") and

**DALTON MANAGEMENT COMPANY., LLC**

(the "Agent").

1. **Appointment and Acceptance:** The Owner appoints the Agent as exclusive agent for the management of the property described in Section 2 of this Agreement, and the Agent accepts the appointment, subject to the terms and conditions set forth in this Agreement.

2. **Description of Project:** The property to be managed by the Agent under this Agreement (the "Project") is a housing development, consisting of the land, buildings, and other improvements which make up Project No. 012-57077 The Project is further described as follows:

   Name: Canaan IV Towers

   Location: 95 Lenox Avenue
   New York, New York 10026

   County: Manhattan

   No. of dwelling units: 161

3. **Definitions:** As used in this Agreement:

   a. "HUD" means the United States Department of Housing and Urban Development.

   b. "Secretary" means the Secretary of the United States Department of Housing and Urban Development.

   c. "Mortgage" means that certain indenture of mortgage by and between the Owner, as mortgagor, and the mortgagee, with respect to the Project, which mortgage is insured by the United States Department of housing and Urban Development.

   d. "Mortgagee" means any holder of the Mortgage.

   e. "Principal Parties" means the Owner and Agent.

   f. "Management Certification" means the Project Owner's and Management Agent's Certification for Multifamily Housing Project for Identity of Interest or Independent Management Agents (Form HUD 9839-B).

Owner has entered into a Regulatory Agreement with the Secretary, whereby the Owner is obligated to provide for management of the Project in a manner satisfactory to the Secretary, and the Principal Parties have executed the Management Certification. In addition, the Owner has entered into a Housing Assistance Payments Contract (HAP) and/or a Rental assistance Payments Contract (RAP) with the Secretary. The Owner has or will furnish the Agent with copies of the Regulatory agreement and the HAP or RAP Contract. In performing its duties under this Management Agreement, the Agent will comply with all pertinent requirements of the Regulatory Agreement, the Management Certification, the Rental Assistance Payments Contract, the Housing assistance Payments Contract, and the directives of the Secretary. In the event of any instruction from the Owner which is in contravention of such requirements, the latter will prevail.

5. **Management Plan (From HUD 9405):** Attached hereto and hereby incorporated herein, is a copy of the Management Plan for the Project, which provides a comprehensive and detailed description of the policies and procedures to be followed in the management of the Project. In many of its provisions, this Agreement briefly defines the nature of the Agent's obligations, with the intention that reference be made to the Management Plan for more detailed policies and procedures. Accordingly, the Owner and the Agent will comply with all applicable provisions of the Management Plan, regardless of whether specific reference is made thereto in any particular provision of this Agreement.

6. **Basic Information:** As soon as possible, the Owner will furnish the Agent with a complete set of plans and specifications as finally approved by the Secretary and copies of all guaranties and warranties pertinent to construction, fixtures, and equipment. With the aid of this information and inspection by competent personnel, the Agent will thoroughly familiarize itself with the character, location, construction, layout, plan and operation of the Project, and especially of the electrical, heating, plumbing, air-conditioning and ventilating systems, the elevators, and all other mechanical equipment.

7. **Marketing:** The Agent will carry out the marketing activities prescribed in the Management Plan, observing all requirements of the Affirmative Marketing Plan. Subject to the Owner's prior approval, advertising expenses will be paid out of the Rental Agency Account as Project expenses.

8. **Rentals:** The Agent will offer for rent and will rent the dwelling units, parking spaces, commercial space and other rental facilities and concessions in the Project. Incident thereto, the following provisions will apply:

    a. The Agent will follow the tenant selection policy described in the Management Plan, giving preference to low income families as required by HUD.

    b. The Agent will show the premises to prospective tenants.

    c. The Agent will take and process applications for rentals. If the application is rejected, the applicant will be told the reason for rejection, and the rejected application, with reason for rejection noted thereon, will be kept on file for three (3) years. A current list of prospective tenants will be maintained.

2

Case 1:08-cv-05646-HB-JCF    Document 73-8    Filed 07/09/2009    Page 3 of 11

d.  The Agent will prepare all dwelling leases and parking permits, and will execute the same in its name, identified thereon as "Agent" for the Owner. The terms of all leases will comply with the pertinent provisions of the Regulatory Agreement, and the directives of the Secretary. Dwelling leases will be in a form approved by the Owner and the Secretary, but individual dwelling leases and parking permits need not be submitted for the approval of the Owner or the Secretary.

e.  The Owner will furnish the Agent with rent schedules, as from time to time approved by the Secretary, showing fair market rents and basic rents for dwelling units, and other charges for facilities and services. In no event will such fair market rents and other charges be exceeded. Eligibility for dwelling rents which are less than such fair market rents, and the amount of such lesser rents, will be determined in accordance with the Regulatory Agreement, the HAP Contract, and the directives of the Secretary.

f.  The Agent will counsel all prospective tents regarding eligibility for dwelling rents which are less than fair market rents, and will prepare and verify eligibility certifications and recertifications in accordance with the Regulatory Agreement, the HAP Contract, and the directives of the Secretary.

g.  The Agent will negotiate commercial leases and concession agreements, and will execute the same in its name, identified thereon as agent for the Owner, subject to the Owner's prior approval of all terms and condition. Commercial rents will not be less than the minimums from time to time approved by the Secretary.

h.  The Agent will collect, deposit, and disburse security deposits, if required, in accordance with the terms of each tenant's lease. The amount of each security deposit will be as specified in the Management Plan. Security deposits will be deposited by the Agent in an interest-bearing account, separate from all other accounts and funds, with a bank or other financial institution whose deposits are insured by an agency of the United States Government, and a pro-rata share of interest earned will be credited to each tenant's security deposit. This account will be carried in the Agent's name and designated of record as " Church Homes Security Deposit Account."

9.  <u>Collection of Rents and Other Receipts</u>: The Agent will collect when due all rents, charges and other amounts receivable on the Owner's account in connection with the management and operation of the Project. Such receipts (except for tenant's security deposits, which will be handled as specified in Subsection 8h above) will be deposited in an account, separate from all other accounts and funds, with a bank who's deposits are insured by the Federal Deposit Insurance Corporation. This account will be carried in the Agent's name and designated of record as" Church Homes Rental Agency Account."

10. <u>Enforcement of leases:</u> The Agent will secure full compliance by each tenant with the terms of his/her/their. Voluntary compliance will be emphasized, and the Agent will counsel tenants and make referrals to community agencies in cases of financial hardship or under other circumstances deemed appropriate by the Agent, to the end that involuntary termination of tenancies may be avoided to the maximum extent consistent

3

with sound management of the Project. Nevertheless, and subject to the pertinent procedures prescribed in the Management Plan, the Agent may lawfully terminate any tenancy when, in the Agent's judgment, sufficient cause (including but not limited to non-payment of rent) for such termination occurs under the terms of the tenant's lease. For this purpose, the Agent is authorized to consult with legal counsel to be designated by the Agent, to bring actions for eviction and to execute notices to vacate and judicial pleading incident to such actions. Subject to the Owner's approval, attorney's fees and other necessary costs incurred in connection with such actions will be paid out of the Rental Agency account as Project expenses.

11. **Maintenance and Repair**: The Agent will cause the Project to be maintained and repaired in accordance with the Management Plan and local codes, and in a condition at all times acceptable to the Owner and the Secretary, including but not limited to cleaning, painting, decorating, plumbing, carpentry, grounds care, and such other maintenance and repair work as may be necessary, subject to any limitations imposed by the Owner in addition to those contained herein.

   Incident thereto, the following provisions will apply:

   a. Special attention will be given to preventive maintenance, and to the greatest extent feasible, the services of regular maintenance employees will be used.

   b. Subject to the Owner's prior approval pursuant to paragraph 11e, below, the Agent will contract with qualified independent contractors for the maintenance and repair of elevators, and for extraordinary repairs beyond the capability of regular maintenance employees.

   c. The Agent will systematically and promptly receive and investigate all service requests from tenants, take such action thereon as may be justified, and will keep records of the same. Emergency requests will be received and serviced on a twenty-four (24) hour basis. Complaints of a serious nature will be reported to the Owner after investigation.

   d. The Agent is authorized to purchase all materials, equipment, tools, appliances, supplies and services necessary for proper maintenance and repair.

   e. Notwithstanding any of the foregoing provisions, the prior approval of the Owner will be required for any expenditure which exceeds Ten Thousand Dollars ($10,000.00) in any one instance for labor, materials, or otherwise in connection with the maintenance and repair of the Project, except for recurring expenses within the limits of the operating budget or emergency repairs involving manifest danger to persons or property, or required to avoid suspensions of any necessary service to the Project. In the latter event, the Agent will inform the Owner of the facts as promptly as possible.

12. **Utilities and Services**: In accordance with the Management Plan and the operating budget, the Agent will make arrangement for water, electricity, gas, fuel oil, trash disposal, vermin extermination, decorating, laundry facilities, and telephone service.

13. **Employees**: The Management Plan prescribes the number, qualifications and duties of the personnel to be regularly employed in the management of the Project, including a Resident Superintendent, and Social Services Director (if applicable) and maintenance personnel. In addition, there will be bookkeeping, clerical, and other managerial employees. All such personnel will be employees of the Agent and not the Owner, and will be hired, paid, supervised, and discharged by the Agent, subject to the following conditions:

   a. As more particularly described in the Management Plan, the Resident Superintendent will have duties of the type usually associated with this position, and the Social Services Director will be responsible for the conduct of a social services program for the project. Each will be directly responsible to the Agent's Project Manager or other officer.

   b. The Owner will reimburse the Agent for compensation (including fringe benefits) payable to front line management employees, such as Project Manager, clerical and bookkeeping personnel, and the maintenance employees, Resident Superintendent and the Social Services Director (where applicable), and for all local, state, and federal taxes and assessments (including but not limited to Social Security taxes, employment insurance, and workman's compensation insurance) incident to the employment of such personnel. Such reimbursements will be paid out of the Rental Agency Account and will be treated as Project expenses. For this purpose, the rental value of any dwelling unit furnished rent-free to the Resident Superintendent will not be considered a part of his compensation, but will be treated as a Project expense.

   c. The Agent will establish and follow an employment policy which affords residents of the Project maximum opportunities for employment in the management and operation of the Project and, to the extent consistent with that consideration, affords employment opportunities to lower-income persons in the area. While personnel will be employed primarily on the basis of ability, the Agent will make a conscientious effort to provide special assistance and training for Project residents and members of minority groups who are not initially qualified.

14. **Disbursements from Rental Agency Account**:

   a. From the funds collected and deposited by the Agent in the Rental Agency account pursuant to Section 11 above, the Agent will make the following disbursements promptly when payable:

      (1) Reimbursements to the Agent for compensation payable to the employees specified in section 13c above, and for the taxes and assessments payable to local, state, and federal governments in connection with the employment of such personnel.

      (2) The single aggregate payment required to be made monthly by the Owner to the Mortgagee, including the amounts due under the mortgage for

5

        principal amortization, interest, mortgage insurance premium, ground rents, taxes and assessments, fire and other hazards insurance premiums, and the amount specified in the or Regulatory Agreement for allocation to the Reserve for Replacements.

    (3)    For projects insured under Section 236, the monthly remittance to the Secretary of all dwelling rents collected in excess of the "basic rents" approved by the Secretary. Form 3104, Monthly Report of Excess Income, will be prepared each month and submitted to the Secretary whether or not there are such excess rent collections for the month. The original form covering each month and the excess rent collections made during that month (if any) will be mailed within ten (10) days after the end of that month directly to the assistant Commissioner comptroller, Department of Housing and Urban Development, Washington, D.C., 20412.

    (4)    All sums otherwise due and payable by the Owner as expenses of the Project authorized to be incurred by the Agent under the terms of this Agreement, including compensation payable to the Agent, pursuant to Section 26 below, for its service hereunder.

    (5)    Charges for front line management related expenses (office supplies, office salaries, advertising, fidelity bond, etc.) Will be charged to the Project in accordance with HUD Handbook #4381.5 and Figure 6-2.

  b.    Except for the disbursements mentioned in Subsection 14a., funds will be disbursed or transferred from the Rental agency account only as the Owner may from time-to-time direct in writing.

  c.    In the event that the balance in the Rental agency Account is at any time insufficient to pay disbursements due and payable under Subsection 14a., the Agent will inform the Owner of that fact and the Owner will then remit to the Agent sufficient funds to cover the deficiency. In no event will the Agent be required to use its own funds to pay such disbursements.

15.    **Budgets**: Annual operating budgets for the Project will be as approved by the Owner. Annual disbursements for each type of operating expense itemized in the budget should not exceed the amount authorized by the approved budget. The agent will prepare a recommended operating budget for each subsequent fiscal year beginning during the term of this agreement, and will submit the same to the Owner at least thirty (30) days before the beginning of the fiscal year. The Owner will promptly inform the Agent of changes, if any, incorporated in the approved budget, and the Agent will keep the Owner informed of any anticipated deviation from the receipts or disbursements stated in the approved budget.

16.    **Records and Reports**: In addition to any requirements specified in the Management Plan or other provisions of this agreement, the Agent will have the following responsibilities with respect to records and reports:

6

a. The Agent will establish and maintain a comprehensive system of records, books, and accounts in a manner conforming to the directives of the Secretary, and otherwise satisfactory to the Owner. All records, books, and accounts will be subject to examination at reasonable hours by any authorized representative of the Owner or the Secretary.

b. With respect to each fiscal year ending the term of this Agreement, the Agent will cause an annual financial report to be prepared by a Certified Public Accountant or other person acceptable to the Owner and Secretary, based upon the preparer's examination of the books and records of the Owner and the Agent. The report will be prepared in accordance with the directives of the Secretary, will be certified by the preparer and the Agent, and will be submitted to the Owner within (60) days after the end of the fiscal year, for the Owner's further certification and submission to the Secretary and the Mortgagee. Compensation for the preparer's services will be paid out to the Rental agency account as an expense of the Project.

c. The Agent will prepare a monthly report comparing actual and budgeted figures for receipts and disbursements, and will submit each such report to the Owner within fifteen (15) days after the end of the month covered. Such reports will not be required for any periods prior to January 1993.

d. The Agent will furnish such information (including occupancy reports) as may be requested by the Owner or the Secretary from time-to-time with respect to the financial, physical, or operational condition of the Project.

e. The Agent will prepare, on a monthly basis, Form 2505, Schedule of Rent Supplement Payments Due, Form 52670, Housing Owner Certification and Application for Housing Assistance Payments, Form 52670A Part 1, Schedule of Tenant Assistance Payments Due, and if necessary, Form 52670A Part 2, Schedule of Section 8 Special Claims, and will submit the same to HUD within ten (10) days after the end of the month for which housing assistance payments are claimed. Such payments will be deposited to the Rental Agency Account.

f. By the fifteenth (15th) day of each month, the Agent will furnish the Owner with an itemized list of all delinquent accounts, including rental accounts, as of the tenth (10th) day of the same month.

g. By the fifteenth (15th) day of each month, that Agent will furnish the Owner with a Statement of receipts and disbursements during the previous month, and with a schedule of accounts receivable and payable, and reconciled bank statements for the Rental Agency Account and Security Deposit Account as of the end of the previous month.

h. If, after the Project reaches sustaining (95%) occupancy, the rental collections plus HUD subsidy fall below operating expenses for a sustained period of sixty (60)

7

days, the Agent will immediately send written notification of the same to the appropriate HUD Area/Insuring office.

l. Except as otherwise provided in this Agreement, all of the Agent's home office bookkeeping, clerical, and other management payroll and overhead expenses (including but not limited to costs office supplies and equipment, postage, transportation for managerial personnel, and telephone services) will be borne by the Agent out of his own funds and will not be treated as Project expenses.

17. Fidelity Bond: The Agent will furnish, at its own expense, a blanket fidelity bond in the principal sum, which is at least equal to the gross potential income for two (2) months and is conditioned to protect the Owner and the Consenting Parties against misapplication of Project funds by the Agent and its employees. The other terms and conditions o the bond, and the surety thereon, will be subject to the approval of the Owner. Fidelity Bond coverage for front-line employees and principal management staff will be paid from the Project account.

18. Bids, Discounts, Rebates, etc.: The Agent will obtain contracts, materials, supplies, utilities, and services on the most advantageous terms tot he Project, which can be obtained from more than one source. The Agent will secure the credit to the Owner all discounts, rebates or commissions obtainable with respect to purchases, service contracts, and all other transactions on the Owner's behalf.

19. Social Services Program: The Agent will be responsible to the Owner for carrying out the social services program described in the Management Plan. The Social Services Director will be directly responsible to the Agent for the conduct of this program.

20. Tenant-Management Relations: The Agent will encourage and assist residents of the Project in forming and maintaining representative organizations to promote their common interests, and will maintain good-faith communication with such organization to the end that problems affecting the Project and its residents may be avoided or solved on the basis of mutual self-interest.

21. On-site Management Relations: Subject to the further agreement of the Owner and Agent as to more specific terms, the Agent will, where practical, maintain a management office within the Project. The Resident Superintendant will reside in one of the dwelling units in the Project, and the Owner will make no rental charge for the same.

22. Insurance: The Owner will inform the agent of insurance to be carried with respect to the Project and its operations, and the Agent will cause such insurance to be placed and kept in effect at all times. The Agent will pay premiums out of the Rental Agency Account, and premiums will be treated as operating expenses. All insurance will be placed with such companies, on such conditions, in such amounts, and with such beneficial interests appearing thereon as shall be acceptable to the Owner and shall be otherwise in conformity with the mortgage; provided that the same will include public liability coverage, with the agent designated as one of the insured, in amounts acceptable to the Agent as well as the Owner. The Agent will investigate and furnish the Owner with full

reports as to all accidents, claims, and potential claims for damage relating to the Project, and will cooperate with the Owner's insurers in connection therewith.

23. <u>Compliance with Governmental Orders</u>: The Agent will take such actions as may be necessary to comply, promptly with any and all governmental orders or other requirements affecting the Project, whether imposed by federal, state, county or municipal authority, subject, however, to the limitations stated in Subsection 13c with respect to repairs. Nevertheless, the Agent shall take no such action so long as the Owner is contesting, or has affirmed its intention to contest, any such order or requirements. The Agent will notify the Owner, in writing, of all notices of such orders or other requirements, within seventy-two (72) hours from the time of their receipt.

24. <u>Nondiscrimination</u>: In the performance of its obligations under this Agreement, the Agent will comply with the provisions of any federal, state or local law prohibiting discrimination in housing on the grounds of race, color, creed or national origin, including Title VI of the Civil Rights Act of 1964 (Public Law 88-352, Stat. 241), all requirements imposed by or pursuant to the Regulations of the Secretary (24 CFR, Subtitle A, Part 1) issued pursuant to that Title; regulations issued pursuant to Executive Order 11063, and Title VIII of the 1968 Civil Rights Act.

25. <u>Agent's Compensation</u>: The Agent will be compensated for its services under this Agreement by monthly fees, to be paid out of the Rental Agency account and Treated as Project expenses. Such fees will be payable on the tenth day of each month for the prior months. Each such monthly fee will be in the amount of $7,084 ($44.00 for each dwelling unit in the Project).

Anything in this Paragraph 25 to the contrary notwithstanding, all management fees shall be computed and paid in accordance with HUD requirements.

26. <u>Term of Agreement</u>: Indefinite.

    a. This Agreement may be terminated by the mutual consent of the Principal Parties as of the end of any calendar month.

    b. In the event that a petition for bankruptcy is filed by or against either of the Principal Parties, or in the event that either makes an assignment for the benefit of creditors, or takes advantage of any insolvency act, the other party may terminate this Agreement without notice to the other.

    c. It is expressly understood and agreed by and between the Principal Parties that the Secretary shall have the right to terminate this Agreement for failure to comply with the provisions of the Management Certification or for other good cause thirty (30) days after the Secretary has mailed written notice to each of the Principal Parties of its desire to terminate this Agreement. In the event of a default by the Owner under the Mortgage, the Note, the HUD Regulatory Agreement, the HAP Contract, the Secretary may terminate this Agreement immediately upon the issuance of a notice of cancellation to each of the Principal Parties. If HUD terminates the Agreement, the Owner will promptly make arrangements for

providing management satisfactory to HUD.

    d. In the event a conflict arises between the terms of this Agreement and HUD's rights and requirements, the latter shall prevail.

    e. Upon termination, the Agent will turnover to the Owner all of the Project's cash, trust accounts, investments and records. After the Principal Parties have accounted to each other with respect to all matters outstanding as of the date of termination, the Owner will furnish the Agent security, in form and principal amount satisfactory to the Agent, against any obligations or liabilities which the Agent may properly have incurred on behalf of the Owner hereunder.

27. Interpretative Provisions

    a. At all times, this Agreement will be subject and subordinate to all rights of the Secretary, and will insure to the benefit of and constitute a binding obligation upon the Principal Parties and their respective successors and assigns.

    b. This Agreement constitutes the entire agreement between the Owner and the Agent with respect to the management and operation of the Project, and no change will be valid, unless made by supplemental written agreement, executed by the Principal Parties.

    c. This Agreement has been executed in several counterparts, each of which shall constitute a complete original Agreement, which may be introduced in evidence or used for any other purpose without production of any of the other counterparts.

IN WITNESS WHEREOF, the Principal Parties by their duly authorized officers have executed this Agreement on the date first above written.

OWNER:

CHURCH HOMES ASSOCIATES

Witness:

By: *[signature: Avery Seavey]*

Avenel Dev. & Const. Corp.

Name/Title: Avery B. Seavey, Pres.

Witness:

Witness:

DALTON MANAGEMENT COMPANY, LLC

By: *[signature]*

Name/Title: *[signature]*