UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN L. EDMONDS, INDIVIDUALLY AND AS A
MANAGING GENERAL PARTNER OF FIFTH AND
106TH STREET HOUSING COMPANY, INC.,
LOGAN PLAZA ASSOCIATES, LP, CHARLES H.
ASSOCIATES a/k/a CHARLES H. HILL
ASSOCIATES, LP AND AS A LIMITED PARTNER
OF CHURCH HOME ASSOCIATES, LP,

Revised
5/30/08

Docket No:

                                              Plaintiff,

-against-

ROBERT W SEAVEY, INDIVIDUALLY AND AS A
GENERAL PARTNER OF FIFTH AND 106TH
STREET ASSOCIATES, LP, LOGAN PLAZA
ASSOCIATES, LP, CHARLES HILL ASSOCIATES,
CHARLES HILL ASSOCIATES, LP AND AS A
LIMITED PARTNER OF CHURCH HOME
ASSOCIATES, LP; PHYLLIS M. SEAVEY
INDIVIDUALLY AND AS OWNER, MANAGER
AND MEMBER OF DALTON MANAGEMENT
COMPANY LLC; AVERY B. SEAVEY,
INDIVIDUALLY AND AS A GENERAL PARTNER
OF LOGAN PLAZA ASSOCIATES, LP, CHURCH
HOME ASSOCIATES AND OWNER OF DALTON
MANAGEMENT COMPANY, LLC; NEALE B.
SEAVEY, INDIVIDUALLY AND AS OWNER,
MANAGER AND MEMBER OF DALTON
MANAGEMENT COMPANY, LLC; AND RONALD
DAWLEY AS CHIEF EXECUTIVE OFFICER OF
DALTON MANAGEMENT COMPANY, LLC;
DALTON MANAGEMENT COMPANY, LLC, THE
SEAVEY ORGANIZATION, and MARKS PANETH
& SHRON, Auditors,

**AFFIDAVIT
IN SUPPORT
OF ORDER TO
SHOW CAUSE**

                                              Defendants.

**I, JOHN L. EDMONDS,** depose and say:

   1.     I am the Plaintiff in the above-captioned action and I make this Affidavit in

support of my application for an order enjoining Defendant Dalton Management Company LLC

("Dalton") as well as the other Defendants, named herein, from causing Defendant Dalton to

undertake any financial commitments beyond routine maintenance and operating expenses in

1



excess of the amount directed by this Court and enjoining Defendants from transferring title and/or assets of the Partnerships' Housing Developments without the consent of Plaintiff herein

    (1)    Pending Defendants' full production to Plaintiff and his auditors the financial records in their possession for the Partnerships' Housing Developments named in this action or

    (2)    The removal of Defendant Dalton as Managing Agent of the said Partnerships' Housing Developments.

2.    Pending Defendants' production to Plaintiff and his auditors all of the financial records in connection with Defendant Dalton's management and operation of the Partnerships' Housing Developments, the immediate relief sought herein in the form of a temporary restraining order is necessary to stop Defendants from further self-dealing, improper and illegal use of the Partnerships' assets and to prevent greater and irreparable harm to Plaintiff by transferring to a third-party the title and assets of the Partnerships' Housing Developments which are the subject of the instant action.

3.    Since May 16, 2007, more than one year ago, Defendant Dalton and the other Defendants named herein have repeatedly, persistently and without explanation or cause, refused to produce to Plaintiff and his auditors the financial records in their possession in connection with Defendant Dalton's management and operation of the Partnerships' Housing Developments named herein in which Plaintiff is a Managing General Partner and has substantial financial interests and ownerships in these properties. **(See Exhibits B & C)**

4.    Defendants and each of them devised a scheme and artifice to deprive Plaintiff of his financial interests and ownerships in the Housing Developments named herein and Defendants have continually and persistently engaged in a course of action that involved breach

2

of their fiduciary and other duties to Plaintiff. Defendants have prepared false financial and accounting statements which they mailed to Plaintiff on a monthly basis; made business arrangements for the unauthorized use of the Partnerships' properties and assets such as cash garages, laundromats, and building antennas from which they have received enormous personal profit, while purposefully depriving Plaintiff and the Partnerships of their assets and financial interests. **(See Exhibit D)**

5.    Defendants Dalton's and Marks Paneth & Shron's refusal to provide Plaintiff's auditors with its financial records for the Partnerships' Housing Developments have caused them to be unable to complete an audit for even one year of the ten (10) years that Defendant Dalton has been managing and operating the Partnerships' Housing Developments. **(See Exhibit A)** However, in their attempt to audit the 2006 financial records of Defendant Dalton, Plaintiff's auditors found no records to support approximately $7,500,000.00 (seven million, five hundred thousand dollars) of expenses in its general ledgers for its management and operation of the Partnerships' Housing Developments. **(See Exhibit E)** Defendants Dalton and Marks Paneth and Shron have repeatedly refused to produce these records to Plaintiff's auditors despite the auditors numerous requests to them for these records, for more than one year. **(See Exhibit B)**

6.    Not only have Defendants Dalton and Marks Paneth & Shron refused to produce to Plaintiff and his auditors the financial records in their possession in connection with Defendant Dalton's management and operation of the Partnerships' Housing Developments but the records presented show that over Plaintiff's vigorous and repeated objections, since 2005 Defendants have taken sole control of the Housing Developments and through their racketeering and self-dealing, they are depriving Plaintiff of his financial and ownership in the Partnerships

while the Defendants named herein are reaping enormous and personal financial gain. (See **Exhibit F**)

7.    Plaintiff has now been advised by individuals seeking to purchase the Partnerships' 446-unit Housing Development known as "Lakeview" that in the face of his efforts to obtain an audit of Defendants' financial records for the management and operations of the Partnerships' Housing Developments, Defendants have now embarked upon efforts to sell the Lakeview Housing Development, without his authorization or approval. A review of **Exhibit B**, attached hereto, reveals that approximately 80% (eighty percent) of the Partnerships' Housing Developments' financial records Defendants have refused to provide to Plaintiff's auditors are in connection with Lakeview Housing Development. Defendants' vigorous efforts to transfer immediately the title of this Development to a third-party is an apparent attempt to scuttle Plaintiff's efforts at unraveling the tortured records of Defendants' mis-dealings over the past 10 (ten) years, particularly, at the largest and most lucrative of the Partnerships' Housing Developments, where the major proportion of misdeeds appear to have taken place.

8.    Plaintiff is advised by his Attorney that he was recently told by the prospective purchaser of the Lakeview Housing Development that Defendant Robert W. Seavey has executed a contract of sale for this Development as a Managing General Partner, and said prospective purchaser is of the opinion that he has sufficient memorandae to enforce such a sale by specific performance, over and above Plaintiff's objections.

7.    Defendants' failure and refusal to produce to Plaintiff and his auditors the financial records of the Partnerships' Housing Developments allow them to continue to conceal their self-dealing, fraudulent conduct and their illegal and improper use of the Partnerships assets by which they continue to obtain enormous and personal financial gain and their sale of the

4

Partnerships' assets, without the consent of Plaintiff, would cause irreparable harm to him and his ownerships and interests in the Partnerships' assets.

## NATURE OF THE ACTION

8.     This is a civil action brought by Plaintiff against Defendants for: Racketeering, fraud, breach of contract, breach of fiduciary duties, unjust enrichment and for other causes of action to obtain an accounting and to recover funds and civil damages caused by Defendants from their unauthorized use and misuse of assets, income and profits of Partnerships' Housing Developments namely: Fifth and 106th Street Associates, LP (hereinafter "Lakeview"), Logan Plaza Associates, LP (hereinafter "Logan"), Charles H. Hill Associates, LP (hereinafter "Charles Hill") and Church Homes Associates, LP (hereinafter "Church Homes") ( hereinafter collectively the "Partnerships and Housing Developments").

9.     For injunctive relief and the immediate removal of Dalton Management, the Managing Agent for the Partnerships' properties listed above, so as to prevent further damage to Plaintiff, the Partnerships and their Housing Developments listed above.

10.     Due to multiple breaches of their fiduciary duties to the Partnerships as well as breaches of the Partnership Agreements with Dalton Management, Plaintiff also seeks the removal of;

(i) Defendant Robert Seavey as Managing General Partner of Lakeview and Charles Hill Partnerships and as a Limited Partner of Church and Logan Partnerships.

(ii) Avery Seavey, President of ANBS Development Corporation, LLC, as Managing General Partner of Logan Plaza Partnership and as Managing General Partner of and Church Partnership and as Limited Partner of Charles Hill and Lakeview Partnerships;

(iii) Neale Seavey as Limited Partner of Logan and Church Partnerships

5

## FACTUAL BACKGROUND

### Plaintiff Enters Into Partnership Agreements with Defendants

11.    Plaintiff, John L. Edmonds, Esq. is a Managing General Partner of Fifth and 106th Street Associates, LP, Logan Plaza Associates, LP, Charles Hill Associates, LP and a Limited Partner of Church Home Associates, LP (hereinafter "Plaintiff"). Plaintiff entered into a number of Partnership Agreements with Defendants Robert Seavey, Avery Seavey, and Neale Seavey, to build, acquire and operate the above-described Housing Developments which are owned by the various Partnerships. **(See Exhibit G)** The Management Agreements between Defendant Dalton and the Partnerships require that HUD's 9405 Management Plan be attached to each agreement between it and the Partnerships and is attached hereto as **Exhibit H.**

12.    The Fifth and 106th Street Associates, LP ("Lakeview Partnership"), a New York Limited Partnership, owns a 446 unit apartment complex with six commercial spaces located at 1259 Fifth Avenue, 4 East 107th Street, 35 East 106th Street and 1590 Madison Avenue in New York County. This housing development is known as the "Lakeview Apartments." The Lakeview Partnership was formed in 1973 and a Partnership Agreement was entered into in 1973 in Nassau County with the Partnership's principal office in New York County. Plaintiff is a Managing General Partner of the Lakeview Partnership and owns a nine percent (9%) interest in that Partnership. Defendant Robert Seavey is a Managing General Partner of the Lakeview Partnership and owns a nine percent (9%) interest in the Partnership. The balance of interest for the Partnership is owned by the Limited Partners.

13.    The Logan Plaza Associates, LP ("Logan Partnership") a New York Limited Liability Corporation, which owns a 131-unit apartment building located on 1425 Amsterdam Avenue between 130th and 131st Streets in New York County. This housing development is

6

known as "Logan Plaza." The Logan Partnership was formed in 1988 and a Partnership Agreement was entered into in 1988 with the Partnership's principal office in New York County. Plaintiff is a Managing General Partner of the Logan Partnership and has a fifty percent (50%) interest in that Partnership. Defendant Robert Seavey is a Limited Partner in the Logan Partnership. Defendant Avery Seavey, President of ANBS Development Corporation, a Limited Liability Corporation, is a Managing General Partner of the Logan Partnership. ANBS and Defendant Avery Seavey have a fifty percent (50 %) interest in the Logan Partnership. Defendant Neale Seavey is a Limited Partner of the Logan Partnership.

14.    The Charles H. Hill Associates, LP ("Charles Hill") a New York Limited Corporation, owns a 101-unit apartment building located at 2050 Fredrick Douglas Boulevard (8th Avenue) in New York County. This building development is known as the "Charles Hill Houses." The Charles Hill Partnership was formed in 1986 and a Partnership Agreement was entered into in 1986 with the Partnership's principal office in New York County. Plaintiff is a Managing General Partner of the Charles Hill Partnership and owns a twenty-five percent (25%) interest in that Partnership. Robert Seavey is a Managing General Partner in the Charles Hill Partnership and owns a twenty-five percent (25%) interest in that Partnership. The balance of the Charles Hill Partnership interest is owned by the Limited Partners.

15.    The Church Home Associates, LP, ("Church Partnership") a New York Limited Partnership, owns a 161-unit apartment building located on 95 Lenox Avenue in New York County. This Partnership housing development is known as the "Church Home." This Partnership was formed in 1982 and a Partnership Agreement was entered into in 1982 with the Partnership's principal office in New York County. Plaintiff is a Limited Partner in the Church Partnership and owns an unspecified amount of interest in that Partnership. Defendant Robert

7

Seavey is a Limited Partner in the Church Partnership and has an unspecified interest in that Partnership. Defendant Avery Seavey is the Managing General Partner of the Church Partnership and owns in excess of a fifty percent (50%) interest in the Church Partnership. Defendant Neale Seavey is also a Limited Partner in the Church Partnership with an unspecified interest in that Partnership.

16.     Defendant Marks Paneth & Shron is a Limited Liability Partnership of Certified Public Accountants and Consultants with offices in New York City and State. The Partnerships for the Housing Developments named herein entered into agreements with Defendant Marks Paneth & Shron to audit the financial records of Defendant Dalton Management and to prepare Independent Auditors Reports based on their audit of the Defendant Dalton Management's financial records for its management and operation of the Partnerships' Housing Developments.

**Defendants Have Breached Their Agreements With The Partnerships And Defendants' Racketeering Conduct and Fraudulent Schemes**

17.     Defendant Dalton is owned by Defendant Phyllis Seavey, who is Defendant Robert Seavey's wife. Defendant Dalton was retained to operate, administer and manage the Partnerships' Housing Developments. Upon Defendant Robert Seavey's insistence and repeated advice, since 1994 no other management companies were considered or interviewed to become the managing agent for the Partnerships' Housing Developments.

18.     Between 1996 and 2000 Plaintiff was persuaded by and induced by Defendant Robert Seavey to retain Defendant Dalton as the Managing Agent for the Partnerships' Housing Developments. As a result of Defendant Robert Seavey's persuasion and insistence Defendant Dalton was retained by the Partnerships to manage all of the finances of the Partnerships' Housing Developments, to administer all third-party agreements in connection with the assets of

8

the Partnerships' Housing Developments and to oversee the financial distributions to the Partners for each Partnership.

19.     Defendant Dalton is responsible for negotiating and contracting with third-parties to lease the commercial spaces of the Partnerships' Housing Developments and to negotiate and contract with third-party vendors to provide various services for the benefit of the Partnerships, all of their Partners and their Housing Developments.  **(See Exhibit G, pp. 2-3, para. 8 (g))**

20.     On or about the summer of 2005, reliable employees of the Partnerships' Housing Developments communicated to Plaintiff that excessive costs were being incurred by the Partnerships' Housing Developments as a result of the contracts that Defendant Dalton had entered into on behalf of the Partnerships' Housing Developments as well as to the improper management and operations of the Partnerships' Housing Developments by Defendant Dalton. Plaintiff continued to receive similar communications from various other reliable employees concerning Defendant Dalton's mismanagement of the Partnerships' Housing Developments.

21.     Plaintiff inquired from Defendants Robert Seavey, Avery Seavey and Neale Seavey about these allegations of mismanagement of the financial and other affairs of the Partnerships' Housing Developments by Defendant Dalton. In order to continue with their self-dealing, deception and scheme to defraud Plaintiff, the Partnerships and their Housing Developments, Defendants Robert Seavey and Phyllis Seavey repeatedly assured Plaintiff that these allegations were false.

22.     Pursuant to the terms of the Management Agreements between Defendant Dalton and the above named Partnerships, Defendant Dalton is required to provide the respective Partnerships with a detailed monthly financial report for each of the Partnerships' Housing

of the Secretary, and otherwise satisfactory to the Owner. **All records, books, and accounts will be subject to examination at reasonable hours by any authorized representative of the Owner or the Secretary.** (Emphasis added) **(See Exhibit G, pp. 6-7, para. 16 (a))**

On March 27, 2007, Plaintiff retained the accounting firm of Cameron, Griffiths & Pryce, CPA's, LLC and directed them to conduct an audit of the financial records and books maintained by Defendant Dalton with respect to its management and operation of the Partnerships' Housing Developments for the past ten (10) years. **(See Exhibits A & C)**

25.    Defendant Dalton did provide Plaintiff and his auditors access to a limited amount of its financial records in connection with its management and operations of the Partnerships' Housing Developments, however, as shown in **Exhibit B** attached hereto, despite Plaintiff's auditors' repeated requests to Defendants Dalton and Marks Paneth & Shron for all of the Partnerships' Housing Developments' financial records to enable them to conduct the audit they were retained to do, Defendants have flatly refused to produce these records. **(See Exhibit B)**

26.    As a matter of fact, as stated in the Affidavit of Plaintiff's auditor, Orley Cameron, the financial records he requested from Defendants Dalton and Marks Paneth & Shron are the basic accounting information which Defendant Dalton is required to maintain in its offices by both HUD 9045 Managing Plan and its Managing Agreements with the Partnerships. **(See Exhibits A, G & H)**

27.    Despite these requirements Defendant Dalton has responded to the requests of Plaintiff's auditors by stating (1) it does not have the information the auditors have requested (2) the information is with its auditors and that Plaintiff would have to pay a fee to obtain it (3) Plaintiff would have to obtain a Court order directing it to produce the personnel records of employees and (4) its software was unable to produce a "trial balance" from the entries made in

11

Developments (hereinafter "Monthly Financial Package"). **(See Exhibit G, pp. 6-7, para. 16 (c) (g))**

As seen in **para. 16(c)(g) of Exhibit G** each Monthly Financial Package is required to provide information as to income and profits received for the Partnerships' Housing Developments including but not limited to rents for the apartments, garages, on site laundromats, building antennas, parking spaces, vacancies, administrative expenses, utility expenses, operating and maintenance expenses, taxes and insurance expenses, payable mortgage interest and other relevant financial information for each of the Partnerships' Housing Developments. Plaintiff and the Partnerships rely upon the Monthly Financial Package in order to review Defendant Dalton's management and operations of the Partnerships' Housing Developments and to determine Partnership distributions, tax payments and other financial obligations in connection with the Partnerships and their Housing Developments.

23.    Plaintiff relied totally upon the Monthly Financial Packages, which Defendant Dalton prepared and sent to him, as being true and accurate. However, Plaintiff's auditors' review of Dalton's financial records reveal that Defendants Phyllis Seavey and Dawley repeatedly and on a consistent basis purposefully provided false and misleading information in the Monthly Financial Package by not reporting amounts paid to the Partnerships in connection with the third-party agreements it entered into for the Partnerships. **(See Exhibit A)**

24.    The Management Agreements between the Partnerships and Defendant Dalton provide:

<u>Records and Reports</u>:  In addition to any requirements specified in the Management Plan or other provisions of this agreement, the Agent will have the following responsibilities with respect to records and reports:

a.    The Agent will establish and maintain a comprehensive system of records, books, and accounts in a manner conforming to the directives

its general ledgers which recorded the daily expenditures incurred for the management and operations of the Partnerships' Housing Developments.

53.    In addition, HUD's 9405 Management Plan attached to the Management Agreements between Defendant Dalton and the Partnerships provide:

## IV. FINANCIAL MANAGEMENT AND REPORTING

All accounting and bookkeeping functions will be handled by Dalton Management's accounting staff under the supervision of our controller Ronald C. Dawley. Dalton Management will maintain a Comprehensive set of books and records for the project in a manner satisfactory to Owner, DHCR and HUD. Accounts payable/ accounts receivable and general ledger will also be handled out of our main office.

### *Internal Control Framework*

Dalton Management has a comprehensive internal control system to ensure that operation and capital funds are only used for its intended purpose.

Our current accounting software package is specifically designed to comply with generally accepted accounting principles ("GAAP"), DHCR and HUD compliance requirements.   The internal control structure of Dalton Management is setup to achieve the following objectives:

• • •

**Dalton Management's** accounting system is designed to identify, assemble, analyze, classify, record and report all transactions and to maintain accountability for the related assets and liabilities. Our accounting system gives appropriate consideration to establishing method and records that will:

• • •

•   Present accurate and timely financial reports to Owner, DHCR and HUD as required by the contracts, and regulations.

• • •

**Dalton Management** plans to implement a fully automated accounting system. Our current system is a Dell power edge 2300-server used by Murray software, which comes highly, recommended within the industry. The software is designed to comply with GAAP, HUD and DHCR and other regulatory financial reporting requirements. Our system and implementation approach is designed to

12

address the significant accounting functions that are relevant to producing the necessary compliance and reporting requirement in accordance with the contract. **(See Exhibit H, pp. 15 & 16)**

54.    Plaintiff's auditors requested Defendant Dalton to provide them with the trial balances for the entries in Defendant Dalton's general ledger. A "trial balance" is a basic tool used by any competent accounting and bookkeeping service in the ordinary course of business to establish monthly reconciliations from its general ledgers. Defendant Dawley informed Plaintiff's auditors that Defendant Dalton was unable to produce this basic and standard information necessary for their audit because Defendant Dalton's software was incapable of producing the required "trial balances" from entries made in their general ledgers which recorded the daily expenditures for the management and operation of the Partnerships' Housing Developments. **(See Exhibit A)**

55.    Hence, not only has Defendant Dalton breached its Management Agreements with the Partnerships and Plaintiff, but its inexcusable failure to maintain the proper computer systems for its operation and management of the Partnerships' financial information is in violation of the federal and state regulations which provide substantial subsidies to the Partnerships' Housing Developments and which govern their management and operations.

**Defendants Have Excluded Plaintiff From Participation In All Financial Matters For The Partnerships' Housing Developments**

43.    The Management Agreements between the Partnerships and Dalton Management provide as follows:

Records and Reports:  In addition to any requirements specified in the Management Plan or other provisions of this agreement, the Agent will have the following responsibilities with respect to records and reports:

• • •

g.    By the fifteenth (15th) day of each month, the Agent will

13

furnish the Owner with a Statement of receipts and disbursements during the previous month, and with a schedule of accounts receivable and payable, and **reconciled bank statements for the Rental Agency Account** (emphasis added) and Security Deposit Account **as of the end of the previous month.** (Emphasis added) **(See Exhibit G, pp. 6-7, para. 16 (g))**

In particular, since December 2005, Defendants Phyllis Seavey and Avery Seavey have taken sole control of the bank accounts for the Partnerships and their Housing Developments, which as shown in the records presented here, such action is contrary to the terms of the Partnership Agreements, and they have since set up new bank accounts which prevent Plaintiff from participating in material financial matters in connection with these Partnerships and their Housing Developments. **(See Exhibit F)** In addition, Defendants Dalton and Phyllis Seavey have never provided Plaintiff with its "reconciled bank statements for the Rental Agency Accounts and have refused to provide Plaintiff's auditors with this information despite their repeated requests. **(See Exhibits A & B)**

55.    The Management Agreements between Defendant Dalton and the Partnerships provide:

15.    <u>Budgets</u>: Annual operating budgets for the Project will be as approved by the Owner. Annual disbursements for each type of operating expense itemized in the budget should not exceed the amount authorized by the approved budget. **The agent will prepare a recommended operating budget for each subsequent fiscal year** (emphasis added) beginning during the term of this agreement, and will submit the same to the Owner at least thirty (30) days before the beginning of the fiscal year. The Owners will promptly inform the Agent of changes, if any, incorporated in the approved

budget, and the Agent will keep the Owner informed of any anticipated deviation from the receipts or

14

disbursements stated in the approved budget.   (See Exhibit G, p. 6, para. 15)

As shown above, the Management Agreements between Defendant Dalton and the Partnerships require Defendant Dalton to submit to Plaintiff with an "operating budget for each fiscal year beginning during the term of this agreement". Plaintiff, a Managing General Partner for the Housing Developments, has never received any such budget from Defendant Dalton and Plaintiff's auditors have informed him that during their attempt to audit Defendant Dalton's financial records, they found no evidence of such budget for the Partnerships' Housing Developments which Defendant Dalton manages and operates. (See Exhibit A)

**Defendants Failed To Obtain Approval For Contracts In Excess Of Ten Thousand Dollars ($10,000.00) As Required By The Management Agreements**

34.     The Management Agreements between Defendant Dalton and Partnerships provide as follows:

<blockquote>

Maintenance and Repair: The Agent will cause the Project to be maintained and repaired in accordance with the Management Plan and local codes, and in a condition at all times acceptable to the Owner and the Secretary, including but not limited to cleaning, painting, decorating, plumbing, carpentry, grounds care, and such other maintenance and repair work as may be necessary, subject to any limitations imposed by the Owner in addition to those contained herein.

Incident thereto, the following provisions will apply:

• • •

e.     Notwithstanding any of the foregoing provisions, the prior approval of the Owner will be required for any expenditure which exceeds Ten Thousand Dollars ($10,000.00) in any one instance for labor, materials, or otherwise in connection with the maintenance and repair of the Project, except for recurring expenses with the limits of the operating budget or emergency repairs involving manifest danger to persons or property, or required to avoid suspensions of any necessary service to the Project. In the latter event, the Agent will inform the Owner of

</blockquote>

15

the facts as promptly as possible. **(See Exhibit G, p. 4, para. 11 (e))**

In their review of the records which Defendant Dalton produced, Plaintiff's auditors found that Defendant Dalton had entered into several contracts in excess of ten thousand dollars ($10,000.00) supposedly in connection with the maintenance and repair for the various Housing Developments of the Partnerships **(See Exhibit I)**. However, despite the fact that the Management Agreements between Defendant Dalton and the Partnerships require approval by the Owner for the execution of such contracts, Plaintiff's auditors found no evidence in Defendant Dalton's records that Plaintiff or any other Owner for the Partnerships' Housing Developments had approved these contracts for the alleged maintenance and repairs in excess of ten thousand dollars ($10,000.00).

36.    Defendant Dalton's response to Plaintiff's auditors' requests for the Owners' approval for such contracts was that the execution of the contract was due to an emergency. However, as shown above, Paragraph 11 (e) of the Management Agreements between Defendant Dalton and the Partnerships requires it to inform the Owner in the case of such emergency or other exception provided in the Management Agreements. **(See Exhibit G, p. 4, para. 11 (e))** In fact, the Affiant became aware that Defendant Dalton had entered into such contracts only after his auditors brought it to his attention. Hence, contrary to the terms of the Management Agreements between Defendant Dalton and the Partnerships, Defendants Phyllis Seavey and Dawley never notified Plaintiff that they had entered into such contracts even in the case of an emergency as required by the Agreements.

**Defendants Have Consistently Transferred The Partnership Funds Without The Knowledge And Consent Of Plaintiff As Required In The Management Agreements With The Partnerships**

37.    The Management Agreements between Defendant Dalton and the Partnerships provide as follows:

<u>Disbursements from Rental Agency Account</u>:

a.    From the funds collected and deposited by the Agent in the Rental Agency account pursuant to Section 11 above, the Agent will make the following disbursements promptly when payable:

•  •  •

b.    Except for the disbursements mentioned in Subsection 14a, funds will be disbursed or transferred from the Rental agency account only as the Owner may from time-to-time direct in writing. **(See Exhibit G, pp. 6-7, para. 14 (a)(b))**

•  •  •

Contrary to the terms of the Management Agreements between Defendant Dalton and the Partnerships, Defendants Phyllis Seavey and Avery Seavey have taken sole control of the bank accounts for the Partnerships and their Housing Developments. On or about December 2005 Plaintiff, who is a Managing General Partner for Logan Associates, established a bank account for the Logan Partnership. Plaintiff then gave Defendant Avery Seavey, who is also a Managing General Partner of the Logan Partnership, bank cards for his signature to be filed with the Logan Partnerships' bank account. **(See Exhibit F)**

39.    Defendant Avery Seavey failed to return to Plaintiff the bank cards which Plaintiff had given to him for his signature. When Plaintiff requested the bank cards with Defendant Avery Seavey's signature, Defendant Avery Seavey told him that Defendant Phyllis Seavey, the owner of Defendant Dalton, had transferred the Logan Partnership funds from the bank where Plaintiff had deposited it and set up new bank accounts. **(See Exhibit F)** This

unauthorized transfer of the Partnerships' funds effectively excluded Plaintiff from participating in the Partnerships' financial and material affairs and this exclusion of Plaintiff by Defendants in all of the Partnerships' financial affairs has continued over the vigorous objections of Plaintiff (See Exhibit F)

40.     As shown in **Exhibit B** attached hereto, in reviewing Defendant Dalton's general ledgers, Plaintiff's auditors found entries indicating that in 2006 Defendant Dalton has deposited approximately eight hundred thousand dollars ($800,000.00) to One Million dollars ($1,000,000.00) in investment accounts for the Lakeview Partnership. As shown in **Exhibits A & B** attached hereto, Defendant Dalton has refused to provide Plaintiff's auditors with the financial statements for these investments accounts, the names and addresses of the investors and/or any contact information for these investments made in 2006 which represents a substantial amount of the Partnership's funds.

41.     In addition, in a letter dated May 4, 2005, and attached hereto as **Exhibit J**, **Defendant** Dalton sent a check in the amount of eighty-two thousand, seven hundred and twenty dollars ($82,720.00) to Merrill Lynch to be deposited in an investment account for the Lakeview Partnership. Plaintiff became aware of the Merrill Lynch account for the Lakeview Partnership when in 2006 the May 4, 2005 letter to Merrill Lynch was sent to him inadvertently with one of the Monthly Financial Statements which Defendant Dalton sends to him via United States Postal Service.

42.     Contrary to the terms of the Management Agreements between Defendant Dalton and the Partnerships, the records presented here show that substantial sums of monies are being transferred from the Partnerships' Rent Revenue Accounts without the knowledge and written consent, as required, of Plaintiff, a Managing General Partner. In fact, Plaintiff only became

aware that Defendants Phyllis Seavey and Dawley had been transferring large sums of money into the Partnerships' investment accounts when his auditors, which he had retained in March 2007, informed him of these investments in Defendant Dalton's general ledger and that Defendant Dalton has refused to produce the information to them for full disclosure of these investment accounts.

**Defendants Leases For The Partnerships' Commercial Spaces Are Glaring Examples of Their Self-Dealing, Fraudulent Conduct And Improper And Illegal Use of The Partnerships' Properties And Assets**

44.     The Management Agreements between Defendant Dalton and the Partnerships provide:

> Rentals: The Agent will offer for rent and will rent the dwelling units, parking spaces, commercial space and other rental facilities and concessions in the Project.  Incident thereto, the following provisions will apply:
>
> • • •
>
> g.     The Agent will **negotiate commercial leases and concession agreements,** and will execute the same in its name, identified thereon as agent for the Owner, **subject to the Owner's prior approval of all terms and condition.  Commercial rents will not be less than the minimum from time to time approved by the Secretary. (Emphasis added) (See Exhibit G, pp. 2-3, para. 8 (g))**

• • •

Defendant Dalton has contracted with TMO Parent, LLC, Merit Parking, LLC, Macquarie New York Parking 3, LLC, Sebco Laundry to lease property of the Partnerships' Housing Developments.  A portion of the monies Defendant Dalton received in connection with these commercial leases for the Partnerships' Housing Developments, was delivered to the Seavey Family and the Seavey Organization. None of the monies from the Partnerships' commercial rentals which Defendant Dalton gave to the Seavey Family and the Seavey Organization were

reported in the Monthly Financial Packages which were prepared by Defendant Dalton and forwarded to Plaintiff via United States Postal Service. The review of Defendant Dalton's records by Plaintiff's auditors shows that Defendant Dalton's lease agreements for the Partnerships' commercial rentals indicate that they are below market rent which is contrary to the above-described terms of the Management Agreements between Defendant Dalton and the Partnerships. **(See Exhibits D & L)** Moreover, Defendants have never sought Plaintiff's approval for the terms and conditions of the commercial rentals for the Partnerships' Housing Developments.

46.    By entering into self-serving agreements with third-parties, Defendants have conspired to funnel monies of the Partnerships' Housing Developments away from Plaintiff and the Partnerships to the Seavey Organization and the Seavey Family and Defendant Dawley. Defendants' self-serving agreements with third-parties including, yet not limited to TMO Parent, LLC, Merit Parking, LLC, Macquarie New York Parking 3, LLC, Sebco Laundry, R&R Supplies and Smuggers Hardware with respect to the lease and management of the resident parking garages, on-site laundromats, building antennas and other Housing Developments properties that are also assets of the Partnerships and their Housing Developments named herein. Here again, except for the copy of the lease agreements attached here as **Exhibit D** Defendants have refused to provide Plaintiff's auditors with any additional information in connection with these third-party lease agreements.

## Defendants Concealed From Plaintiff That The Internal Revenue Service Was Auditing The 2003 Tax Returns For One of the Partnerships

Further evidence of Defendants self-dealing, improper and illegal use of the Partnerships' assets and their exclusion of Plaintiff from the financial and other matters of the Partnerships and their Housing Developments is shown in Defendant Robert Seavey's April 18, 2007 letter to Plaintiff regarding an apparent audit of the Lakeview tax returns for 2003. **(See Exhibit P)** Prior to receiving Defendant Robert Seavey's April 18, 2007 letter, attached hereto as **Exhibit P**, Plaintiff, a Managing General Partner for the Lakeview Partnership and its Housing Development was not aware that the Internal Revenue Service was auditing the 2003 tax returns for Lakeview.

Plaintiff consulted with his auditors, whom he had retained in March 2007 to audit Defendant Dalton's financial records for the Partnerships' Housing Developments, regarding the IRS review of the 2003 tax return for Lakeview. However, Plaintiff's auditors have informed him that during their attempt to audit Defendant Dalton's financial records for the Housing Developments they found no evidence of this IRS "review" in its records. Hence, this rather important financial affair of the Partnership remains totally unknown to Plaintiff, even though he is a Managing General Partner of that Partnership.

## Defendants Have Refused To Produce The Personnel Records Of Its Employees Who Are Being Paid From The Partnerships' Funds Contrary To Their Management Agreements With The Partnerships

28.     The Management Agreements between the Partnerships and Dalton Management provide as follows:

> <u>Employees</u>: The Management Plan prescribes the number, qualifications and duties of the personnel to be regularly employed in the management of the Project, including a Resident Superintendent, and social Services Director (if applicable) and maintenance

21

personnel. In addition, there will be bookkeeping, clerical, and other managerial employees. All such personnel will be employees of the Agent and not the Owner, and will be hired, paid, supervised, and discharged by the Agent, subject to the following conditions: (See **Exhibit G, p.5, para. 13)**

. . .

b.    The Owner will reimburse the Agent for compensation (including fringe benefits) payable to front line management employees, such as Project Manager, clerical and bookkeeping personnel, and the maintenance employees, Resident superintendent and the Social Services Director (where applicable), and for all local, state, and federal taxes and assessments (including but not limited to Social Security taxes, employment insurance, and workman's compensation insurance) incident to the employment of such personnel. Such reimbursements will be paid out of the Rental agency Account and will be treated as Project expenses. For this purpose, the rental value of any dwelling unit furnished rent-free to the Resident Superintendent will not be considered a part of his compensation, but will be treated as a Project expense. **(See Exhibit G, p. 5, para. 13 (b))**

. . .

Plaintiff is aware that he is not entitled to the personnel records of the employees of Defendant Dalton, however, the limited records, which Defendant Dalton has produced to Plaintiff's auditors, reveal that the salaries of several of Defendant Dalton's home office employees, including Defendant Dawley are being paid from the Partnerships' rental revenue and not by Defendant Dalton as required by its Management Agreements with the Partnerships. See **Exhibit G, pp.6-8, para. 16 (i))**

30.    As shown in **Exhibit Q** attached hereto, on May 16, 2007 Plaintiff's auditors requested the personnel records of the employees in Defendant Dalton's records whose salaries are being paid from the Partnerships' rent revenues but who are not listed in Defendant Dalton's records as employees of the Partnerships' Housing Developments.

31.    Defendant Dalton has refused to produce the personnel records of its employees listed in **Exhibit Q** and Defendant Dawley has told Plaintiff's auditors that Plaintiff would have to commence legal action and obtain a Court order directing it to produce to him and his auditors the personnel records of Defendant Dalton's employees listed in **Exhibit A, p.    para.    )**

32.    There is no provision in the Management Agreements between Defendant Dalton and the Partnerships to pay the salaries of Defendant Dalton's employees, including Defendant Dawley, who was paid $140,000.00 (One hundred and forty thousand dollars) in 2006 from the Partnerships' rent revenues. **(See Exhibit Q)**    In fact, the Management Agreements between Defendant Dalton and the Partnerships provide:

Records and Reports:    In addition to any requirements specified in the Management Plan or other provisions of this agreement, the Agent will have the following responsibilities with respect to records and reports:

• • •

i.    Except as otherwise provided in this Agreement, all of the Agent's home office bookkeeping, clerical, and other management payroll and overhead expenses (including but not limited to costs office supplies and equipment, postage, transportation for managerial personnel, and telephone services) **will be borne by the agent out of his own funds and will not be treated as Project expenses.** (Emphasis added) **(See Exhibit G, pp. 6-8, para. 16 (i))**

• • •

33.    Based on the findings of Plaintiff's auditors, Plaintiff is entitled to full disclosure of the personnel records of the persons listed in **Exhibit Q** attached hereto.

**Contrary To The Management Agreements, HUD Regulations And Government Auditing Standards, Defendant Dalton's Accounting Is Performed By The Partnerships' Auditors, Defendant Marks Paneth &: Shron.**

47.    Generally Accepted Auditing Standards promulgated by the United States Office of General Accounting (Yellow Book) require auditors who perform audits of HUD-Assisted Projects to be independent in fact and appearance. The financial records for the Partnerships' Housing Developments which Defendant Dalton did produce to Plaintiff's auditors were inadequate in that it did not support the revenues or expenditures in its general ledgers and showed several million dollars in expenses for which Defendant Dalton failed and refused to provide supporting records and/or documents concerning these expenditures. **(See Exhibit A, B & E)**

48.    During their attempt to audit Defendant Dalton's financial records for the Partnerships' Housing Developments, Plaintiff's auditors noted that several journal entries were generated by Defendant Marks Paneth and Shron, the Partnerships' auditors, without any evidence that these journal entries were approved by Defendant Dalton. Defendant Dalton was unable to provide Plaintiff's auditors with explanations and/or support for the journal entries in its general ledger and referred Plaintiff's auditors to Defendant Marks Paneth and Shron for support and explanations.

49.    Section 3.16 of Government Auditing Standards states that the auditor's independence is impaired when "concurrent or subsequent performance of an audit is done by the same individual who maintains the official accounting records". The Standards define maintaining the official records as the individual who performs a substantial part of the accounting process or cycle, such as analyzing, journalizing, posting, preparing adjusting entries and preparing the financial statements. The Standards do allow for instances when the

24

independent auditor is permitted to propose adjusting journal entries. These entries, however, must be approved and become the responsibilities of the company's management.

50.     Clearly, Defendants are in blatant violation of the Government Auditing Standards since the conduct of Defendants Dalton, Dawley and Marks Paneth & Shron demonstrates that Defendant Dalton is not the party preparing the account journals but that Defendant Dalton's accounting is being performed by the Defendant Marks Paneth & Shron, who were retained as the Partnerships' auditors. This role-reversal of the Defendants creates an unacceptable conflict and makes clear, contrary to standard practice and state and federal regulations, the affairs of the Partnerships Housing Developments are not being audited.

51.     Among the many journal entries, which are attached hereto as **Exhibit K,** made by Defendant Marks Paneth & Shron, from Defendant Dalton's general ledger, and attached hereto as **Exhibit L,** for which Defendant Dalton took no responsibility, nor did it provide any explanation or support, was a reclassification from Accounting Fees to Management Consulting for $74,370 (seventy-four thousand, three hundred and seventy dollars) **(See Exhibits K & L)**

In 2006 Defendant Dalton's general ledger states that it paid $108,525 (one hundred and eight thousand, five hundred and twenty-five dollars) for accounting fees to Defendant Marks Paneth & Shron for services it provided at the Lakeview Housing Development. **(See Exhibit L)** The amount of $108,525 (one hundred and eight thousand, five hundred and twenty-five dollars) for accounting fees to Defendant Marks Paneth & Shron is in conflict with Defendant Marks Paneth & Shron's contract with the Department of Housing and Community Renewal (DHCR) which provides $34,155 (thirty-four thousand, one hundred and fifty-five dollars) for 2005 and 2006 respectively for its auditing services to the Partnerships' Housing Developments. **(See Exhibit M, p. 3, para. 9)** Further, DHCR contract requires that

25

Case 1:08-cv-05646-HB-JCF    Document 83-3    Filed 07/24/2009    Page 26 of 27

Defendant Marks Paneth & Shron's services to the Partnerships' Housing Developments in excess of $34,155 (thirty-four thousand, one hundred and fifty-five dollars) must be approved before the services are rendered. **(See Exhibit M, p. 3, paras. 8 & 10)** Plaintiff's auditors have informed him that they found no evidence in Defendant Dalton's records of DHCR's approval for the monies in excess of the contracted amount of $34,155 (thirty-four thousand, one hundred and fifty-five dollars) which Defendant Dalton has paid to Defendant Marks Paneth & Shron.

52.    Moreover, approximately $40,000 (forty thousand dollars) of the $108,525 (one hundred and eight thousand, five hundred and twenty-five dollars) accounting fees paid to Defendant Marks Paneth and Shron related to invoices from previous years. **(See Exhibit N)** A review of these invoices show that they were not accrued but instead charged against the 2006 expenses, which is a departure from generally accepted accounting principles. In addition, as seen in **Exhibit P,** attached hereto, only the allowed contract amount of $34,155 (thirty-four thousand, one hundred & fifty five dollars) of the $108,525 (one hundred and eight thousand, five hundred and twenty-five dollars) Defendant Marks Paneth & Shron received in 2006 was reported to DHCR by Defendant Marks Paneth & Shron in its Certified Annual Financial Operating Report. **(See Exhibit P)**

53.    The audits by Defendant Marks Paneth & Shron of Defendant Dalton's financial records of the Partnerships' Housing Developments were to be conducted in accordance with auditing standards generally accepted in the United States of America and in accordance with state and federal regulations. Defendant Marks Paneth & Shorn is aware that those auditing standards require it to plan and perform the audit of Defendant Dalton's financial records and provide assurance that the financial statements it prepares from the financial records of

26

Defendant Dalton for the Partnerships' Housing Developments are free of material misstatements.

59.    Plaintiff is advised by his Attorney that based on the records in this matter he has a good and meritorious cause of action, with strong likelihood of success on the merits.

60.    No previous application has been made to this, or any other court for similar relief.

**WHEREFORE,** Plaintiff prays that the Court grants the relief sought herein in its entirety and for such further relief as this Court deems just and proper.

John L. Edmonds

Sworn to before me on the
17th day of June, 2008

Notary Public

MELVYN DOUGLAS HAYWOODE
Notary Public, State of New York
No. 24-6820825
Qualified in Kings County
Commission Expires Aug. 31, 19/0

27