1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  CASE NO.: 08 CIV 5646
4  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
   JOHN L. EDMONDS, Individually and as a
5  managing general partner of FIFTH AND 106TH
   STREET HOUSING COMPANY, INC., LOGAN PLAZA
6  ASSOCIATES, LP, CHARLES H. ASSOCIATES a/k/a
   CHARLES H. HILL ASSOCIATES, LP and as a
7  limited partner of CHURCH HOME ASSOCIATES, LP,
8
9                          Plaintiffs,
10     -against-
11
   ROBERT W. SEAVEY, Individually and as a general
12 partner of FIFTH AND 106TH STREET ASSOCIATES, LP,
   LOGAN PLAZA ASSOCIATES, LP, CHARLES HILL
13 ASSOCIATES, CHARLES HILL ASSOCIATES, LP and as a
   limited partner of CHURCH HOME ASSOCIATES, LP;
14 PHYLLIS M. SEAVEY, individually and as owner,
   manager and member of DALTON MANAGEMENT and
15 member of DALTON MANAGEMENT COMPANY, LLC; AVERY
   B. SEAVEY, individually and as a general partner
16 of LOGAN PLAZA ASSOCIATES, LP, CHURCH HOME
   ASSOCIATES and owner of DALTON MANAGEMENT
17 COMPANY, LLC; NEALE B. SEAVEY, individually and
   as owner, manager and member of DALTON MANAGEMENT
18 COMPANY, LLC; and RONALD DAWLEY as chief
   executive officer of DALTON MANAGEMENT COMPANY,
19 LLC; DALTON MANAGEMENT COMPANY, LLC, THE SEAVEY
   ORGANIZATION, and MARK PANETH & SHRON, Auditors,
20
21                        Defendants.
22 - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
23          DEPOSITION of JOHN EDWARDS
24              APRIL 17, 2009
25



2

1
2
3    DEPOSITION of JOHN EDWARDS,
4    taken by Defendants, held at the offices of
5    Herrick, Feinstein, LLP, 2 Park Avenue, New York,
6    New York, on April 17, 2009, commencing at
7    10:00 a.m., before Eileen Mulvenna, CSR/RMR,
8    Certified Shorthand Reporter, Registered Merit
9    Reporter and Notary Public of the State of New
10   York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4

1
2    IT IS HEREBY STIPULATED AND AGREED,
3    by and between the attorneys for the respective
4    parties herein, that filing and sealing be and
5    the same are hereby waived.
6
7    IT IS FURTHER STIPULATED AND AGREED
8    that all objections, except as to the form of the
9    question, shall be reserved to the time
10   of the trial.
11
12   IT IS FURTHER STIPULATED AND AGREED
13   that the within deposition may be signed and
14   sworn to before any officer authorized to
15   administer an oath, with the same force and
16   effect as if signed and sworn to before the
17   officer before whom the within deposition was
18   taken.
19
20
21
22
23
24
25

3

1
2    A P P E A R A N C E S :
3
4
     M. DOUGLAS HAYWOODE, ESQ.
5    Attorneys for Plaintiff
     71 Maple Street
6    Kings Chancellery
     Brooklyn, New York 11225-5001
7    BY:  HERRICK, FEINSTEIN, LLP, ESQ.
8
9
10   HERRICK FEINSTEIN, LLP
     Attorneys for Defendants Seavey, et al.
11   2 Park Avenue
     New York, New York 10016
12   BY:  M. DARREN TRAUB, ESQ.
     dtraub@herrick.com
13
14
15   WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
     Attorneys for Defendant Mark Paneth & Shron
16   3 Gannett Drive
     White Plains, New York 10604-3407
17   BY:  WILLIAM J. KELLY, ESQ.
     william.kelly@wilsonelser.com
18
19
20   A L S O  P R E S E N T :
21
22   Robert Seavey
     Phyllis Seavey
23
24
25

5

1                Jehn Edmonds
2    JOHN EDMONDS,
3        having been duly sworn by Eileen Mulvenna,
4        a Notary Public of the State of New York,
5        was examined and testified as follows:
6    EXAMINATION
7    BY MR. TRAUB:
8        Q.    State your name and address for the
9    record, please.
10       A.    John L. Edmonds, E-D-M-O-N-D-S,
11   187-20 Grand Central Parkway, Jamaica, New York.
12   11432 is the zip.
13       MR. TRAUB: This deposition is being
14   taken pursuant to notice and agreement of
15   counsel and will be used for the purpose of
16   cross-examination at trial and all other
17   uses in accordance with the Federal Rules
18   of Civil Procedure.
19   BY MR. TRAUB:
20       Q.    Mr. Edmonds, good morning.
21       A.    Good morning.
22       Q.    We've met several times.
23       A.    That's correct.
24       Q.    It's nice to see you again.
25             I just want to let you know, I know

2  (Pages 2 to 5)



6

John Edmonds
you've had your deposition taken before and I'm
sure you've even taken a few depositions. This
will be similar to any deposition that you've
seen or that you've taken in that we have a court
reporter here.

And, obviously, she can only take
down what is stated orally. So what I would ask
is that you allow me to ask my questions to you
and let me finish. And then a response, if you
could give an oral answer. Obviously, a head nod
yes or a head nod no can't be taken down.

And I'll give you the same courtesy
of allowing you to finish your complete answer
before talking back over so that the court
reporter doesn't have us talking over each other.

A.    Very good.

Q.    Also, if you need a break at any
time, obviously, please feel free to do so. I
just ask that you allow me to finish any question
that's pending and for you to give a complete
answer to any pending question before we take
such a break.

A.    Very good.

Q.    We do have coffee and water behind

7

John Edmonds
you as well, so if at any time, please turn
around and help yourself.

Can you describe for me all of your
real estate investments that you currently have.

A.    Fifth and 106th Street.

Q.    And that's the one that's in this
deposition -- or that's in this case known as
Lakeview?

A.    Lakeview.

Charles Hill. Church Home. And
Logan Plaza. I think they comprise perhaps 952
units.

Q.    Are there any other real estate
investments that you're currently in other than
the four partnerships at issue in this action?

A.    Not at the present time.

Q.    In the past ten years, have you been
involved in any other real estate investments?

A.    Yes, I have.

Q.    In which real estate investments
were those?

A.    Those were investments in the city
of Newark, New Jersey.

Q.    We'll take these one at a time.

8

John Edmonds
With the investment in the city of
Newark, New Jersey, can you describe for me the
actual property.

A.    Yes. The property was located
almost against Elizabeth, New Jersey. The back
end of the property ends up in Elizabeth. It was
across the street from a public golf facility
there for the people that live in that community.
It's quite a nice community.

Q.    Was it a vacant piece of property?

A.    Yes, it was.

Q.    Who was your partner, if any, in
that investment, that city of Newark?

MR. HAYWOODE:  Object to the
relevance.

Now the witness may answer.

A.    I had an arrangement with three or
four people. Rod Shaw, who is an engineer of
some 30 or 40 years. I've forgotten this
fellow's name now, but at any rate, the
arrangement was a very elemental one. It was a
part of the kind of thing that I do frequently,
and that is to say that I involve them to the
extent that they were partners, and they each got

9

John Edmonds
a percentage of the amounts to be made.

Q.    Were you the managing general
partner?

A.    Managing general partner, that's
correct.

Q.    And what percentage ownership did
you have in that partnership?

A.    I believe I kept somewhere between
68 and 75 percent.

Q.    And the other remaining 32 to
25 percent was split between the other three
partners?

A.    Yes, that's correct. And of course,
the budget included a fee for Rod Shaw because he
was the person to be on the site to assist in the
management of that project.

Q.    What did the project actually
consist of?

A.    It consisted of -- I believe it was
116 units of housing under a HUD program that
would have given the public housing residents an
opportunity to own their own unit in a
condominium fashion.

Q.    I guess I'm a little confused.

10

John Edmonds

1  Because earlier when I asked, you said it was a
2  vacant piece of land.
3      A.    It was vacant as of the time that we
4  started the construction, yes.
5      Q.    And then you actually built a
6  116-family apartment building --
7      A.    We finished -- we finished
8  two-thirds of the project.
9      Q.    And then what happened with the
10 project?
11     A.    The City of Newark called me in,
12 Harold Lucas, who was then the executive director
13 of the Newark Housing Authority and had been, in
14 the Clinton administration, the deputy assistant
15 commissioner for public housing. And in that
16 role, he made certain that his old city would get
17 a good part of those funds, and they did.
18     Q.    So did you sell the property then to
19 the City of Newark; is that --
20     A.    I was put off the property. What
21 happened was that I had a state senator there who
22 was a partner of the contractor, the builder,
23 that was a local builder there on the site. And
24 he was a vice president of -- the contractor's

11

John Edmonds

1  name was Tony Gomes. He was a vice president of
2  Tony Gomes' construction company, a state senator
3  and a deputy mayor, I believe.
4          And they called me in on an occasion
5  before their board and indicated to me that they
6  desired to have Mr. Gomes complete the project
7  without the further participation of the Edmonds
8  group. And incidentally, I had Phyllis over
9  there on one occasion to discuss --
10         MR. HAYWOODE:  Indicating
11 Mrs. Seavey, who is with us today.
12     A.    -- to discuss the management
13 capability of her company, Dalton Management.
14 And that was for the reason that if the place was
15 to become a condominium for the tenants, then
16 they would have to have a managing agent there.
17     Q.    So that you were considering then
18 Dalton Management as a management group for this
19 project?
20     A.    That's correct.
21     Q.    You said that the Edmonds group
22 was -- believe me, I apologize if I get the term
23 wrong -- was put out of the project by the City
24 of Newark.

12

John Edmonds

1          When you say "the Edmonds group,"
2  you're talking about yourself and your three
3  partners; is that correct?
4      A.    Yes.
5      Q.    Was it taken from you through a
6  condemnation?
7      A.    No.
8      Q.    Was there --
9      A.    By a direction of the mayor of the
10 City of Newark.
11     Q.    So there was no lawsuit?
12     A.    No lawsuit.
13     Q.    Did you get paid for --
14     A.    I got paid for the percentage of
15 completion, yes. And I'll tell you that I had
16 several meetings with the board of the Housing
17 Authority, which consisted mainly of tenants,
18 their counsel, the executive director and this
19 state senator, who represented the mayor at the
20 meetings, and --
21     Q.    Not to interrupt you.
22         Is this the City of Newark Housing
23 Authority? Is that --
24     A.    Yes, the City of Newark Housing

13

John Edmonds

1  Authority.
2          And the first meeting I had with
3  them, they asked me what was the total amount of
4  completion of the project. And I indicated to
5  them that it was about three-quarters completed,
6  two-thirds to three-quarters. And they asked me
7  how much of a fee I was expecting. And I told
8  them $1.4 million, which would be the fee that we
9  had -- that I earned for three-quarters of
10 completion.
11     Q.    At that time, were there any tenants
12 that were in the property?
13     A.    As far as I can recall, no, no
14 tenants at that time, because it was not
15 completed.
16     Q.    Okay. So this isn't a project that
17 was completed in phases; in other words, there
18 was one building completed, tenants moved in. It
19 was supposed to all be completed before tenants
20 moved in?
21     A.    That's correct.
22     Q.    Okay.
23     A.    And after having a couple of
24 meetings with them, they told me that they could

4  (Pages 10 to 13)

14

John Edmonds

1
2 only pay $1.2 million for the services of the
3 Edmonds group. And so I recognized that I was in
4 a very difficult position, with the mayor opposed
5 to me and so forth and so on, so I accepted that
6 and we left the job.
7     Q.    You said that you were expecting
8 around about $1.4 million for the project. Was
9 this the fee that you would obtain if you had
10 sold the project upon completion?
11     A.    No, I think we were looking for a
12 fee of approximately $2 million.
13     Q.    Is that for selling the project upon
14 completion?
15     A.    Yes, that's correct.
16     Q.    So you never planned to actually run
17 this project, then?
18     A.    No. I -- I was looking really at
19 that time as to whether or not Dalton Management
20 Company could -- could be the manager of that
21 project once it was completed.
22     Q.    When you say "at that time," about
23 what year were you considering Dalton Management
24 Company to be the management company of ---
25     A.    I think this began in 1996, I

15

John Edmonds

1
2 believe. And I finally finished with them I
3 think in 2002, from the point of the lawsuit and
4 so forth and so on. Because I brought a lawsuit
5 in the Superior Court in Newark, New Jersey.
6     Q.    Against the City of Newark?
7     A.    Yes, against the City of Newark and
8 against also the young man that I had selected to
9 be an architect. His name was Ben Thompson, I
10 believe. Benny Thompson.
11     Q.    You were the plaintiff in that
12 lawsuit?
13     A.    Yes.
14     Q.    And at what point did you sell,
15 finally for $1.2 million, the property to the
16 City of Newark?
17     A.    I guess it must have been about
18 2000, about then.
19     Q.    What was the outcome of the lawsuit
20 that you had filed?
21     A.    The outcome was that the judge -- I
22 realized, after I had retained these attorneys,
23 et cetera, that this was a part of a relationship
24 between the courts and these lawyers and so forth
25 and so on, they had good political contact, that

16

John Edmonds

1
2 I had to hire the wrong group of lawyers.
3     And so the judge told me, on an
4 examination that was being conducted by myself
5 and the lawyer that I had retained on Benny
6 Thompson, that Benny Thompson committed some
7 perjury statements. And the judge says, Well, I
8 think that Mr. Thompson is senile. So,
9 Mr. Edmonds, I don't think I will permit this to
10 go further. I'm going to award the lawyers here
11 their fees and that should end this litigation.
12     Q.    When you say "an examination," is
13 this a cross-examination at trial or was this an
14 examination before trial?
15     A.    Cross-examination at trial.
16     Q.    And so then at the end of the trial,
17 the judge dismissed your lawsuit; is that
18 correct?
19     A.    That's correct.
20     Q.    Are there any other properties that
21 you have owned other than in the last ten years,
22 other than the five real estate projects you've
23 named so far?
24     A.    Yes, I made -- I made an approach to
25 the -- to the housing authority in North

17

John Edmonds

1
2 Carolina, to -- I can't think of the name of that
3 city now.
4     MR. HAYWOODE:  Durham?
5     THE WITNESS:  Durham, North
6 Carolina, that's correct.
7     A.    And the approach was similar to the
8 one that I had used in Newark where -- this
9 acreage that I had there, about 15 acres, which
10 was very close to a school, North Carolina
11 College, was that this site could be used for
12 students, graduate students, et cetera.
13     And we were going to build type of
14 housing that was beginning to be very popular
15 down there, three-story buildings. Something
16 that Seavey and I did in the last job we did
17 here, that type, which was the -- we did a job
18 here for the -- for the Harlem River Development
19 Corporation on Eighth Avenue, 138th Street.
20     Q.    Not to interrupt you, but when you
21 say "we," who is the we --
22     A.    I'm talking about Bob and I --
23     Q.    I'm talking about the one in Durham,
24 North Carolina.
25     A.    I owned the site. I brought my team



18

John Edmonds

1
2  down. Team consisted of Hal Harris, young
3  engineer by the name of Phil -- Philip Zerbrisky
4  [ph], of course, Rod Shaw and myself. And we
5  made this proposal.
6         And once again, it was one of those
7  situations in which the board consisted of the
8  presidents of the public housing authority. And
9  they had the executive director and counsel. And
10 the lawyer there was a gentleman by the name of
11 Banks, again, very involved in the politics of
12 Durham.
13    Q.    Whose lawyer was Banks? For the
14 City?
15    A.    For the City.
16    Q.    And going back a step further, you
17 had described it was yourself, Hal Harris, Philip
18 Zerbrisky and Rod Shaw. Were you the managing
19 general partner of this property as well?
20    A.    Yes.
21    Q.    What was your ownership interest?
22    A.    Probably about the same. I made the
23 same arrangement I attempted to arrange in
24 Newark, New Jersey.
25    Q.    About 68 to 75 percent?

19

John Edmonds

1
2    A.    Yes.
3    Q.    Did you actually end up acquiring
4 any property with respect to this partnership?
5    A.    No. What occurred was that the
6 executive director and counsel had formed a
7 not-for-profit. And that not-for-profit was to
8 be their development arm. And they were using
9 this as a way of siphoning the federal funds off
10 of the project. And what happened was that the
11 feds came in, federal -- FHA's office was in
12 Greensboro, and fired all of them.
13    Q.    When you say "all of them," you're
14 talking about the City housing --
15    A.    Yes, the --
16    Q.    -- development?
17    A.    -- the executive director, he fired
18 them -- fired the executive director and he fired
19 the deputy executive director, a female, who was
20 an architect.
21    Q.    Fired them from their job or fired
22 them off of this project?
23    A.    Fired them from their job.
24         Apparently the executive director
25 had used some of the funds to buy a diamond ring

20

John Edmonds

1
2 for his daughter and to go on vacations,
3 et cetera, with federal funds. And that's the
4 reason they were fired.
5         Now, when I appeared in court, I
6 indicated to the judge that I was not a member of
7 the North Carolina bar. And he asked me whether
8 I intended to request of him a special permission
9 to appear. And I told him no.
10    Q.    Was that a pro hac vice application?
11    A.    Yes, it would have been.
12    Q.    I guess I'm a little bit lost. When
13 you say you appeared in front of the judge, was
14 there a lawsuit involved?
15    A.    Yes, there was a lawsuit that I
16 brought, I think I brought this lawsuit, in order
17 that I might be able to go forward and do the
18 development in accordance with my original plan.
19    Q.    Who did you sue in this lawsuit?
20    A.    The housing authority there in
21 Durham.
22    Q.    Were there any other defendants
23 other than the housing authority?
24    A.    I think that the individuals -- the
25 executive director was I believe one of the

21

John Edmonds

1
2 defendants, yeah.
3    Q.    In what year was this lawsuit filed
4 in?
5    A.    It must have been in about 2000,
6 2002. I don't recall the exact time.
7    Q.    And that was in state court of North
8 Carolina?
9    A.    Yes, Durham, North Carolina.
10         MR. HAYWOODE: Darren, note my
11 continuing objection to this entire line of
12 questioning as to its relevancy.
13         The witness may answer.
14    Q.    And what was the outcome of that
15 lawsuit?
16    A.    The City -- I mean, the court
17 dismissed my lawsuit because he said that -- the
18 judge said that the Edmonds group was an LLC and,
19 as such, was required to have local counsel to
20 represent them. And I had enough of the
21 relationships between local counsel and the --
22 and the courts in these states and so I didn't go
23 forward.
24    Q.    Had you tried to obtain local
25 counsel for that lawsuit?

6 (Pages 18 to 21)



22

1          John Edmonds
2     A.    No.
3     Q.    Are there any other real estate
4 investments that you've owned in the last ten
5 years?
6     A.    No, none. Just this year I started
7 a negotiation with the housing authority of North
8 Charleston, South Carolina. Again the same
9 approach. It is a proposal to build
10 condominium-type apartments for public housing
11 residents.
12    Q.    Going back real quick to the Durham,
13 North Carolina project that you were considering,
14 had you discussed this project with Dalton
15 Management Company?
16    A.    I don't think I did, no.
17    Q.    Who are your partners in the North
18 Charleston, South Carolina matters, if anyone?
19    A.    I was going to use, obviously, Rog
20 and myself. And I was going to bring in my CPA,
21 who's actually in Greensboro, North Carolina,
22 Rudolph Clark, to be on the spot and be able to
23 keep up with things for me.
24    Q.    Is that your personal CPA?
25    A.    Yes.

23

1          John Edmonds
2     Q.    Or a corporate CPA?
3     A.    A personal CPA.
4     Q.    Had you established a partnership or
5 LLC or any other entity with regard to this North
6 Charleston, South Carolina --
7     A.    No, I had not. I realized, after
8 having a discussion with the lawyer who called me
9 from -- on two or three occasions, that I might
10 be stepping into the same kind of situation that
11 I was in before. And so I just indicated to this
12 lawyer that I didn't think that we wanted to go
13 forward.
14    Q.    Is that currently moving forward?
15    A.    No, it is not going forward now.
16    Q.    Is that it then for your real estate
17 investments in the last ten years?
18    A.    Yes.
19    Q.    Other than stocks, bonds, mutual
20 funds, secured instruments, CDs, bank accounts,
21 do you have any non-real estate investments that
22 you're involved in currently?
23    A.    The only investments that I would
24 have would have been -- would be the investments
25 that are managed and controlled by Dalton

24

1          John Edmonds
2 Management Company and Bob Seavey.
3     Q.    What about in the last ten years;
4 did you have any other non-real estate
5 investments?
6          MR. HAYWOODE: Objection to the
7     relevance.
8          The witness may answer.
9     A.    I can't think of any.
10    Q.    Were you involved with a radio
11 station?
12    A.    Oh, with -- yes, with -- Inner City
13 Broadcasting.
14    Q.    Inner City Broadcasting?
15    A.    Yes. I was vice chairman and then
16 general counsel, and then I ended up suing the
17 company.
18    Q.    Did you have partners -- let me ask,
19 was Inner City Broadcasting a partnership or --
20    A.    No, that's a corporation controlled
21 by Percy Sutton.
22    Q.    Was he the majority shareholder in
23 that corporation?
24    A.    Well, what Percy did was to form
25 another LLC, transferred all the assets from the

25

1          John Edmonds
2 original corporation to that LLC, and made his
3 son the chairman of the new LLC, and had -- had
4 the board -- basically people identified with
5 Percy in the political circle in Harlem had the
6 board to approve that.
7          And I objected to this. And many of
8 the members on the board would tell me after
9 meetings that they agreed with me, that I was
10 right and so forth and so on; but none of them,
11 except one, the president, a young man by the
12 name of David Lantell, was willing to join me in
13 my lawsuit.
14    Q.    How many members of the board were
15 there?
16    A.    I don't recall, but there were some
17 rather prominent people there. Hal Jackson was a
18 vice chairman and -- Hal must be a hundred years
19 old today, but he still works -- he has, I think,
20 a Sunday morning jazz program on BLS.
21    Q.    Would you say there's more than five
22 members on the board?
23    A.    Yes.
24    Q.    More than ten?
25    A.    I think -- yes, more than ten at

**VERITEXT REPORTING COMPANY**
(212) 279-9424        www.veritext.com        (212) 490-3430



26

```
 1              John Edmonds
 2   that time.
 3          And also John Procope was on that
 4   board. He's now deceased. And John was back and
 5   forth. First he was going to join me and then he
 6   didn't. Then he was trying to make some
 7   arrangement with me, he and Carl McCall, that
 8   would bring us together, that is to be able to
 9   negotiate with Percy.
10          And what happened was, I realized
11   after I had several meetings that these guys
12   didn't intend to force a return of the corporate
13   assets to the corporation, but they just wanted
14   to see whether or not they could make some
15   arrangement that would satisfy me and satisfy
16   Sutton.
17   Q.    What was your ownership interest in
18   the Inner City Broadcasting?
19   A.    I would say -- I think I owned
20   somewhere between maybe -- maybe 20 percent. I
21   don't remember the interest.
22   Q.    Were you the sole plaintiff in your
23   lawsuit?
24   A.    No.
25   Q.    Who was --
```

27

```
 1              John Edmonds
 2   A.    I was joined by the young man who
 3   was then the president, David Lantell. We ended
 4   up with 18 percent of the ownership in this
 5   lawsuit.
 6   Q.    Combined between the two of you?
 7   A.    Combined between the two of us.
 8   Q.    Who are the defendants in that
 9   lawsuit?
10   A.    Sutton and his son. And I may have
11   named a couple of the other members. I think
12   Dr. Watkins. It was -- he was a very well-known
13   physician, medical person here in the Harlem
14   community.
15   Q.    Was he another member of the board?
16   A.    Yes, he was.
17   Q.    Were you represented by counsel in
18   that lawsuit, or did you file that lawsuit on
19   your own?
20   A.    I was represented by counsel.
21   Q.    What was the basis of that lawsuit?
22   A.    The basis of the lawsuit was the
23   assets owned by the Inner City Broadcasting
24   Corporation had been transferred, that is all of
25   the properties, et cetera, to this newly created
```

28

```
 1              John Edmonds
 2   LLC that Sutton had formed, and left the -- the
 3   original company a shell company.
 4   Q.    Was that lawsuit filed in state
 5   court or federal court?
 6   A.    State court, state Supreme Court
 7   here in New York County.
 8   Q.    When was that lawsuit filed?
 9   A.    I think that was in '95 or '96.
10   Q.    What was the outcome of that
11   lawsuit?
12   A.    We won an award from the court based
13   upon an offer made by Sutton after Pepe, his son,
14   had obviously committed perjury in his testimony.
15   Q.    When you say "his testimony," at a
16   lawsuit or in a deposition?
17   A.    At the lawsuit, during
18   cross-examination.
19   Q.    So it actually went to trial then?
20   A.    Yes, it did.
21   Q.    And when you said during an offer,
22   was it a settlement that was approved by the
23   court?
24   A.    Yes.
25   Q.    So it wasn't an actual verdict then?
```

29

```
 1              John Edmonds
 2   A.    No.
 3   Q.    It was --
 4   A.    No.
 5   Q.    It was a settlement --
 6   A.    Yes.
 7   Q.    -- approved by the court?
 8   A.    Yes, it was. What happened was that
 9   the judge asked me what would be the value of
10   your interest at this time in the corporation.
11   And I told her it was probably about $6 million.
12   And she then had Sutton to go into her study, the
13   back.
14          And then when he came out, she
15   called myself and my counsel in and said, Look,
16   Mr. Sutton is willing to pay $5.9 million, and I
17   would urge you to accept it rather than continue
18   to go forward.
19          And I said, Fine.
20   Q.    Can you think of any other non-real
21   estate investments similar to the radio station
22   that you've been involved in?
23   A.    Yes, Amsterdam News. I was a
24   principal holder of the interest in the Amsterdam
25   News. We purchased it. That was Sutton, myself,
```

**VERITEXT REPORTING COMPANY**
www.veritext.com

(212) 279-9424                                    (212) 490-3430



30

John Edmonds

1  John Procope, Carl McCall, Clarence Jones, Bill
2  Tatum.
3      Q.   Was the Amsterdam News a partnership
4  or an entity?
5      A.   It was a corporation.
6      Q.   And so what was your shareholder --
7  what was your stock percentage ownership of
8  Amsterdam News?
9      A.   After we got going, Percy wanted
10 out, so we bought him out. And we ended up with
11 three owners; Edmonds, Tatum and Procope. And I
12 would say I owned 40 percent of the company.
13 Made me the principal. And we had a shareholders
14 agreement.
15     Q.   Were you the managing shareholder?
16     A.   I was the chairman of the
17 corporation.
18     Q.   Okay.
19     A.   This matter was tried once again in
20 the Supreme Court in New York County.
21     Q.   I hate to interrupt, but when you
22 say "this matter," was there a lawsuit that was
23 brought in connection with Amsterdam News?
24     A.   Yes, that's correct.
25

31

John Edmonds

1      Q.   Who was the plaintiff in this
2  lawsuit?
3      A.   I was.
4      Q.   Was there anyone else who was a
5  plaintiff with you?
6      A.   No.
7      Q.   And who were the defendants in that
8  lawsuit?
9      A.   It was Procope and Tatum.
10     Q.   Those were the other -- your other
11 partners?
12     A.   Two, yes.
13     Q.   Did you file the lawsuit on your own
14 behalf or did an attorney file it for you?
15     A.   I was represented by counsel.
16     Q.   Was this in state court or federal
17 court?
18     A.   State court.
19     Q.   What was the basis of your lawsuit?
20     A.   That the -- that the shareholders
21 agreement gave me the right to purchase the
22 controlling interest of the corporation. And
23 Tatum was represented by Victor Kovner at that
24 time. Kovner had been a partner of Ed Koch.
25

32

John Edmonds

1      And this matter was -- went before a
2  judge there, who was obviously friendly to them.
3  And he made a ruling that -- citing the Agora
4  case, if you remember that case. He said, yes,
5  you have a right under this ruling.
6      And I think the jury went out and
7  took about five minutes to come back with an
8  award for me of the amounts of monies that Tatum
9  had been taking under the table from the company.
10     And then the judge said that the
11 issue of the control of the corporation is one of
12 law. And I decided that, in view of the fact
13 that Mr. Tatum has been the editor and the
14 managing person there, actively every day, that
15 he should continue to own the newspaper.
16     Q.   So this lawsuit went to trial as
17 well?
18     A.   Yes.
19     Q.   Did the judge overturn the jury's
20 verdict? Is that --
21     A.   No, he did not. He kept the jury's
22 verdict to the extent of the award -- the money
23 award. But he took the position that the -- that
24 the right to the controlling interest would go to
25

33

John Edmonds

1  Tatum.
2      Q.   Are there any other non-real estate
3  investments besides the radio station and
4  Amsterdam News that you can think of?
5      A.   None at the moment.
6      Q.   Are you a partner in any company
7  that has served as a vendor for any of the four
8  partnerships or buildings in issue in this
9  lawsuit?
10     A.   None that I know of.
11     Q.   Have you received any money as a
12 referral fee from any vendor which has provided
13 services to any of the partnerships or buildings
14 in this lawsuit?
15     A.   No. I don't -- I don't deal with --
16 if the vendor is a local person from the Harlem
17 community, I try to give him as much business as
18 I possibly can in whatever situation I find
19 myself.
20     Q.   Can you give me an example of a
21 local businessman in Harlem that you've
22 recommended to work at the partnerships or at the
23 buildings?
24     A.   Hal Harris is a good example. He
25

9 (Pages 30 to 33)

34

John Edmonds

1    John Edmonds
2    lives in -- in Lakeview and he's a licensed real
3    estate broker. And he came to me on one occasion
4    and said to me that he had an assignment of a
5    lease from a hospital which was on the west side
6    of Manhattan.
7         And he says, You know, your medical
8    space here at Lakeview has been vacant for five
9    or six years, and I can produce a client for
10   this -- for this space.
11        And I said, Fine.
12        And I signed the agreement because I
13   had -- I had spoken to Bob about it and I said --
14   and Bob wanted to know what was the deal, who was
15   the client, so forth. And I said, Bob, he says
16   he can deliver. We got space that's been vacant
17   for five or six years. Let's see whether he can
18   deliver.
19        And the client he had was Mount
20   Sinai Hospital. And apparently he did deliver
21   Mount Sinai. I don't know whether he -- whether
22   he and Bob later changed the deal. Because
23   apparently, as I kind of -- looking at it, what
24   he did was to assign his contract to Seavey or to
25   Fifth and 106th Street associates.

35

John Edmonds

2    Q.    When you say "he" assigned it,
3    you're talking about Hal Harris?
4    A.    Yes, that's correct.
5    Q.    And Hal Harris' company is T-wall
6    [ph]; is that correct?
7    A.    He's got a couple of companies. One
8    is Win Back [ph]. One is T-wall, the one you
9    just mentioned. And then sometimes he operates
10   in his own, just as a broker.
11        Q.    And there's actually a lawsuit
12   concerning T-wall suing Fifth and 106th Street --
13   A.    Yes.
14   Q.    -- over this payment for this --
15   A.    That's correct.
16   Q.    -- contract?
17   A.    Hal made me understand that he was
18   entitled to get from Dalton Management Company, I
19   assume, because -- a hundred thousand dollars a
20   year after the first two years of this agreement.
21   He told me further that the agreement provided
22   for -- for Lakeview or Dalton to have $685,000
23   per year for the use of this space.
24        Q.    Now, you said earlier Hal Harris
25   lives at Lakeview; is that correct?

36

John Edmonds

2    A.    Yes.
3    Q.    Does he pay rent?
4    A.    Ask Bob Seavey here. Bob would
5    know. I wouldn't.
6    Q.    Are you --
7    A.    The last time I saw any
8    information --
9         MR. HAYWOODE: Lord knows we've sued
10   him often enough.
11   A.    Last time I saw any information, I
12   think Hal owed either 38,000 or 138,000,
13   something like that, he hasn't paid.
14   Q.    And your counsel, Mr. Haywoode, said
15   Lord knows we've sued him enough.
16        Was he referring to you sued him in
17   landlord/tenant court for --
18   A.    Yeah, I remember on one occasion he
19   asked me to come to testify in court. Hal has
20   some kind of a deal. And I had been in his
21   apartment several times. And he has this
22   business about -- he's supposed to be very
23   religous. So when you come into his apartment,
24   he wants you to take off your shoes.
25        And he records everything, every

37

John Edmonds

2    conversation he has of any kind. He just says,
3    I'm so busy, John, that I don't remember, so I
4    want to record what we say here.
5         And so then he came to me later,
6    after that lawsuit, in which, you know, I
7    testified that Hal -- he's got the best apartment
8    I've seen in the building. What are you talking
9    about? Four bedrooms and -- and he's running a
10   business out of there and so forth and so on.
11        And he's got a front man. I've
12   forgotten the guy's name. I don't know whether
13   he lives there or not, but I know I got some
14   recent correspondence from them in which this guy
15   uses the building entrance on Fifth Avenue -- he
16   called it Upper Manhattan something, and said
17   that his office was located in this suite,
18   Suite 2R or 3R, which suite he's talking about is
19   Hal's apartment.
20        Q.    Have you ever shared an office space
21   with Hal Harris?
22   A.    No, none that I know of.
23   Q.    Has Hal Harris ever paid you any
24   income or fee for referring business to him?
25   A.    No.

10 (Pages 34 to 37)

38

John Edmonds

2    Q.    So if Hal Harris had told Mr. Seavey
3  that he splits commissions with you, he would be
4  lying?
5    A.    That's correct.
6    Q.    Are there any other local Harlem
7  businesses that you can think of that you
8  referred business to from the partnerships?
9    A.    Well, at one point, I was insisting
10  upon having minority firm -- a local minority
11  firm in managing the properties. And somehow
12  they always would get some conflict with the
13  state housing division and they would move them
14  off of the site. And I wondered about that, if
15  that would happen.
16    Q.    Are you familiar with the security
17  company called Enterprise 9?
18    A.    I believe that's a company that Mel
19  owns.
20    Q.    Are you a partner in that company?
21    A.    No, I'm not.
22    Q.    Have you ever received any money
23  from Enterprise 9?
24    A.    No, not that I know of.
25    Q.    Did you ever represent to anyone at

39

John Edmonds

2  DHCR or HUD that Enterprise 9 was your company?
3    A.    No. I might have said that it was
4  an associate of mine. And I'm sure if anyone
5  there asked me, that's what I said, Oh, yes, it's
6  Mel Haywoode's company.
7    Q.    Did you recommend Enterprise 9 to be
8  a vendor for one of the partnerships?
9    A.    I might have. I don't recall. I
10  really don't recall. I know that I always wanted
11  Mel. And Mel wanted to handle the
12  landlord/tenant matters, so I may have
13  recommended Enterprise 9 also.
14    Q.    And so did you recommend
15  Mr. Haywoode then to perform landlord/tenant work
16  for the partnerships?
17    A.    Yes.
18    Q.    And you recommended that to
19  Prestige, a former management company at the
20  property?
21    A.    Perhaps to Prestige. And I know I
22  recommended it to Bob Seavey.
23    Q.    In fact at one point, Mr. Haywoode
24  actually sued at least one of the partnerships,
25  Logan Plaza, claiming RICO violations for unpaid

40

John Edmonds

2  attorneys' fees; is that correct?
3    A.    That's correct.
4    Q.    Were you named as a defendant in
5  that lawsuit?
6    A.    I don't know whether I was named as
7  a defendant or not, but I do know that -- yes,
8  what happened was that Seavey named me as a
9  defendant in which he was counterclaiming against
10  me for his failure to pay Mel the amounts due
11  him.
12    Q.    So Mr. Haywoode then named
13  Mr. Seavey as one of the named defendants, but
14  not you; and then Mr. Seavey did a third-party
15  complaint against you as a defendant?
16    A.    Yes.
17    Q.    Turning to this matter --
18        MR. TRAUB:    Mark this as Exhibit
19  No. 1.
20        (Defendants' Exhibit 1, 3/8/07
21  Letter to Seavey from Edmonds, marked for
22  identification.)
23    Q.    Mr. Edmonds, you've been handed
24  what's been marked as Defendants' Exhibit No. 1.
25  Do you recognize this document?

41

John Edmonds

2    A.    Yes, it was a letter that I wrote
3  Bob.
4    Q.    And what's the date on the letter?
5    A.    It's March 8, 2007.
6    Q.    And if you can read for the record
7  the first sentence in your letter.
8    A.    "Rudy Clark, CPA, has forwarded to
9  me a copy of your response dated March 2, 2007,
10  in connection with my retention of Mr. Clark in
11  his professional capacity to examine the books
12  and records of Dalton Management Company, LLC,
13  your family-owned management company.
14        "In view of the above-cited
15  correspondence, I am directing this
16  correspondence to you and to Phyllis Seavey,
17  Esq., the principal owner of Dalton Management
18  Company; Avery Seavey, Esq., a minority owner;
19  and Nealie Seavey, Esq., a minority owner; and
20  Ron Dawley, the chief executive" --
21        I said chief executive officer. I
22  now understand that Mr. Dawley considers himself
23  the chief operating officer.
24        -- "of Dalton Management Company
25  Corporation."

11 (Pages 38 to 41)



42

John Edmonds
2 Q. Okay. And then your next sentence
3 says that you retained Mr. Clark --
4 A. "For the precise purpose of
5 examining all of the books and records of Dalton
6 Management Company as it relates to the above
7 property."
8 Q. Why did you retain Mr. Clark to
9 examine the books and records of Dalton
10 Management Company?
11 A. Rudy Clark has been my CPA for maybe
12 10, 12, 15 years. He originally was here in
13 New York City. And as a matter of fact, if my
14 recollection is clear, when we were at 5 Beekman
15 Street, we rented space to Rudy Clark and to a
16 Londell MacMillian, who was a CPA at that time.
17 I now understand that he is considered New York's
18 top litigator or something to that effect.
19 Q. I don't --
20 A. So that's the reason I sent the
21 correspondence.
22 Q. My question was, why did you retain
23 him for the purpose of examining the books and
24 records of Dalton? Was there something that
25 triggered your desire for an examination of the

43

John Edmonds
2 books and records of Dalton?
3 A. Yes.
4 Q. And what was that?
5 A. I had -- on the Logan Plaza matter,
6 I had gone to Avery Seavey, and I told him that,
7 with respect to Logan, since we were the only two
8 parties interested, that is the Seaveys and
9 Edmonds, each own about 50 percent each, that I
10 thought that we should open an account at the
11 bank that I did business with, which was Valley
12 National Bank.
13 And I took Avery there to the bank,
14 to the Madison Avenue office at 40th Street,
15 that's my principal office, introduced him to the
16 officers. And the vice president in charge of
17 the office said to me, Mr. Edmonds, you go ahead
18 and sign and Mr. Seavey can get this back to us
19 as early as he can.
20 And I did and gave Avery a document.
21 And maybe three, four, five weeks
22 later, I called Avery, because I figured that he
23 was busy doing other things. And I said, Avery,
24 you haven't returned that -- that signature card
25 or document to the bank. You know, what's

44

John Edmonds
2 holding it up?
3 And he said to me that he had given
4 it to his mother.
5 And I said, Well, why would you do
6 that?
7 He says, Well, that's our way of
8 handling matters. My mother is in charge of
9 Dalton and so forth and so on.
10 And so I said, Okay.
11 And I came down to Seavey's office
12 and asked to meet with Bob. Phyllis has a habit
13 of sitting in the back. Bob's office is like a
14 horseshoe. And when you talk to Bob, she
15 generally hears everything that you say to him.
16 And when I told him that I wanted
17 this to be done, I wanted it done immediately, he
18 said to me that he would have to discuss it with
19 Phyllis. And just at that point, Phyllis came
20 forward and said to me, John, darling -- she
21 always calls me darling when she's getting ready
22 to do you in.
23 She says, John, darling, that's not
24 the way that we're going to handle this.
25 And I said, Phyllis, that's not a

45

John Edmonds
2 determination for you to make; it's a
3 determination for the managing partners of the
4 property to make. And where's Bob?
5 Bob then came out and says to me --
6 he says, John, let's not have an extended
7 discussion about this today. You -- I'll work it
8 out with Phyllis and I'll get back to you.
9 And he didn't get back to me. So I
10 called him again. And then Bob arranged a
11 meeting at a restaurant on 34th Street, a Thai
12 restaurant, as I recall, between Park and Lex, on
13 the northern side of the street.
14 And when I got to the meeting, I was
15 surprised, because I thought it was the meeting
16 between Bob and myself, that the Singer brothers
17 was there. And they -- I said, Gee, I didn't
18 know that the Singers were going to be a part of
19 this meeting.
20 They are the limited partners in the
21 Lakeview situation.
22 Q. And you understood this meeting to
23 discuss opening a bank account about Logan?
24 A. Yes.
25 The meeting was concluded. And then

**VERITEXT REPORTING COMPANY**
(212) 279-9424          www.veritext.com          (212) 490-3430



46

```
 1              John Edmonds
 2   I said to Bob, Look, we need to settle this
 3   business about the bank account today.
 4              So he says, Well, let me talk to
 5   Phyllis further and I'll give you a call.
 6              I said, Fine.
 7              I didn't get a call from Bob.  So
 8   one day I came down here and I said, Bob, I want
 9   to talk to you about this.  Bob said to me that
10   he was on his way to a meeting and that I could
11   discuss it with Phyllis and Avery.
12              And I undertake the discussion, and
13   Phyllis said to me, John, I've told you, this is
14   not the way it's going to be done.  Dalton is
15   going to manage these accounts.  And I've asked
16   you not to -- to come in making this demand.  And
17   as a matter of fact, I want you out of my office.
18              By the time, Bob had disappeared.
19              And I said, Well, I didn't come to
20   see you.  I came to see Seavey.  Seavey is not
21   here.  He has a meeting outside the office.  And
22   I order you out or else I'm going to call
23   security.
24              And she said, Well, Seavey is not
25        Q.   When you mean "Seavey," you mean Bob
```

47

```
 1              John Edmonds
 2   Seavey; is that correct?
 3        A.   Yes, Bob Seavey.
 4        Q.   And what time was this meeting?
 5        A.   Maybe 2 o'clock in the afternoon.
 6        Q.   I'm sorry, what date?  2006, 2007?
 7        A.   I think this is 2007.
 8        Q.   Okay.
 9        A.   I think it was 2007.
10              And so I left.  And when I got
11   downstairs, I told the -- the security guy
12   there -- I said, Look, when Bob comes in here,
13   you tell him that I'm not going to come down here
14   to be insulted by Phyllis and if he wants to
15   discuss anything further with me, then be in
16   touch.
17              In the meantime, I think the
18   Singers -- even earlier the Singers had brought a
19   lawsuit against Bob as it related to a parcel
20   that they own at 23rd Street -- they're the
21   limited, Bob is the general -- and 23rd -- I
22   think between First and Second Avenue.
23              And they came to me and asked me --
24   and said to me that they were going to start a
25   lawsuit against Seavey on Lakeview because they
```

48

```
 1              John Edmonds
 2   said they only own 25 percent of the parcel on
 3   23rd Street and that would be difficult to
 4   overturn as a minority holder, but that the
 5   combination of them and myself come to somewhere
 6   between 85 and 90 percent of the ownership of
 7   Lakeview.  And I joined with them on that
 8   occasion.
 9              And I think the brother said that --
10   I said, You know -- and this is going to be
11   rough -- this is going to be a tough lawsuit.  I
12   said, Because Bob doesn't give up very easily.
13              And they said to me that -- Well,
14   neither do we.
15              And then I recall that, at one
16   point, Bob had been the senior counsel, I believe
17   right here in this building, for the Singers and
18   Andrew Cuomo.  They had a firm.
19        Q.   And the purpose of the lawsuit that
20   the Singers brought was to force the sale of
21   Lakeview; is that correct?
22        A.   That's correct.
23        Q.   And you had joined in wanting to
24   sell the property at Lakeview?
25        A.   Yes.
```

49

```
 1              John Edmonds
 2              And then --
 3        Q.   Let me back you up for one second.
 4   You said that initially you wanted, with respect
 5   to Logan, to transfer the Logan bank accounts to
 6   Valley National Bank?
 7        A.   Yes.
 8        Q.   And that the Seaveys refused to
 9   transfer the bank account to Valley National
10   Bank?
11        A.   That's correct.
12        Q.   Were you aware of which bank
13   account -- I'm sorry, which bank Logan currently
14   had accounts at at that time?
15        A.   Oh, yes, I remember a discussion I
16   had with Phyllis about that.  The bank that we
17   had been was Chase Bank, had been the bank
18   that -- where all these accounts were.  And I
19   approached Phyllis and I said -- she transferred
20   them to the Bank of New York.
21              And I said, Why did you transfer
22   those -- you know, we were getting good service,
23   et cetera.
24              She says, For Dalton's convenience,
25   John.
```

13 (Pages 46 to 49)



50

John Edmonds

1
2    So I said, Well, you know, I don't
3  approve of that at all and I want you to know
4  that.
5    Q.    Now, you will agree that Logan has a
6  management contract with Dalton; is that correct?
7    A.    That's what they tell me.
8    Q.    Were you a signator to the contract?
9    A.    I don't recall whether I was or not.
10  I may have been, but I don't really recall.
11   Q.    Why did you want to move Logan's
12  account to Valley National Bank?
13   A.    Because I wanted to begin to get in
14  a position to have more involvement with how our
15  monies were being used, either the reserves and
16  whatever else. I wanted to be able to keep up
17  with that. I wanted to know where that was and
18  so forth and so on.
19   Q.    Now, the Seaveys offered you the
20  opportunity to cosign all checks from Logan,
21  didn't they?
22   A.    I have no recollection of that. The
23  only thing I generally receive from Logan and any
24  of the other developments is a monthly statement
25  that sets forth the amounts collected, the

51

John Edmonds

1
2  amounts -- generally speaking, they do attach the
3  checks that relate to the employees and Domestic
4  Relations Corp. checks and that kind of thing,
5  but the other checks they do not.
6    MR. TRAUB:  Can I have this marked
7    Defendants' Exhibit No. 2, please.
8    (Defendants' Exhibit 2, 7/31/06
9    Letter to Edmonds from Seavey, marked for
10   identification.)
11  BY MR. TRAUB:
12   Q.    Mr. Edmonds, you've just been handed
13  Defendants' Exhibit No. 2. Have you ever seen
14  this letter before?
15   A.    Yes. It was sent to me by Phyllis
16  in 2006.
17   Q.    Do you recall receiving this letter?
18   A.    I don't recall receiving it, but I
19  acknowledge that I received it.
20   Q.    If you look at the last paragraph,
21  can you read that paragraph for the record,
22  please.
23   A.    "As for the taking of your money,
24  again, be advised that such a thing was never,
25  ever done. Dalton chose to change its banking

52

John Edmonds

1
2  relations and bank with the Bank of New York and
3  eliminate the Chase account. All monies
4  transferred to the Bank of New York was a Logan
5  Plaza Management account and its Chase account
6  ceased to exist.
7    "We suggested that you cosign all
8  Logan checks, and this would require your weekly
9  attendance at the Dalton office. You thought it
10  would be sufficient to have all checks xeroxed
11  and copies sent to you. I thought this was okay
12  and we so did and do," which is not accurate.
13   Q.    Does that reflect your recollection,
14  though, that --
15   A.    That this was the letter, yes.
16   Q.    -- that Seaveys asked you to
17  cosign --
18   A.    Yes.
19   Q.    -- on the Logan checks?
20   A.    Yes.
21   Q.    And that you said that you didn't
22  need to come in and cosign on the checks?
23   A.    I believe I may have said that,
24  Look, if you just send me copies of all the
25  checks, that would be sufficient for me.

53

John Edmonds

1
2    Q.    So turning back your attention to
3  Defendants' Exhibit No. 1, you said you had
4  retained Mr. Clark for the precise purpose of
5  examining all of the books and records of Dalton
6  Management as it relates to the above properties.
7    Why did Mr. Clark not end up being
8  the CPA that you used for the examination?
9    A.    Mr. Clark's office is now in
10  Greensboro, North Carolina, and he obviously has
11  many clients. And --
12   MR. HAYWOODE:  I'm just going to
13   note my objection to the question insofar
14   as it might call for speculation.
15   The witness may respond.
16   A.    He contacted either Mel or the firm
17  that's now doing the examination here in
18  Brook-- who have an office in Brooklyn, on
19  Utica Avenue, to do the examinations and they're
20  undertaken there.
21   Q.    And the reason you didn't use
22  Mr. Clark is because he was in Greensboro, North
23  Carolina?
24   A.    Yes, and not -- you know, just was
25  not feasible for him to examine -- be here to

14 (Pages 50 to 53)

54

John Edmonds

1
2  examine and try to run his business in North
3  Carolina.
4      Q.    Prior to sending this March 8, 2007,
5  letter to Robert Seavey, had you discussed with
6  Mr. Clark retaining him to examine the books and
7  records?
8      A.    Yes, I probably did discuss it with
9  him. And he said to me that, John, it's not
10 feasible for me because I have other clients -- a
11 lot of clients and I can't come to New York and
12 spend, you know, weeks examining books and
13 records, et cetera.
14     Q.    So if he told you that he was in
15 Greensboro, North Carolina, which you knew at
16 that time, and he told you it was not feasible
17 for him to do the examination, why did you write
18 a letter to the Seaveys telling them that
19 Mr. Clark would in fact be doing the examination?
20     A.    I think I wrote that letter because
21 he was my CPA. And at that time, I had no other
22 involvement with any other CPA firm. And so I
23 wrote that letter to say, Look, Rudy is my CPA
24 and I'm going to ask him to do thus and so on.
25     And then I discussed it with him and

55

John Edmonds

1
2  he made it plain that it would be almost
3  impossible for him to assume that responsibility.
4      Q.    I guess I'm confused by your
5  testimony. At the time you wrote this letter,
6  you had or had not already discussed the
7  retention of Mr. Clark with you?
8      A.    I believe I had discussed the
9  retention of Mr. Clark at the time that I wrote
10 the letter. I wouldn't have written a letter
11 without -- without his having knowledge of the
12 fact that -- that I was seeking to use him for
13 that purpose.
14     Q.    Even though Mr. Clark told you he
15 was in Greensboro and it would be practically
16 impossible for him to come to New York to
17 undertake such a large examination, you still
18 wrote this letter?
19     MR. HAYWOODE: My objection is to
20 the form, Counsel, because we don't know
21 when which of those informations [sic] was
22 provided unless you lay a foundation at the
23 time.
24     Object to the form.
25     MR. TRAUB: I'm going to cite to you

56

John Edmonds

1
2  Federal Rule 30, which is what corresponds
3  with this deposition. And under Federal
4  Rule 30(c)(2), it states, "An objection
5  must be stated concisely, in a
6  nonargumentative and a nonsuggestive
7  manner."
8      And I'm taking issue with your
9  suggestive comments in your objection. So
10 I'll let you do a concise and
11 nonargumentative and nonsuggestive
12 objection, but that's the basis of the
13 extent that I'm going to allow your
14 objections.
15     MR. HAYWOODE: Counsel, you said, he
16 spoke with you, he spoke with you. The
17 witness has testified, I spoke with him, I
18 spoke with him. Your question suggests,
19 again, that he did the one act before
20 having spoken with him.
21     And I simply said that you should
22 lay a foundation for the sequence of these
23 conversations. Because you're saying
24 something that is unspecified and he's
25 answering something which is entirely

57

John Edmonds

1
2  different.
3      MR. TRAUB: I think the record
4  speaks for itself, that we actually did
5  discuss the precise sequence of
6  conversations and events, and that was the
7  determination of my prior questions.
8  BY MR. TRAUB:
9      Q.    Mr. Edmonds, if you turn to the
10 fourth paragraph down in your March 8, 2007,
11 letter, can you please read that statement.
12     A.    "This examination will be in
13 accordance with 28 U.S.C. 1331, the Racketeer
14 Influenced and Corrupt Organizations Act (RICO),
15 18 U.S.C.1964(a), personal jurisdiction over the
16 named defendants pursuant to U.S.C. 1965."
17     Q.    Mr. Edmonds, what is your
18 understanding as to what a RICO action is?
19     MR. HAYWOODE: Objection to the
20 relevance of his understanding.
21     The witness may answer.
22     A.    My understanding of it is that it's
23 an action brought on behalf of the plaintiff in
24 connection with alleged racketeering as it
25 relates -- in this instance, as it relates to a

15 (Pages 54 to 57)

58

John Edmonds

2 number of parcels of real property.
3     Q.    Do you understand actually, though,
4 what a claim under RICO is?
5     A.    I don't know whether I do or not.
6     Q.    But yet, you stated in your
7 March 8th letter that this would be in
8 accordance with RICO; is that correct?
9     A.    Yes, that's correct.
10    Q.    Did you actually look up 28 U.S.C.
11 1330 --
12    A.    I did not, no.
13    Q.    Did you look up 18 U.S.C. 1964(a) at
14 the time?
15    A.    No, I did not. I believe that the
16 conduct of the Seaveys was such and continues to
17 be such that it fitted the pattern of a RICO
18 action.
19    Q.    You say it fit with the pattern of a
20 RICO action. What is your understanding of what
21 a pattern of a RICO action is?
22    A.    The pattern is where there is an
23 abuse on the part of a party, in this instance,
24 Dalton, Seavey, Bob Seavey, Phyllis, and the
25 Seavey kids, as it relates to these properties

59

John Edmonds

2 that I named in the action. I think that their
3 conduct is racketeer influenced. They're looking
4 to skin the cat all for themselves and leave
5 nothing for any partner, including Edmonds.
6     Q.    When you say "abuse," please be
7 specific in what you mean by "abuse."
8     A.    Well, it's an abuse, in terms of how
9 I understand it, for a party to enter into
10 partnerships with another party and then assume
11 complete control and refuse to give accountings
12 for all of the dollars that are received and the
13 use of those dollars.
14          As a matter of fact, sir, the last
15 time I was at DHCR, the young fellow who is the
16 deputy commissioner who -- Lakeview is part of
17 his mission, told me to speak to his counsel when
18 I asked them to give me a record of all of the
19 holdings and the deposits that they cosign on
20 behalf of the partnerships.
21          When I spoke to his counsel, his
22 counsel told me that he would not permit it. And
23 then when I was leaving the building on the
24 elevator, this young fellow said to me, I'm going
25 to have lunch with Bob tomorrow and I'll tell him

60

John Edmonds

2 that you were down here.
3          And I said, Fine.
4     Q.    When was the last time that you were
5 at DHCR?
6     A.    I think that was just before -- that
7 was in 2007. 2007, I think. 2007 or 2008. I
8 don't remember.
9     Q.    And who was this quote-unquote young
10 man that you're testifying to?
11    A.    I don't know. Fernandez -- I don't
12 know his name. I know that he -- he apparently
13 lives in the East Harlem area, but I don't know
14 his name. But I do know that he's a functionary
15 down there.
16    Q.    And that he had lunch with Bob?
17    A.    According to him. I don't know that
18 he had lunch with Bob. According to him.
19    Q.    Are there any other abuses that you
20 can think of when you used the term "abuse"?
21    A.    Well, I think that when you are in a
22 business relationship with a person and you
23 attempt to -- and you go forward -- not attempt,
24 but go forward to secure complete control of the
25 relationship and dominate the placing of monies

61

John Edmonds

2 and determine where the monies should be sent and
3 so forth and so on, that -- that you are
4 committing a quality of abuse that fits
5 criminality.
6     Q.    You will agree with me -- strike
7 that.
8          Are you aware that each of the four
9 housing projects at issue --
10          MR. HAYWOODE:  You meant to withdraw
11 something from the record, not strike it?
12 You meant to withdraw --
13          MR. TRAUB:  I'm okay with striking
14 my comment. Same thing.
15          MR. HAYWOODE:  Does the federal
16 rules give you the authority to strike
17 something?
18          MR. TRAUB:  It's my deposition --
19          MR. HAYWOODE:  So you're going to
20 withdraw it?
21          MR. TRAUB:  I'll withdraw the first
22 incorrect part of my sentence, if that
23 makes you happy.
24          MR. HAYWOODE:  No, I just want to be
25 sure that you're withdrawing the question.

16 (Pages 58 to 61)

62

John Edmonds
1
2  Because we don't have authority to strike
3  it.
4          MR. TRAUB:  It wasn't a question.  I
5  hadn't finished my question.
6          MR. HAYWOODE:  Okay.
7  BY MR. TRAUB:
8      Q.   Mr. Edmonds, are you aware that all
9  four of the partnership housings are controlled
10 in some part by a different federal- or
11 state-sponsored housing agency?
12     A.   Yes.
13     Q.   For instance, Lakeview is controlled
14 by DHCR; is that correct?
15     A.   DHCR on behalf of the State Urban
16 Development Corporation.
17     Q.   Do you know how Lakeview is
18 financed?
19     A.   Yeah.  I believe that it was
20 financed by the State Urban Development
21 Corporation.  And in those years -- now, this is
22 some, what, 40 years ago, I think there was a
23 provision of that -- of the law at that time that
24 permitted the funding of these affordable housing
25 developments up to 90 percent.

63

John Edmonds
1
2          And I believe that what Bob did here
3  was to go to Rubin Glick, who I think we hired at
4  that time as the -- as a principal contractor, to
5  borrow the funds, 10 percent.  And on that basis,
6  I think the project was funded.  And I believe
7  the funding was somewhere between 16 and
8  $20 million that -- at that time.
9      Q.   Do you know how Lakeview takes in
10 money on a daily, weekly or monthly basis?
11     A.   At one point, the documents that I
12 would get from Phyllis on the left-hand column
13 would list the amounts taken and deposited, the
14 dates of deposit, et cetera.  And the other
15 column would list the uses of the dollars.
16          The most recent thing that I've
17 received does not do that.  It doesn't give you
18 that information.  In other words, there's much
19 less information given by the most recent
20 statements that they've been giving.
21     Q.   Do you know which entities regulate
22 Lakeview?
23     A.   Yeah, I've said on behalf of -- on
24 behalf of the State Urban Development
25 Corporation, DHCR.  And there's another agency

64

John Edmonds
1
2  that's at 40th Street, I believe, and Third
3  Avenue -- I can't think of the name of that
4  agency -- that has a role in the -- in the
5  regulation.  And also, I believe HUD has one.
6          I remember that -- I think that this
7  lady, Deborah Van, something, Amorgin, was at
8  HUD.  And I think that basically the federal
9  government is responsible for putting these
10 monies into various states and state housing
11 agencies to be used for affordable housing
12 purposes.
13     Q.   And do you have an understanding as
14 to whether or not each of these government
15 entities have regulations or rules that govern
16 the operation of Lakeview?
17     A.   Yes, I understand that.  And I
18 understand, also, that at one point Seavey's
19 nephew was the deputy commissioner for downstate
20 New York with the state agency.  And I think that
21 he had a role in enunciating the policy of DHCR.
22     Q.   So you're saying that Seavey's
23 nephew may have had a role in actually --
24     A.   Not "may have had."  He did have a
25 role.

65

John Edmonds
1
2      Q.   He had a role --
3      A.   Bob arranged for his appointment for
4  that purpose through the governor then, Cuomo.
5      Q.   You're saying Bob's nephew had a
6  role in drafting the DHCR regulations?
7      A.   No, I didn't say that.  He had a
8  role in implementing them and defining them.
9      Q.   With respect to Lakeview or with
10 respect to all housing projects?
11     A.   With respect to, I would presume,
12 all housing of an affordable nature in the
13 downstate area here in New York.
14     Q.   Do you know how the management fees
15 are calculated for Lakeview?
16     A.   No, I guess Phyllis has -- has a
17 system for calculating them.  And I think she
18 told me she only -- We only -- We only -- We only
19 take what they will permit, John.  And in fact,
20 our fees are only -- management fees are only
21 2 1/2 percent.
22     Q.   Are you aware that --
23          MR. HAYWOODE:  Just a minute.  He
24 wasn't exactly finished.
25     A.   And if you look at -- you know, if

17  (Pages 62 to 65)

66

```
1              John Edmonds
2  you look at the statements that I've seen at the
3  end of the year, you'll see that some 18 or
4  20 percent, somewhere between 12 and 20 percent
5  will have gone to -- to Dalton Management for
6  management purposes.  For example, Phylis' staff
7  are all paid by the partnership, not by -- by
8  Dalton Management.  They get a percentage of
9  income --
10     Q.    Mr. -- I'm going to stop you now --
11            MR. HAYWOODE:  Wait a second.
12            MR. TRAUB:  Mr. Haywoode, let me
13     finish my interruption.
14  BY MR. TRAUB:
15     Q.    I don't believe you're answering the
16  question that I have on the table.
17            MR. HAYWOODE:  Just a minute.  I
18     believe the process is to let him answer
19     and then move to strike what's not
20     relevant.
21            MR. TRAUB:  Given that I have a time
22     constraint today --
23            MR. HAYWOODE:  To interrupt the
24     witness in the middle of a question that
25     you asked him?
```

67

```
1              John Edmonds
2  BY MR. TRAUB:
3     Q.    Did you understand the question
4  that's before you right now?
5     A.    I thought I did.
6            MR. TRAUB:  Can the court reporter
7     read back the question.
8            (Record read.)
9            MR. HAYWOODE:  Had you finished your
10     answer?
11            THE WITNESS:  Yes.
12            MR. HAYWOODE:  You were in the midst
13     of saying something when Mr. Traub stopped
14     you.
15            THE WITNESS:  No --
16            MR. HAYWOODE:  Are you finished?
17            THE WITNESS:  -- I think I've
18     completed the answer.
19            MR. HAYWOODE:  Okay.
20  BY MR. TRAUB:
21     Q.    Are you aware, with respect to
22  Lakeview, that DHCR provides a flat rate fee for
23  management fees?
24     A.    I'm aware of the fact that they may
25  well do that, but they also provide some device
```

68

```
1              John Edmonds
2  where that flat rate is avoided.
3     Q.    With respect to -- withdrawn.
4            When you say there may be some
5  device for avoiding that fee, is that what you're
6  referring to when you said that some of the
7  employees of Dalton are paid directly from the
8  partnerships?
9     A.    All of them.
10     Q.    All of them are paid directly from
11  the partnerships?
12     A.    Everybody there, as far as I can
13  determine, are paid with partnership funds and
14  not the management fee of Dalton Management.
15     Q.    In your view, that's inappropriate?
16     A.    Yes.
17     Q.    And in your view, does that breach a
18  contractual obligation?
19     A.    I think it does.
20     Q.    And which contractual obligation do
21  you believe that to breach?
22     A.    The contractual obligation is that
23  the contract would require them to receive X
24  dollars for management services.  Most of the
25  companies that do this kind of business receive
```

69

```
1              John Edmonds
2  something like 6 percent for their fee and
3  they're responsible to pay their own employees.
4  In this instance, that does not apply.
5     Q.    And that would be -- and we'll get
6  to it a little later.
7            That would be the basis for your
8  statement in the verified complaint and in your
9  affidavit that the -- I want to be precise in my
10  quotation here of you -- that "there's no
11  provision in the management agreements between
12  defendant Dalton and the partnerships to pay the
13  salaries of defendant Dalton's employees
14  including defendant Dawley, who was paid
15  $140,000"; is that correct?
16     A.    I know of no provision in the
17  management contract that would permit the payment
18  of management -- management fees above and beyond
19  what is normal and usual in the -- in the
20  industry.  Okay.
21            And I repeat, I think for the fourth
22  time, that that is not the way in which Dalton
23  Management handles that management fees and that
24  the employees of Dalton Management are paid by
25  the partnership above and beyond any fee that
```

VERITEXT REPORTING COMPANY
(212) 279-9424        www.veritext.com        (212) 490-3430



70

John Edmonds

1   John Edmonds
2   Dalton Management receives.
3        Q.    In your view, that's incorrect, it
4   shouldn't be paid from the partnerships, it
5   should be paid by Dalton directly?
6        A.    Not in my view, but I think it's
7   rational. Yes. That's what should be done, yes.
8              Incidentally, is Phyllis denying
9   that this is the process?
10        Q.    I'm not here to answer your
11   questions. Unfortunately, this is -- I'm taking
12   your deposition today.
13        A.    Okay.
14        Q.    Are there any other abuses that you
15   can think of specifically --
16        A.    I've said to you over and over
17   again, Mr. Traub, today that the system of
18   management imposed by the Seaveys in each of the
19   projects is a system that is abusive and it's a
20   system that should not be and it's a system for
21   the kind of racketeering, et cetera, that the
22   Seaveys -- that the Seaveys go forward with.
23             For instance, Phyllis has all the
24   records of all these monies everywhere, okay, and
25   my accountants are having a very difficult time

71

John Edmonds

1   John Edmonds
2   getting the kind of information that would give
3   us an accurate picture of where the monies are
4   and where the reserves are and where the
5   investments are.
6        Q.    Is it your understanding that over
7   the last two days, being Wednesday and Thursday,
8   that your accountants have been at Dalton
9   Management reviewing all of the retainage
10   accounts --
11        A.    My --
12        Q.    Let me finish my question for the
13   record.
14        A.    Go ahead.
15        Q.    Thank you.
16             -- all of the investment accounts
17   and retainage accounts over the last two days?
18        A.    I don't set their schedule for them.
19   Okay. And I don't know whether they're there or
20   not. They set their own schedule. So they may
21   be there, they may not be there.
22             But I do know that they have
23   informed me on more than one occasion that on the
24   occasions that they're there for the examination
25   of books and records, their examination is not

72

John Edmonds

1   John Edmonds
2   unfettered, but rather that -- principally Nealle
3   sits and tells them what they can have and what
4   they can't have.
5             MR. HAYWOODE:  Indicating the
6   defendant Nealle Seavey?
7             THE WITNESS:  That's correct.
8        A.    And that does not make it feasible
9   for them to go quickly through this examination.
10             MR. TRAUB:  Can I mark this
11   Defendants' Exhibit 3, please.
12             (Defendants' Exhibit 3, 3/27/07
13   Letter to Seavey from Edmonds, marked for
14   identification.)
15        Q.    Mr. Edmonds, I've given what's been
16   marked to you as Defendants' Exhibit No. 3. Do
17   you recognize this letter?
18        A.    Yes.
19        Q.    Is that your signature at the
20   bottom?
21        A.    Yes.
22        Q.    And can you please read the very
23   first line.
24        A.    "I have retained the accounting firm
25   of Cameron Griffiths & Pryce, CPAs, LLC, to

73

John Edmonds

1   John Edmonds
2   conduct an examination of the referenced
3   properties under the management of Dalton
4   Management, LLC."
5        Q.    And so a second ago when you were
6   referring to your accounting firm, is this who
7   you were referring to, Cameron Griffiths & Pryce?
8        A.    That is correct.
9        Q.    When did you first meet Cameron
10   Griffiths & Pryce?
11        A.    Sometime after I had written --
12   sometime in 2007 or 2006.
13        Q.    Would it be between the time that
14   you wrote Defendants' Exhibit No. 1 and
15   Defendants' Exhibit No. 3?
16        A.    Yes.
17             MR. HAYWOODE:  My objection is
18   that's already in the record from the
19   previous testimony, but the witness has
20   answered again.
21   BY MR. TRAUB:
22        Q.    I'm sorry, I missed your answer,
23   Mr. Edmonds.
24             MR. HAYWOODE:  He said yes.
25        Q.    Mr. Edmonds, you said yes, between

19 (Pages 70 to 73)

74

John Edmonds

1  John Edmonds
2  the time that you wrote those two?
3      A.   Yes.
4      Q.   And how did you locate Cameron
5  Griffiths & Pryce?
6          MR. HAYWOODE:  Objection to the
7  relevance.
8          The witness may answer.
9      A.   I located them -- I believe I might
10 have had asked Mel if he knew of any accountants
11 that did this quality -- this kind of auditing
12 work.  And Mel I think said he did.  He had in
13 mind another gentleman, and this person told Mel
14 that he was actually too busy to take on that
15 kind of an assignment, but that he was aware of a
16 group of CPAs who could undertake this
17 assignment.  And he had reference to the Cameron
18 group.
19     Q.   When you say "this assignment," can
20 you tell me what the scope of the assignment is.
21     A.   The scope of the assignment is to
22 examine the books and records over -- over the
23 last ten years, going all the way back to, I
24 guess, 2000.
25     Q.   And at the time that you had

75

John Edmonds

1  John Edmonds
2  retained Cameron Griffiths & Pryce, were you
3  already seeking to file a RICO action against the
4  defendants?
5      A.   Yes, that was the --
6          MR. HAYWOODE:  Objection to so much
7  of that as might call for attorney-client
8  privilege of some attorney or other.
9      Q.   Well, let's go back to Defendants'
10 Exhibit No. 1, please.  If you look at the last
11 paragraph, last full paragraph, not the one that
12 says, "I should be happy to address this issue,"
13 but the one above that.  Can you please read that
14 for the record.
15     A.   Which --
16     Q.   Defendants' Exhibit No. 1, your
17 March 8, 2007, letter.
18     A.   Which paragraph?
19     Q.   The second-to-last paragraph, the
20 one that begins, "I anticipate."
21     A.   "I anticipate that you, Dalton
22 Management and the owners thereof, will be served
23 by my counsel forthwith.  Upon that service, it
24 is your view that you have -- it is your view
25 that you have been libeled.  I invite you to

76

John Edmonds

1  John Edmonds
2  respond -- if it is your view that you've been
3  libeled, I invite you to respond in the usual
4  counterclaim and say what fees you might have to
5  pay in any state court action."
6      Q.   When you say "you will be served by
7  counsel forthwith," will be served with what?
8      A.   Obviously a summons and complaint.
9      Q.   In a RICO action?
10     A.   Yes.
11     Q.   So at the time then that you did
12 retain Cameron Griffiths & Pryce, the date after
13 you said you wrote this first letter, you were
14 already anticipating filing a RICO action?
15     A.   That is correct.
16     Q.   Regardless of what Cameron
17 Griffiths & Pryce found in their audit?
18         MR. HAYWOODE:  Objection.
19         Argumentative.
20     A.   I knew that their audit -- assuming
21 that the books and records would be made
22 available to them, their audit would -- would
23 come up with -- with a consistent number of just
24 abuses that Seaveys committed as managing -- as
25 managers and controllers of the property.

77

John Edmonds

1  John Edmonds
2      Q.   When you say you knew that, why did
3  you know that?  What is the basis of your
4  knowledge?
5      A.   Oh, all of the -- the exchanges that
6  I had with Bob and Phyllis through -- through an
7  extended period.
8      Q.   And I guess I'm a little lost.
9  Based on your exchanges with Bob and Phyllis,
10 what did you know --
11         MR. HAYWOODE:  I'm going to object
12     to counsel being lost, but -- please, can
13     you restate the question.
14     Q.   I'm okay with my question.  You can
15 answer if you understood it.
16     A.   No, I really don't understand why
17 you continue to repeat this.  I made my position
18 very clear here.  I've said to you over and over
19 again, and I repeat, the Seaveys have abused and
20 taken advantage of the other managing general
21 partner of these properties that have been
22 identified in these letters.  Okay.  And that's
23 John Edmonds.
24         And John Edmonds is now moving,
25 through counsel, to correct that.  And I intend

20  (Pages 74 to 77)



78

John Edmonds
1
2  to do whatever I have to do to correct it in
3  terms of lawsuits. I am prepared to go to my
4  grave fighting Robert Seavey and his abuse. He
5  and I both will go to the grave.
6       Q.   Mr. Edmonds, let me -- maybe I'll
7  rephrase the question for you.
8            I had asked you whether or not
9  depending on the outcome -- whether or not your
10  filing of a RICO action depended upon the outcome
11  of Cameron Griffiths & Pryce's audit. And you
12  said you knew that the Cameron Griffiths & Pryce
13  audit would find irregularities.
14           And my question to you is, what
15  irregularities did you know of at that time?
16           MR. HAYWOODE:  Objection to the form
17       of the question.
18       There were letters to Pryce
19  Cameron and Griffiths --
20           MR. TRAUB:  Mr. Haywoode, your
21  objection is now going beyond what is
22  allowed for under federal rules. Your
23  objection is noted.
24  BY MR. TRAUB:
25       Q.   You can answer the question.

79

1            John Edmonds
2       MR. HAYWOODE:  Just so we're clear,
3  litigation followed the CPA inquiry. So
4  you're putting a hypothetical question.
5       MR. TRAUB:  Mr. Haywoode, again,
6  your objection goes beyond what is called
7  for under federal rules. Your objection is
8  noted on the record. Mr. Edmonds --
9       MR. HAYWOODE:  My objection is it's
10  hypothetical and the witness can answer the
11  question.
12       Q.   You cannot direct --
13       MR. HAYWOODE:  -- if he understands
14  it.
15       A.   I retained them because I knew that
16  these abuses existed.
17       Q.   And my question is, what abuses did
18  you know of?
19       A.   I knew of the management abuses. I
20  just answered that several times.
21       Q.   No, you --
22       A.   Yes, I did. I told you that I knew
23  that the abuses existed based upon the kind of
24  responses that I was getting from Seavey and from
25  Phyllis.

80

1            John Edmonds
2       Q.   But my question is, what
3  irregularities in accounting did you have
4  knowledge of at that time?
5       A.   I'm not an accountant. And I would
6  not know of what irregularities. That's the
7  reason I retained those accountants.
8       Q.   You said you knew there were
9  irregularities.
10       A.   I knew there were irregularities,
11  but the nature of the irregularities and how they
12  were being handled, I didn't know. So that's the
13  reason I went and got the accountants.
14       Q.   Did you know of any specific
15  irregularities at that time?
16           MR. HAYWOODE:  Counsel, at this
17       point, I object. There is an element of
18       badgering the witness. The irregularities
19       are in the complaint. I mean, again, I
20       don't see the purpose of asking him for a
21       restatement of what he knew before the
22       complaint. Again, it's argumentative.
23       It's badgering the witness.
24       Q.   Mr. Edmonds, did you have any
25  specific knowledge of any irregularities before

81

1            John Edmonds
2  Cameron Griffiths & Pryce did their audit?
3       A.   I told you yes, I did.
4       Q.   And which --
5       A.   The specific irregularities was the
6  process by which her staff is paid. That's one
7  specific irregularity.
8       Q.   By "she" are you referring to --
9       MR. HAYWOODE:  Indicating the
10  defendant Phyllis Seavey.
11       MR. TRAUB:  Mr. Haywoode, again,
12  this is not your deposition today, so I'd
13  ask you not to testify.
14       Q.   Are you referring to her being
15  Mrs. Seavey?
16       A.   Yes.
17       Q.   So it's the way that her staff was
18  paid out of the partnerships is one of the
19  specific irregularities that you knew of?
20       A.   That's right.
21       Q.   Okay. Have you used Cameron
22  Griffiths & Pryce on any other real estate
23  multifamily housing projects?
24       A.   No.
25       Q.   Have you used Cameron Griffiths &



82

John Edmonds

1
2       Pryce at all before this audit?
3           A.  No.
4           Q.  How much were you paying Cameron
5       Griffiths & Pryce for their audit?
6               MR. HAYWOODE: Objection.
7           A.  I paid them whatever the fees are
8       that they charge.
9           Q.  And what are those fees?
10              MR. HAYWOODE: Objection.
11              We're getting into an area here of
12      confidentiality. As to how much the
13      accountants are being paid?
14              MR. TRAUB: Absolutely.
15              MR. HAYWOODE: What's the relevance
16      of that to this inquiry?
17              MR. TRAUB: Are you instructing him
18      not to answer the question?
19              MR. HAYWOODE: I have to instruct
20      him at this point not to answer that, yes.
21              MR. TRAUB: I'll give you one chance
22      to withdraw your objection, for two
23      reasons.
24              MR. HAYWOODE: Am I under threat
25      here?

83

John Edmonds

1
2               MR. TRAUB: No, I'm giving you a
3       chance to withdraw your objection.
4               Number 1, it's relevant if you're
5       going to use them as an expert witness on
6       accounting.
7               MR. HAYWOODE: We haven't indicated
8       their use as an expert witness.
9               MR. TRAUB: And number 2 --
10              MR. HAYWOODE: Just a minute.
11              I haven't indicated their use as an
12      expert witness. I have not even specified
13      any particular accountant as an expert
14      witness.
15              I think I've informed you, Darren,
16      that there are several accountants who may
17      be becoming interested in this matter. I
18      haven't designated anybody as an expert
19      witness.
20              MR. TRAUB: As you've also made
21      clear throughout your pleadings and your
22      depositions, that an accountant's
23      independent auditing which can be
24      influenced by payment is an issue when
25      relying on an accountant and an auditor.

84

John Edmonds

1
2       And so, again --
3               THE WITNESS: Bob ought to know all
4       about that because the firm who's -- who he
5       has retained through the years have blown
6       their independence a thousand times
7       already.
8               MR. TRAUB: Again --
9               MR. KELLY: Let me also add that if
10      Cameron Griffiths & Pryce are fact
11      witnesses, and that if they're being paid
12      by a party for any purpose, that should be
13      disclosed, if asked, and it's relevant that
14      way.
15              MR. HAYWOODE: A fact witness?
16              MR. TRAUB: If you're not using them
17      as an expert witness, then you're using
18      them as a fact witness.
19      BY MR. TRAUB:
20          Q.  And so again I'll ask you one more
21      time on the record, in light of all of the
22      statements, how much have you paid Cameron
23      Griffiths & Pryce?
24              MR. HAYWOODE: No determination has
25      been made as to who will testify as an

85

John Edmonds

1
2       expert. No designation has been made of
3       any fact witness as opposed to an expert
4       witness. They have done what they are
5       attempting to do. And from the records,
6       they haven't been terribly successful with
7       getting the information they were asked to
8       get.
9               MR. KELLY: Actually, they have
10      testified already in this case when you
11      submitted affidavits by Mr. Cameron, which
12      makes them a fact witness in this case.
13      You submitted the affidavit in connection
14      with the order to show cause. You
15      submitted the affidavit again in connection
16      with the opposition to the motion to
17      dismiss.
18              They are witnesses in this case.
19      We're entitled to find out how much they've
20      been paid by a party in this case.
21              MR. HAYWOODE: My objection to this
22      question at this point, Cameron Griffiths &
23      Pryce are going to be examined, you better
24      put that question to them.

22 (Pages 82 to 85)





86

1          John Edmonds
2    BY MR. TRAUB:
3        Q.    My question, Mr. Edmonds, to you is,
4    how much have you paid Cameron Griffiths & Pryce?
5    My question to Cameron Griffiths & Pryce will be
6    how much have they received. This is your --
7        A.    My answer to that question is that
8    I'm paying them as -- as they proceed in
9    accordance with their requirements.
10       Q.    Do you know how much you have paid
11   them?
12       A.    As of this time?
13       Q.    As of this time.
14       A.    I don't.
15       Q.    Have you paid them more than a
16   hundred thousand dollars?
17       A.    Yes.
18       Q.    Have you paid them more than
19   $500,000?
20       A.    No.
21       Q.    Have you paid them more than
22   $250,000?
23       A.    No.
24       Q.    More than $200,000?
25       A.    I don't know.

87

1          John Edmonds
2        Q.    So it's more than $100,000 and less
3    than $250,000?
4        A.    Yes.
5        Q.    Do you know the specific number that
6    you've paid them?
7        A.    No, I do not.
8        Q.    When you retained Cameron
9    Griffiths & Pryce, what did you tell them the
10   scope of the project was?
11       A.    I told them, as I've outlined in
12   these letters, that it would be a RICO
13   examination and I was looking for them to examine
14   the books, records, et cetera of Dalton and the
15   conduct of Seavey, Phyllis and Avery and Nealle,
16   over the last ten-year period.
17       Q.    Did you give them any specific
18   instruction as to what they should be looking
19   for?
20       A.    No, just go through the books and
21   records. I said to them, You go through the
22   books and records and I'm sure you're going to
23   find these abuses.
24       Q.    Did you tell them of any abuses that
25   you suspected at that time?

88

1          John Edmonds
2        A.    I've testifed to that already.
3        Q.    My question was, did you tell
4    Cameron Griffiths & Pryce of any of the abuses
5    that you --
6        A.    I testified to that already. I
7    said -- I told you that I told them that one of
8    the abuses that I was aware of was the business
9    of putting Dalton's management people on the
10   payroll of the partnerships rather than on the
11   payroll of the management company.
12       Q.    Did you tell them of any other
13   abuses that you suspected?
14       A.    No, I told them in general terms
15   that, as they went through these records, I was
16   sure that they would find a substantial number of
17   abuses.
18       Q.    What is your understanding of
19   Cameron Griffiths & Pryce's credentials with
20   respect to audits and forensic accounting of
21   government-subsidized multifamily housing
22   projects?
23            MR. HAYWOODE:  Objection to his
24       understanding. It calls for speculation.
25            MR. TRAUB:  His understanding calls

89

1          John Edmonds
2    for speculation, Mel?
3            MR. HAYWOODE:  His understanding of
4       their --
5            MR. TRAUB:  I want to know what his
6       understanding is. I'm not asking him to
7       speculate. I'm asking if he is --
8            MR. HAYWOODE:  His understanding of
9       what?
10           MR. TRAUB:  Can you repeat the
11      question.
12           (Record read.)
13           MR. TRAUB:  Of government-subsidized
14      multifamily housing projects.
15       A.    I've been given to understand that
16   they have substantial experience in this area.
17   As a matter of fact, I believe that the young
18   lady, Miss Pryce -- Miss Griffith owns it --
19   Miss Pryce -- Miss Griffith was an auditor -- I
20   believe an auditor for DHCR, retained -- they
21   would retain her to examine the books and records
22   of affordable housing companies. That's what
23   I -- you know -- and that they have -- as a team,
24   they have this background experience.
25       Q.    What is the source of your

90

John Edmonds
1 John Edmonds
2 understanding?
3     A.     The source of my understanding is
4 information that they gave me with respect to
5 their backgrounds as I discussed it.
6     Q.     Did they actually give you a
7 physical document on their backgrounds?
8     A.     No, just a -- just a discussion back
9 and forth in their offices.
10     Q.     When you were looking to retain
11 them?
12     A.     Yes.
13     Q.     Can you name any other multifamily
14 real estate properties for which they are the
15 accountants for?
16     A.     No, I cannot.
17          THE REPORTER:  Do you think we can
18 take a break?
19          MR. TRAUB:  It's 12 o'clock now.  Do
20 you want to take a one-hour lunch break at
21 this point?
22          MR. KELLY:  Let's take a five-minute
23 break.
24          MR. TRAUB:  That's perfect.
25          (Recess from the record.)

91

John Edmonds
1 John Edmonds
2          MR. TRAUB:  Can I get you to mark
3 this Defendants' Exhibit No. 4.
4          (Defendants' Exhibit 4, 12/12/07
5 Cameron, Griffiths & Pryce letter
6 attaching their report, marked for
7 identification.)
8 BY MR. TRAUB:
9     Q.     Mr. Edmonds, I've just handed you
10 what's been given to you as Defendants' Exhibit
11 No. 4.  Do you recognize this document?
12     A.     Yeah.
13     Q.     What is this document?
14     A.     It's a letter to me from Cameron
15 Griffiths & Pryce.
16     Q.     And did you receive this document?
17     A.     Yes.
18     Q.     And when did you receive this
19 document?
20     A.     Well, I guess at or about the -- at
21 or about the date as set forth here, 12/12/2007.
22     Q.     Did you receive any other reports or
23 summaries from Cameron Griffiths & Pryce
24 regarding their audit of the books and records of
25 the partnerships?

92

John Edmonds
1 John Edmonds
2     A.     I don't think -- other than oral
3 discussions had with Cameron Griffiths & Pryce at
4 their office, I don't think I've gotten anything
5 else.
6          One of the things that they report
7 to me at all times is that -- that the documents
8 that they asked for, they had great difficulty in
9 getting them and that not more than 40 to
10 60 percent of them had been responded to.
11     Q.     My question was, was this the last
12 written -- or the only written document that
13 you've received that constitutes --
14     A.     As long as -- yeah, I don't recall
15 receiving any other document.
16     Q.     You testified there were oral
17 discussions that you also had with Cameron
18 Griffiths & Pryce.
19     A.     Yes, I just stated that.
20     Q.     Were the oral discussions after you
21 received this document or before this document?
22     A.     After.  We've had several
23 meetings --
24     Q.     Okay.
25     A.     -- at their office.

93

John Edmonds
1 John Edmonds
2     Q.     Did your oral discussions result in
3 any modification in any way of the information
4 contained in that report?
5     A.     As far as I know, no.
6     Q.     So this report, then, constitutes
7 the findings of Cameron Griffiths & Pryce as of
8 today?
9          MR. HAYWOODE:  I'm going to object
10 to this question because you're suggesting
11 categories, of this witness, of something
12 that he could not possibly know.  You know,
13 Cameron & Griffith, as we speak, are
14 looking at records pursuant to our --
15          MR. TRAUB:  Mr. Haywoode, I'm going
16 to remind you once again of your
17 limitations on what you're allowed to
18 object to under Federal Rule 30.  You can
19 give a short, concise, nonargumentative and
20 nonsuggestive objection.
21          MR. HAYWOODE:  I'm going to follow
22 your example from the last deposition at
23 which you set the record straight.  And as
24 we speak, they're looking at information.
25 So the form of the question, how can we say

24  (Pages 90 to 93)

94

```
 1            John Edmonds
 2    that that's the end?  They're still engaged
 3    in the process.
 4         MR. TRAUB:  Can you please read back
 5    my question.
 6         (Record read.)
 7    A.   The answer is no.
 8    Q.   No, you've received another --
 9    A.   I've said to you that I've had
10    several meetings with them as they go through the
11    auditing process at their office in which we
12    discuss what progress they've made and what
13    difficulties they're having in getting
14    information.
15    Q.   And I asked you whether or not any
16    of those discussions resulted in any modification
17    of this report and you said no; is that --
18    A.   That's correct.
19    Q.   Okay.  So other than being advised
20    that they were having problems receiving certain
21    documents --
22    A.   Difficulties.
23    Q.   -- difficulties receiving certain
24    documents, have they ever shared findings with
25    you other than as contained in that report?
```

95

```
 1            John Edmonds
 2    A.   Orally, they've informed me of what
 3    those findings were to date.  If you take a look
 4    at this, this is only one year.  This is only
 5    2006 they're talking about.
 6    Q.   So what else have they advised you
 7    of that they found other than as contained in
 8    this report?
 9         MR. HAYWOODE:  Just a second.
10         Let the record show that I have
11    provided to counsel all the reports and
12    documents in my possession from Cameron
13    Pryce and Griffith.  They certainly go
14    beyond this.
15         MR. TRAUB:  Actually, they don't,
16    Mel.  It was this and it was five or six
17    letters requesting documents and items.
18    That was all --
19         MR. HAYWOODE:  And the information
20    in the order to show cause, a complete set
21    of the letters that Cameron and Pryce --
22         MR. TRAUB:  And again, it may be
23    you're misunderstanding; maybe it's me
24    that's misunderstanding.
25         What we've been provided with,
```

96

```
 1            John Edmonds
 2    including what's in the order to show
 3    cause, is letters requesting documents and
 4    items, an affidavit from Cameron orally
 5    saying that he didn't get all the documents
 6    and items that were requested in his
 7    letters in this report.
 8         We've not received any other
 9    information that constitutes a finding or
10    conclusion so far based on their audit.
11         Are you --
12         MR. HAYWOODE:  The audit -- I would
13    object to any characterization of anything
14    they've said as a finding and conclusion
15    because they haven't seen everything.  They
16    say that consistently.  They say, We
17    haven't been able to --
18         MR. TRAUB:  My role here today and
19    your role is not to argue with each other.
20         MR. HAYWOODE:  Darren, you know I
21    wouldn't do that.
22         MR. TRAUB:  I know.
23         MR. HAYWOODE:  I just want to say
24    the question, the form, findings and
25    conclusions, there's no conclusion here.
```

97

```
 1            John Edmonds
 2    BY MR. TRAUB:
 3    Q.   Have they shared with you any other
 4    findings other than as contained in their report
 5    that's been marked as Exhibit No. 4?
 6    A.   Orally, we've had discussions in
 7    their office as to -- as to what progress they're
 8    making in the examination of the books and
 9    records.
10    Q.   Other than them telling you that
11    they are having, to use your term, "difficulties"
12    finding or obtaining documents, have they told
13    you that they have found any other issues with
14    regards to the audit and accounting?
15    A.   Yeah, they discussed those issues
16    with me orally.
17    Q.   And what were those issues that they
18    discussed with you?
19    A.   Essentially, the refusal of the
20    Seaveys to provide them with critical information
21    in order that they might complete the other years
22    going -- 2005, '4 and so forth and so on.
23    Q.   Anything else shared with you in
24    those oral discussions?
25    A.   I can't think of anything else.
```

25 (Pages 94 to 97)



98

John Edmonds
2  Q.   Did you ever -- after obtaining the
3 report marked as Defendants' Exhibit No. 4, did
4 you ever share that report with the Seaveys or
5 anyone else from Dalton Management?
6  A.   I don't recall whether I did or not.
7  (Witness peruses the exhibit.)
8  A.   I might have spoken to Bob and said
9 to him that -- you know, that my accountants are
10 having a very difficult time with Phyllis and
11 Dalton, getting information so that they can
12 complete their audit.
13  Q.   Did you ever discuss with either the
14 Seaveys or anyone else from Dalton the
15 information contained in the report dated
16 12/12/2007?
17  A.   I think I did.
18  Q.   What did you discuss with them?
19  A.   That -- that this account reflects
20 what their auditing approach has found thus far.
21  Q.   Do you recall whether or not you
22 actually presented them with a copy of the
23 report?
24  A.   I think I may have given it to Bob.
25 I'm not sure.

99

John Edmonds
2  Q.   Did you ever share or discuss this
3 report with anyone from Marks Paneth & Shron?
4  A.   I have no recollection of that.
5  Q.   Before commencing this lawsuit, did
6 you or Cameron Griffiths & Pryce ever attempt to
7 sit down with either -- let's start ever sit down
8 with the Seaveys to discuss the issues concerned
9 in Defendants' Exhibit No. 4 to see if there was
10 an explanation or if they could be fixed?
11  A.   I testified earlier that Phyllis
12 threatened to have me arrested if I came to that
13 office to -- to have any discussion about Dalton
14 and its management of the properties.
15  Q.   So is then your answer to my
16 previous question no?
17  A.   The answer is what I gave. So no, I
18 have not been back there because I don't want to
19 suffer further insults. I'm a very sensitive
20 guy.
21  Q.   Have you ever asked anyone else on
22 your behalf to discuss this document with the
23 Seaveys to determine whether or not --
24  A.   I have counsel and --
25  Q.   Mr. Edmonds, you have to let me

100

John Edmonds
2 finish my question, just for the record. I
3 understand that you know what I'm going to ask,
4 but my question is, before filing this lawsuit,
5 did you ask anyone else on your behalf to sit
6 down with the Seaveys to discuss the findings
7 enumerated in Defendants' Exhibit No. 4?
8  A.   I may have discussed it with Mel.
9 And I think the position was that, you know,
10 you're not going to get anything positive from
11 the Seaveys, so why bother?
12  Q.   What about with anyone from Dalton;
13 did you or any agent of yours discuss this with
14 anyone else from Dalton?
15  A.   When I would call, I would call on
16 104. And Dawley's on 103. He would generally
17 end up with a call. And he was always -- to him
18 it was a source of great humor. He was always
19 laughing. Oh, John, in other words, what are you
20 bothering us about again kind of thing.
21  And so --
22  Q.   So your answer is you didn't discuss
23 it with anyone from --
24  A.   No.
25  Q.   How about with anyone from Marks

101

John Edmonds
2 Paneth & Shron; did you or anyone on your behalf
3 try to discuss the items contained in Defendants'
4 Exhibit No. 4 with Marks Paneth & Shron to
5 determine if there was an explanation behind the
6 items?
7  MR. HAYWOODE:  Objection to form in
8 the sense there are a series of letters
9 from the accountants to Marks Paneth &
10 Shron stating questions, which are in this
11 record.
12  Is your question directed to
13 anything he might have said outside of that
14 pattern, that sequence of communications,
15 all of which is in the pleadings and all of
16 which have been presented here?
17  MR. TRAUB:  Mr. Haywoode, again,
18 your objection goes far beyond that that is
19 allowed in Federal Rule 30.
20  MR. HAYWOODE:  Counsel's question is
21 did he or anyone on his behalf ask these
22 questions. And there are a series of
23 documents from Cameron Pryce & Mitchell
24 [sic] in the pleadings and presented to
25 you, which raise the very question that I

26 (Pages 98 to 101)



102

John Edmonds

1
2  understand you to be asking him.
3       MR. TRAUB:  Mel, your objection is
4  now suggestive, which violates Federal
5  Rule 30.  So, Mel, I don't need a response
6  from you.
7  BY MR. TRAUB:
8       Q.    Mr. Edmonds, did you understand my
9  question?
10      A.    Repeat it, please.
11      Q.    Did you or anyone on your behalf
12 ever try to discuss Defendants' Exhibit No. 4
13 with Marks Paneth & Shron?
14      A.    It may be that the accountants
15 attempted to discuss it with them.  But after I
16 retained them, you know, I was not going to
17 bother Jennings' office.  Because there was
18 another situation in which some charming lady
19 would get on the phone and tell me that he was
20 out or in California or whatever.
21      Q.    Turning to Defendants' Exhibit
22 No. 4, have you actually sat down with Cameron
23 Griffiths & Pryce and discussed all of the
24 information contained in this letter?
25      A.    Well, the information contained in

103

John Edmonds

1
2  the letter seems to me to be restricted to 2006.
3  And if you're asking that question, the answer is
4  yes, I've had oral discussions with them, as I've
5  testified to several times this morning, at their
6  office.
7       Q.    And so you understand, then, what is
8  contained in this letter?
9       A.    Yes.
10      Q.    If you turn to the second page of
11 their letter, the very first issue that they
12 raise is that there's an accounts payable on the
13 books and records of 181,000 as amount owing to
14 Dalton Management.
15           Do you see where I'm looking at?
16      A.    Which page is this?
17      Q.    It actually says page 2 at the
18 bottom, and it's Issue No. 1.
19      A.    Uh-huh, yeah.
20      Q.    Are you familiar with this issue?
21      A.    Yes, it's the $181,000 that are fees
22 due the partners as a result of the 6 percent
23 annual fee that you are entitled to if your
24 project is running -- up and running and there
25 are no major problems, et cetera.

104

John Edmonds

1
2       That would mean that it would be
3  3 percent each.  But Phylis and Bob are those
4  that decided to use this as -- that amount as a
5  tax write-off, and so they keep it on the record.
6  And I think every year they write it off rather
7  than to pay -- pay me my $91,000.
8       Q.    Do you have an understanding,
9  though, that if the $181,000 is paid, that you'll
10 get $90,500?
11      A.    I have an understanding that I'm a
12 50 percent owner of the project and I would
13 insist upon that.
14      Q.    So your issue, though, with respect
15 to Item No. 1 is --
16      A.    Issue very simply is pay me my
17 $91,000.
18      Q.    In other words, you want -- you're
19 not claiming that 181,000 was not paid or was
20 paid inappropriately; you're claiming that it
21 remains on the books and records, but the $90,500
22 should be paid to you?
23      A.    The inappropriateness is the use of
24 a fee that belongs to me.  I don't care what they
25 do with their 90 -- to benefit Dalton taxwise,

105

John Edmonds

1
2  Dalton writes it off every year.
3       Q.    Have you made a demand for your
4  portion --
5       A.    Several times.
6       Q.    -- of the $181,000?
7       A.    Certainly.
8       Q.    Did you make it in writing?
9       A.    I don't know if I made it in writing
10 or not.  I made the demand several times, but one
11 occasion or so I did make it in writing.
12      Q.    Who did you make the demand to?
13      A.    I think I sent a letter to Bob, a
14 letter to Phylis, a letter to Dalton Management
15 and cc'd Avery and Nealle.
16      Q.    What was their response when you
17 asked for this $181,000?
18      A.    I didn't ask for the $181,000.
19      Q.    Or for your portion -- sorry, you're
20 right.  For your half of the $181,000.
21      A.    That -- the response is that the
22 partnership has not agreed and the fee will
23 remain a fee payable to Dalton until such time as
24 the partnership decides that this fee should be
25 paid.

27 (Pages 102 to 105)



106

1            John Edmonds
2    Q.    You were present at the deposition
3 of Ron Dawley, were you not?
4    A.    Yes.
5    Q.    Have you reviewed the transcript of
6 Mr. Dawley?
7    A.    No, I have not.
8    Q.    Do you recall Mr. Dawley's testimony
9 about this $181,000 when asked questions by your
10 counsel, Mr. Haywoode?
11    A.    No.
12    Q.    If Mr. Dawley had testified that
13 there was an agreement between the partners that
14 if this money were to be paid, that it would be
15 paid 50/50, 50 percent to you and 50 percent to
16 the Seaveys as the other partners, but that you
17 had insisted it remain on the books and
18 records --
19    A.    If he testified to that, that's an
20 absolute lie. So I don't want anything that
21 belongs to me in the hands of the Seaveys.
22    Q.    So it's your position that this
23 money is to be paid 50/50 to the partners and not
24 remain on the books and records?
25    A.    That's correct.

107

1            John Edmonds
2    THE WITNESS: Bob, do you have a
3 check for me today?
4    Q.    Turning to --
5    MR. SEAVEY: I know where to get it
6 for you, but I'll have to beat her up.
7    MR. HAYWOODE: It's on the way.
8 You'll lose that fight.
9    THE WITNESS: I always do.
10 BY MR. TRAUB:
11    Q.    Mr. Edmonds, if you look actually
12 under the subheadings under -- I guess we'll call
13 it Issue No. 1 -- subheadings are observation,
14 background, recommendation and then it says,
15 "Management's response."
16    Do you see where I'm looking? I'm
17 back --
18    MR. HAYWOODE: Page 2.
19    MR. TRAUB: Page 2.
20    MR. HAYWOODE: You're on page 2,
21 Darren, and you're looking at management
22 response (indicating).
23    A.    I have page 2, "Management response
24 to [sic] not used."
25    Q.    Above the "to [sic] not used," do

108

1            John Edmonds
2 you see how the management response is kind of a
3 subheading under Issue No. 1?
4    A.    The recommendation?
5    Q.    Under the recommendation, see where
6 it says -- Issue No. 1, it says, "Accounts
7 payable Logan Plaza Associates," and the
8 subheading that says, "Observation" that has some
9 language, "Background" has some statements,
10 "Recommendation" has some statements, and then it
11 says "Management response."
12    Have you ever received any
13 information to fill in this management response?
14    A.    Is that the statement -- the
15 recommendation, "The management company should
16 ensure the proper accounting records are kept.
17 The auditor should verify that amounts listed in
18 the accounts payable schedule is actually due to
19 those vendors.
20    "The 181,000 attributed to Dalton
21 Management Company should be requested by the
22 appropriate account to ensure that the future
23 remittances are made to the appropriate vendor."
24    Q.    And then there's another subheading
25 right under that and it says, "Management

109

1            John Edmonds
2 response," and then there's nothing after that.
3    A.    That's correct.
4    Q.    Have you ever received any response
5 from management to fill in this information?
6    A.    The response that I've testified to
7 earlier, and that was that Phyllis told me
8 that -- that this amount would remain on -- on
9 the books and records of Dalton until there's --
10 there was an agreement by both partners that
11 respectfully [sic] that they should get their
12 fees. And she said -- and Avery has not agreed.
13    Q.    Have you told Cameron Griffiths &
14 Pryce about Miss Seavey's response that you just
15 gave?
16    A.    Yes.
17    Q.    Do you have any understanding one
18 way or the other that the $181,000 was money owed
19 to a former management company?
20    A.    I have an understanding that that
21 $181,000 is the fee passed over to Dalton from
22 the former management company, which fee is a
23 part of that 6 percent that the owners are
24 entitled to get where the project is operating
25 efficiently and above and beyond any obligations.

28 (Pages 106 to 109)

VERITEXT REPORTING COMPANY
www.veritext.com
(212) 279-9424                      (212) 490-3430



110

John Edmonds

1
2  Q.  Turning on to Number 3 and it says,
3  "Management fees."  You see where I'm looking --
4  A.  Yes.
5  Q.  -- kind of the bottom part of
6  page 2?
7  A.  Yeah.
8  Q.  And the issue raised in there is
9  that Dalton Management paid itself fees that are
10  called overages totaling $64,052 for the three
11  years, 2006, 2005, and 2004.
12      Do you see where I'm reading?
13  A.  Yeah.
14  Q.  Do you agree with that statement?
15  A.  I can't agree with it.  They got the
16  books and records.  How can I -- I don't know
17  what --
18  Q.  Do you have any reason to doubt your
19  auditor's statements?
20      MR. HAYWOODE:  Objection.
21  A.  No.
22      MR. HAYWOODE:  Objection.
23  A.  No, I don't have any reason to doubt
24  their statement.
25  Q.  When you go to background at the

111

John Edmonds

1
2  very bottom of page 2, it says, "In an attempt to
3  address the overpayments, the management company
4  set up a receivable for the 44,675, which was
5  credited to the current year's expense.  This
6  resulted in a partial reimbursement."
7      MR. HAYWOODE:  Just one second.  Are
8      you reading the entire statement?
9  BY MR. TRAUB:
10  Q.  -- "and an understatement of current
11  year management fee."
12      Do you see where I'm reading?
13  A.  Yes.
14  Q.  Have you discussed this issue with
15  Cameron Griffiths & Pryce?
16  A.  In oral discussions, yes.
17  Q.  And what did they tell you about
18  this issue?
19  A.  Just what they put here.
20  Q.  And their recommendation is that the
21  management make an additional reimbursement of
22  approximately 69,634 for payment in excess of
23  what is permitted by the management contract; is
24  that correct?
25  A.  Yes.

112

John Edmonds

1
2  Q.  Have they told you any other issues
3  with regards to Issue No. 3 regarding management
4  fees of Church Homes?
5  A.  Church Homes, I thought we were
6  talking about Logan.
7  Q.  If you look at Issue No. 3, it says,
8  "Management fees for Church Home Associates."
9  A.  Okay.
10  Q.  Have they told you any other issues
11  with management fees for Church Home Associates?
12  A.  They're continuing their
13  examination.  That's all they said to me.  This
14  is what they've -- in 2000 -- in their
15  examination of the 2006 records, this is what
16  they found.  And this is -- they're continuing to
17  look at the books and records.
18  Q.  But as of today, they haven't told
19  you of any other issues that they have found thus
20  far with respect to management fees of Church
21  Home Associates?
22  A.  Orally, they have discussed with me
23  their findings as they go along.
24  Q.  Have they told you about any
25  findings that they have found with regards to

113

John Edmonds

1
2  management fee of Church Home Associates?
3  A.  They discuss with me the whole
4  process used by Dalton to retain these monies.
5  Q.  Mr. Edmonds, other than the process,
6  have they told you of any other monies that they
7  have found that they have issue with with regards
8  to management fee of Church Home Associates?
9  A.  This report tells me what they have
10  found thus far.
11  Q.  So the answer then is, other than
12  what's in this report, they've not told you any
13  other issues orally with regards to -- any issues
14  or with regards to management fees --
15  A.  I told you, they've discussed with
16  me --
17  Q.  Problems finding --
18  A.  -- problems and so forth and so on.
19  For instance, they have indicated to me that --
20  you know, we've asked them for these specific
21  things, and he would name a few of the items.
22      And he says, We have not been able
23  to get them, and we're continuing to attempt to
24  get those.
25  Q.  Turning to Issue No. 4, the audit

29 (Pages 110 to 113)



114

John Edmonds
1
2  fee for Church Homes, it says that the issue that
3  they've found --
4      MR. HAYWOODE: Page 3.
5      THE WITNESS: Uh-huh.
6      Q.    -- the issue that they found was
7  that $41,769 was paid for audit services of
8  Church Homes and that they believe that it
9  exceeded the contracted amount by 17,769 plus
10 2,000 accrued to be paid in a subsequent period.
11     Do you see where I'm looking at?
12     A.    Yeah.
13     Q.    Are you contesting the services
14 received by Church Home Associates or just the
15 amount that was paid?
16     A.    Well, Church Home Associates is a
17 project in which Seavey owns 25 percent, I own
18 25 percent, the limited partner owns 50 percent.
19 We purchased that mortgage in 2006, I believe,
20 for 2 million -- each party paid -- 25 percent
21 investment was $2,100,000.
22     Seavey put up that amount. I put up
23 that amount. And I know Seavey thought I
24 wouldn't have the money, but I did have it.
25     Q.    Are you sure you're not confusing

115

John Edmonds
1
2  that with Charles Hill Associates?
3      A.    The Church Home? Yes, I am
4  confusing that -- I am. I'm talking about
5  Charles Hill, yes.
6      Q.    So Charles Hill -- you do not own
7  25 percent of Church Home Associates; is that
8  correct?
9      A.    I don't think either of the managing
10 general partners do.
11     Q.    So your last testimony about the
12 25 percent and 25 percent and then the limited
13 owning the remainder, that was with regards to
14 Charles Hill and not Church Home?
15     A.    That's correct, that's correct, not
16 Church Home.
17     Q.    So my question with regard to the
18 audit fee of Church Homes, are you contesting the
19 actual audit services received or just that you
20 believe that there was a 17,769 overpayment other
21 than what was due under the contract?
22     A.    I'm contesting the process used by
23 the Seaveys to pay obligations of theirs of a
24 management company, and the business of using
25 fees that belong to the partnership to pay for

116

John Edmonds
1
2  these services.
3      Q.    And so --
4      MR. HAYWOODE: My objection, for the
5  record, the statement you just read,
6  Darren, says audit expense for 2006
7  exceeded the contracted amount of 17,769,
8  plus 2,000 accrued to be paid in a
9  subsequent period. That was the full
10 statement. You asked him about the 17,000,
11 but not the 2,000.
12     MR. TRAUB: I believe that I
13 actually read the full statement into the
14 record. And my question to him had nothing
15 to do with the payment, but it had to do
16 with are you contesting the services
17 received or are you contesting the alleged
18 overpayment of those services.
19     MR. HAYWOODE: But you said 17,769.
20 You did not add the 2,000.
21 BY MR. TRAUB:
22     Q.    Mr. Edmonds, do you understand my
23 question?
24     A.    Am I contesting --
25     Q.    With regard to the issue of audit

117

John Edmonds
1
2  fee for Church Homes Associates that's discussed
3  in Item No. 4 on page 3 of Defendants' Exhibit
4  No. 4, is the issue with regard to the audit
5  services received or is the issue with respect to
6  the alleged overpayment for these audit services?
7      A.    The issue, sir, for the 20th time,
8  is the objection I have to the Seaveys'
9  management control of these -- the dollars,
10 including Church Home, that result in issuing
11 monies paid to Dalton Management that Dalton
12 Management is not entitled to.
13     Q.    Mr. Edmonds --
14     A.    I don't care -- I don't know how
15 they used the money.
16     Q.    This will go a lot faster today,
17 meaning this deposition, if you listen to the
18 question that I'm asking and you respond to that
19 question.
20     My question has to do, not with your
21 issue with regards to your lawsuit, and this is
22 to Issue No. 4 specified in this. With regards
23 to this --
24     A.    For me, Mr. Traub, it's a report of
25 the auditors. And this report only continues to

30  (Pages 114 to 117)

118

```
1              John Edmonds
2    reflect the quality of abuse that I'm talking
3    about. That's how I view it.
4         Q.    So your issue then is that you
5    believe --
6         A.    I've answered you, Mr. Traub. I
7    don't want you to give me an answer. You know,
8    I've answered your question.
9         Q.    With all due respect, Mr. Edmonds,
10   you have not, and I think that the record will
11   reflect that. But I'll move on.
12             MR. HAYWOODE: Object to it as
13        argumentative.
14   BY MR. TRAUB:
15        Q.    With regard to the salaries and
16   office expenses, which is the issue raised in
17   Number 5 at the bottom of page 3 --
18             Do you see that?
19        A.    Yes, what about it?
20        Q.    -- what discussions have you had
21   with Cameron Griffiths & Pryce regarding the
22   salaries and office expenses --
23        A.    Look, I've answered that a thousand
24   times. I've said to you that the discussions
25   are, in connection with that, the business of
```

119

```
1              John Edmonds
2    Dalton placing their employees on the payroll of
3    the partnership rather than of the management
4    company.
5         Q.    Mr. Edmonds, before you filed this
6    lawsuit and you served it as a verified complaint
7    and before you filed your affidavit in support of
8    the order to show cause, did you review all of
9    the contracts with Dalton Management?
10        A.    I've said to you earlier I could not
11   review all of the contracts because they were not
12   made available to me.
13        Q.    What about all of the contracts that
14   you attached as exhibits to your affidavit; did
15   you review all of those contracts?
16        A.    I don't remember whether I did or
17   not.
18        Q.    So you didn't check to see whether
19   or not those contracts state --
20        A.    Mr. Traub --
21        Q.    Again, Mr. Edmonds --
22        A.    I -- I want to be very plain, if I
23   can again. And that is that my objection is to
24   the process followed by the Seaveys in gaining
25   control and in -- in putting excessive monies in
```

120

```
1              John Edmonds
2    the pockets of Dalton Management Company as a
3    matter of practice.
4         Q.    And my question to you, Mr. Edmonds,
5    was, before you filed your complaint and before
6    you signed your affidavit in support of the order
7    to show cause, did you in fact review the
8    documents and contracts attached to your
9    affidavit?
10        A.    I probably did, yeah. I probably
11   would have, sure.
12        Q.    Let's just skip the formalities and
13   turn to this.
14             MR. TRAUB: Can you mark this as
15        Defendants' Exhibit No. 5.
16             (Defendants' Exhibit 5, Affidavit in
17        Support of Order to Show Cause, marked for
18        identification.)
19   BY MR. TRAUB:
20        Q.    Actually, let me take that back for
21   one second and get you a clean copy.
22             MR. TRAUB: Can we take a
23        five-minute break? Let's break for lunch
24        now. This would be a good time. It's
25        almost one o'clock.
```

121

```
1              John Edmonds
2             MR. KELLY: Is that okay with
3        everybody?
4             MR. TRAUB: Why don't we come back
5        at two o'clock.
6             THE WITNESS: How long do you expect
7        to go today?
8             (Luncheon recess from the record.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

31 (Pages 118 to 121)





122

John Edmonds
1
2   A F T E R N O O N   S E S S I O N
3   (1:51 p.m.)
4   JOHN EDMONDS,
5       having been previously sworn, resumed the
6       stand and testified further as follows:
7   EXAMINATION (Cont'd.)
8   BY MR. TRAUB:
9       Q.    Mr. Edmonds, before we move on,
10  Defendants' Exhibit No. 4, which is the
11  investigative report as of 12/12/2007 from
12  Cameron Griffiths & Pryce, is this the report
13  that forms the basis for your complaint with
14  respect to inaccuracies in the auditing of the
15  partnerships' books and records?
16      A.    I think that it will be necessary
17  for these accountants to do the investigation
18  that I have retained them to do in order that we
19  can go forward with proof of our case.
20      Q.    But for the actual monies and
21  statements made in your complaint, other than for
22  difficulties to get documents, which you stated
23  earlier, it's Defendants' Exhibit No. 4 that
24  makes up the basis for those -- or contains all
25  Cameron Griffiths & Pryce's findings to date?

123

1           John Edmonds
2       A.    I don't know whether that's accurate
3   or not. At least as of the time when they gave
4   me this report, this was -- this was how far they
5   had been able to go.
6       Q.    And as of the time that your
7   complaint was written, this is all you had
8   received from the auditors; is that correct?
9           MR. HAYWOODE: I'm going to object
10  to the form. There are a series of letters
11  here. Counsel has seen them. They predate
12  this report. All of those came to the
13  client, obviously.
14          MR. TRAUB: Mel, Number 1, if that's
15  the case, he can answer to that extent. I
16  don't need you telling him what my question
17  means. And there's nothing inappropriate
18  about my question if there are such
19  letters.
20      Q.    So Mr. Edmonds, other than the
21  letters requesting other documents, is this the
22  statement that makes up the basis for your
23  complaint?
24      A.    I've told you earlier that --
25          MR. HAYWOODE: Objection to form,

124

1           John Edmonds
2       A.    -- that the basis for my complaint
3   is the conduct of the Seaveys and their
4   management company in connection with the
5   management of these four properties.
6       Q.    And what you stated earlier was that
7   that conduct, as you understand it, is to be that
8   they paid Dalton employees directly from the
9   partnerships?
10      A.    That's one of the -- one of the
11  basis for the complaint.
12      Q.    What are the others?
13      A.    I cannot be specific about that
14  because the accountants are continuing their
15  investigation --
16      Q.    But as of the date of the
17  complaint --
18          MR. HAYWOODE: Darren --
19          Were continuing their investigation.
20      A.    -- and I expect that they will find
21  a series of defalcations and abuses that would be
22  the basis for proceeding with respect to this
23  matter.
24      Q.    As of the date that you filed the
25  complaint, had they notified you of any

125

1           John Edmonds
2   defalcations they had found?
3       A.    I believe we retained them --
4   when --
5           THE WITNESS: After we filed the
6   complaint, isn't that correct?
7           MR. HAYWOODE: (Nods head in the
8   negative.)
9       Q.    Other than turning to your counsel,
10  let me try --
11          MR. HAYWOODE: I don't know why he's
12  looking at me, because he may not know when
13  the complaint was filed. He didn't file
14  it. Perhaps you could tell him the dates.
15          MR. TRAUB: And I will --
16          MR. HAYWOODE: We know they were
17  retained in March.
18          MR. TRAUB: The complaint was filed
19  on June 23, 2008.
20          MR. HAYWOODE: Okay.
21      A.    They had been retained prior to
22  that.
23      Q.    So at the time of June 23, 2008, had
24  they told you of any defalcations that they had
25  uncovered?

VERITEXT REPORTING COMPANY
www.veritext.com
(212) 279-9424                                    (212) 490-3430



126

John Edmonds

2    A.    I've indicated to you that -- that
3    this --
4    Q.    "This," you mean Defendants' Exhibit
5    No. 4?
6    A.    Yes, this report was what they --
7    they had found for the year 2006.
8    Q.    And so that report for what they
9    found for the year 2006 formed the basis for your
10   complaint as of June 23, 2008?
11          MR. HAYWOODE:  My objection is that
12   the complaint will speak for itself.
13          The witness may answer.
14   A.    The answer is that -- that the
15   complaint was filed as a result of my decision to
16   go forward with this -- this action in view of
17   the kind of responses that I was getting from the
18   Seaveys.
19          MR. TRAUB:  Can I mark this as
20   Defendants' Exhibit No. 6.
21          (Defendants' Exhibit 6, Verified
22   Complaint, marked for identification.)
23   BY MR. TRAUB:
24   Q.    I'm also handing you what's been
25   marked as Defendants' Exhibit No. 5 and 6.

127

John Edmonds

2          MR. HAYWOODE:  I was wondering where
3    5 was.  Okay.  5, Darren, is --
4          MR. TRAUB:  It's marked --
5          MR. HAYWOODE:  Oh, I'm sorry.
6          MR. TRAUB:  I made a --
7          MR. HAYWOODE:  Okay.
8    Q.    Mr. Edmonds, if you turn with me
9    first to Defendants' Exhibit No. 6, and that's
10   the complaint.  And if you turn to the
11   second-to-last page in Defendants' Exhibit
12   No. 6 --
13   A.    Page numbered what?
14   Q.    It actually is unnumbered.  It comes
15   out to page 48.  You just had your hand on it.
16   It has your signature, or what appears to be your
17   signature.  The next page.  The next page.
18          MR. HAYWOODE:  The other way.
19   A.    Yeah, uh-huh.
20   Q.    Mr. Edmonds, is that in fact your
21   signature?
22   A.    Yes, it is.
23   Q.    And can you read the paragraph that
24   your signature is attesting to.
25   A.    "I, John L. Edmonds, have read the

128

John Edmonds

2    foregoing summons and complaint and know the
3    contents thereof and the same is true to my own
4    knowledge except as to matters therein stated to
5    be true on information and belief.  And as to
6    those matters, I believe it to be true."
7    Q.    Before you signed this verification,
8    did you read through the verified complaint?
9    A.    Yes, I did.
10   Q.    And did you agree with all of the
11   statements in the verified complaint?
12   A.    My counsel prepared the complaint.
13   I obviously agreed with them because I signed the
14   complaint.
15   Q.    If you turn with me to page 18 and
16   you look at the second paragraph in 18, the one
17   that says "Over a period of one year."
18          Do you see where I'm looking?
19   A.    Yes.
20   Q.    It says, "Over a period of one year
21   in which plaintiff's auditors attempted to review
22   the accounts for business tax year 2006, Dalton
23   was unable to supply fundamental support
24   information for the revenues or expenditures of
25   that year from the information contained in its

129

John Edmonds

2    general ledgers.
3          "Plaintiff's auditors found Dalton
4    Management and Marks Paneth & Shron's financial
5    records for the housing developments disclosed an
6    approximately $4 million discrepancy between
7    claimed expenses and any documented support from
8    which those figures could be verified in 2006."
9          Do you agree with that statement?
10   A.    Yes, I do.
11   Q.    And where are you getting the basis
12   for your --
13          MR. HAYWOODE:  Again, my objection
14   is, your question to him does he agree with
15   it -- this is received information.  You
16   know --
17          MR. TRAUB:  Mel, he verified this in
18   a complaint.
19          MR. HAYWOODE:  Well, to the extent
20   that that verification --
21   BY MR. TRAUB:
22   Q.    Mr. Edmonds --
23          MR. HAYWOODE:  -- is not
24   exhaustive --
25   A.    No, sir, I did not ever sign at any

130

1          John Edmonds
2   time a false statement for anyone --
3          MR. HAYWOODE:  Knowingly.
4      A.  -- okay?
5      Q.  Thank you.
6          So what is the basis for your
7   signing a verified complaint that states that
8   your auditors disclose an approximately
9   $4 million discrepancy between the claimed
10  expenses and any document supported from which
11  these figures could be verified in 2006?
12     A.   The basis for that statement would
13  be the conferences that I had with these
14  auditors.
15     Q.    Well, now, earlier when I asked you
16  about the conferences that you had with the
17  auditors, you told me that nothing was added
18  substantively than is found in Defendants'
19  Exhibit No. 4 and that those conferences had to
20  do with their -- I'm sorry, your word was
21  "difficulty" in obtaining papers.
22         MR. HAYWOODE:  Objection.
23         Not the witness' testimony as
24  characterized.
25     A.   Mr. Traub, let me tell you this --

131

1          John Edmonds
2      Q.   It's Traub with an R.
3      A.   Traub.
4      Q.   Yes.
5      A.   Mr. Traub, let me tell you this:  I
6   signed this complaint.  I believe it to be true
7   and that's the reason I signed it.  All right?
8          Now, if you're asking me did you
9   check this, did you check that, did you do this,
10  did you look at that, did you check this, the
11  answer is no.  I used what information I had and
12  signed the complaint or this affidavit as -- as
13  set forth in the complaint.
14     Q.    Did your auditors orally tell you
15  that they found $4 million of --
16     A.   I answered that question -- I've
17  answered that question for you a thousand times.
18     Q.    But my question specifically,
19  Mr. Edmonds, which has never been asked today,
20  was, did your --
21     A.   That's not true.  It was asked
22  earlier.  That same question was asked earlier.
23     Q.    The record will reflect what the
24  record reflects.  And that's incorrect.
25         My question for you --

132

1          John Edmonds
2          MR. HAYWOODE:  Darren, I recall
3   specifically giving you a document at the
4   deposition of William Jennings --
5          MR. TRAUB:  Mel, your statements --
6          MR. HAYWOODE:  -- which had this
7   information in it, which talked about it
8   and set up in categories the amount of
9   money.
10         MR. TRAUB:  Mel --
11         MR. HAYWOODE:  Now, again, that's
12  why I'm objecting to the form of these
13  questions --
14         MR. TRAUB:  But, Mel --
15         MR. HAYWOODE:  -- because you're
16  trying it to what he said or may have said
17  orally, but there are papers you have which
18  show it isn't so.
19         MR. TRAUB:  And the papers that you
20  gave us at Bill Jennings' deposition is
21  Exhibit No. 4; is that correct?
22         MR. HAYWOODE:  I have no
23  recollection as we sit here what number it
24  was, but I do remember the document as
25  vividly as if it were before me.  And it

133

1          John Edmonds
2   talked about an impact risk analysis or
3   something like that, and it talked about
4   the discrepancies that you're asking him
5   about.
6          MR. TRAUB:  Can I finish asking the
7   witness questions?
8          MR. HAYWOODE:  My objection to the
9   form of the question.  It mischaracterizes,
10  obviously, the documents that you have.
11         MR. TRAUB:  Let me ask my question
12  again, Mel.  I want you to listen to it
13  this time as well, because it has nothing
14  to do with documents.
15         MR. HAYWOODE:  Okay.  Go ahead.
16  BY MR. TRAUB:
17     Q.    My question Mr. Edmonds, is, did
18  Cameron Griffiths & Pryce orally ever tell you
19  that they found a $4 million discrepancy when
20  reviewing the partnerships' books and records in
21  2006?
22     A.    They told me as they approach an
23  analysis of the problems, it would come to
24  approximately that amount of money.
25     Q.    They did tell you that?

34  (Pages 130 to 133)



134

John Edmonds

1
2     A.    I believe they did, yes.
3     Q.    And which of the accountants told
4   you that?
5     A.    I don't remember. I've never had a
6   meeting with an individual accountant. I've had
7   meetings with the team.
8     Q.    When you turn to page 47 of your
9   verified complaint and you look at paragraph G,
10  which comprises part of your prayer for relief in
11  this action, you state that you were praying "for
12  a judgment against the defendants for money
13  damages in an amount not yet determined as such
14  damages are increasing, but in no event less than
15  $500 million, together with costs and attorneys'
16  fees and such other further relief as this court
17  deems proper."
18    A.    That's correct.
19    Q.    Now, what is --
20    A.    I base that statement --
21          MR. HAYWOODE:  Had you finished your
22  question?
23          MR. TRAUB:  Yes. He was answering
24  the question.
25          MR. HAYWOODE:  Okay.

135

John Edmonds

1
2     A.    What I believe to be the value of
3   the four projects as of that time.
4     Q.    Has the four projects -- it's your
5   contention that the four projects have been
6   wholly taken from you by the defendants?
7     A.    Yes.
8     Q.    I'd like you to turn with me now to
9   your affidavit, which is Defendants' Exhibit
10  No. 5. And I'll start off by asking you, if you
11  look at page 27 --
12    A.    Page 24 -- yes.
13    Q.    Do you recognize that signature?
14    A.    Yes, I do.
15    Q.    Whose signature is that?
16    A.    It's my signature.
17    Q.    Did you read this entire affidavit
18  before --
19    A.    Yes, I did.
20    Q.    Did you actually write this
21  affidavit?
22    A.    No, I did not prepare the affidavit.
23    Q.    But you thoroughly reviewed the
24  affidavit?
25    A.    I reviewed the affidavit.

136

John Edmonds

1
2     Q.    Did you review every sentence in the
3   affidavit before you signed it?
4     A.    I read the affidavit. I don't know
5   whether I reviewed every sentence, but I agreed
6   with my allegations in that affidavit.
7     Q.    Before signing the affidavit, did
8   you do any independent verification of the
9   information contained in your affidavit?
10    A.    What independent verification could
11  I do? They have all of the books and records.
12    Q.    For instance, did you read all of
13  the contracts specified and referred to in your
14  affidavit?
15    A.    I could not read all of them. I --
16          MR. HAYWOODE:  Objection.
17          Unless counsel states a time. He
18  may have read some of these things 20 years
19  ago. I don't know. You're saying did he
20  read them, what, before signing that
21  document?  Is that your question?
22          MR. TRAUB:  Yes.
23          MR. HAYWOODE:  Did he read it at the
24  time?
25

137

John Edmonds

1
2   BY MR. TRAUB:
3     Q.    Before signing your document --
4          MR. HAYWOODE:  No, "before" means at
5   any time before --
6          MR. TRAUB:  Let me --
7          MR. HAYWOODE:  -- in the last 20
8   years.
9          MR. TRAUB:  No, you have got to let
10  me finish my statement.
11          MR. HAYWOODE:  Go ahead.
12    Q.    Before signing your affidavit, did
13  you do any independent verification of the
14  language contained in here, such as reading an
15  entire agreement that's referred to in your
16  document, to determine whether or not the
17  language contained in your affidavit is in fact
18  reflected in that document?
19    A.    And I'll --
20          MR. HAYWOODE:  Objection to form.
21          The witness can answer if he
22  understands the question.
23    A.    I will answer in the same way that I
24  answered earlier, and that is that I reviewed the
25  affidavit. And on the basis of my review of the

35 (Pages 134 to 137)



**138**

John Edmonds

1
2  affidavit and the information that was flowing to
3  me, I believe the complaint to be accurate and,
4  on that basis, I signed it.
5      Q.   If you turn with me to page 23, and
6  specifically looking at paragraph No. 32.
7      Will you read the first sentence for
8  the record, please.
9      A.   I said, "Defendant Dalton has
10  refused to produce" --
11      Q.   No, page 23, paragraph 32.
12      A.   Paragraph 32.
13      "There's no provision in the
14  management agreements between defendant Dalton
15  and the partnerships to pay the salaries of
16  defendant Dalton's employees, including defendant
17  Dawley, who was paid $140,000 in 2006 from the
18  partnerships' rent revenues.  In fact, the
19  management agreement" --
20      Q.   Let's stop, just with the first
21  sentence.  And you cite to an Exhibit Q; is that
22  correct?
23      A.   Yeah.
24      Q.   Okay.  Now, when you turn to -- I
25  apologize.

**139**

John Edmonds

1
2      Let's start this way:  The
3  management agreement that you're testifying to
4  you've attached as Exhibit G.  Can you turn with
5  me to Exhibit G?
6      A.   Where is it?  What page?
7      MR. HAYWOODE:  It's in the back
8  (indicating).
9      (Pause from the record.)
10      Q.   Exhibit G is a housing management
11  agreement dated January 3, 2000.  This one is for
12  Church Home Associates.
13      (Witness peruses the exhibit.)
14      Q.   Mr. Edmonds, am I to understand from
15  your testimony earlier that you didn't fully read
16  through this housing management agreement at the
17  time that you signed the affidavit?  Is that
18  correct?
19      MR. HAYWOODE:  Objection.  That is
20  not the witness' testimony.
21      A.   I said I read it fully, I understood
22  it, I discussed it with my counsel, and it's my
23  testimony that the allegations are correct and
24  truthful.
25      Q.   Okay.  If you'd turn with me -- if

**140**

John Edmonds

1
2  you keep your finger there and you flip back to
3  Exhibit -- I'm sorry, page 23, paragraph 32, I
4  don't want you to lose the Exhibit G.
5      A.   Page 23?
6      Q.   Uh-huh.  Again, paragraph 32.
7      A.   Yeah.
8      Q.   You reference paragraph 161 of the
9  Church Home Associates' management agreement.  Do
10  you see where I'm looking?
11      A.   I said, "See Exhibit Q," according
12  to --
13      Q.   No, keep going.
14      A.   Records and reports.
15      Q.   You say, "In fact, the management
16  agreements between defendant Dalton and the
17  partnerships provide," then it has "records and
18  reports," and then you cite to --
19      A.   "Including but not limited to the
20  cost of office supplies and" -- "will be borne by
21  the agent out of his own funds and will not be
22  treated as project expenses."
23      Q.   So you're referring to paragraph 161
24  of Exhibit G; is that correct?
25      A.   Yes.

**141**

John Edmonds

1
2      Q.   Now, can you read the very first
3  clause of Exhibit I, how it begins, please.
4      A.   Begins what, records and reports?
5      Q.   Where it says, "Except" --
6      A.   "Except as otherwise provided in
7  this agreement."
8      Q.   Let me ask you a question.
9      Before you signed your affidavit,
10  did you look to determine if there was any other
11  language in this agreement that related to
12  payment of salaries of defendant Dalton's
13  employees?
14      A.   I went through this agreement.  I
15  believe it to be true.  And I used that
16  information and the information that I was
17  receiving from the accountants.
18      Q.   Okay.  If you can now turn back to
19  Exhibit --
20      A.   No -- we're not going to get
21  anywhere with this -- this case is not going to
22  turn on the basis of whether I remembered line 2
23  of page 3.  It's not going to turn on that basis.
24      Q.   Mr. Edmonds, do me a favor --
25      MR. HAYWOODE:  Unfortunately there

**VERITEXT REPORTING COMPANY**
www.veritext.com
(212) 279-9424                    (212) 490-3430



142

John Edmonds

1  are other judges -- I forgot what I was
2  going to say.
3          MR. TRAUB: There's no question
4  pending, so there's no objection for you to
5  be making right now.
6          MR. HAYWOODE: My objection to your
7  last question, because you're referring to
8  another section of the contract and asking
9  him if he read the other section of the
10 contract.
11         And my objection is, there's no
12 foundation that whatever other section
13 you're referring to says something
14 different from what he's reading there.
15         MR. TRAUB: Mel, this is --
16         MR. HAYWOODE: Lay the foundation
17 and then he can answer the question.
18         MR. TRAUB: Mel, when you read the
19 transcript, you'll see I didn't ask him if
20 he read a specific section. I asked him if
21 he read through any agreement to make sure
22 that no other section --
23         MR. HAYWOODE: So you're saying any
24 other agreement anywhere?

143

John Edmonds

1          MR. TRAUB: My question was, did he
2  read through this agreement -- it says,
3  "Except as otherwise provided in this
4  agreement."
5          My question was, did he read through
6  that agreement to make sure there was no
7  other section that related to his
8  statements in paragraph 32.
9          MR. HAYWOODE: And his answer --
10         MR. TRAUB: And his --
11         MR. HAYWOODE: -- was, I went
12 through it.
13         MR. TRAUB: His answer was, I went
14 through it, correct.
15 BY MR. TRAUB:
16 Q.   Now, I'm asking you, please, to turn
17 back to Exhibit G.
18 A.   What page is Exhibit G?
19 Q.   It's one where you should be holding
20 your finger on.
21         THE WITNESS: Is this G?
22         MR. HAYWOODE: Yes.
23 Q.   And specifically if you'll turn with
24 me to page 5 of Exhibit G.

144

John Edmonds

1          MR. HAYWOODE: Is there any
2  particular spot, Darren, on page 5 that you
3  want him to look at?
4          MR. TRAUB: Let's look at 13B.
5  A.   Page 5, 13D?
6  Q.   B as in boy.
7  A.   B?
8  Q.   Uh-huh.
9  A.   It begins by reading, "The owner
10 will reimburse the agent for compensation
11 including fringe benefits payable to frontline
12 management employees, such as a project manager,
13 clerical and bookkeeping personnel and the
14 maintenance employees, resident superintendents
15 and the social services director, where
16 applicable, and for all security, taxes,
17 employment insurance and Workmen's Compensation
18 insurance."
19 Q.   I think you skipped a part. It
20 says, "All local state and federal taxes and
21 assessments."
22         MR. HAYWOODE: I don't -- well --
23 A.   And for all local, state and federal
24 taxes and assessments, yes.

145

John Edmonds

1  Q.   And then it continues. You can
2  continue, please.
3  A.   "Such reimbursements will be paid
4  out of the rental agency's account and will be
5  treated as project expenses. For this purpose,
6  the rental value of any dwelling unit furnished
7  rent-free to the resident superintendent will not
8  be considered a part of his compensation, but
9  will be treated as a project expense."
10 Q.   And Mr. Edmonds, had you read this
11 paragraph before you signed --
12 A.   Yes, I did.
13 Q.   -- the affidavit --
14 A.   Yes, I did. I'll repeat. I read
15 all of the paragraphs. I read with the
16 assertions I've made here.
17 Q.   Paragraph 13B, though, specifically
18 states that "The owner," which is the project
19 owner, in this case I believe it's Church Homes
20 because that's this management agreement, "will
21 pay out of their rental agency account for
22 compensation" --
23 A.   That was an agreement --
24 Q.   Hold on, Mr. Edmonds. Let me finish



146

John Edmonds

1  John Edmonds
2  my statement. You're interrupting.
3  -- "for compensation payable to
4  frontline management employees."
5  That seems to state that the owner
6  will pay for, directly out of his rental agency
7  account, the salary of Dalton's employees, does
8  it not?
9  MR. HAYWOODE: Objection.
10  There's no foundation in what you
11  just read for the question that you just
12  put.
13  BY MR. TRAUB:
14  Q. Mr. Edmonds, does it not?
15  A. Yes. And that's -- that -- this
16  citation reflects for me and the reason it's
17  cited here is the quality of abuse that the
18  Seaveys have -- have done in this case. If they
19  made the arrangement to do this, then that
20  arrangement must have been made with his nephew.
21  Q. Okay. If you'll turn with me --
22  MR. HAYWOODE: For the record,
23  Darren, are you saying that 13B says
24  something different from the first
25  paragraph?

147

1  John Edmonds
2  MR. TRAUB: Mel, I'm not
3  responding -- again, I'm not here for a
4  deposition. And there's no question
5  pending on the table, Mel.
6  MR. HAYWOODE: Well, the question
7  presupposes that there's some difference --
8  MR. TRAUB: Mel.
9  MR. HAYWOODE: -- between the two
10  paragraphs.
11  MR. TRAUB: What you're doing right
12  now is inappropriate.
13  MR. HAYWOODE: Note my objection to
14  form.
15  MR. TRAUB: The question was asked
16  and it was answered. There was no question
17  pending for you to object to. Once again,
18  Mel, your objection is inappropriate under
19  the federal rules, and I need you to please
20  conduct yourself in accordance with those.
21  MR. HAYWOODE: Again, my objection
22  for the record is as to form.
23  MR. TRAUB: That's it.
24  MR. HAYWOODE: The question
25  presupposes a different between the two --

148

John Edmonds

1  John Edmonds
2  MR. TRAUB: No, you're entitled to
3  make objection to form, period. You're not
4  entitled to make an argument or a
5  suggestion. And if you continue doing
6  this, Mel, if you continue acting like
7  this, we're going to have to involve the
8  court. Because this is not appropriate
9  under the federal rules.
10  MR. HAYWOODE: Once again, I made no
11  argument for the record. I made no legal
12  argument. I simply pointed out where the
13  form objection lies; that's it.
14  MR. TRAUB: I'll cite you one more
15  time, "An objection must be stated
16  concisely, in a nonargumentative and
17  nonsuggestive manner."
18  There's nothing in there about legal
19  or anything. Your objection is both
20  argumentative and suggestive and,
21  therefore, opposite to what is provided in
22  the federal rules.
23  So I don't need a response from you.
24  There's no question pending to Mr. Edmonds,
25  and that's who my questions are going to

149

1  John Edmonds
2  today.
3  BY MR. TRAUB:
4  Q. Mr. Edmonds, if you'll turn with me
5  to paragraph 2 -- I'm sorry, page 2, paragraph 3
6  of your affidavit, which is Exhibit No. 5.
7  Do you see where I'm looking?
8  A. Yes.
9  Q. You state that "Since May 16, 2007,
10  more than one year ago, defendant Dalton and the
11  other defendants named herein have repeatedly,
12  persistently and without explanation or cause
13  refused to produce to plaintiff and his auditors
14  the financial records in their possession in
15  connection with defendant Dalton's management and
16  operation of the partnerships' housing
17  developments named herein in which plaintiff is a
18  managing general partner and has substantial
19  financial interest and ownership in these
20  properties."
21  Do you see where I'm reading?
22  A. Yes.
23  Q. Isn't it true, though, that your
24  auditors were at defendant Dalton for almost six
25  months obtaining and reviewing records and

38 (Pages 146 to 149)

150

John Edmonds

1
2 documents?
3         MR. HAYWOODE: Objection to the form
4 as to what is meant by at the auditors for
5 almost six months.
6         MR. TRAUB: At Dalton.
7         MR. HAYWOODE: At them for six
8 months? Did they reside with them? I
9 mean, I don't know.
10        MR. TRAUB: Mel, your objection --
11        MR. HAYWOODE: That's my objection
12 as to form.
13        MR. TRAUB: Thank you.
14        MR. HAYWOODE: What does that
15 question mean?
16        MR. TRAUB: You're entitled to say
17 objection to form; that's it.
18    A.   I answered that question before for
19 you, too, and I'll answer it again.
20         I said that the auditors reported to
21 me orally that they were having a very, very
22 difficult time getting books and records that
23 they require to do their audit from Dalton
24 Management, and that Dalton Management had a
25 setup that impeded or blocked that information.

151

John Edmonds

1
2         And that setup was that Nealle would
3 sit there at the table. And when they would ask
4 for A, B or C, she would indicate whether it was
5 available or not. And if it were not available,
6 and they insisted upon it, she would then turn to
7 her mother, Phyllis, and Phyllis would then make
8 a decision. And that decision was that, Look,
9 this is all you're going to get from us.
10    Q.   But you'll agree that they did get
11 something, didn't they?
12        MR. HAYWOODE: Objection.
13    A.   Yeah, I guess they got something
14 because they -- for one year, for 2006.
15    Q.   They certainly made enough -- got
16 enough books and documents to write their report
17 that's Defendants' Exhibit No. 4; is that
18 correct?
19    A.   A report that reflects that
20 experience for the year of 2006, examination of
21 the records for the year of 2006.
22         Are you suggesting, sir --
23        MR. TRAUB: Let's mark this as
24 Defendants' Exhibit No. 7, please.
25

152

John Edmonds

1
2         (Defendants' Exhibit 7, 6/22/07
3 Letter to variety of people from John
4 Edmonds with attachments, marked for
5 identification.)
6 BY MR. TRAUB:
7    Q.   Mr. Edmonds, do you recognize
8 Defendants' Exhibit No. 7?
9    A.   Yes, I do.
10   Q.   Is this a letter that you sent on
11 June 22, 2007?
12   A.   That's correct.
13   Q.   Will you please read the last
14 paragraph on the first page.
15   A.   "I have been informed by my
16 accountants, who I have directed to examine the
17 books and records of all of the developments that
18 Edmonds and Seavey or the Edmonds and Seavey organization
19 have an interest in, that every effort to
20 frustrate the examination of the books and
21 records are being made.
22         "Books and records not available due
23 to vacation of an employee and/or books and
24 records available only at the site on Saturday.
25 This will not deter my efforts herewith."

153

John Edmonds

1
2    Q.   And then you continue and you
3 threaten -- you state -- I apologize. You state
4 that the examination is necessary to support the
5 RICO lawsuit which you're proposing to file; is
6 that correct?
7    A.   That's correct.
8    Q.   And in fact, you threaten that you
9 will -- if you don't get the documents, that you
10 will call the office of the U.S. Attorney to
11 request that their office direct the IRS to
12 conduct an investigation; is that correct?
13   A.   That's correct.
14        MR. HAYWOODE: I'm sorry. May I
15 interrupt you for just a moment? You had
16 graciously said that we might do the
17 deposition here Monday, rather than at the
18 court?
19        MR. TRAUB: Yes.
20        MR. HAYWOODE: So that perhaps we'll
21 do it that way for the benefit of the
22 witnesses so they don't wind up going --
23        MR. TRAUB: Okay.
24        MR. HAYWOODE: Please go ahead.
25        MR. TRAUB: Remind me at the end so



154

John Edmonds

1
2    we can book an appropriate conference room.
3        A.    Yes, I made that statement because I
4    knew that -- that the Internal Revenue Service
5    previously investigated Seaveys' tax filings.
6        Q.    Do you know what the outcome of that
7    investigation was?
8        A.    Yeah, they -- they noticed Seavey
9    that they would not proceed, but that he would be
10   required to notice everyone with an interest in
11   the partnership that -- that they had looked at
12   his books and records.
13           So for me, it would have meant that
14   maybe his accountants were smart enough or
15   experienced enough or had enough influence in the
16   IRS to permit Seavey to escape.
17       Q.    So you think that the Seaveys'
18   accountants had some influence over the IRS that
19   allowed them to escape?
20       A.    Well, yeah. I think, obviously, the
21   accountants or Seavey had that quality of
22   influence.
23       Q.    Okay.
24           MR. HAYWOODE: Once again, Darren --
25           MR. TRAUB: Could you mark this as --

155

John Edmonds

1
2    Exhibit 8.
3           MR. HAYWOODE: Your phone number.
4           MR. TRAUB: (212) 592-1578.
5           (Defendants' Exhibit 8, 10/26/06
6    Letter from the IRS to Jennings with
7    attachment, marked for identification.)
8           MR. TRAUB: This will be Exhibit 8.
9           MR. HAYWOODE: This is 8.
10   BY MR. TRAUB:
11       Q.    Mr. Edmonds, I've given you what's
12   marked as Defendants' Exhibit No. 8. Have you
13   seen this document before?
14       A.    I don't remember seeing it, no.
15       Q.    This document at least purports to
16   be a letter dated October 26, 2006, from the IRS.
17   Do you see that? And the very first line says,
18   "I've completed the examination of your return
19   for the year shown above" -- and the tax year
20   shown above is December 31, 2003 -- "and I am
21   pleased to inform you I'm proposing no change to
22   your tax return."
23           And so is it your testimony that you
24   believe that this letter was obtained by
25   influence?

156

John Edmonds

1
2        A.    First of all, it doesn't -- it
3    doesn't mention Seavey at all, this letter
4    doesn't.
5        Q.    If you look at the re line, it's
6    Fifth and 106th Associates, is it not?
7        A.    Yes.
8        Q.    So is it your testimony about the
9    IRS -- it was your understanding that the IRS did
10   an audit, but -- so is it your testimony then
11   that it's this letter that was procured by the
12   influence of Marks Paneth & Shron over the IRS?
13       A.    Yeah. I believe so, yes. I believe
14   that -- that Marks Paneth & Shron have that kind
15   of relationship. They're a firm that's, what, 40
16   or 50 years old, and they deal with the Internal
17   Revenue Services all the time. And you know,
18   they -- you identify, you know, who you can deal
19   with.
20       Q.    And going back --
21       A.    But I mean, the issue is whether or
22   not they required Seavey to give notice to all of
23   the interested parties in the partnerships. You
24   have that letter?
25       Q.    Give notice of what, Mr. Edmonds?

157

John Edmonds

1
2        A.    Notice of the fact that his -- that
3    the 2003 return for Fifth and 106th Street
4    Associates had been -- had been reviewed by the
5    IRS and a decision had been made to accept the
6    return.
7        Q.    So is it --
8        A.    Accept the return, but that Seavey
9    would be required -- and that's what he said in
10   his letter -- be required to notice all of the
11   parties interested in the partnerships of that
12   fact.
13       Q.    Where in Defendants' Exhibit No. 8
14   does it state that the IRS is compelling
15   Mr. Seavey to give notice?
16       A.    It does not -- it does not in any
17   way state -- make that statement; but I do know
18   that Seavey sent a letter and said in his letter
19   that the government -- in response to the IRS
20   review of the -- of the return for Fifth and
21   106th Street Associates requires that I notice
22   you of the fact that the return had been
23   investigated.
24       Q.    So you did in fact then get notice
25   that the return had been investigated?

158

John Edmonds

2   A.   Yeah, from Seavey.
3   Q.   Okay.  Going back --
4   A.   You --
5   Q.   Going back --
6   A.   Do you agree with that, that Seavey
7   sent such a notice out?
8   Q.   Mr. Edmonds, going back to
9   Defendants' Exhibit No. 7 --
10  A.   Go ahead.
11  Q.   The great part, Mr. Edmonds, about
12  you being the plaintiff and me being the attorney
13  is that I get to take the --
14  A.   You're back to --
15  Q.   Back to Defendants' Exhibit No. 7.
16  And looking again at the bottom paragraph, you
17  state that "Edmonds and Seavey, or the Seavey
18  organization" -- they're frustrating your
19  auditors' examination because of vacation of an
20  employee and books and records available only at
21  the site on Saturday; is that correct?
22  A.   That's what I was told.
23  Q.   Did you ever inform the Seaveys in
24  writing that Nealle and Phyllis Seavey were not
25  providing all of the documents to your

159

John Edmonds

2   accountants?
3   A.   I believe I did.  It may have been
4   an oral notification, but I think I probably sent
5   them a letter.
6   Q.   Okay.
7   A.   This had to do with -- this letter
8   had to do with the alleged interest of Abe
9   Mordowitz, a lawyer, in his effort to purchase
10  the property of Fifth and 106th Street, at
11  106th and Fifth Avenue.
12       We went to a closing.  Bob was at
13  the closing.  We were going through the
14  contract -- and in fact, the contract might have
15  been signed.  I think we did sign some
16  documents -- and then Bob's son-in-law, who was
17  there representing the Seaveys, said, "Let's
18  review this again," et cetera.
19       And at this point, Seavey then got
20  up and said that he had to leave because he had
21  not eaten and that his diabetes was beginning to
22  bother him and he felt very faint.  So he left.
23       Subsequent to that, I got a series
24  of calls from Abe Mordowitz, who said to me that
25  he had deposited with Seavey $3.8 million and

160

John Edmonds

2   that he could bring a lawsuit to force the sale.
3        And I said, Well, you know, that's
4   up to you.
5        Then subsequent to that, on an
6   occasion that I was down in Florida, I got about
7   ten calls from Abe Mordowitz indicating that he
8   was going to proceed in this lawsuit.  He never
9   did.
10       And my conclusion was that Abe
11  Mordowitz was never a legitimate purchaser, but a
12  front man for Bob Seavey in connection with the
13  ownership of that property.
14       I want to repeat for you that that
15  property is the most valuable piece of property
16  of the partnerships; that I had been told that
17  the property could add an additional 100 units on
18  the Fifth Avenue side because it was underzoned
19  when built.
20       MR. TRAUB:  I'm going to move to
21  strike all of that as nonresponsive to my
22  question.
23  BY MR. TRAUB:
24  Q.   Mr. Edmonds, if you turn back with
25  me to Defendants' Exhibit No. 5, page 3, turn

161

John Edmonds

2   with me to Paragraph No. 5.
3   A.   Paragraph Number 5 in what?
4   Q.   Defendants' Exhibit No. 5, your
5   affidavit.
6   A.   Where?
7   Q.   Right in the middle of that
8   paragraph, there's a sentence that begins,
9   "However, their attempt to audit the 2006
10  financial records of defendant Dalton."
11       MR. HAYWOODE:  I'm sorry, Darren.
12  Where is this?
13       MR. TRAUB:  Page 3, paragraph 5.
14       THE WITNESS:  He keeps going back to
15  that same --
16       MR. HAYWOODE:  Must be a pony in
17  there somewhere.
18  Q.   You could probably rest assured that
19  you can keep that on your knee for quite some
20  time.  We're going to go through every paragraph
21  on this page -- on this document.
22       You have in there, "However, in the
23  attempt to audit the 2006 financial records of
24  defendant Dalton, plaintiff's auditors" --
25       MR. HAYWOODE:  Paragraph 5?

41 (Pages 158 to 161)

162

1              John Edmonds
2        MR. TRAUB: Paragraph 5.
3        THE WITNESS: Yes.
4        MR. KELLY: Slow down.
5        MR. HAYWOODE: Of the what?
6        MR. TRAUB: Do you see where it says
7     "However"?
8        THE WITNESS: Yeah, here.
9        MR. HAYWOODE: You see it?
10       THE WITNESS: Yes.
11    BY MR. TRAUB:
12       Q.    "However, in their attempts to audit
13    the 2006 financial records of defendant Dalton,
14    plaintiff's auditors found no records to support
15    approximately $7,500,000 of expenses in its
16    general ledgers for its management and operation
17    fee of the partnership housing development."
18       Mr. Edmonds, what is the basis for
19    your $7,500,000 figure?
20       A.    The basis would be the reports and
21    the oral interviews that I had with -- with the
22    accountants.
23       Q.    Again, earlier today, I asked you
24    was there anything in one of the oral interviews
25    you had with the accountants that changed or

163

1              John Edmonds
2     modified or somehow amended the investigation
3     report that we've discussed earlier and that's
4     been marked as Defendants' Exhibit No. 4, and you
5     told me no.
6        A.    I repeat, then.
7        Q.    Where in Defendants' Exhibit No. 4,
8     which is the 12/12/2007 investigation report, do
9     you find the basis to support a $7,500,000
10    figure?
11       A.    The basis to support that allegation
12    is in the first sentence, "Defendants Dalton and
13    Marks Paneth & Shron's refusal to provide
14    plaintiff's auditors with the financial records
15    of the partnership housing developments have
16    caused them to be unable to complete an audit for
17    even one year of the ten years that defendant
18    Dalton has been managing and operating housing
19    developments. See Exhibit A.
20       "However, in their" --
21       Q.    That's not --
22       A.    What's that?
23       Q.    That's not what you state here.
24    What you state here is "In their attempt to
25    audit, they found no records to support

164

1              John Edmonds
2     $7,500,000 of expenses in general ledgers."
3        The question is --
4        A.    That's right.
5        Q.    -- where are you getting the
6     $7,500,000 number?
7        A.    I'll repeat, the accountants -- the
8     accountants, in oral discussions in their office,
9     gave me that information.
10       Q.    Okay.
11       MR. HAYWOODE: Let the record also
12    show documents were produced showing that
13    analysis by the accountants. I think the
14    record showed more from different analyses
15    at different dates.
16       MR. TRAUB: Mel, again, your
17    testimony is not what we're here for today.
18       MR. HAYWOODE: I'm pointing to the
19    record that you have documents in your
20    possession which would substantiate --
21       MR. TRAUB: Mel, this is my
22    deposition --
23       MR. HAYWOODE: -- what you're
24    asking.
25       MR. TRAUB: -- transcript and you

165

1              John Edmonds
2     are not entitled to make notes on it, nor
3     are you entitled to testify on it.
4        MR. HAYWOODE: The documents will
5     speak for themselves.
6     BY MR. TRAUB:
7        Q.    Mr. Edmonds, you cite for this
8     paragraph Exhibit E.
9        A.    Yeah. Where is that?
10       Q.    It's attached to your affidavit as
11    Exhibit E.
12       A.    Yes, it's Exhibit E.
13       Q.    Do you see that?
14       A.    Yeah.
15       Q.    What is Exhibit E?
16       A.    It's the -- it says, "Combined
17    financial summary for the period ended
18    December 2006."
19       Q.    Do you know who provided this
20    combined financial summary to you?
21       A.    The auditors.
22       Q.    Do you know who prepared this
23    combined financial --
24       A.    No, I do not.
25       Q.    If you turn to paragraph 6, you

42  (Pages 162 to 165)



166

```
1            John Edmonds
2    state that "The defendants are" -- and I'm
3    quoting -- "depriving plaintiff" -- being you --
4    "of this financial and ownership interest in the
5    partnerships while the defendants named herein
6    are reaping enormous and personal financial
7    gains."
8        A.    Absolutely true.
9        Q.    How are the defendants depriving you
10   of your ownership interest in the partnerships?
11       A.    By refusing my participation in the
12   decision-making of the projects and by having
13   exclusive and sole control of these projects and
14   using their management company, Dalton Management
15   Company, owned by Phyllis, to disregard any
16   requests that I make.
17       Q.    And what ownership -- withdrawn.
18             What is the basis for your statement
19   that Phyllis is the owner of Dalton Management
20   Company?
21       A.    Every time I talk to Phyllis or to
22   any of the Seaveys, including Bob, and Phyllis
23   will, in my recollection, state to me that she is
24   the owner. That's how she identifies herself, I
25   am the owner.
```

167

```
1            John Edmonds
2             Everybody else has -- has an
3    interest, but I think that the way in which the
4    Seaveys had worked it out, I think Phyllis owns
5    52 percent of the company. She doesn't call
6    herself chairman or anything. She says, I'm the
7    owner. And the other percentages are controlled
8    by Avery in a partnership called ABN -- I think
9    ABNS; Avery, Bob, Nealie Seavey.
10       Q.    Turn with me to page 6. It's
11   paragraph 12 of your affidavit.
12             MR. TRAUB:  This is going to be 9
13   and this will be 10.
14       Q.    Mr. Edmonds, in this paragraph, it
15   refers to Lakeview partnership. You state that
16   you own a 9 percent interest in the partnership
17   and you describe that interest as a managing
18   general partner; is that correct?
19       A.    I don't describe the interest as
20   managing. I say I am a managing general partner.
21   I say further, I believe, that the managing
22   general partners own 18 percent. But I've been
23   informed by Bob Seavey -- we originally I think
24   owned 7 percent each, but Bob arranged to
25   purchase from one of the relatives of the Singers
```

168

```
1            John Edmonds
2    her interest, which I think was 2 or 3 percent.
3        Q.    You say, "Plaintiff is a managing
4    general partner of the Lakeview partnership and
5    owns a 9 percent interest in that partnership."
6        A.    That's the basis upon which I made
7    that statement, is what -- the information that
8    Seavey had given me.
9        Q.    And is that what you understand
10   yourself to own and to be?
11       A.    That's correct.
12       Q.    I'm going to hand you what's been
13   marked as Defendants' Exhibit No. 9.
14             (Defendants' Exhibit 9, Agreement
15   for Purchase and Sale of Partnership
16   Interest, marked for identification.)
17       Q.    And also what's being marked as
18   Defendants' Exhibit No. 10.
19             (Defendants' Exhibit 10, Second
20   Amended Agreement of Limited Partnership of
21   Fifth and 106th Street Associates, L.P.,
22   marked for identification.)
23   BY MR. TRAUB:
24       Q.    Mr. Edmonds, Defendants' Exhibit
25   No. 9, it's an agreement for purchase and sale of
```

169

```
1            John Edmonds
2    partnership interest.
3             Have you seen this document before?
4        A.    I may have, yeah. I think I may
5    have seen it.
6        Q.    If you turn to page 5 and the
7    Exhibit A and B, do you recognize your signature?
8        A.    Yes, I do.
9        Q.    This agreement for purchase and sale
10   of partnership interest is an agreement whereby
11   you are selling your partnership interest in
12   Fifth and 106th Street to BNA Realty Company,
13   LLC; is that correct?
14       A.    Yes, Bob Seavey and --
15       Q.    If you turn to page 2, the very top
16   of page 2, it says, under little z, that "The
17   balance of Edmonds' interest in the partnership
18   (1.2 percent), which is now converted at this
19   time to a limited partnership interest, however,
20   the assignment of which shall not be effective
21   until Edmonds' death."
22             Do you see that?
23       A.    Yes.
24       Q.    Then in connection with that, a
25   second amended agreement of limited partnership
```

43 (Pages 166 to 169)



170

John Edmonds

1  John Edmonds
2  of Fifth and 106th Street Associates was signed;
3  is that correct? And that's what's been given to
4  you as Defendants' Exhibit No. 10.
5      A.   Yes. That's the agreement Bob --
6      Q.   If you look at --
7      A.   Yes, that's the agreement that Bob
8  Seavey went out to -- to Mineola and removed so
9  that there would be no record of this agreement.
10  And the reason he went to Mineola was that the
11  original partner had filed this partnership in
12  Nassau County.
13      Q.   If you turn to paragraph 3 on page 3
14  of this agreement, it states that 'Edmonds'
15  7.5 percent partnership interest is assigned,
16  transferred and conveyed to BNA so that BNA shall
17  have a 6.2 percent of said 7.5 percent interest
18  in the partnership as a general partner and
19  Edmonds shall retain and does retain 1.2 percent
20  of his former 7.5 percent partnership interest as
21  a limited partner."
22          And then on page 5, it appears to
23  have your signature; is that correct?
24      A.   Yes.
25      Q.   And the signatures of, in fact, all

171

John Edmonds

1  John Edmonds
2  of the partners in Fifth and 106th Street?
3      A.   That's correct.
4      Q.   Do you know of any amendment to the
5  partnership agreement of Fifth and 106th Street
6  Associates that came after this second amended
7  agreement?
8      A.   I know of no amendment. I do know
9  that the amounts of monies that is being cited
10  here were repaid to the partnership. Seavey had
11  set up a situation in Chase Bank where
12  $1.7 million of $3 billion was in his name and
13  1.3 in mine.
14          Those monies are the monies that
15  I've repeated to you several times were the
16  6 percent fee that the partners are entitled to
17  while operating the project in a positive
18  fashion.
19          I was given a certain date to pay
20  that money. I did not make that date, but I paid
21  the money later. As a matter of fact, I called
22  Bob Seavey and told him that I was prepared to
23  pay it, and I paid it with the highest legal
24  rate, I think it was 16 percent, back to the
25  partnership in order to redeem my position.

172

John Edmonds

1  John Edmonds
2          And Seavey, when I told him that I
3  was prepared to do that, he instructed me to
4  place the check back in the Chase account and
5  endorse it for -- I think the letter was CL --
6  client number so and so and so, and put it in the
7  account. And that's exactly what I did.
8      Q.   Can you show me where in the second
9  amended agreement of limited partnership of Fifth
10  and 106th Street Associates, L.P. provides that
11  when you repay the money, you'll be put back in
12  as a --
13      A.   No.
14      Q.   -- managing partner?
15      A.   No, I can't. I can't. And
16  that's -- but I repaid the money. And I don't
17  think Seavey can take the position that, yeah, we
18  got the money back, but you're still out. I
19  think that's a ludicrous position and I doubt
20  that he would take it in any set of
21  circumstances.
22          Do you deny that I repaid the money?
23      Q.   Going back to --
24      A.   Answer my question. Do you deny
25  that I repaid the money?

173

John Edmonds

1  John Edmonds
2      Q.   Going back to Defendants' Exhibit
3  No. 5, which is your affidavit, looking at
4  paragraph 13 discussing Logan Plaza, you are in
5  fact a 50 percent owner of Logan Plaza; is that
6  correct?
7      A.   That's correct.
8      Q.   Prior to Dalton taking over as the
9  management company of Logan Plaza in 2000, had
10  you ever received a distribution for your
11  ownership interest in Logan Plaza?
12      A.   No. There -- there were no
13  distributions at Logan Plaza till such time as we
14  purchased the project. In other words, the
15  project was -- the limited part of the project as
16  I recall was the Boston Financial organization.
17          They told Avery Seavey that they
18  were getting out of the business of having an
19  interest in the affordable housing area and that
20  it would be available for sale.
21          Avery and I then negotiated with
22  them. They agreed to accept from us each 2
23  point, I think it was -- no. They agreed to
24  accept $640,000 each, from Avery and from me.
25  And that -- the Logan Plaza, being an 80/20

44 (Pages 170 to 173)

174

John Edmonds

1
2 situation, HVC then stepped in, took control of
3 the mortgage and I believe paid out Boston
4 Financial for its participation.
5       MR. TRAUB: This as Number 12,
6 please.
7       (Defendants' Exhibit 11, Amended and
8 Restated Certificate of Limited Partnership
9 of Charles H. Housing Associates, marked
10 for identification.)
11 BY MR. TRAUB:
12    Q.    Mr. Edmonds, if you look at
13 paragraph 14 of your affidavit concerning Charles
14 Hill Associates, you testified that you own
15 25 percent interest in that partnership; is that
16 correct?
17    A.    That's correct.
18    Q.    Is that your understanding of your
19 ownership interest in Charles Hill?
20    A.    That's correct.
21    Q.    I've given you what's been marked as
22 Defendants' Exhibit No. 11, which is the amended
23 and restated certificate of limited partnership
24 of Charles H. Housing Associates.
25       (Witness peruses the exhibit.)

175

John Edmonds

1
2    Q.    Is Charles H. Housing Associates the
3 same as your Charles H. Hill Associates
4 partnership?
5    A.    Charles H. Housing Associates are
6 the owners of Charles H.
7    Q.    And if you turn to page 47 --
8       MR. HAYWOODE: I'm sorry, did the
9 witness finish?
10       Are the owners of Charles H., the --
11       THE WITNESS: Yes, the real
12 estate -- Charles H. is the -- is the real
13 estate.
14       MR. HAYWOODE: Uh-huh.
15    Q.    Now, Mr. Edmonds, if you turn to
16 page 47 --
17    A.    Yeah.
18    Q.    -- it lays out all of the different
19 ownership interests in this partnership. It
20 provides that you have a 1 percent interest in
21 the operations of the partnership; is that
22 correct?
23    A.    What does that mean, "a 1 percent
24 interest in the operations"?
25    Q.    Well, if you're looking at

176

John Edmonds

1
2 Schedule A, it says capital contribution, you
3 made $100. It says your interest in the
4 operations is 1 percent and your interest in
5 capital transactions is 24.745 percent.
6    A.    That's correct.
7    Q.    And that actually the investor
8 limited partner, Charles Hill Tower Associates,
9 has 98 percent of the interest in the operations.
10       Is that correct?
11    A.    That's what it says here.
12    Q.    Did you --
13    A.    I only know that the investor
14 limited partner purchased for himself and his
15 company that 50.51 percent and that the general
16 partners purchased, by the payment of
17 $2.1 million each, the 24.745 percent.
18    Q.    So you purchased, am I correct, the
19 mortgage actually on this property?
20    A.    That's correct.
21    Q.    So you get 25 percent of all
22 mortgage payments on this property?
23    A.    That's correct.
24    Q.    But you actually own a 1 percent
25 interest in the ownership on this property?

177

John Edmonds

1
2    A.    No, I own a 25 percent interest in
3 the ownership of this property. Why would I own
4 a 1 percent interest in the property when -- when
5 I've paid for 25 percent interest?
6    Q.    Do you know --
7    A.    Why would I do that?
8    Q.    Do you know of any other document
9 other than the one that I've given you that sets
10 forth the ownership interest of Charles Hill
11 partnership?
12    A.    I can't think of one.
13    Q.    Turning back to your Defendants'
14 Exhibit No. 5, which is your affidavit --
15       (Discussion off the record between
16 the witness and his counsel.)
17    Q.    -- looking at paragraph 20, which is
18 on page 9 of your affidavit --
19       (Pause from the record.)
20    Q.    -- you state that "On or about the
21 summer of 2005, reliable employees of the
22 partnerships' housing developments communicated
23 to plaintiff that excessive costs were being
24 incurred by the partnerships' housing
25 developments as a result of the contracts

45 (Pages 174 to 177)




178

1       John Edmonds
2   defendant Dalton had entered into on behalf of
3   the partnerships' housing developments, as well
4   as to the improper management and operation of
5   the partnerships' housing developments by
6   defendant Dalton."
7       A.  Yes.
8       Q.  Which employees?
9       A.  Basically they were the -- the
10  employees who did the work at the development,
11  who clean, made the repairs and so forth and so
12  on. They told me that -- that Phyllis had made
13  an arrangement with a company someplace in Long
14  Island that required them to spend about three to
15  four hours a day to go out there to get materials
16  that they might need to service the tenants and
17  that they didn't understand that since the
18  largest supplier of equipment, plumbing,
19  electrical, et cetera, was right at
20  86th Street -- 88th Street and Third Avenue
21  and within 15 to 20 minutes they could go down
22  and order their material. And they said that
23  this company would deliver any materials that
24  they needed within 24 hours.
25          And beyond that, they said that this

179

1       John Edmonds
2   was the company who supplied these materials
3   originally and there was no issue, no question of
4   them not having the particular piece of pipe or
5   electrical fixture, et cetera, that they needed
6   to make a repair.
7       Q.  Do you remember the name of any of
8   the employees that told you this?
9       A.  I don't -- I don't wish to disclose
10  any names as I fear that they would be -- they
11  would be punished in the strong and determined
12  way that Phyllis Seavey has.
13      Q.  Mr. Edmonds, while I recognize that
14  you may not want to disclose the names --
15      A.  I haven't answered the question.
16  I'm not going to. Okay?
17      Q.  On the record, are you refusing to
18  state the basis for your paragraph 20?
19      A.  No, no. I've set forth in plain
20  language what the basis of paragraph 20 is. I've
21  said I decline to name the individual employees
22  because I don't want them fired or put out of
23  work.
24      Q.  What about deposed in this action;
25  don't you think that their testimony would be

180

1       John Edmonds
2   relevant to this action?
3       A.  Well, when that comes, if it's
4   necessary, I'll consider whether I should call
5   any of them.
6       Q.  Actually, Mr. Edmonds, it's
7   necessary right now for you to either disclose --
8       A.  It isn't necessary for me to
9   disclose it. I not going to disclose it, and
10  I've told you that before.
11      Q.  You don't have to raise your voice.
12      A.  Well, I do because you don't seem to
13  understand me.
14      Q.  And you don't have to point to me
15  either.
16      A.  Yes, I do because you don't seem to
17  understand me.
18          MR. HAYWOODE: Counsel, I suggest
19  you make a motion for a ruling on this.
20          MR. TRAUB: I'm trying to avoid
21  making unnecessary motions when Mr. Edmonds
22  brought this lawsuit on the basis of
23  statements from, quote-unquote, reliable
24  employees, but is now refusing to --
25          THE WITNESS: I didn't bring the

181

1       John Edmonds
2   lawsuit on the basis -- that was a part of
3   the information that I received from
4   various sources. All right? And that's
5   the basis of my bringing the lawsuit and
6   the fact of the kind of control that the
7   Seaveys have exercised over these
8   properties.
9           MR. TRAUB: Again, Mr. Edmonds, I've
10  asked you not to raise your voice.
11          MR. HAYWOODE: And I object to
12  characterizing his voice as being raised.
13  I've heard him much louder.
14          THE WITNESS: That's absolutely
15  correct. You should be in court with me
16  one day --
17          MR. TRAUB: I plan on it.
18          THE WITNESS: -- on opposite sides
19  and you'll see how I raise my voice.
20          MR. TRAUB: I plan on it soon.
21          MR. HAYWOODE: Counsel, nationwide
22  we have a whistle-blower problem. There
23  are regulations that pertain to that. And
24  that's why I think it should be relegated
25  to a motion. I think any court would

46 (Pages 178 to 181)



182

```
1           John Edmonds
2    understand at least the logic of what
3    Mr. Edmonds is saying. To the extent we
4    offer it as proof in a trial, that's
5    another issue.
6    BY MR. TRAUB:
7        Q.   Mr. Edmonds, turning to
8    paragraph 23, you state that the auditor's review
9    of Dalton's financial records --
10       A.   What page is that?
11       Q.   Page 10.
12       A.   I state which?
13           MR. KELLY:  I'm missing 10 in mine.
14           MR. TRAUB:  Paragraph 23, page 10.
15           MR. HAYWOODE:  I don't have 10
16   either.
17           MR. KELLY:  It goes to 11 and then
18   10. One page out of order.
19           MR. TRAUB:  You can take off the
20   binder and switch the pages --
21           MR. KELLY:  Oh, thanks.
22           MR. TRAUB:  -- if you want to put
23   them back in order.
24           MR. HAYWOODE:  You wanted something
25   to do; right?
```

183

```
1           John Edmonds
2    BY MR. TRAUB:
3        Q.   You state that your auditor's review
4    of Dalton's records "reveal that defendants
5    Phyllis Seavey and Dawley repeatedly and on a
6    consistent basis purposefully provided false and
7    misleading information in the monthly financial
8    package by not reporting amounts paid to the
9    partnerships in connection with the third-party
10   agreements it entered into for the partnerships."
11       A.   Uh-huh.
12       Q.   Which third-party agreements are you
13   referring to in paragraph 23?
14       A.   Which third-party agreements?
15       Q.   Yes.
16       A.   I'm talking about an agreement with
17   the -- with the garage operator. Talking about
18   an agreement with the laundry operator. And I'm
19   talking about an agreement with -- with the
20   people who install these telephonic wires on the
21   roofs of these buildings.
22       Q.   And are you contending that these
23   vendors actually paid money to the partnerships?
24       A.   No, I'm contending that these
25   vendors have what you would call sweetheart
```

184

```
1           John Edmonds
2    deals. For instance, the garage -- as an
3    example, that contract with that garage operator
4    gives him the right to operate that garage at a
5    fee substantially below what the fees ought to
6    be.
7           And it also gives him the right
8    that, in the event that the project is disposed
9    of, that he continues to operate the garage and
10   that if he at any time decided that he didn't
11   want to operate it further, that he would have
12   six months to make up his mind and go from there.
13          And I'm saying that the Seaveys, by
14   doing that, and having this garage operator enter
15   into an agreement with ABNS, then they -- that
16   they should be removed because I think that the
17   basic partnership rule is that the managing
18   general partner has the responsibility to always
19   act in the best interest of the partnership.
20          And I consider that if Seavey and
21   those are behaving in a way to benefit themselves
22   and some third party, that he was not acting in
23   the best interest of the partnership and should
24   be removed.
25       Q.   Are you aware of when that agreement
```

185

```
1           John Edmonds
2    with the garage was entered into?
3        A.   Whenever they came aboard. I don't
4    know when they came aboard.
5        Q.   Have you seen this agreement?
6        A.   I haven't seen the agreement.
7        Q.   So you're not aware of the date that
8    the agreement was signed --
9        A.   Does Bob deny that the agreement
10   exists? No, I don't know when it was signed.
11       Q.   Are you aware of the term of the --
12   the length and term of the agreement?
13       A.   It has an indefinite term.
14       Q.   But in paragraph 23, you state that
15   they're providing misleading information by not
16   reporting amounts paid to the partnerships in
17   connection with these third-party agreements.
18          What payments are you referring to
19   that the partnerships are receiving from these
20   third-party agreements?
21       A.   I don't know that the partnerships
22   are receiving any payment. I believe that, on
23   behalf of the partnership, these companies that
24   the Seaveys have formed are the -- are the
25   operators of this. And my essential position is
```



186

John Edmonds

1
2  that these are monies that should go to the
3  partnerships and not to Seavey or to any company
4  that he might have formed.
5       Q.   Have you seen any document showing
6  that there's money going to the Seaveys or any
7  partnership that he might --
8       A.   No, I only have been able to
9  determine that, in fact, Avery Seavey is a
10 managing general partner of an agreement between
11 the Seaveys and the operator of the garage.
12      Q.   Is there money from the garage that
13 you believe is going to the Seaveys?
14      A.   Yes.
15      Q.   And --
16      A.   If he's a partner with the garage
17 operator, then obviously monies are going to him.
18      Q.   So it's your understanding that
19 Avery is a partnership in the garage?
20      A.   Yes.  And in the laundromat, also.
21      Q.   And he's also partnership in the
22 laundromat?
23      A.   Yes.  And also partners in that
24 electronic --
25           MR. HAYWOODE:  Sign.

187

John Edmonds

1
2       A.   -- sign upstairs.
3       Q.   What documents have you seen to
4  support your understanding --
5       A.   Those are not the kind of documents
6  that Seavey would distribute to me.
7       Q.   Has anyone ever told you that Avery
8  is a partner in those --
9       A.   I said I investigated that.
10      Q.   And who told you that Avery was a
11 partner in the partnership --
12      A.   State of New York.
13      Q.   Which document of the State of New
14 York told you that?
15      A.   I went to Albany and visited their
16 office --
17      Q.   Whose offices?
18      A.   The Secretary of State at the
19 Harriman campus.
20           -- and secured this information.
21      Q.   By looking at what document at the
22 Secretary of State's office?
23      A.   They showed me a document that
24 reflected the organizations of this corporation
25 or limited liability company, of which Avery

188

John Edmonds

1
2  Seavey was the managing general partner along
3  with the garage operator.
4       Q.   Do you remember the name of the LLC?
5       A.   ABNS.
6       Q.   It's your understanding that the
7  garage operator is a partner in ABNS?
8       A.   ABNS, that's correct.
9       Q.   You cite, though -- for your
10 contention, paragraph No. 3, you cite Exhibit A.
11      A.   What's Exhibit A?
12      Q.   Well, you cite here that "The
13 plaintiff's auditor's review revealed that, on a
14 consistent basis, they provided false, misleading
15 information by not reporting amounts paid to the
16 partnership."  And you say, "See Exhibit A."
17           MR. HAYWOODE:  Are you referring to
18 the Cameron Griffiths letter of --
19           MR. TRAUB:  If you look at
20 paragraph 23, in bold, at the very end of
21 23, you say, "See Exhibit A."
22           MR. HAYWOODE:  I see listing
23 Exhibit Q.  Where am I --
24           THE WITNESS:  "Plaintiff relied
25 totally upon the monthly financial packages

189

John Edmonds

1
2  which defendant Dalton prepared and sent to
3  him as being true and accurate.  However,
4  plaintiff's auditor's review of Dalton's
5  financial records reveal that defendants
6  Phyllis Seavey and Dawley repeatedly, and
7  on a consistent basis, purposely provided
8  false and misleading information in the
9  monthly financial package by not reporting
10 amounts paid to the partnership in
11 connection with third-party agreements it
12 entered into for the partnerships."
13      Q.   Then what's the very next thing in
14 the parentheses say?
15      A.   "See Exhibit A."
16      Q.   So when we go to Exhibit A, we find
17 an independent auditor's report; is that correct?
18      A.   Exhibit A and Exhibit -- that's G.
19           MR. HAYWOODE:  (Indicating.)
20      A.   Yeah.
21      Q.   Where in the defendants' -- in the
22 independent auditor's report in Exhibit A does it
23 state that they found false, misleading
24 information by not reporting amounts paid to the
25 partnerships in connection with the --

48 (Pages 186 to 189)



190

John Edmonds
1
2      A.    The answer to that is paragraph 2.
3   "We were unable to complete the audits because
4   the company's management refused to provide
5   documentation and/or explanation to substantiate
6   items in the general ledger, some of which
7   include several journal entries recorded in
8   general ledgers of all four companies, the
9   original document to support the notes payable to
10  Seavey or Lakeview, support for the balances
11  recorded in Lakeview money market and investment
12  accounts, among many others."
13      Q.    And you --
14      A.    "Because we were unable to obtain
15  substantiation for several items recorded in the
16  general ledger and we were unable to apply
17  alternative auditing procedures to the items
18  listed and the others mentioned as discussed in
19  the preceding paragraph, the scope of our work
20  was not sufficient to enable us to express and we
21  do not express an opinion as to the financial
22  statements referred to in the first paragraph."
23      Q.    And you understand those two
24  paragraphs to mean that there was false,
25  misleading information in the monthly financial

191

John Edmonds
1
2   package because they didn't report amounts to
3   partnerships in connection with the third-party
4   agreements that it entered into for the
5   partnerships?
6      A.    Yes. Because I believe that he has
7   the prime responsibility for reporting any
8   amounts of monies engendered by the partnerships
9   and that those monies should go into the
10  partnerships, not into the Seaveys' pockets.
11      Q.    You state here in paragraph 54 on
12  page 13 that "Defendant Dawley informed
13  plaintiff's auditors that Dalton was unable to
14  produce this basic and standard information
15  necessary for the audit because defendant
16  Dalton's software was incapable of producing the
17  required 'trial balances' -- that term's in
18  quote -- 'from entries made in their general
19  ledgers which recorded the daily expenditures for
20  the management and operation of the partnerships'
21  housing developments."
22            Who told you that Mr. Dawley stated
23  the software is incapable of producing trial
24  balances?
25      A.    Obviously this is information

192

John Edmonds
1
2   that -- that the auditors got from Dawley.
3      Q.    Did the auditors tell you that
4   Dawley was able to provide them with a general
5   balance -- with a general ledger?
6      A.    I don't recall.
7      Q.    Do you know the --
8      A.    I only know that -- that they
9   informed me that Dawley's position was if -- if
10  they were looking for these trial balances,
11  et cetera, that they would have to go to the
12  accountants.
13      Q.    That's your understanding of what
14  Mr. Dawley told them?
15      A.    Yes.
16      Q.    In paragraph 55, you state that "The
17  defendants have breached their management
18  agreements and by refusing to maintain proper
19  computer systems, they're in violation of the
20  federal and state regulations which provide
21  substantial subsidies to the partnerships'
22  housing developments which govern their
23  management and operations."
24            Which federal and state regulations
25  are you referring to, Mr. Edmonds?

193

John Edmonds
1
2      A.    I'm sure that they're both federal
3   and state regulations related to the management
4   of these parcels that requires the management to
5   maintain a proper computer system for the
6   management of the partnerships' financial
7   information. And either the Seaveys don't have
8   it or either they refuse to use it.
9            I understand that what they do,
10  according to Dawley, is that they -- that the
11  expenditures are made and that the checks for the
12  expenditures are attached, and that it is then
13  turned over to their accountants for their
14  accountants to convert from -- whatever the
15  system -- convert it from -- from the way in way
16  in which they keep their books to another form.
17            And I just can't think of it right
18  now.
19      Q.    Have you seen any specific federal
20  and state regulations that --
21      A.    No, I have not.
22      Q.    If you turn to page 16 of your
23  affidavit, you state that "The auditors found
24  that defendant Dalton had entered into several
25  contracts in excess of $10,000 supposedly in

194

John Edmonds

1
2 connection with the maintenance and repair for
3 the various housing developments of the
4 partnership," and then you cite to Exhibit I.
5      If you turn to Exhibit I --
6      A.    Where's that?
7      Q.    Under -- close to the back. And you
8 have a tab that says, "Exhibit I."
9      What is your understanding of what
10 is Exhibit I?
11     A.    Let me see.
12           (Witness peruses the exhibit.)
13     A.    As far as I can determine, these are
14 a listing of the checks that would have gone out
15 to various outfits who perform, according to
16 this, repair contracts, payroll, and that kind of
17 thing.
18     Q.    Is it your contention that each one
19 of these items is a violation of the management
20 agreement?
21     A.    My contention is that these items
22 reflect a process by which the Seaveys are able
23 to use the partnership monies as they see fit.
24 And I would suggest that perhaps the partnerships
25 are paying perhaps expenses for his other

195

John Edmonds

1
2 interests, the other partnerships that he may
3 own.
4      Q.    So is it your contention that even
5 though each one of these is listed under Church
6 Homes Associates, that you believe some of these
7 may have been related to work at a different
8 entity?
9      A.    That's correct. Maybe related to an
10 entity that is wholly unrelated to these
11 partnerships.
12     Q.    And what document have you seen that
13 gives you that belief?
14     A.    Just looking at this document that
15 spells out, you know, what the repairs were and
16 so forth and so on. I don't know that all of
17 these are repairs that were made at any of the
18 partnerships' properties.
19     Q.    Have you or your auditors undertaken
20 to contact any of these vendors to ask them for
21 proof about these repairs?
22     A.    I don't think that they've
23 undertaken that. They're trying to complete the
24 examination of the books and records of Dalton
25 Management. And I guess at some point my counsel

196

John Edmonds

1
2 will determine whether or not these companies
3 should be contacted in connection with our
4 lawsuit.
5      Q.    So is it my understanding then,
6 without any documentary proof and without even
7 contacting these vendors, that you attached this
8 as an exhibit to a federal complaint and a
9 federal affidavit testifying --
10     A.    For me a court is a court. Okay.
11 And I attached those because these are documents
12 that the accountants have been able to get and
13 they indicate what Seavey says are expenses of
14 Dalton Management related to the operation of the
15 projects.
16     Q.    Can you point to me in your
17 paragraph 35 where you state that the information
18 made is upon information and belief and not your
19 firsthand --
20     A.    I don't -- I do not use the language
21 "information and belief." I set forth in
22 unequivocal terms what I understand that's going
23 on here.
24     Q.    And again, your understanding is not
25 based on documentary evidence and not based on

197

John Edmonds

1
2 contacting these vendors, but just your belief?
3      A.    No, based upon information that I've
4 gleaned from my auditors as they go through the
5 books and records.
6      Q.    What did your auditors glean then to
7 show them that your understanding is --
8      A.    I do not know. I'm not an
9 accountant. I don't know. I only know what my
10 oral discussions have been with them and what
11 their reports are to date.
12     Q.    Have they orally reported to you
13 that they found proof that not all of these
14 vendors supplied work for Church Homes
15 Associates?
16     A.    They have indicated to me that it is
17 likely that -- the fact that all of these vendors
18 may not be doing work on behalf of the
19 partnerships. They may be doing work for the
20 Seaveys' other interests.
21     Q.    And your auditors determined that
22 based upon a review of the books and records that
23 they've received so far?
24           MR. HAYWOODE: Objection.
25           I object to the suggestion in this

50 (Pages 194 to 197)

198

John Edmonds

1
2  question that the auditors now have
3  determined that. I don't hear any
4  testimony here about anybody having
5  determined it.
6      MR. TRAUB: He stated that he
7  unequivocally made a statement to the
8  court. So clearly someone --
9      A.   I unequivocally made it. This is my
10 affidavit, and I don't -- I don't submit
11 affidavits on information and belief; I never do
12 that.
13     Q.   Do you wish to strike or remove that
14 paragraph sitting here today?
15     A.   I do not. I want it in. I do not
16 wish to strike any paragraph of any affidavit or
17 document that I have submitted in this matter.
18     Q.   Okay. Turning to page 18,
19 paragraph 40.
20     A.   What exhibit is that?
21     Q.   It's not an exhibit. It's the
22 actual affidavit itself.
23     A.   Okay. All right. As shown in
24 Exhibit B, reads, "Attached hereto, in reviewing
25 defendant Dalton's general ledgers, plaintiff's

199

John Edmonds

1
2  auditors found entries indicating that, in 2006,
3  defendant Dalton has deposited approximately
4  $800,000 to $1 million in investment accounts for
5  Lakeview partnership, as shown in Exhibit A and B
6  attached hereto.
7      "Defendant Dalton has refused to
8  provide plaintiff's auditors with the financial
9  statements for these investment accounts, names
10 and addresses of the investors, and/or any
11 contact information for these investments made in
12 2006 which represent a substantial amount of the
13 partnerships' funds."
14     Q.   When you look at Exhibit B, it shows
15 that the account that they're referring to is the
16 Salomon Smith reserve account. Isn't it true,
17 Mr. Edmonds, that you are in fact a signatory on
18 that account?
19     A.   I may be, but that does not -- that
20 does not give me -- if the other side, Seaveys,
21 are controlling the books and records, that does
22 not give me a right to get the information.
23     Q.   Did you give your accountants any
24 information with regards to the Salomon Smith
25 reserve account?

200

John Edmonds

1
2      A.   No, all I did was to ask them to go
3  forward, to get as much information as they can
4  get and continue to -- to investigate and to
5  determine what the problems were.
6      Q.   Other than not receiving -- or
7  allegedly not receiving information on this
8  account, are you contending there's anything
9  wrong with this investment account at Salomon
10 Smith?
11     A.   I don't know whether there's
12 anything wrong or not. That's the reason that
13 I'm having the accountants go through it. But
14 if -- if they continue and the Seaveys continue
15 to refuse to give me access, then I believe that
16 they're secreting and hiding.
17     Q.   Mr. Edmonds, in this lawsuit, you
18 filed a series of different document requests,
19 did you not?
20     A.   Yes.
21     Q.   And in response to those document
22 requests, the Seaveys have made, along with Marks
23 Paneth & Shron, a large number of documents
24 available to your accountants; is that --
25     MR. HAYWOODE: I'm going to

201

John Edmonds

1
2  object --
3      Q.   -- correct?
4      MR. HAYWOODE: -- to the question
5  based on the use of relative terms like
6  "large" and "some" unless there's an
7  accurate quantification here.
8      Q.   Over 20 banker's boxes full of
9  boxes, have they not?
10     MR. HAYWOODE: Is it 20 banker's
11 boxes?
12     A.   I know nothing about that.
13     Q.   Do you know how many pages of
14 documents have been produced in response to
15 document request?
16     A.   No. I've indicated to you, and I
17 can repeat, that my accountants indicate to me
18 that somewhere between 40 to 60 percent of the
19 requests that they have made for documents have
20 been declined.
21     Q.   Since the inception of this lawsuit?
22     A.   Beginning as of the time that they
23 were retained.
24     Q.   My question for you was, since the
25 inception of this lawsuit, have they --

VERITEXT REPORTING COMPANY
(212) 279-9424          www.veritext.com          (212) 490-3430



202

John Edmonds

2    A.    Beginning as of the time that they
3    were retained to investigate this matter and to
4    report their findings.
5    Q.    And in fact, you made a partnership
6    demand under the New York partnership laws to
7    come to Dalton and do an inspection of the books
8    and records, did you not?
9    A.    I may have. I probably did. And
10   that has nothing to do with whether or not those
11   partnership documents were made available and
12   indeed those investment accounts were made
13   available. They continue to refuse to make those
14   available.
15   Q.    To your knowledge, as you sit here
16   today, have those documents been -- have the
17   defendants in any way refused to produce those
18   documents?
19   A.    I repeat what I said earlier, that
20   my accountants report to me --
21   Q.    When is the last time that your
22   accountants reported this to you?
23   A.    The accountants -- I said I've had
24   several oral meetings with them, and they have
25   indicated to me that they have great difficulty

203

John Edmonds

2    in getting the information and materials that
3    they need about the partnerships' investments,
4    et cetera.
5    Q.    When was the last time they made
6    that representation to you?
7    A.    In any meeting that we might have
8    had --
9    Q.    When is the last meeting you had
10   with them?
11   A.    I don't recall the exact date, but
12   it's been since we've instituted this action.
13   Q.    Has it been in 2009?
14   A.    Yes, I've met with them in 2009.
15   Q.    Have you ever asked them whether or
16   not they have enough documents to --
17   A.    They obviously do not.
18   Q.    Mr. Edmonds, let me finish my
19   question.
20   A.    I mean, there's no point in putting
21   that question to me, do they have enough
22   documents.
23   Q.    Mr. Edmonds --
24   A.    They obviously do not. That's the
25   reason that they are continuing to do the

204

John Edmonds

2    examination of the books and records as they are
3    made available.
4    Q.    Mr. Edmonds, have you ever asked
5    yourself if maybe the accountants you hired are
6    not capable of doing this audit?
7    A.    No, I would not ask myself that. I
8    think that they're very capable. I think they're
9    at least as capable as the accountants that
10   Shron -- at least as capable and probably better
11   accountants.
12   Q.    Mr. Edmonds, again, I'm going to ask
13   you not point to me or raise your voice.
14   A.    Well, when you tell me about whether
15   or not --
16   MR. HAYWOODE:  Let the record
17   reflect this is a capacious room and
18   there's a long distance between Mr. Edmonds
19   and Mr. Traub, my esteemed counsel or -- I
20   just object to characterizations that he's
21   pointing or raising his voice inordinately.
22   He has a powerful voice. And there
23   is some emotion here. I don't feel it's
24   excessive. I think it's prejudicial on the
25   record to keep saying pointing your finger

205

John Edmonds

2    and shouting.
3    Q.    Mr. Edmonds, if you'll look on
4    paragraph 41 on page 18 of your affidavit. Would
5    you please look at paragraph 41, page 18,
6    Mr. Edmonds. You talked about a Merrill Lynch
7    account set up for Lakeview partnership in which
8    a check for $82,720 was sent.
9    Are you aware that the DHCR requires
10   certain monies to be placed into a
11   DHCR-controlled account every month?
12   A.    I'm aware, as I said to you earlier,
13   that DHCR has signature rights on partnership
14   accounts and that accounts are handled in that
15   fashion because they have a program in which they
16   look to have these investments made in government
17   instruments, county instruments, city
18   instruments, this kind of thing. So to the
19   extent that that's being done, they require that
20   they also sign off.
21   Q.    So you require then the
22   partnerships -- or at least Lakeview, which is
23   under DHCR purview, requires that money be sent
24   from the rent revenue accounts to a
25   DHCR-controlled account; is that correct?

**VERITEXT REPORTING COMPANY**
**(212) 279-9424**           **www.veritext.com**           **(212) 490-3430**



206

1          John Edmonds
2      A.    To an account controlled by DHCR and
3    Seavey.
4      Q.    You believe that DHCR is conspiring
5    with Seavey on this account?
6          MR. HAYWOODE:  Excuse me, the word
7    was what?
8          THE WITNESS:  "Conspiring."
9          MR. HAYWOODE:  Conspiring.
10          THE WITNESS:  No.
11          MR. HAYWOODE:  Objection.
12      A.    I believe that DHCR is doing what
13    they're required to do, and that is to have a
14    signature on the accounts to make certain that
15    the governmental programs are in accordance with
16    the mandate from the federal government, where
17    these monies begin.
18      Q.    What is the basis for your statement
19    that the Seaveys have signature rights on this
20    Merrill Lynch account?
21      A.    If it's DHCR-controlled, they
22    obviously have signature rights because it would
23    require two signatures, DHCR's signature and the
24    signature on behalf of the partnership.
25      Q.    Have you seen any documents to show

207

1          John Edmonds
2    you that the Seaveys have signature rights on
3    this Merrill Lynch account?
4      A.    They haven't produced any.  They
5    have all the documents.  I keep telling you they
6    have all these documents.  Ask your -- ask your
7    clients where those documents are.
8      Q.    Sir, again, this is just your
9    presumption then that the Seaveys have signature
10    rights in this Merrill Lynch account?
11      A.    My presumption, what I understand to
12    be the process used by government agencies to
13    protect these investments so that the investors
14    are not able to go in and invest in items that
15    they would not approve.
16      Q.    Looking at paragraph 44 on page 19
17    of your affidavit.
18          MR. TRAUB:  Why don't we take a take
19    a five-minute break.
20          (Recess from the record.)
21    BY MR. TRAUB:
22      Q.    Mr. Edmonds, if you'll turn with me
23    to page 19, paragraph 44.
24      A.    Of the affidavit?
25      Q.    Of the affidavit, please.

208

1          John Edmonds
2          You state, "The defendant Dalton had
3    contracted with TMO Parent, LLC; Merit Parking,
4    LLC; Macquarie New York Parking III, LLC; Sebco
5    Laundry to lease property of the partnerships'
6    housing developments.  A portion of the monies
7    defendant Dalton received in connection with
8    these commercial leases for the partnership
9    housing developments was delivered to the Seavey
10    family and the Seavey organization."
11          What is the basis for your statement
12    that a portion of the money was delivered to the
13    Seavey family and the Seavey organization?
14      A.    The partnership agreements that the
15    Seaveys have with the lessee.
16      Q.    Have you seen any partnership
17    agreements between the Seaveys and the lessee?
18      A.    Well, these are -- they're here.
19    That's what this is.
20      Q.    Exhibits D and L?
21      A.    Yeah.
22      Q.    Well, Exhibit D appears to be a
23    garage lease agreement dated December 16, 1996,
24    and then with an extension in 1996.
25      A.    And also talks about the fact that

209

1          John Edmonds
2    the -- that the lessee has the right to renew and
3    to renew and to renew.
4      Q.    Let's start with this one.  What is
5    your understanding of what the fair market value
6    for the rent for this garage would have been in
7    1996?
8      A.    I've been reliably informed that
9    this lease is substantially under what other
10    leases in the area are paying.
11      Q.    And who informed you of this fact?
12      A.    Hal H. Harris, who has or had
13    clients in the garage business.
14      Q.    But again, this is not a partnership
15    agreement, is it?  This is a lease.
16      A.    It's a lease between --
17      Q.    Fifth and 106th as approved by the
18    DHCR?
19      A.    Yes.
20      Q.    With the -- with Merit Parking Corp;
21    is that correct?
22      A.    Yes, Merit.  They have several
23    names, Merit, et cetera.
24      Q.    And this is the source of your
25    understanding that the Seaveys are personally

53 (Pages 206 to 209)

210

1    John Edmonds
2    getting money from the commercial leases?
3    A.    I said -- yes. I said that I
4    visited Albany and secured this information from
5    the Department of State.
6    Q.    Have you even any checks whereby the
7    garage or the laundry are paying the Seaveys
8    directly?
9    A.    If checks, they go to the Seaveys.
10    They don't come to me.
11    Q.    So is your answer no, you have not
12    seen any checks?
13    A.    I have not seen any checks.
14    Q.    Other than this lease agreement and
15    this -- and the partnership agreement that you
16    said you saw at the Secretary of State's office,
17    have you seen any other documents to support your
18    contention that payments are going directly to
19    the Seaveys or the Seavey organization?
20    A.    No, I haven't. And once again, they
21    have the books and records and they can tell you
22    whether or not Dalton Management and/or ABNS
23    receives payments from this lessee.
24    Q.    Mr. Edmonds, do you have any
25    evidence that the money that is supposed to go to

211

1    John Edmonds
2    the partnerships actually ended up in the
3    Seaveys' personal accounts?
4    A.    What would be evidence? The only
5    evidence that there could be would be checks,
6    money orders, whatever, that would go to Dalton
7    Management or to ABNS.
8    Q.    And you haven't seen any such
9    checks?
10    A.    No, I have not.
11    Q.    Isn't it true that Cameron,
12    Griffiths & Pryce's report, which is Defendants'
13    Exhibit No. 4, alleges problems with
14    classification of funds and the way that the
15    books are maintained; they do not actually allege
16    that there are any missing or unaccounted funds
17    at this time?
18    MR. HAYWOODE:    I'm going to object
19    to the characterization of the report.
20    That report, like any auditor's report,
21    will say that --
22    MR. TRAUB:    Mel, your objection --
23    for what you said so far, that's what
24    you're allowed under the rules.
25    MR. HAYWOODE:    Well, no, I want to

212

1    John Edmonds
2    point to where it is.
3    The auditors are saying we didn't
4    see it --
5    MR. TRAUB:    Mel, you're testifying
6    now.
7    MR. HAYWOODE:    -- it doesn't say
8    there's not support. It says we didn't see
9    it.
10    MR. TRAUB:    Mel, you're
11    testifying --
12    MR. HAYWOODE:    I'm not testifying to
13    any fact in this case, Darren.
14    MR. TRAUB:    You just did.
15    MR. HAYWOODE:    I'm simply -- no, I'm
16    not. I'm saying that your question as to
17    form is wrong because an accountant's
18    comment -- any accountant, the IRS,
19    anybody, wouldn't say that, you know --
20    MR. TRAUB:    Mel, you're testifying
21    right now.
22    MR. HAYWOODE:    -- they're just
23    saying we didn't see it.
24    MR. TRAUB:    Mel, you're testifying.
25    Your objection is improper under Federal

213

1    John Edmonds
2    Rule 30. I'm going to ask you --
3    MR. HAYWOODE:    I hear your ruling.
4    I except from it.
5    BY MR. TRAUB:
6    Q.    Mr. Edmonds --
7    MR. HAYWOODE:    There may be a day
8    when I won't be able to do that.
9    Q.    -- is there anything you can point
10    me in the auditor's investigation report at
11    Defendants' Exhibit No. 4 that states that there
12    are actually missing or unaccounted-for funds?
13    MR. HAYWOODE:    Objection again as to
14    form as to what we mean by
15    "unaccounted-for."
16    A.    Well, no, I testified to the effect
17    that Dalton Management as the managing agent
18    receives whatever monies that are paid, either
19    Dalton Management or ABNS receives, whatever
20    monies that are paid by Merit Parking. And I
21    haven't seen the checks, no.
22    Q.    But there's nothing in the report
23    that's Defendants' Exhibit No. 4 that says
24    there's money that's unaccounted for, is there?
25    A.    No, thus far.

54    (Pages 210 to 213)

(212) 279-9424

(212) 490-3430



214

John Edmonds

2 Q. Are you personally aware of any
3 money that is missing or unaccounted for?
4 A. No, I'm not. All I know --
5 Q. Do you --
6 A. -- is that the Seaveys have all the
7 records. And if I'm inaccurate, then I'm
8 inaccurate. They have all the records. They
9 keep those records. They make it difficult or
10 impossible to get any copy of anything that might
11 tend to support the fact that they are receiving
12 monies from these rental institutions, from the
13 garage and so forth.
14 Q. Mr. Edmonds, do you have any
15 documents that show you that the monthly reports
16 that you receive are inaccurate?
17 A. No, I do not. I have documents only
18 that show very recently the monthly reports have
19 been made more difficult to decipher. They
20 changed the way in which they were reporting up
21 to 2008 and in 2009. Now the monthly reports are
22 different.
23 Q. Mr. Edmonds, were you a party to a
24 conversation where all the defendants conspired
25 to transfer money away from the partnerships to

215

John Edmonds

2 the Seaveys?
3 A. No, I've never been a party to any
4 such conversation.
5 Q. Are you aware of any witness who
6 claims to have documentary or other evidence that
7 the defendants conspired to transfer money away
8 from the partnerships to the Seaveys?
9 A. I only have the statement that I
10 made to you that -- that Hal H. Harris has
11 indicated to me that the lease agreements with
12 Merit Parking are such that it is substantially
13 below what is the market in the area.
14 And beyond that, that -- that the
15 agreement is an agreement between ABNS and the
16 Merit Parking Corporation, with Merit Parking
17 having the right to endless renewals at a
18 below-the-market rate interest -- or payment.
19 Q. Mr. Edmonds, are you aware of any
20 witness who claims to have witnessed or
21 participated in a conversation --
22 A. No, I'm not.
23 Q. -- where the defendants conspired to
24 transfer money away from the partnership to the
25 Seaveys?

216

John Edmonds

2 A. No, I'm not.
3 MR. TRAUB: Let's just take a
4 five-minute break real quick. And I might
5 be finished. I just want to look over
6 everything one more time.
7 (Recess from the record.)
8 MR. TRAUB: Back on the record.
9 BY MR. TRAUB:
10 Q. Mr. Edmonds, this agreement that you
11 state that you saw at the Albany Secretary of
12 State, do you have a copy of that?
13 A. No, I do not.
14 Q. Do you remember the name of the
15 document that you saw?
16 A. It was just a document that set
17 forth the -- the name of the -- of the company
18 filed by Avery, with the ABNS name, setting forth that
19 previously the Seaveys had listed these -- these
20 corporations, et cetera, as being inoperative.
21 They were -- they were apparently filed and they
22 would indicate to the State that they're not
23 operating these -- these companies.
24 Q. And which companies are you
25 referring to when you say "these companies"? The

217

John Edmonds

2 garages or ABNS?
3 A. ABNS. ABNS.
4 Q. So is it a certificate of
5 incorporation for ABNS that you're referring to?
6 A. Yes, it would be the certificate of
7 incorporation.
8 Q. And that's the basis for your belief
9 that ABNS is getting money paid directly from the
10 garages and the laundromat?
11 A. That, and statements made to me by
12 reliable sources that the Seaveys have
13 contractual agreements with -- with the laundry
14 and with the garage.
15 Q. And who --
16 A. What I basically --
17 Q. Mr. Edmonds, who are those reliable
18 sources that told you that?
19 A. I just decline to disclose them at
20 this time.
21 Q. Are they the same ones that you're
22 referring to earlier that told you that there
23 were contracts with vendors to deliver
24 materials --
25 A. I decline to comments on that.

55 (Pages 214 to 217)



218

John Edmonds

1    Okay. But what really is the -- is the cooker
2    here is the kind of provisions that is set forth
3    in the lease agreement with this vendor.
4         Q.    It's your contention that, because
5    the lease is under market and renews for
6    indefinite period of time, that that is the basis
7    for your contention that the Seaveys are getting
8    some sort of payment directly from the garage
9    and/or the laundromat?
10        A.    That's correct.
11        MR. TRAUB:  Thank you.  Nothing
12   further.
13        Bill, I don't know if you wanted to
14   start.  It's 4:15.
15        MR. KELLY:  I can start.
16   EXAMINATION
17   BY MR. KELLY:
18        Q.    Good afternoon, Mr. Edmonds.
19        A.    Good afternoon, sir.
20        Q.    I'm going to try my best to avoid
21   going over some of the same ground, but I may --
22        A.    That would be appreciated.
23        Q.    -- I may seem to be doing that when
24   I introduce whatever topic I'm going to be

219

John Edmonds

1    addressing, so bear with me.
2         You mentioned the name Hal Harris
3    before.
4         A.    Yes.
5         Q.    What is your relationship with
6    Mr. Harris?
7         A.    None other than that he's a tenant
8    and a real estate broker.
9         Q.    Do you know where Mr. Harris'
10   address is?
11        A.    Yes, he lives in Lakeview. And he
12   hasn't paid Seavey any rent recently --
13        THE WITNESS:  Did he pay his rent
14   yet, Bob?
15        Q.    When did he tell you that the
16   market -- that the garage lease was below market?
17        A.    Oh, maybe a couple of years ago.
18   Based upon his -- his relationship with other
19   clients.
20        Q.    Do you know how he came to learn
21   what the lease for the garage required as the
22   lease payments?
23        A.    No, I don't think he indicated what
24   the payments were.  He just indicated to me that

220

John Edmonds

1    it would be a most unusual circumstance for the
2    partnerships -- or the partnership, Fifth and
3    106th Street, to enter into an agreement with a
4    below-the-market-rate tenant and, beyond that, to
5    enter into an agreement where all the rights to
6    renewal, et cetera, lie with the tenants.
7         Q.    So I guess my question is, if he
8    didn't know what the rate under the lease was,
9    how could he know if it was below market?
10        A.    He apparently knew that it was below
11   market because of his expertise in the community.
12   He had clients that were -- or has clients that
13   were in the business, in the parking business.
14        And on that basis -- and this was
15   maybe three years ago, two or three years ago.
16   On that basis, he said that any -- that there
17   must be an arrangement made with the -- with the
18   garage operator because of the advantages that he
19   had under the terms of the lease.
20        Q.    Are you familiar with -- well, let
21   me withdraw that.
22        Do you have any educational
23   background in accounting?
24        A.    No.

221

John Edmonds

1         Q.    Have you ever taken any accounting
2    courses?
3         A.    None.
4         Q.    Are you familiar with generally
5    accepted auditing standards?
6         A.    I hear accountants use that term.  I
7    don't know what it means.
8         Q.    Are you familiar with government
9    auditing standards?
10        A.    No.  I don't know anything about
11   accounting.  That's the reason I've retained
12   these accountants.
13        Q.    Are you aware that there are several
14   paragraphs in your affidavit that you discuss
15   generally accepted auditing standards and you
16   cite specific --
17        A.    I discussed them only on the basis
18   of my discussion with my -- with my auditors.
19        Q.    Which one of your auditors did you
20   have the discussion regarding Section 3.1 --
21        A.    With all of them at any meeting that
22   we might have.
23        Q.    Are you familiar with the term
24   "trial balance"?

56  (Pages 218 to 221)

222

John Edmonds
1
2    A.    Yes, I've heard of the term.
3    Q.    What is your understanding of what a
4 trial balance is?
5         MR. HAYWOODE:  Objection.  Vague as
6 to what his understanding is.
7         The witness can answer.
8    A.    All I know is that it would be a
9 record, I assume, kept by the management company,
10 in this instance, of the monies received and the
11 expenditure.
12   Q.    You spent a paragraph in your
13 affidavit discussing the definition of a trial
14 balance --
15   A.    Based upon that definition given to
16 me by my accountants.
17   Q.    But other than what your accountants
18 told you, do you have any understanding of what a
19 trial balance is?
20   A.    No, I don't.
21   Q.    Do you know what a general ledger
22 is?
23   A.    No, except that my accountants
24 indicated, with respect to the Seaveys, that the
25 general ledger was not kept up to date.

223

John Edmonds
1
2    Q.    Who told you that the general ledger
3 was not kept up to date?
4    A.    The accountants.
5    Q.    Was it one of the accountants or all
6 of the accountants?
7    A.    In the course of my discussion with
8 them, that was their analysis on the basis of the
9 examination of 2006.
10   Q.    So to the extent there's a
11 discussion in your affidavit about trial balances
12 or general ledgers, it's based on your
13 discussions with the accountants?
14   A.    That's correct.
15   Q.    No other independent knowledge that
16 you bring from somewhere else?
17   A.    No.
18        MR. HAYWOODE:  For the record,
19 Mr. Dawley testified to these things in
20 Mr. Edmonds' presence.  That record will
21 speak for itself.
22        MR. TRAUB:  The record will also
23 show that that deposition was taken months
24 after the filing of the complaint and the
25 affidavit.

224

John Edmonds
1
2        THE WITNESS:  Yes, that's correct.
3 And it also -- the affidavit reflects the
4 information as gathered by the accountants
5 as of that time.  And I think that what
6 they were referencing is the 2006 records
7 that they had been able to review.
8 BY MR. KELLY:
9    Q.    Do you know what a journal entry is?
10   A.    Nope.
11   Q.    To the extent that there's
12 discussion of journal entries in your affidavit,
13 is that based upon -- what is that based upon?
14   A.    Based upon my discussion with my
15 accountants.
16   Q.    Do you have any knowledge -- or at
17 the time you -- at the time you signed this
18 affidavit, did you have any knowledge of the
19 procedures for journal entries at Dalton?
20   A.    No, that's -- that's something that
21 Dalton keeps among itself.  I do recall the
22 testimony of the chief operating officer with
23 respect to the journal entries, et cetera.
24   Q.    So what is the basis for your
25 statement in the affidavit, page 25,

225

John Edmonds
1
2 paragraph 50, "Clearly defendants are in blatant
3 violation of the government auditing
4 standards" --
5    A.    Based upon --
6    Q.    Excuse me, let me finish.
7         -- "since the conduct of defendants
8 Dalton, Dawley and Marks Paneth & Shron
9 demonstrates that defendant Dalton is not the
10 party preparing the account journals"?
11   A.    Well, based upon two things.  First
12 of all, the statement by the accountants, the
13 statement by the accountants.  And then Dawley's
14 own testimony.
15   Q.    Well, wasn't Mr. Dawley's testimony
16 taken several months after you signed this
17 affidavit?
18   A.    Yes.
19   Q.    So that couldn't be the basis of
20 this affidavit.
21   A.    Yes --
22        MR. HAYWOODE:  I'm going to object
23 to that because Dawley talked to the
24 accountants originally.  If he said the
25 same thing to them that he said at the

**VERITEXT REPORTING COMPANY**
(212) 279-9424          www.veritext.com          (212) 490-3430



226

```
 1            John Edmonds
 2    deposition on February 24th, that might
 3    explain it.
 4            I just point that out as an
 5    objection to form. You're saying it
 6    couldn't have happened, but they talked to
 7    each other. I don't know.
 8    BY MR. KELLY:
 9        Q.   So if the deposition of Dawley
10    happened after you signed this affidavit, then it
11    couldn't form the basis of any knowledge you had
12    in --
13        A.   I've indicated to you --
14            MR. HAYWOODE: Objection again.
15        Go on.
16        A.   -- that the information that I have
17    in connection with my affidavit is information
18    that I've secured from my accountants. And their
19    information I gather is based upon their
20    conversations with Dawley and Nealle Seavey and,
21    I guess, Phyllis Seavey.
22        Q.   When did you have the conversation
23    with the accountants in which they gave you
24    information that supported the statement that
25    Marks Paneth and not Dalton is a party to
```

227

```
 1            John Edmonds
 2    preparing the account journal entries?
 3        A.   I believe that the accountants
 4    interviewed Dawley in his capacity as chief
 5    operating officer and inquired, about these
 6    government operating standards and the other
 7    standards, of him.
 8            And apparently he responded in the
 9    same way in which he responded in his testimony,
10    that -- I have to think. He must have told them,
11    because that's what they told me, that these --
12    that the Seaveys do not keep a record of their
13    management and control of the monies, that they
14    write down the figure and they put a check next
15    to that figure, or -- and/or bill or whatever,
16    and that they then give it to the accountant and
17    then the accountant converts it to meet their
18    needs.
19        Q.   So the basis of your discussion in
20    your affidavit regarding journal entries is
21    solely based upon your knowledge received from
22    the accountants?
23        A.   That's correct.
24        Q.   Have you ever reviewed any invoices
25    submitted by Marks Paneth & Shron to Dalton or
```

228

```
 1            John Edmonds
 2    any of the partnerships?
 3        A.   Nope. The only thing I ever
 4    received from Dalton are the -- as I said, the
 5    family court records and checks that impact upon
 6    the employees at the various projects.
 7        Q.   So in your affidavit, when you
 8    state, "A review of these invoices show that
 9    they're not accrued, but instead charged against
10    the 2006 expenses, which is a departure from
11    generally accepted accounting principles" --
12        A.   That's a statement made to me by my
13    accountants.
14        Q.   You have no other outside knowledge
15    about what the contents of the invoices show or
16    whether or not --
17        A.   No.
18        Q.   -- they depart from generally
19    accepted accounting principles?
20        A.   None.
21        Q.   Did you ever have the occasion to
22    have a conversation with William Jennings from
23    Marks Paneth & Shron?
24        A.   I've had some conversations with
25    Jennings through the years, but usually I speak
```

229

```
 1            John Edmonds
 2    to his first assistant, young lady.
 3        Q.   Do you recall that young lady's
 4    name?
 5        A.   No.
 6        Q.   Do you recall having a conversation
 7    with Mr. Jennings at the end of 2007 regarding
 8    requests for information from your accountants?
 9        A.   I may have. I know that -- I know
10    that I had informed Rudy Clark he should -- at
11    that time that he should be in touch with
12    Jennings. And also I told the accountants,
13    Cameron, et cetera, that they should talk to
14    Jennings.
15        Q.   You mentioned Rudy Clark in your
16    answer just now. Did you have discussions with
17    Mr. Clark regarding contacting William Jennings
18    or Marks Paneth & Shron?
19        A.   Yeah, I told him to be in touch with
20    them to get complete copies of tax returns on
21    each of these developments, the whole return, not
22    just that part of the return that might impact
23    on -- on me.
24        Q.   Do you know when you spoke with
25    Mr. Clark about getting this information from
```

**VERITEXT REPORTING COMPANY**
www.veritext.com

(212) 279-9424                    (212) 490-3430



230

John Edmonds

Marks Paneth & Shron

A. Oh, I think I spoke to him at the time when I first discussed with him this process, that I was going to go forward on this. And also Rudy had informed me that they sent him, you know, only a partial return. I don't know the term for it.

But that did not reflect the return -- did not reflect all of the information necessary for him to do a tax return that reflects properly what my interest was, et cetera.

And as a matter of fact, it appeared that the tax return was prepared such that Edmonds ended up paying all the taxes.

Q. Do you know who prepared the tax returns for the partnerships?

A. I only know that the only firm that's represented Seavey, maybe for 40 years, is the Shron firm.

MR. HAYWOODE: Indicating the defendant Marks Paneth & Shron.

Q. Do you recall when you had Mr. Clark request this information?

231

John Edmonds

A. Is it -- when I first spoke to him before I retained these accountants as a result of Rudy saying to me that he could not do this kind of investigation because of his engagements and work in North Carolina, and that I should seek other accountants who are familiar with affordable housing projects and the requirements of the federal government and the state government and the City of New York.

Q. Did Mr. Clark ever advise you that money was unaccounted for with regards to the partnerships?

A. I don't think he did. I don't think he advised me of that. I think that information I received from Cameron, et cetera.

Q. Going back to communications, conversations you may have had with Mr. Jennings, do you recall a particular phone call in which Mr. Jennings said he was going to Europe and that he wouldn't be able to respond to requests from Cameron Griffiths?

A. Yes.

Q. What do you recall about that conversation?

232

John Edmonds

A. Only that he said he would be away for two or three weeks.

Q. Did you say anything during that conversation?

A. To him?

Q. Yes, to him.

A. I said to him that -- you know, that Cameron Griffiths are in need of this information if we're going to progress in terms of our lawsuit, and that we shouldn't have to wait until he came back from Europe to get that information.

And he said, John, you know, my assistant is here and you can always deal with her.

Q. And did you direct Cameron Griffiths' advice to deal with the assistant?

A. I don't recall whether I did or not, but I probably did.

Q. In your communications with Cameron Griffiths & Pryce, did you ever have any written communications to them?

A. No. My communications with Cameron Griffiths & Pryce are always at meetings in their office in Brooklyn, on Utica Avenue.

233

John Edmonds

Q. Other than the two reports that have been marked in evidence today, which is Exhibit 4 --

A. Those are the reports related to the 2006 --

Q. -- and Exhibit A to your affidavit, have they provided you any other written materials?

A. No other written. Oral materials. They have said A, B and C, and they're still having great difficulty in getting the Seaveys to make books, records, et cetera, available to them.

Q. Have they complained to you about Marks Paneth & Shron not making books and records available that were in their possession?

A. I don't recall them making any statement to that effect as to Marks Paneth & Shron.

Q. Are you aware of any statement by Marks Paneth & Shron, written or oral, that you believe to be false?

A. There's no basis for me to -- to assume that any statement that they made may be

59 (Pages 230 to 233)



234

John Edmonds

1
2  false; but I do refer you to my conversations
3  with Cameron in which -- when I say "Cameron," I
4  mean his group -- in which they indicate to me
5  that the Shron auditors have the principal
6  responsibility for the returns and accounting at
7  Dalton Management.
8      Q.    Which one of the auditors told that
9  to you?
10     A.    These are discussions I have had
11  with all three auditors at one time. Usually the
12  meetings -- everybody's present at the meeting.
13  You know, these auditors --
14     Q.    Are you aware -- can you identify --
15         MR. HAYWOODE: Bill, you asked a
16  question several -- three questions back,
17  and I apologize being late with it,
18  concerning anyone writing to Marks Paneth &
19  Shron.
20         I would --
21         MR. KELLY: No, I did not ask a
22  question about anybody writing to Marks
23  Paneth & Shron.
24         MR. HAYWOODE: Well, if you didn't,
25  then I will not point to the series of

235

John Edmonds

1
2  letters contained in the --
3         MR. KELLY: Let's not point to them.
4         MR. HAYWOODE: But if you did, there
5  are several letters in the order to show
6  cause addressed to Marks Paneth & Shron
7  here from the accountants.
8  BY MR. KELLY:
9      Q.    Do you recall, Mr. Edmonds, any
10  representations that have been made to you from
11  Marks Paneth & Shron?
12     A.    Representations of what nature?
13     Q.    Do you recall any statements made to
14  you by Marks Paneth & Shron?
15         MR. HAYWOODE: Note my objection to
16  the form.
17         Because they issued financial
18  statements every year concerning --
19         MR. KELLY: Mel, no. You have your
20  objection. You don't need to suggest
21  information to the witness.
22         MR. HAYWOODE: Well, you're saying
23  did they make any representations and there
24  is a financial statement --
25         MR. KELLY: Mel, please --

236

John Edmonds

1
2         MR. HAYWOODE: -- and I object to
3  the form of the question.
4         MR. TRAUB: Mel, a deposition is not
5  your place to argue with the question other
6  than to form or instruct the witness if
7  there's a problem. This is not an
8  opportunity to argue the merits of the
9  case.
10         MR. HAYWOODE: I'm not arguing the
11  merits of any case. I'm just pointing out
12  that the question carries a tautology in it
13  because it's saying did they make any
14  representations to you when they made
15  representations in a financial statement.
16         Now, who would that be to?
17  Certainly not the subscribers to the New
18  York Times.
19         MR. TRAUB: You're now arguing with
20  me.
21         MR. HAYWOODE: I'm not arguing. I'm
22  objecting to the form of the question.
23         MR. KELLY: Make your objection and
24  then we proceed.
25         MR. TRAUB: You don't need to give,

237

John Edmonds

1
2  nor are you entitled to give your basis for
3  your objection to form. You're entitled to
4  say, Objection to form, and that's it.
5         THE WITNESS: Well, I gather that
6  the process that Mr. Kelly is following
7  here is an attempt to, in effect, indict
8  the accountants. When I say that, I mean
9  he's trying to show that these accountants,
10  these community accountants, as they've
11  been called by people, don't really know
12  what they're doing and so, therefore, any
13  information that they've gleaned is
14  invalid.
15  BY MR. KELLY:
16     Q.    I'll ask the question again.
17         Do you recall any statements from
18  Marks Paneth & Shron to you?
19         MR. HAYWOODE: Same objection.
20     A.    I've said to you that, based upon my
21  accountants report, 2006 report, and my various
22  meetings with the Cameron group, I made the
23  statement that I made in my affidavit.
24     Q.    So is your testimony that you do not
25  recall any statements made by Marks Paneth &

VERITEXT REPORTING COMPANY
www.veritext.com
(212) 279-9424                                    (212) 490-3430



238

John Edmonds

Shron to you?

A.   To me, no, no.  Because I -- the only statement that I recall is the one that I've already testified to, when Jennings told me that he'd be away for three to four weeks and that I could deal with his assistant.

Q.   In your discussions with your accountants, were any statements that Marks Paneth & Shron made to them communicated to you?

MR. HAYWOODE:  Objection to form.
How would he know?  Well, objection.

A.   Repeat your question.  What did you say?

Q.   In your discussion with your accountants, did they tell you about any statements that Marks Paneth & Shron made to them?

A.   They may have.  They probably did, once again, in the meetings that we would have.

Q.   Do you recall if they identified any statements that they believe were made by Marks Paneth & Shron that they believed to be false?

A.   No, they merely point to the role that Marks Paneth & Shron has in the

239

John Edmonds

partnerships.  It's their position that the books and records of the partnerships are kept by the Shron firm, not by partnerships.

Q.   And other than what your accountants have told you, you have no source of information for that belief?

A.   No, I haven't.

Q.   Have you seen any advertisements by Marks Paneth & Shron?

A.   None that I know of.

MR. HAYWOODE:  Off the record.

(Discussion off the record.)

BY MR. KELLY:

Q.   What contracts did you enter into based upon fraudulent statements?

A.   All of them.

Q.   When did you enter into these contracts?

A.   Whenever the dates are on the documents.

Q.   Are you referring to the partnership agreements?

A.   Yeah.

Q.   Can you identify what statements

240

John Edmonds

were said to you at the time that you entered into these agreements?

A.   I've said to you that -- that -- well, there's really only one kind of approach that Seavey would make that grew out of my use my own monies, that is the monies that I was entitled to get from the partnerships in which he said that he required -- the partnerships required me to resign and they required me to have a limited time, one year, to return the funds, failure to return the funds would mean that I would lose my general partnership and that I would become 1.4 -- one-fourth partner -- limited partner and that, at my death, the properties would go to the Seaveys.

Q.   Are you aware of --

MR. HAYWOODE:  Are you finished?

A.   And I said that the monies that I used and repaid was a year late on the basis of the advice given to me by Seavey in which he said, Just put the check in the account and mark it as CL number so and so and so, and it would go -- the bank will have that returned to the account.

241

John Edmonds

And I also said that those were -- I recognized late that those weren't Seaveys' money that he was talking about.  He was talking about my own monies.

Q.   Are you referring to the agreement marked as Exhibit 10?

A.   I guess so.  That's the agreement in which he had me sign all these things, yes, in order to get this advance.

Q.   Exhibit 9 and 10 actually is what I was referring to.

THE WITNESS:  Where's 9?

MR. HAYWOODE:  Here's 10.

BY MR. KELLY:

Q.   Prior to commencing this action, did you give any consideration to what impact a complaint for $500 million would have on defendant Marks Paneth & Shron?

A.   Yeah, serious consideration to that.

Q.   What was your consideration?

A.   I thought it would send their heads spinning in particular, if a jury made that kind of an award.

Q.   Did you consider the impact on Marks



242

1    John Edmonds
2    Paneth & Shron's business that a filing of a
3    $500 million complaint would have?
4        A.    No, I didn't consider that.  I
5    considered only that I would sign this complaint
6    and that we would proceed and that -- that the
7    courts would make that determination as we went
8    down the road.
9        Q.    I want to direct your attention to
10   Exhibit 8, which is a letter from the Internal
11   Revenue Service.
12       A.    Yeah.
13       Q.    Do you recall discussing this letter
14   earlier today?
15       A.    Yeah.
16       Q.    Isn't it probable and possible that
17   the IRS proposed no change to the tax returns
18   because they were done properly to begin with?
19       A.    Yes, that's all together probable
20   and possible.  But I don't know why then they
21   would require Seavey to notice the partnerships
22   and its participants to the effect that there
23   need not be any change in his return.
24            And Seavey said so in his letter.
25   He said that pursuant to the direction of the

243

1    John Edmonds
2    Internal Revenue Service, you are hereby noticed
3    that the return that was filed on the year it was
4    filed, I think, what, 2003, has been accepted,
5    and I'm sending you this letter or notice
6    pursuant to the direction of the Internal Revenue
7    Service.
8            So, you know --
9        Q.    Do you see that the letter is
10   addressed to Mr. Jennings of Marks Paneth &
11   Shron?
12       A.    I don't know who it's addressed to.
13   I only know that I got a copy of it from Seavey.
14       Q.    Do you have any knowledge of any
15   work besides -- well, let me withdraw that.
16            What is your understanding of the
17   work Marks Paneth & Shron did on behalf of the
18   partnerships and Dalton Management?
19       A.    They are, according to the Seaveys,
20   auditors of the partnerships.  They also
21   apparently convert the -- the Seaveys' factual
22   situation into a form that reflects a consistent
23   and accurate return.  In other words, they play a
24   dual role.  The exact nature of that role, you
25   know, I don't want to argue, but --

244

1    John Edmonds
2        Q.    Has anyone ever told you that Marks
3    Paneth & Shron has done anything wrong in
4    connection with their work done on behalf of the
5    partnerships --
6        A.    Yes, yeah.  Sure.  That's what my
7    accountants have stated.
8        Q.    What have they stated in that
9    regard?
10       A.    They stated that Marks Paneth &
11   Shron are not auditors, but they're both
12   bookkeepers and the auditors.
13       Q.    Which one of the accountants told
14   you that?
15       A.    The group, as a result of what they
16   saw in the 2006 books and records.
17       Q.    And when did they tell you that?
18       A.    From the very beginning of their --
19   of their tenure.
20       Q.    When did you decide to include Marks
21   Paneth & Shron as a defendant in this action?
22       A.    I decided to include them because I
23   felt that they were facilitating this wrongful
24   conduct by -- and protecting the Seaveys in that
25   wrongful conduct, in that racketeering.

245

1    John Edmonds
2        Q.    When did you make that
3    determination?
4        A.    I made that determination when my
5    accountants reported to me the dual role of Marks
6    Paneth & Shron.  They said that's against
7    accounting standards, that was improper; that
8    you --
9        Q.    Did they --
10       A.    They said the two functions should
11   be separated.  And they said further, that,
12   generally speaking, in order for an accounting
13   firm to establish that they are strictly the
14   auditors, that there was a procedure whereby the
15   client would -- would be required by the auditing
16   firm to get another auditor for -- to make
17   certain that their role was not improperly
18   interpreted.
19
20            THE WITNESS:  Any further questions,
21   Mr. Kelly?
22            MR. KELLY:  No, I have no further
23   questions.
24            THE WITNESS:  Thank you very much.
25            MR. TRAUB:  I have just a few

**VERITEXT REPORTING COMPANY**
www.veritext.com
(212) 279-9424                                          (212) 490-3430



246

```
1              John Edmonds
2        follow-up.
3        EXAMINATION (Cont'd.)
4        BY MR. TRAUB:
5        Q.    Mr. Edmonds, you are an attorney; is
6    that correct?
7        A.    That's correct.
8        Q.    And you are a member of the state
9    bar of New York?
10       A.    Yes, for 52 years.
11       Q.    For 52 years as an attorney, and I
12   presume for equally as much time, if not more, as
13   a sophisticated businessman as well --
14       A.    I don't know whether I'm
15   sophisticated or not.  And the reason I don't
16   know that is that a sophisticated businessman
17   wouldn't have allowed his partners to get the
18   kind of advantage that the Seaveys had in this
19   situation.
20       Q.    Then as a businessman, before you
21   sign a contract, and especially as an attorney,
22   you review that contract, do you not?
23       A.    Yes, of course.
24       Q.    And you read every term in that
25   contract and you probably even negotiate
```

247

```
1              John Edmonds
2    contracts that you sign before you sign them?
3        A.    Yeah, particularly for clients, but
4    I don't do it necessarily with that kind of
5    approach as it relates to partners, people who
6    are in business with me.
7        Q.    But you are capable of doing that
8    type of approach, are you not?
9        A.    Yes.
10       MR. TRAUB:  Nothing further.
11   EXAMINATION
12   BY MR. HAYWOODE:
13       Q.    You mentioned the redemption of your
14   interest in the partnership paid in 2001 and that
15   you gave --
16       A.    No, I think -- I think -- was it
17   2001?  Whatever the check -- the date -- I think
18   maybe it was 2001.
19       Q.    September 2001, would that refresh
20   your recollection?
21       I'll withdraw the question.  That's
22   not important.
23       How much money did you pay to redeem
24   your interest in the corporation?
25       A.    I paid --
```

248

```
1              John Edmonds
2        MR. TRAUB:  Objection to the form.
3    I don't think that --
4        MR. KELLY:  No talking objections.
5        MR. TRAUB:  I just object to form in
6    terms -- objection to the use of the term
7    "for redeeming your partnership interest."
8        A.    Well, the -- did I pay -- how much I
9    paid, I think it was $2.1 million.  I'm not sure.
10   2.1 -- no, wait a minute.  Was it -- no.  Yeah,
11   it was 2.1, but that included interest at the
12   rate of 16 percent annually.  I paid that -- I
13   put that money back in the account that Seavey
14   instructed me to put it in.
15       Q.    Was any further discussion held on
16   the subject after you paid that money?
17       A.    No, I just told Bob that I was
18   redeeming my interest, although it was a year
19   late, by repaying the obligation.
20       Q.    And in whose name was the account to
21   which you returned that money?
22       A.    It was in the Morgan Chase account.
23       Q.    Were you a signatory on that
24   account?
25       A.    Yes, I was.
```

249

```
1              John Edmonds
2        Q.    Was anyone else a signatory along
3    with you on that account?
4        A.    Seavey and -- as I read it, I
5    realized that Avery, Dalton Management and
6    Nealle, everybody was on the account.
7        MR. HAYWOODE:  All right.  Nothing
8    further.
9        (Examination concluded.  The time is
10   4:55 p.m.)
```



**VERITEXT REPORTING COMPANY**
www.veritext.com
(212) 279-9424                               (212) 490-3430

250

```
1
2   STATE OF NEW YORK      )
3              ss:
4   COUNTY OF WESTCHESTER  )
5
6
7       I, JOHN EDWARDS, the witness herein,
8   having read the foregoing testimony of the pages
9   of this deposition, do hereby certify it to be a
10  true and correct transcript, subject to the
11  correction, if any, shown on the attached page.
12
13             oOo
14
15
16
17
18          _____
19             JOHN EDWARDS
20
21  Subscribed and sworn before me
22  this _____ day of _____, 2009.
23
24  _____
25     NOTARY PUBLIC
```

251

```
1
2   April 17, 2009
3          I N D E X
4   WITNESS        EXAMINATION BY        PAGE
5
6   JOHN EDWARDS
7          MR. TRAUB          5
           MR. KELLY          218
           MR. TRAUB          246
8          MR. HAYWOODE       247
9
10         E X H I B I T S
11  EDWARDS                         PAGE
12
13  Exhibit 1  3/8/07 Letter to Seavey from   40
14      Edmonds
15  Exhibit 2  7/31/06 Letter to Edmonds from 51
16      Seavey
17  Exhibit 3  3/27/07 Letter to Seavey from  72
18      Edmonds
19  Exhibit 4  12/12/07 Cameron, Griffiths &  91
20      Pryce letter  attaching their
21      report
22  Exhibit 5  Affidavit in Support of Order to 120
23      Show Cause
24  Exhibit 6  Verified Complaint          126
25
```

252

```
1
2   (Continued)
3          E X H I B I T S
4
5   Exhibit 7  6/22/07 Letter to variety of    152
6       people from John Edmonds with
7       attachments
8   Exhibit 8  10/26/06 Letter from the IRS to 155
9       Jennings with attachment
10  Exhibit 9   Agreement for Purchase and Sale 168
11      of Partnership Interest
12  Exhibit 10  Second Amended Agreement of    168
13      limited partnership of Fifth and
14      106th Street Associates, L.P.
15  Exhibit 11  Amended and Restated Certificate 174
16      of Limited Partnership of Charles
17      H. Housing Associates
18
19
20
21
22
23
24
25
```

253

```
1
2          ERRATA SHEET
        VERITEXT REPORTING COMPANY
3           1-800-727-6396
4             1350 BROADWAY
        NEW YORK, NEW YORK 10018
5
6   NAME OF CASE:    EDMONDS V. SEAVEY
    DATE OF DEPOSITION:  APRIL 17, 2009
7   NAME OF DEPONENT:  JOHN EDWARDS
8
9   PAGE LINE(S)  CHANGE      REASON
10  ___|___|_____|_____
11  ___|___|_____|_____
12  ___|___|_____|_____
13  ___|___|_____|_____
14  ___|___|_____|_____
15  ___|___|_____|_____
16  ___|___|_____|_____
17  ___|___|_____|_____
18  ___|___|_____|_____
19  ___|___|_____|_____
20  ___|___|_____|_____
21          _____
22              JOHN EDWARDS
    Subscribed and sworn to before me
23  this _____ day of _____ 2009.
24
25
```

64  (Pages 250 to 253)

254

1
2  STATE OF NEW YORK    )
3                 ss:
4  COUNTY OF NEW YORK   )
5
6          I, Eileen Mulvenna, Notary Public
7  within and for the State of New York, do hereby
8  certify:
9
10         That I reported the proceedings in
11  the within entitled matter, and that the within
12  transcript is a true record of said proceedings.
13
14         I further certify that I am not
15  related to any of the parties to the action by
16  blood or marriage, and that I am in no way
17  interested in the outcome of this matter.
18
19         IN WITNESS WHEREOF, I have hereunto
20  set my hand this 28th day of April, 2009.
21
22
23         Eileen Mulvenna, CSR/RMR
24
25

VERITEXT REPORTING COMPANY
www.veritext.com
(212) 279-9424                                    (212) 490-3430