UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

JOHN L. EDMONDS, et al.,

Plaintiffs,

Case No.

- against - 08-CV-5648(HB)

ROBERT W. SEAVEY, et al.,

Defendants.

------------------------------------------x

April 21, 2009
10:20 a.m.

DEPOSITION of ORLEY GEORGE CAMERON, taken by the Parties, pursuant to Subpoena, held at the offices of Herrick, Feinstein, LLP, 2 Park Avenue, New York, New York 10016, before Donna A. Metz, a Registered Professional Reporter and Notary Public in and for the State of New York.

A P P E A R A N C E S

M. DOUGLAS HAYWOODE, ESQ.
Attorney for Plaintiffs
71 Maple Street
Kings Chancellery
Brooklyn, New York 11225-5001

HERRICK, FEINSTEIN LLP
Attorneys for Defendants Robert W. Seavey, Phyllis M. Seavey, Avery B. Seavey, Neale B. Seavey, Ronald Dawley, Dabon Management Company LLC and The Seavey Organization
2 Park Avenue
New York, New York 10016
By: M. DARREN TRAUB, ESQ.,
of Counsel
(File No. 6955.004)

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
Attorneys for Defendant Marks Paneth & Shron
3 Gannett Drive
White Plains, New York 10604-3407

By: WILLIAM J. KELLY, ESQ.,
of Counsel
(File No. 01439.03148)

A L S O  P R E S E N T:

JOHN L. EDMONDS
PHYLLIS M. SEAVEY
RONALD DAWLEY

S T I P U L A T I O N S:

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the parties hereto that sealing and filing of the within deposition be and the same are hereby waived; and that the transcript may be signed before any Notary Public with the same force and effect as if signed before the Court.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of trial.

o 0 o

O R L E Y  G E O R G E  C A M E R O N, having been duly sworn by the Notary Public (Donna A. Metz), was examined and testified as follows:

EXAMINATION

BY MR. KELLY:

Q. Good morning, Mr. Cameron.
My name is Bill Kelly. I represent defendant Marks Paneth & Shron in the action that brought us here today known as Edmonds against Seavey, et al.
I'm going to ask you a series of questions this morning. If you don't understand me or if you don't hear me, please let me know. I will rephrase or I will speak louder.
If you do answer the question, we will assume that you understood it and that you heard it and that your answer is to that question.
A. Um-hum.
Q. Are you represented by counsel here today?

THE WITNESS: Am I?
MR. HAYWOODE: I think he is represented by independent counsel, but I am here to assist, you know.
But he has no independent attorney.
THE WITNESS: Do I need one?
MR. KELLY: It's not for me to answer your questions today.
MR. HAYWOODE: Perhaps if you come to that conclusion at any time you will tell Mr. Kelly and then you will have to arrange to get a lawyer.
I don't know.
MR. KELLY: I am going to ask the court reporter to mark the Subpoena to Orley Cameron as Defendants' Exhibit 13.
(Copy of Subpoena issued to Orly Cameron (sic), marked Defendants' Exhibit 13 for identification, this date.)
Q. Mr. Cameron, did you bring any documents with you here today in connection with this matter?
A. Yes.
Q. What documents did you bring with



Orley George Cameron

you today?

A. I brought with me a couple of correspondence between our firm Cameron, Griffiths & Pryce and Dalton Management.

Some of them were directed to Marks Paneth, yes.

Q. Did you bring any timesheets or diaries reflecting -- first, did you bring any timesheets reflecting time spent in connection with this engagement?

A. No.

Q. Did you bring any billing records in connection with this engagement?

A. No.

Q. I am going to ask the witness to look at Exhibit 13, please.

Have you ever seen this Exhibit 13 before today?

A. Yes.

Q. Were you served with this subpoena in a civil case prior to your appearance here today?

A. Yes.

Q. When you were served with the

Orley George Cameron

subpoena, did you review the subpoena?

A. Yes.

Q. Did anybody instruct you not to bring documents with you today that may have been called for in the subpoena?

A. No.

Q. Can you tell me why you did not bring any timesheets in regard to your engagement here with Mr. Edmonds?

A. We don't keep timesheets.

Q. When you say "we," are you referring to the firm Cameron Griffiths & Pryce?

A. Yes.

Q. How does Cameron Griffiths & Pryce keep a record of the time spent on any particular engagement?

A. We keep a record of the time in the workpapers, some of the workpapers that we do.

Generally we don't keep regular time. We estimate the time that any engagement would have taken us and we work within that time.

Q. Do you bill your clients for the time you spend on an engagement?

Orley George Cameron

A. We generally bill the client based on estimated time. We have a budget and we negotiate a price at the beginning of the engagement.

Q. Do you bill by the hour or by some other method?

A. We are billing is based on estimated hours, but we don't bill by the hours.

We determine upfront based on an assessment of what the engagement might be and then we determine what the price should be.

Q. So starting a new engagement or an engagement with the clients, is it correct to say that you estimate the amount of time you anticipate spending on that engagement --

A. Yes.

Q. -- agree to that total with the client for the total sum fees and that's how you bill your clients?

A. Correct.

Q. Is that how you billed Mr. Edmonds in this case?

A. Correct.

Q. Prior to or at the time of the

Orley George Cameron

engagement, how much time did you estimate you would bill Mr. Edmonds for this engagement?

A. We -- based on having discussed with Mr. Edmonds and based on the fact this is an organization and we ask him, that is being audited over a period of time, we estimate it should not take us more than at most two, two and a half months. It's on that basis we determine, and two and a half months only to the extent we have to wait for confirmation.

Q. Did you come to an amount that you thought would be the appropriate fee when you first were engaged by Mr. Edmonds?

A. Yes.

Q. What was that amount?

A. We agreed on 1 percent of revenues for each project.

Q. Did you have an understanding at the time you started the engagement of what the approximate revenues were for each project?

A. Yes.

Q. What projects are you referring to?

A. Logan, Church Home, Charles Hill, Lakeview.




Orley George Cameron

Q. What was your understanding at the time you started your engagement for the revenues for each of those projects?

A. Lakeview we understand was approximately five million.

Church -- Logan was a little less than a million.

And Church Home was approximately two million, were approximately two million.

Q. So, if my math is correct, you anticipated about eight million dollars of revenue for the projects?

A. Yes.

MR. HAYWOODE: I am sorry, Bill.

Can I hear the numbers again?

Five for Lakeview.

Two for Church Home.

MR. KELLY: And one for Logan.

THE WITNESS: About 1.5.

MR. HAYWOODE: 1.5 for Logan?

THE WITNESS: Um-hum.

Q. And how much did you anticipate for Church?

A. Approximately $2 million.

Orley George Cameron

MR. HAYWOODE: So it's a higher number.

Q. So adding in now the Church amount, you anticipated about $10 million of revenue for these projects?

A. I think we estimate approximately $9.5 million, thereabouts, $10 million.

Q. Do you know how much you have charged Mr. Edmonds thus far for your work in connection with this engagement?

A. Well, it's approximately 1 percent of that bill and that was what we had agreed on.

Q. Have you been paid by Mr. Edmonds the amount of money you have charged him?

A. Yes.

Q. Do you anticipate charging Mr. Edmonds any additional fees?

A. Well, we have to do additional engagement.

Once the engagement expands on what we anticipate, I expect it would have been, yes.

Q. Can you put a dollar amount on the

Orley George Cameron

amount of fees that you have received from Mr. Edmonds thus far?

A. I think approximately about 150, 160, approximately.

$150,000, approximately.

Q. Do you have any outstanding invoices to Mr. Edmonds as we sit here today?

A. No.

Q. Do you anticipate billing Mr. Edmonds for work incurred thus far that he hasn't been billed yet?

A. We would have to go back and review our work; but, currently, no.

Q. When you say you have received 150 or $160,000, is that the fees received by you, personally, or the Cameron Griffiths & Pryce firm?

A. The firm.

Q. Is the 1 percent of revenues a regular practice of the firm in charging their audit clients?

A. Yes.

Q. When were you first engaged by Mr. Edmonds in connection with anything?

Orley George Cameron

A. Approximately March -- approximately March of '07.

Q. Had you done any work for Mr. Edmonds prior to March of '07?

A. Never met him before.

Q. Had you done any work for Mr. Edmonds prior to March of '07?

A. No.

Q. Had you done any work for Mr. Haywoode prior to March of '07?

A. No.

Q. How did you come to know Mr. Edmonds?

A. Still a mystery to me.

Someone from North Carolina called me, I think it's a CPA, another colleague, called me, asked me if I am willing to review some housing projects, and I said yes, and he told me that a gentleman named Mr. Edmonds is coming to see me.

Q. Had you reviewed any -- had you done any work whatsoever in connection with real estate properties in the past?

A. Yes.



Q. Let's go through your professional history.

Are you a licensed CPA?

A. Yes, I am.

Q. Where are you licensed?

A. New York State.

Q. When did you become licensed?

A. I think around '92, 1992. It's so long ago I can't remember.

Q. Did you attend a college prior to becoming a CPA?

A. Yes, that's a requirement.

Q. What college did you attend?

A. Brooklyn College.

Q. What degree -- did you get a degree from Brooklyn College?

A. Yes. I got a bachelor's degree from Brooklyn College.

I continued on with the master's program, yes.

Q. What was your degree in?

A. Accounting.

Q. After completing your time at Brooklyn College, what did you do

professionally next?

A. Actually, while at Brooklyn College I worked as an auditor. I mean that's after my first degree. I worked as an auditor at -- for the Department of Social Services.

Then I transferred to the State Controller's Office and that's where I got my experience.

Q. What years did you work at the State Controller's Office?

A. I think it should be between 1990 and '94. No, 1990 and '92, '93, yes.

Q. And what were your duties while at the State Controller's Office?

A. I was a state auditor.

Q. What did you audit while you were there?

A. I audited various state agencies, not-for-profit organizations that received funding from including DHCR, state funded.

Q. Did you audit the state agencies or the entities that received funding from state agencies?

A. We audit agencies that received

funding from state agencies and we also audited state agencies because we audit -- we do performance audit.

So basically review their oversight of the agencies that they fund.

Q. After you left the State Controller's Office, what did you do next professionally?

A. I worked as a controller for a not-for-profit organization in the city.

Q. What organization was that?

A. I think the current name is FACES.

Then the name was Minority Task Force.

Q. How long did you work at what was then called Minority Task Force?

A. Approximately two and a half years.

Q. Do you recall the year you stopped working at Minority Task Force?

A. I remember clearly because that's when I start my own practice.

It was August of 1994.

Q. And when you started your own practice in August of 1994, what was it

called?

A. My practice? Cameron Accounting.

Q. When you started your own company Cameron and Company, did you have any partners?

A. No.

Q. Did you have any employees?

A. Yes.

Q. What was the nature of the work you provided at Cameron and Company?

A. The same I provide now.

I do audits, tax and consulting.

Q. What type of audits do you perform?

A. I perform audits of -- financial audits.

Q. Do you audit financial statements of companies?

A. Yes.

Q. Do you perform forensic audits?

A. Yes.

Q. Do you perform fraud examinations?

A. No.

Q. What type of entities do you currently perform audits of financial



Orley George Cameron

statements for?

A. I audit numerous agencies: credit unions, mortgage brokers, churches, not-for-profit agencies, for-profit agencies.

Q. Other than your engagement with Mr. Edmonds, do you audit any entities that own apartment complexes?

A. No.

Q. Other than your engagement with Mr. Edmonds, do you audit any entities that manage apartment complexes?

A. No.

Q. Other than your engagement with Mr. Edmonds, do you audit any entities that provide low income housing?

A. No.

Q. Other than your engagement with Mr. Edmonds, do you audit any companies that manage low income housing projects?

A. No, but it might be instructive to know that Minority Task Force does provide low income assisted houses.

One of the projects I have, I actually receive -- I oversaw the building of

Orley George Cameron

it while I was there.

Q. You are referring to the Minority Task Force that you were at between '92 and '94?

A. Yes.

Q. Since your completion of your studies at Brooklyn Law, have you taken any --

A. Brooklyn College.

Q. Brooklyn College. Sorry.

-- have you taken any other educational courses in connection with your profession?

A. Oh, that's required.

Q. Have you taken any other professional courses in connection with auditing --

A. Yes.

Q. -- in connection with auditing?

A. Yes.

Every year, at least 40 credits.

Q. Have you taken any professional courses in connection with auditing entities that provide low income housing?

A. Yes. That's required, yes.

Orley George Cameron

Q. What courses have you taken?

A. Yellow Book Standard, GAGAS, Government Accounting Government Auditing Standards.

Q. In your work at Cameron, Griffiths & Pryce, does Cameron, Griffiths & Pryce audit any entities that are regulated by the DHCR?

A. Yes, the projects that we are currently on.

Q. Other than the Edmonds engagement, does Cameron, Griffiths & Pryce audit any entities that are regulated by the DHCR?

A. No.

Q. Other than the Edmonds engagement, does Cameron, Griffiths & Pryce audit any entities that are regulated by HUD?

A. No.

Q. Other than the Edmonds engagement, does Cameron, Griffiths & Pryce audit any entities that are regulated by any state or government subsidized projects?

A. No.

Q. When you were first engaged by Mr. Edmonds, what was the engagement?

Orley George Cameron

A. The engagement was a regular financial statement audit.

Q. Of what entities?

A. The four projects: Lakeview, Charles Hill, Church Home, Logan.

Q. Once you accepted the engagements, did you take steps to review any literature in connection with auditing these four projects?

A. Sure.

Q. What literature did you review?

A. Well, the first thing I do I went to the HUD website to look at their -- what their requirements are.

And by the way, just to be specific, Cameron, Griffiths & Pryce was formed specifically because I have my separate practice. I brought all twelve of them together to provide the necessary expertise to work on the project.

Q. So prior to the engagement with Mr. Edmonds, Cameron, Griffiths & Pryce did not exist?

A. Right.

Q. What type of legal entity is

Orley George Cameron

Cameron, Griffiths & Pryce?
A. LLC.
Q. Prior to the formation of Cameron, Griffiths & Pryce, what was the legal entity that you practiced at?
A. Sole proprietorship.
Q. Prior to the formation of Cameron, Griffiths & Pryce, what was the practice of Ms. Griffiths?
A. She does the same type of practice we were.
Actually, both of us collaborate and audit, but we have the same type of practice, yes.
Q. Prior to the formation of Cameron, Griffiths & Pryce, what was the type of practice that Mr. Pryce practiced?
A. Actually, he's a controller at FACES.
Q. Is he a controller at FACES now?
A. Now, yes.
Q. Do you know if Ms. Griffiths, if she is a CPA?
A. Yes.

Orley George Cameron

Q. Do you know if Mr. Pryce is a CPA?
A. Yes, he is a CPA.
We are not permitted to form partnership unless we are CPAs.
Q. Do you know whether Ms. Griffiths prior to the formation of Cameron, Griffiths & Pryce had been involved in any audits of any DHCR regulated entities?
A. I am not sure she audited.
She worked almost every year at Deloitte and Touche.
Q. Was that the seven years prior to forming Cameron, Griffiths & Pryce?
A. I met her just about three years -- about three years ago when she left.
Q. Does Cameron, Griffiths & Pryce have any other client other than Mr. Edmonds?
A. No.
Q. Do I understand it correctly, though, that you in your sole proprietorship have other clients other than Mr. Edmonds?
A. Correct.
Q. Does Ms. Griffiths in her practice also have a sole proprietorship other than in

Orley George Cameron

connection with Cameron, Griffiths & Pryce?
A. Yes.
Q. And in her sole proprietorship she has other clients other than Mr. Edmonds?
A. Yes.
Q. Do you know if Mr. Pryce has a sole proprietorship outside of Cameron, Griffiths & Pryce?
A. Yes, he does practice, yes.
Q. That's in addition to his work as controller at Minority FACES?
A. Yes.
Q. I believe you said that Mr. Edmonds is Cameron, Griffiths & Pryce's only client; correct?
A. You are correct.
Q. So all of the revenue generated by Cameron, Griffiths & Pryce is generated from the engagement with Mr. Edmonds?
A. Correct.
Q. What percentage of revenue to you, personally, is the engagement with John Edmonds?
A. For me, personally?

Orley George Cameron

Q. Correct.
A. Less than 5 percent.
Q. Do you know what percentage of revenue to Ms. Griffiths the engagement with John Edmonds provides?
A. No.
Q. Do you know what percentage of revenue to Mr. Pryce the engagement with John Edmonds provides?
A. No.
Q. When you first started the engagements with Mr. Edmonds, other than reviewing the HUD website, what other literature did you review in preparing for the audit?
A. None that I recall offhand. I mean the only difference with those projects as compared to any other revenue-based project, it's the regulatory aspects.
Q. In planning and preparing for your audit, did you develop any audit programs?
A. Unfortunately, we did not get to that spot.
Why? Because when we began, one of



Orley George Cameron

the first requests we have, in order to develop -- you develop first your planning program and in order to get to your audit program with various steps, cash, et cetera, you first need a trial balance in order to review the accounting, do analytic -- get a sense of what the organization is.

Unfortunately, they did not have trial balance.

Q. When you were --

MR. HAYWOODE: When you said they did not have trial balances, indicating Dalton Management?

THE WITNESS: Dalton Management.

Q. When you were first engaged by Mr. Edmonds, what did Mr. Edmonds tell you about the partnerships?

A. He had a concern. He had a concern because he was getting -- he was receiving monthly financial statements, and one of the problems with the financial statement was there were entries in the distribution account that seems out of whack.

I hope that's an English word.

Orley George Cameron

That was not normal. That was unusual.

For example, the distribution account was showing a distribution in '06, for example, December of '06, of I think about over $6,000, based on his estimation he should have received over 3,000 -- $300,000. I am sorry. Over 600,000. Based on his estimation he should have received over 300,000, but there was not.

So that was one of his major concerns.

Q. What other concerns did he have?

A. Those were the concerns that he articulate to me.

His concern was basically whether or not he was getting his fair share of distribution.

Q. Do you recall what entity he was referring to on that particular distribution?

A. It was in all the four projects, but the one that we actually looked over in greater detail was Logan Plaza.

Q. Did you enter into an engagement

Orley George Cameron

agreement with Mr. Edmonds that was written?

A. Yes.

Q. Do you still maintain a copy of that engagement agreement?

A. Correct, sure.

Q. Do you recall what the terms of that engagement were?

A. Basically, we were going to do a financial statement audit in accordance with generally accepted auditing standards.

Q. Once you started your engagement, what was the first step you undertook in furtherance of that engagement?

A. I think we contacted Ron --

MR. HAYWOODE: Indicating Mr. Dawley who is present today.

A. And we asked for him to provide us with a number of items: bank reconciliation, trial balance, the standard items that we require for planning engagements.

Q. Did you receive the items you requested?

A. We did not receive the trial balance. We received the bank reconciliation,

Orley George Cameron

not all at once.

Then it was -- we got -- what we got as far as the trial balance was monthly general ledgers.

There is no way we can do an audit with that, but he was able to facilitate us for the annual general ledger.

Q. At some point you received an annual general ledger?

A. Yes.

Q. And did that general ledger have an opening balance for each account?

A. For the balance sheet account, yes.

Q. Did that general ledger have a closing balance for each account?

A. Yes.

Q. What information is contained on a trial balance that is not contained on a general ledger?

A. The general ledger is a detail listing of the account.

The trial balance is a summary of the account. That's a basic tool of an audit. If we did not get a trial balance, we



30

Orley George Cameron

must necessarily create one.

Q. Does the general ledger break out the transactions by account?

A. Yes.

Q. And in breaking out those transactions by account, does it do it in a chronological order?

A. Yes.

Q. And at the end of that chronological order, is there a total for that account?

A. Yes.

Q. So could somebody take a general ledger with those totals broken out on an account by account basis and create a trial balance from that?

A. Yes. Unfortunately, that's what we have to do. That's what we have to do if you didn't get a trial balance. But a trial balance is a basic tool of any competent accounting system.

Q. How many accounts do each one of these partnerships have on their general ledger?

A. I didn't count. We didn't count.

31

Orley George Cameron

Several. Many.

Q. So is it fair to say that the information that you required on the trial balance was contained in the general ledger but that it would have been difficult for you to take the information from the general ledger and use that as a trial balance?

A. Time consuming. I mean difficulty, but time consuming.

You have to create something that is automatically done by any competent accounting system.

Q. Other than the bank reconciliations and the trial balance and general ledger items that we were just discussing, what else did you request in connection with performing the audits of the financial statements of these partnerships?

A. Oh, God. We request -- request the loans, request the loans, request to see the schedule of accounts payable, accounts receivable, request the schedule for revenues.

Q. Would the accounts payable be reflected on the general ledger?

32

Orley George Cameron

A. Yes, the summary, yes.

Q. Would the accounts receivable be reflected on the general ledger?

A. Yes, the summary.

Q. Would the loans be reflected on the general ledger?

A. Yes.

The amount would be reflected, but then if I see a loan for, if I may say, 29,000, I need to see. So what we request is the documentation supporting those items on the general ledger.

Q. At some point, did you issue a report in connection with your engagement in this matter?

A. Yes.

MR. KELLY: I am going to ask the court reporter to mark as Exhibit 14, this document.

(Document entitled "Independent Auditors' Report," was marked as Defendants' Exhibit 14 for identification, as of this date.)

MR. KELLY: I have asked the witness

33

Orley George Cameron

to review Exhibit 14.

(Witness perusing document.)

Q. Is this the report you issued in connection with your engagement in this matter?

A. Yes.

Q. Have you issued any other report in connection with your engagement in this matter?

A. We issue what we call management comment, yes.

Q. Do you see at the top of this document it's titled "Independent Auditors' Report"?

A. Yes.

Q. Has there been any subsequent auditors' report with a similar title?

A. No.

Q. In your work in connection with the engagements in this action, did you gain an understanding of the internal controls of these partnerships?

A. Did we?

MR. HAYWOODE: I didn't hear the

34

Orley George Cameron

answer.

THE WITNESS: He asked me, did we.

A. Our assessment was there was no internal control that can be relied on, unfortunately.

Q. What facts are you relying on to come to that assessment?

A. To begin with, number one, we didn't have a trial balance. We did not have the trial balance.

Number two, the accounts were, as Ron said, were on a cash basis, but we don't know because the accounts receivable and the revenue account had the same number of debits and credit.

One of the things -- it's important to know that the revenue account is strictly a credit balance account.

Your debit revenue -- I'm sorry. It's a credit revenue, a balance. You have your credit revenue, your debit, accounts receivable, or cash.

You never credit revenues, then

35

Orley George Cameron

debit revenues to bring it back to any.

If your account is kept on an accrual basis, your credit revenues, debit accounts receivable.

When you call it cash, you credit accounts receivable and you debit cash. Revenue remains the same.

If you are on a cash basis, when you collect cash, your credit revenues, debit cash.

Never do you have debit-credit going through your accounts receivable account unless you need to make correction adjustments which is generally few and far between.

That's number one.

Number two, with due respect to Ron, and he was very helpful, but he's the CEO. Much of the standard documentation that we request and require of the audit, he didn't have them. He didn't know where they are. He didn't have them in his possession.

MR. HAYWOODE: I am sorry. He didn't have them in his possession?

36

Orley George Cameron

THE WITNESS: I don't know if he did not have them. He could not make them available to us. So let me put it this way.

Q. In conducting your audit and in reaching whatever conclusions you reached, did you find that any money from any of the partnerships was improperly taken by any individual?

A. We did not come to that conclusion, but we make some observation which obviously raises some concern to us.

Q. Can you tell me your understanding of what a cash basis accounting method is?

A. A cash basis accounting method is one where you report cash as you receive them, as opposed to, if I may say, because it's difficult to explain cash basis without referring to accrual basis.

Accrual basis, you recognize revenues when earned, whether the cash is received or not, and you recognize expenses when incurred, whether they are paid or not.

The cash basis on the other hand is

37

Orley George Cameron

you just book the cash at the time you receive it.

Q. Do you know which basis of accounting the partnerships were managed under?

A. Well, Ron told us they use a cash basis, but then in a cash basis you don't bill revenues.

MR. HAYWOODE: You don't --

THE WITNESS: On the cash basis you don't bill revenues. You just collect revenues.

I think what really happened and what complicated the issue was he was using both together, because he would bill the clients and then he reversed it, the billing.

That's what, in my judgment, makes it difficult for us to audit revenues.

Q. Earlier you said that you had not reached any conclusion as to whether or not money was improperly taken from the partnerships.

Did you convey that information to



Orley George Cameron

Mr. Edmonds?

MR. HAYWOODE: Objection.
That was not the witness's total answer.
You left out the second part where he said concerns were raised.

A. I conveyed -- if I may just add -- I conveyed those concerns. We conveyed those concerns in our management comment, management comment.

Q. Did you ever tell Mr. Edmonds that you had not found any money improperly taken from any of these partnerships?

MR. HAYWOODE: Objection.
Asked and answered.
The witness may respond if he understands.

A. I did not convey those terms.

Q. Did you ever tell Mr. Edmonds that you did find money that was improperly taken?

MR. HAYWOODE: Objection.
Asked and answered.
The witness may answer.

A. I did not confirm -- did not convey

Orley George Cameron

those comments.
We allow our reports to speak for themselves.

Q. In Exhibit 14, I note that the last sentence -- actually, the entire last paragraph is one sentence, which concludes, "The scope of our work was not sufficient to enable us to express and we do not express an opinion on the financial statements referred to in the first paragraph."
Do you see that?

A. Yes.

Q. Has that changed?

A. No.

MR. KELLY: I am going to ask the court reporter to mark as the next exhibit which is Exhibit 15.

(Copy of document on the letterhead of Cameron, Griffiths & Pryce, to Mr. John Edmonds, was marked as Defendants' Exhibit 15 for identification, as of this date.)

Q. Do you have Exhibit 15 in front of you?

Orley George Cameron

A. Yes, I do.

Q. What is this document?

A. This is what we call the management comments.

Q. Is this the document you were referring to in your earlier testimony regarding management comments?

A. Correct, yes.

Q. Other than Exhibit 14, which is the independent auditors' report, and Exhibit 15, the one you have in front of you, did you provide any other reports or comments in writing to Mr. Edmonds?

A. None that I recollect.

MR. HAYWOODE: Let the record show that it is my representation that all the reports provided by Mr. Cameron and his associates have been delivered to you.
So, again, to my present understanding, you have them all.

MR. KELLY: Okay.

Q. Are Exhibit 14 and Exhibit 15 all of the reports provided by Cameron, Griffiths & Pryce to Mr. Edmonds?

Orley George Cameron

MR. HAYWOODE: Again, not to interfere here, but if that's available, the only ones we have given you, then that might be all.

MR. KELLY: I believe Mr. Cameron will be able to tell us if these were all the reports.

Q. Are these all the reports you provided?

A. Reports, yes.

MR. KELLY: I think the fact that we have them both marked as exhibits indicate they have been provided to us.

MR. HAYWOODE: I am simply saying I don't know if there may be more. You would know that.

Q. Mr. Cameron, are there any other reports, other than Exhibits 14 and 15?

A. We may have provided comments. I don't know. We may have provided communication. If we sent a memo, I don't know what else we have. These are the reports, these are the standard reports for audit, yes.



Orley George Cameron

MR. HAYWOODE: My objection is he may not remember.

A. I don't remember all the communication we have had between, but I know these are the standard reports that we have provided.

Q. Did you provide any other writings to Mr. Edmonds or Mr. Haywoode in connection with your engagement in this matter?

A. I'm sure we have.

Q. What writings did you provide to Mr. Edmonds?

A. I communicate with him.

I remember the first one that I communicated with him was the difficulty we had in getting information for the audit.

Q. Did you bring a copy of that communication with you?

A. No.

Q. Do you remember when that communication occurred?

MR. HAYWOODE: Once again, Bill, objection, because we supplied all this and Mr. Cameron knew that we supplied

Orley George Cameron

it, which may explain why he didn't bring it.

I think your question is asking him to recall things that, you know, I don't know that it is humanly possible to tell you, yes, there were seven of this and six of that.

My objection to your question is how would he recall?

MR. KELLY: I think we will ask him the question and we will find out what he does recall.

MR. HAYWOODE: Okay.

Q. What communications in writing have you had with Mr. Edmonds?

MR. HAYWOODE: Objection, again. Same objection.

A. I communicate to him some of the difficulties we are having in conducting the audit.

Q. Did you send these communications as letters or memos?

A. Memos.

Q. Were those mailed to Mr. Edmonds?

Orley George Cameron

A. They were mailed, faxed, e-mailed.

Q. Did you retain copies of these communications?

A. Yes, we did.

Q. What format would these communications look like?

A. Word document.

Q. Would they be addressed to Mr. Edmonds?

A. Some of the ones, some of the communication to Mr. Edmonds were actually cc's, communication to Ron, the company, and they were cc'd to Mr. Edmonds, yes.

Q. Let me see if I understand this so I can cut off some of these questions.

The only formal reports were the two marked as 14 and 15?

A. Yes.

Q. But there were other communications and Mr. Edmonds may have been cc'd on some other documents that went to Dalton or other people?

A. Correct.

Q. In any of those other documents,

Orley George Cameron

other than the two reports, did you render an opinion regarding your audit of the financial statements?

A. We only render opinion on the financial statement or a disclaimer of opinion.

Q. So none of those other documents would modify any opinion in these reports?

A. No, unfortunately.

Q. I am going to ask you to take a look at Exhibit 15, page 3.

Do you see item 5, salaries and office expense?

A. Um-hum.

Q. What is your understanding of the issue you raise in this document?

A. There was a contract which my reading of the contract indicates, number one, the project, I think they call them the projects, will pay frontline fees.

But there is also a statement which said none of the fees, expenses, salaries of the central office shall be borne by the project.



Orley George Cameron

Q. Do you recall what contract you are referring to?

A. That's the management contract. That's a contract between the partnership and the management company.

Q. Did you read that entire contract when reaching this issue?

A. Yes.

Q. Did you notice any other provision of that contract that allowed for payment of front office salaries?

A. Frontline, yes, but we define frontline office as the office at the project: Bookkeeping, project manager, clerks at the project, yes.

And I think the wording of the contract will clearly illustrate to me that there was a delineation being made between the frontline office of the project and the central office, because in that contract it said all the salaries, expenses, rent of the management company, shall be borne out of the management company's own expense, if I remember that clearly.

Orley George Cameron

I didn't know that my memory was so good.

MR. KELLY: I am going to ask the court reporter to mark as the next exhibit, Exhibit 16.

(Copy of Affidavit of Orley G. Cameron, was marked as Defendants' Exhibit 16 for identification, as of this date.)

Q. Do you have Exhibit 16 in front of you?

A. Um-hum.

Q. Do you recognize Exhibit 16?

A. Yes, I do.

Q. Is Exhibit 16 an affidavit you supplied in this case?

A. Yes.

Q. I direct your attention to paragraph 4 of the affidavit.

A. Um-hum.

Q. Do you see that?

A. Yes.

Q. Does that paragraph discuss the issue of the payment of salaries of Dalton

Orley George Cameron

employees?

A. Yes.

Q. This paragraph has a reference to Exhibit G to the papers submitted in connection with that.

Do you see that?

A. Is G attached here? I see the reference, G, Exhibit G. I don't see G.

Q. I actually think you just quoted from the document before.

A. I did.

MR. KELLY: I will state for the record I have Exhibit G in front of me and you had it right.

Exhibit G, page 8, paragraph 16-I states:

"Except as otherwise provided in this agreement, all of the agent's home office bookkeeping, clerical and other management, payroll, and overhead expenses, including, but not limited to, costs, office supplies and equipment, postage, transportation for managerial personnel, and telephone services, will

Orley George Cameron

be borne by the agent out of his own funds and will not be treated as project expenses."

Q. Is that the section you were referring to here in your affidavit here and in your testimony just before?

A. Correct.

Q. And you had a copy of this agreement at the time you were performing your audit services; correct?

A. Um-hum.

Q. And you had a copy of this agreement at the time you signed this affidavit?

A. Um-hum.

I said um-hum, but I did say yes.

THE REPORTER: You did not say yes. I am writing exactly what you say, sir.

THE WITNESS: I'm sorry.

What did I say?

THE REPORTER: You said um-hum.

Q. Did somebody point out to you the clause of that contract or is that something you discovered on your own?

A. I read it, yes. I read it. I had a

Orley George Cameron

discussion with Ron.

I have a discussion with Mr. Edmonds about it.

Q. What did --

MR. HAYWOODE: Have you finished?

Q. Did you finish your answer?

A. Yes.

Q. What did Mr. Dawley tell you about that in connection with this?

A. He disagreed with my positions.

I don't remember.

Q. Did he explain why he disagreed with your position?

A. I mean, he asserted that the payment or the employees that we were looking for, he said those were -- as a matter of fact, he confirmed that they were Dalton's employees and that's one of the reasons why he objected that we would not be able to see the personnel file, but he confirmed, he assert that they are frontline employees.

There seemed to be a contradiction of that statement.

Q. At the time you made the statement

Orley George Cameron

in the affidavit and had your discussion with Mr. Dawley --

A. I had discussion -- my discussion was way before I made the statement in the affidavit.

Q. At the time you made the statement in the affidavit, then, were you familiar with section 13 of the contract, 13-B specifically, which states, "The owner will reimburse the agent for compensation, including fringe benefits payable to frontline management employees, such as project manager, clerical and bookkeeping personnel and the maintenance employees, resident superintendent and the social services director, where applicable, and for all local, state and federal tax assessments, including, but not limited to, Social Security taxes, employment insurance and workman's compensation insurance, incident to the employment of such personnel. Such reimbursements will be paid out of the rental agency account and will be treated as project expenses. For this purpose, the rental value of any dwelling unit furnished rent free to

Orley George Cameron

the resident superintendent will not be considered part of his compensation but will be treated as a project expense."

A. Yes. I was very familiar with that. Those are the basic contending issues.

Because the history was if that's the basis on which the allocations were made, then it means that the employees were project employees and, therefore, we have the right to see the personnel file.

So if they were not project employees and we did not have the right to see the files, then they are central office employees, yes.

Q. Section 13 says, "All such personnel will be employees of the agent and not the owner."

Were you familiar with that provision of the contract?

A. Section.

Q. 13, "All such personnel will be employees of the agent and not the owner, and will be hired, paid, supervised and discharged by the agent."

Orley George Cameron

Were you familiar with that section of this contract?

A. Yes.

Q. Is it your understanding that the employees were paid from funds from the project rather than funds from Dalton Management?

A. Yes.

MR. HAYWOODE: Objection.

I don't understand the question, but the witness has answered.

Q. Is it your understanding that --

MR. KELLY: Let me withdraw that.

Q. Is it your position that payment of the employees out of project expenses is improper pursuant to the contract?

MR. HAYWOODE: Well, unless you say which employees -- if the witness understands, I don't.

A. I prefer to answer the question you asked first.

And it is my position that the employees were paid out of Dalton -- I mean the Dalton employees were paid out of the





Orley George Cameron

project expense.

Q. Is it your position that that was in contravention of the agreement?

A. Yes.

MR. HAYWOODE: My objection is that the agreement clearly speaks for itself.

Q. Are you familiar with an accounting term called adjusting journal entries?

A. Oh, yes, yes.

Q. Are you familiar with an accounting term, journal entries?

A. Oh, yes.

Q. Did you gain an understanding, as part of your audit involvement, how journal entries were made at Dalton Management in connection with these four projects?

A. Not clearly, no.

Q. Did you gain an understanding as to how adjusting journal entries were made by Dalton in connection with these four projects?

MR. HAYWOODE: I object to the form of the question, "did you gain an understanding" because I don't know --

Orley George Cameron

A. You are right. I am not clear what it means if I gain an understanding.

Journal entries are basic tools of accounting that we use to adjust and/or correct account balances.

They were the same way at any organization.

Q. Did you gain an understanding about how adjusting journal entries were made at Dalton in connection with these projects?

MR. HAYWOODE: My objection, again, it sounds as if you are asking him, did you comprehend what method was being used by Dalton.

Is that the question?

Q. Does the witness understand the term "gain an understanding"?

A. No, I'm not sure what it means.

Q. Are you familiar with the term "gain an understanding"?

A. Yes, I am familiar.

Q. What is your -- explain to me what the term "gain an understanding" means to you?

Orley George Cameron

MR. HAYWOODE: My objection is that it is argumentative.

Perhaps you would change the question. I honestly don't understand what you're asking him.

Did he gain an understanding of the French language, or did he gain an understanding of how the French language was being spoken in Quebec?

Do you hear the nuance?

MR. KELLY: I do, Mel, and I am comfortable with my line of questioning and I appreciate your objection.

If the witness has a problem, he will let me know.

Q. Are you familiar with the term "gain an understanding"?

A. I am familiar with the term but I don't know what you mean, if we gain an understanding -- you mean of who did or of how they were done? We just saw the journal entries.

Q. Putting that aside, I just want to explore your definition of "gain an

Orley George Cameron

understanding."

A. Okay.

Q. How are you familiar with the term "gain an understanding"?

MR. HAYWOODE: I object to the relevancy of his understanding of that phrase.

The witness may answer.

A. Gain an understanding means you comprehend, you have seen a situation and you review the situation and you come to an understanding, get a knowledge on the working, conceptually, of that situation.

Q. Is "gain an understanding" a phrase often used in accounting standards?

A. Very often, yes.

Q. So when I use the term "gain an understanding," you understand that it's relating to your work as an accountant?

A. Right, but I understand it's also a technical term.

So unless you use it -- we generally use the term "gain an understanding" of the internal control structure, but we don't



58

Orley George Cameron

really gain an understanding of journal entries, because journal entries are journal entries.

Q. Did you gain an understanding of how the journal entries were made, not of the particular journal entries, but the process in which Dalton made those entries?

A. No.

Q. Did you gain an understanding of how the adjusting journal entries were made, not the individual entries, but how the process was made?

A. My understanding, and I hope this goes to the question that you asked, because my understanding of what Ron communicated to me was that the auditors make those entries. I don't know if that's the question you're asking. If that's the question you're asking, yes.

Q. Do you know if anybody from Marks Paneth & Shron made journal entries on the books and records of Dalton Management in connection with these projects or do you know if Marks Paneth proposed journal entries, or

59

Orley George Cameron

something else?

A. Well, the journal entries were -- I will put it this way: We get copies of the journal entries, listing of the journal entries, and they were described to us as the auditor's adjusting journal entries.

So whether they were proposed, we see no evidence that they were approved of.

The journal standards are the sole responsibility of management and they may be proposed by the auditors, but must be the responsibility of management, is the standard.

Q. In your audits of other companies and in your experience as an accountant, when an auditor comes in and does their audit, is it common for the auditor to proposed adjusting journal entries?

A. Yes.

Not to the extent that they were at Dalton, no. But, yes.

MR. HAYWOODE: I'm sorry. The answer was not to the extent --

THE WITNESS: Not to the extent -- not to the extent -- if I may say, not to

60

Orley George Cameron

the amount of journal entries at Dalton.

Q. You are referring to the number of journal entries, not the amount of money involved?

A. Both, both.

Q. How much money was involved in the journal entries at Dalton?

A. As a matter of fact, it's difficult for us to quantify because we have a spreadsheet where we separate the ledger on the adjusting trial balance of the accountant. It's way in the millions, several millions of dollars.

Q. The adjusting journal entries, is it fair to characterize those as reclassification of entries on the general ledger?

A. Yes. Many of them were, yes.

Q. It does not -- is it fair to say that it doesn't reflect that money was improperly paid, just mischaracterized?

A. It's difficult for me to say that.

Let me say, for example, in one of the instances listed in our report where management -- where fees were reclassified

61

Orley George Cameron

from accounting line to management consulting, number one, we have no way and we could not determine whether or not those -- because one of the purposes of us looking at the account is to see whether or not the expenses themselves were appropriate, were appropriate. We have no way of seeing whether they were appropriate.

There were invoices coming from '02 that were reclassified into current year's expense. So, are those accounts?

And, by the way, they were not accrued in the financial statements prior. So, are those appropriate? I don't know.

That's a report we provide, that it raised concerns for us.

Q. Do you know on what basis, cash basis or accrual basis, the financial statements were audited by Marks Paneth & Shron?

A. They were -- well, the report that he had given, by its nature it was audited on an accrual basis.

Q. And for the most part, the records



Orley George Cameron

of Dalton were on a cash basis; correct?
A. Yes. For the most part, yes.
Q. In order to convert the cash basis records for an accrual basis financial statement, don't you need several adjusting journal entries?
A. You need basically -- there are two entries that you need, actually.
You need to adjust accounts receivable and you need to adjust accounts payable.
That's all you need to adjust.
Those are the two entries you need to adjust to bring cash basis to accrual basis.
Q. And, in that process, did you review those adjusting journal entries?
A. One of the difficulties we had, because, remember, Ron worked with us, with Marks Paneth for the explanation of the journal entries. But unfortunately, we have never -- I was looking forward to the opportunity to meet. We had never met until I think at the deposition, yes.
MR. HAYWOODE: Indicating the

Orley George Cameron

February 3rd deposition of William Jennings.
Q. Prior to that depositon of Mr. Jennings, did Mr. Jennings and you have a conversation regarding your work in connection with the Edmonds project?
A. Yes.
Q. In any of those conversations, did Mr. Jennings offer to meet with you to go over these journal entries?
A. Yes.
Q. Did you have an agreement to meet with him to go over these journal entries?
A. No.
Q. How often did you speak with Mr. Jennings?
A. I spoke with him, I think it's once.
As a matter of fact, when he called we had a conference call.
I know he called and he left a message at my office once, and that was after we had a conversation before. So when I spoke with him, yes, it was a conference call

Orley George Cameron

between myself and Sandra.
Q. Did you ask Mr. Jennings questions during this conference call?
A. Yes, I did.
Q. Did Mr. Jennings answer your questions during this conference call?
A. Not -- yes, he did answer the questions.
Q. Did he refuse to answer any of your questions?
A. All right, if I may say, one of the issues we were discussing at that meeting was the fact that there was a loan that was forgiven and that loan was being amortized over a 30-year period, and we had a discussion as to why.
They said that was not in accordance with GAAP.
He took the position that GAAP was not -- GAAP was not important.
Q. Do you recall the amount of the loan that was discussed?
A. I think the loan -- I think it was a $200,000 -- I don't remember the exact amount,

Orley George Cameron

but the loan was for a ten-year period, and the fact is that GAAP required that such loan must be amortized.
I mean for tax purposes, it should have been recognized immediately.
GAAP, over the period of the loan, at the minimum, even for tax purposes, it is to be amortized over the period of the loan, but it was being amortized over the period for 30 years, which seemed to us arbitrary.
Q. Other than this dispute about how to characterize -- how to treat the loan, did you have any other disputes with Mr. Jennings?
A. No, there were no disputes.
Actually, at that time we left on an agreement that we were going to put off, because we were going back and forth, we were going to put all the questions that we have together and we would have one meeting, which I think was -- which I think was good, was a desired compromise on both of our parts.
Q. But the meeting never occurred?
A. Well, the meeting never occurred, because when I asked to have him, then there

66

Orley George Cameron

was a dispute, actually not between Jennings and myself but between Ron and myself, as to who was going to pay for his time.

Q. So there was a dispute as to who would pay for Mr. Jennings' time --

A. Right.

Q. -- to respond to these inquiries from Cameron, Griffiths & Pryce?

A. Right.

Q. As auditor for these entities, are the fees charged by Marks Paneth & Shron set by a contract?

A. Yes.

Q. And if additional work outside the audit is to be undertaken, such as responding to these inquiries, they can't be charged under the audit; correct?

A. Correct.

Q. So Mr. Jennings could not charge his time to the partnerships without violating that contract; correct?

A. Correct.

Q. And it was your understanding that Mr. Jennings wanted to be paid for his time

67

Orley George Cameron

spent responding to these inquiries?

A. Yes. That was what was communicated to me, yes.

MR. HAYWOODE: Indicating Mr. Dawley communicated that?

THE WITNESS: Yes.

Q. Do you know if Mr. Jennings was ever paid for his time in responding to these inquiries?

A. I don't know.

It's interesting to note, though, that we were not auditing Marks Paneth & Shron.

We were auditing --

MR. HAYWOODE: Dalton.

A. -- Dalton. I keep forgetting that because their name is so similar.

We were auditing Dalton. So the information we requested was and expected to be provided by Dalton.

Q. Did you expect Mr. Jennings to provide his time to respond to these inquiries without receiving compensation?

A. No.

68

Orley George Cameron

MR. HAYWOODE: Objection.

That was not the witness's testimony.

A. And, frankly, that was not my concern.

Q. As a professional, though, you would agree that Mr. Jennings should be entitled to be compensated for his time?

MR. HAYWOODE: Objection.

What his opinion is on someone else's time is not relevant.

A. Yes. I would expect it, yes.

Q. Did you ever have any discussions with Mr. Edmonds regarding Generally Accepted Auditing Standards in the context of this engagement?

A. Oh, yes.

Q. What did you tell Mr. Edmonds about Generally Accepted Auditing Standards in the context of this engagement?

A. I mean, we had several discussions. I can't recall what I told him.

What I told him, obviously, if you look at -- Generally Accepted Auditing -- I'm

69

Orley George Cameron

sorry Standard --

Q. Yes, GAAS.

A. Yes, many.

One of the salient points which was of concern was the independence as compared to the standard that is promulgated by the GAO.

Q. What are you referring to when you talk about the independence?

A. The auditor's independence, GAO, as well as the Office of Government Accounting office, as well as SAS, Statement on Auditing Standards, specifically delineate, if I may say, the arm's length requirement between an auditor and an auditee.

Q. In the context of this engagement between Marks Paneth & Shron and the partnerships, what issue did you have with regard to Marks Paneth & Shron's independence?

A. Numerous.

We saw those numerous journal entries that were being made, number one.

Number two, the documentations that we requested of Dalton Management, he referred us to the accountant.



Orley George Cameron

MR. HAYWOODE: I'm sorry. He, meaning Mr. Dawley?

THE WITNESS: Right.

A. He referred us to the accountants Marks Paneth & Shron.

As a matter of fact, with regard to the journal entries, he said those are the accountants' journal entries. You may ask them about that. If I may quote Ron, he said those are the accountants' journal entries. You have to ask them about that.

The standards specifically state, specifically state that, number one, the books and records of the auditee is the sole responsibility of management.

The accountant's responsibility is to assist and to render an opinion on them. That's number one.

Number two, there is also a standard, what they call, there is a contract, it's the de minimis, that rule requires that additional, what they call nonaudit service that is performed by the auditor should not be more than 40 hours and should not exceed

Orley George Cameron

$5,000. That's a GAGAS rule.

Anything above that, it says, destroys the auditor's independence.

We know that in '06, request a contract for $34,000 -- actually, we did not see the contract but we know the contract is amount is $34,000 because that is what was disclosed in the supplemental report, but all the prior year's contracts said $34,000, approximately 34,000, I think it's 34,155, which clearly set out what the accountant's responsibilities are, and that there should be additional services, that those services must be approved by DHCR.

Q. That was a long answer. I am going to try and break it down so we can have a discussion.

A. Yes.

Q. At some point you talked about the de minimis rule.

A. Yes.

Q. Do you know what standard you are referring to when you talk about that?

A. The de minimis rule, it's the

Orley George Cameron

accounting independent standard. I think it's Amendment No. 3. I don't remember the specific, but read along from point 13 to 26 and it clearly illustrates.

Q. And what standard are you referring to?

A. GAGAS, Government Accounting Standards, Auditing Standards, Government Auditing Standard -- I'm sorry.

Q. Generally Accepted Government Auditing Standards?

A. Thank you. That's the definition.

Q. What section?

A. Amendment No. 3, and that was promulgated and became effective in '03. So that's the rule.

Q. Other than in that section, are you aware of any other provisions that govern the de minimis rule?

A. SAS standard, but I don't remember the exact one.

Q. What in SAS governs the de minimis rule?

A. And the basic standards -- the basic

Orley George Cameron

overarching principle is that the auditor must be independent in both substance and appearance.

It says, the auditor should not perform nonaudit service, such that anyone is familiar with these types of services, these activities, would have any suspicions that independence is violated.

Q. You mentioned the auditor should not have more than 40 hours of work or $5,000 in fees?

A. Right. That's the de minimis rule, yes.

Q. In what rule does it set forth 40 hours or $5,000?

A. I don't remember it off the bat. I can find it.

I think the rule speaks of materiality. The rule speaks of materiality.

In the question and answer, at least the guidance that is provided for that rule states no more than 40 hours, no more than $5,000.

So, number one, the rule

74

Orley George Cameron

specifically states materiality, the guidance provides the amount.

Q. So the de minimis rule has a materiality component such that the larger the organization being audited, the larger the de minimis level?

A. I don't know.

MR. HAYWOODE: Objection. Is that a question or are you testifying?

A. I am not aware of that.

The guidance basically says 40 hours, 5,000.

MR. HAYWOODE: My objection, again, to the question, because it sounded like testimony rather than a question to the witness.

Excuse me. I would just assume from that if someone was paid $3 million he had more leeway to his relative materiality figure which would be astronomical, but it doesn't work that way. It doesn't hold. The proposition doesn't hold, is my point.

Q. Do you know if Marks Paneth & Shron

75

Orley George Cameron

provided tax preparation services to any of the partnerships?

A. That's included in the contract.

Q. What contract are you referring to?

A. The engagement between them, yes.

Q. Are the fees charged for the tax preparation work included within the audit fees?

A. Yes, it is one contract, yes.

Q. The amount of audit fees charged, does that include work done for tax preparation?

A. The contract, the engagement letter, especially for -- has three components: Audit, tax and cash flow analysis.

Q. Were those three components charged separately by Marks Paneth & Shron?

A. When you say if they were charged separately, no, not to my knowledge. All of that is covered in the contract.

Q. Does the fact that an accounting firm provides tax preparation services, in addition to audit services, compromise the firm's independence?

76

Orley George Cameron

A. No, it would not.

Q. Even in situations in which the tax preparer charged fees in excess of the 40 hours and $5,000, would that compromise independence?

MR. HAYWOODE: Objection, because from the witness's testimony, that's not this case.

He just testified it was included in the contract.

A. To answer the question, no, it would not, but it was included in the contract, yes, but that's permitted. That's what is nonaudit services permitted in the independence rule.

Q. Would representation of the taxpayer, the entity, in connection with an IRS audit, also be permitted under the rule you are discussing?

A. It would, but it is still, though, governed by the de minimis rule.

Actually, the standard clearly expresses that when there is a conflict, when such conflict between audit service and nonaudit service arises, the audit

77

Orley George Cameron

organization must evaluate and make a choice as to what they want to do, whether they want to maintain the audit service or maintain the nonaudit service.

But because of the independence, because of the concern for independence, the rule clearly, the de minimis rule basically fixed, said nonaudit service should not exceed 5,000 or 40 hours because it may compromise independence.

Q. Are you aware that Fifth and 106th Street Associates was subjected to an IRS audit during -- for yearend 2003?

A. I saw an invoice to that extent, yes. That was paid, apparently, I don't know if it's all of it or some of it, I don't know what the amount of it, but there was an invoice to the extent that it was paid in '06.

Q. Does the representation of Marks Paneth & Shron in connection with that IRS audit, is that an exception to the de minimis rule and the rule of independence?

A. There is no exception to the de minimis rule.

Orley George Cameron

There is an exception to the nonaudit service, but it is bound by the de minimis rule.

Q. Is that engagement to represent Fifth and 106th Street Associates in connection with the IRS audit an exception to the independence rule?

A. I don't know what the price was, and I don't know what the amount of time that was involved.

Q. Do you recall what the outcome was in connection with the IRS audit?

MR. HAYWOODE: Objection to the relevance.

A. No. That was not an issue for me.

MR. KELLY: I am going to ask the court reporter to mark this as the next exhibit.

(Copy of document on the letterhead of Internal Revenue Service, Department of the Treasury, dated October 26, 2006, was marked as Defendants' Exhibit 17 for identification, as of this date.)

Q. Do you have Exhibit 17 in front of

Orley George Cameron

you?

A. Um-hum.

Q. Have you seen this letter before?

(Witness perusing document.)

A. I don't recall.

I saw something related to this, but not specifically this one, no.

Q. What did you see related to the IRS audit?

A. Huh?

Q. What did you see related to the IRS audit?

A. I saw a letter from I think one of the Seaveys, saying that the audit was done and there was no change.

Q. What does no change mean in the context of an IRS audit?

MR. HAYWOODE: Objection to the relevance of this entire line.

MR. TRAUB: I want to point out that objection to relevancy is not permissible under the Federal Rules.

MR. HAYWOODE: I'm sorry?

MR. TRAUB: Objection to relevancy

Orley George Cameron

is not an objection permissible under the Federal Rules.

A. What a no change means?

Q. Yes.

A. It means that an audit was done and there were no findings.

The tax return was not adjusted. It remained as it was filed.

MR. HAYWOODE: Just one second.

Darren, we've had this discussion a couple of times.

We never know where these depositions wind up being heard, whether it's a state agency or a federal agency, which is why the suggestion as to better practice is to make objections which would be made in a court of law, so long as you are compliant for the most part with 221 rules. That's why we do it.

MR. TRAUB: 221 is a state court rule and this is a federal court proceeding.

MR. HAYWOODE: New York State practice and federal practice is very

Orley George Cameron

similar.

I have the book here and I can show it to you.

It talks about the depositions in the federal rule states. New York is a federal rule state.

MR. TRAUB: There is a difference between federal rules and state rules.

My only point is your objection to relevancy is not permissible and appropriate under the federal rules.

I am not going to argue with you about it. I made my statement on the record.

MR. HAYWOODE: You never know where these transcripts wind up being heard.

That is why it is the suggestion of the bar, some lawyers, some professors, that it's better to say it than not.

That's all.

EXAMINATION

BY MR. KELLY:

Q. Isn't it fair to say that a no change decision by the IRS is a good thing for



Orley George Cameron

the taxpayer to receive?

A. Oh, every time.

MR. HAYWOODE: Off the record.

(Whereupon, a discussion was held off the record.)

MR. HAYWOODE: May I have 35 seconds?

MR. KELLY: We haven't taken a break yet. Let's take a short recess.

(Whereupon, a recess was taken from 11:56 a.m. to 12:04 p.m.)

EXAMINATION

BY MR. KELLY:

Q. In connection with your work in connection with the engagement with Mr. Edmonds, did you have the occasion to review monthly reports that were sent to Mr. Edmonds?

A. I saw them. I frankly didn't review them because they were not necessarily in good form. We were working on the project, so I didn't necessarily --

MR. HAYWOODE: I'm sorry?

A. They were not necessarily in good

Orley George Cameron

form.

MR. HAYWOODE: You said something after that.

A. We were working on the project, so I didn't want to have to spend time on those monthly reports.

Q. So is it safe to say that you haven't identified anything misstated or wrong in those monthly reports?

A. Oh, yes.

The one that I saw, the distribution account was incorrect.

Q. What was incorrect about the distribution account?

A. I mean the distribution account, first of all the distribution account has debit balance, which it will have, but it was -- when we compared one for December, for example, Logan, it was showing 651,000 and that continued, I am talking about December of '06, and that continued through January, February, March, April, May of '07. It continued through '07.

But when we reviewed the

Orley George Cameron

distribution, the distribution was actually, I think, 260 for '06.

Q. Any other discrepancies you found with regard to the monthly reports?

A. I mean, I just focused on the account. Those monthly reports were not relevant for us.

Q. Do you know if anybody else at Cameron, Griffiths & Pryce had any communications with Mr. Jennings, other than yourself?

A. I mean that one time when we spoke it was a conference call between Sandra -- with Sandra, me, and Mr. Jennings.

Q. Do you know if Ms. Griffiths had any conversations with Mr. Jennings outside of your being involved in the call?

A. Not to my knowledge.

Q. Do you know if Mr. Pryce had any conversations with Mr. Jennings outside of your presence?

A. Not to my knowledge, but I can almost say a firm no.

Q. I am sorry. I didn't mean to limit

Orley George Cameron

it to just Mr. Jennings.

Did anybody at Marks Paneth & Shron have conversations with -- I will put it in the same order. Excuse me.

Do you know if Ms. Griffiths had any conversations with anybody at Marks Paneth & Shron, other than what you are aware of with that conference call?

A. Not to my knowledge.

Q. And the same question for Mr. Pryce.

A. Not to my knowledge.

Q. Is it fair to say that you are the primary professional on this engagement for Cameron, Griffiths & Pryce?

A. To the extent that, yes, I was the one first contacted, right.

Q. Are you the person most knowledgeable at Cameron, Griffiths & Pryce with regard to the engagements?

A. No. We are equally knowledgeable, yes.

I think I am the least knowledgeable, actually. They're much sharper

Orley George Cameron

than me.

Q. What was your role in this engagement?

A. In terms of what? All three of us worked on it together.

Adam much less because while Sandra and myself are self-employed, Adam has other employment.

Q. Do you know if Ms. Griffiths or Mr. Pryce had any communications with Mr. Edmonds outside of your presence?

A. Not to my knowledge, no.

Q. Prior to appearing here today for this deposition, did you have discussions about this deposition with anybody?

A. Yes. We discussed it together, Adam and Sandra, we discuss it together.

Q. What did you discuss?

A. We discussed the -- we went over the information for the audit. We went over the audit procedures. We went over the standards, applicable standards.

Q. When you say you went over procedures and applicable standards, are you

Orley George Cameron

referring to specific documents you looked at or in general?

A. Both.

Q. What documents did you look at?

A. I looked at the -- I looked at the GAGAS independent standard.

Sandra looked at SAS.

Adam looked at the Yellow Book.

And we shared notes.

Q. Did you look at any documents other than what you just testified to?

A. In general, there were many documents we looked at. We shared notes.

Q. Other than those specific documents you identified, do you recall any other specific documents you looked at in preparation for the deposition?

A. No, not specific for the deposition.

Q. Did you have any conversations with Mr. Edmonds?

A. In preparation, no.

Q. Did you have any conversations with Mr. Haywoode?

A. Yes.

Orley George Cameron

MR. HAYWOODE: I object.

Q. What were those conversations?

A. He told me what time and where to go.

MR. KELLY: It seems like Mr. Haywoode has an objection.

MR. HAYWOODE: Yes.

My objection is if they had conversations with me as an attorney or in contemplation of my representation of them, I'm not sure that's something you are permitted to inqure about.

MR. TRAUB: Are you stating on the record that you represent Cameron, Griffths & Pryce as their attorney?

MR. HAYWOODE: No. I made the statement that I did not, this morning.

But if they approached me with such an intention, then I would question if that aspect of any discussion would be admissible.

With that caution, the witness can answer.

Q. Did you ever approach Mr. Haywoode

Orley George Cameron

with the intention of engaging his services as an attorney?

A. No.

Q. What were the discussions you had with Mr. Edmonds -- excuse me.

A. By the way I asked him did I think we needed an attorney for this. That was the only question.

Q. What else did the discussion with Mr. Haywoode do you recall?

A. As a matter of fact, the discussion we had this morning, because the deposition said 150 East 42nd Street, and he told me, no, it's at 2 Park Place.

So that was the last discussion I remember.

Q. Turning back to Exhibit 16, the affidavit, did you prepare this document?

A. Exhibit 16?

Q. Exhibit 16.

A. I didn't prepare it. I edited it.

Q. Do you have in your possession --

MR. KELLY: Strike that.

Q. Were you provided a draft of this



90

Orley George Cameron

document that you then edited?

A. Yes.

Q. Do you still have a copy of that draft of that document?

A. No. It was sent to me and I get on my WordPerfect. Whatever was sent was...

Q. Who sent you this document?

A. I don't remember.

Q. Do you --

A. I think, was it Joan?

Q. Is it that you don't recall the individual who sent it but you recall it was sent from a particular law office?

A. It came from --

MR. HAYWOODE: If the question is was the document typed at my office, I believe that every document in this litigation was typed in my office or prepared in my office by my personnel.

Q. So is it fair to say the draft of this document was sent to you from Mr. Haywoode's office, you made changes on your computer and sent it back?

A. Right.

91

Orley George Cameron

Q. Do you recall what changes you made from the original document?

A. No. That's over a year ago.

MR. KELLY: I believe I am finished with my questioning.

I will be handing off the witness to Mr. Traub.

Is this a good time to take a break or do you want to go right into it?

MR. HAYWOODE: You can go right through, Darren.

MR. TRAUB: I can be done by one o'clock.

MR. KELLY: Then let's do that.

(Pause.)

EXAMINATION

BY MR. TRAUB:

Q. Mr. Cameron, as you know, I am Darren Traub from the law firm of Herrick, Feinstein LLP and we represent the Seavey defendants, Dalton Management, Ron Dawley, the Seavey organization in this matter.

I have a few questions to ask you. I ask that you give me the same courtesy that

92

Orley George Cameron

you gave Mr. Kelly today and that you let me finish my question, first, and that you give an oral answer to it.

Again, if you don't understand my question or statement in it, please let me know and I will rephrase it for you.

A. Okay. Did I do such with Kelly?

Q. Yes. That's what you did with him so I am asking that you do the same thing with me.

A. Okay.

Q. When Mr. Edmonds first approached you in March of 2007 about this project, what did he tell you was the scope of the project?

A. He told me that he needed an audit. He needed to have the audit.

My question was, was this an audit to comply with changing auditors, or is it an audit to comply with HUD requirement?

He said, no, it's an audit.

And he raised the issue with the distribution in the account. He just want to see why. He's concerned because of those amounts in the distribution were not

93

Orley George Cameron

reflecting what he should have been getting. So that was where he had a concern.

Q. Did he ask you to perform a forensic accounting on some of these matters or simply an audit?

A. We gave him a regular, what do you call it, standard audit engagement, forensic, yes.

Q. When you say we, who are you referring to?

A. Cameron, Griffiths & Pryce.

Q. At that time in March of 2007 was Cameron, Griffiths & Pryce already organized?

A. No. We organized, but at the time when we gave him the engagement we were organized.

He contacted me in '05. In March I looked at the scope of the project.

I am familiar with the audit, but I forget when I bring additional expertise, forensic to the project.

Q. Did he tell you how large each of the partnership's housing projects were?

A. Yes. In terms of the number of

94

Orley George Cameron

units?

Q. Yes.

A. Yes.

Q. Did he tell you that these housing projects were regulated by different entities, such as DHCR, HUD, Mitchell-Lama, and others?

A. Yes.

Q. Did you tell him at that time that you did not have experience, prior to this engagement, with government regulated -- with government regulated housing projects?

A. No, not in those terms, no.

Q. What terms did you use?

A. I told him I'm not quite familiar with them, but his issue was not so much the regulation or the compliance issue. So we didn't see that as a conflict.

That's one of the reasons why Adam was brought in, because of that regulation.

Q. And what is Adam's experience again?

A. Adam currently is a controller at FACES where they manage or the firm manages HUD-assisted projects.

Q. Do they manage DHCR projects?

95

Orley George Cameron

A. I don't know who or what are the agencies that are involved.

When I was there, it was HPD. But since then they have had funding from various government agencies.

Q. Do you think that to do a complete audit of the four partnerships at issue here that you need to have an understanding of the different governmental regulations and requirements to understand the different types of investment accounts, capital accounts, and distributions that are made?

A. To some extent, but remember our focus was not on the regulation or the compliance issue.

Our focus was on the financial, internal controls, and there's a difference.

Q. Specifically your focus was what?

A. My focus was first financial.

Q. To determine whether or not Mr. Edmonds was getting all of the distributions that were due to him?

A. And that the financial statements were in accordance with Generally Accepted

96

Orley George Cameron

Accounting Standards.

Q. Did anyone counsel you to form Cameron, Griffiths & Pryce as an entity?

A. No. We elected to.

Q. And who wrote the organizational documents for you?

A. I did.

Q. And who filed the organizational documents for Cameron, Griffiths & Pryce?

A. I did.

Q. Did you inform Mr. Edmonds that you would be forming Cameron, Griffiths & Pryce in response to his retaining the company?

A. Yes, we did. An engagement letter is in Cameron, Griffiths & Pryce.

Q. Did the three members of Cameron, Griffiths & Pryce put in capital contributions into the formation of Cameron, Griffiths & Pryce?

A. Yes.

Q. And those capital contributions paid for things such as the letterhead?

A. Um-hum.

Q. And the business cards?

97

Orley George Cameron

A. Yes.

Q. And any other related expenses?

A. Um-hum.

MR. KELLY: Can you just clarify those last couple of answers?

THE WITNESS: Yes, yes, yes.

MR. KELLY: Thank you.

Q. To date since its formation Mr. Edmonds has been the only client of Cameron, Griffiths & Pryce; is that correct?

A. That's correct.

Q. In reviewing the files for Lakeview, did Cameron, Griffiths & Pryce discover that any money was actually missing or unaccounted for?

A. We could not make that determination.

Q. In reviewing the files for Logan, did Cameron, Griffiths & Pryce discover that any money was missing or unaccounted for?

A. We could not make that determination.

Q. In reviewing the files of Church Homes, did you discover any home that was



Orley George Cameron

missing or unaccounted for?

A. We could not make that determination.

MR. HAYWOODE: I object to the use of the term "unaccounted for," because there were several projections that would say supporting evidence was not supported.

MR. TRAUB: Your objection goes beyond --

MR. HAYWOODE: I object to the form of the question.

MR. TRAUB: That is all you need to say.

There is no question before you right now.

Q. My next question is, in reviewing the files of Charles Hill, did Cameron, Griffiths & Pryce discover any money that was missing or unaccounted for?

A. If I may use this opportunity to clarify --

Q. First answer the last question.

A. Not based on -- again, based on

Orley George Cameron

information we have we can't make that determination.

You notice that the report is a disclaimer because we did not have sufficient -- we were not provided with all the information that we need.

Q. When you say the report is a disclaimer report, are you referring to Defendants' Exhibit 14 or Defendants' Exhibit 15?

A. Let me see which one is which.

This is 15.

Number 14, yes.

Q. Okay.

Did you or anyone to your knowledge at Cameron, Griffiths & Pryce ever tell Mr. Edmonds or Mr. Haywoode that you have discovered approximately a $4 million discrepancy between the claimed expenses and any supporting documents for 2006 in any of the partnerships?

A. At various stages, yes.

Q. And what did you tell him about that?

Orley George Cameron

A. Because the expenses were on the books.

The document was not available to vouch for those expenses, and that's what is in the disclaimer report. We were unable to vouch for the amounts.

Q. So do you see the amount of money that is being reported but you are unable to actually verify that that amount --

A. Right.

Q. -- was spent?

A. Right. In other words, the documentation supporting them, and most of those within those adjusting journal entries were not available.

Q. Did you ever tell him a figure different than $4 million?

A. When we get, after -- I think, what do you call it -- the deposition started, discovery started and we were given additional information, we were able to update our records.

Q. Since the discovery has started and you were given additional information, have

Orley George Cameron

you been able to find documents to support some of the numbers?

A. Some, yes.

Q. But the number has not gone up since then?

A. No. It has not gone up, no.

Q. Have you discovered in reviewing all of the documents any payments that have gone directly to any of the Seaveys from a vendor?

A. Gone to the Seaveys from a vendor?

Q. Directly to the Seaveys from a vendor.

A. That would not be in the document, no.

Q. Have you not seen any documents that show that?

A. That shows the vendor is someone that Dalton would have paid.

Q. Yes. So you are not seeing any money from a vendor to the Seaveys; is that correct?

MR. HAYWOODE: Objection.

A. No. I don't know. Why would I see them in these books?





Q. So the answer is no, then, you have not seen any documents?

MR. HAYWOODE: In these books.

A. Not in those books, no.

Q. Have you seen any documents outside of the books?

A. No.

Q. Have you seen any payments that have gone from a tenant to any of the partnership projects directly to the Seaveys?

A. No.

Q. Earlier you said you have been paid roughly $150,000 or $160,000 for the original project, and then you stated that you may anticipate expanding the project and getting a different retainer?

A. No, not that I anticipate. Well, I anticipate, because of the expansion of the project, right.

Q. How has the project expanded since the original project that you had already discussed with us?

A. The original engagement was to do a financial statement audit of '06.

We have since then, there's a need to look at records going back to 2000.

Q. So, in other words, you have now been asked to look at documents and records other than the 2006 audit, but when you were originally retained it was only to review the books and records of 2006; is that right?

A. Right.

Actually, Mr. Edmonds contemplated a full audit beginning with 2002, but as a start we said let's start with '06.

Q. When were you asked to expand your review of the audit outside of 2006, tax returns, documents and statements?

MR. KELLY: I object to the form of that.

Q. You can answer.

A. When was I asked?

Q. When were you asked to expand the scope of your audit from the 2006 books and records?

A. I don't remember specifically.

I think we gave -- the report is dated November 29, '08.

Q. Which report are you talking about?

A. Exhibit 14.

Q. Exhibit 14. Okay.

A. So I'm sure it's subsequent to that.

Q. Before you began your audit, were you shown any drafts of any complaints, affidavits or any other legal pleadings prepared for this lawsuit?

A. No.

Q. I think you testified earlier that the only auditor's report and written report giving or setting forth some findings were Defendants' Exhibits 14 and 15; is that correct?

A. Um-hum.

MR. KELLY: Wait. An oral answer, please.

A. Oh, yes. I'm sorry.

Q. Have you modified in any way Defendants' Exhibits 14 or 15 orally to Mr. Edmonds?

A. If I modified it?

Q. Yes.

A. I don't understand what you mean by

modify it.

Q. Have you told him any additional information or findings, other than as reflected in Defendants' Exhibits 14 and 15?

A. Yes. Actually, yes.

Since, based on the discovery, there was an invoice for $22,000 that was dated, I think, in '05. I think it was dated in '05 that was providing support of a closing and was amortized as part of a closing cost that was conducted in March of '04. The closing was in March or -- I'm sorry -- '04, yes, March or April of '04.

And that invoice was issued in '05. I think it's about thirteen months after and was being amortized as part of the closing.

I obviously had some concern about that. Number one, it's legitimacy, since it came in a year after, and it's proprietary because it's amortized. Audits are never amortized. That's number one.

Number two, I think it compromises the audit function because the auditor is actually auditing his own work.

Orley George Cameron

I mean, assuming the invoice, because the invoice was amortized -- the word is "capitalized" -- as part of the audit, as part of a mortgage closing, but it lists several items on the invoice including, I don't remember the specific wording, something that has to do with review mortgage document, because it talks about taxes, it talks about cash flows, it talks about requests from the partners. That was the invoice from Marks Paneth & Shron.

Q. So other than the invoice to Marks Paneth & Shron for $22,000 --

A. Actually, it's a little bit more than that.

Q. Approximately $22,000.

Have you advised Mr. Edmonds of any other issues you have discovered other than as set forth in Defendants' Exhibits 14 and 15?

A. No, just general discussion of the nature and the quality of the internal control structure and accounting records.

MR. HAYWOODE: Mr. Traub, I know most of the exhibits were given to you.

Orley George Cameron

You are asking him if he said anything else.

All those documents came from this witness.

MR. TRAUB: I think when you review the transcript you will see my question was, did he give any other investigation reports or statements of what he's discovered.

What you are referring to is you have, and I will state on the record, you have provided us with letters from Cameron, Griffiths & Pryce to Dalton Management and some of the other defendants, including Marks Paneth & Shron, requesting additional documents.

MR. HAYWOODE: And you have certain commentary which I specifically recall which you have not questioned this witness about today, and all of that originated with this witness.

I just want that clear on the record, because you are asking him is there anything else, and you and I and

Orley George Cameron

Bill know there is something else.

MR. TRAUB: I think the witness has already answered the questions and the transcript and the witness's sworn testimony will speak for itself, and I am comfortable with that.

MR. HAYWOODE: We, the attorneys, know there were more documents than you have referred to.

MR. TRAUB: I will give you a chance.

What other documents do you believe constitute an investigative report or are you constituting show one of the auditor's commentary or discovery was related to their audit that is not contained in Defendants' Exhibits 14 and 15, which Mr. Cameron himself has testified constitute the world of those such documents?

MR. HAYWOODE: I am not going to take your question because I don't know what you mean by the terminology "auditing" report.

I am simply stating for the record

Orley George Cameron

that you have in your possession, and Bill Kelly has, too, more documents from Cameron, Griffiths & Pryce than you have raised and referred to in this deposition.

That's all I'm pointing out. You have more.

MR. TRAUB: I am sure in your response to our discovery and motion, you will answer that to the court.

MR. HAYWOODE: Everyone will answer something.

Q. You stated in response to Mr. Kelly's question about what did you find was inaccurate or misleading about the monthly statements Mr. Edmonds was receiving from Dalton, and your comment was the distribution accounts were incorrect.

Is that a fair characterization of your testimony?

A. Yes.

Q. When you discussed the distribution number which is identified in the monthly statements with Mr. Dawley, didn't he tell you



Orley George Cameron

that number was actually the running total of what had been distributed to the partners from Dalton not just in the year identified on that financial statement?

MR. HAYWOODE: Objection to the leading nature of the question.

A. No. The question is clear. He didn't tell me that.

What he told me was the adjusting entries were booked in the distribution account.

Q. Isn't it true, though, that what you found when you were auditing the financial statements of the company that the financial statements only showed what had actually been distributed for that year?

A. Yes.

It showed what was distributed for that year, but where is the cumulative distribution?

Q. Did you find any distributions that were unequal, in other words, more money that was going to the Seaveys than was going to Mr. Edmonds?

Orley George Cameron

A. No, we didn't find that, no.

MR. TRAUB: I am done with my questions.

I think Mr. Kelly has a few additional questions.

MR. KELLY: Actually, Mr. Haywoode has the opportunity to question you before I ask my questions.

EXAMINATION

BY MR. HAYWOODE:

Q. Mr. Cameron, with regard to Fifth and 106th Street Housing Corporation, have you heard that Mr. Edmonds has been previously advised or did he discuss with you that previous managers had indicated that $638 per unit would cover the expense, the yearly expense of Fifth and 106th Street Corporation?

Had you heard that; $638 per month?

A. Yes. Mr. Edmonds had that discussion with me.

Q. I am just throwing out positive figures. When you multiply that out for the 446 units there, that would be about $3.12

Orley George Cameron

million in expense for that housing company for one year, would that be correct, approximately?

A. I generally depend on computers for the calculation.

Q. Assuming, arguendo, multiplying 446 on a yearly monthly basis, an average of $638 would be that, do you know the gross income of Fifth and 106th Street to be 7 million or so dollars a year?

A. In '06 the gross income is 6 plus, I don't remember the exact amount, but it's above $6 million.

Q. So it is fair to say that, assuming the accuracy of those numbers, about $3 million yearly being generated at Fifth and 106th which is not attributable to expense?

MR. TRAUB: Objection. Lacks foundation.

Q. Assuming that the expense was $3 million and the income was 6. whatever, it would be $3 million theoretically left after all expenditures, according to what we all discussed; is that correct?

Orley George Cameron

MR. TRAUB: Objection. Assumes facts not in evidence.

MR. KELLY: Objection.

MR. HAYWOODE: The witness just testified to that.

A. Theoretically, it's a theoretical question, and I answered theoretically yes.

Q. Did 106th Street report a profit for 2006 or did they report a deficit?

A. They reported a deficit.

Q. And how much was that deficit, if you recall?

A. I don't recall.

It's in excess of a million dollars. I don't recall exactly what the amount is.

Q. If I suggested it was $2,000, would that refresh your recollection, a deficit for 106th Street after receiving $6.8 million was $2,000, does that refresh your recollection at all?

MR. KELLY: Objection.

A. I would have to go back and look at it.

Q. Now, was any distribution made from



Orley George Cameron

106th Street to either Mr. Edmonds as the general managing partner or to any of the limiteds, was any distribution made to them?

A. In '06, I don't recall any distribution.

Q. You are aware, are you not, that in addition to the lawsuit being brought by John Edmonds that several of the limited partners have also brought a claim against these defendants for these same reasons, are you aware of that?

MR. TRAUB: Objection.

A, that's not accurate.

If you are going to ask a question, you should also reflect on the record that Mr. Edmonds was also named as a defendant in that lawsuit.

MR. HAYWOODE: Which part of it is not accurate?

MR. TRAUB: Not all of these defendants were named in the lawsuit brought by the Singers, and in fact your lawsuit was a named defendant in there as well.

Orley George Cameron

MR. HAYWOODE: I will accept your correction that there were two lawsuits.

The first one did not claim John Edmonds, is that correct, and the second one did, but it sought the sale of the property; is that correct?

MR. TRAUB: Are you talking about the current one that is actually pending now?

MR. HAYWOODE: I am talking about the two suits that were brought by the limiteds.

MR. TRAUB: I believe the first one did not name Mr. Edmonds as a defendant.

It also did not name all of these defendants as named defendants.

MR. HAYWOODE: Okay.

I have no further questions.

MR. KELLY: I have some questions about what Mr. Haywoode was just asking about.

MR. TRAUB: Just so the record is clear, I believe Mr. Edmonds testified that he joined as a plaintiff in the

Orley George Cameron

first lawsuit as well.

MR. HAYWOODE: Okay.

EXAMINATION

BY MR. KELLY:

Q. Mr. Cameron, you were just asked several questions about other lawsuits involving the limited partners.

How did you learn about those lawsuits?

A. I mean, just in conversation between the attorneys.

Q. Do you mean conversation between you and Mr. Haywoode prior to today or just now as we are sitting here?

A. Well, I mean conversation between the attorneys.

MR. HAYWOODE: Indicating Mr. Edmonds and myself.

THE WITNESS: Right.

A. I mean, those are not conversation that I am a part of, but in the same way I am hearing it between you both or between you. That's all I heard.

MR. HAYWOODE: So indicating

Orley George Cameron

Mr. Edmonds, Mr. Haywoode, Mr. Traub and Mr. Kelly.

Q. In connection with one of the questions Mr. Traub asked you about the $4 million discrepancy, you responded, we update our records.

A. Yes.

Q. What did you mean by update our records?

A. In other words, some of the information we got during the discovery, we were able to vouch for some of the items that we were looking for.

We still need explanation.

Q. What records do you maintain in connection with this?

A. The records that we received we have.

Q. Do you have workpapers that you created in connection with this engagement?

A. Yes, we do.

Q. Are those workpapers maintained at Cameron, Griffiths & Pryce?

A. Yes.



Q. Are those the records you are referring to when you say you have updated the records?

A. Right, um-hum.

Q. Do you know what the current amount of the discrepancy you identified is?

A. No. I have not -- I don't have it in front of me.

Q. But is that the figure you could figure out if you saw your records?

A. Yes.

Q. Do you have any idea of what it is as we sit here today?

A. No, because I remember there was 2.1 million on Lakeview specifically, yes.

Q. The 2.1 million for Lakeview that you are recalling, that is information you haven't been able to get the records to verify?

A. Right, to vouch, right, or some of the records that we received is not clear.

Q. So if you were to review --

MR. HAYWOODE: I am sorry. The witness was still answering.

A. (continuing) I am saying some of the records we received were not clear.

So, for example, we had asked for information to support the prepaid real estate tax. The information we got is actually a printout from the Department -- from the New York City Tax Department, which shows payment for tax for the current period.

I think there was one payment for a subsequent period, which did not amount to the amount on the -- we can go over it, the records I got -- that amount on the balance sheet or in the general ledger for prepaid tax.

Q. So if you were provided the appropriate record, you could then verify that the amounts were paid properly?

MR. HAYWOODE: Objection as to what the appropriate record is.

A. If we were provided the appropriate record, yes, because that's what we do. We look for appropriate records.

MR. KELLY: I have no further questions.

MR. TRAUB: I have a few.

EXAMINATION

BY MR. TRAUB:

Q. The loss that was reported in 2006 for Lakeview, that included depreciation and amortization, did it not?

A. I'm sure it would, yes.

Q. Those are non-cash items, isn't that correct?

A. Correct.

Q. And you actually found invoices to support expenditures in excess of $3 million for 2006 on Lakeview; did you not?

A. Since we have a difference, the expenditures -- I don't recall. I don't recall.

Q. In the invoices and the backup documentation that you have been provided, have you found any discrepancies between those invoices or other items and the amounts reported in the general ledger?

A. The discrepancy between those amounts, yes, because one of which I pointed out was that invoice from Marks Paneth & Shron

for '05.

The invoice was dated in '05, but it was for service and was capitalized for service performed in '04. That's number one.

Number two, we saw -- there were invoices, I think it was displayed at one of the depositions, there was an invoice for service that was provided in '04.

Actually, the invoice was dated in '02, but it was expensed in '06.

Q. But the numbers were accurate, were they not?

MR. HAYWOODE: Objection.

A. I don't know whether they were accurate.

Q. In other words, the numbers that were reported on the books and records were the same as the numbers that are on the actual invoices; isn't that true?

A. Right. It was compounded. So part of that payment, it was a compound payment and part of that payment and included in that payment was an invoice dated from '02 and it was expensed in '06.



Orley George Cameron

Q. And the numbers that were listed on the 2002 invoice and the numbers that are listed on the books and records for that invoice, the payments are the same?

A. The payments are the same but there is a problem with the invoice.

The invoice, if it was outstanding from '02, I mean obviously there's a problem with that, number one.

If the auditor was not paid since '02 it's a problem with independence. That's number one.

Number two, it was not accrued in the financial statement before because it was not listed as an outstanding amount, and if it was, it also would pose an independence problem.

And since it was dated in '02 and it was paid in '06, it should have been adjusted to the prior period and not be expensed in the current period.

So there were quite a number of issues with it.

Q. But, Mr. Cameron, my question to you

Orley George Cameron

is the numbers --

A. The amounts.

Q. -- the amounts are the same?

A. Yes.

Q. And the same question for the 2005 approximately $22,000 invoice that you were referring to, the amounts are the same on the invoice than are listed in the books and records; is that correct?

A. Yes.

EXAMINATION

BY MR. HAYWOODE:

Q. May I inquire on this point:

These books are kept on the accrual basis and expense accrued in 2002 would have been expensed in 2002; is that correct?

MR. TRAUB: Objection.

I want to quickly correct your question.

MR. HAYWOODE: Hold it.

MR. TRAUB: The books are on a cash basis.

MR. HAYWOODE: Let's let him answer it.

Orley George Cameron

Q. If they were on an accrual basis, they would have expensed that money in 2002, is that correct?

MR. KELLY: Objection.

A. If I may answer the question or if I may clarify the issue. I am using my expertise as an accountant, if you will permit me to answer the question.

MR. TRAUB: Before you do, Mr. Haywoode --

MR. HAYWOODE: Let's let him answer the question.

MR. TRAUB: No.

Are you proffering him as an expert on accounting?

MR. HAYWOODE: I am not dealing with that now.

May we have his answer? Let's have his answer and then -- Darren, you're interrupting the witness's testimony.

MR. TRAUB: He is about to testify as an expert on accounting.

THE WITNESS: As a professional accountant.

Orley George Cameron

MR. TRAUB: Are you proffering him as an expert on accounting, Mr. Haywoode?

MR. HAYWOODE: I am asking that the witness answer the question, and you can put any other question you have.

EXAMINATION

BY MR. HAYWOODE:

Q. Do you recall the question?

A. No. Could you remind me of the question?

Q. If I am on the accrual basis and I receive money in 2005, the money to Marks Paneth & Shron, would it not have been expensed -- I'm sorry -- in 2002, would it not have been expensed in 2002 and deducted in 2002?

A. That is correct.

MR. TRAUB: Objection.

Q. Now, if it later appeared in 2006 and was deducted in 2006 again in whole, wouldn't I be expensing the same amount of money twice in two different years?

A. That is correct.



Orley George Cameron

MR. KELLY: Objection.

Q. Now, you heard testimony here that $181,000 in 2000, I believe Mr. Dawley testified to it, was made payable to Dalton, which was really money that was owed to Prestige Management, Marion Scott Management and Grenadier Management -- did you hear that testimony?

MR. TRAUB: Objection to form. Misstates prior testimony.

MR. KELLY: Objection.

MR. TRAUB: And for the record, Mr. Edmonds actually testified that he believed that money is due to him.

MR. HAYWOODE: Counsel is testifying now.

Q. Did you hear about the 181,000 previously that Mr. Dawley I believe testified was attributed as being payable to Dalton though it was owed to the previous management company before Dalton came on board? Did you hear that testimony?

MR. KELLY: Objection.

A. I heard the testimony from Dawley,

Orley George Cameron

yes.

In our review of the records we asked for documentation to support the accounts payable and part of what we were given was from the accountant, actually, was information that $181,000 is payable to Dalton Management.

But then I later learned, and also confirmed by Mrs. Seavey, that was actually due to the partners.

Q. And if they were accounting on the accrual basis in the 1990s when this money was accrued to Prestige, Grenadier, and Marion Scott, money would have been expensed in those years; is that correct?

A. It should have been expensed, yes.

MR. TRAUB: Objection.

A. That's the reason why it was -- for it to be listed as accounts payable it means that it was expensed, yes.

Q. And if that money continues on the books for a period of nine years and if it were to be paid out, let's say, in 2012 to Dalton Management, it would be wrong to

Orley George Cameron

expense that money yet again; would it not?

MR. TRAUB: Objection. Calls for an improper hypothetical and a legal conclusion.

MR. KELLY: Objection.

A. Yes, but if it's paid out again it doesn't have to be expensed because it's not really accrued.

So when you pay the second time, it's not expensed.

Q. It shouldn't be expensed?

A. It shouldn't be expensed.

Q. So that if Mr. Dawley testified at his deposition that the money was being held and could be expensed a second time in paying it to the managing general partners, that would be a double expensing of the same amount of money; would it not?

MR. TRAUB: Objection. Misstates prior testimony.

MR. KELLY: Objection.

A. I mean, if it was expensed, but I don't think -- just to add, I don't think the issue was whether or not it could be expensed

Orley George Cameron

again because it had already been expensed and is listed in accounts payable.

I think the issue for us, when we reviewed it, was the appropriateness of it being listed as due to Dawley.

MR. TRAUB: Dalton?

THE WITNESS: I'm sorry. To Dalton Management.

Why do I keep mixing the two?

Q. What was inappropriate about it?

A. The fact that it was an invoice presented by another management company and this is now being made payable to the current management company.

As a matter of fact, technically, number one, the fact that the tax returns, and the tax returns are prepared on an accrual basis, they are not prepared on a cash basis. They are prepared on an accrual basis.

The fact that they are prepared on an accrual basis and were included in expense -- you are shaking your head -- the tax returns I have is prepared on an accrual basis.

Orley George Cameron

So that if they were expensed on the tax return in whatever year, technically if it's not paid within a certain period of time, it has to be written back or written off or be charged off, had to be adjusted back. That's an IRS requirement.

A GAAP requirement is that if the liability is not going to be paid to the invoice, to the vendor that supplied that invoice, that it has to be written off.

So it's not -- it's not GAAP for it to be carried on the balance sheet indefinite.

Q. Do you know who the --

A. And GAAP means not accepted by accounting principle.

Q. Do you know who the principals of Dalton Management are?

A. I'm not sure.

Q. To your knowledge, is John Edmonds in any way a principal involved with Dalton Management other than as a general managing partner of properties that they manage?

He is not a principal of Dalton?

A. John told me he is not a part owner

Orley George Cameron

of Dalton Management.

Q. To your knowledge, is Nealle Seavey a member of Dalton Management, to your knowledge?

A. To my knowledge, frankly, I'm not sure who the owners, the principal of Dalton Management are.

I know Ron is the CEO.

Q. Indicating Mr. Dawley?

A. Mr. Dawley.

I don't know who the owners are.

Q. You have no knowledge as to whether Phyllis or Robert Seavey are members of Dalton Management?

A. I think not knowledge that I can verify, but I think by in discussion, yes, I have, yes. They are the principals.

MR. HAYWOODE: That's all.

MR. KELLY: I have just a clarifying question from what Mr. Haywoode asked regarding the '02 invoice.

THE WITNESS: Which one?

EXAMINATION

BY MR. KELLY:

Orley George Cameron

Q. I have some followup questions about what Mr. Haywoode was asking regarding the invoice for, I think you just referred to it as the '02 invoice that accrued in '02.

Then it was recorded on the financial statements on the accrual basis for '02, but it wasn't actually paid until '06.

A. Is that what my response was?

Q. I want to clarify that. I wasn't sure what your response was.

A. My response was that there was an invoice that was dated in '02 but was expensed in '06. It was paid and expensed in '06. And I'm saying that it's clearly improper, because if it was an '02 invoice, if it was not paid, it should have been accrued.

MR. HAYWOODE: Do you know --

MR. KELLY: Let me finish.

Q. How many times was that invoice actually paid?

A. I have no way of knowing.

Q. Do you know if that invoice was actually paid?

A. In '06, yes.

Orley George Cameron

Q. It was paid in '06?

A. Yes.

Q. Do you know if it was paid in '02, as well?

A. I do not know.

Q. So as far as you know it was only paid once?

A. It was paid in '06, as far as I know.

Q. And whether it was properly recorded as an expense in '02 or '06, that's just an accounting column to put it in, it's not a misappropriation of funds; correct?

A. Well, it was also a misstatement of the report, especially given the fact that it's the auditor's invoice.

Q. Do you know the amount of that invoice?

A. The invoice, I think the amount that was paid from that invoice, the total invoice is exceeding 100,000, but the balance that was paid -- I know the balance that was paid in '06 was 15,000.

Q. 15,000?



134

Orley George Cameron

A. The total amount of the invoice, I don't know.

Q. When conducting an audit, does the auditor determine a level of materiality for transactions?

A. Yes.

Q. Do you know what the level of materiality for transactions were for the audit of this entity?

A. Each auditor determines their own level of materiality.

Q. Do you know what the level of materiality was that Marks Paneth & Shron as auditors determined for this entity?

A. No.

Q. So do you know if this payment in 2006 was above or below that level of materiality?

A. I would not know, but given the fact that amount was adjusted -- I mean materiality is what you use as a gauge to determine the extent of your audit or if there is a misstatement, whether or not you are going to consider it serious.

135

Orley George Cameron

However, when you are aware of -- when you are aware of, it doesn't matter if it's a penny, if you are aware of a misstatement you have a duty, too. You cannot shun that based on materiality. You have to -- I mean you have to address it.

And that invoice -- those payments were reclassed from accounting to management consulting.

Q. Do you know what sources were provided in connection with that reclassification?

A. Well, actually it's a whole variety of services, including auditing, management consulting, it was a very detailed bill, phone calls, conversation. It was very detailed.

Q. So that some of the items on that bill relating to management consulting would justify reclassifying part of that invoice to management consulting duties?

A. It would, yes, but it would also need to be reclassed to the prior period.

Q. Another topic Mr. Haywoode asked you about included the $181,000 that Mr. Edmonds

136

Orley George Cameron

--

A. 181.

Q. -- 181 payable to a previous management company, and you had testified that it shouldn't be on the books for this long.

A. Right.

Q. What would happen --

MR. KELLY: Strike that.

Q. If you wrote that payment off the books, would that result in an income to -- taxable income to the entity?

A. Yes.

Q. And by keeping it on the books, you are avoiding having to report that taxable income or claim that taxable income; correct?

A. Yes. Be careful with the term you use.

Q. I am using layman's terms at this point, not technical accounting terms.

So if that payment were to be made, it would cause taxable income to the entity?

MR. HAYWOODE: I assume you mean Dalton Management?

A. If the payment were to be made?

137

Orley George Cameron

Q. The partnership has it on the books as an expense that has already been paid; correct?

A. That had been accrued.

Q. That had already been accrued.

If that expense is written off, that would count as income to the partnership; correct?

A. Yes.

MR. TRAUB: Can you clarify that?

Q. To Logan Partnership?

A. Yes.

Q. If Logan Partnership has to report 181,000 in additional income, it would have to pay taxes on that additional income; correct?

A. The partners would.

Q. Partners would?

A. Um-hum.

Q. So if this amount was written off, then the partners would have to report income in relation to that 181,000; correct?

A. Um-hum, yes.

Q. And the partnership I am referring to is Logan?



138

Orley George Cameron

A. Logan, yes.

Q. The money, no matter who it's paid to, would have to be recaptured -- that's the term -- as income --

A. Right.

Q. -- to Logan Partnership?

A. Partnership.

Q. Whoever received that money would also have to pay income tax depending on the personal situation on that as income?

A. Yes.

MR. KELLY: I have no further questions.

EXAMINATION

BY MR. TRAUB:

Q. Mr. Haywoode had asked you a bunch of hypotheticals regarding books and records that are kept on an appreciated basis.

A. On an accrual basis.

Q. I'm sorry. On an accrual basis.

Isn't it true that the books and records of the partnership are kept on a cash basis?

A. They're kept on a cash basis, but

139

Orley George Cameron

the accruals are carried back -- the accruals are entered in by the accountant each year in order to adjust it.

Q. By the auditors Marks Paneth & Shron?

A. By the auditors Marks Paneth & Shron.

Q. But they are kept on a cash basis?

A. The books are kept on a cash basis, right.

Q. I just want to be clear:

With regard to the $181,000 that we have all been discussing over the last few minutes, that has not been paid to anyone; is that correct?

A. No.

Q. The Seaveys have not been paid any money from that $181,000, as far as you know?

A. As far as '06.

Q. And Dalton Management has not been paid that $181,000?

A. As far as '06, yes.

Q. Has Mr. Edmonds ever told you that he is laying claim to half of that $181,000?

140

Orley George Cameron

A. Did we have a discussion about that? I'm not sure.

I think Mr. Seavey told me it belongs to the partners.

Q. Has Mr. Edmonds ever told you that half of that belongs to him?

A. No. We have never had such discussion, no.

MR. TRAUB: I have nothing further.

EXAMINATION

BY MR. HAYWOODE:

Q. Mr. Cameron, if another ten years went by and the current party has moved to another jurisdiction, something like that, this money would still be on the books payable to Dalton Management; is that correct?

A. I am not speaking of the prophesies.

Q. The hypothetical.

A. That's prophesying.

MR. TRAUB: He wasn't finished with his answer.

A. The fact that it is from my information it has been on the books prior to

141

Orley George Cameron

the year 2000.

I'm saying based on all standards, GAAP and IRS standards, it should not be.

One of the major problems, it was renamed. The vendor was renamed. I mean, a vendor supplied an invoice and the invoice is accrued. So that if that vendor is entered to the invoice, it remains in the vendor's name.

If it doesn't, if the vendor is not entitled to the invoice and it is so determined, then it has to be written back.

I mean, that's what my profession tells me how to treat that.

Q. And if I carry it for ten more years in the name of Dalton Management, ten years from now, what would stop me from expensing that money a second time to Dalton Management?

MR. KELLY: Objection.

MR. TRAUB: Objection.

A. Well, I'm not a prophet, but if you notice in our management comment, we adjust that. The fact that if it doesn't belong, it



Orley George Cameron

has to be labeled to who it belongs, and if it's not it should be written off.

Q. With regard to related parties and materiality, if monies are paid, say to Dalton Management, and if Dalton Management is an organization owned or controlled by the Seavey group or members of the family, should there be any particular attention paid by the auditor to transactions in the partnership between related parties?

MR. KELLY: Objection.

MR. TRAUB: Objection.

A. Related party transaction?

Q. Yes.

A. Related party transactions are required to be disclosed. Related party transactions cannot be not disclosed on the basis that it's immaterial.

Q. If a note was taken by any individual, by any of the managing general partners or a note payable to that general managing partner at any time, should that be material regardless of the amount of the note?

Orley George Cameron

MR. TRAUB: Objection.

A. It may or may not be material, but it must be disclosed, the nature of that, the nature of that loan and, what do you call it, the terms of the note are required to be disclosed in their footnotes to the financial statement.

Q. There was a note for $29,000 that you came across, and I believe you testified about it a few seconds ago, and the issue was put to Mr. Jennings concerning the backup and support of that $29,000; is that correct?

MR. TRAUB: Objection, compound.

MR. KELLY: Objection.

A. I know Mr. Jennings had addressed it in his testimony, yes.

Q. Do you recall his answer was that it was beneath the level of materiality?

A. Yes.

MR. KELLY: Objection.

Q. Do you agree with that analysis of Mr. Jennings, that a $29,000 loan payable to a managing general partner would be beneath the level of materiality?

Orley George Cameron

MR. KELLY: Objection.

Q. As to documentation?

MR. TRAUB: Objection.

A. I cannot agree because the standard would not permit me to agree with that.

The standard requires that related party transactions be disclosed.

Q. Are you aware of how many developments owned by the Seavey group maintain the management of the Dalton company and the auditing services of Marks Paneth & Shron, other than the four developments that John Edmonds is involved in? Are you aware of how many of those?

MR. TRAUB: Objection.

MR. KELLY: Objection.

A. Based on the allocation that we received, I would assume -- not assume.

Based on the salary allocation that we received, there are about twelve companies that are managed by Dalton Management.

How many of them are audited by Marks Paneth & Shron, I don't know.

MR. HAYWOODE: I have nothing

Orley George Cameron

further.

MR. KELLY: I have nothing.

MR. TRAUB: I have nothing.

MR. KELLY: Okay.

(Time noted: 1:20 p.m.)



Orley George Cameron

A C K N O W L E D G M E N T

I, ORLEY GEORGE CAMERON, hereby certify that I have read the transcript of my testimony taken under oath on the 21st day of April, 2009, that the transcript is a true, complete and correct record of what was asked, answered, and said during the deposition, and that the answers on the record as given by me are true and correct.

_______________________
ORLEY GEORGE CAMERON

Signed and subscribed to before me this ____ day of ______________, 2009.

_______________________
Notary Public

STATE OF NEW YORK )
) ss:
COUNTY OF NEW YORK)

I, DONNA A. METZ, R.P.R., a Notary Public in and for the County of New York and State of New York, do hereby certify:

That I reported the proceedings in the within entitled matter, and that the within transcript is a true record of such proceedings.

I further certify that I am not related by blood or marriage to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of April, 2009.

_______________________
DONNA A. METZ, R.P.R.
Notary Public

I N D E X

| WITNESS | EXAMINED BY | PAGE |
|---|---|---|
| ORLEY GEORGE CAMERON | (Mr. Kelly) | 4 |
| | | 116 |
| | | 131 |
| | (Mr. Traum) | 93 |
| | | 120 |
| | | 138 |
| | (Mr. Haywoode) | 113 |
| | | 123 |
| | | 140 |

E X H I B I T S

| DEFENDANTS' FOR IDENTIFICATION | PAGE |
|---|---|
| Exhibit 13 Copy of Subpoena issued to Orly Cameron (sic). | 5 |
| Exhibit 14 Document entitled "Independent Auditors' Report." | 32 |
| Exhibit 15 Copy of document on the letterhead of Cameron, Griffiths & Pryce, to Mr. John Edmonds, | 39 |
| Exhibit 16 Copy of Affidavit of Orley G. Cameron. | 47 |
| Exhibit 17 Copy of document on the letterhead of Internal Revenue Service, Department of the Treasury, dated October 26, 2005. | 78 |

E R R A T A S H E E T

CASE NAME: EDMONDS et al. vs SEAVEY et al.
DEPOSITION DATE: April 21, 2009
NAME OF WITNESS: ORLEY GEORGE CAMERON

C H A N G E S

| PAGE | LINE | FROM | TO |
|---|---|---|---|
| | | | |

_______________________
ORLEY GEORGE CAMERON

Subscribed and sworn to before me this ____ day of ______, 2009

_______________________
(Notary Public) (commission expires)

**A**

**able** 29:7 41:7 50:20 100:22 101:2 117:13 118:19
**accept** 115:2
**accepted** 21:7 28:11 68:15,20,25 72:11 95:25 130:15
**account** 26:23 27:5 29:13,14,16,22,24 30:4,7,11,15,15 34:16,19,20 35:3 35:13 51:23 55:6 61:5 83:13,15,16 83:17 84:7 92:23 110:12
**accountant** 57:20 59:15 60:13 69:25 124:8,25 127:6 139:3
**accountants** 70:5,9 70:11
**accountant's** 70:17 71:12
**accounting** 14:23 17:3 20:4 26:7 30:21 31:12 36:15 36:16 37:5 54:8,11 55:5 57:16 61:2 69:11 72:2,8 75:22 93:5 96:2 106:23 124:16,23 125:3 127:12 130:16 133:13 135:9 136:20
**accounts** 30:22 31:22,22,24 32:3 34:13,15,23 35:5,7 35:13 61:12 62:10 62:11 95:12,12 109:19 127:5,20 129:3
**accrual** 35:4 36:20 36:21 61:19,24 62:5,15 123:15 124:2 125:13 127:13 129:18,20 129:22,24 132:7 138:20,21
**accruals** 139:2,2
**accrued** 61:14 122:14 123:16 127:14 128:9 132:5,17 137:5,6 141:8
**accuracy** 112:16
**accurate** 114:14,20 121:12,16
**action** 4:11 33:21
**activities** 73:8
**actual** 121:19
**Adam** 86:7,8,17 87:9 94:19,22
**Adam's** 94:21
**add** 38:8 128:24
**adding** 11:4
**addition** 24:11 75:24 114:8
**additional** 11:19,20 66:15 70:23 71:14 93:21 100:21,25 105:3 107:17 111:6 137:15,16
**address** 135:7
**addressed** 44:9 143:16
**adjust** 55:5 62:10,11 62:13,14 139:4 141:24
**adjusted** 80:8 122:20 130:6 134:21
**adjusting** 54:9,20 55:10 58:11 59:7 59:18 60:12,15 62:6,17 100:15 110:10
**adjustments** 35:14
**admissible** 88:22
**advised** 106:18 111:15
**affidavit** 47:7,16,20 49:6,14 51:2,6,8 89:19 148:19
**affidavits** 104:8
**agencies** 15:19,22 15:24,25 16:2,3,6 18:3,5,5 95:3,6
**agency** 51:23 80:15 80:15
**agent** 49:2 51:11 52:17,23,25
**agent's** 48:19
**ago** 14:10 23:16 91:4 143:11
**agree** 8:18 68:8 143:22 144:5,6
**agreed** 3:7,16 9:17 11:13
**agreement** 28:2,5 48:19 49:9,13 54:4 54:7 63:13 65:17
**al** 1:5,8 4:13 149:3,3
**allocation** 144:18,20
**allocations** 52:8
**allow** 39:3
**allowed** 46:11
**Amendment** 72:3 72:15
**amortization** 120:7
**amortized** 64:15 65:4,9,10 105:11 105:17,21,22 106:3
**amount** 8:15 9:12 9:16 11:4,16,25 12:2 32:9 60:2,4 64:22,25 71:8 74:3 75:11 77:18 78:10 100:8,10 112:13 113:16 118:6 119:11,12,13 122:16 125:23 128:18 133:18,20 134:2,21 137:20 142:24
**amounts** 92:25 100:7 119:18 120:21,24 123:3,4 123:8
**analysis** 75:16 143:22
**analytic** 26:7
**and/or** 55:5
**annual** 29:8,9
**answer** 4:19,21 5:9 34:2 38:5,24 50:7 53:21 57:9 59:23 64:6,8,10 71:16 73:21 76:12 88:24 92:4 98:24 102:2 103:18 104:17 109:11,12 123:24 124:6,9,12,19,20 125:6 140:23 143:18
**answered** 38:16,23 53:12 108:4 113:8 146:15
**answering** 118:25
**answers** 97:6 146:16
**anticipate** 8:16 10:23 11:18,23 12:10 102:16,18 102:19
**anticipated** 10:12 11:5
**anybody** 7:4 58:21 84:9 85:3,7 86:16
**apartment** 18:8,12
**apparently** 77:16
**appearance** 6:22 73:4
**appeared** 125:21
**appearing** 86:14
**applicable** 51:16

86:23,25
**appreciate** 56:14
**appreciated** 138:19
**approach** 88:25
**approached** 88:19 92:13
**appropriate** 9:13 61:7,8,9,15 81:12 119:17,20,21,23
**appropriateness** 129:5
**approved** 59:9 71:15
**approximate** 9:21
**approximately** 10:6 10:9,10,25 11:7,12 12:4,5,6 13:2,2 16:18 71:11 99:19 106:17 112:4 123:7
**April** 1:11 83:23 105:14 146:12 147:18 149:3
**arbitrary** 65:11
**argue** 81:13
**arguendo** 112:7
**argumentative** 56:3
**arises** 76:25
**arm's** 69:14
**arrange** 5:13
**articulate** 27:16
**aside** 56:24
**asked** 13:18 28:18 32:25 34:3 38:16 38:23 53:22 58:15 65:25 89:7 103:5 103:13,19,20 116:6 117:5 119:4 127:4 131:21 135:24 138:17 146:14
**asking** 43:4 55:13 56:6 58:19,19 92:10 107:2,24
115:21 125:5 132:3
**aspect** 88:21
**aspects** 25:20
**assert** 50:21
**asserted** 50:15
**assessment** 8:11 34:5,9
**assessments** 51:18
**assist** 5:5 70:18
**assisted** 18:23
**associates** 40:19 77:13 78:6
**assume** 4:20 74:18 136:23 144:19,19
**Assumes** 113:2
**assuming** 106:2 112:7,15,21
**astronomical** 74:22
**attached** 48:8
**attend** 14:11,14
**attention** 47:19 142:9
**attorney** 2:4 5:6 88:10,16 89:3,8
**attorneys** 2:8,16 3:7 108:8 116:12,17
**attributable** 112:18
**attributed** 126:20
**audit** 12:22 15:17 15:22,25 16:3,4 17:17 18:3,7,11,15 18:19 20:7,12,16 20:20 21:3 22:14 25:16,22,22 26:4 28:10 29:6,25 35:20 36:6 37:20 41:25 42:17 43:21 45:3 49:10 54:15 59:16 66:16,18 75:8,11,16,24 76:18,24,25 77:4 77:14,22 78:7,13 79:10,13,15,18
80:6 86:21,22 92:16,17,18,20,21 93:6,8,20 95:8 102:25 103:6,11 103:14,21 104:6 105:24 106:4 108:16 134:4,10 134:23
**audited** 9:7 15:19 16:3 23:10 61:20 61:23 74:6 144:23
**auditee** 69:15 70:15
**auditing** 19:17,19 19:23 20:4 21:9 28:11 67:13,15,19 68:16,20,25 69:12 72:9,10,12 105:25 108:24 110:14 135:15 144:12
**auditor** 15:4,5,16 59:16,17 66:11 69:15 70:24 73:2,5 73:10 105:24 122:11 134:5,11 142:10
**auditors** 32:22 33:14,18 40:11 58:17 59:12 92:19 134:15 139:5,7 148:15
**auditor's** 59:7 69:10 71:4 104:12 108:15 133:17
**audits** 17:13,14,15 17:16,20,25 23:8 31:18 59:14 105:21
**August** 16:23,25
**automatically** 31:12
**available** 36:4 41:3 100:4,16
**Avenue** 1:19 2:10
**average** 112:8
**Avery** 2:8
**avoiding** 136:15
**aware** 72:19 74:11 77:12 85:8 114:7 114:12 135:2,3,4 144:9,15
**a.m** 1:12 82:12

**B**

**B** 2:8,9 148:10
**bachelor's** 14:18
**back** 12:13 35:2 65:18 89:18 90:24 103:3 113:23 130:5,6 139:2 141:13
**backup** 120:18 143:12
**balance** 26:6,10 28:20,25 29:4,13 29:14,16,19,23,25 30:16,19,20 31:5,8 31:15 34:11,12,20 34:22 60:12 83:18 119:13 130:13 133:22,23
**balances** 26:13 55:6
**bank** 28:19,25 31:14
**bar** 81:19
**based** 8:2,8,10 9:4,5 27:7,9 98:25,25 105:7 135:6 141:3 144:18,20
**basic** 29:24 30:20 52:6 55:4 72:25,25
**basically** 16:5 27:17 28:9 62:8 74:12 77:8
**basis** 9:9 30:15 34:14 35:4,9 36:15 36:16,19,20,21,25 37:4,8,8,11 52:8 61:18,19,19,24 62:2,4,5,15,15 112:8 123:16,23 124:2 125:13



127:13 129:19,19
129:20,22,25
132:7 138:19,20
138:21,24,25
139:9,10 142:19
**bat** 73:17
**becoming** 14:12
**began** 25:25 104:6
**beginning** 8:4
103:11
**believe** 24:14 41:6
90:18 91:5 108:12
115:14,24 126:4
126:19 143:10
**believed** 126:15
**belong** 141:25
**belongs** 140:5,7
142:2
**beneath** 143:19,24
**benefits** 51:12
**better** 80:16 81:20
**beyond** 98:11
**bill** 4:10 7:24 8:2,6,9
8:20 9:3 10:15
11:13 37:8,12,17
42:23 108:2 109:3
135:16,19
**billed** 8:22 12:12
**billing** 6:13 8:8
12:10 37:18
**bit** 106:15
**blood** 147:14
**board** 126:22
**book** 20:3 37:2 81:3
87:9
**booked** 110:11
**bookkeeping** 46:15
48:20 51:14
**books** 58:23 70:14
100:3 101:25
102:4,5,7 103:8,21
121:18 122:4
123:9,15,22
127:23 136:6,11

136:14 137:2
138:18,22 139:10
140:17,25
**borne** 45:24 46:23
49:2
**bound** 78:3
**break** 30:3 71:17
82:9 91:9
**breaking** 30:6
**bring** 5:21,25 6:8,9
6:13 7:5,9 35:2
42:18 43:2 62:15
93:21
**broken** 30:14
**brokers** 18:4
**Brooklyn** 2:5 14:15
14:17,19,25 15:3
19:8,9,10
**brought** 4:12 6:3
21:18 94:20 114:8
114:10,23 115:12
**budget** 8:3
**building** 18:25
**bunch** 138:17
**business** 96:25

**C**
**C** 2:2 4:3 146:4
149:5
**calculation** 112:6
**call** 33:11 35:6 40:4
45:20 63:21,25
64:4,7 70:21,23
84:14,18 85:9 93:8
100:20 143:5
**called** 7:6 13:16,18
16:17 17:2 54:9
63:20,22
**calls** 128:4 135:17
**Cameron** 1:16 4:9
5:1,17,19,21 6:1,4
7:1,13,15 8:1 9:1
10:1 11:1 12:1,17
13:1 14:1 15:1
16:1 17:1,3,5,11

18:1 19:1 20:1,6,7
20:12,16,20 21:1
21:16,22 22:1,2,4
22:8,16 23:1,7,14
23:17 24:1,2,8,15
24:19 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1,20 40:1,18,24
41:1,6,18 42:1,25
43:1 44:1 45:1
46:1 47:1,8 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1,9
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1,10
85:1,16,20 86:1
87:1 88:1,15 89:1
90:1 91:1,19 92:1
93:1,12,14 94:1
95:1 96:1,4,10,13
96:16,17,19 97:1
97:11,14,20 98:1
98:19 99:1,17
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1,14
108:1,18 109:1,4
110:1 111:1,12
112:1 113:1 114:1
115:1 116:1,6
117:1,24 118:1
119:1 120:1 121:1
122:1,25 123:1

124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1,14
141:1 142:1 143:1
144:1 145:1 146:1
146:9,20 148:4,13
148:17,19 149:4
149:20
**capital** 95:12 96:18
96:22
**capitalized** 106:4
121:4
**cards** 96:25
**careful** 136:17
**Carolina** 13:16
**carried** 130:13
139:2
**carry** 141:16
**case** 1:7 6:22 8:23
47:17 76:9 149:3
**cash** 26:5 34:14,24
35:6,7,9,10,11
36:15,16,17,19,22
36:25 37:2,7,8,11
61:18 62:2,4,15
75:16 106:10
123:22 129:19
138:23,25 139:9
139:10
**cause** 136:22
**caution** 88:23
**cc'd** 44:14,21
**cc's** 44:13
**central** 45:24 46:21
52:14
**CEO** 35:18 131:9
**certain** 107:18
130:4
**certify** 146:10 147:8
147:13
**cetera** 26:5



**chance** 108:11
**Chancellery** 2:5
**change** 56:4 79:16 79:17 80:4 81:25
**changed** 39:14
**changes** 90:23 91:2
**changing** 92:19
**characterization** 109:20
**characterize** 60:16 65:13
**charge** 66:20
**charged** 11:10,16 66:12,17 75:7,11 75:17,19 76:4 130:6
**charging** 11:18 12:21
**Charles** 9:24 21:6 98:19
**choice** 77:2
**chronological** 30:8 30:10
**Church** 9:24 10:7,9 10:18,24 11:4 21:6 97:24
**churches** 18:4
**city** 16:11 119:8
**civil** 6:22
**claim** 114:10 115:4 136:16 139:25
**claimed** 99:20
**clarify** 97:5 98:23 124:7 132:10 137:11
**clarifying** 131:20
**clause** 49:23
**clear** 55:2 107:23 110:8 115:24 118:22 119:3 139:12
**clearly** 16:21 46:18 46:25 54:7,18 71:12 72:5 76:22 77:8 132:15
**clerical** 48:20 51:13
**clerks** 46:16
**client** 8:2,19 23:18 24:15 97:10
**clients** 7:24 8:14,20 12:22 23:22 24:5 37:17
**closing** 29:16 105:10 105:11,12,17 106:5
**collaborate** 22:13
**colleague** 13:17
**collect** 35:10 37:12
**college** 14:11,14,15 14:17,19,25 15:3 19:9,10
**column** 133:13
**come** 5:10 9:12 13:13 34:9 36:11 57:12
**comes** 59:16
**comfortable** 56:13 108:7
**coming** 13:21 61:10
**comment** 33:12 38:10,11 109:18 141:24
**commentary** 107:19 108:15
**comments** 39:2 40:5 40:8,13 41:20
**commission** 149:23
**common** 59:17
**communicate** 42:14 43:19
**communicated** 42:16 58:16 67:3,6
**communication** 41:22 42:5,19,22 44:12,13
**communications** 43:15,22 44:4,7,20 84:11 86:11
**companies** 17:18 18:19 59:14 144:21
**company** 2:9 17:4,5 17:11 44:13 46:6 46:23 96:14 110:15 112:2 126:22 129:13,15 136:5 144:12
**company's** 46:24
**compared** 25:19 69:6 83:19
**compensated** 68:9
**compensation** 51:11 51:20 52:3 67:24
**competent** 30:20 31:12
**complaints** 104:7
**complete** 95:7 146:13
**completing** 14:24
**completion** 19:7
**complexes** 18:8,12
**compliance** 94:17 95:16
**compliant** 80:19
**complicated** 37:15
**comply** 92:19,20
**component** 74:5
**components** 75:15 75:17
**compound** 121:22 143:14
**compounded** 121:21
**comprehend** 55:14 57:11
**compromise** 65:22 75:24 76:5 77:10
**compromises** 105:23
**computer** 90:24
**computers** 112:5
**conceptually** 57:14
**concern** 26:19,19 27:17 36:13 68:6 69:6 77:7 93:3 105:18
**concerned** 92:24
**concerning** 143:12
**concerns** 27:13,14 27:15 38:7,9,10 61:17
**concludes** 39:7
**conclusion** 5:11 36:11 37:22 128:5
**conclusions** 36:7
**conducted** 105:12
**conducting** 36:6 43:20 134:4
**conference** 63:21,25 64:4,7 84:14 85:9
**confirm** 38:25
**confirmation** 9:11
**confirmed** 50:18,21 127:10
**conflict** 76:23,24 94:18
**connection** 5:22 6:10,14 11:11 12:25 13:23 19:12 19:16,19,23 21:9 24:2 31:17 32:15 33:5,9,20 42:9 48:6 50:10 54:17 54:21 55:11 58:24 63:6 76:17 77:21 78:7,13 82:15,16 117:4,17,21 135:12
**consider** 134:25
**considered** 52:3
**constitute** 108:13,19
**constituting** 108:14
**consulting** 17:13 61:2 135:10,16,19 135:21
**consuming** 31:9,10

**contacted** 28:15 85:18 93:18
**contained** 29:18,19 31:5 108:17
**contemplated** 103:10
**contemplation** 88:11
**contending** 52:6
**context** 68:16,21 69:16 79:18
**continued** 14:20 83:21,22,24
**continues** 127:22
**continuing** 119:2
**contract** 45:18,19 46:2,4,5,7,11,18 46:21 49:23 51:9 52:20 53:3,17 66:13,22 70:21 71:6,7,7 75:4,5,10 75:14,21 76:11,13
**contracts** 71:10
**contradiction** 50:23
**contravention** 54:4
**contributions** 96:18 96:22
**control** 34:6 57:25 106:22
**controlled** 142:7
**controller** 16:10 22:19,21 24:12 94:22
**Controller's** 15:8,11 15:15 16:8
**controls** 33:22 95:18
**conversation** 63:6 63:24 116:11,13 116:16,21 135:17
**conversations** 63:9 84:17,21 85:4,7 87:20,23 88:3,10
**convert** 62:4
**convey** 37:25 38:19 38:25
**conveyed** 38:8,9,9
**copies** 44:3 59:4
**copy** 5:18 28:4 39:19 42:18 47:7 49:9,13 78:20 90:4 148:13,16,19,20
**Corporation** 111:13 111:19
**correct** 8:14,21,24 10:11 23:23 24:16 24:17,21 25:2 28:6 40:9 44:24 49:8,11 55:6 62:2 66:18,19 66:22,23 97:11,12 101:22 104:15 112:3,25 115:5,7 120:10,11 123:10 123:17,19 124:4 125:19,25 127:16 133:14 136:16 137:4,9,16,22 139:16 140:18 143:13 146:14,17
**correction** 35:14 115:3
**correctly** 23:20
**correspondence** 6:4
**cost** 105:11
**costs** 48:23
**counsel** 2:12,19 4:24 5:4 96:3 126:16
**count** 30:25,25 137:8
**County** 147:4,7
**couple** 6:3 80:12 97:6
**courses** 19:12,16,23 20:2
**court** 1:3 3:13 5:16 32:19 39:17 47:5 78:18 80:18,21,22 109:11
**courtesy** 91:25
**cover** 111:17
**covered** 75:21
**CPA** 13:17 14:4,12 22:24 23:2,3
**CPAs** 23:5
**create** 30:2,15 31:11
**created** 117:21
**credit** 18:3 34:17,20 34:22,23,25 35:4,6 35:10
**credits** 19:21
**cumulative** 110:20
**current** 16:13 61:11 115:9 118:6 119:9 122:22 129:14 140:15
**currently** 12:14 17:25 20:10 94:22
**cut** 44:16

**D**

**D** 146:4 148:2
**Dalton** 2:9 6:5 26:14 26:15 44:22 47:25 53:7,24,25 54:16 54:21 55:11,15 58:8,23 59:21 60:2 60:8 62:2 67:16,17 67:19,21 69:24 91:22 101:19 107:14 109:18 110:4 126:5,20,22 127:7,25 129:7,8 130:18,21,24 131:2,4,7,14 136:24 139:21 140:18 141:17,19 142:5,6 144:11,22
**Dalton's** 50:18
**Darren** 2:12 80:11 91:12,20 124:20
**date** 5:20 32:24 39:23 47:10 78:24 97:9 149:3
**dated** 78:22 103:25 105:8,9 121:3,10 121:24 122:19 132:13 148:22
**Dawley** 2:9,23 28:16 50:9 51:3 67:5 70:3 91:22 109:25 126:4,19,25 128:14 129:6 131:10,11
**day** 146:12,22 147:18 149:22
**de** 70:22 71:21,25 72:20,23 73:13 74:4,7 76:21 77:8 77:22,25 78:4
**dealing** 124:17
**debit** 34:21,23 35:2 35:4,7,10 83:18
**debits** 34:16
**debit-credit** 35:12
**December** 27:6 83:19,21
**decision** 81:25
**deducted** 125:17,22
**defendant** 2:16 4:11 114:18,24 115:15
**defendants** 1:9 2:8 5:17,19 32:23 39:22 47:8 78:23 91:22 99:10,10 104:14,21 105:5 106:20 107:16 108:17 114:11,22 115:17,17 148:11
**deficit** 113:10,11,12 113:18
**define** 46:13
**definition** 56:25 72:13
**degree** 14:16,16,18 14:22 15:5
**delineate** 69:13
**delineation** 46:19
**delivered** 40:19



**Deloitte** 23:12
**Department** 15:6 78:21 119:7,8 148:21
**depend** 112:5
**depending** 138:10
**deposition** 1:16 3:9 62:24 63:2 86:15 86:16 87:18,19 89:13 100:20 109:6 128:15 146:15 149:3
**depositions** 80:14 81:5 121:8
**depositon** 63:4
**depreciation** 120:6
**described** 59:6
**desired** 65:22
**destroys** 71:4
**detail** 27:24 29:21
**detailed** 135:16,17
**determination** 97:18,23 98:4 99:3
**determine** 8:10,12 9:10 61:4 95:21 134:5,22
**determined** 134:15 141:13
**determines** 134:11
**develop** 25:22 26:3 26:3
**developments** 144:10,14
**DHCR** 15:21 20:8 20:13 23:9 71:15 94:7,25
**diaries** 6:9
**DICKER** 2:15
**difference** 25:18 81:8 95:18 120:15
**different** 94:6 95:10 95:11 100:18 102:17 125:24
**difficult** 31:6 36:19 37:20 60:9,22
**difficulties** 43:20 62:18
**difficulty** 31:9 42:16
**direct** 47:19
**directed** 6:6
**directly** 101:10,12 102:11
**director** 51:16
**disagreed** 50:11,13
**discharged** 52:24
**disclaimer** 45:6 99:5 99:9 100:6
**disclosed** 71:9 142:17,18 143:4,7 144:8
**discover** 97:14,20 97:25 98:20
**discovered** 49:24 99:19 101:8 106:19 107:10
**discovery** 100:21,24 105:7 108:15 109:10 117:12
**discrepancies** 84:4 120:20
**discrepancy** 99:20 117:6 118:7 120:23
**discuss** 47:24 86:18 86:19 111:15
**discussed** 9:4 64:23 86:17,20 102:23 109:23 112:25
**discussing** 31:16 64:13 76:19 139:14
**discussion** 50:2,3 51:2,4,4 64:16 71:18 80:11 82:5 88:21 89:10,12,16 106:21 111:22 131:17 140:2,9
**discussions** 68:14,22 86:15 89:5
**displayed** 121:7
**dispute** 65:12 66:2,5
**disputes** 65:14,15
**distributed** 110:3,17 110:19
**distribution** 26:23 27:4,5,19,21 83:12 83:15,16,17 84:2,2 92:23,25 109:18 109:23 110:11,21 113:25 114:4,6
**distributions** 95:13 95:23 110:22
**DISTRICT** 1:3,3
**document** 32:20,21 33:3,14 39:19 40:3 40:6 44:8 45:17 48:11 78:20 79:5 89:19 90:2,5,8,17 90:18,22 91:3 100:4 101:14 106:8 148:14,16 148:20
**documentation** 32:12 35:19 100:14 120:19 127:4 144:3
**documentations** 69:23
**documents** 5:22,25 7:5 44:22,25 45:8 87:2,5,11,14,15,17 96:7,10 99:21 101:2,9,16 102:3,6 103:5,15 107:4,17 108:9,12,20 109:3
**dollar** 11:25
**dollars** 10:12 60:14 112:11 113:15
**Donna** 1:20 4:5 147:6,22
**double** 128:18
**DOUGLAS** 2:3
**draft** 89:25 90:5,21
**drafts** 104:7
**Drive** 2:17
**due** 35:17 95:23 126:15 127:11 129:6
**duly** 4:4
**duties** 15:14 135:21
**duty** 135:5
**dwelling** 51:25

**E**

**E** 2:2,2,21,21 4:3,3,3 4:3 146:4,4 148:2 148:10 149:2,2,2,5
**earlier** 37:21 40:7 102:13 104:11
**earned** 36:22
**East** 89:14
**EDELMAN** 2:15
**edited** 89:22 90:2
**Edmonds** 1:5 4:12 7:10 8:22 9:3,5,14 11:10,15,19 12:3,8 12:11,25 13:5,8,14 13:20 18:7,11,15 18:19 20:11,15,19 20:25 21:22 23:18 23:22 24:5,14,20 24:24 25:6,10,13 26:17,17 28:2 38:2 38:12,20 39:21 40:14,25 42:9,13 43:16,25 44:10,12 44:14,21 50:3 63:7 68:15,19 82:17,19 86:12 87:21 89:6 92:13 95:22 96:12 97:10 99:18 103:10 104:22 106:18 109:17 110:25 111:14,21 114:2,9,17 115:5 115:15,24 116:19 117:2 126:14



130:20 135:25 139:24 140:6 144:14 148:18 149:3
**EDMONS** 2:22
**educational** 19:12
**effect** 3:13
**effective** 72:16
**eight** 10:12
**either** 114:2
**elected** 96:5
**ELSER** 2:15
**else's** 68:12
**employees** 17:8 48:2 50:16,18,22 51:13 51:15 52:9,10,13 52:15,17,23 53:6 53:16,19,24,25
**employment** 51:19 51:21 86:9
**enable** 39:9
**engaged** 9:14 12:24 20:24 26:16
**engagement** 6:11,14 7:10,17,22,25 8:5 8:11,13,14,16 9:2 9:3,20 10:3 11:11 11:21,22 18:6,10 18:14,18 20:11,15 20:19,25 21:2,21 24:20,23 25:5,9 27:25 28:5,8,12,14 32:15 33:5,9 42:10 68:17,21 69:16 75:6,14 78:5 82:16 85:15 86:4 93:8,16 94:11 96:15 102:24 117:21
**engagements** 21:7 25:13 28:21 33:21 85:21
**engaging** 89:2
**English** 26:25
**enter** 27:25
**entered** 139:3 141:8
**entire** 39:6 46:7 79:20
**entities** 15:23 17:24 18:7,11,15 19:23 20:8,13,17,21 21:4 23:9 66:11 94:6
**entitled** 32:21 68:8 141:12 147:10 148:14
**entity** 21:25 22:5 27:20 76:17 96:4 134:10,15 136:12 136:22
**entries** 26:23 54:9 54:12,16,20 55:4 55:10 56:23 58:3,3 58:4,6,7,8,11,12 58:17,22,25 59:3,5 59:6,7,18 60:2,4,8 60:15,17 62:7,9,14 62:17,21 63:11,14 69:22 70:8,9,11 100:15 110:11
**equally** 85:22
**equipment** 48:23
**especially** 75:15 133:16
**ESQ** 2:3,12,18
**estate** 13:24 119:5
**estimate** 7:21 8:15 9:2,7 11:7
**estimated** 8:3,8
**estimation** 27:7,9
**et** 1:5,8 4:13 26:5 149:3,3
**evaluate** 77:2
**evidence** 59:9 98:8 113:3
**exact** 64:25 72:22 112:13
**exactly** 49:18 113:16
**EXAMINATION** 4:7 81:22 82:13 91:17 111:10 116:4 120:3 123:12 125:8 131:24 138:15 140:12
**examinations** 17:22
**examined** 4:5 148:3
**example** 27:4,6 60:23 83:20 119:4
**exceed** 70:25 77:9
**exceeding** 133:22
**exception** 77:22,24 78:2,7
**excess** 76:4 113:15 120:13
**excuse** 74:18 85:5 89:6
**exhibit** 5:17,19 6:17 6:18 32:19,23 33:2 39:5,18,18,22,24 40:10,11,23,23 45:12 47:6,6,9,11 47:14,16 48:5,9,14 48:16 78:19,23,25 89:18,20,21 99:10 99:10 104:3,4 148:13,14,16,19 148:20
**exhibits** 41:13,19 104:14,21 105:5 106:20,25 108:17
**exist** 21:23
**expand** 103:13,20
**expanded** 102:21
**expanding** 102:16
**expands** 11:22
**expansion** 102:19
**expect** 11:23 67:22 68:13
**expected** 67:20
**expenditures** 112:24 120:13,16
**expense** 45:14 46:24 52:4 54:2 61:12 111:17,18 112:2 112:18,21 123:16 128:2 129:23 133:12 137:3,7
**expensed** 121:11,25 122:21 123:17 124:3 125:16,17 127:15,17,21 128:8,11,12,13,16 128:23,25 129:2 130:2 132:13,14
**expenses** 36:23 45:23 46:22 48:22 49:4 51:24 53:16 61:6 97:3 99:20 100:2,5
**expensing** 125:23 128:18 141:18
**experience** 15:9 59:15 94:10,21
**expert** 124:15,23 125:3
**expertise** 21:19 93:21 124:8
**expires** 149:23
**explain** 36:19 43:2 50:13 55:23
**explanation** 62:20 117:15
**explore** 56:25
**express** 39:9,9
**expresses** 76:23
**extent** 9:11 59:20,23 59:24,25 77:15,19 85:17 95:14 134:23
**e-mailed** 44:2

F

**FACES** 16:13 22:20 22:21 24:12 94:23
**facilitate** 29:7
**fact** 9:5 41:12 50:17 60:9 63:20 64:14

65:3 70:7 75:22 89:12 114:23 129:12,16,17,21 133:16 134:20 140:24 141:25
**facts** 34:8 113:3
**fair** 27:18 31:3 60:16,19 81:24 85:14 90:21 109:20 112:15
**familiar** 51:8 52:5 52:19 53:2 54:8,11 55:20,22 56:17,19 57:4 73:7 93:20 94:15
**family** 142:8
**far** 11:10 12:3,11 29:4 35:15 133:7,9 139:19,20,23
**faxed** 44:2
**February** 63:2 83:23
**federal** 51:17 79:23 80:3,15,22,25 81:6 81:7,9,12
**fee** 9:13
**fees** 8:19 11:19 12:2 12:16 45:21,23 60:25 66:12 73:12 75:7,9,11 76:4
**Feinstein** 1:18 2:7 91:21
**Fifth** 77:12 78:6 111:12,18 112:10 112:17
**figure** 74:21 100:17 118:10,11
**figures** 111:24
**file** 2:13,19 50:21 52:11
**filed** 80:9 96:9
**files** 52:14 97:13,19 97:24 98:19
**filing** 3:9
**financial** 17:15,17 17:25 21:3 26:21 26:22 28:10 31:18 39:10 45:3,6 61:14 61:19 62:5 95:17 95:20,24 102:25 110:5,14,15 122:15 132:7 143:7
**find** 36:8 38:21 43:12 73:18 101:2 109:15 110:22 111:2
**findings** 80:7 104:13 105:4
**finish** 50:7 92:3 132:19
**finished** 50:6 91:5 140:22
**firm** 6:4 7:13 12:18 12:19,21 75:23 84:24 91:20 94:23
**firm's** 75:25
**first** 6:9 9:14 12:24 15:5 20:24 21:12 25:12 26:2,3,6,16 28:13 39:11 42:15 53:22 83:17 85:18 92:3,13 95:20 98:24 115:4,14 116:2
**five** 10:6,17
**fixed** 77:9
**flow** 75:16
**flows** 106:10
**focus** 95:15,17,19,20
**focused** 84:6
**follows** 4:6
**followup** 132:2
**footnotes** 143:7
**force** 3:12 16:15,17 16:20 18:22 19:4
**forensic** 17:20 93:4 93:8,22
**forget** 93:21
**forgetting** 67:17
**forgiven** 64:15
**form** 3:17 23:4 54:23 82:22 83:2 96:3 98:12 103:16 126:10
**formal** 44:17
**format** 44:6
**formation** 22:4,8,16 23:7 96:19 97:9
**formed** 21:16
**forming** 23:14 96:13
**forth** 65:18 73:15 104:13 106:20
**forward** 62:22
**for-profit** 18:5
**found** 38:13 84:4 110:14 120:12,20
**foundation** 112:20
**four** 21:5,9 27:22 54:17,21 95:8 144:13
**frankly** 68:5 82:20 131:6
**fraud** 17:22
**free** 51:25
**French** 56:8,9
**fringe** 51:11
**front** 39:24 40:12 46:12 47:11 48:14 78:25 118:9
**frontline** 45:21 46:13,14,20 50:22 51:12
**full** 103:11
**function** 105:24
**fund** 16:6
**funded** 15:21
**funding** 15:21,23 16:2 95:5
**funds** 49:3 53:6,7 133:14
**furnished** 51:25
**further** 3:15 115:19 119:24 138:13 140:11 145:2 147:13
**furtherance** 28:14

G

**G** 4:3,3 47:7 48:5,8 48:9,9,9,14,16 146:4 148:19 149:5
**GAAP** 64:19,20,21 65:3,7 130:8,12,15 141:4
**GAAS** 69:3
**GAGAS** 20:3 71:2 72:8 87:7
**gain** 33:21 54:14,19 54:24 55:3,9,18,20 55:24 56:7,8,17,20 56:25 57:5,10,15 57:18,24 58:2,5,10
**Gannett** 2:17
**GAO** 69:7,10
**gauge** 134:22
**general** 29:5,8,10,12 29:15,20,21 30:3 30:13,23 31:5,7,15 31:25 32:4,7,13 60:17 87:3,13 106:21 114:3 119:14 120:22 128:17 130:22 142:21,22 143:24
**generally** 7:20 8:2 28:11 35:15 57:23 68:15,20,25 72:11 95:25 112:5
**generated** 24:18,19 112:17
**gentleman** 13:20
**George** 1:16 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1





17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1,9,20 148:4
149:4,20
**getting** 26:20 27:18 42:17 93:2 95:22 102:16
**give** 91:25 92:3 107:8 108:11
**given** 41:4 61:23 100:21,25 106:25 127:6 133:16 134:20 146:17
**giving** 104:13
**go** 12:13 14:2 63:10 63:14 88:5 91:10 91:11 113:23 119:12
**God** 31:20
**goes** 58:15 98:10
**going** 4:14 5:15 6:16 28:9 32:18 35:12 39:16 45:11 47:4 65:17,18,19 66:4 71:16 78:17 81:13 103:3 108:21 110:24,24 114:15 130:9 134:24
**good** 4:9 47:3 65:21 81:25 82:21,25 91:9
**govern** 72:19
**governed** 76:21
**government** 20:4,4 20:22 69:11 72:8,9 72:11 94:11,12 95:6
**governmental** 95:10
**governs** 72:23
**greater** 27:24
**Grenadier** 126:8 127:14
**Griffiths** 6:5 7:13 7:15 12:17 20:6,7 20:12,16,20 21:16 21:22 22:2,5,9,10 22:17,23 23:6,7,14 23:17,24 24:2,8,15 24:19 25:5 39:20 40:24 66:9 84:10 84:16 85:6,16,20 86:10 88:16 93:12 93:14 96:4,10,13 96:16,18,19 97:11 97:14,20 98:20 99:17 107:14 109:4 117:24 148:17
**gross** 112:9,12
**group** 142:8 144:10
**guidance** 73:22 74:2 74:12

**H**

**H** 148:10 149:2,5
**half** 9:9,10 16:18 139:25 140:7
**hand** 36:25 147:18
**handing** 91:7
**happen** 136:8
**happened** 37:14
**Haywoode** 2:3 5:3 5:10 10:15,21 11:2 13:11 26:12 28:16 33:25 35:23 37:10 38:3,15,22 40:16 41:2,15 42:2,9,23 43:14,17 50:6 53:10,18 54:6,23 55:12 56:2 57:6 59:22 62:25 67:5 67:16 68:2,10 70:2 74:9,14 76:7 78:14 79:19,24 80:10,24 81:16 82:4,7,24 83:3 87:24 88:2,7 88:8,17,25 89:11 90:16 91:11 98:5 98:12 99:18 101:23 102:4 106:24 107:18 108:8,21 109:12 110:6 111:7,11 113:5 114:19 115:2,11,18,21 116:3,14,18,25 117:2 118:24 119:19 121:14 123:13,21,24 124:11,12,17 125:4,5,9 126:16 131:19,21 132:3 132:18 135:24 136:23 138:17 140:13 144:25 148:8
**Haywoode's** 90:23
**head** 129:23
**hear** 4:16 10:16 33:25 56:11 126:8 126:18,23
**heard** 4:21 80:14 81:17 111:14,20 116:24 126:3,25
**hearing** 116:23
**held** 1:18 82:5 128:15
**helpful** 35:18
**hereto** 3:8
**hereunto** 147:17
**Herrick** 1:18 2:7 91:20
**higher** 11:2
**Hill** 9:24 21:6 98:19
**hired** 52:24
**history** 14:3 52:7
**hold** 74:23,24 123:21
**home** 9:24 10:9,18 21:6 48:19 97:25
**Homes** 97:25
**honestly** 56:5
**hope** 26:25 58:14
**hour** 8:6
**hours** 8:9,9 70:25 73:11,16,23 74:13

76:5 77:10
**houses** 18:23
**housing** 13:19 18:16 18:20 19:24 93:24 94:5,12 111:13 112:2
**HPD** 95:4
**HUD** 20:17 21:13 25:14 92:20 94:7
**HUD-assisted** 94:24
**Huh** 79:11
**humanly** 43:6
**hypothetical** 128:4 140:20
**hypotheticals** 138:18

**I**

**idea** 118:13
**identification** 5:20 32:24 39:23 47:9 78:24 148:12
**identified** 83:9 87:16 109:24 110:4 118:7
**illustrate** 46:18
**illustrates** 72:5
**immaterial** 142:19
**immediately** 65:6
**important** 34:18 64:21
**improper** 53:17 128:4 132:15
**improperly** 36:9 37:23 38:13,21 60:21
**inaccurate** 109:16
**inappropriate** 129:11
**incident** 51:20
**include** 75:12
**included** 75:4,8 76:10,13 120:6 121:23 129:22 135:25
**including** 15:21 48:22 51:11,18 106:6 107:16 135:15
**income** 18:16,20,23 19:24 112:9,12,22 136:11,12,16,16 136:22 137:8,15 137:16,21 138:5 138:10,11
**incorrect** 83:13,14 109:19
**incurred** 12:11 36:24
**indefinite** 130:13
**independence** 69:6 69:9,10,19 71:4 73:9 75:25 76:6,15 77:6,7,11,23 78:8 122:12,17
**independent** 5:4,6 32:21 33:14 40:11 72:2 73:3 87:7 148:15
**indicate** 41:14
**indicated** 111:16
**indicates** 45:19
**indicating** 26:13 28:16 62:25 67:5 116:18,25 131:10
**individual** 36:10 58:12 90:13 142:21
**inform** 96:12
**information** 29:18 31:4,7 37:25 42:17 67:20 86:21 99:2,7 100:22,25 105:4 117:12 118:18 119:5,6 127:7 140:25
**inquire** 88:13 123:14
**inquiries** 66:8,17
67:2,10,23
**instances** 60:24
**instruct** 7:4
**instructive** 18:21
**insurance** 51:19,20
**intention** 88:20 89:2
**interested** 147:16
**interesting** 67:12
**interfere** 41:3
**internal** 33:22 34:6 57:25 78:21 95:18 106:22 148:21
**interrupting** 124:21
**investigation** 107:8
**investigative** 108:13
**investment** 95:12
**invoice** 77:15,19 105:8,15 106:2,3,6 106:11,13 120:25 121:3,8,10,24 122:3,5,7,8 123:7 123:9 129:12 130:10,11 131:22 132:4,5,13,16,20 132:23 133:17,19 133:20,21,21 134:2 135:8,20 141:7,7,9,12
**invoices** 12:7 61:10 120:12,18,21 121:7,20
**involved** 23:8 60:5,7 78:11 84:18 95:3 130:21 144:14
**involvement** 54:15
**involving** 116:8
**IRS** 76:18 77:13,21 78:7,13 79:9,12,18 81:25 130:7 141:4
**issue** 32:14 33:11 37:15 45:17 46:8 47:25 69:18 78:16 92:22 94:16,17 95:8,16 124:7
128:25 129:4 143:11
**issued** 5:18 33:4,8 105:15 148:13
**issues** 52:6 64:13 106:19 122:24
**item** 45:13
**items** 28:19,20,22 31:15 32:12 106:6 117:13 120:9,21 135:18

**J**

**J** 2:18
**January** 83:22
**Jennings** 63:3,5,5 63:10,17 64:3,6 65:14 66:2,6,20,25 67:8,22 68:8 84:11 84:15,17,21 85:2 143:12,16,23
**Joan** 90:11
**John** 1:5 2:22 24:23 25:6,9 39:21 114:8 115:4 130:20,25 144:14 148:18
**joined** 115:25
**journal** 54:9,12,15 54:20 55:4,10 56:22 58:2,3,3,6,7 58:11,22,25 59:3,5 59:5,7,10,18 60:2 60:4,8,15 62:7,17 62:21 63:11,14 69:21 70:8,9,11 100:15
**judgment** 37:19
**jurisdiction** 140:16
**justify** 135:20

**K**

**K** 146:4
**keep** 7:11,16,18,20 67:17 129:10
**keeping** 136:14





**Kelly** 2:18 4:8,10 5:8,12,15 10:19 32:18,25 39:16 40:22 41:6,12 43:11 47:4 48:13 53:14 56:12 78:17 81:23 82:9,14 88:6 89:24 91:5,15 92:2 92:8 97:5,8 103:16 104:17 109:3 111:5,7 113:4,22 115:20 116:5 117:3 119:24 124:5 126:2,12,24 128:6,22 131:20 131:25 132:19 136:9 138:13 141:21 142:12 143:15,21 144:2 144:17 145:3,5 148:4
**Kelly's** 109:15
**kept** 35:3 123:15 138:19,23,25 139:9,10
**Kings** 2:5
**knew** 42:25
**know** 4:17 5:5,14 11:9 13:13 18:22 22:23 23:2,6 24:7 25:4,8 34:15,19 35:21 36:2 37:4 41:16,17,21,23 42:5 43:5,6 47:2 54:25 56:16,20 58:18,21,24 61:15 61:18 63:22 67:8 67:11 71:5,7,23 74:8,25 77:16,17 78:9,10 80:13 81:16 84:9,16,20 85:6 86:10 91:19 92:7 95:2 101:24 106:24 108:2,9,23 112:9 118:6 121:15 130:14,17 131:9,12 132:18 132:23 133:4,6,7 133:10,18,23 134:3,8,13,17,20 135:11 139:19 143:16 144:24
**knowing** 132:22
**knowledge** 57:13 75:20 84:19,23 85:10,13 86:13 99:16 130:20 131:3,5,6,13,16
**knowledgeable** 85:20,22,25
**known** 4:12

**L**

**L** 1:5 2:21,22 3:3 4:3 146:4
**labeled** 142:2
**Lacks** 112:20
**Lakeview** 9:25 10:5 10:17 21:5 97:13 118:16,17 120:6 120:14
**language** 56:8,9
**large** 93:23
**larger** 74:5,6
**law** 19:8 80:18 90:14 91:20
**lawsuit** 104:9 114:8 114:18,22,24 116:2
**lawsuits** 115:3 116:7 116:10
**lawyer** 5:13
**lawyers** 81:19
**laying** 139:25
**layman's** 136:19
**leading** 110:7
**learn** 116:9
**learned** 127:9
**ledger** 29:8,10,12,15 29:20,21 30:3,14 30:24 31:5,8,15,25 32:4,7,13 60:11,17 119:14 120:22
**ledgers** 29:5
**leeway** 74:20
**left** 16:7 23:16 38:6 63:22 65:16 112:23
**legal** 21:25 22:5 104:8 128:5
**legitimacy** 105:19
**length** 69:14
**letter** 75:14 79:4,14 96:15
**letterhead** 39:19 78:20 96:23 148:17,21
**letters** 43:23 107:13
**let's** 14:2 82:10 91:15 103:12 123:24 124:12,19 127:24
**level** 74:7 134:5,8,12 134:13,18 143:19 143:25
**liability** 130:9
**licensed** 14:4,6,8
**limit** 84:25
**limited** 48:22 51:18 114:9 116:8
**limiteds** 114:4 115:13
**line** 56:13 61:2 79:20 149:6
**listed** 60:24 122:2,4 122:16 123:9 127:20 129:3,6
**listing** 29:22 59:5
**lists** 106:5
**literature** 21:8,11 25:15
**litigation** 90:19
**little** 10:7 106:15
**LLC** 2:9 22:3
**LLP** 1:19 2:7,15 91:21
**loan** 32:10 64:14,15 64:22,24 65:2,3,7 65:9,13 143:5,23
**loans** 31:21,21 32:6
**local** 51:17
**Logan** 9:24 10:7,19 10:21 21:6 27:24 83:20 97:20 137:12,14,25 138:2,7
**long** 14:10 16:16 71:16 80:18 136:6
**look** 6:17 21:13 44:7 45:11 68:25 87:5 87:11 103:3,5 113:23 119:23
**looked** 27:23 87:2,6 87:6,8,9,14,17 93:19
**looking** 50:16 61:5 62:22 117:14
**loss** 120:5
**louder** 4:18
**low** 18:16,20,22 19:24

**M**

**M** 2:3,8,12,23 4:3 146:4
**mailed** 43:25 44:2
**maintain** 28:4 77:4 77:4 117:16 144:11
**maintained** 117:23
**maintenance** 51:14
**major** 27:12 141:5
**manage** 18:12,20 94:23,25 130:23
**managed** 37:5 144:22
**management** 2:9 6:5 26:14,15 33:11



38:10,10 40:4,8 46:4,6,23,24 48:21 51:12 53:8 54:16 58:23 59:11,13 60:25 61:2 69:24 70:16 91:22 107:15 126:7,7,8 126:21 127:8,25 129:9,13,15 130:18,22 131:2,4 131:8,15 135:9,15 135:19,21 136:5 136:24 139:21 140:18 141:17,20 141:24 142:6,6 144:11,22
**manager** 46:15 51:13
**managerial** 48:24
**managers** 111:16
**manages** 94:23
**managing** 114:3 128:17 130:22 142:21,23 143:24
**Maple** 2:4
**March** 13:2,3,5,8,11 83:23 92:14 93:13 93:18 105:12,13 105:14
**Marion** 126:7 127:14
**mark** 5:16 32:19 39:17 47:5 78:18
**marked** 5:19 32:22 39:21 41:13 44:18 47:8 78:23
**Marks** 2:16 4:11 6:6 58:21,25 61:20 62:20 66:12 67:13 69:17,19 70:6 74:25 75:18 77:20 85:3,7 106:11,13 107:16 120:25 125:14 134:14
139:5,7 144:12,24
**marriage** 147:14
**master's** 14:20
**material** 142:24 143:3
**materiality** 73:20,20 74:2,5,21 134:5,9 134:12,14,19,21 135:6 142:5 143:19,25
**math** 10:11
**matter** 5:23 32:16 33:6,10 42:10 50:17 60:9 63:20 70:7 89:12 91:23 129:16 135:3 138:3 147:10,15 147:16
**matters** 93:5
**mean** 15:4 25:17 31:9 50:15 53:24 56:20,21 65:5 68:22 79:17 83:16 84:6,13,25 104:25 106:2 108:23 116:11,13,16,21 117:9 122:9 128:23 134:21 135:7 136:23 141:6,14
**meaning** 70:3
**means** 52:9 55:3,19 55:24 57:10 80:4,6 127:20 130:15
**meet** 62:23 63:10,13
**meeting** 64:13 65:20 65:23,24
**Mel** 56:12
**member** 131:4
**members** 96:17 131:14 142:8
**memo** 41:22
**memory** 47:2
**memos** 43:23,24
**mentioned** 73:10
**message** 63:23
**met** 13:6 23:15 62:23
**method** 8:7 36:15,16 55:14
**Metz** 1:20 4:5 147:6 147:22
**million** 10:6,8,10,10 10:12,25 11:5,8,8 74:19 99:19 100:18 112:2,10 112:14,17,22,23 113:15,19 117:6 118:16,17 120:13
**millions** 60:13,14
**minimis** 70:22 71:21 71:25 72:20,23 73:13 74:4,7 76:21 77:8,22,25 78:4
**minimum** 65:8
**Minority** 16:14,17 16:20 18:22 19:3 24:12
**minutes** 139:15
**misappropriation** 133:14
**mischaracterized** 60:21
**misleading** 109:16
**missing** 97:15,21 98:2,21
**misstated** 83:9
**misstatement** 133:15 134:24 135:5
**Misstates** 126:11 128:21
**Mitchell-Lama** 94:7
**mixing** 129:10
**modified** 104:20,23
**modify** 45:9 105:2
**money** 11:16 36:8 37:23 38:13,21
60:4,7,20 97:15,21 98:20 100:8 101:21 110:23 124:3 125:14,14 125:24 126:6,15 127:13,15,22 128:2,15,19 138:3 138:9 139:19 140:17 141:19
**monies** 142:5
**month** 111:20
**monthly** 26:21 29:4 82:18 83:7,10 84:5 84:7 109:16,24 112:8
**months** 9:9,10 105:16
**morning** 4:9,15 88:18 89:13
**mortgage** 18:4 106:5,8
**MOSKOWITZ** 2:15
**motion** 109:10
**moved** 140:15
**multiply** 111:24
**multiplying** 112:7
**mystery** 13:15

**N**

**N** 2:2,21 3:3 4:3 146:4,4 148:2 149:5
**name** 4:10 16:13,14 67:18 115:15,16 141:10,17 149:3,4
**named** 13:20 114:17 114:22,24 115:17
**nature** 17:10 61:23 106:22 110:7 143:4,5
**Nealle** 2:9 131:3
**necessarily** 30:2 82:21,23,25
**necessary** 21:19





**need** 5:7 26:6 32:11 35:14 62:6,8,9,10 62:11,13,14 95:9 98:14 99:7 103:2 117:15 135:23
**needed** 89:8 92:16 92:17
**negotiate** 8:4
**never** 13:6 34:25 35:12 62:22,23 65:23,24 80:13 81:16 105:21 140:8
**new** 1:3,19,19,22 2:5,11,11,17 8:13 14:7 80:24 81:6 119:8 147:3,4,7,8
**nine** 127:23
**nonaudit** 70:23 73:6 76:14,25 77:5,9 78:3
**non-cash** 120:9
**normal** 27:2
**North** 13:16
**Notary** 1:21 3:12 4:4 146:25 147:6 147:22 149:23
**note** 39:5 67:12 142:20,22,25 143:6,9
**noted** 145:6
**notes** 87:10,14
**notice** 46:10 99:4 141:24
**not-for-profit** 15:20 16:11 18:5
**November** 103:25
**nuance** 56:11
**number** 11:3 28:19 34:10,13,16 35:16 35:17 45:19 60:3 61:3 69:22,23 70:14,19,20 73:25 93:25 99:14 101:5 105:19,22,23 109:24 110:2 121:5,6 122:10,13 122:14,23 129:17
**numbers** 10:16 101:3 112:16 121:12,17,19 122:2,3 123:2
**numerous** 18:3 69:20,21

**O**

**o** 2:21 3:3,21,21 4:3 4:3,3 146:4
**oath** 146:11
**object** 54:23 57:6 88:2 98:5,12 103:16
**objected** 50:19
**objection** 38:3,15,22 42:2,24 43:9,17,18 53:10 54:6 55:12 56:2,14 68:2,10 74:9,14 76:7 78:14 79:19,22,25 80:2 81:10 88:7,9 98:10 101:23 110:6 112:19 113:2,4,22 114:13 119:19 121:14 123:18 124:5 125:20 126:2,10,12,24 127:18 128:3,6,20 128:22 141:21,22 142:12,13 143:2 143:14,15,21 144:2,4,16,17
**objections** 3:16 80:17
**observation** 36:12
**obviously** 36:12 68:24 105:18 122:9
**occasion** 82:17
**occurred** 42:22 65:23,24
**October** 78:22 148:22
**offer** 63:10
**offhand** 25:17
**office** 15:8,11,15 16:8 45:14,24 46:12,14,14,20,21 48:20,23 52:14 63:23 69:11,12 90:14,17,19,20,23
**offices** 1:18
**Oh** 19:14 31:20 54:10,13 68:18 82:3 83:11 104:19
**Okay** 40:22 43:14 57:3 92:8,12 99:15 104:4 115:18 116:3 145:5
**once** 11:22 21:7 28:12 29:2 42:23 63:19,23 133:8
**ones** 41:4 44:11
**opening** 29:13
**opinion** 39:10 45:3 45:5,7,9 68:11 70:18
**opportunity** 62:23 98:22 111:8
**opposed** 36:18
**oral** 92:4 104:17
**orally** 104:21
**order** 26:2,4,6 30:8 30:11 62:4 85:5 139:4
**organization** 2:10 9:6 16:11,12 26:8 55:8 74:6 77:2 91:23 142:7
**organizational** 96:6 96:9
**organizations** 15:20
**organized** 93:14,15 93:17
**original** 91:3 102:14 102:22,24
**originally** 103:7
**originated** 107:22
**Orley** 1:16 5:1,17 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1,7 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1

124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1,9,20 148:4,19 149:4,20
**Orly** 5:18 148:13
**outcome** 78:12 147:16
**outside** 24:8 66:15 84:17,21 86:12 102:6 103:14
**outstanding** 12:7 122:8,16
**overarching** 73:2
**overhead** 48:21
**oversaw** 18:25
**oversight** 16:5
**owed** 126:6,21
**owned** 142:7 144:10
**owner** 51:10 52:18 52:23 130:25
**owners** 131:7,12
**o'clock** 91:14

**P**

**P** 2:2,2,21 3:3
**page** 45:12 48:16 148:3,11 149:6
**paid** 11:15 36:24 51:22 52:24 53:6 53:24,25 60:21 66:25 67:9 74:19 77:16,19 96:22 101:19 102:13 119:18 122:11,20 127:24 128:7 130:4,9 132:8,14 132:16,21,24 133:2,4,8,9,21,23 133:23 137:3 138:3 139:15,18 139:22 142:5,9
**Paneth** 2:16 4:11 6:7 58:22,25 61:20 62:20 66:12 67:13 69:17,19 70:6 74:25 75:18 77:21 85:3,7 106:12,14 107:16 120:25 125:15 134:14 139:5,7 144:13,24
**papers** 48:5
**paragraph** 39:7,11 47:19,24 48:4,16
**Park** 1:19 2:10 89:15
**part** 38:6 52:3 54:15 61:25 62:3 80:19 105:11,17 106:4,5 114:19 116:22 121:21,23 127:5 130:25 135:20
**particular** 7:17 27:21 58:7 90:14 142:9
**parties** 1:17 3:8 142:4,11 147:15
**partner** 114:3 130:23 142:23 143:24
**partners** 17:6 106:11 110:3 114:9 116:8 127:11 128:17 137:17,18,21 140:5 142:22
**partnership** 23:5 46:5 102:10 137:2 137:8,12,14,24 138:7,8,23 142:10
**partnerships** 26:18 30:23 31:19 33:23 36:9 37:5,24 38:14 66:21 69:18 75:3 95:8 99:22
**partnership's** 93:24
**parts** 65:22
**party** 140:15 142:14 142:16,17 144:8
**Pause** 91:16
**pay** 45:21 66:4,6 128:10 137:16 138:10
**payable** 31:22,24 51:12 62:12 126:5 126:20 127:5,7,20 129:3,14 136:4 140:17 142:22 143:23
**paying** 128:16
**payment** 46:11 47:25 50:15 53:15 119:9,10 121:22 121:22,23,24 134:17 136:10,21 136:25
**payments** 101:9 102:9 122:5,6 135:8
**payroll** 48:21
**pending** 115:9
**penny** 135:4
**people** 44:23
**percent** 9:17 11:12 12:20 25:3
**percentage** 24:22 25:4,8
**perform** 17:14,15 17:20,22,25 73:6 93:4
**performance** 16:4
**performed** 70:24 121:5
**performing** 31:17 49:10
**period** 9:7 64:16 65:2,7,9,10 119:9 119:11 122:21,22 127:23 130:4 135:23
**permissible** 79:22 80:2 81:11
**permit** 124:8 144:6
**permitted** 23:4 76:14,15,18 88:13
**person** 85:19
**personal** 138:11
**personally** 12:17 24:23,25
**personnel** 48:25 50:20 51:14,21 52:11,16,22 90:20
**perusing** 33:3 79:5
**phone** 135:16
**phrase** 57:8,15
**Phyllis** 2:8,23 131:14
**Place** 89:15
**Plains** 2:17
**plaintiff** 115:25
**Plaintiffs** 1:6 2:4
**planning** 25:21 26:3 28:21
**Plaza** 27:24
**pleadings** 104:8
**please** 4:16 6:17 92:6 104:18
**plus** 112:12
**point** 29:9 32:14 49:22 71:20 72:4 74:24 79:21 81:10 123:14 136:20
**pointed** 120:24
**pointing** 109:7
**points** 69:5
**pose** 122:17
**position** 50:14 53:15 53:23 54:3 64:20
**positions** 50:11
**positive** 111:23
**possession** 35:22,25 89:23 109:2
**possible** 43:6



**postage** 48:24
**practice** 12:21 16:22 16:25 17:3 21:18 22:9,11,14,18 23:24 24:10 80:17 80:25,25
**practiced** 22:6,18
**prefer** 53:21
**prepaid** 119:5,14
**preparation** 75:2,8 75:13,23 87:18,22
**prepare** 89:19,22
**prepared** 90:20 104:9 129:18,19 129:20,21,24
**preparer** 76:4
**preparing** 25:15,21
**presence** 84:22 86:12
**present** 28:17 40:20
**presented** 129:13
**Prestige** 126:7 127:14
**previous** 111:16 126:21 136:4
**previously** 111:14 126:19
**price** 8:4,12 78:9
**primary** 85:15
**principal** 130:21,24 131:7
**principals** 130:17 131:18
**principle** 73:2 130:16
**printout** 119:7
**prior** 6:22 8:25 13:5 13:8,11 14:11 21:21 22:4,8,16 23:7,13 61:14 63:4 71:10 86:14 94:10 116:14 122:21 126:11 128:21 135:23 140:25
**problem** 56:15 122:7,9,12,18
**problems** 26:22 141:5
**procedures** 86:22 86:25
**proceeding** 80:23
**proceedings** 147:9 147:12
**process** 58:7,12 62:16
**profession** 19:13 141:14
**professional** 1:21 14:2 19:16,22 68:7 85:15 124:24
**professionally** 15:2 16:9
**professors** 81:19
**proffering** 124:15 125:2
**profit** 113:9
**program** 14:21 26:4 26:5
**programs** 25:22
**project** 9:18,21 21:20 25:19 45:20 45:25 46:15,15,16 46:20 49:3 51:13 51:23 52:4,9,12 53:7,16 54:2 63:7 82:22 83:5 92:14 92:15 93:19,22 102:15,16,20,21 102:22
**projections** 98:7
**projects** 9:23 10:4 10:13 11:6 13:19 18:20,24 20:9,22 21:5,9 25:18 27:22 45:21 54:17,22 55:11 58:24 93:24 94:6,12,24,25 102:11
**promulgated** 69:7 72:16
**properly** 119:18 133:11
**properties** 13:24 130:23
**property** 115:7
**prophesies** 140:19
**prophesying** 140:21
**prophet** 141:23
**proposed** 58:25 59:8 59:12,17
**proposition** 74:23
**proprietary** 105:20
**proprietorship** 22:7 23:21,25 24:4,8
**provide** 17:12 18:16 18:22 19:24 21:19 28:18 40:13 42:8 42:12 61:16 67:23
**provided** 17:11 40:18,24 41:10,14 41:20,21 42:7 48:18 67:21 73:22 75:2 89:25 99:6 107:13 119:16,21 120:19 121:9 135:12
**provides** 25:6,10 74:3 75:23
**providing** 105:10
**provision** 46:10 52:20
**provisions** 72:19
**Pryce** 6:5 7:13,15 12:18 20:7,7,12,16 20:20 21:16,22 22:2,5,9,17,18 23:2,8,14,17 24:2 24:7,9,19 25:9 39:20 40:25 66:9 84:10,20 85:12,16 85:20 86:11 88:16 93:12,14 96:4,10 96:13,16,18,20 97:11,14,20 98:20 99:17 107:14 109:4 117:24 148:17
**Pryce's** 24:15
**Public** 1:21 3:12 4:5 146:25 147:7,22 149:23
**purpose** 51:24
**purposes** 61:5 65:5 65:8
**pursuant** 1:17 53:17
**put** 11:25 36:4 59:4 65:17,19 85:4 96:18 125:7 133:13 143:12
**Putting** 56:24
**p.m** 82:12 145:6

**Q**

**quality** 106:22
**quantify** 60:10
**Quebec** 56:10
**question** 3:17 4:19 4:22 43:4,9,12 53:11,21 54:24 55:16 56:5 58:15 58:18,19 73:21 74:10,15,16 76:12 85:11 88:20 89:9 90:16 92:3,6,18 98:13,16,18,24 107:7 108:22 109:15 110:7,8 111:8 113:8 114:15 122:25 123:6,20 124:6,9 124:13 125:6,7,10 125:12 131:21
**questioned** 107:20
**questioning** 56:13 91:6
**questions** 4:15 5:9 44:16 64:3,7,9,11



65:19 91:24 108:4 111:4,6,9 115:19 115:20 116:7 117:5 119:25 132:2 138:14
**quickly** 123:19
**quite** 94:15 122:23
**quote** 70:10
**quoted** 48:10

**R**

**R** 2:2,21 4:3,3,3 149:2,2
**raise** 45:17
**raised** 38:7 61:17 92:22 109:5
**raises** 36:13
**reached** 36:7 37:22
**reaching** 36:7 46:8
**read** 46:7 49:25,25 72:4 146:10
**reading** 45:19
**real** 13:23 119:5
**really** 37:14 58:2 126:6 128:9
**reason** 127:19
**reasons** 50:19 94:19 114:11
**recall** 16:19 25:17 27:20 28:7 43:5,10 43:13 46:2 64:22 68:23 78:12 79:6 87:16 89:11 90:12 90:13 91:2 107:19 113:13,14,16 114:5 120:16,17 125:10 143:18
**recalling** 118:18
**recaptured** 138:4
**receivable** 31:23 32:3 34:15,24 35:5 35:7,13 62:11
**receive** 18:25 28:22 28:24 36:17 37:2 82:2 125:14
**received** 12:2,15,16 15:20,23,25 27:8 27:10 28:25 29:9 36:23 117:18 118:22 119:3 138:9 144:19,21
**receiving** 26:20 67:24 109:17 113:19
**recess** 82:10,11
**reclassed** 135:9,23
**reclassification** 60:16 135:13
**reclassified** 60:25 61:11
**reclassifying** 135:20
**recognize** 36:21,23 47:14
**recognized** 65:6
**recollect** 40:15
**recollection** 113:18 113:20
**reconciliation** 28:19 28:25
**reconciliations** 31:14
**record** 7:16,18 40:16 48:14 81:15 82:4,6 88:15 107:12,24 108:25 114:16 115:23 119:17,20,22 126:13 146:14,16 147:11
**recorded** 132:6 133:11
**records** 6:13 58:23 61:25 62:5 70:15 100:23 103:3,5,8 103:22 106:23 117:7,10,16,18 118:2,4,11,19,22 119:3,13,23 121:18 122:4
123:10 127:3 138:18,23
**reference** 48:4,9
**referred** 39:10 69:24 70:5 108:10 109:5 132:4
**referring** 7:12 9:23 19:3 27:21 36:20 40:7 46:3 49:6 60:3 69:8 71:24 72:6 75:5 87:2 93:11 99:9 107:11 118:3 123:8 137:24
**reflect** 60:20 114:16
**reflected** 31:25 32:4 32:6,9 105:5
**reflecting** 6:9,10 93:2
**refresh** 113:18,20
**refuse** 64:10
**regard** 7:9 69:19 70:7 84:5 85:21 111:12 139:13 142:4
**regarding** 40:8 45:3 63:6 68:15 131:22 132:3 138:18
**regardless** 142:24
**Registered** 1:20
**regular** 7:20 12:21 21:2 93:7
**regulated** 20:8,13 20:17,21 23:9 94:6 94:11,12
**regulation** 94:17,20 95:15
**regulations** 95:10
**regulatory** 25:20
**reimburse** 51:10
**reimbursements** 51:22
**related** 79:7,9,12 97:3 108:16 142:4
142:11,14,16,17 144:7 147:14
**relating** 57:20 135:19
**relation** 137:22
**relative** 74:20
**relevance** 78:15 79:20
**relevancy** 57:7 79:22,25 81:11
**relevant** 68:12 84:8
**relied** 34:6
**relying** 34:8
**remained** 80:9
**remains** 35:8 141:9
**remember** 14:10 16:21 42:3,4,15,21 46:25 50:12 62:19 64:25 72:3,21 73:17 89:17 90:9 95:14 103:23 106:7 112:13 118:15
**remind** 125:11
**renamed** 141:6,6
**render** 45:2,5 70:18
**rent** 46:22 51:25
**rental** 51:22,24
**rephrase** 4:17 92:7
**report** 32:15,22 33:4 33:8,15,18 36:17 40:11 60:24 61:16 61:22 71:9 99:4,8 99:9 100:6 103:24 104:2,12,12 108:13,24 113:9 113:10 133:16 136:15 137:14,21 148:15
**reported** 100:9 113:11 120:5,22 121:18 147:9
**reporter** 1:21 5:16 32:19 39:17 47:5



49:17,21 78:18
**reports** 39:3 40:13
  40:18,24 41:8,9,11
  41:19,24,24 42:6
  44:17 45:2,9 82:18
  83:7,10 84:5,7
  107:9
**represent** 4:10 78:5
  88:15 91:21
**representation**
  40:17 76:16 77:20
  88:11
**represented** 4:24
  5:4
**request** 31:17,20,20
  31:21,21,23 32:11
  35:20 71:5
**requested** 28:23
  67:20 69:24
**requesting** 107:17
**requests** 26:2
  106:10
**require** 28:21 35:20
**required** 19:14,25
  31:4 65:3 142:17
  143:6
**requirement** 14:13
  69:14 92:20 130:7
  130:8
**requirements** 21:14
  95:11
**requires** 70:22
  144:7
**reserved** 3:18
**resident** 51:15 52:2
**respect** 35:17
**respond** 38:17 66:8
  67:23
**responded** 117:6
**responding** 66:16
  67:2,9
**response** 96:14
  109:10,14 132:9
  132:11,12

**responsibilities**
  71:13
**responsibility** 59:11
  59:13 70:16,17
**result** 136:11
**retain** 44:3
**retained** 103:7
**retainer** 102:17
**retaining** 96:14
**return** 80:8 130:3
**returns** 103:15
  129:17,18,24
**revenue** 10:13 11:5
  24:18,22 25:5,9
  34:16,19,21,22,23
  35:8 78:21 148:21
**revenues** 9:17,21
  10:4 12:20 31:23
  34:25 35:2,4,10
  36:22 37:9,12,13
  37:20
**revenue-based**
  25:19
**reversed** 37:17
**review** 7:2 12:13
  13:18 16:5 21:8,11
  25:15 26:7 33:2
  57:12 62:16 82:18
  82:20 103:7,14
  106:8 107:6
  118:23 127:3
**reviewed** 13:22
  83:25 129:5
**reviewing** 25:14
  97:13,19,24 98:18
  101:8
**right** 21:24 48:15
  52:10,13 55:2
  57:21 64:12 66:7
  66:10 70:4 73:13
  85:18 90:25 91:10
  91:11 98:17
  100:11,13 102:20
  103:8,9 116:20

118:5,21,21
  121:21 136:7
  138:6 139:11
**Robert** 1:8 2:8
  131:14
**role** 86:3
**Ron** 28:15 34:14
  35:17 37:7 44:13
  50:2 58:16 62:19
  66:3 70:10 91:22
  131:9
**Ronald** 2:9,23
**roughly** 102:14
**rule** 70:22 71:2,21
  71:25 72:17,20,24
  73:13,15,19,20,22
  73:25 74:4 76:15
  76:18,21 77:8,8,23
  77:23,25 78:4,8
  80:22 81:6,7
**rules** 79:23 80:3,20
  81:9,9,12
**running** 110:2
**R.P.R** 147:6,22

**S**
**S** 2:2,21,21 3:3,3
  148:10 149:2,5
**safe** 83:8
**salaries** 45:13,23
  46:12,22 47:25
**salary** 144:20
**sale** 115:6
**salient** 69:5
**Sandra** 64:2 84:14
  84:15 86:7,18 87:8
**SAS** 69:12 72:21,23
  87:8
**saw** 56:22 69:21
  77:15 79:7,14
  82:20 83:12
  118:11 121:6
**saying** 41:15 79:15
  119:2 132:15
  141:3

**says** 52:16 71:3 73:5
  74:12
**schedule** 31:22,23
**scope** 39:8 92:15
  93:19 103:21
**Scott** 126:7 127:15
**sealing** 3:8
**Seavey** 1:8 2:8,8,9,9
  2:10,23 4:13 91:21
  91:23 127:10
  131:3,14 140:4
  142:7 144:10
  149:3
**Seaveys** 79:15
  101:10,11,12,21
  102:11 110:24
  139:18
**second** 38:6 80:10
  115:5 128:10,16
  141:19
**seconds** 82:8 143:11
**section** 49:5 51:9
  52:16,21 53:2
  72:14,18
**Security** 51:19
**see** 13:21 31:21
  32:10,11 33:13
  39:12 44:15 45:13
  47:22 48:7,8,9
  50:20 52:11,13
  59:9 61:6 71:7
  79:9,12 92:24
  94:18 99:12 100:8
  101:24 107:7
**seeing** 61:8 101:20
**seen** 6:18 57:11 79:4
  101:16 102:3,6,9
**self-employed** 86:8
**send** 43:22
**sense** 26:8
**sent** 41:22 82:18
  90:6,7,8,13,14,22
  90:24
**sentence** 39:6,7

**separate** 21:17 60:11
**separately** 75:18,20
**series** 4:14
**serious** 134:25
**served** 6:21,25
**service** 70:23 73:6 76:24,25 77:4,5,9 78:3,21 121:4,5,9 148:21
**services** 15:6 48:25 49:11 51:16 71:14 71:14 73:7 75:2,23 75:24 76:15 89:2 135:15 144:12
**set** 66:12 71:12 73:15 106:20 147:18
**setting** 104:13
**seven** 23:13 43:7
**shaking** 129:23
**share** 27:18
**shared** 87:10,14
**sharper** 85:25
**sheet** 29:14 119:14 130:13
**short** 82:10
**show** 40:16 81:3 101:17 108:14
**showed** 110:16,19
**showing** 27:5 83:20
**shown** 104:7
**shows** 101:18 119:8
**Shron** 2:16 4:11 58:22 61:21 66:12 67:14 69:17 70:6 74:25 75:18 77:21 85:3,8 106:12,14 107:17 120:25 125:15 134:14 139:6,8 144:13,24
**Shron's** 69:19
**shun** 135:6
**sic** 5:19 148:13
**signed** 3:11,13 49:14 146:21
**similar** 33:18 67:18 81:2
**simply** 41:15 93:5 108:25
**Singers** 114:23
**sir** 49:18
**sit** 12:8 118:14
**sitting** 116:15
**situation** 57:11,12 57:14 138:11
**situations** 76:3
**six** 43:8
**social** 15:6 51:16,19
**sole** 22:7 23:21,25 24:4,7 59:10 70:15
**somebody** 30:13 49:22
**sorry** 10:15 19:10 27:9 34:21 35:23 49:19 59:22 69:2 70:2 72:10 79:24 82:24 84:25 104:19 105:13 118:24 125:16 129:8 138:21
**sought** 115:6
**sounded** 74:15
**sounds** 55:13
**sources** 135:11
**SOUTHERN** 1:3
**speak** 4:17 39:3 63:16 108:6
**speaking** 140:19
**speaks** 54:7 73:19 73:20
**specific** 21:15 72:4 87:2,15,17,19 106:7
**specifically** 21:17 51:9 69:13 70:13 70:14 74:2 79:8 95:19 103:23
107:19 118:16
**spend** 7:25 83:6
**spending** 8:16
**spent** 6:10 7:16 67:2 100:12
**spoke** 63:18,24 84:13
**spoken** 56:10
**spot** 25:24
**spreadsheet** 60:11
**ss** 147:3
**stages** 99:23
**standard** 20:3 28:20 35:19 41:24 42:6 59:13 69:2,7 70:21 71:23 72:2,6,10,21 76:22 87:7 93:8 144:5,7
**standards** 20:5 28:11 57:16 59:10 68:16,20 69:13 70:13 72:9,9,12,25 86:22,23,25 96:2 141:3,4
**start** 16:22 103:11 103:12
**started** 9:20 10:3 16:24 17:4 25:12 28:12 100:20,21 100:24
**starting** 8:13
**state** 1:22 14:7 15:7 15:10,15,16,19,21 15:22,23 16:2,3,7 20:21 48:13 51:17 70:13,14 80:15,21 80:24 81:7,9 107:12 147:3,8
**stated** 102:15 109:14
**statement** 21:3 26:22 28:10 45:6 45:22 50:24,25 51:5,7 62:6 69:12
81:14 88:18 92:6 102:25 110:5 122:15 143:8
**statements** 17:17 18:2 26:21 31:18 39:10 45:4 61:14 61:20 95:24 103:15 107:9 109:17,25 110:15 110:16 132:7
**states** 1:3 48:17 51:10 73:23 74:2 81:6
**stating** 88:14 108:25
**step** 28:13
**steps** 21:8 26:5
**STIPULATED** 3:6 3:15
**stop** 141:18
**stopped** 16:19
**Street** 2:4 77:13 78:6 89:14 111:13 111:18 112:10 113:9,19 114:2
**strictly** 34:19
**Strike** 89:24 136:9
**structure** 57:25 106:23
**studies** 19:8
**subjected** 77:13
**submitted** 48:5
**subpoena** 1:17 5:16 5:18 6:21 7:2,2,6 148:13
**subscribed** 146:21 149:21
**subsequent** 33:17 104:5 119:11
**subsidized** 20:22
**substance** 73:3
**sufficient** 39:8 99:6
**suggested** 113:17
**suggestion** 80:16 81:18

**suits** 115:12
**sum** 8:19
**summary** 29:23
  32:2,5
**superintendent**
  51:15 52:2
**supervised** 52:24
**supplemental** 71:9
**supplied** 42:24,25
  47:17 130:10
  141:7
**supplies** 48:23
**support** 101:2
  105:10 119:5
  120:13 127:4
  143:13
**supported** 98:9
**supporting** 32:12
  98:8 99:21 100:14
**sure** 21:10 23:10
  28:6 42:11 55:19
  88:12 104:5 109:9
  120:8 130:19
  131:7 132:11
  140:3
**suspicions** 73:8
**sworn** 4:4 108:5
  149:21
**system** 30:21 31:13

**T**

**T** 2:21 3:3,3 146:4
  148:10 149:2,2
**take** 9:8 21:8 30:13
  31:7 45:11 82:10
  91:9 108:22
**taken** 1:17 7:22 19:8
  19:11,15,22 20:2
  36:9 37:23 38:13
  38:21 82:9,11
  142:20 146:11
**talk** 69:9 71:24
**talked** 71:20
**talking** 83:21 104:2
  115:8,11

**talks** 81:5 106:9,9
  106:10
**Task** 16:14,17,20
  18:22 19:4
**tax** 17:13 51:17 65:5
  65:8 75:2,7,12,16
  75:23 76:3 80:8
  103:14 119:6,8,9
  119:15 129:17,18
  129:24 130:3
  138:10
**taxable** 136:12,15
  136:16,22
**taxes** 51:19 106:9
  137:16
**taxpayer** 76:17 82:2
**technical** 57:22
  136:20
**technically** 129:16
  130:3
**telephone** 48:25
**tell** 5:12 7:8 26:17
  36:14 38:12,20
  41:7 43:6 50:9
  68:19 92:15 93:23
  94:5,9 99:17,24
  100:17 109:25
  110:9
**tells** 141:15
**ten** 140:14 141:16
  141:17
**tenant** 102:10
**ten-year** 65:2
**term** 54:9,12 55:17
  55:20,24 56:17,19
  57:4,18,22,24 98:6
  136:17 138:5
**terminology** 108:23
**terms** 28:7 38:19
  86:5 93:25 94:13
  94:14 136:19,20
  143:6
**testified** 4:6 76:10
  87:12 104:11

108:19 113:6
115:24 126:5,14
126:19 128:14
136:5 143:10
**testify** 124:22
**testifying** 74:10
  126:16
**testimony** 40:7 49:7
  68:4 74:16 76:8
  108:6 109:21
  124:21 126:3,9,11
  126:23,25 128:21
  143:17 146:11
**Thank** 72:13 97:8
**theoretical** 113:7
**theoretically** 112:23
  113:7,8
**thereabouts** 11:8
**thing** 21:12 81:25
  92:10
**things** 34:18 43:5
  96:23
**think** 5:3 11:7 12:4
  13:17 14:9 15:12
  16:13 27:6 28:15
  37:14 41:12 43:4
  43:11 45:20 46:17
  48:10 62:24 63:18
  64:24,24 65:21,21
  71:11 72:2 73:19
  79:14 84:3 85:24
  89:7 90:11 95:7
  100:19 103:24
  104:11 105:9,9,16
  105:23 107:6
  108:3 111:5
  119:10 121:7
  128:24,24 129:4
  131:16,17 132:4
  133:20 140:4
**thirteen** 105:16
**thought** 9:13
**three** 23:15,16 75:15
  75:17 86:5 96:17

**throwing** 111:23
**time** 3:18 5:11 6:10
  7:16,18,21,21,23
  7:25 8:3,15,25 9:2
  9:7,20 10:3 14:24
  31:9,10 37:2 49:10
  49:14 50:25 51:7
  65:16 66:4,6,21,25
  67:9,23 68:9,12
  78:10 82:3 83:6
  84:13 88:4 91:9
  93:13,15 94:9
  128:10,16 130:4
  141:19 142:23
  145:6
**times** 80:12 132:20
**timesheets** 6:8,10
  7:9,11
**title** 33:18
**titled** 33:14
**today** 4:12,25 5:9,22
  6:2,19,23 7:5 12:8
  28:17 86:14 92:2
  107:21 116:14
  118:14
**told** 13:20 37:7
  68:23,24 88:4
  89:14 92:16 94:15
  105:3 110:10
  130:25 139:24
  140:4,6
**tool** 29:24 30:20
**tools** 55:4
**top** 33:13
**topic** 135:24
**total** 8:18,19 30:11
  38:4 110:2 133:21
  134:2
**totals** 30:14
**Touche** 23:12
**transaction** 142:14
**transactions** 30:4,7
  134:6,9 142:10,16
  142:18 144:8



**transcript** 3:11 107:7 108:5 146:10,13 147:11
**transcripts** 81:17
**transferred** 15:7
**transportation** 48:24
**Traub** 2:12 79:21 79:25 80:21 81:8 88:14 91:8,13,18 91:20 98:10,14 106:24 107:6 108:3,11 109:9 111:3 112:19 113:2 114:13,21 115:8,14,23 117:2 117:5 120:2,4 123:18,22 124:10 124:14,22 125:2 125:20 126:10,13 127:18 128:3,20 129:7 137:11 138:16 140:10,22 141:22 142:13 143:2,14 144:4,16 145:4 148:6
**Treasury** 78:22 148:22
**treat** 65:13 141:15
**treated** 49:3 51:23 52:4
**trial** 3:18 26:6,10,13 28:20,24 29:4,19 29:23,25 30:15,19 30:19 31:4,8,15 34:11,12 60:12
**true** 110:13 121:20 138:22 146:13,17 147:11
**try** 71:17
**Turning** 89:18
**twelve** 21:18 144:21
**twice** 125:24
**two** 9:8,8,10 10:10 10:10,18 16:18 34:13 35:17 44:17 45:2 62:8,14 69:23 70:20 105:23 115:3,12 121:6 122:14 125:24 129:10
**type** 17:14,24 21:25 22:11,14,17
**typed** 90:17,19
**types** 73:7 95:11

U

**U** 3:3
**um-hum** 4:23 10:22 45:15 47:13,21 49:12,15,16,21 79:3 96:24 97:4 104:16 118:5 137:19,23
**unable** 100:6,9
**unaccounted** 97:15 97:21 98:2,6,21
**understand** 4:16 10:5 23:20 44:15 53:11 55:17 56:5 57:19,21 92:5 95:11 104:25
**understanding** 9:19 10:2 33:22 36:14 40:21 45:16 53:5 53:13 54:14,19,25 55:3,9,18,21,24 56:7,9,18,21 57:2 57:5,7,10,13,15,19 57:24 58:2,5,10,14 58:16 66:24 95:9
**understands** 38:18 53:20
**understood** 4:20
**undertaken** 66:16
**undertook** 28:13
**unequal** 110:23
**unfortunately** 25:23 26:9 30:17 34:7 45:10 62:21
**unions** 18:4
**unit** 51:25 111:17
**UNITED** 1:3
**units** 94:2 111:25
**unusual** 27:3
**update** 100:22 117:7 117:9
**updated** 118:3
**upfront** 8:10
**use** 31:8 37:7 55:5 57:18,23,24 94:14 98:5,22 134:22 136:18

V

**value** 51:24
**variety** 135:14
**various** 15:19 26:5 95:5 99:23
**vendor** 101:10,11 101:13,18,21 130:10 141:6,7,8 141:11
**vendor's** 141:9
**verify** 100:10 118:20 119:17 131:17
**violated** 73:9
**violating** 66:21
**vouch** 100:5,7 117:13 118:21
**vs** 149:3

W

**W** 1:8 2:8 146:4
**wait** 9:11 104:17
**waived** 3:10
**want** 56:24 77:3,3 79:21 83:6 91:10 92:23 107:23 123:19 132:10 139:12
**wanted** 66:25
**wasn't** 132:8,10 140:22
**way** 21:15 29:6 36:5 51:5 55:7 59:4 60:13 61:3,8,13 74:23 89:7 104:20 116:22 130:21 132:22 147:15
**website** 21:13 25:14
**went** 21:12 44:22 86:20,21,22,24 140:15
**we've** 80:11
**whack** 26:24
**whatsoever** 13:23
**WHEREOF** 147:17
**White** 2:17
**William** 2:18 63:2
**willing** 13:18
**WILSON** 2:15
**wind** 80:14 81:17
**withdraw** 53:14
**witness** 5:2,7 6:16 10:20,22 26:15 32:25 33:3 34:3 36:2 37:11 38:17 38:24 49:19 53:12 53:19 55:17 56:15 57:9 59:24 67:7 70:4 74:17 79:5 88:23 91:7 97:7 107:5,21,22 108:3 113:5 116:20 118:25 124:24 125:6 129:8 131:23 147:17 148:3 149:4
**witness's** 38:4 68:3 76:8 108:5 124:21
**word** 26:25 44:8 106:3
**wording** 46:17 106:7
**WordPerfect** 90:7
**words** 100:13 103:4



110:23 117:11 121:17
**work** 7:22 11:10 12:11,14 13:4,7,10 13:23 15:10 16:16 17:10 20:6 21:20 24:11 33:20 39:8 57:20 63:6 66:15 73:11 74:22 75:8 75:12 82:15 105:25
**worked** 15:4,5 16:10 23:11 62:19 86:6
**working** 16:20 57:13 82:22 83:5
**workman's** 51:20
**workpapers** 7:19,19 117:20,23
**world** 108:19
**wouldn't** 125:23
**writing** 40:14 43:15 49:18
**writings** 42:8,12
**written** 28:2 104:12 130:5,5,11 137:7 137:20 141:13 142:3
**wrong** 83:9 127:25
**wrote** 96:6 136:10

X

**x** 1:4,10 148:2,10

Y

**Y** 4:3
**year** 16:19 19:21 23:11 91:4 105:20 110:4,17,20 112:3 112:11 130:3 139:3 141:2
**yearend** 77:14
**yearly** 111:17 112:8 112:17
**years** 15:10 16:18 23:13,15,16 65:11 125:24 127:16,23 140:14 141:16,17
**year's** 61:11 71:10
**Yellow** 20:3 87:9
**York** 1:3,19,19,22 2:5,11,11,17 14:7 80:24 81:6 119:8 147:3,4,7,8

$

**$10** 11:5,8
**$150,000** 12:6 102:14
**$160,000** 12:16 102:14
**$181,000** 126:4 127:7 139:13,19 139:22,25
**$191,000** 135:25
**$2** 10:25
**$2,000** 113:17,20
**$200,000** 64:25
**$22,000** 105:8 106:14,17 123:7
**$29,000** 143:9,13,23
**$3** 74:19 112:17,22 112:23 120:13
**$3.12** 111:25
**$300,000** 27:8
**$34,000** 71:6,8,10
**$4** 99:19 100:18 117:6
**$5,000** 71:2 73:11 73:16,24 76:5
**$6** 112:14
**$6,000** 27:7
**$6.8** 113:19
**$638** 111:16,20 112:8
**$9.5** 11:8

0

**0** 3:21
**01439.00148** 2:19
**02** 61:10 121:11,24 122:9,12,19 131:22 132:5,5,8 132:13,16 133:4 133:12
**03** 72:16
**04** 105:12,13,14 121:5,9
**05** 93:18 105:9,9,15 121:2,3
**06** 27:5,6 71:5 77:19 83:22 84:3 102:25 103:12 112:12 114:5 121:11,25 122:20 132:8,14 132:14,25 133:2,9 133:12,24 139:20 139:23
**07** 13:3,5,8,11 83:23 83:24
**08** 103:25
**08-CV-5648(HB)** 1:7

1

**1** 9:17 11:12 12:20
**1.5** 10:20,21
**1:20** 145:6
**10:20** 1:12
**100,000** 133:22
**10016** 1:20 2:11
**106th** 77:12 78:6 111:13,18 112:10 112:18 113:9,19 114:2
**10604-3407** 2:17
**11:56** 82:12
**111** 148:8
**11225-5001** 2:5
**116** 148:4
**12:04** 82:12
**120** 148:6
**123** 148:8
**13** 5:17,20 6:17,18 51:9 52:16,22 72:4 148:13
**13-B** 51:9
**131** 148:5
**138** 148:7
**14** 32:19,23 33:2 39:5 40:10,23 41:19 44:18 99:10 99:14 104:3,4,14 104:21 105:5 106:20 108:17 148:14
**140** 148:9
**15** 39:18,22,24 40:11,23 41:19 44:18 45:12 99:11 99:13 104:14,21 105:5 106:20 108:18 148:16
**15,000** 133:24,25
**150** 12:4,16 89:14
**16** 47:6,9,11,14,16 89:18,20,21 148:19
**16-1** 48:16
**160** 12:5
**17** 78:23,25 148:20
**181** 136:3,4
**181,000** 126:18 137:15,22
**1990** 15:12,13
**1990s** 127:13
**1992** 14:9
**1994** 16:23,25

2

**2** 1:19 2:10 89:15
**2.1** 118:16,17
**2000** 103:3 126:4 141:2
**2002** 103:11 122:3 123:16,17 124:3 125:16,17,18
**2003** 77:14
**2005** 123:6 125:14
**2006** 78:22 99:21



103:6,8,14,21 113:10 120:5,14 125:21,22 134:18 148:22
**2007** 92:14 93:13
**2009** 1:11 146:12,22 147:18 149:3,22
**2012** 127:24
**21** 1:11 149:3
**21st** 146:12
**221** 80:20,21
**26** 72:4 78:22 148:22
**260** 84:3
**28th** 147:18
**29** 103:25
**29,000** 32:11

**3**

**3** 2:17 45:12 72:3,15
**3rd** 63:2
**3,000** 27:8
**30** 65:11
**30-year** 64:16
**300,000** 27:10
**32** 148:15
**34,000** 71:11
**34,155** 71:11
**35** 82:7
**39** 148:18

**4**

**4** 47:20 148:4
**40** 19:21 70:25 73:11,16,23 74:12 76:4 77:10
**42nd** 89:14
**446** 111:25 112:7
**47** 148:19

**5**

**5** 25:3 45:13 148:13
**5,000** 74:13 77:10

**6**

**6** 112:12,22
**600,000** 27:9
**651,000** 83:20
**6955-004** 2:13

**7**

**7** 112:10
**71** 2:4
**78** 148:22

**8**

**8** 48:16

**9**

**91** 148:6
**92** 14:9 15:13 19:4
**93** 15:13
**94** 15:13 19:5

