1

1

2

3    UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------------------------x

5    JOHN L. EDMONDS, et al.,

6                    Plaintiff,

7                                    Case No.

- against -            08-CV-5648(HB)

8

ROBERT W. SEAVEY, et al.,

9

Defendants.

10

------------------------------------------------x

11

April 22, 2009

12                    10:15 a.m.

13

14

15

16        DEPOSITION of ADAM M. PRYCE, taken by

17    the Parties, pursuant to Subpoena, held at the

18    offices of Herrick, Feinstein, LLP, 2 Park

19    Avenue, New York, New York 10016, before Donna

20    A. Metz, a Registered Professional Reporter

21    and Notary Public in and for the State of

22    New York.

23

24

25

**2**

```
 1
 2   A P P E A R A N C E S:
 3
 4     M. DOUGLAS HAYWOODE, ESQ.
       Attorney for Plaintiffs
       21 Maple Street
 5     Kings Chancellery
       Brooklyn, New York 11225 5691
 6
 7
 8   HERRICK, FEINSTEIN LLP
     Attorneys for Defendants Robert W.
 9   Seavey, Phyllis M. Seavey, Avery D.
     Seavey, Ingbie B. Seavey, Ronald Dawdey,
10   Dalton Management Company, LLC and
     The Seavey Organization
       2 Park Avenue
11     New York, New York 10016
12   By:  M. DARREN TRAUB, ESQ.,
       of Counsel
13     (File No. 5965-004)
14
15   WILSON ELSER MOSKOWITZ
     EDELMAN & DICKER LLP
16   Attorneys for Defendant Marks
     Paneth & Shron
17     3 Gannett Drive
       White Plains, New York 10604-3407
18
19   By:  WILLIAM J. KELLY, ESQ.,
       of Counsel
       (File No. 01439.00148)
20
21
22   A L S O   P R E S E N T:
23     JOHN L. EDMONDS
       PHYLLIS M. SEAVEY
24
25
```

**3**

```
 1
 2
 3   S T I P U L A T I O N S:
 4
 5
 6           IT IS HEREBY STIPULATED AND
 7   AGREED by and between the attorneys for
 8   the parties hereto that sealing and
 9   filing of the within deposition be and
10   the same are hereby waived; and that the
11   transcript may be signed before any
12   Notary Public with the same force and
13   effect as if signed before the Court.
14
15           IT IS FURTHER STIPULATED AND
16   AGREED that all objections, except as to
17   the form of the question, shall be
18   reserved to the time of trial.
19
20
21               o 0 o
22
23
24
25
```

**4**

```
 1
 2
 3   A D A M  M .  P R Y C E, having been
 4      duly sworn by the Notary Public
 5      (Donna A. Metz), was examined and
 6      testified as follows:
 7   EXAMINATION
 8   BY MR. KELLY:
 9      Q.  Good morning, Mr. Pryce.
10      A.  Good morning, Mr. Kelly.
11      Q.  Obviously you know my name.
12         This morning, we will be asking you
13   a few questions regarding your engagement with
14   Mr. Edmonds.
15         If at any time you don't understand
16   my question or you don't hear my question,
17   please let us know.
18         If you answer the question, we will
19   assume you understood the question and that
20   you are responding to that question.
21         Does that seem fair to you?
22      A.  Yes.
23      Q.  At any time you would like to take a
24   break, please let us know.
25         Are you represented by counsel here
```

**5**

```
 1              Adam M. Pryce
 2   today?
 3         THE WITNESS:  Am I?
 4         MR. HAYWOODE:  I have explained to
 5   Orley, I did not talk to you, I do not
 6   represent you.  I represent John Edmonds.
 7         If you wish to be represented by
 8   counsel you may do that, but yesterday
 9   Orley determined that he would not be
10   represented.
11         You may do the same.
12         I will listen to what is said.
13         I will object in the interest of
14   John Edmonds, but I am mindful that you
15   are a witness put forward by my client
16   John Edmonds.
17         THE WITNESS:  Okay.
18      A.  I take the same position that Orley
19   took yesterday.
20      Q.  Can you tell me a little bit about
21   your educational history?
22      A.  I did my bachelor's in accounting at
23   the University of West Indies, Kingston,
24   Jamaica.
25         I did also the ACCA.  That is the
```

2 (Pages 2 to 5)



6

Adam M. Pryce
1
2  Association of Chartered Certified Accountants
3  in U.K. I did level 2, which is equivalent of
4  a master's in accounting.
5        Q.  When did you complete that
6  educational --
7        A.  I completed that in 1994.
8        The bachelor's in 1986 and the ACCA
9  in 1994 and my bachelor -- ACCA.
10       MR. HAYWOODE:  What is that?
11       THE WITNESS:  Association of
12       Chartered Certified Accountants in U.K.
13       Q.  You said that was a level 2?
14       A.  Level 2 which is equivalent of
15  master's in accounting.
16       Q.  When did you complete that
17  educational aspect?
18       A.  In 1994.
19       Sorry.
20       1994, yes, 1994.
21       Q.  When you completed that educational
22  aspect, did you then begin your professional
23  career?
24       A.  No.
25       I started my professional career --

7

Adam M. Pryce
1
2  I did ten years in accounting in Jamaica.
3        Q.  I am going to ask that you keep your
4  voice loud so the court reporter can hear and
5  type down what is being said.
6        A.  Okay.
7        Are you talking about experience?
8  Do you want me to go to that?
9        Q.  Right now I would like to know where
10  you worked and when.
11       A.  My first job was the Investment Bank
12  of Jamaica, which I worked for two years as a
13  senior accountant.
14       Then I moved on to Alcan Sprostons.
15  This is a division of Alcan Aluminum of
16  Canada, which I worked for two years.
17       Then I worked with Jamaica Aluminum
18  Company for six years as the chief accountant.
19       Q.  After your work at the Jamaica
20  Aluminum Company, what did you do next?
21       A.  Well, I migrated to United States in
22  1995.
23       Q.  Did you change your employer in 1995
24  when you migrated to the United States?
25       A.  In 1995 I worked with H & R Block.

8

Adam M. Pryce
1
2        Q.  What did you do with H & R Block?
3        A.  Tax preparer, tax preparation.
4        Q.  How long did you work at H & R
5  Block?
6        A.  Between I think December '95 to
7  '98.  I don't remember, somewhere around that
8  time.
9        Q.  After your work at H & R Block, what
10  did you do next?
11       A.  At that time I was doing the CPA
12  examination, which I passed in November of
13  2000.
14       MR. HAYWOODE:  Sorry.  What
15       examination?
16       THE WITNESS:  CPA.
17       A.  The CPA exam which I passed in
18  November of 2000.
19       Q.  I didn't mean to interrupt.
20       Were you continuing?
21       A.  Yes.
22       Q.  Okay.
23       A.  And then I work with Leroy Duffus,
24  CPA.
25       Q.  Can you spell that please?

9

Adam M. Pryce
1
2        A.  L-e-r-o-y D-u-f-f-u-s, CPA, for a
3  year.
4        Q.  What did you do there?
5        A.  I was an auditor.
6        Q.  Was that the first position you held
7  that you did any auditing work?
8        A.  Yes.
9        Q.  What types of companies did you
10  audit?
11       A.  Not-for-profits, most
12  non-for-profits.
13       Q.  After your time at Leroy Duffus,
14  where did you work next?
15       A.  I worked with Orley Cameron, CPA for
16  two years as a senior auditor.
17       Q.  Do you know what years those were?
18       A.  I think it's 2002 to 2004.
19       Q.  During your work with Orley Cameron,
20  CPA, what type of companies did you audit?
21       A.  Small not-for-profit companies,
22  daycare.
23       Q.  After your work with Orley Cameron
24  CPA, where did you work next?
25       A.  Well, at that time I have -- while I

3  (Pages 6 to 9)

10

Adam M. Pryce
1
2 was working with Orley I had a position at
3 FACES New York, Inc., FACES NY, Inc., as a
4 controller.
5       This is a company that is a
6 not-for-profit organization. Its main service
7 is low income housing, HUD assisted projects.
8       And there's also a limited liability
9 partnership that is owned by Citibank, ESIC
10 Enterprise. This is a Citigroup limited
11 liability partnership which FACES New York
12 is the management company, and I'm the
13 controller.
14    Q.  As controller of FACES New York, can
15 you describe your work responsibilities?
16    A.  Well, I'm responsible for overall
17 financial management of the corporation,
18 501(c)3 corporation, including the
19 partnership, the limited liability
20 partnership.
21    Q.  Does FACES New York prepare
22 financial statements that are audited?
23    A.  Yes.
24    Q.  What is your involvement in the
25 preparation of those financial statements?

11

Adam M. Pryce
1
2    A.  Well, I prepare the inhouse
3 financial statements, as independent auditor.
4 So I'm responsible for arranging the audit,
5 overseeing it.
6    Q.  Is your work as controller for FACES
7 New York a full-time position?
8    A.  It's a full-time position, yes.
9    Q.  Do you have any other employment
10 other than your work at FACES New York at the
11 current time?
12    A.  Yes.
13       I have a public company -- a public
14 accounting firm, Adam Pryce, CPA.
15    Q.  How long have you had a public
16 accounting firm Adam Pryce, CPA?
17    A.  I think since 2005.
18    Q.  And what type of work does Adam
19 Pryce, CPA do?
20    A.  I do audits, small audits. I do
21 compilation.
22       I review engagements, income taxes,
23 financial planning.
24    Q.  What type of clients does Adam
25 Pryce, CPA provide audit services for?

12

Adam M. Pryce
1
2    A.  Audit service, I did one for a
3 school, churches, most not-for-profit.
4    Q.  Other than your work at FACES
5 New York, as controller, and Adam Pryce, CPA,
6 do you have any other professional
7 engagements?
8    A.  Well, when I came to this country I
9 did real estate. I have a real estate
10 broker's license.
11       I worked with Century 21.
12    Q.  Did there come a point in time where
13 you were a founding member of an accounting
14 firm known as Cameron, Griffiths & Pryce?
15    A.  Yes.
16       Cameron, Griffiths & Pryce was
17 incorporated in June, 2007, to do
18 specifically this job here, this project.
19    Q.  So Cameron, Griffiths & Pryce has no
20 other business purpose other than this
21 engagement with Mr. Edmonds?
22    A.  It was formed to do this engagement,
23 yes.
24    Q.  How did you come to learn about the
25 engagement with Mr. Edmonds?

13

Adam M. Pryce
1
2    A.  Orley invited me on the project.
3    Q.  What did Orley Cameron tell you
4 about the project when he invited you?
5    A.  Well, he told me that Edmonds had
6 certain concerns about distribution.
7    Q.  Did he tell you anything else?
8    A.  No, distribution, and he wants an
9 audit to be done.
10    Q.  What did you say in response to
11 Mr. Cameron?
12    A.  Well, I said I will join the team.
13    Q.  At that point you were engaged by
14 Mr. Edmonds to conduct an audit, is that
15 correct?
16    A.  Can you repeat that?
17    Q.  At that point you were engaged by
18 Mr. Edmonds to conduct an audit?
19    A.  A financial audit.
20       We were engaged to do a financial
21 audit.
22    Q.  What is a financial audit?
23    A.  A financial audit is one in which we
24 follow GAAS, generally acceptable accounting
25 standards -- auditing standards, which is set

4 (Pages 10 to 13)



14

Adam M. Pryce

1
2  by the AICPA, GAGAS in this case, which is
3  government auditing standards which we follow
4  in this case, and GAAP, general accepted
5  accounting principles, GAAP, G-A-A-P.
6      So we follow GAAP, we follow GAAS,
7  and we follow GAGAS.
8      Q.  What steps did you take in planning
9  for this audit?
10     A.  Well, first we visited the Dalton
11  Management, and first thing we asked for,
12  trial balance.
13     We didn't get a trial balance.  This
14  was very strange because usually the system
15  produces a trial balance.
16     We use this trial balance to do the
17  planning and the preliminary analytic review.
18     Q.  In preparing for the audit, did you
19  consult any professional guide?
20     A.  All guides we do 40 credits per
21  year, we have our accounting, GAAP, GAAS, we
22  consult those, GAAS, GAGAS, and the GAAS is
23  what we consult.
24     We consult also the HUD, the
25  government project, because we notice that

15

Adam M. Pryce

1
2  three of them were HUD assisted projects.
3      Q.  Just to clarify for the court
4  reporter, HUD is H-U-D?
5      A.  Yes, HUD, yes.
6      MR. HAYWOODE:  Housing and Urban
7  Development Corporation.
8      THE WITNESS:  Yes.
9      Q.  GAAP is G-A-A-P, all capital
10  letters?
11     A.  Yes.
12     Q.  GAAS is G-A-A-S, all capital
13  letters?
14     A.  Um-hum.
15     Q.  And GAGAS is G-A-G-A-S, all capital
16  letters?
17     A.  Yes.
18     Q.  Prior to your involvement with
19  Mr. Edmonds, had you audited any clients that
20  were subject to HUD regulations?
21     A.  I have not audited with HUD
22  regulation, but I have the experience, seven
23  years as a controller with a project that are
24  HUD assisted projects.
25     Q.  For projects that are HUD assisted,

16

Adam M. Pryce

1
2  can you tell me what regulations or rules HUD
3  imposes on those projects?
4      A.  Well, first thing, HUD -- this is
5  government.  Then GAGAS, we have to know the
6  GAGAS rules.  This is governed by GAGAS, also
7  GAAP, because GAAP, we cannot forget GAAP, and
8  GAAS, we have to be governed by GAAS.
9      Q.  In your time as an auditor in any of
10  your positions, had you audited any entity
11  that was regulated by DHCR?
12     A.  No.
13     Well, one of our projects at FACES;
14  one of our projects, the DHCR is regulated by
15  DHCR, the HDFC projects.
16     Q.  What does HDFC stand for?
17     A.  Housing -- I don't remember exactly
18  right now.
19     Q.  When you were first engaged by
20  Mr. Edmonds, did you agree upon a price you
21  would charge Mr. Edmonds for the services
22  provided?
23     A.  We look on -- we got the financial
24  statements, the trial balance, and our fee was
25  determined 1 percent of revenue.

17

Adam M. Pryce

1
2      Q.  For what year were you going to
3  audit?
4      A.  It was to be audited 2005, 2006.
5      Q.  Was your fee going to be 1 percent
6  per year of audit?
7      A.  1 percent of the revenue, yes; 1
8  percent of whatever the revenue per year, yes.
9      Q.  Maybe my question wasn't clear.
10     You said you were going to audit
11  2005 and 2006?
12     A.  Yes, two years.  Usually two years
13  when you are auditing, two years comparison.
14     If the corporation is in business
15  for at least two years, you need to have two
16  years in order to do proper planning because
17  you are comparing, like for example, salary,
18  contract, expenses, against rental revenue,
19  the percentage.  You want to see if it's
20  consistent over the years.
21     If it's 80 percent here, 70 percent
22  there, then you have to examine why has it
23  changed.  So you need to have at least two
24  years comparison.
25     Q.  When you were first engaged by



18

Adam M. Pryce

1
2    Mr. Edmonds, did you enter into an engagement
3    agreement?
4        A.   Yes. We had an engagement
5    agreement, yes.
6        Q.   Do you still have a copy of that
7    engagement agreement?
8        A.   Yes, we have the engagement. Yes.
9        Q.   After you began your engagement,
10   what steps did you take next to do the
11   engagement?
12       A.   Okay. When we got the engagement,
13   the next step was to do the fieldwork.
14       Q.   What do you mean by "fieldwork"?
15       A.   Fieldwork, that is to go to the
16   client and then do the testing. We have to do
17   a sample, based on our analytic procedure,
18   based on the fluctuation, if there is
19   fluctuation.
20            We compare previous years and we do
21   testing based on the fluctuation. We
22   determine high risk areas to be tested.
23            That is our professional judgment,
24   based on our professional judgment.
25       Q.   How many times did you go and do

19

Adam M. Pryce

1
2    fieldwork?
3        A.   How many times? Many times.
4    I didn't count them.
5        Q.   Was it more than a hundred times?
6        A.   I don't think it's one hundred
7    times.
8        Q.   Do you maintain records reflecting
9    what you did on a particular day in connection
10   with this engagement?
11       A.   The only records we maintain in
12   terms of testing, we have documentary evidence
13   to support what we test.
14            So I don't know what you mean, if
15   you're talking about time. You mean logs?
16       Q.   Yes, timesheets or time logs.
17       A.   No. Our engagement was a fixed
18   engagement, fixed fee.
19       Q.   What documents did you request from
20   Dalton Management at the beginning of your
21   fieldwork?
22       A.   A number of documents.
23       Q.   Do you recall any of those documents
24   in particular?
25       A.   Yes.

20

Adam M. Pryce

1
2    For example, there was $180,000 in
3    accounts payable. In Dalton books it says it
4    belongs to Dalton Management, and we did test
5    that and we found that was not Dalton
6    Management. It's for the partners.
7        Q.   Who told you it was for the
8    partners?
9        A.   Well, I think Orley and Sandra
10   confirm with Ron.
11       Q.   With Ron Dawley?
12       A.   Confirm with Ron and Edmonds.
13   Edmonds says it's for the partners.
14            Ron, I don't know. After we found
15   out that is for the partners, is not for
16   Dalton.
17            In the books it said for Dalton
18   Management. So one of the questions is that
19   how, if a vendor gives an invoice, how is it
20   that another vendor owes the liability -- owns
21   the liability, belongs.
22            A vendor gives an invoice. So we
23   couldn't get invoice. We tried to test the
24   invoice. There was no testing. It was just
25   stated in the invoice, $180,000, in Dalton,

21

Adam M. Pryce

1
2    when in fact further that was a great mystery,
3    and that was a third-party transaction,
4    related party transaction, which is not an
5    arm's length transaction and was not disclosed
6    in the audit report.
7            It doesn't matter the amount.
8    Related party transaction should be disclosed.
9        Q.   You mentioned in your previous
10   answer that Mr. Edmonds acknowledged that the
11   money was due to the partners; is that your
12   understanding?
13       A.   Yes.
14       Q.   How did you get that understanding?
15       A.   Well, Orley corroborated, my partner
16   corroborated, and I think he corroborated with
17   Seavey as well, like 180,000.
18       Q.   So Orley corroborated that $180,000
19   was due to the partners with both Mr. Edmonds
20   and the Seaveys?
21       A.   Yes.
22       Q.   Who was in charge of the engagement
23   for Cameron, Griffiths & Pryce?
24       A.   Orley is the lead partner in the
25   engagement.

6  (Pages 18 to 21)





22

Adam M. Pryce

1
2    Q.   At some point after commencing your
3    fieldwork, did Cameron, Griffiths & Pryce
4    issue an independent auditor's report?
5    A.   We did issue a report, a disclaimer
6    opinion.
7        We didn't form an opinion of
8    financial statement because there were client
9    scope limitations, client restriction.  We
10   didn't get to finish our testing in order to
11   form an opinion.  That was called a
12   disclaimer.
13       We didn't form an opinion because we
14   had a number of client restrictions and scope
15   limitations.
16       MR. KELLY:  I am going to ask the
17   court reporter to hand the witness
18   Exhibit 14.
19   Q.   Is this the independent auditor's
20   report that you were referring to in your
21   previous answer?
22   A.   Yes.  This is what they call
23   disclaimer, yes.
24   Q.   After you issued this independent
25   auditor's report, did you then provide a

23

Adam M. Pryce

1
2    document to Mr. Edmonds relating to specific
3    issues you had identified?
4    A.   No.  Before that we always inform
5    Edmonds as to, with management, management
6    reports, as to where we are, as to where we
7    are, what are the items that we need, what we
8    tested and what's the problem.
9        So this was the final report after
10   that.
11   Q.   When you informed Mr. Edmonds about
12   items you were testing before this report, how
13   did you do that?
14   A.   Through written agreement, written
15   communication.  We have a number of management
16   reports that we gave Edmonds.
17   Q.   Do you still have copies of these
18   management reports?
19   A.   Yes, we do have copies of them.
20       MR. TRAUB:  I want the record to
21   reflect we have not receive any written
22   management reports dated before November
23   29, 2007.
24       MR. HAYWOODE:  Let the record
25   reflect, as it did yesterday, that I have

24

Adam M. Pryce

1
2    given to both counsel all records, all
3    papers, all notes received by Mr. Edmonds
4    and in my file with regard to this
5    investigation by the Cameron, Griffiths &
6    Pryce Corporation.
7        You have everything in your
8    possession.  Whether you call it an
9    auditor's report or you call it just
10   something scribbled on a piece of paper
11   or scribbled on any other document, it is
12   all in your possession.
13   Q.   What do written management reports
14   look like?
15   A.   Before that, let me clarify.
16       One of the items that were addressed
17   in our management report was the $180,000,
18   that was one of the items, material items that
19   was raised.
20   Q.   What do the written management
21   reports look like?
22   A.   Well, it tells you what are the
23   discrepancies, what we test, what we see, what
24   we didn't get clarification for, because what
25   are there to verify, verify based on what

25

Adam M. Pryce

1
2    Dalton gives us, the trial balance, these
3    figures.
4    Q.   And how many of these written
5    management reports did you provide to
6    Mr. Edmonds?
7    A.   A number.  I don't recall how many.
8    I don't recall how many.
9    Q.   Was it more than five?
10   A.   I don't know.
11   Q.   After you issued the auditor's
12   report --
13       MR. KELLY:  Strike that.
14       I am going to ask the court reporter
15   to show the witness Exhibit 15.
16       MR. HAYWOODE:  I would urge that all
17   counsel withdraw their questions rather
18   than strike them, because there is no
19   judge here.
20       If it's a motion, it's going
21   nowhere.
22   Q.   Mr. Pryce, do you have Exhibit 15 in
23   front of you?
24   A.   Yes.
25   Q.   Do you recognize this document?

7  (Pages 22 to 25)



26

Adam M. Pryce

2  A.  Yes.

3  Q.  What is this document?

4  A.  This document is from Cameron,
5  Griffiths & Pryce, addressed to Mr. John
6  Edmonds.

7  Q.  What is the purpose of this
8  document?

9  A.  The purpose of this document is to
10  say that we have performed the audit of the
11  above entities, and then it refers, on which
12  we base no opinion, and saying that this is
13  solely for inhouse use.

14  Q.  Other than Exhibits 14 and 15 --

15  A.  Yes.

16  Q.  -- in which you express no opinion
17  with regard to your audit work --

18  A.  This is the disclaimer opinion.

19  Q.  -- have you modified that disclaimer
20  of opinion in any way since you issued these
21  documents?

22  A.  No, we have not modified the
23  disclaimer because of scope limitations.

24  We have not been satisfied based on
25  what we tested, based on issues surrounding

27

Adam M. Pryce

2  independence, independence of external
3  auditors and who was doing the accounting,
4  issues of independence.  That's very
5  important.

6  We saw evidence, appearance of
7  independence, based on GAGAS, based on GAAP,
8  based on GAAS, and we weren't satisfied with
9  some of these.  So we couldn't -- we made no
10  opinion.  We still have disclaimer of opinion.

11  MR. HAYWOODE:  We were dissatisfied,
12  Ms. Metz.

13  THE WITNESS:  We were not satisfied.

14  MR. HAYWOODE:  "We were not
15  satisfied."  Dissatisfied.

16  A.  We still stick with the disclaimer
17  of opinion.

18  Q.  You said you saw evidence regarding
19  independence issues?

20  A.  Yes.

21  Q.  What evidence are you referring to?

22  A.  Okay.

23  GAGAS mentions two overreaching
24  principles.

25  One is auditors are not supposed to

28

Adam M. Pryce

2  make management decisions.

3  When you have audit services, must
4  be the de minimis rule, says that less than 40
5  hours, maximum of $5,000.

6  We see, for example, at Lakeview,
7  for example, where there was a contract from
8  DHCR for $34,000 and there was $108,000
9  charged, a difference.  We considered that as
10  overreaching.

11  So those were overreaching according
12  to GAGAS.

13  Q.  Is there anything else you saw that
14  you referred to when you said you saw evidence
15  of independence issues?

16  A.  Yes.

17  One of the requirements of the audit
18  is that you test management estimates.

19  Management makes estimates.  You
20  test the estimates to make sure the estimates
21  are reasonable, according to professional
22  requirements.

23  One of the requirements for DHCR was
24  to calculate a shelter tax and the estimate
25  was not made by Dalton, but it was done by the

29

Adam M. Pryce

2  auditor.  And the estimate was done by the
3  external auditor.

4  Q.  Anything else?

5  A.  That's one of the examples.

6  There are a number of other things
7  which -- there is a pattern at Lakeview, in,
8  for example, Church Home, for example, where
9  we have the exact contract amount exceeded
10  over $5,000, the de minimis rule as well.

11  Q.  Anything else?

12  A.  Those are examples.

13  Q.  When you said you saw evidence, I
14  just want to know what evidence you saw.

15  A.  I gave you two evidences.

16  Q.  Anything else?

17  A.  The others --- this audit was done
18  over a year ago --

19  MR. HAYWOODE:  Objection to any
20  question --

21  A.  -- so I can't remember everything
22  that you want me to remember, but I give you
23  examples.

24  MR. HAYWOODE:  I withdraw my
25  objection.

8  (Pages 26 to 29)

30

Adam M. Pryce

1
2  My objection to the question which
3  calls upon a witness who submitted
4  documentation which counsel all have in
5  their possession, and you are asking for
6  his present recollection as he sits here
7  today of what he wrote over a year ago.
8  I object to the form of that question.
9      MR. KELLY: I heard your objection.
10  I am going to proceed with my
11  questioning.
12      MR. HAYWOODE: Please.
13  Q. At any point, did you speak with
14  anybody from Marks Paneth & Shron regarding
15  the Edmonds engagement?
16  A. My partners Sandra and Orley spoke
17  to one of the partners. I did not personally
18  speak to anybody from -- to any of the
19  auditors, Shron, I didn't speak to anybody.
20  Q. What did your partners,
21  Ms. Griffiths and Mr. Cameron, tell you about
22  their conversation with Marks Paneth & Shron?
23  A. This was an issue that has to do
24  with our refinance, a loan refinance, in which
25  the fees, the finance fees were amortized over

31

Adam M. Pryce

1
2  thirty years instead of over the life of the
3  loan, which disputes GAAP. General acceptable
4  accounting principles says that when you
5  refinance it should be written over the life
6  of the loan instead of thirty years.
7      So that is a GAAP problem. I think
8  that is what they spoke to him about. I can't
9  recall.
10  Q. Did Mr. Cameron tell you that the
11  partner at Marks Paneth & Shron offered to sit
12  down with Cameron, Griffiths & Pryce and go
13  over any issues they may have?
14      MR. HAYWOODE: Objection to the
15  leading nature of the question, but the
16  witness may answer.
17  A. Let me answer that.
18      I think at the time when the partner
19  was contested, he said he was traveling to
20  Europe or he was traveling somewhere.
21      In fact, Sandra or we decided to
22  communicate -- I'm saying we, my two
23  partners. It was Ron Dawley who referred them
24  to Shron. So we didn't contact. It was Ron
25  Dawley who referred them because of

32

Adam M. Pryce

1
2  information that we needed.
3      That was strange.
4  Q. Did your partners, Mr. Cameron or
5  Ms. Griffiths, tell you that Marks Paneth &
6  Shron had offered to meet with Cameron,
7  Griffiths & Pryce and go over any issues they
8  may have?
9      MR. HAYWOODE: Objection, again.
10  A. I don't recall.
11      I don't see why Dalton Management
12  was the accountant. I don't see why Dalton
13  Management shouldn't deal with the matter,
14  because they are the accountants.
15      MR. KELLY: I am going to ask the
16  court reporter to mark this as the next
17  exhibit.
18      (Copy of Subpoena issued to Adam
19  Pryce, was marked as Defendant's Exhibit
20  18 for identification, as of this date.)
21  Q. Do you see Exhibit 18 in front of
22  you?
23  A. Yes.
24  Q. Have you seen that document before?
25  A. Yes.

33

Adam M. Pryce

1
2  Q. Was that document given to you
3  several weeks ago at your office?
4  A. Yes.
5  Q. At the time you received this
6  document, did you review the document?
7  A. Yes, I did.
8  Q. What did you do in response to this
9  document?
10  A. I'm here today.
11  Q. Did you contact anybody when you
12  received this document?
13  A. No.
14  Q. Prior to your deposition here today,
15  did you speak with anybody about your
16  deposition?
17  A. No.
18  Q. Did you speak with anybody in
19  connection with your anticipated testimony
20  today?
21  A. No.
22  Q. Looking back at Exhibit 15, is this
23  something that you described previously as a
24  written management report?
25  A. Yes. These are the questions from

9 (Pages 30 to 33)



34

Adam M. Pryce
1
2  the management report, we call it, yes.  These
3  were issued, yes.
4       Q.   Am I understanding you correctly
5  that you issued several of these types of
6  documents prior to this particular one?
7       A.   I don't know what you mean by
8  "several."
9       Q.   Did you issue previous documents
10  similar to this prior to this one?
11       A.   I don't know if it's prior to
12  this, but these were issued by us to John
13  Edmonds.
14           I don't know if there were
15  previous.  I didn't count them.
16       Q.   After the date of this document,
17  December 12th, 2007, did you or Cameron,
18  Griffiths & Pryce prepare similar documents
19  updating the findings in this one?
20       A.   Well, this is December 12th, 2007.
21  So this is after the audit report.  This is
22  after the audit report.
23           Yes, we did update Edmonds.  We did
24  update Edmonds.
25       Q.   After you issued Exhibit 15 on

35

Adam M. Pryce
1
2  December 12th, 2007 --
3       A.   Yes.
4       Q.   -- did you provide additional
5  written updates to Mr. Edmonds?
6       A.   I can't recall.
7           Because, remember, we were given
8  some documents after we came here.  I think we
9  came two places.  So we did update it.  So
10  this is the update.
11       Q.   Do you recall any additional update
12  after this?
13       A.   No.
14       MR. KELLY:  I think I may be
15  finished.
16       (Pause.)
17       MR. KELLY:  I am finished with my
18  questioning.
19       MR. HAYWOODE:  For the record, let
20  me indicate that Sandra Griffiths, the
21  third partner, had indicated her
22  intention to be present this morning and
23  she was ready and willing to be deposed
24  in any order or at least after
25  Mr. Pryce's testimony, but we were

36

Adam M. Pryce
1
2  informed by Bill Kelly that he has an
3  assignment this afternoon in the federal
4  district courts and must leave before one
5  o'clock, and that when apprised of that
6  information and at Mr. Kelly's direction,
7  we advised Ms. Griffiths not to come.
8           She is ill and has been somewhat
9  ill, but she was prepared to come and
10  give her testimony this morning.
11       MR. KELLY:  And let me also just
12  clarify for the record that Ms. Griffiths
13  was subpoenaed to appear yesterday and we
14  were informed that she was ill.
15           So her deposition had been adjourned
16  on that premise.
17           We were informed when we appeared
18  here this morning that Ms. Griffiths was
19  available for this afternoon, and as I
20  indicated, I was unavailable, and I'm
21  sure we will work together to reschedule
22  her deposition at the nearest open date
23  for all of us.
24       MR. HAYWOODE:  I always work
25  together with you.

37

Adam M. Pryce
1
2  EXAMINATION
3  BY MR. TRAUB:
4       Q.   Good morning, Mr. Pryce.
5       A.   Good morning.
6       Q.   My name is Darren Traub.  I
7  represent the other defendants in this action
8  other than Marks Paneth & Shron and I just
9  have a few followup questions for you.
10           You stated that you have a full-time
11  job at FACES New York, Inc. as a controller;
12  is that correct?
13       A.   Yes.
14       Q.   Does FACES know that you also have a
15  job with with Cameron, Griffiths & Pryce?
16       A.   Well, I'm a partner of Cameron,
17  Griffiths & Pryce.
18       Q.   And did you disclose your
19  partnership interests in Cameron, Griffiths &
20  Pryce to FACES New York?
21       A.   If I disclosed it?  Yes.
22       Q.   So they are aware of the project you
23  are handling for Mr. Edmonds?
24       A.   Of course.
25       Q.   And you stated that FACES New York

10  (Pages 34 to 37)



38

Adam M. Pryce
1
2 is involved with the project called HDFC, is
3 that correct?
4     A.   The HDFC building, it reports on HUD
5 as well.
6     Q.   I believe you testified --
7     A.   By the way, because HDFC is on DHCR
8 as well.
9     Q.   You also said that HDFC is regulated
10 by DHCR, is that correct?
11     A.   Yes.
12     Q.   What is your involvement with HDFC?
13     A.   I don't know. I don't understand.
14 You mean in terms of what?
15     Q.   Are you also -- do you do the
16 accounting for the books and records of HDFC?
17     A.   Yes. HDFC is a HUD project, which I
18 do the books for.
19     Q.   So you do work with DHCR also --
20     A.   No.
21     Q.   -- for HDFC?
22     A.   No. I work with FACES New York.
23 That is a HUD assisted project.
24     Q.   Let me rephrase my question.
25         On behalf of FACES New York and on

39

Adam M. Pryce
1
2 behalf of its project HDFC, do you have
3 contact with DHCR?
4     A.   No, I don't. I don't have any
5 direct contact with DHCR.
6     Q.   Who is responsible for the direct
7 contact with DHCR for the HDFC project?
8     A.   Well, the executive director.
9     Q.   Other than the current project, have
10 you ever audited a project that is regulated
11 by Mitchell-Lama?
12     A.   No.
13     Q.   Other than the current project, have
14 you ever regulated -- have you ever audited a
15 project that is regulated by HDC?
16     A.   HDFC?
17     Q.   HDC.
18     A.   What HDC mean?
19     Q.   Are you not familiar with the term
20 HDC?
21     A.   I don't know what is HDC. I am not
22 familiar with HDC.
23         What is that? HDC can mean many
24 things. I don't know. Clarify that.
25     Q.   Are you familiar with the

40

Adam M. Pryce
1
2 governmental institute?
3     A.   I am familiar with HUD.
4     Q.   HUD is the entity which you are
5 familiar with?
6     A.   And DHCR works with HUD. That's the
7 state.
8     Q.   What about any other governmental
9 regulated agencies, are you familiar with any
10 other ones other than HUD?
11     A.   I don't know. You mean --
12         MR. HAYWOODE: I object.
13     A.   I don't know.
14         MR. HAYWOODE: I don't know that is
15 appropriate.
16     A.   I don't know what you're driving at.
17     Q.   My question is you said you are
18 familiar with HUD.
19         Are you familiar with any --
20     A.   No. Let me explain what I said.
21         I do the accounting for FACES
22 New York, HUD assisted projects.
23         I do not have any personal contact
24 with anybody of DHCR or HUD.
25     Q.   What about with any other state or

41

Adam M. Pryce
1
2 legal governmental agencies that regulate
3 multifamily housing projects?
4     A.   I don't have any personal contact
5 with any of them.
6     Q.   You also stated that Mr. Cameron
7 asked you or said you should join the team,
8 and you did, and the team you referred to is
9 Cameron, Griffiths & Pryce, and you formed the
10 entity Cameron, Griffiths & Pryce for the
11 purpose of conducting the audit of the
12 projects for Mr. Edmonds; is that correct?
13     A.   Yes.
14     Q.   Did you put a capital contribution
15 into Cameron, Griffiths & Pryce?
16     A.   In initiating the formation.
17     Q.   What was your initial capital
18 contribution?
19     A.   I put in the fees, the state fees.
20     Q.   You, personally, put up the fees?
21     A.   Yes, I put in the fees as well.
22     Q.   In reviewing --
23         MR. TRAUB: Withdrawn.
24     Q.   In auditing the projects, and by
25 that I mean the four partnerships that

11 (Pages 38 to 41)



42

Adam M. Pryce

1
2  Mr. Edmonds retained you to review, did you
3  report all of your findings to Mr. Cameron?
4      A.  If I report my findings to
5  Mr. Cameron?
6          Okay.  We audited the financial
7  statements and we joined together.
8      Q.  So Mr. Cameron, then, would be aware
9  of any findings that you came across during
10  the audit?
11     A.  Mr. Cameron, Ms. Griffiths and
12  myself, the three of us are aware.  We all
13  aware of the findings.  We did review each
14  other's work.
15     Q.  You did review each other's work?
16     A.  Yes.
17     Q.  Have you ever audited any other
18  multifamily dwelling residential housing
19  projects?
20     A.  Not audited, but I have experience
21  working with FACES New York on similar
22  projects, yes.
23     Q.  With FACES New York, how many
24  housing projects does FACES New York have?
25     A.  We have about seventy-seven.

43

Adam M. Pryce

1
2      Q.  Seventy-seven?
3      A.  Plus we have scatter site projects
4  as well, which is funded by New York City, HRA
5  administration.
6      Q.  You are not the auditor for those
7  projects?
8      A.  No.  I'm the controller.
9      Q.  In reviewing the files for the
10  different projects on behalf of Mr. Edmonds,
11  have you discovered any money that is missing
12  or unaccounted for?
13     A.  Before we go, we did not review.
14         We did an audit.  An audit is
15  full-blown attestation agreement.
16         A review is a limited assurance
17  agreement.  We didn't do a review for
18  Mr. Edmonds.  We did a financial audit.  It's
19  different from a review.
20         When you use review, it's kind of
21  confusing to me, based on GAAP, based on GAAS.
22     Q.  Let me rephrase my question.
23         In doing your financial audit for
24  Mr. Edmonds of the four partnerships, did you
25  discover any money that is missing or

44

Adam M. Pryce

1
2  unaccounted for?
3      A.  We didn't discover any cash
4  problems.
5          We discovered transactions that we
6  couldn't test.
7          We discovered, for example, there
8  was $29,000 in the books for Seavey, for
9  Seavey loan, which couldn't be tested and
10  couldn't be disclosed because of third party
11  transaction.
12         We didn't discover any cash
13  missing.  We discovered figures that we
14  couldn't verify.
15     Q.  Did you discover any payments that
16  should have gone to either the partnerships or
17  Dalton Management but instead went directly to
18  any of the Seaveys?
19     A.  We didn't see that.  We didn't see
20  that.
21         However, when we look at Church Home
22  there was a bank account that suddenly
23  appearing at the end in our testing that the
24  details that was distributed, that the details
25  was not in the books of Dalton.

45

Adam M. Pryce

1
2      Q.  But did that account show any monies
3  being paid directly to the Seaveys?
4      A.  It was a distribution.  There was a
5  distribution paid to the partners, but the
6  detail of it was not inside the general
7  ledger.
8      Q.  Thank you.
9          MR. HAYWOODE:  I object to any
10  characterization, monies paid directly to
11  the Seaveys, because we know that the
12  Seavey group and the Seavey family is
13  a substantial component of Dalton
14  Management.
15         MR. TRAUB:  Once again, I remind you
16  that your objection is beyond what is
17  permissible under the Federal Rules.
18         MR. HAYWOODE:  In your opinion.  I
19  am not going to be governed here today by
20  your opinion.
21         MR. TRAUB:  You are going to be
22  governed by the Federal Rules.
23         MR. HAYWOODE:  I have seen enough of
24  your opinions.
25         MR. TRAUB:  I have no further

12 (Pages 42 to 45)



46

1          Adam M. Pryce
2    questions.
3          Since we are on the record, I want
4    to state on the record at 5:35 yesterday
5    you filed a motion for sanctions and to
6    compel documents that had been produced
7    to your office more than seven hours
8    prior to the filing of your motion.
9          I also pointed that out to you in an
10   email after you filed.
11        MR. HAYWOODE:  I missed what
12   Mr. Traub said about seven hours,
13   Ms. Metz.
14        Could you read it back?
15        (Whereupon, the requested portion
16   was read back by the reporter.)
17        MR. TRAUB:  Your motion.  And I
18   asked you to withdraw or correct the
19   statements in your motion to compel
20   documents in your statements that you had
21   not yet received those documents, as they
22   were untrue, and I have not heard a
23   response from your office yet.
24        So I want to ask on the record, do
25   you intend to withdraw your motion filed

47

1          Adam M. Pryce
2    seven hours after the production of
3    documents?
4          MR. HAYWOODE:  Mr. Traub, what time
5    did you produce the documents that you
6    say you produced to my office?
7          MR. TRAUB:  10:11 a.m.
8          MR. HAYWOODE:  Where was I yesterday
9    at 10:11 a.m.?
10        You know I was here with you
11   yesterday.
12        MR. TRAUB:  Until one o'clock.
13        MR. HAYWOODE:  Until one o'clock, so
14   if you served something on my office on
15   that morning and I wasn't there, I didn't
16   see it.
17        The documents -- the motion was made
18   prior to my knowledge that you had served
19   papers which we had asked for as long ago
20   as Thursday, the 16th, which were
21   withheld from us, which we requested on
22   Sunday afternoon after you deposed
23   Mr. Edmonds for five hours on Friday, the
24   day after we asked for the documents, and
25   you put a series of questions to him

48

1          Adam M. Pryce
2    which are directly addressed by the
3    documents that you were concealing, and
4    on Sunday when I indicated to you that I
5    could not proceed with any further
6    deposition unless I heard and found what
7    those documents were, what did you do?
8          You didn't send it to me Sunday, but
9    you knew it and you had it.
10        You didn't send it to me or tell me
11   Monday morning when I said send me the
12   documents and the deposition of
13   Ms. Seavey will ensue.  You didn't
14   respond to that.
15        Your response was to make a motion
16   for sanctions at the end of the day at
17   5:30 with nothing further.
18        When I came here yesterday you
19   didn't bring the documents to me and give
20   them to me, if you intended me to know it
21   or to have it.
22        The questions I raised before the
23   magistrate is why a lawyer would conceal
24   documents, represent they had nothing to
25   do with the deposition that Mrs. Seavey

49

1          Adam M. Pryce
2    was about to give?
3          Why would a lawyer do that when in
4    the midst of the document are documents
5    which contravene allegations made by him
6    and his client in three or four lawsuits
7    that I know of, especially this one?
8          You argued before the magistrate
9    certain circumstances which are directly
10   contradicted by the documents that you
11   submitted to my office sometime yesterday
12   when I wasn't home, there.
13        Particularly, the motion made to the
14   magistrate raises the question as to why
15   you would write a 21-page affidavit
16   complaining about our inability to
17   proceed to the deposition of Mrs. Seavey
18   because we say we wanted to see the
19   documents being held since Thursday, the
20   16th, and never produced to the
21   magistrate the documents that you say you
22   produced to me one day later.
23        That looks to me like a deliberate
24   effort to conceal evidence, to force a
25   deposition under circumstances where I

13 (Pages 46 to 49)



50

Adam M. Pryce

1 knew on Thursday, so far as I could see,
2 that the documents that you were
3 spiriting and hiding away are documents
4 which directly related to the testimony
5 to be given by Mrs. Seavey and any other
6 defendant.
7       And I don't understand that
8 professionally, counselor. I have a
9 professional problem with that.
10      MR. TRAUB: Exactly, Mr. Haywoode.
11      The professional problem I have is
12 the abundant misstatements that come
13 out of your mouth without any factual
14 knowledge whatsoever.
15      First of all, you should know that
16 the first time that I was told that you
17 were actually missing documents was in
18 your e-mail Sunday night.
19      In fact, I had not seen the
20 documents until Monday morning.
21      At that time, we began to review
22 them, Bates label them, and prepare them
23 for production to your office.
24      I had not known anything Thursday

51

Adam M. Pryce

1 afternoon and in fact the investigation
2 and review of those documents were
3 continuing by your office on Friday and,
4 as far as your e-mail made it sound like
5 to the magistrate, Saturday and Sunday.
6       So we were not going to continue to
7 piecemeal photocopies for you. We were
8 going to wait for you to tell us
9 everything you wanted, photocopy them
10 at one time, and produce them to you,
11 just like we have done twice in the past.
12      In addition, you should note that
13 both the document production that have
14 occurred to your office in the past
15 occurred through my office, after we
16 reviewed them and were able to determine
17 whether or not any of the documents were
18 privileged, confidential, or how they
19 need to be produced.
20      That is the way discovery occurs in
21 both state and in federal court.
22      Moreover, regardless of whether you
23 knew the documents had been produced to
24 your office at 10:11 a.m., at the time I

52

Adam M. Pryce

1 then informed you, at 5:38 p.m.
2 yesterday, that your motion was incorrect
3 because your office had already had the
4 documents. You never responded, which is
5 why I am now giving you a chance on the
6 record to state whether or not you will
7 withdraw your motion that was filed seven
8 hours after the documents had been
9 produced to your office.
10      That's the only question I am posing
11 to you.
12      MR. HAYWOODE: I say again, the
13 question raised in my motion was why this
14 document wasn't presented to us Monday
15 morning before the depositon of Phyllis
16 Seavey.
17      MR. TRAUB: Because you didn't show
18 up for the deposition, Mr. Haywoode.
19      MR. HAYWOODE: I am speaking.
20      I want to know why the document
21 wasn't given to us Thursday afternoon at
22 the time we requested. This recent
23 fabrication about Bates numbering is
24 ridiculous.

53

Adam M. Pryce

1 MR. TRAUB: Did you request
2 documents from my office?
3       MR. HAYWOODE: Hundreds of pieces of
4 paper have been exchanged by all the
5 parties in boxloads and you will not see
6 a Bates number on any one of those
7 hundreds, maybe several thousands of
8 pages, not a Bates number on one of them.
9       This was nothing but a contrivance
10 to suppress evidence directly relevant to
11 the cross-examination that you did of
12 Mr. Edmonds. The very following day
13 while we were waiting for those documents
14 you put a series of questions to John
15 Edmonds concerning his ownership of
16 shares in these corporations which were
17 directly contravened by the documents
18 that were being suppressed and held, and
19 you continued to hold them, and even when
20 you went to the magistrate with your
21 21-page production, you did not include
22 the documents.
23      Why not before the magistrate?
24 Because then the magistrate might have

14 (Pages 50 to 53)



54

Adam M. Pryce

1
2  seen what everyone else saw, what I
3  referred to as my sentinels and shepherds
4  in the field saw Thursday night, that you
5  were suppressing evidence which you
6  intended -- which directly touched upon
7  your deposition of John Edmonds and which
8  would have directly impacted on the
9  deposition of Phyllis Seavey, Bob Seavey,
10  Avery Seavey, Nealie Seavey, any other
11  defendant that you would have produced.
12     And when did you produce it? Not to
13  me Monday morning, not to the magistrate
14  in your motion, but you snuck it into my
15  office allegedly in the morning.
16     I don't monitor the e-mails all day,
17  and I don't see them sometimes until the
18  following day.
19     I had no idea that you even sent
20  other e-mails to my office last night.
21     I don't live in the office.
22     MR. TRAUB: Mr. Haywoode --
23     MR. HAYWOODE: Why, when I said to
24  you I have a cell phone number, and I
25  said it to both counsel, a 24-hour cell

55

Adam M. Pryce

1
2  phone number, anything you had to say to
3  me you could have said. You could have
4  said it Sunday, all night Sunday, Monday.
5     My motion to the magistrate is as to
6  why a lawyer would have held this
7  document until even Tuesday morning and
8  sent it to me at a time when he knew I
9  was in his office engaged in another
10  deposition.
11     I call that sleight of hand,
12  which bothers me professionally.
13     MR. TRAUB: That's nice,
14  Mr. Haywoode.
15     I ask you number one to show me a
16  single request to my office to produce
17  documents Thursday. You cannot because
18  the request never came to me or my
19  office.
20     MR. HAYWOODE: That's what you say.
21  I don't know. But you certainly knew it
22  Sunday and it still took you until
23  Tuesday to give it to us, and you
24  certainly knew the text of it on Sunday.
25     MR. TRAUB: Mr. Haywoode, I did not

56

Adam M. Pryce

1
2  know --
3     MR. HAYWOODE: Because you said it
4  didn't have anything to do with anything
5  and you said Phyllis Seavey's name wasn't
6  in it.
7     So you knew what it was.
8     I want to know if any body of
9  attorneys looking at those exhibits and
10  knowing the facts of this case could
11  conclude that a lawyer looked at those
12  exhibits and said, oh, this has nothing
13  to do with any question he could possibly
14  ask any of my clients.
15     I have a professional problem with
16  that assessment.
17     MR. TRAUB: Mr. Haywoode, when you
18  have the facts, you argue the facts.
19  When you have the facts on your side, you
20  argue the facts. When you have the law
21  on your side you argue the law, and when
22  you have neither you do as Mr. Haywoode
23  is now doing and you pound the table.
24     MR. HAYWOODE: I haven't pounded any
25  table.

57

Adam M. Pryce

1
2     MR. TRAUB: Figuratively.
3     MR. HAYWOODE: When you have the
4  evidence which contravenes your case
5  and indicates major, major contradictions
6  in presentations you have made in this
7  and several other suits, you suppress
8  it.
9     MR. TRAUB: Mr. Haywoode, clearly
10  you have not reviewed the documents
11  that have been produced to your office
12  because when you see them you will know
13  that what they are a cover letter from
14  Mr. Seavey to various parties enclosing
15  the exact same documents that were
16  provided and marked as exhibits in your
17  client's deposition on Friday.
18     I don't intend to engage in this any
19  further with you.
20     Clearly, you are not going to
21  withdraw your motion. So we will respond
22  in due course.
23     Do you have any other questions?
24     MR. KELLY: No.
25     THE WITNESS: I just want to say

15 (Pages 54 to 57)



58

1    Adam M. Pryce
2  something,
3        MR. HAYWOODE: Oh, one further
4  thing.
5        Did you not say that Mrs. Seavey
6  would be unavailable after the 20th and
7  will not be here and would be unable to
8  be deposed?
9        Mrs. Seavey was certainly here today
10  and yesterday.
11        Did you not say it was difficult to
12  get to this place, when her office is
13  right across the street, and when I said
14  let's do the deposition here as a
15  courtesy to the Seaveys, who I have known
16  for many years, so it is convenient to
17  them rather than have them come out to my
18  office?
19        MR. TRAUB: Mr. Haywoode, I think
20  this is the problem.
21        MR. HAYWOODE: This has nothing to
22  do with the deposition record.
23        I don't know. If you want to keep
24  it on, go ahead.
25        You said what you wanted to say. I

59

1    Adam M. Pryce
2  said what I wanted to say.
3        MR. TRAUB: I will just correct the
4  misstatement.
5        My comment was that Mrs. Seavey
6  would be unavailable over the course of
7  the next two weeks.
8        There were depositions scheduled
9  yesterday so Mrs. Seavey's deposition
10  could not be held.
11        There was a deposition scheduled for
12  today.
13        I stand by my statement to the
14  magistrate, as I presume you do as
15  well.
16        I have nothing further for this
17  witness and there are no questions in
18  front of him.
19        THE WITNESS: May I say something?
20        MR. TRAUB: No. There is no
21  question.
22        THE WITNESS: Can I say something?
23        MR. TRAUB: No.
24        MR. HAYWOODE: I wish to examine the
25  witness.

60

1    Adam M. Pryce
2  EXAMINATION
3  BY MR. HAYWOODE:
4        Q. Mr. Pryce, let me try to get a fix
5  on this.
6        You and your associates looked at
7  the 2006 books of these corporations at one
8  point; is that correct?
9        A. Yes.
10        Q. Is it your testimony that when you
11  looked at the books and you tested areas, you
12  were unable to come to any conclusion because
13  you could not see the supporting evidence to
14  support the areas of testing that you
15  conducted?
16        A. Yes.
17        MR. KELLY: Objection.
18        Q. Is that what you said?
19        A. Yes. There were material areas that
20  we couldn't get evidence, we couldn't form an
21  opinion.
22        Q. Now, sir, when these --
23        MR. HAYWOODE: I withdraw that.
24        Q. This is not an unusual circumstance
25  for an auditor; is it?

61

1    Adam M. Pryce
2        MR. KELLY: Objection.
3        A. Well, first thing, the system didn't
4  produce a trial balance.
5        We saw a number of adjusting journal
6  entries, correcting journal entries at the
7  yearend which were above the normal
8  requirement, five adjusting entries that the
9  auditors usually propose, five to ten. That's
10  a normal audit.
11        We saw over twenty journal entries
12  at least each year.
13        It suggests that there was
14  deficiency in the internal control of the
15  auditor.
16        Q. Would you describe those
17  deficiencies?
18        A. Deficiency and a number of entries
19  that Dalton should have made, because Dalton I
20  understand was using cash basis of accounting
21  but that was confusing, because if you use
22  cash base of accounting you do not record
23  receivables or payables.
24        We saw receivables in Dalton's book
25  and yet it was confusing.

16  (Pages 58 to 61)



62

Adam M. Pryce
1
2    Now, those journal entries that we
3    saw, the number of journal entries we saw
4    proposed by the auditor, we didn't see any
5    evidence that they were approved by Dalton
6    and Dalton did not book them that way neither.
7    Now, if you are converting from cash
8    basis of accounting to accrual basis, which is
9    GAAP, GAAP, then there are two journal entries
10   you need to see at yearend. One with
11   receivables and one with payables.
12   They were excessive journal
13   entries. They were evidence that they were
14   approved by Dalton.
15   Usually --
16   Q. Did you say there were?
17   A. There were no evidence that these
18   proposed entries were approved by Dalton.
19   Dalton is responsible for the financial
20   statement.
21   Management is responsible for the
22   management statement.
23   Auditors are there to form an
24   opinion of the financial statement.
25   Q. So that your findings were that

63

Adam M. Pryce
1
2    these decisions were being made by the
3    auditor?
4    A. Yes.
5    MR. KELLY: Objection.
6    A. Because the accountant, normal
7    practice according to GAAP, should have sent a
8    letter to the client asking the client to
9    approve the journal entries, and we didn't see
10   the evidence, and Dalton didn't book them in
11   that order neither.
12   So the question is, those are things
13   we didn't have the evidence. So we couldn't
14   form an opinion neither.
15   Q. Is it fair to say that an objective
16   observer might have looked at this and
17   determined that Dalton was not the accountant
18   but that Marks Paneth & Shron was the
19   accountant for these developments?
20   MR. KELLY: Objection.
21   A. Well, the journal entries were not
22   approved by Dalton. So if they're not
23   approved, then there is an implication that
24   management decisions were being made by the
25   auditor, and this is overreaching, one of the

64

Adam M. Pryce
1
2    aspects of the overreaching rule of GAGAS.
3    We were not there -- we were there
4    to conduct a financial audit on any matters
5    that come to our attention which were
6    considered material, we need to disclose them
7    for our client, and this is what we did in our
8    management letters.
9    Q. Are you familiar with the issue that
10   arose concerning frontline employees and
11   central office employees being paid by the
12   partnership corporation?
13   A. Yes, I am familiar.
14   Q. And you are aware that one of
15   Mr. Edmonds's concerns was that the
16   developments of which he is a partner may be
17   paying expenses having to do with other
18   developments owned by the Seavey group that he
19   is not a member of? Have you heard that
20   situation?
21   A. Yes.
22   Q. To your knowledge --
23   MR. HAYWOODE: I withdraw that.
24   Q. Are you aware that there are some
25   twelve other units which John Edmonds is not

65

Adam M. Pryce
1
2    associated with, which are owned by the Seavey
3    group?
4    A. Yes, I am aware.
5    Q. Are you aware that all of those
6    developments in our present information have
7    Dalton Management as the manager and Marks
8    Paneth & Shron as the auditor? Are you aware
9    of that?
10   MR. KELLY: Objection.
11   A. Yes.
12   MR. KELLY: You just asked a
13   question upon information.
14   Can I ask you to identify what
15   information you are referring to?
16   MR. HAYWOODE: Information provided
17   in discovery by the parties.
18   MR. KELLY: Can you be more specific
19   than that?
20   MR. HAYWOODE: Well, I will.
21   On one occasion we asked for an
22   allocation of the amounts of payment
23   being made by each development to the
24   central office staff of Dalton Management
25   and we received a paper which listed

17 (Pages 62 to 65)



66

1    Adam M. Pryce
2    three developments: Charles Hill, Logan
3    Plaza, and Church Home.
4        On another occasion previous, when
5    we had raised the same question, we
6    received the same sheet but it listed the
7    several other developments, including
8    Lakeview, indicating the same
9    assessments.
10        This is the source of our
11    information and it was raised in a
12    previous deposition with Mr. Dawley
13    because we were wondering why the second
14    time it was raised the paper, which
15    listed the other developments, was cut
16    off and we were only given three.
17        MR. KELLY: What aspect of that
18    information implies Marks Paneth & Shron
19    was the auditor for those?
20        MR. HAYWOODE: That was the
21    testimony of the previous witnesses at
22    the previous depositions. That is my
23    recollection of the testimony of
24    Mr. Dawley and of Mr. Jennings. That is
25    my recollection.

67

1    Adam M. Pryce
2        MR. KELLY: That is definitely not
3    the testimony of Mr. Jennings.
4    That's why I asked you what
5    information --
6        MR. HAYWOODE: I say it on
7    information and that's my present
8    recollection of the source of that
9    information.
10        MR. KELLY: Okay.
11        MR. HAYWOODE: If it is not true, I
12    am certainly subject to correction.
13        It is my present information that in
14    every one of these buildings, from
15    fourteen to sixteen of them, that Marks
16    Paneth & Shron is the auditor and Dalton
17    Management is the accountant.
18        If that's not true, counsel, you
19    certainly have the means to correct me
20    and I will stand corrected.
21        MR. KELLY: That's why I asked you
22    what information you were relying on.
23        MR. HAYWOODE: And I told you what
24    it was.
25        MR. KELLY: Thank you.

68

1    Adam M. Pryce
2        Now you can answer the question.
3    EXAMINATION
4    BY MR. HAYWOODE:
5        Q. The question was, are you aware that
6    that situation pertains or had you heard that
7    that situation pertains?
8        MR. KELLY: Objection.
9        A. Yes.
10        Q. Would that impact the questions of
11    independence that you referred to in the GAGAS
12    rules?
13        A. Yes.
14        MR. KELLY: Objection.
15        A. Yes, but this is also related party
16    transaction as well, a number of related party
17    transactions as well, and independent rule,
18    yes.
19        Q. If you look, and I am not talking
20    about this situation, but let's take any
21    situation, if you come to a situation and you
22    conduct an audit and you see, for instance,
23    figures are presented in the end year
24    financial statement done by the auditor which
25    show no relationship in terms of adjusted

69

1    Adam M. Pryce
2    journal entries to the figures in the books of
3    the accountants, is there any way that you can
4    form any opinion as to what happened to the
5    difference in the money between the
6    accountant's journal and the money reported in
7    the financial statement by the auditor?
8        Is there any way you can form any
9    opinion as to what happened to that money?
10        MR. KELLY: Objection.
11        A. This problem suggests that the
12    proposed journal entries were not approved by
13    management.
14        Q. By the accountant?
15        A. By the accountant.
16        MR. KELLY: Objection.
17        Q. And with regard to the monies which
18    are in that spread between what the
19    accountants had and what the auditors issued,
20    put the case that that amount of money was
21    $7 million, just theoretically. Could you
22    tell what happened to that $7 million from
23    simply looking at the general ledger and then
24    looking at the financial statement?
25        MR. KELLY: Objection.

18 (Pages 66 to 69)



70

Adam M. Pryce

1
2    A.  Yes.  Well, the bottom line of any
3  financial statement, in this case they were
4  partnerships.  The bottom line of everything
5  goes to the capital account which is where
6  distribution takes place.  So everything goes
7  there.
8        So whatever transaction takes place,
9  that's the bottom line and that sets up the
10  distribution.
11        The bottom line of the financial
12  statement, in this case the partnership goes
13  right to the capital account, and it's that
14  bottom line that is used to distribute to the
15  partners.
16    Q.  Sir, what I am trying to understand,
17  without anything else, if you looked at a
18  situation and the general ledger said
19  $3 million was expended and then you looked at
20  a financial statement, and it says $7 million
21  was expended, and you saw no request proposed
22  for journal entry adjustments, no proposal
23  coming from the auditor, no acceptance coming
24  back from the accountant to the auditor, could
25  you in any way tell what happened to the

71

Adam M. Pryce

1
2  monies which were between the two accounts?
3    MR. KELLY:  Objection.
4    A.  Well, first thing you need to look
5  for supporting evidence, because we are there
6  to do a financial audit, to test, based on our
7  sample, any matters, to disclose them.
8        So as I said, if the bottom line of
9  all these transactions go to the capital
10  account and that's where the distribution
11  takes place, so it has implication for moneys
12  as well.
13    Q.  But you wouldn't know what happened
14  to those monies, is that correct?
15    MR. KELLY:  Objection.
16    MR. TRAUB:  Objection.
17    A.  If I have no evidence.
18    Q.  If you have no evidence, you
19  couldn't tell.
20    MR. KELLY:  Objection.
21    A.  (No response.)
22    Q.  So if someone were to tell you that
23  money was given to Casey Stengle, would you be
24  able to say yes or no the money went to Casey
25  Stengle?

72

Adam M. Pryce

1
2    MR. KELLY:  Objection.
3    MR. TRAUB:  Objection.
4    A.  The transaction we couldn't form.
5  We didn't have the evidence.  So we couldn't
6  form an opinion.
7    Q.  You wouldn't know if that money went
8  to Mel Haywoode, would you?
9    MR. KELLY:  Objection.
10    A.  No.
11    Q.  You wouldn't know if Mel Haywoode
12  stole that money, took that money, invested
13  that money with Bear Stearns, you would have
14  no way of knowing what happened to that
15  money?
16    MR. KELLY:  Objection.
17    Q.  Would you?
18    MR. KELLY:  Objection.
19    A.  Our aim there, Mel, was to test the
20  records, because if there's any matters that
21  is questionable we are supposed to bring that
22  to the attention.
23        This is what GAGAS, GAAP, GAAS asks
24  us to do.  That's what governs our behavior.
25        It is not personal.  We are there to

73

Adam M. Pryce

1
2  follow those rules.
3    Q.  So you formed no personal opinions?
4    A.  We formed no personal opinions about
5  Ron or Seavey.  We were there as independent
6  auditor to follow GAAS.  That's what governed
7  our behavior, to follow GAAP, which is the
8  presentation of financial statements, to
9  assure that accrual basis of accounting is
10  used, and that's what we report on.
11    Q.  Mr. Pryce, you wouldn't know what
12  happened?
13    A.  We wouldn't know anything.
14    MR. KELLY:  Objection.
15    A.  If we don't have anything, we
16  wouldn't know.
17    MR. HAYWOODE:  No further questions.
18        THE WITNESS:  We are there to gather
19  evidential matter and to test them.  We
20  don't know if we don't see evidence.
21    MR. HAYWOODE:  No further
22  questions.
23  EXAMINATION
24  BY MR. KELLY:
25    Q.  Mr. Pryce, I am going to follow up

19  (Pages 70 to 73)

74

1          Adam M. Pryce
2  on some of the questions Mr. Haywoode just
3  asked you.
4      A.  Yes.
5      Q.  Can you identify any statement or
6  section of GAGAS, GAAS or GAAP that requires
7  a letter to go from the auditor to the
8  management regarding adjusting journal
9  entries?
10     A.  Well, it's normal practice.  If you
11 look on any requirement that the auditors
12 are supposed to go, that is one of the
13 requirements that this is the practice in the
14 accounting profession.
15     Q.  Are you testifying that it is a
16 practice in the accounting profession for a
17 letter to be sent from the accountants to
18 management for the adjusting proposed journal
19 entries?
20     A.  Let me say this.  Let me go back.
21     There are two letters that the
22 accountants prepare at the end of an audit.
23 One is called a management representation
24 letter.
25     That letter is supposed to be on the

76

1          Adam M. Pryce
2  Ron Dawley?
3      A.  Yes.
4      Q.  Did you hear testimony at those
5  depositions that Ron Dawley was the individual
6  who physically made the journal entries?
7      MR. HAYWOODE:  Objection to leading
8      the witness.
9      A.  No.
10     Q.  If you were told that Mr. Dawley
11 would take the adjusting journal entries from
12 a sheet provided by the accountant, sit at a
13 computer, make the journal entries he thought
14 were appropriate, would that satisfy you that
15 management was making the adjusting journal
16 entries?
17     MR. HAYWOODE:  Objection.
18     Calls for a hypothetical.
19     A.  Let me explain --
20     MR. HAYWOODE:  Calls for testimony
21     concerning facts not in evidence.
22     A.  When you do an audit, there are
23 matters that the client did not see and you go
24 there, and following GAAP, GAAS, you propose
25 entries.

75

1          Adam M. Pryce
2  client's letterhead, telling the CPA that they
3  have kept proper accounting records, they have
4  complied with the law, they have done that,
5  and that has to be on the client's letterhead,
6  similar with this proposed journal entry.
7  That has to be on the client's letterhead,
8  saying we approved the journal entries.
9  Because they are proposed, the auditors can
10 only propose.  They are not supposed to
11 make the journal entries and book them like
12 that.
13     Q.  Who made the journal entries for the
14 partnerships?
15     A.  Who made the journal entries?  We
16 saw a number of journal entries made by the
17 auditor.
18     Q.  How do you know they were made by
19 the auditor?
20     A.  Well, we saw the auditors on them.
21 They have the auditors' letterhead here.
22     Q.  Were you present at the deposition
23 of Mr. Jennings?
24     A.  Yes.
25     Q.  Were you present at the depositon of

77

1          Adam M. Pryce
2      If you propose -- these are called
3  proposed.  Then they have to be approved by
4  the client.
5      You have no authority.  That is
6  management's decision.
7      You have no authority to book
8  something in the client's books without
9  getting the approval of the client.
10     Q.  Do you have any knowledge that
11 anyone at Marks Paneth & Shron entered
12 anything into the books of any of these
13 partnerships?
14     A.  When we look on the financial
15 statement of Marks Paneth & Shron and compare
16 to Dalton, there is a wide gap between the
17 figures.
18     One of the requirements of the
19 auditor, when you start an audit, you need to
20 audit the previous balance to make sure the
21 client books them.
22     We don't do that.
23     We see, for example, like Seavey
24 loan coming from way back in the books and no
25 adjustment was made, that 29,000, no

20  (Pages 74 to 77)



78

Adam M. Pryce

1
2 adjustment was made in the books and that was
3 carrying.
4     We saw it in 2005. So it was coming
5 back before 2005.
6     MR. KELLY: Can you read back my
7 question, please?
8     (Whereupon, the requested portion
9 was read back by the reporter.)
10    A. The only evidence I have is the
11 financial statement differs from Dalton.
12    Q. Can you identify any professional
13 standard that sets the normal requirements or
14 the normal amount of adjusting journal entries
15 at five or ten?
16    A. Well, this is the normal practice.
17    Q. Can you point to any professional
18 standard or any professional literature that
19 sets the normal practice at five or ten?
20    A. No. For example, the engagement
21 letter, that is not in GAAP or GAAS, but is
22 recommended.
23    Q. Can you identify any recommendation
24 in any professional literature that sets the
25 normal adjusting journal entries at five or

79

Adam M. Pryce

1
2 ten?
3    A. No, no. That's normal practice.
4 I'm giving example, like letter of engagement
5 letter, it is not in GAAP but it's
6 recommended.
7    Q. When you say it's normal practice,
8 that's based on your experience?
9    A. Normal audit practice.
10    Q. Do you have any experience with the
11 number of adjusting journal entries in
12 partnerships involved in HUD-regulated housing
13 projects?
14    A. I don't think this has to do with
15 HUD-regulated. Whether it's HUD-regulated or
16 not, excessive journal entries, over 21, it's
17 excessive.
18    It says that there is internal
19 control deficiency.
20    Q. Can you point me to --
21    A. (Continuing) Which has to be
22 reported, according to SAS 112.
23    Q. Can you point me to any professional
24 standard that sets a standard of the number of
25 adjusting journal entries as being excessive?

80

Adam M. Pryce

1
2    A. No. It's a practice. It's a normal
3 practice that it's about five or ten journal
4 entries.
5    As I said, the engagement letter is
6 not in GAAS, but it's recommended.
7    You don't have to see, but it's
8 normal practice in the profession.
9    Q. What recommends it?
10    A. AICPA recommends it, New York State
11 Society of CPAs recommends it.
12    AICPA recommend it.
13    Q. Can you point me to some
14 recommendation from New York State Society of
15 CPAs or AICPA, the Society of CPAs?
16    A. No.
17    MR. TRAUB: You are talking over
18 each other.
19    MR. HAYWOODE: This is not a CPA
20 exam this morning.
21    A. This is my field. I've been in it a
22 long time.
23    MR. HAYWOODE: All right. So go
24 ahead.
25    A. I am defending my work here what I

81

Adam M. Pryce

1
2 do.
3    MR. HAYWOODE: Go ahead.
4    MR. KELLY: Can you read my question
5 back, please?
6    THE WITNESS: Yes.
7    MR. HAYWOODE: You were asking for
8 any regulations. I want you to cite the
9 rule right now.
10    (Whereupon, the requested portion
11 was read back by the reporter.)
12    A. Recommendation? Have proper working
13 papers so that one can follow your conclusion,
14 the opinion. Keep proper working papers,
15 follow GAAP, follow GAAS. These are all
16 recommendation.
17    Q. Wouldn't you agree that the number
18 of adjusting journal entries is less important
19 than the actual character of those adjusting
20 journal entries?
21    A. Let me say something.
22    SAS 112 that was issued November 15,
23 2006, exact date, that applies to audits after
24 that date, requires that you report control
25 deficiency, internal control deficiency.

21 (Pages 78 to 81)



82

Adam M. Pryce
1    Adam M. Pryce
2        And if you go to auditing the books,
3    there are so many figures and some large
4    figures, because we have materiality levels --
5        MR. TRAUB: Stop.
6        MR. HAYWOODE: Stop. You have an
7    accent.
8    A.    Materiality levels.
9        MR. TRAUB: Materiality levels.
10       THE WITNESS: I go too fast.
11   A.    Based on material levels, when we
12   examine transactions, accounting transactions,
13   based on that, if it's above material levels,
14   we test those. We see many of those journal
15   entries were not only to convert the books
16   from cash basis to accrual basis, but there
17   were a number of incorrect entries, that those
18   entries are made that Paneth had to make, and
19   that's a question of independence.
20   Q.    Again, you said Paneth had to make.
21       Do you mean that Paneth went to the
22   books and made those entries themselves?
23       MR. HAYWOODE: Objection. That's
24   not the witness's testimony.
25   A.    I cannot determine auditor judgment

83

1    Adam M. Pryce
2    because Paneth determines their judgment based
3    on their testing. I am not here to explain
4    that, but what I see, I can only talk about
5    what I test and what I see.
6    Q.    Maybe my question wasn't clear.
7        When you say Paneth made the
8    entries --
9    A.    Proposed journal entries.
10   Q.    -- do you mean that someone from
11   Marks Paneth & Shron went to the offices
12   of Dalton and made the entry in Dalton's
13   books?
14   A.    They produced the documentation of
15   entries that they made to support their
16   financial statements, and these were not
17   booked by Dalton.
18   Q.    So those entries were not put on the
19   books of Dalton?
20   A.    They were not put on by Dalton, so
21   that suggestss that Dalton did not approve
22   them.
23   Q.    That suggests that Dalton did not
24   approve those journal entries or looked at
25   them -- let me withdraw that.

84

1    Adam M. Pryce
2        So that suggests that Dalton looked
3    at those journal entries and made a decision?
4    A.    Dalton -- I can't talk for that,
5    what Dalton makes.
6    Q.    Okay.
7    A.    I can't tell you. I don't know what
8    was in Dalton's mind. I can't tell you what
9    Dalton made.
10       If that's what you want me to tell
11   you, but I can't.
12   Q.    Would it be acceptable under GAGAS
13   for the client to, even though the auditor
14   made the adjusting journal entries, to accept
15   responsibility for those journal entries
16   without impairing the independence of the
17   auditor?
18   A.    What I said, I said. These entries
19   were material. Many of them were material,
20   and those, we saw no evidence that they were
21   approved by Dalton.
22       We saw a few things that Dalton
23   booked, but they were not the exact same
24   journal entries.
25       So I don't know who was the

85

1    Adam M. Pryce
2    accountant or who was depending on the auditor
3    to do their job. I don't know. We couldn't
4    test those.
5        And that's why we issued scope
6    limitation. We didn't form an opinion because
7    of restriction in our testing. We couldn't
8    test them. We couldn't form an opinion.
9        MR. KELLY: Can the court reporter
10   read back my question, please.
11       (Whereupon, the requested portion
12   was read back by the reporter.)
13   A.    The client has to approve the
14   proposed journal entries.
15   Q.    Did you ask Mr. Dawley about the
16   procedure for the adjusting journal entries?
17   A.    We did ask him.
18   Q.    What did he tell you?
19   A.    He booked in a different way. We
20   were not satisfied. He booked part of this,
21   part of that, part of that, and we were not
22   satisfied how he booked them.
23       That's why the books of Dalton,
24   again, the financial statements of Shron, they
25   didn't reconcile.

22 (Pages 82 to 85)



86

Adam M. Pryce

1
2  Q.  Did you ask anyone at Marks Paneth &
3  Shron how the adjusting journal entries were
4  dealt with?
5  A.  No, no.  We were not -- the only
6  time we contact, as I said, two of my partners
7  contact Shron, was when Ron refer.
8       There was no reason for us to
9  contact an auditor.
10      The only case, we didn't contact
11  them, because Ron couldn't explain certain
12  information.
13      MR. HAYWOODE:  Indicating Ron
14  Dawley?
15      THE WITNESS:  Ron Dawley, yes.
16  A.  So he referred us, my two partners
17  spoke to Shron.
18  Q.  In conducting an audit of an entity
19  that had been previously audited by a CPA
20  firm, isn't it required procedure to contact
21  the previous CPA firm?
22  A.  Only case when you are taking over
23  from that auditor.  You are the new auditor
24  and that auditor, you must contact the
25  predecessor.

87

Adam M. Pryce

1
2  That's in a case like you are the
3  new auditor for the entity.  Then you contact
4  that person to find out why, if there is
5  something you didn't like.  That's the only
6  case.  That is required by GAAS.
7  Q.  Is it fair to say that if you had
8  any questions concerning the decisions made by
9  Marks Paneth & Shron in conducting their
10  audit, that you could have called up Marks
11  Paneth & Shron and asked them?
12  A.  Well, there's no requirement by
13  GAAS.
14  Q.  Would it have been good practice to
15  call up the auditor and ask how they came to
16  their decisions?
17  A.  We don't have anything like that
18  that governs that in GAAS.
19  Q.  Well, would it have been good
20  practice, whether or not it's in GAGAS or
21  GAAS, to call up the previous auditor and
22  say, I don't understand something, can you
23  explain it to me?
24      MR. HAYWOODE:  I object to what
25  could have been, because anything could

88

Adam M. Pryce

1
2  have been.
3       Please, go ahead.
4  A.  We are governed by, in this case,
5  GAAS, GAGAS, GAAP.  We don't have anything to
6  say, other than the case that I talk about
7  previous auditor, to contact them, because
8  that is how our behavior is governed.
9       MR. KELLY:  I have no further
10  questions.
11      I have no further questions.
12      MR. TRAUB:  I have nothing further.
13      MR. KELLY:  Are we finished?
14      MR. HAYWOODE:  I am finished.
15      (Time noted: 11:56 a.m.)
16
17
18
19
20
21
22
23
24
25

89

Adam M. Pryce

1
2
3
4  A C K N O W L E D G M E N T
5
6
7
8
9       I, ADAM M. PRYCE, hereby certify
10  that I have read the transcript of my
11  testimony taken under oath on the 22nd
12  day of April, 2009, that the transcript
13  is a true, complete and correct record of
14  what was asked, answered, and said during
15  the deposition, and that the answers on
16  the record as given by me are true and
17  correct.
18
19
20      _____
         ADAM M. PRYCE
21  Signed and subscribed to before me
22  this ____ day of _____, 2009.
23
24
25      _____
         Notary Public

23  (Pages 86 to 89)



90

```
 1
 2
 3   STATE OF NEW YORK )
                     ) ss:
 4   COUNTY OF NEW YORK)
 5
 6        I, DONNA A. METZ, R.P.R., a Notary
 7   Public in and for the County of New York and
 8   State of New York, do hereby certify:
 9        That I reported the proceedings in
10   the within entitled matter, and that the
11   within transcript is a true record of such
12   proceedings.
13        I further certify that I am not
14   related by blood or marriage to any of the
15   parties in this matter and that I am in no way
16   interested in the outcome of this matter.
17        IN WITNESS WHEREOF, I have hereunto
18   set my hand this 28th day of April, 2009.
19
20
21
22        ------------------------------
          DONNA A. METZ, R.P.R.
23        Notary Public
24
25
```

91

```
 1
 2            I N D E X
 3   WITNESS        EXAMINED BY       PAGE
 4   ADAM M. PRYCE      (Mr. Kelly)       4
                                   73
 5
 6                 (Mr. Traub)       37
 7
                   (Mr. Haywoode)    60
 8
 9            E X H I B I T S
10   DEFENDANTS'                   PAGE
     FOR IDENTIFICATION
11
     Exhibit 18  Copy of Subpoena issued
12        to Adam Pryce,           32
13
14            o 0 o
15
16        DOCUMENT REQUEST:  Page 23
17            o 0 o
18
19
20
21
22
23
24
25
```

92



```
 1
 2            E R R A T A   S H E E T
 3   CASE NAME: EDMONDS vs SEAVEY
     DEPOSITION DATE:  April 23, 2009
 4   NAME OF WITNESS: ADAM M. PRYCE
 5            C H A N G E S
 6   PAGE  LINE     FROM         TO
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20            ADAM M. PRYCE
21   Subscribed and sworn to before me
22   this _____ day of _____ , 2009.
23        ----------------------
24   (Notary Public)   (commission expires)
25
```

**A**

able 51:17 71:24
abundant 50:13
ACCA 5:25 6:8,9
accent 82:7
accept 84:14
acceptable 13:24
  31:3 84:12
acceptance 70:23
accepted 14:4
account 44:22 45:2
  70:5,13 71:10
accountant 7:13,18
  32:12 63:6,17,19
  67:17 69:14,15
  70:24 76:12 85:2
accountants 6:2,12
  32:14 69:3,19
  74:17,22
accountant's 69:6
accounting 5:22 6:4
  6:15 7:2 11:14,16
  12:13 13:24 14:5
  14:21 27:3 31:4
  38:16 40:21 61:20
  61:22 62:8 73:9
  74:14,16 75:3
  82:12
accounts 20:3 71:2
accrual 62:8 73:9
  82:16
acknowledged
  21:10
action 37:7
actual 81:19
Adam 1:16 5:1 6:1
  7:1 8:1 9:1 10:1
  11:1,14,16,18,24
  12:1,5 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1

30:1 31:1 32:1,18
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1 40:1 41:1
  42:1 43:1 44:1
  45:1 46:1 47:1
  48:1 49:1 50:1
  51:1 52:1 53:1
  54:1 55:1 56:1
  57:1 58:1 59:1
  60:1 61:1 62:1
  63:1 64:1 65:1
  66:1 67:1 68:1
  69:1 70:1 71:1
  72:1 73:1 74:1
  75:1 76:1 77:1
  78:1 79:1 80:1
  81:1 82:1 83:1
  84:1 85:1 86:1
  87:1 88:1 89:1,9
  89:20 91:4,12 92:4
  92:20
addition 51:13
additional 35:4,11
addressed 24:16
  26:5 48:2
adjourned 36:15
adjusted 68:25
adjusting 61:5,8
  74:8,18 76:11,15
  78:14,25 79:11,25
  81:18,19 84:14
  85:16 86:3
adjustment 77:25
  78:2
adjustments 70:22
administration 43:5
advised 36:7
affidavit 49:15
afternoon 36:3,19
  47:22 51:2 52:22
agencies 40:9 41:2
ago 29:18 30:7 33:3
  47:19

agree 16:20 81:17
AGREED 3:7,16
agreement 18:3,5,7
  23:14 43:15,17
ahead 58:24 80:24
  81:3 88:3
AICPA 14:2 80:10
  80:12,15
aim 72:19
al 1:5,8
Alean 7:14,15
allegations 49:5
allegedly 54:15
allocation 65:22
Aluminum 7:15,17
  7:20
amortized 30:25
amount 21:7 29:9
  69:20 78:14
amounts 65:22
analytic 14:17 18:17
answer 4:18 21:10
  22:21 31:16,17
  68:2
answered 89:14
answers 89:15
anticipated 33:19
anybody 30:14,18
  30:19 33:11,15,18
  40:24
appear 36:13
appearance 27:6
appeared 36:17
appearing 44:23
applies 81:23
apprised 36:5
appropriate 40:15
  76:14
approval 77:9
approve 63:9 83:21
  83:24 85:13
approved 62:5,14
  62:18 63:22,23
  69:12 75:8 77:3

84:21
April 1:11 89:12
  90:18 92:3
areas 18:22 60:11
  60:14,19
argue 56:18,20,21
argued 49:8
arm's 21:5
arose 64:10
arranging 11:4
asked 14:11 41:7
  46:18 47:19,24
  65:12,21 67:4,21
  74:3 87:11 89:14
asking 4:12 30:5
  63:8 81:7
asks 72:23
aspect 6:17,22 66:17
aspects 64:2
assessment 56:16
assessments 66:9
assignment 36:3
assisted 10:7 15:2
  15:24,25 38:23
  40:22
associated 65:2
associates 60:6
Association 6:2,11
assume 4:19
assurance 43:16
assure 73:9
attention 64:5 72:22
attestation 43:15
Attorney 2:4
attorneys 2:8,16 3:7
  56:9
audit 9:10,20 11:4
  11:25 12:2 13:9,14
  13:18,19,21,22,23
  14:9,18 17:3,6,10
  21:6 26:10,17 28:3
  28:17 29:17 34:21
  34:22 41:11 42:10
  43:14,14,18,23

61:10 64:4 68:22
71:6 74:22 76:22
77:19,20 79:9
86:18 87:10
**audited** 10:22 15:19
15:21 16:10 17:4
39:10,14 42:6,17
42:20 86:19
**auditing** 9:7 13:25
14:3 17:13 41:24
82:2
**auditor** 9:5,16 11:3
16:9 29:2,3 43:6
60:25 61:15 62:4
63:3,25 65:8 66:19
67:16 68:24 69:7
70:23,24 73:6 74:7
75:17,19 77:19
82:25 84:13,17
85:2 86:9,23,23,24
87:3,15,21 88:7
**auditors** 27:3,25
30:19 61:9 62:23
69:19 74:11 75:9
75:20,21
**auditor's** 22:4,19,25
24:9 25:11
**audits** 11:20,20
81:23
**authority** 77:5,7
**available** 36:19
**Avenue** 1:19 2:10
**Avery** 2:8 54:10
**aware** 37:22 42:8,12
42:13 64:14,24
65:4,5,8 68:5
**a.m** 1:12 47:7,9
51:25 88:15

**B**

**B** 2:8,9 91:9
**bachelor** 6:9
**bachelor's** 5:22 6:8
**back** 33:22 46:14,16
70:24 74:20 77:24

78:5,6,9 81:5,11
85:10,12
**balance** 14:12,13,15
14:16 16:24 25:2
61:4 77:20
**bank** 7:11 44:22
**base** 26:12 61:22
**based** 18:17,18,21
18:24 24:25 26:24
26:25 27:7,7,8
43:21,21 71:6 79:8
82:11,13 83:2
**basis** 61:20 62:8,8
73:9 82:16,16
**Bates** 50:23 52:24
53:7,9
**Bear** 72:13
**began** 18:9 50:22
**beginning** 19:20
**behalf** 38:25 39:2
43:10
**behavior** 72:24 73:7
88:8
**believe** 38:6
**belongs** 20:4,21
**beyond** 45:16
**Bill** 36:2
**bit** 5:20
**Block** 7:25 8:2,5,9
**blood** 90:14
**Bob** 54:9
**body** 56:8
**book** 61:24 62:6
63:10 75:11 77:7
**booked** 83:17 84:23
85:19,20,22
**books** 20:3,17 38:16
38:18 44:8,25 60:7
60:11 69:2 77:8,12
77:21,24 78:2 82:2
82:15,22 83:13,19
85:23
**bothers** 55:12
**bottom** 70:2,4,9,11

70:14 71:8
**boxloads** 53:6
**break** 4:24
**bring** 48:19 72:21
**broker's** 12:10
**Brooklyn** 2:5
**building** 38:4
**buildings** 67:14
**business** 12:20
17:14

**C**

**C** 2:2 4:3 89:4 92:5
**calculate** 28:24
**call** 22:22 24:8,9
34:2 55:11 87:15
87:21
**called** 22:11 38:2
74:23 77:2 87:10
**calls** 30:3 76:18,20
**Cameron** 9:15,19,23
12:14,16,19 13:3
13:11 21:23 22:3
24:5 26:4 30:21
31:10,12 32:4,6
34:17 37:15,16,19
41:6,9,10,15 42:3
42:5,8,11
**Canada** 7:16
**capital** 15:9,12,15
41:14,17 70:5,13
71:9
**career** 6:23,25
**carrying** 78:3
**case** 1:7 14:2,4
56:10 57:4 69:20
70:3,12 86:10,22
87:2,6 88:4,6 92:3
**Casey** 71:23,24
**cash** 44:3,12 61:20
61:22 62:7 82:16
**cell** 54:24,25
**central** 64:11 65:24
**Century** 12:11
**certain** 13:6 49:9

86:11
**certainly** 55:21,24
58:9 67:12,19
**Certified** 6:2,12
**certify** 89:9 90:8,13
**chance** 52:6
**Chancellery** 2:5
**change** 7:23
**changed** 17:23
**character** 81:19
**characterization**
45:10
**charge** 16:21 21:22
**charged** 28:9
**Charles** 66:2
**Chartered** 6:2,12
**chief** 7:18
**Church** 29:8 44:21
66:3
**churches** 12:3
**circumstance** 60:24
**circumstances** 49:9
49:25
**cite** 81:8
**Citibank** 10:9
**Citigroup** 10:10
**City** 43:4
**clarification** 24:24
**clarify** 15:3 24:15
36:12 39:24
**clear** 17:9 83:6
**clearly** 57:9,20
**client** 5:15 18:16
22:8,9,14 49:6
63:8,8 64:7 76:23
77:4,9,21 84:13
85:13
**clients** 11:24 15:19
56:14
**client's** 57:17 75:2,5
75:7 77:8
**come** 12:12,24 36:7
36:9 50:13 58:17
60:12 64:5 68:21



coming 70:23,23
  77:24 78:4
commencing 22:2
comment 59:5
commission 92:23
communicate 31:22
communication
  23:15
companies 9:9,20,21
company 2:9 7:18
  7:20 10:5,12 11:13
compare 18:20
  77:15
comparing 17:17
comparison 17:13
  17:24
compel 46:6,19
compilation 11:21
complaining 49:16
complete 6:5,16
  89:13
completed 6:7,21
complied 75:4
component 45:13
computer 76:13
conceal 48:23 49:24
concealing 48:3
concerning 53:16
  64:10 76:21 87:8
concerns 13:6 64:15
conclude 56:11
conclusion 60:12
  81:13
conduct 13:14,18
  64:4 68:22
conducted 60:15
conducting 41:11
  86:18 87:9
confidential 51:19
confirm 20:10,12
confusing 43:21
  61:21,25
connection 19:9
  33:19

considered 28:9
  64:6
consistent 17:20
consult 14:19,22,23
  14:24
contact 31:24 33:11
  39:3,5,7 40:23
  41:4 86:6,7,9,10
  86:20,24 87:3 88:7
contested 31:19
continue 51:7
continued 53:20
continuing 8:20
  51:4 79:21
contract 17:18 28:7
  29:9
contradicted 49:10
contradictions 57:5
contravene 49:5
contravened 53:18
contravenes 57:4
contribution 41:14
  41:18
contrivance 53:10
control 61:14 79:19
  81:24,25
controller 10:4,13
  10:14 11:6 12:5
  15:23 37:11 43:8
convenient 58:16
conversation 30:22
convert 82:15
converting 62:7
copies 23:17,19
copy 18:6 32:18
  91:11
corporation 10:17
  10:18 15:7 17:14
  24:6 64:12
corporations 53:17
  60:7
correct 13:15 37:12
  38:3,10 41:12
  46:18 59:3 60:8

67:19 71:14 89:13
  89:17
corrected 67:20
correcting 61:6
correction 67:12
correctly 34:4
corroborated 21:15
counsel 2:12,19 4:25
  5:8 24:2 25:17
  30:4 54:25 67:18
counselor 50:9
count 19:4 34:15
country 12:8
County 90:4,7
course 37:24 57:22
  59:6
court 1:3 3:13 7:4
  15:3 22:17 25:14
  32:16 51:22 85:9
courtesy 58:15
courts 36:4
cover 57:13
CPA 8:11,16,17,24
  9:2,15,20,24 11:14
  11:16,19,25 12:5
  75:2 80:19 86:19
  86:21
CPAs 80:11,15,15
credits 14:20
cross-examination
  53:12
current 11:11 39:9
  39:13
cut 66:15

─── D ───

D 4:3 89:4 91:2
Dalton 2:9 14:10
  19:20 20:3,4,5,16
  20:17,25 25:2
  28:25 32:11,12
  44:17,25 45:13
  61:19,19 62:5,6,14
  62:18,19 63:10,17

63:22 65:7,24
  67:16 77:16 78:11
  83:12,17,19,20,21
  83:23 84:2,4,5,9
  84:21,22 85:23
Dalton's 61:24
  83:12 84:8
Darren 2:12 37:6
date 32:20 34:16
  36:22 81:23,24
  92:3
dated 23:22
Dawley 2:9 20:11
  31:23,25 66:12,24
  76:2,5,10 85:15
  86:14,15
day 19:9 47:24
  48:16 49:22 53:13
  54:16,18 89:12,22
  90:18 92:22
daycare 9:22
de 28:4 29:10
deal 32:13
dealt 86:4
December 8:6 34:17
  34:20 35:2
decided 31:21
decision 77:6 84:3
decisions 28:2 63:2
  63:24 87:8,16
defendant 2:16 50:7
  54:11
defendants 1:9 2:8
  37:7 91:10
Defendant's 32:19
defending 80:25
deficiencies 61:17
deficiency 61:14,18
  79:19 81:25,25
definitely 67:2
deliberate 49:23
depending 85:2
deposed 35:23 47:22
  58:8



**4**

deposition 1:16 3:9
33:14,16 36:15,22
48:6,12,25 49:25
52:19 54:7,9 55:10
57:17 58:14,22
59:9,11 66:12
75:22 89:15 92:3
depositions 59:8
66:22 76:5
depositon 49:17
52:16 75:25
describe 10:15
61:16
described 33:23
detail 45:6
details 44:24,24
determine 18:22
51:17 82:25
determined 5:9
16:25 63:17
determines 83:2
development 15:7
65:23
developments 63:19
64:16,18 65:6 66:2
66:7,15
DHCR 16:11,14,15
28:8,23 38:7,10,19
39:3,5,7 40:6,24
DICKER 2:15
difference 28:9 69:5
different 43:10,19
85:19
differs 78:11
difficult 58:11
direct 39:5,6
direction 36:6
directly 44:17 45:3
45:10 48:2 49:9
50:5 53:11,18 54:6
54:8
director 39:8
disclaimer 22:5,12
22:23 26:18,19,23

27:10,16
disclose 37:18 64:6
71:7
disclosed 21:5,8
37:21 44:10
discover 43:25 44:3
44:12,15
discovered 43:11
44:5,7,13
discovery 51:21
65:17
discrepancies 24:23
disputes 31:3
dissatisfied 27:11,15
distribute 70:14
distributed 44:24
distribution 13:6,8
45:4,5 70:6,10
71:10
district 1:3,3 36:4
division 7:15
document 23:2
24:11 25:25 26:3,4
26:8,9 32:24 33:2
33:6,6,9,12 34:16
49:4 51:14 52:15
52:21 55:7 91:16
documentary 19:12
documentation 30:4
83:14
documents 19:19,22
19:23 26:21 34:6,9
34:18 35:8 46:6,20
46:21 47:3,5,17,24
48:3,7,12,19,24
49:4,10,19,21 50:3
50:4,18,21 51:3,18
51:24 52:5,9 53:3
53:14,18,23 55:17
57:10,15
doing 8:11 27:3
43:23 56:23
Donna 1:19 4:5 90:6
90:22

DOUGLAS 2:3
Drive 2:17
driving 40:16
due 21:11,19 57:22
Duffus 8:23 9:13
duly 4:4
dwelling 42:18
D-u-f-f-u-s 9:2

...................... E .....................
E 2:2,2,21,21 4:3
89:4,4 91:2,9 92:2
92:2,2,5
EDELMAN 2:15
Edmonds 1:5 4:14
5:6,14,16 12:21,25
13:5,14,18 15:19
16:20,21 18:2
20:12,13 21:10,19
23:2,5,11,16 24:3
25:6 26:6 30:15
34:13,23,24 35:5
37:23 41:12 42:2
43:10,18,24 47:23
53:13,16 54:7
64:25 92:3
Edmonds's 64:15
EDMONS 2:22
educational 5:21 6:6
6:17,21
effect 3:13
effort 49:24
either 44:16
ELSER 2:15
email 46:10
employees 64:10,11
employer 7:23
employment 11:9
enclosing 57:14
engage 57:18
engaged 13:13,17
13:20 16:19 17:25
55:9
engagement 4:13
12:21,22,25 18:2,4

18:7,8,9,11,12
19:10,17,18 21:22
21:25 30:15 78:20
79:4 80:5
engagements 11:22
12:7
ensue 48:13
enter 18:2
entered 77:11
Enterprise 10:10
entities 26:11
entitled 90:10
entity 16:10 40:4
41:10 86:18 87:3
entries 61:6,6,8,11
61:18 62:2,3,9,13
62:18 63:9,21 69:2
69:12 74:9,19 75:8
75:11,13,15,16
76:6,11,13,16,25
78:14,25 79:11,16
79:25 80:4 81:18
81:20 82:15,17,18
82:22 83:8,9,15,18
83:24 84:3,14,15
84:18,24 85:14,16
86:3
entry 70:22 75:6
83:12
equivalent 6:3,14
ESIC 10:9
especially 49:7
ESQ 2:3,12,18
estate 12:9,9
estimate 28:24 29:2
estimates 28:18,19
28:20,20
et 1:5,8
Europe 31:20
evidence 19:12 27:6
27:18,21 28:14
29:13,14 49:24
53:11 54:5 57:4
60:13,20 62:5,13




62:17 63:10,13
71:5,17,18 72:5
73:20 76:21 78:10
84:20
**evidences** 29:15
**evidential** 73:19
**exact** 29:9 57:15
81:23 84:23
**exactly** 16:17 50:11
**exam** 8:17 80:20
**examination** 4:7
8:12,15 37:2 60:2
68:3 73:23
**examine** 17:22
59:24 82:12
**examined** 4:5 91:3
**example** 17:17 20:2
28:6,7 29:8,8 44:7
77:23 78:20 79:4
**examples** 29:5,12,23
**exceeded** 29:9
**excessive** 62:12
79:16,17,25
**exchanged** 53:5
**executive** 39:8
**exhibit** 22:18 25:15
25:22 32:17,19,21
33:22 34:25 91:11
**exhibits** 26:14 56:9
56:12 57:16
**expended** 70:19,21
**expenses** 17:18
64:17
**experience** 7:7
15:22 42:20 79:8
79:10
**expires** 92:23
**explain** 40:20 76:19
83:3 86:11 87:23
**explained** 5:4
**express** 26:16
**external** 27:2 29:3
**e-mail** 50:19 51:5
**e-mails** 54:16,20

## F

**fabrication** 52:24
**FACES** 10:3,3,11
10:14,21 11:6,10
12:4 16:13 37:11
37:14,20,25 38:22
38:25 40:21 42:21
42:23,24
**fact** 21:2 31:21
50:20 51:2
**facts** 56:10,18,18,19
56:20 76:21
**factual** 50:14
**fair** 4:21 63:15 87:7
**familiar** 39:19,22,25
40:3,5,9,18,19
64:9,13
**family** 45:12
**far** 50:2 51:5
**fast** 82:10
**federal** 36:3 45:17
45:22 51:22
**fee** 16:24 17:5 19:18
41:19,20,21
**Feinstein** 1:18 2:7
**field** 54:4 80:21
**fieldwork** 18:13,14
18:15 19:2,21 22:3
**Figuratively** 57:2
**figures** 25:3 44:13
68:23 69:2 77:17
82:3,4
**file** 2:13,19 24:4
**filed** 46:5,10,25 52:8
**files** 43:9
**filing** 3:9 46:8
**final** 23:9
**finance** 30:25
**financial** 10:17,22
10:25 11:3,23
13:19,20,22,23
16:23 22:8 42:6
43:18,23 62:19,24

64:4 68:24 69:7,24
70:3,11,20 71:6
73:8 77:14 78:11
83:16 85:24
**find** 87:4
**findings** 34:19 42:3
42:4,9,13 62:25
**finish** 22:10
**finished** 35:15,17
88:13,14
**firm** 11:14,16 12:14
86:20,21
**first** 7:11 9:6 14:10
14:11 16:4,19
17:25 50:16,17
61:3 71:4
**five** 25:9 47:23 61:8
61:9 78:15,19,25
80:3
**fix** 60:4
**fixed** 19:17,18
**fluctuation** 18:18,19
18:21
**follow** 13:24 14:3,6
14:6,7 73:2,6,7,25
81:13,15,15
**following** 53:13
54:18 76:24
**follows** 4:6
**followup** 37:9
**force** 3:12 49:24
**forget** 16:7
**form** 3:17 22:7,11
22:13 30:8 60:20
62:23 63:14 69:4,8
72:4,6 85:6,8
**formation** 41:16
**formed** 12:22 41:9
73:3,4
**forward** 5:15
**found** 20:5,14 48:6
**founding** 12:13
**four** 41:25 43:24
49:6

**fourteen** 67:15
**Friday** 47:23 51:4
57:17
**front** 25:23 32:21
59:18
**frontline** 64:10
**full-blown** 43:15
**full-time** 11:7,8
37:10
**funded** 43:4
**further** 3:15 21:2
45:25 48:5,17
57:19 58:3 59:16
73:17,21 88:9,11
88:12 90:13

## G

**G** 89:4 92:5
**GAAP** 14:4,5,6,21
15:9 16:7,7,7 27:7
31:3,7 43:21 62:9
62:9 63:7 72:23
73:7 74:6 76:24
78:21 79:5 81:15
88:5
**GAAS** 13:24 14:6
14:21,22,22 15:12
16:8,8 27:8 43:21
72:23 73:6 74:6
76:24 78:21 80:6
81:15 87:6,13,18
87:21 88:5
**GAGAS** 14:2,7,22
15:15 16:5,6,6
27:7,23 28:12 64:2
68:11 72:23 74:6
84:12 87:20 88:5
**Gannett** 2:17
**gap** 77:16
**gather** 73:18
**general** 14:4 31:3
45:6 69:23 70:18
**generally** 13:24
**getting** 77:9
**give** 29:22 36:10



48:19 49:2 55:23
**given** 24:2 33:2 35:7
  50:6 52:22 66:16
  71:23 89:16
**gives** 20:19,22 25:2
**giving** 52:6 79:4
**go** 7:8 18:15,25
  31:12 32:7 43:13
  58:24 71:9 74:7,12
  74:20 76:23 80:23
  81:3 82:2,10 88:3
**goes** 70:5,6,12
**going** 7:3 17:2,5,10
  22:16 25:14,20
  30:10 32:15 45:19
  45:21 51:7,9 57:20
  73:25
**good** 4:9,10 37:4,5
  87:14,19
**governed** 16:6,8
  45:19,22 73:6 88:4
  88:8
**government** 14:3,25
  16:5
**governmental** 40:2
  40:8 41:2
**governs** 72:24 87:18
**great** 21:2
**Griffiths** 12:14,16
  12:19 21:23 22:3
  24:5 26:5 30:21
  31:12 32:5,7 34:18
  35:20 36:7,12,18
  37:15,17,19 41:9
  41:10,15 42:11
**group** 45:12 64:18
  65:3
**guide** 14:19
**guides** 14:20
**G-A-A-P** 14:5 15:9
**G-A-A-S** 15:12
**G-A-G-A-S** 15:15

························H························

**H** 7:25 8:2,4,9 91:9

92:2.5

**hand** 22:17 55:11
  90:18
**handling** 37:23
**happened** 69:4,9,22
  70:25 71:13 72:14
  73:12
**Haywoode** 2:3 5:4
  6:10 8:14 15:6
  23:24 25:16 27:11
  27:14 29:19,24
  30:12 31:14 32:9
  35:19 36:24 40:12
  40:14 45:9,18,23
  46:11 47:4,8,13
  50:11 52:13,19,20
  53:4 54:22,23
  55:14,20,25 56:3
  56:17,22,24 57:3,9
  58:3,19,21 59:24
  60:3,23 64:23
  65:16,20 66:20
  67:6,11,23 68:4
  72:8,11 73:17,21
  74:2 76:7,17,20
  80:19,23 81:3,7
  82:6,23 86:13
  87:24 88:14 91:6
**HDC** 39:15,17,18,20
  39:21,22,23
**HDFC** 16:15,16
  38:2,4,7,9,12,16
  38:17,21 39:2,7,16
**hear** 4:16 7:4 76:4
**heard** 30:9 46:22
  48:6 64:19 68:6
**held** 1:17 9:6 49:19
  53:19 55:6 59:10
**hereto** 3:8
**hereunto** 90:17
**Herrick** 1:18 2:7
**hiding** 50:4
**high** 18:22
**Hill** 66:2

**history** 5:21
**hold** 53:20
**home** 29:8 44:21
  49:12 66:3
**hours** 28:5 46:7,12
  47:2,23 52:9
**housing** 10:7 15:6
  16:17 41:3 42:18
  42:24 79:12
**HRA** 43:4
**HUD** 10:7 14:24
  15:2,4,5,20,21,24
  15:25 16:2,4 38:4
  38:17,23 40:3,4,6
  40:10,18,22,24
**HUD-regulated**
  79:12,15,15
**hundred** 19:5,6
**hundreds** 53:4,8
**hypothetical** 76:18
**H-U-D** 15:4

························I························

**idea** 54:19
**identification** 32:20
  91:10
**identified** 23:3
**identify** 65:14 74:5
  78:12,23
**ill** 36:8,9,14
**impact** 68:10
**impacted** 54:8
**impairing** 84:16
**implication** 63:23
  71:11
**implies** 66:18
**important** 27:5
  81:18
**imposes** 16:3
**inability** 49:16
**include** 53:22
**including** 10:18
  66:7
**income** 10:7 11:22
**incorporated** 12:17

**incorrect** 52:3 82:17
**independence** 27:2
  27:2,4,7,19 28:15
  68:11 82:19 84:16
**independent** 11:3
  22:4,19,24 68:17
  73:5
**indicate** 35:20
**indicated** 35:21
  36:20 48:4
**indicates** 57:5
**indicating** 66:8
  86:13
**Indies** 5:23
**individual** 76:5
**inform** 23:4
**information** 32:2
  36:6 65:6,13,15,16
  66:11,18 67:5,7,9
  67:13,22 86:12
**informed** 23:11 36:2
  36:14,17 52:2
**inhouse** 11:2 26:13
**initial** 41:17
**initiating** 41:16
**inside** 45:6
**instance** 68:22
**institute** 40:2
**intend** 46:25 57:18
**intended** 48:20 54:6
**intention** 35:22
**interest** 5:13
**interested** 90:16
**interests** 37:19
**internal** 61:14 79:18
  81:25
**interrupt** 8:19
**invested** 72:12
**investigation** 24:5
  51:2
**Investment** 7:11
**invited** 13:2,4
**invoice** 20:19,22,23
  20:24,25



7

**involved** 38:2 79:12
**involvement** 10:24
    15:18 38:12
**issue** 22:4,5 30:23
    34:9 64:9
**issued** 22:24 25:11
    26:20 32:18 34:3,5
    34:12,25 69:19
    81:22 85:5 91:11
**issues** 23:3 26:25
    27:4,19 28:15
    31:13 32:7
**items** 23:7,12 24:16
    24:18,18

**J**
**J** 2:18
**Jamaica** 5:24 7:2,12
    7:17,19
**Jennings** 66:24 67:3
    75:23
**job** 7:11 12:18 37:11
    37:15 85:3
**John** 1:5 2:22 5:6,14
    5:16 26:5 34:12
    53:15 54:7 64:25
**join** 13:12 41:7
**joined** 42:7
**journal** 61:5,6,11
    62:2,3,9,12 63:9
    63:21 69:2,6,12
    70:22 74:8,18 75:6
    75:8,11,13,15,16
    76:6,11,13,15
    78:14,25 79:11,16
    79:25 80:3 81:18
    81:20 82:14 83:9
    83:24 84:3,14,16
    84:24 85:14,16
    86:3
**judge** 25:19
**judgment** 18:23,24
    82:25 83:2
**June** 12:17

**K**
**K** 89:4
**keep** 7:3 58:23
    81:14
**Kelly** 2:18 4:8,10
    22:16 25:13 30:9
    32:15 35:14,17
    36:2,11 57:24
    60:17 61:2 63:5,20
    65:10,12,18 66:17
    67:2,10,21,25 68:8
    68:14 69:10,16,25
    71:3,15,20 72:2,9
    72:16,18 73:14,24
    78:6 81:4 85:9
    88:9,13 91:4
**Kelly's** 36:6
**kept** 75:3
**kind** 43:20
**Kings** 2:5
**Kingston** 5:23
**knew** 48:9 50:2
    51:24 55:8,21,24
    56:7
**know** 4:11,17,24 7:9
    9:17 16:5 19:14
    20:14 25:10 29:14
    34:7,11,14 37:14
    38:13 39:21,24
    40:11,13,14,16
    45:11 47:10 48:20
    49:7 50:16 52:21
    55:21 56:2,8 57:12
    58:23 71:13 72:7
    72:11 73:11,13,16
    73:20 75:18 84:7
    84:25 85:3
**knowing** 56:10
    72:14
**knowledge** 47:18
    50:15 64:22 77:10
**known** 12:14 50:25
    58:15

**L**
**L** 1:5 2:21,22 3:3
    89:4
**label** 50:23
**Lakeview** 28:6 29:7
    66:8
**large** 82:3
**law** 56:20,21 75:4
**lawsuits** 49:6
**lawyer** 48:23 49:3
    55:6 56:11
**lead** 21:24
**leading** 31:15 76:7
**learn** 12:24
**leave** 36:4
**ledger** 45:7 69:23
    70:18
**legal** 41:2
**length** 21:5
**Leroy** 8:23 9:13
**letter** 57:13 63:8
    74:7,17,24,25
    78:21 79:4,5 80:5
**letterhead** 75:2,5,7
    75:21
**letters** 15:10,13,16
    64:8 74:21
**let's** 58:14 68:20
**level** 6:3,13,14
**levels** 82:4,8,9,11,13
**liability** 10:8,11,19
    20:20,21
**license** 12:10
**life** 31:2,5
**limitation** 85:6
**limitations** 22:9,15
    26:23
**limited** 10:8,10,19
    43:16
**line** 70:2,4,9,11,14
    71:8 92:6
**listed** 65:25 66:6,15
**listen** 5:12
**literature** 78:18,24

**little** 5:20
**live** 54:21
**LLC** 2:9
**LLP** 1:18 2:7,15
**loan** 30:24 31:3,6
    44:9 77:24
**Logan** 66:2
**logs** 19:15,16
**long** 8:4 11:15 47:19
    80:22
**look** 16:23 24:14,21
    44:21 68:19 71:4
    74:11 77:14
**looked** 56:11 60:6
    60:11 63:16 70:17
    70:19 83:24 84:2
**looking** 33:22 56:9
    69:23,24
**looks** 49:23
**loud** 7:4
**low** 10:7
**L-e-r-o-y** 9:2

**M**
**M** 1:16 2:3,8,12,23
    4:3,3 5:1 6:1 7:1
    8:1 9:1 10:1 11:1
    12:1 13:1 14:1
    15:1 16:1 17:1
    18:1 19:1 20:1
    21:1 22:1 23:1
    24:1 25:1 26:1
    27:1 28:1 29:1
    30:1 31:1 32:1
    33:1 34:1 35:1
    36:1 37:1 38:1
    39:1 40:1 41:1
    42:1 43:1 44:1
    45:1 46:1 47:1
    48:1 49:1 50:1
    51:1 52:1 53:1
    54:1 55:1 56:1
    57:1 58:1 59:1
    60:1 61:1 62:1
    63:1 64:1 65:1

66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1,4,9
89:20 91:4 92:4,20
**magistrate** 48:23
49:8,14,21 51:6
53:21,24,25 54:13
55:5 59:14
**main** 10:6
**maintain** 19:8,11
**major** 57:5,5
**making** 76:15
**management** 2:9
10:12,17 14:11
19:20 20:4,6,18
23:5,5,15,18,22
24:13,17,20 25:5
28:2,18,19 32:11
32:13 33:24 34:2
44:17 45:14 62:21
62:22 63:24 64:8
65:7,24 67:17
69:13 74:8,18,23
76:15
**management's** 77:6
**manager** 65:7
**Maple** 2:4
**mark** 32:16
**marked** 32:19 57:16
**Marks** 2:16 30:14
30:22 31:11 32:5
37:8 63:18 65:7
66:18 67:15 77:11
77:15 83:11 86:2
87:9,10
**marriage** 90:14
**master's** 6:4,15
**material** 24:18
60:19 64:6 82:11

82:13 84:19,19
**materiality** 82:4,8,9
**matter** 21:7 32:13
73:19 90:10,15,16
**matters** 64:4 71:7
72:20 76:23
**maximum** 28:5
**mean** 8:19 18:14
19:14,15 34:7
38:14 39:18,23
40:11 41:25 82:21
83:10
**means** 67:19
**meet** 32:6
**Mel** 72:8,11,19
**member** 12:13
64:19
**mentioned** 21:9
**mentions** 27:23
**Metz** 1:20 4:5 27:12
46:13 90:6,22
**midst** 49:4
**migrated** 7:21,24
**million** 69:21,22
70:19,20
**mind** 84:8
**mindful** 5:14
**minimis** 28:4 29:10
**missed** 46:11
**missing** 43:11,25
44:13 50:18
**misstatement** 59:4
**misstatements**
50:13
**Mitchell-Lama**
39:11
**modified** 26:19,22
**Monday** 48:11
50:21 52:15 54:13
55:4
**money** 21:11 43:11
43:25 69:5,6,9,20
71:23,24 72:7,12
72:12,13,15

**moneys** 71:11
**monies** 45:2,10
69:17 71:2,14
**monitor** 54:16
**morning** 4:9,10,12
35:22 36:10,18
37:4,5 47:15 48:11
50:21 52:16 54:13
54:15 55:7 80:20
**MOSKOWITZ**
2:15
**motion** 25:20 46:5,8
46:17,19,25 47:17
48:15 49:13 52:3,8
52:14 54:14 55:5
57:21
**mouth** 50:14
**moved** 7:14
**multifamily** 41:3
42:18
**mystery** 21:2

─────── **N** ───────

**N** 2:2,21 3:3 89:4,4
91:2 92:5
**name** 4:11 37:6 56:5
92:3,4
**nature** 31:15
**Nealle** 2:9 54:10
**nearest** 36:22
**need** 17:15,23 23:7
51:20 62:10 64:6
71:4 77:19
**needed** 32:2
**neither** 56:22 62:6
63:11,14
**never** 49:20 52:5
55:18
**new** 1:3,19,19,22
2:5,11,11,17 10:3
10:11,14,21 11:7
11:10 12:5 37:11
37:20,25 38:22,25
40:22 42:21,23,24
43:4 80:10,14

86:23 87:3 90:3,4
90:7,8
**nice** 55:13
**night** 50:19 54:4,20
55:4
**non-for-profits** 9:12
**normal** 61:7,10 63:6
74:10 78:13,14,16
78:19,25 79:3,7,9
80:2,8
**Notary** 1:21 3:12
4:4 89:25 90:6,22
92:23
**note** 51:13
**noted** 88:15
**notes** 24:3
**notice** 14:25
**not-for-profit** 9:21
10:6 12:3
**Not-for-profits** 9:11
**November** 8:12,18
23:22 81:22
**number** 19:22 22:14
23:15 25:7 29:6
53:7,9 54:24 55:2
55:15 61:5,18 62:3
68:16 75:16 79:11
79:24 81:17 82:17
**numbering** 52:24
**NY** 10:3

─────── **O** ───────

**o** 2:21 3:3,21,21
89:4 91:14,14,17
91:17
**oath** 89:11
**object** 5:13 30:8
40:12 45:9 87:24
**objection** 29:19,25
30:2,9 31:14 32:9
45:16 60:17 61:2
63:5,20 65:10 68:5
68:14 69:10,16,25
71:3,15,16,20 72:2
72:3,9,16,18 73:14

76:7,17 82:23
objections 3:16
objective 63:15
observer 63:16
Obviously 4:11
occasion 65:21 66:4
occurred 51:15,16
occurs 51:21
offered 31:11 32:6
office 33:3 46:7,23
  47:6,14 49:11
  50:24 51:4,15,16
  51:25 52:4,10 53:3
  54:15,20,21 55:9
  55:16,19 57:11
  58:12,18 64:11
  65:24
offices 1:18 83:11
oh 56:12 58:3
Okay 5:17 7:6 8:22
  18:12 27:22 42:6
  67:10 84:6
Once 45:15
ones 40:10
open 36:22
opinion 22:6,7,11,13
  26:12,16,18,20
  27:10,10,17 45:18
  45:20 60:21 62:24
  63:14 69:4,9 72:6
  81:14 85:6,8
opinions 45:24 73:3
  73:4
order 17:16 22:10
  35:24 63:11
organization 2:10
  10:6
Orley 5:5,9,18 9:15
  9:19,23 10:2 13:2
  13:3 20:9 21:15,18
  21:24 30:16
other's 42:14,15
outcome 90:16
overall 10:16

overreaching 27:23
  28:10,11 63:25
  64:2
overseeing 11:5
owes 20:20
owned 10:9 64:18
  65:2
ownership 53:16
owns 20:20
o'clock 36:5 47:12
  47:13

P

P 2:2,2,21 3:3 4:3
Page 91:3,10,16
  92:6
pages 53:9
paid 45:3,5,10 64:11
Paneth 2:16 30:14
  30:22 31:11 32:5
  37:8 63:18 65:8
  66:18 67:16 77:11
  77:15 82:18,20,21
  83:2,7,11 86:2
  87:9,11
paper 24:10 53:5
  65:25 66:14
papers 24:3 47:19
  81:13,14
Park 1:18 2:10
part 85:20,21,21
particular 19:9,24
  34:6
Particularly 49:13
parties 1:17 3:8
  53:6 57:14 65:17
  90:15
partner 21:15,24
  31:11,18 35:21
  37:16 64:16
partners 20:6,8,13
  20:15 21:11,19
  30:16,17,20 31:23
  32:4 45:5 70:15
  86:6,16

partnership 10:9,11
  10:19,20 37:19
  64:12 70:12
partnerships 41:25
  43:24 44:16 70:4
  75:14 77:13 79:12
party 21:4,8 44:10
  68:15,16
passed 8:12,17
pattern 29:7
Pause 35:16
payable 20:3
payables 61:23
  62:11
paying 64:17
payment 65:22
payments 44:15
percent 16:25 17:5,7
  17:8,21,21
percentage 17:19
performed 26:10
permissible 45:17
person 87:4
personal 40:23 41:4
  72:25 73:3,4
personally 30:17
  41:20
pertains 68:6,7
phone 54:24 55:2
photocopies 51:8
photocopy 51:10
Phyllis 2:8,23 52:16
  54:9 56:5
physically 76:6
piece 24:10
piecemeal 51:8
pieces 53:4
place 58:12 70:6,8
  71:11
places 35:9
Plains 2:17
Plaintiff 1:6
Plaintiffs 2:4
planning 11:23 14:8

14:17 17:16
Plaza 66:3
please 4:17,24 8:25
  30:12 78:7 81:5
  85:10 88:3
Plus 43:3
point 12:12 13:13
  13:17 22:2 30:13
  60:8 78:17 79:20
  79:23 80:13
pointed 46:9
portion 46:15 78:8
  81:10 85:11
posing 52:11
position 5:18 9:6
  10:2 11:7,8
positions 16:10
possession 24:8,12
  30:5
possibly 56:13
pound 56:23
pounded 56:24
practice 63:7 74:10
  74:13,16 78:16,19
  79:3,7,9 80:2,3,8
  87:14,20
predecessor 86:25
preliminary 14:17
premise 36:16
preparation 8:3
  10:25
prepare 10:21 11:2
  34:18 50:23 74:22
prepared 36:9
preparer 8:3
preparing 14:18
present 30:6 35:22
  65:6 67:7,13 75:22
  75:25
presentation 73:8
presentations 57:6
presented 52:15
  68:23
presume 59:14

**previous** 18:20 21:9
  22:21 34:9,15 66:4
  66:12,21,22 77:20
  86:21 87:21 88:7
**previously** 33:23
  86:19
**price** 16:20
**principles** 14:5
  27:24 31:4
**prior** 15:18 33:14
  34:6,10,11 46:8
  47:18
**privileged** 51:19
**problem** 23:8 31:7
  50:10,12 56:15
  58:20 69:11
**problems** 44:4
**procedure** 18:17
  85:16 86:20
**proceed** 30:10 48:5
  49:17
**proceedings** 90:9,12
**produce** 47:5 51:11
  54:12 55:16 61:4
**produced** 46:6 47:6
  49:20,22 51:20,24
  52:10 54:11 57:11
  83:14
**produces** 14:15
**production** 47:2
  50:24 51:14 53:22
**profession** 74:14,16
  80:8
**professional** 1:20
  6:22,25 12:6 14:19
  18:23,24 28:21
  50:10,12 56:15
  78:12,17,18,24
  79:23
**professionally** 50:9
  55:12
**project** 12:18 13:2,4
  14:25 15:23 37:22
  38:2,17,23 39:2,7

39:9,10,13,15
**projects** 10:7 15:2
  15:24,25 16:3,13
  16:14,15 40:22
  41:3,12,24 42:19
  42:22,24 43:3,7,10
  79:13
**proper** 17:16 75:3
  81:12,14
**proposal** 70:22
**propose** 61:9 75:10
  76:24 77:2
**proposed** 62:4,18
  69:12 70:21 74:18
  75:6,9 77:3 83:9
  85:14
**provide** 11:25 22:25
  25:5 35:4
**provided** 16:22
  57:16 65:16 76:12
**Pryce** 1:16 4:9 5:1
  6:1 7:1 8:1 9:1
  10:1 11:1,14,16,19
  11:25 12:1,5,14,16
  12:19 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1,23 22:1,3
  23:1 24:1,6 25:1
  25:22 26:1,5 27:1
  28:1 29:1 30:1
  31:1,12 32:1,7,19
  33:1 34:1,18 35:1
  36:1 37:1,4,15,17
  37:20 38:1 39:1
  40:1 41:1,9,10,15
  42:1 43:1 44:1
  45:1 46:1 47:1
  48:1 49:1 50:1
  51:1 52:1 53:1
  54:1 55:1 56:1
  57:1 58:1 59:1
  60:1,4 61:1 62:1
  63:1 64:1 65:1

66:1 67:1 68:1
  69:1 70:1 71:1
  72:1 73:1,11,25
  74:1 75:1 76:1
  77:1 78:1 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1 88:1
  89:1,9,20 91:4,12
  92:4,20
**Pryce's** 35:25
**public** 1:21 3:12 4:4
  11:13,13,15 89:25
  90:7,22 92:23
**purpose** 12:20 26:7
  26:9 41:11
**pursuant** 1:17
**put** 5:15 41:14,19,20
  41:21 47:25 53:15
  69:20 83:18,20
**p.m** 52:2

---

**Q**

**question** 3:17 4:16
  4:16,18,19,20 17:9
  29:20 30:2,8 31:15
  38:24 40:17 43:22
  49:14 52:11,14
  56:13 59:21 63:12
  65:13 66:5 68:2,5
  78:7 81:4 82:19
  83:6 85:10
**questionable** 72:21
**questioning** 30:11
  35:18
**questions** 4:13
  20:18 25:17 33:25
  37:9 46:2 47:25
  48:22 53:15 57:23
  59:17 68:10 73:17
  73:22 74:2 87:8
  88:10,11

---

**R**

**R** 2:2,21 4:3 7:25

8:2,4,9 92:2,2
**raised** 24:19 48:22
  52:14 66:5,11,14
**raises** 49:14
**read** 46:14,16 78:6,9
  81:4,11 85:10,12
  89:10
**ready** 35:23
**real** 12:9,9
**reason** 86:8
**reasonable** 28:21
**recall** 19:23 25:7,8
  31:9 32:10 35:6,11
**receivables** 61:23,24
  62:11
**receive** 23:21
**received** 24:3 33:5
  33:12 46:21 65:25
  66:6
**recognize** 25:25
**recollection** 30:6
  66:23,25 67:8
**recomendation**
  78:23
**recommend** 80:12
**recommendation**
  80:14 81:12,16
**recommended**
  78:22 79:6 80:6
**recommends** 80:9
  80:10,11
**reconcile** 85:25
**record** 23:20,24
  35:19 36:12 46:3,4
  46:24 52:7 58:22
  61:22 89:13,16
  90:11
**records** 19:8,11 24:2
  38:16 72:20 75:3
**refer** 86:7
**referred** 28:14
  31:23,25 41:8 54:3
  68:11 86:16
**referring** 22:20



27:21 65:15
**refers** 26:11
**refinance** 30:24,24
  31:5
**reflect** 23:21,25
**reflecting** 19:8
**regard** 24:4 26:17
  69:17
**regarding** 4:13
  27:18 30:14 74:8
**regardless** 51:23
**Registered** 1:20
**regulate** 41:2
**regulated** 16:11,14
  38:9 39:10,14,15
  40:9
**regulation** 15:22
**regulations** 15:20
  16:2 81:8
**related** 21:4,8 50:5
  68:15,16 90:14
**relating** 23:2
**relationship** 68:25
**relevant** 53:11
**relying** 67:22
**remember** 8:7 16:17
  29:21,22 35:7
**remind** 45:15
**rental** 17:18
**repeat** 13:16
**rephrase** 38:24
  43:22
**report** 21:6 22:4,5
  22:20,25 23:9,12
  24:9,17 25:12
  33:24 34:2,21,22
  42:3,4 73:10 81:24
**reported** 69:6 79:22
  90:9
**reporter** 1:20 7:4
  15:4 22:17 25:14
  32:16 46:16 78:9
  81:11 85:9,12
**reports** 23:6,16,18

23:22 24:13,21
  25:5 38:4
**represent** 5:6,6 37:7
  48:24
**representation**
  74:23
**represented** 4:25
  5:7,10
**request** 19:19 53:2
  55:16,18 70:21
  91:16
**requested** 46:15
  47:21 52:23 78:8
  81:10 85:11
**required** 86:20 87:6
**requirement** 61:8
  74:11 87:12
**requirements** 28:17
  28:22,23 74:13
  77:18 78:13
**requires** 74:6 81:24
**reschedule** 36:21
**reserved** 3:18
**residential** 42:18
**respond** 48:14 57:21
**responded** 52:5
**responding** 4:20
**response** 13:10 33:8
  46:23 48:15 71:21
**responsibilities**
  10:15
**responsibility** 84:15
**responsible** 10:16
  11:4 39:6 62:19,21
**restriction** 22:9 85:7
**restrictions** 22:14
**retained** 42:2
**revenue** 16:25 17:7
  17:8,18
**review** 11:22 14:17
  33:6 42:2,13,15
  43:13,16,17,19,20
  50:22 51:3
**reviewed** 51:17

57:10
**reviewing** 41:22
  43:9
**ridiculous** 52:25
**right** 7:9 16:18
  58:13 70:13 80:23
  81:9
**risk** 18:22
**Robert** 1:8 2:8
**Ron** 20:10,11,12,14
  31:23,24 73:5 76:2
  76:5 86:7,11,13,15
**Ronald** 2:9
**rule** 28:4 29:10 64:2
  68:17 81:9
**rules** 16:2,6 45:17
  45:22 68:12 73:2
**R.P.R** 90:6,22

........................
**S**
........................
**S** 2:2,21,21 3:3,3
  91:9 92:2,5
**salary** 17:17
**sample** 18:17 71:7
**sanctions** 46:5 48:16
**Sandra** 20:9 30:16
  31:21 35:20
**SAS** 79:22 81:22
**satisfied** 26:24 27:8
  27:13,15 85:20,22
**satisfy** 76:14
**Saturday** 51:6
**saw** 27:6,18 28:13
  28:14 29:13,14
  54:2,4 61:5,11,24
  62:3,3 70:21 75:16
  75:20 78:4 84:20
  84:22
**saying** 26:12 31:22
  75:8
**says** 20:3,13 28:4
  31:4 70:20 79:18
**scatter** 43:3
**scheduled** 59:8,11
**school** 12:3

**scope** 22:9,14 26:23
  85:5
**scribbled** 24:10,11
**sealing** 3:8
**Seavey** 1:8 2:8,8,9,9
  2:10,23 21:17 44:8
  44:9 45:12,12
  48:13,25 49:17
  50:6 52:17 54:9,9
  54:10,10 57:14
  58:5,9 59:5 64:18
  65:2 73:5 77:23
  92:3
**Seaveys** 21:20 44:18
  45:3,11 58:15
**Seavey's** 56:5 59:9
**second** 66:13
**section** 74:6
**see** 17:19 24:23 28:6
  32:11,12,21 44:19
  44:19 47:16 49:18
  50:2 53:6 54:17
  57:12 60:13 62:4
  62:10 63:9 68:22
  73:20 76:23 77:23
  80:7 82:14 83:4,5
**seen** 32:24 45:23
  50:20 54:2
**send** 48:8,10,11
**senior** 7:13 9:16
**sent** 54:19 55:8 63:7
  74:17
**sentinels** 54:3
**series** 47:25 53:15
**served** 47:14,18
**service** 10:6 12:2
**services** 11:25 16:21
  28:3
**set** 13:25 90:18
**sets** 70:9 78:13,19
  78:24 79:24
**seven** 15:22 46:7,12
  47:2 52:8
**seventy-seven** 42:25

43:2
shares 53:17
sheet 66:6 76:12
shelter 28:24
shepherds 54:3
show 25:15 45:2
52:18 55:15 68:25
Shron 2:16 30:14,19
30:22 31:11,24
32:6 37:8 63:18
65:8 66:18 67:16
77:11,15 83:11
85:24 86:3,7,17
87:9,11
side 56:19,21
signed 3:11,13
89:21
similar 34:10,18
42:21 75:6
simply 69:23
single 55:16
sir 60:22 70:16
sit 31:11 76:12
site 43:3
sits 30:6
situation 64:20 68:6
68:7,20,21,21
70:18
six 7:18
sixteen 67:15
sleight 55:11
small 9:21 11:20
snuck 54:14
Society 80:11,14,15
solely 26:13
somewhat 36:8
Sorry 6:19 8:14
sound 51:5
source 66:10 67:8
SOUTHERN 1:3
speak 30:13,18,19
33:15,18
speaking 52:20
specific 23:2 65:18

specifically 12:18
spell 8:25
spiriting 50:4
spoke 30:16 31:8
86:17
spread 69:18
Sprostons 7:14
ss 90:3
staff 65:24
stand 16:16 59:13
67:20
standard 78:13,18
79:24,24
standards 13:25,25
14:3
start 77:19
started 6:25
state 1:21 40:7,25
41:19 46:4 51:22
52:7 80:10,14 90:3
90:8
stated 20:25 37:10
37:25 41:6
statement 22:8
59:13 62:20,22,24
68:24 69:7,24 70:3
70:12,20 74:5
77:15 78:11
statements 10:22,25
11:3 16:24 42:7
46:19,20 73:8
83:16 85:24
States 1:3 7:21,24
Stearns 72:13
Stengle 71:23,25
step 18:13
steps 14:8 18:10
stick 27:16
STIPULATED 3:6
3:15
stole 72:12
Stop 82:5,6
strange 14:14 32:3
street 2:4 58:13

strike 25:13,18
subject 15:20 67:12
submitted 30:3
49:11
Subpoena 1:17
32:18 91:11
subpoenaed 36:13
subscribed 89:21
92:21
substantial 45:13
suddenly 44:22
suggests 61:13
69:11 83:23 84:2
suggestss 83:21
suits 57:7
Sunday 47:22 48:4
48:8 50:19 51:6
55:4,4,22,24
support 19:13 60:14
83:15
supporting 60:13
71:5
supposed 27:25
72:21 74:12,25
75:10
suppress 53:11 57:7
suppressed 53:19
suppressing 54:5
sure 28:20 36:21
77:20
surrounding 26:25
sworn 4:4 92:21
system 14:14 61:3

**T**

T 2:21 3:3,3 89:4
91:9 92:2,2
table 56:23,25
take 4:23 5:18 14:8
18:10 68:20 76:11
taken 1:16 89:11
takes 70:6,8 71:11
talk 5:5 83:4 84:4
88:6
talking 7:7 19:15

68:19 80:17
tax 8:3,3 28:24
taxes 11:22
team 13:12 41:7,8
tell 5:20 13:3,7 16:2
30:21 31:10 32:5
48:10 51:9 69:22
70:25 71:19,22
84:7,8,10 85:18
telling 75:2
tells 24:22
ten 7:2 61:9 78:15
78:19 79:2 80:3
term 39:19
terms 19:12 38:14
68:25
test 19:13 20:4,23
24:23 28:18,20
44:6 71:6 72:19
73:19 82:14 83:5
85:4,8
tested 18:22 23:8
26:25 44:9 60:11
testified 4:6 38:6
testifying 74:15
testimony 33:19
35:25 36:10 50:5
60:10 66:21,23
67:3 76:4,20 82:24
89:11
testing 18:16,21
19:12 20:24 22:10
23:12 44:23 60:14
83:3 85:7
text 55:24
Thank 45:8 67:25
theoretically 69:21
thing 14:11 16:4
58:4 61:3 71:4
things 29:6 39:24
63:12 84:22
think 8:6 9:18 11:17
12:17 19:6 20:9
21:16 31:7,18 35:8



13

35:14 58:19 79:14
**third** 35:21 44:10
**third-party** 21:3
**thirty** 31:2,6
**thought** 76:13
**thousands** 53:8
**three** 15:2 42:12
  49:6 66:2,16
**Thursday** 47:20
  49:19 50:2,25
  52:22 54:4 55:17
**time** 3:18 4:15,23
  8:8,11 9:13,25
  11:11 12:12 16:9
  19:15,16 31:18
  33:5 47:4 50:17,22
  51:11,25 52:23
  55:8 66:14 80:22
  86:6 88:15
**times** 18:25 19:3,3,5
  19:7
**timesheets** 19:16
**today** 5:2 30:7 33:10
  33:14,20 45:19
  58:9 59:12
**told** 13:5 20:7 50:17
  67:23 76:10
**touched** 54:6
**transaction** 21:3,4,5
  21:8 44:11 68:16
  70:8 72:4
**transactions** 44:5
  68:17 71:9 82:12
  82:12
**transcript** 3:11
  89:10,12 90:11
**Traub** 2:12 23:20
  37:3,6 41:23 45:15
  45:21,25 46:12,17
  47:4,7,12 50:11
  52:18 53:2 54:22
  55:13,25 56:17
  57:2,9 58:19 59:3
  59:20,23 71:16

72:3 80:17 82:5,9
  88:12 91:5
**traveling** 31:19,20
**trial** 3:18 14:12,13
  14:15,16 16:24
  25:2 61:4
**tried** 20:23
**true** 67:11,18 89:13
  89:16 90:11
**try** 60:4
**trying** 70:16
**Tuesday** 55:7,23
**twelve** 64:25
**twenty** 61:11
**twice** 51:12
**two** 7:12,16 9:16
  17:12,12,13,15,15
  17:23 27:23 29:15
  31:22 35:9 59:7
  62:9 71:2 74:21
  86:6,16
**type** 7:5 9:20 11:18
  11:24
**types** 9:9 34:5

——— **U** ———
**U** 3:3
**Um-hum** 15:14
**unable** 58:7 60:12
**unaccounted** 43:12
  44:2
**unavailable** 36:20
  58:6 59:6
**understand** 4:15
  38:13 50:8 61:20
  70:16 87:22
**understanding**
  21:12,14 34:4
**understood** 4:19
**United** 1:3 7:21,24
**units** 64:25
**University** 5:23
**untrue** 46:22
**unusual** 60:24
**update** 34:23,24

35:9,10,11
**updates** 35:5
**updating** 34:19
**Urban** 15:6
**urge** 25:16
**use** 14:16 26:13
  43:20 61:21
**usually** 14:14 17:12
  61:9 62:15
**U.K** 6:3,12

——— **V** ———
**various** 57:14
**vendor** 20:19,20,22
**verify** 24:25,25
  44:14
**visited** 14:10
**voice** 7:4
**vs** 92:3

——— **W** ———
**W** 1:8 2:8 89:4
**wait** 51:9
**waiting** 53:14
**waived** 3:10
**want** 7:8 17:19
  23:20 29:14,22
  46:3,24 52:21 56:8
  57:25 58:23 81:8
  84:10
**wanted** 49:18 51:10
  58:25 59:2
**wants** 13:8
**wasn't** 17:9 47:15
  49:12 52:15,22
  56:5 83:6
**way** 26:20 38:7
  51:21 62:6 69:3,8
  70:25 72:14 77:24
  85:19 90:15
**weeks** 33:3 59:7
**went** 44:17 53:21
  71:24 72:7 82:21
  83:11
**weren't** 27:8

**West** 5:23
**whatsoever** 50:15
**WHEREOF** 90:17
**White** 2:17
**wide** 77:16
**WILLIAM** 2:18
**willing** 35:23
**WILSON** 2:15
**wish** 5:7 59:24
**withdraw** 25:17
  29:24 46:18,25
  52:8 57:21 60:23
  64:23 83:25
**Withdrawn** 41:23
**withheld** 47:21
**witness** 5:3,15,17
  6:11 8:16 15:8
  22:17 25:15 27:13
  30:3 31:16 57:25
  59:17,19,22,25
  73:18 76:8 81:6
  82:10 86:15 90:17
  91:3 92:4
**witnesses** 66:21
**witness's** 82:24
**wondering** 66:13
**work** 7:19 8:4,9,23
  9:7,14,19,23,24
  10:15 11:6,10,18
  12:4 26:17 36:21
  36:24 38:19,22
  42:14,15 80:25
**worked** 7:10,12,16
  7:17,25 9:15 12:11
**working** 10:2 42:21
  81:12,14
**works** 40:6
**wouldn't** 71:13 72:7
  72:11 73:11,13,16
  81:17
**write** 49:15
**written** 23:14,14,21
  24:13,20 25:4 31:5
  33:24 35:5

14

**wrote** 30:7

**X**

**x** 1:4,10 91:2,9

**Y**

**Y** 4:3
**year** 9:3 14:21 17:2
  17:6,8 29:18 30:7
  61:12 68:23
**yearend** 61:7 62:10
**years** 7:2,12,16,18
  9:16,17 15:23
  17:12,12,13,15,16
  17:20,24 18:20
  31:2,6 58:16
**yesterday** 5:8,19
  23:25 36:13 46:4
  47:8,11 48:18
  49:11 52:3 58:10
  59:9
**York** 1:3,19,19,22
  2:5,11,11,17 10:3
  10:11,14,21 11:7
  11:10 12:5 37:11
  37:20,25 38:22,25
  40:22 42:21,23,24
  43:4 80:10,14 90:3
  90:4,7,8

**$**

**$108,000** 28:8
**$180,000** 20:2,25
  21:18 24:17
**$29,000** 44:8
**$3** 70:19
**$34,000** 28:8
**$5,000** 28:5 29:10
**$7** 69:21,22 70:20

**0**

**0** 3:21 91:14,17
**01439.00148** 2:19
**08-CV-5648(HB)**
  1:7

**1**

**1** 16:25 17:5,7,7
**10:11** 47:7,9 51:25
**10:15** 1:12
**10016** 1:19 2:11
**10604-3407** 2:17
**11:56** 88:15
**112** 79:22 81:22
**11225-5001** 2:5
**12th** 34:17,20 35:2
**14** 22:18 26:14
**15** 25:15,22 26:14
  33:22 34:25 81:22
**16th** 47:20 49:20
**18** 32:20,21 91:11
**180,000** 21:17
**1986** 6:8
**1994** 6:7,9,18,20,20
**1995** 7:22,23,25

**2**

**2** 1:18 2:10 6:3,13
  6:14
**20th** 58:6
**2000** 8:13,18
**2002** 9:18
**2004** 9:18
**2005** 11:17 17:4,11
  78:4,5
**2006** 17:4,11 60:7
  81:23
**2007** 12:17 23:23
  34:17,20 35:2
**2009** 1:11 89:12,22
  90:18 92:3,22
**21** 12:11 79:16
**21-page** 49:15 53:22
**22** 1:11 92:3
**22nd** 89:11
**23** 91:16
**24-hour** 54:25
**28th** 90:18
**29** 23:23
**29,000** 77:25

**3**

**3** 2:17
**32** 91:12
**37** 91:5

**4**

**4** 91:4
**40** 14:20 28:4

**5**

**5:30** 48:17
**5:35** 46:4
**5:38** 52:2
**501(c)3** 10:18

**6**

**60** 91:6
**6955-004** 2:13

**7**

**70** 17:21
**71** 2:4
**73** 91:4

**8**

**80** 17:21

**9**

**95** 8:6
**98** 8:7