UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------x

JOHN L. EDMONDS, individually and as a Managing : 
General Partner of Fifth and 106th Street Housing Company, : 
Inc., Logan Plaza Associates, LP, Charles H. Hill Associates : 
a/k/a Charles H. Hill Associates, LP, and as a Limited : 
Partner of Church Home Associates, LP, : 
                                 : 

                         **Plaintiff,** :       **08 Civ. 5646 (HB)**
                                   : 

                 **-against-** :       **OPINION & ORDER**
                                   : 

ROBERT W. SEAVEY, individually and as a General : 
Partner of Fifth and 106th Street Associates, LP, Logan Plaza : 
Associates, LP, Charles Hill Associates, LP, and as a Limited : 
Partner of Church Home Associates, LP; PHYLLIS M. : 
SEAVEY, individually and as owner, manager and member : 
of Dalton Management Company LLC; AVERY B. SEAVEY, : 
individually and as General Partner of Logan Plaza : 
Associates, LP, Church Home Associates and owner of : 
Dalton Management Company, LLC; NEALE B. SEAVEY, : 
Individually and as owner, manager and member of Dalton : 
Management Company, LLC; RONALD DAWLEY as Chief : 
Executive Officer of Dalton Management Company, LLC; : 
DALTON MANAGEMENT COMPANY, LLC; THE : 
SEAVEY ORGANIZATION; and MARKS PANETH & : 
SHRON, Auditors, : 
                                   : 

                       **Defendants.** : 

-------------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., United States District Judge:**

       This case concerns an alleged scheme to defraud Plaintiff John L. Edmonds ("Edmonds" or "Plaintiff") of his financial stake as partner in numerous government-assisted residential building projects in upper Manhattan. Following six months of inspection of the Partnerships' books and records, on June 23, 2008 Edmonds filed a $500 million lawsuit alleging various violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, as well as numerous state law claims that sound in fraud, breach of contract and breach of fiduciary duty against individuals and entities involved in the various Partnerships, who are Robert W. Seavey, Phyllis M. Seavey, Avery B. Seavey, Neale B. Seavey, Ronald Dawley, Dalton Management Company LLC ("Dalton") and the Seavey Organization (the "Seavey Defendants") as well as the Partnerships' auditors, the accounting firm Marks, Paneth & Shron ("MP&S")

(collectively, "Defendants").  The Defendants have moved for summary judgment on all of Edmonds's claims;[1] the Seavey Defendants also move for summary judgment on their counterclaim for breach of fiduciary duty.  For the reasons set forth below, Defendants' motion for summary judgment on Edmonds's RICO claim is granted, and the balance are state claims, and with respect to each I choose not to exercise supplemental jurisdiction and thus they must be dismissed.

## I.  FACTUAL BACKGROUND[2]

### A.  Edmonds's Relationship with the Seaveys and the Partnerships

In approximately 1973, Edmonds entered into four limited partnerships with members of the Seavey family or entities owned by members of the Seavey family (the "Partnerships").  These Partnerships were: Fifth and 106th Street Associates, LP, a/k/a Lakeview Apartments ("Lakeview"), Logan Plaza Associates, LP ("Logan Plaza"), Charles H. Housing Associates, LP ("Charles Hill") and Church Home Associates, LP ("Church Home").  The Partnerships each owns and operates a different low- or middle-income residential real estate development.  The projects together consist of approximately 840 residential units, each of which is subsidized by the city, state or federal government, and each is overseen and regulated pursuant to statute, e.g., Mitchell-

---

[1] On December 16, 2008, MP&S filed a pre-answer motion to dismiss Edmonds's claims against it pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  While that motion was *sub judice*, the Defendants filed the instant joint motion for summary judgment, which repeats many of the same arguments propounded in MP&S's motion to dismiss.  Accordingly, there will be no separate resolution of the motion to dismiss, and all issues will be resolved in this Opinion and Order.

[2] Pursuant to Local Rule 56.1, a party who opposes summary judgment must submit a response to the moving party's statement of undisputed facts that sets forth, with references to the record, the genuine issues to be tried.  Failure to specifically controvert facts contained in the moving party's Local Rule 56.1 Statement, or failure to support any such response with record references allows the Court to deem the facts proffered by the moving party admitted for purposes of a summary judgment motion.  *See, e.g., Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (holding district court has "broad discretion" to refuse to consider "what the parties fail to point out in their Local Rule 56.1 statements") (internal quotation marks omitted); *Folkes v. New York College of Osteopathic Med. of N.Y. Inst. of Tech.*, 214 F. Supp. 2d 273, 280-81 (S.D.N.Y. 2002); *see also Elgamil v. Syracuse Univ.*, 99-CV-611(NPM/GLS), 2000 U.S. Dist. LEXIS 12598, at *2-4 (N.D.N.Y. Aug. 21, 2000) (defendant's Rule 56.1 statement of facts deemed admitted as matter of law where plaintiff failed to comply with Northern District Local Rule 7.1(a)(3), similar to Local Rule 56.1(c), by submitting a counterstatement that failed to admit or deny specific assertions and failed to contain citation to the record).  Here, Plaintiff's response to the Defendants' Local Rule 56.1 Statement is deficient inasmuch as it contains virtually no references to the record, and contains general denials and conclusory allegations that fail to specifically controvert the facts presented by the Defendants.  Thus, while I will not enumerate them specifically, I note that the vast majority of the facts cited in Defendants' Local Rule 56.1 Statement are deemed admitted for the purpose of this motion.  Accordingly, unless otherwise indicated, the following recitation of the factual background is taken from Defendants' Local Rule 56.1 Statement.

Lama and Section 8,[3] and agencies such as the New York State Division of Housing and Community Renewal ("DHCR"), HUD, the New York City Housing Preservation & Development ("HPD") and the New York City Housing Development Corp. ("HDC").

Throughout the years, the Partnerships have used different management companies to manage the day-to-day operations of the properties. After having determined that previous management companies had not successfully managed the properties, in 2000, with Edmonds's knowledge and consent, the Partnerships entered into management agreements with Dalton, a limited liability company with approximately eleven employees and owned by certain members of the Seavey family. Because each of the properties that Dalton manages is subject to city, state or federal programs, Dalton likewise is regulated and monitored by various government agencies, including DHCR, HUD, HDC and HPD.

Dalton maintains the books and records of the Partnerships and retains MP&S to provide accounting and auditing services for the partnerships.[4] Periodically and at the end of each business year, MP&S conducts an audit of the Partnerships' books and records and offers recommendations to Dalton for the maintenance of its books and records. MP&S also provides tax return preparation services to the Partnerships and assists in dealing with the Internal Revenue Service and handling any audits conducted by the taxing authorities. All other bookkeeping services for the Partnerships are performed by Dalton, for example processing accounts payable and receivable, and handling and recording rent bills and receipts.

Throughout the years, Edmonds has often complained that he has not received income from his interest in the Partnerships to which he believes he is entitled, although he did receive partnership distributions in excess of $20,000 monthly in 2007 and 2008. Edmonds has varying interests in each of the Partnerships.[5] On numerous occasions Edmonds has threatened to file a RICO action against the Seavey Defendants if he did not receive the money from Dalton and/or

---

[3] Section 8, also known as the Housing Choice Voucher Program, is a federal assistance program provided by the United States Department of Housing and Urban Development ("HUD") that sponsors subsidized housing for low-income individuals and families. The voucher program under Section 8 was initially authorized pursuant to the U.S. Housing Act of 1937, also known as the Wagner-Steagall Act, named for after Representative Henry B. Steagall, Democrat of Alabama, and Senator Robert F. Wagner, Democrat of New York, who introduced the bill to Congress.

[4] Plaintiff protests that MP&S is more than merely an auditor for Dalton and the Partnerships, and that it collected improper consulting and management fees in excess of its auditing contract fees. As will be discussed in further detail below, this dispute is immaterial for purposes of the instant motion.

[5] Edmonds initially had a 7.5% interest in the Lakeview partnership, but after several transfers to third parties, he currently retains a 1.2% interest in that property as a general partner. Edmonds has 50% ownership interest in Logan Plaza and a 1.34% interest in Church Home as a limited partner. With respect to Charles Hill, Edmonds has a 1% interest in the operations of the property and a 24.745% interest in "capital transactions" of the property.

the Partnerships that he deemed due to him.  The Seavey Defendant repeatedly reminded Edmonds that the properties are low- to middle-income government-subsidized housing projects and as such do not generate significant profit.  However, since the time that Dalton took over management of the Partnerships' properties, their income streams have increased.  By contrast, before Dalton was retained as the management company in 2000, the partners in Logan Plaza, Charles Hill and Church Home had never received a distribution payment.  As a partner in each of the Partnerships, Edmonds has the right to inspect the books and records of the Properties and Dalton; in addition, Dalton monthly provides copies of dispersed checks, financial statements and payroll documents for the Partnerships to Edmonds at his request.

**B.** **Edmonds's 2007 Review of Dalton's Books and Records**

The crux of Edmonds's complaint in this matter, once the myriad of cobwebs are cast aside, is his belief that Dalton is misappropriating the Partnerships' funds by using Partnership proceeds to pay its own employees and entering into below-market contracts with vendors, among other things, and that the financial statements that he receives from Dalton through the mails are therefore fraudulent.  To amass fodder for an anticipated RICO lawsuit, in March 2007 Edmonds retained the accounting firm Cameron, Griffiths & Pryce ("CG&P") to review the books and records of the Partnerships.  For approximately six months, CG&P came to Dalton's offices to review these records.  While CG&P never complained that any information was not provided to them, at the conclusion of their review they claimed that the documentation to support certain accounting entries was unavailable.  CG&P sent several requests for information, none of which specified the information they sought.  MP&S offered to sit down with CG&P to review any issues with any of the accounting documents, but CG&P never accepted the invitation.

On December 12, 2007, CG&P submitted its only written report that summarized its conclusions and recommendations based on its six-month inspection of the Partnerships' books and records.  *See* Declaration of Robert Seavey ("Seavey Decl.") Ex. 12.  Although the report notes several problems with the accounting methodology used by Dalton, the report nowhere states that any of the financial statements contained any false or misleading financial information. *See id.*  Further, they failed to find any additional distributions were due to Edmonds or the other partners.[6]  *See id.*  The majority of the issues identified by CG&P relate to classifications of

---

[6] The report simply identifies one line item of $181,000 listed as an account payable (but not paid) to Dalton that is identified on the financial statements that Edmonds contends should be due to the partners.  However, Edmonds has

certain fees; that is, CG&P concluded that the amounts were reflected accurately in the financial statements, but that it would have been better accounting practice if they were classified differently. *See id.* The report also concludes that Dalton misappropriated funds from Logan Plaza to pay its salaries and other expenses and states that these payments are "contrary to the management contract." *Id.* However, the management contracts expressly permit Dalton to use Partnership funds to pay employee salaries. *See* Declaration of Robert Seavey ("Seavey Decl.") Ex. 6 at ¶ 13(b). Despite these "issues," one of the named partners in the accounting firm testified at his deposition that the actual numbers and calculations in each of these entries were accurate and that all supporting documentation, such as the underlying invoices, matched the amounts contained in the books and ledgers. *See* Deposition of Orley George Cameron ("Cameron Dep.") 121:17-123:11.

**C.     Edmonds's Agreements with T-WOL Leasing Corporation**

The Partnership Agreement of the Lakeview property sets forth the agreement and relationship among the general partners and limited partners with respect to the management and operation of that property. Under the Partnership Agreement, the managing partners are required to "act unanimously at all times; otherwise their actions shall be null and void." From 1996 through 1998, Edmonds, at the time a general partner of Lakeview, entered into a series of agreements with an unrelated company called T-WOL Leasing Corporation ("T-WOL") that culminated in a document entitled "Confidential Negotiated Settlement and Release of All Claims" (the "Confidential Agreement"). In the Confidential Agreement, Edmonds, purporting to act on behalf of Lakeview, agreed to pay T-WOL the sum of $100,000 in exchange for subleasing T-WOL's leased commercial space to a subtenant. The Confidential Agreement was entered into without the consent of Lakeview's other general partner, Robert Seavey. T-WOL has now commenced litigation against Lakeview in state court seeking payment on the Confidential Agreement. In turn, the Seavey Defendants have asserted a counterclaim against Edmonds in this action for breach of fiduciary duty for having entered into the Confidential Agreement without Robert Seavey's consent.

---

acknowledged that he has known about the $181,000 item for some time and has discussed it with the Seaveys. Edmonds has acknowledged that this amount has not been paid to Dalton or anyone else, and that once the Seaveys have determined to whom the money is owed, it will be distributed appropriately.

## II.  DISCUSSION

### A.    Legal Standard

A motion for summary judgment must be granted if the moving party shows "there is no genuine issue as to any material fact" and that it "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute of fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *id.* ("Factual disputes that are irrelevant or unnecessary will not be counted.").  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party.  *See Anderson*, 477 U.S. at 255; *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001).  Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party has made a sufficient showing as to the absence of a genuine issue of material fact, "the non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Golden Pacific Bancorp v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted); *see also* Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in [the] rule, . . . the adverse party's response . . . must set forth *specific facts* showing that there is a genuine issue for trial.") (emphasis added).  To survive summary judgment, the nonmoving party must do more than merely rely on the allegations of the complaint or on attestations made "on information and belief."  *See, e.g.*, *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 138 (2d Cir. 2009); *Vaughn v. Consumer Home Mortgage Co., Inc.*, 297 Fed. Appx. 23, 27 (2d Cir. 2008) (quoting *Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981)); *Roswell Capital Partners LLC v. Alternative Constr. Techs.*, 08 Civ. 10647 (DLC), 2009 U.S. Dist. LEXIS 62061, at *16 (S.D.N.Y. July 20, 2009).  The facts presented must be in a form that would be admissible at trial.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Even if the parties dispute material facts, summary judgment must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.*

**B.**     **RICO Claims**

    *1. Substantive RICO Violations*

Edmonds's only federal cause of action arises under RICO and involves, at its core, allegations that the Seavey Defendants, with the help of MP&S, are "cooking the books" of the Partnerships to hide certain self-dealing payments and vendor agreements that allow the Seavey Defendants to siphon funds away from the Partnerships to themselves.  To engineer a RICO claim, Edmonds alleged in his complaint that the Partnerships' financial statements that Dalton sent to him through the mails and/or wires were fraudulent.  His complaint alleges two substantive RICO violations, as well as two claims for conspiracy to violate RICO.  Unfortunately for Edmonds, however, the record in this case is absolutely devoid of any evidence of fraud whatsoever, and instead is replete with devastating admissions by Edmonds's own auditors CG&P and Edmonds himself that there is, in fact, no evidence of such fraud.[7]

To establish a civil RICO claim, a plaintiff must show that he was injured by the (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *See World Wrestling Entm't, inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 495 (S.D.N.Y. 2007), *aff'd*, No. 28-0118-cv, 2009 U.S. App. LEXIS 10585 (2d Cir. May 19, 2009).  The RICO statute lists specific offenses that can constitute the predicate acts of "racketeering" activity, and includes mail fraud and wire fraud.  *See* 18 U.S.C. § 1961(1); *see also id.* §§ 1341 (mail fraud), 1343 (wire fraud).  A "pattern" of racketeering activity requires at least two acts of racketeering activity within a ten-year period.  *Id.* § 1951(5).

Moreover, to satisfy the requirements of a RICO claim, a plaintiff "must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Northwest Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  The requisite "continuity" of the pattern of racketeering may be either closed-ended or open-ended.  *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999).  "A party alleging a

---

[7] At the eleventh hour, in his papers submitted in opposition to summary judgment, Edmonds belatedly, and at least for the third time, requests an extension of the discovery period so that he may obtain documentation to support his RICO claims that was supposedly improperly withheld from him.  In other words, what Edmonds now urges in at least an hour of soliloquy at oral argument and his new late submissions is that Defendants have failed to perform their discovery obligations and that he needs additional time to seek the discovery he contends is due him.  His request is denied.  Not only has Edmonds had six-months to roam freely over the Partnerships' books and records prior to filing his complaint, but he also had an additional nine months of discovery, and believe it or not he never once availed himself of the procedures under the Federal Rules that would have enabled him to object to perceived discovery failures and to seek redress and possible sanctions if Defendants had not, as he now contends, complied with their discovery obligations.  It is too late in the day for Plaintiff now to contend that there are documents out there that would support his claim that he has not yet discovered.

RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. "Predicate acts are 'related' when they 'have the same or similar purposes, results, participants, victims, methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Weizmann Inst. of Sci. v. Neschis*, 421 F. Supp. 2d 654, 688 (S.D.N.Y. 2005) (quoting *H.J. Inc.*, 492 U.S. at 240). Although the Supreme Court has "left the precise contours of the continuity requirement to further development," the Second Circuit has provided some guidance, and has "never found a closed-ended pattern where the predicate acts spanned fewer than two years." *Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 Fed. Appx. 94, 98-99 (2d Cir. 2008) (quoting *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004)). "Open-ended" continuity, on the other hand, entails proof of the threat of long-term criminal conduct. "A fact-specific inquiry, open-ended continuity may inhere in racketeering acts themselves," or can be "satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business . . . , or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" *Id.* at 99 (quoting *H.J. Inc.*, 492 U.S. at 242-43); *see also Cofacredit*, 187 F.3d at 242-43. Courts consider the "overall context in which the racketeering acts took place" to determine whether there is sufficient continuity to make out a RICO claim. *United States v. Kaplan*, 886 F.2d 536, 542 (2d Cir. 1989).

Irrespective of these intricacies, the basic requirement of a RICO violation is the existence of at least two predicate acts committed within ten years of one another. It is this fundamental element that Edmonds is missing. The predicate acts on which Edmonds relies are mail fraud and wire fraud. To be guilty of mail or wire fraud, Defendants must have engaged in intentional fraud or acted with reckless indifference to the truth while engaged in the use of the wires or mails. *See O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 706 (2d Cir. 1990). Mere negligence is insufficient to support a RICO claim that is based on these predicate acts. *Qatar Nat'l Navigation & Transp. Co. v. Citibank*, No. 89 Civ. 0464, 1992 WL 276565, at *5 (S.D.N.Y. Sept. 29, 1992), *aff'd*, 182 F.3d 901 (2d Cir. 1999). Although Edmonds alleges that Defendants engaged in mail fraud by sending him fraudulent monthly financial documents through the mail, in his deposition testimony, Edmonds admitted unequivocally that he has received no inaccurate monthly financial reports, Deposition of John Edmonds ("Edmonds Dep.") 214:14-22, he never received any false statement from MP&S, *id.* at 237:24-239:7, and most devastating to his case, that he has no

evidence that demonstrates that any illegal or improper payments that the Seavey Defendants received should have gone instead to the Partnerships, *id.* at 210:6-211:10, or that any money is missing from the Partnerships or otherwise unaccounted for, *id.* at 213:9-214:4.  Moreover, although part and parcel of Edmonds's allegations is that the Partnerships engaged in self-dealing by entering into below-market vendor agreements, he admits that he has never even seen those agreements.  *Id.* at 185:5-6; 218:5-11.  Just to make the cheese more binding, CG&P admitted that, even after months of investigation and review of the Partnerships' books and records, it had not uncovered any money that was missing from the Partnerships or that was paid directly from Dalton to the Seavey Defendants, *see* Cameron Dep. 97:19-99:3, 101:8-102:12, and that all dollar amounts were accurately reported in the financial statements and matched the underlying invoices and supporting documents, *id.* at 121:17-123:11; *see also* Deposition of Adam Pryce ("Pryce Dep.") 43:23-44:4 ("Q: In doing your financial audit for Mr. Edmonds of the four partnerships, did you discover any money that is missing or unaccounted for? A: We didn't discover any cash problems.").

    The single most damning document that Plaintiff cites in favor of his RICO claim – which, incidentally, came to the Court's attention through the Defendants – is CG&P's December 2007 report, which contains all of the "issues" the auditors found in their review of the books and records.  However, a close parsing of the document reveals that although CG&P had recommendations for better accounting procedures and noted issues with the classifications of certain line items, the December 2007 report makes no finding of missing money, misappropriated funds, or any other allegations of fraud.  Nor does the Declaration of Orley Cameron submitted in support of Edmonds's opposition to summary judgment.  Contrary to Plaintiff's counsel's protestations during oral argument, in which he contended that the Cameron declaration supports a finding of "outright fraud," Cameron does not attest to any such thing.  Rather, the most Cameron notes is that there were problems with adjustments in Dalton's ledgers, that MP&S was overly involved in the day-to-day accounting activities of the Partnerships, and that the accounting system used in the ledgers was improper and made it difficult "to compare performance in any particular period to any other period."  Declaration of Orley G. Cameron ("Cameron Decl.") ¶ 6; *see also id.* at ¶ 3, 4, 8.  None of it provides any evidence of fraud.  Moreover, the majority of Edmonds's opposition to summary judgment is dedicated to an exposition on the alleged dual role played by MP&S, and its alleged conflict of interest and violation of generally accepted

government auditing standards.  While these allegations might be indicative of negligence, that is simply not enough to sustain a claim for RICO based on mail or wire fraud.

Edmonds's memorandum in opposition to summary judgment references no documents, declarations, deposition testimony or record evidence of any kind; rather, he relies almost exclusively on the allegations of the complaint and states that his claim is "sufficiently alleged." However, we are well past the time where reference to the allegations in the complaint is sufficient to survive a motion for summary judgment.  Indeed, it is beyond peradventure that to survive summary judgment, a party must show that there is sufficient *evidence* for a reasonable jury to find in his favor.  At this stage, mere reference to *allegations* is simply not enough.  *See, e.g.*, *SCR Joint Venture*, 559 F.3d at 138; *Vaughn*, 297 Fed. Appx. at 27.  Further, in the specific context of RICO, it is axiomatic that without evidence of an underlying predicate act, a RICO claim cannot survive.  *Crown Heights Jewish Cmty. Council, Inc. v. Fischer*, 63 F. Supp. 2d 231, 253 (S.D.N.Y. 1998); *Vasile v. Dean Witter Reynolds Inc.*, 20 F. Supp. 2d 465, 484 (E.D.N.Y. 1998) ("Because Vasile can prove no criminal activity was committed by Dean Witter, or establish the existence of a predicate act . . . , the RICO claim must fail."); *see also First Capital Asset Mgmt.*, 385 F.3d at 178 (affirming dismissal of RICO claim where predicate acts were not pled with sufficient particularity "and without those acts, the Amended Complaint fails to allege the requisite continuity to sustain a RICO claim").  Here, based on the undisputed record facts, Edmonds has been unable to unearth any evidence to support the allegations of his alleged predicate acts.[8]  In short, to paraphrase an old Wendy's commercial, one is forced to ask, "Where's the meat?" and

---

[8] Edmonds's complaint also contains allegations that Defendants committed bank fraud in violation of 18 U.S.C. § 1344.  Defendants appear to presume that Edmonds's allegations are an attempt to state an independent cause of action for bank fraud.  Taken as such, the claim must fail, as there is no private cause of action under 18 U.S.C. § 1344.  *E.g.*, *Rivera v. Golden Nat'l Mortgage Banking Corp.*, No. 00 Civ. 4368, 2001 U.S. Dist. LEXIS 8508, at *1 (S.D.N.Y. June 25, 2001); *see also Connell v. Regions Bank*, No. 07cv77/MCR/EMT, 2007 WL 1877677, at *2 (N.D. Fla. June 27, 2007); *Milgrom v. Burstein*, 374 F. Supp. 2d 523, 528-29 (E.D. Ky. 2005); *Park Nat'l Bank of Chi. V. Michael Oil Co.*, 702 F. Supp. 703, 704 (N.D. Ill. 1989).  In opposition to summary judgment, Edmonds attempts to clarify that he did not intent to state an independent cause of action for bank fraud, but rather that he intended that bank fraud be considered a predicate act to his RICO claim.  This approach, too, must fail.  First, Edmonds has put forward no specific facts or evidence to suggest that any bank fraud has occurred.  Second, as one court recently has recognized, § 1344 only prohibits "a scheme or artifice . . . to defraud *a financial institution*," and a RICO plaintiff who is not a financial institution under the statute lacks standing or injury to bring a RICO claim based on bank fraud as the predicate act.  *See Hilgeford v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 3:08-CV-699, 2009 WL 302161, at *6 (E.D. Va. Feb. 6, 2009) (emphasis in original).

the answer here is nowhere. Accordingly, Defendants' motion for summary judgment on Edmonds's substantive RICO claims must be granted.[9]

   2. *Conspiracy to Commit RICO Violations*

   Defendants separately argue that summary judgment is appropriate because Edmonds can present no evidence of a conspiracy to commit a RICO violation. To establish liability for a RICO conspiracy under 18 U.S.C. § 1962(d), a plaintiff must show that each defendant "embraced the objective of the alleged conspiracy and agreed to commit two predicate acts in furtherance thereof." *United States v. Viola*, 35 F.3d 37, 43 (2d Cir. 1994); *see also Cofacredit*, 187 F.3d at 244 ("To establish the existence of a RICO conspiracy, a plaintiff must prove the existence of an agreement to violate RICO's substantive provisions."). Defendants argue that they are entitled to summary judgment on this claim because Edmonds's deposition testimony revealed that he has no evidence that the Defendants had engaged in any conspiracy. *See* Edmonds Dep. 214:23-216:2. Even more fundamentally, however, where a plaintiff fails to establish a claim for a substantive RICO violation, as Edmonds has failed to do here, any claim for conspiracy to commit that violation must necessarily fail as well. *See, e.g.*, *Medinol Ltd. v. Boston Sci. Corp.*, 346 F. Supp. 2d 575, 616 (S.D.N.Y. 2004); *Allen v. New World Coffee, Inc.*, No. 00-CV-2610, 2002 WL 432685, at *6 (S.D.N.Y. Mar. 19, 2002) ("The dismissal of all of plaintiffs' RICO claims leaves the conspiracy cause of action without a leg to stand on. 'Any claim under § 1962(d) based on conspiracy to violate the other subsections of section 1962 must fail if the substantive claims are themselves deficient.'") (quoting *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1065 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998)). For both these reasons, Defendants' motion for summary judgment on Plaintiff's RICO conspiracy claims is granted.

## C.   State Law Claims

   All of Plaintiff's remaining causes of action allege violations of state law, *i.e.*, fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, conversion, breach of fiduciary duty, deceptive trade practices and accounting under New York law. Where a plaintiff lacks a valid federal claim, a district court has discretion to decline to exercise supplemental jurisdiction over his pendent state-law claims. *E.g.*, *Matican v.*

---

[9] Because I find that Plaintiff's substantive RICO claims fail for failure to adduce evidence of any predicate act, I need not address the separate argument of MP&S that it should be excluded from liability because it did not participate in the management or operation of the alleged enterprise.

*City of N.Y.*, 524 F.3d 151, 154-55 (2d Cir. 2008) (citing *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006)); *Klein & Co. Futures, Inc. v. Board of Trade*, 464 F.3d 255, 262 (2d Cir. 2006) ("In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining jurisdiction over the remaining state-law claims.") (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)); *see also* 28 U.S.C. § 1367(c)(3).  Here, summary judgment is granted on all of Plaintiff's federal causes of action, and I decline to exercise supplemental jurisdiction over his remaining state-law claims or the Seavey Defendants' counterclaim for breach of fiduciary duty, and they are dismissed without prejudice.

Defendants acknowledge the Court's discretion to dismiss for lack of subject matter jurisdiction under these circumstances, but argue that in the interest of equity and fairness, this Court should adjudicate the state-law claims on their merits.  That is, due to the many months of discovery here, and this Court's familiarity with the claims and theories espoused in the papers, the Defendants contend they will be prejudiced by having to "start over" in a state court litigation, should the Plaintiff choose to file one.  In the event that a separate complaint is filed in the New York Supreme, stemming from the same or similar allegations as the instant matter, I have no doubt but that the justices of the Commercial Division are fully equipped to familiarize themselves with the issues quickly and to resolve the issue fairly.  Indeed, based on the parties' representations, there appear to be several other cases already pending in the New York state courts that relate to Edmonds's relationship with the Seaveys and/or the Partnerships.  Moreover, there is no prejudice to the Defendants as a result of the extensive discovery here, since the Defendants will have the opportunity to use all of that discovery in any subsequent state court action.  Consequently, the remainder of Edmonds's state-law claims, and the Seavey Defendants' counterclaim, are dismissed without prejudice.

### III.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in its entirety.  Plaintiff's RICO claims are dismissed with prejudice.  The remainder of Plaintiff's complaint and the Seavey Defendants' counterclaim are dismissed without prejudice for lack of subject matter jurisdiction.  The Clerk of this Court is instructed to close this motion (Docket No. 68).  The dismissal of Plaintiff's complaint renders moot the previous motion to dismiss filed by MP&S; accordingly, the Clerk of the Court is instructed to close that motion, as well (Docket No.

22). This case is to remain open until such time as the motion of MP&S for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure, which is now fully briefed, has been decided, at which time this matter will be closed and removed from my docket.

**IT IS SO ORDERED.**

**New York, New York**
**September 15, 2009**

_____
U.S.D.J.